**IMPORTANT: A BANKRUPTCY CASE HAS NOT BEEN COMMENCED
AS OF THE DATE OF THE DISTRIBUTION OF THIS DOCUMENT**

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------- x

In re                                                      :     Chapter 11

PENTON BUSINESS MEDIA HOLDINGS, INC., et al.,    :     Case No. 10-_____ (____)

                    Debtors.[1]    :     (Jointly Administered)

                                         :

---------------------------------------------------------------------- x

## FIRST AMENDED DISCLOSURE STATEMENT FOR FIRST AMENDED JOINT PREPACKAGED PLAN OF REORGANIZATION FOR PENTON BUSINESS MEDIA HOLDINGS, INC. AND ITS DEBTOR SUBSIDIARIES

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Lisa G. Laukitis (NY I.D. LG 9248)

- and -

77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
Brad B. Erens (IL I.D. 6206864)
David A. Hall (IL I.D. 6280151)

February 4, 2010                         PROPOSED ATTORNEYS FOR DEBTORS

---

[1] The Debtors are the following nine entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Penton Business Media Holdings, Inc. (9837); Penton Media, Inc. (5386); Penton Business Media, Inc. (1277); Duke Communications International, Inc. (7904); Duke Investments, Inc. (2160); DVGM & Associates (5363); Internet World Media, Inc. (5519); Penton Business Media Internet, Inc. (8290); and Penton Business Media Publications, Inc. (8292).

**FIRST AMENDED DISCLOSURE STATEMENT DATED FEBRUARY 4, 2010**
**SOLICITATION OF VOTES WITH RESPECT TO THE**
**FIRST AMENDED JOINT PREPACKAGED PLAN OF REORGANIZATION OF**
**PENTON BUSINESS MEDIA HOLDINGS, INC. AND ITS DEBTOR SUBSIDIARIES**

All creditors entitled to vote thereon are urged to vote in favor of the Joint Prepackaged Plan of Reorganization of Penton Business Media Holdings, Inc. ("Holdings") and its Debtor Subsidiaries attached as Exhibit I (the "Plan") to this Disclosure Statement (the "Disclosure Statement"). A summary of the voting instructions is set forth in Section II.C.1. Additional instructions are contained on the ballots distributed to creditors entitled to vote on the Plan (the "Ballots"). **To be counted, your Ballot must be duly completed, executed and received by 5:00 p.m., New York City time, on February 5, 2010 (the "Voting Deadline"), unless extended in writing by the Debtors.** In the event the Debtors determine to commence chapter 11 cases, the Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the holders of two-thirds in amount and more than one-half in number of claims in each class that votes on the Plan, or if the Plan otherwise satisfies the requirements of section 1129 of the Bankruptcy Code.

**Because no cases under chapter 11 of the Bankruptcy Code have yet been commenced, this Disclosure Statement has not been approved by any U.S. bankruptcy court as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code.**

**The boards of directors of each of the Debtors have not at this time taken any action approving the commencement of cases for the Debtors under chapter 11 of the Bankruptcy Code. If you vote in favor of the Plan, your vote on the Plan can be used by the Debtors in connection with any bankruptcy filing. If 100% of the First Lien Lenders, and substantially all of the Second Lien Lenders, vote in favor of the Plan, the Debtors may seek to implement the transactions contemplated in the Plan without seeking bankruptcy protection under the Bankruptcy Code, subject to consent from the First Lien Lenders.**

**Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof.**

**The effectiveness of the proposed Plan is subject to material conditions precedent, some of which may not be satisfied, or waived by the relevant parties. See Section II.C.4.**

**PLEASE NOTE THAT THE PLAN, IF CONFIRMED, PROPOSES TO PAY ALL HOLDERS OF GENERAL UNSECURED CLAIMS IN CASH THE FULL AMOUNT OF SUCH CLAIMS IN THE ORDINARY COURSE OF BUSINESS.**

No person is authorized by any of the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein, and, if given or made, such information or

representation may not be relied upon as having been authorized by any of the Debtors. Although the Debtors will make available to creditors entitled to vote on acceptance of the Plan such additional information as may be required by applicable law prior to the Voting Deadline, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time after the date hereof.

All creditors entitled to vote on the Plan are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan attached as Exhibit I and the Risk Factors described under Article VIII, prior to submitting Ballots in response to this solicitation.

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the exhibits thereto and the documents described therein. Additional copies of this Disclosure Statement, the Plan, and all Exhibits to the Plan will be available for review free of charge from Kurtzman Carson Consultants (the "Voting Agent") by calling 877-499-4513. Plan materials may also be obtained by First Lien Lenders by accessing https://services.intralinks.com/login/, and by Second Lien Lenders by accessing the Intralinks site with the Second Lien Administrative Agent titled: "Penton Media, Inc. Second Lien Credit Agreement."

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the financial information regarding the Debtors and the liquidation analyses and projections relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, and not for any other purpose. Nothing in this Disclosure Statement is intended to be or constitutes a concession by or admission of any Debtor for any purpose.

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses. The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Risk Factors" in Article VIII. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. The Debtors do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.

All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings given to them in the Plan.

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................... 1

II.    CLAIMS CLASSIFICATION UNDER THE PLAN AND CONFIRMATION ............... 3

    A.    Introduction ................................................................................. 3

    B.    Summary of Classes and Treatment of Claims and Interests ................ 4

    C.    Voting on and Confirmation of the Plan ......................................... 8

        1.    Voting Procedures and Requirements ...................................... 8

        2.    Special Ballot Elections for Second Lien Lenders ................... 9

        3.    Hearing on the Disclosure Statement and Confirmation of the Plan ....... 10

        4.    Conditions Precedent to the Effective Date ............................. 11

        5.    Waiver of Conditions to the Effective Date ............................. 11

    D.    Effect of Nonoccurrence of Conditions to the Effective Date ............ 12

III.    THE DEBTORS' BUSINESSES ............................................................ 12

IV.    CAPITAL STRUCTURE ...................................................................... 15

    A.    First Lien Indebtedness .................................................................. 15

    B.    Second Lien Indebtedness ............................................................. 16

    C.    Equity Ownership ........................................................................ 17

V.    EVENTS LEADING TO THE DEBTORS' CHAPTER 11 FILING ............................ 17

VI.    RESTRUCTURING AND PLAN OF REORGANIZATION ........................................ 18

    A.    Business Realignment & Cost Reduction Efforts ................................ 19

    B.    Amended and Restated Credit Agreement ......................................... 19

    C.    Rights Offering ........................................................................... 22

    D.    Interest Rate Hedge Waiver ........................................................... 25

    E.    Management Incentive Program ...................................................... 25

    F.    Shareholders' Agreement .............................................................. 25

VII.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN .................................... 26

    A.    Requirements of Section 1129(a) of the Bankruptcy Code ................. 26

    B.    Requirements of Section 1129(b) of the Bankruptcy Code ................. 27

        1.    Fair and Equitable ............................................................. 27

        2.    "Unfair Discrimination" ..................................................... 28

    C.    Best Interests of Creditors Test; Liquidation Analysis ...................... 28

| | | | |
|---|---|---|---|
| | D. | Feasibility | 29 |
| VIII. | | RISK FACTORS | 29 |
| | A. | Risks In Connection with the Chapter 11 Cases | 29 |
| | | 1. Risk of Non-Confirmation of the Plan | 29 |
| | | 2. The Bankruptcy Court May Find the Plan Solicitation to be Inadequate | 30 |
| | | 3. Delays in Confirmation or Effective Date | 30 |
| | | 4. Nonconsensual Confirmation | 31 |
| | | 5. Conditions Precedent to the Effectiveness of the Plan | 31 |
| | | 6. Timing of Distributions Under the Plan | 31 |
| | B. | Risks Associated With the Debtors' Businesses | 31 |
| | | 1. Projections | 31 |
| | | 2. Secured Debt | 32 |
| | | 3. Increases in Interest Rates | 32 |
| | | 4. Dependence on Advertising Revenues | 33 |
| | | 5. Inability to Transform the Company's Products to Provide Additional Digital Products | 33 |
| | | 6. New Product Launches or Acquired Products May Reduce Earnings or Generate Losses | 33 |
| | | 7. Success of Tradeshows and Conferences Dependent on Desirable Dates and Locations | 33 |
| | | 8. Product Revenues Vary Based on Timing of Customer Product Launches | 34 |
| | | 9. Reliance on Vendors | 34 |
| | | 10. Increases in Paper or Postage Costs May Adversely Affect Business | 34 |
| | | 11. Dependence on Key Personnel | 34 |
| IX. | | MEANS FOR IMPLEMENTATION OF THE PLAN | 35 |
| | A. | Rights Offering, Second Lien Lender Equity Elections and Revolving Commitments | 35 |
| | B. | Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors | 35 |

C.     Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs; Other Agreements ......................... 36

      1.     Certificates of Incorporation and Bylaws ................................ 36

      2.     Directors and Officers of the Reorganized Debtors................................ 36

      3.     Employment-Related Agreements and Compensation Programs............ 36

      4.     Other Agreements ..................................................................... 36

      5.     Plan Transactions Approved and Effective as of the Effective Date ....... 37

D.     Assumption of Pension Plans; Retiree Welfare Benefits..................................... 37

E.     Preservation of Rights of Action; Settlement of Claims and Releases ............... 38

      1.     Preservation of Rights of Action by the Reorganized Debtors; Recovery Actions................................................................... 38

      2.     Comprehensive Settlement of Claims and Controversies....................... 38

      3.     Releases.................................................................................. 38

F.     Reinstatement and Continuation of Insurance Policies ....................................... 39

G.     Cancellation of Instruments, Securities and Other Documentation..................... 40

H.     Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes ...................................................................................... 40

X.     EFFECT OF CONFIRMATION ............................................................................ 40

A.     Discharge of Claims............................................................................... 40

B.     Injunctions................................................................................................ 40

C.     Exculpation ...................................................................................... 41

D.     Termination of Certain Subordination Rights.......................................... 41

E.     Dissolution of Any Creditors' Committee ........................................... 41

XI.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 42

A.     Executory Contracts and Unexpired Leases to Be Assumed............................... 42

      1.     Assumption Generally ........................................................... 42

      2.     Assumption Procedures ........................................................ 42

B.     Payments Related to the Assumption of Executory Contracts and Unexpired Leases........................................................................... 42

C.     Contracts and Leases Entered Into After the Petition Date ................................ 43

D.     Rejection of Executory Contracts and Unexpired Leases.................................... 43

E.     Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases ............................................................................... 43

F.     Bar Date for and Payment of Rejection Damages ............................... 44

G.     Obligations to Insure and Indemnify Directors, Officers and Employees ........... 44

XII.    PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 44

A.     Distributions for Claims as of the Effective Date ................................ 44

B.     Delivery of Distributions and Undeliverable or Unclaimed Distributions to Holders of Claims in Class 4 ......................................... 45

     1.     Distribution Procedures ............................................................. 45

     2.     Undeliverable Distributions ....................................................... 45

C.     Compliance with Tax Requirements ..................................................... 46

D.     Distribution Record Date ....................................................................... 46

E.     Surrender of Canceled Instruments ...................................................... 46

F.     Setoffs ..................................................................................................... 47

G.     Disputed Claims ..................................................................................... 47

H.     Allocation Between Principal and Accrued Interest ............................ 47

XIII.    ADMINISTRATIVE CONSOLIDATION AND CASE CLOSING ............... 47

XIV.    FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN ...................................................................................................... 48

A.     General .................................................................................................... 48

B.     U.S. Federal Income Tax Consequences to the Debtors ...................... 49

     1.     Cancellation of Debt Income ..................................................... 49

     2.     Interest and Original Issue Discount Under the Amended and Restated Credit Agreement ......................................... 50

     3.     Limitation on NOL Carryforwards ........................................... 51

     4.     Alternative Minimum Tax .......................................................... 51

     5.     Accrued Interest ......................................................................... 52

C.     U.S. Federal Income Tax Consequences to Holders of Claims ........... 52

     1.     In General .................................................................................. 52

     2.     Holders of First Lien Term Loan Claims and First Lien Revolver Claims (Class 2 and Class 3) ............................. 52

     3.     Holders of Second Lien Claims (Class 4) ................................ 54

| | | | |
|---|---|---|---|
| | 4. | Certain Other Tax Considerations for Holders of Claims | 55 |
| | 5. | Importance of Obtaining Professional Tax Assistance | 57 |
| XV. | APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS | | 57 |
| | A. | Solicitation of Votes Prior to Commencement of the Chapter 11 Cases | 57 |
| | B. | Post-Commencement Offers and Sales Pursuant to Section 1145 of the Bankruptcy Code | 57 |
| | | 1. Initial Offer and Sale of Stock | 57 |
| | | 2. Resales of Stock | 58 |
| | | 3. Subsequent Transfers Under State Law | 59 |
| XVI. | ADDITIONAL INFORMATION | | 60 |
| XVII. | RECOMMENDATION AND CONCLUSION | | 60 |

**EXHIBIT I**     **First Amended Joint Prepackaged Plan of Reorganization of Penton Business Media Holdings, Inc.**

**EXHIBIT II**    **Liquidation Analysis**

**EXHIBIT III**   **Historical Financial Information & Projections**

# I. PRELIMINARY STATEMENT

The Debtors are one of the leading business-to-business media companies in the United States, delivering proprietary business information to owners, operators, managers and professionals in a number of industries. The current company was formed in February 2007 out of the acquisition by Prism Business Media Holdings, Inc. of Penton Media, Inc., which created one of the largest business-to-business media companies in the United States. The Debtors provide a diverse platform of media products across 15 industry clusters, including: publishing 113 trade magazines and associated web brands, hosting approximately 35 trade shows, conferences and roadshows and providing electronic media offerings, including websites, electronic newsletters, web conferences and other web-based media products. The Debtors offer 25 data products and applications. The Debtors' products reach more than 6 million business professionals.

Over the past year, the global economy has suffered a prolonged recession, the impact of which has been felt in virtually every key part of the United States economy, including business-to-business media spending. In this environment, the Debtors have faced a challenging operating environment, like many other business-to-business media companies.

This global economic downturn has amplified and accelerated already existing cyclical and structural shifts in the industry, and in particular, a decline in advertising spending and a shift from print to digital mediums. Business-to-business media spending is expected to have declined approximately 15% during 2009, with spending in print declining approximately 28%.[2] And although the business-to-business media industry is expected to recover, print media — the Debtors' primary business segment — is expected to experience a permanent downsizing as a result of secular industry shifts.

With the decline in the industry environment, the Debtors' primary source of revenue — advertising — has been materially affected. The industry has witnessed a significant decrease in advertising budgets in the wake of the larger economy-wide recession. Consequently, given the softening of the business-to-business media industry over the last two years, the Debtors' revenue has steadily decreased, with revenue declining 7.5% between 2007 and 2008 and an estimated decline of 26.2% between 2008 and 2009.

As a result of the reduction in revenue and operating income, the delevering of the Debtors' balance sheet expected at the time of the February 2007 combination has not occurred. Instead, the Debtors continue to operate with a levered capital structure. This created a significant cash interest expense of approximately $41.9 million during 2009. This is further augmented by the Debtors' interest rate hedging positions, which cost an additional $24.7 million during 2009, for a total interest expense burden of $66.6 million for the year.

In the face of difficult operating conditions and a levered capital structure, the Debtors previously initiated an internal review of their operating strategy and business plan. The review was commenced under the leadership of new management, Sharon Rowlands, CEO and Jean

---

[2] Source: Outsell, Inc.

Clifton, CFO, who joined the company in November 2008 and June 2008, respectively. As a result of the review, the Debtors implemented a number of cost cutting measures and repositioned operations to capitalize on developing industry trends. The Debtors also began realigning their businesses in light of secular changes to the business-to-business industry and expected permanent declines in print media.

These efforts, however, have not been sufficient to address the Debtors' capital structure and liquidity position in light of the expectation that a full recovery in the business media industry may still take some time. As a result of their levered capital structure, the Debtors would have been in default of the total leverage ratio and the first lien leverage ratio financial covenants under the First Lien Credit Agreement for the reporting period ending in the second quarter 2009, but for the fact that the potential default was cured on August 21, 2009 through an equity infusion by the Debtors' equity sponsors in the amount of $13.7 million.

The Debtors would have again been in default with respect to the first lien leverage ratio covenant under the First Lien Credit Agreement for the reporting period ending September 30, 2009. However, in connection with negotiations leading to the formulation of the Plan, this financial covenant was waived by the First Lien Lenders.

In order to avoid a "free-fall" bankruptcy process, and the resulting impact such a bankruptcy filing would have on the Debtors' businesses, and to avoid significant impact on the Debtors' core constituents — including their employees, vendors, customers and lenders — the Debtors, their equity sponsors, and their First and Second Lien Lenders have engaged in constructive negotiations leading to the development of the Plan, and its related agreements, including:

(1)  the elimination of the Debtors' second lien debt in exchange for (1) 15% of the principal amount (not including accrued but unpaid interest) of such debt in cash or (2) at the election of a Second Lien Lender, Stock in the reorganized Debtors valued at 15% of such debt (based on the stock value used in the Debtors' rights offering described below), with the Debtors' equity sponsors agreeing to take distributions on the second lien debt they hold solely in such Stock;

(2)  an agreement from the Equity Investors to backstop a rights offering to the Debtors' Second Lien Lenders whereby the sponsors have committed to ensure that the Debtors will receive between $38.9 million and $51.2 million in cash in the rights offering in connection with the Plan for liquidity and to fund cash distributions to the Second Lien Lenders under the Plan who elect to take their distributions in cash; and

(3)  an Amended and Restated Credit Agreement with the Debtors' First Lien Lenders, which, among other things, provides the Debtors with various covenant and other relief and extends the maturity of the Debtors' first lien facility by approximately 18 months to August, 2014. See Section VI.B.

## II. CLAIMS CLASSIFICATION UNDER THE PLAN AND CONFIRMATION

### A. Introduction

The following is a brief overview of certain material provisions of the Plan. This overview is qualified by reference to the provisions of the Plan, which is attached hereto as <u>Exhibit I</u>, and the exhibits thereto, as amended from time to time.

The confirmation of a plan, which is the vehicle for satisfying the rights of holders of claims against and equity interests in a debtor, is the overriding purpose of a chapter 11 case. Upon confirmation of a plan, it becomes binding on the debtor and all of its creditors and stakeholders, and the obligations owed by the debtor to those parties are compromised and exchanged for the obligations specified in the plan. The Plan contemplates a reorganization of the Debtors and is therefore referred to as a "Plan of Reorganization." As of the date hereof, the Debtors have not filed chapter 11 cases under the Bankruptcy Code. To the extent the legally sufficient amount and number of impaired claims vote in favor of the Plan, the Debtors will likely file chapter 11 cases and seek confirmation of the Plan.

The Debtors believe that the Plan is in the best interests of creditors and other stakeholders. **All creditors entitled to vote on the Plan are urged to vote in favor of the Plan by no later than 5:00 p.m., New York City time, on February 5, 2010, the Voting Deadline.** The Debtors believe that the solicitation of acceptance or rejection of the Plan satisfies the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code because the solicitation documents contain adequate information and disclosure in accordance with any applicable non-bankruptcy law and section 1125(a) of the Bankruptcy Code. In the event the Debtors determine to commence cases under chapter 11 of the Bankruptcy Code, they intend to seek approval of the Disclosure Statement and the solicitation process at the hearing on confirmation of the Plan (the "<u>Confirmation Hearing</u>").

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code for confirmation are met. Among such requirements are that, among other things, the Plan:

(1)      is accepted by the requisite holders of claims and interests in each impaired class under the Plan;

(2)      provides that each creditor in the impaired classes will receive as much as it would if the Debtors were instead liquidated pursuant to chapter 7 of the Bankruptcy Code; and

(3)      is not likely to be followed by the liquidation, or need for further financial reorganization, of the Debtors.

The "cramdown" provisions of section 1129(b) of the Bankruptcy Code permit confirmation of a chapter 11 plan of reorganization in certain circumstances even if the plan is not accepted by all impaired classes of claims and interests. <u>See</u> Section VII.B. The Debtors have reserved the right to request Confirmation pursuant to the cramdown provisions of the Bankruptcy Code and to amend the Plan if, any of Classes 2, 3 or 4 fails to accept the Plan. The

Debtors will be seeking to confirm the Plan pursuant to the cramdown provisions of section 1129(b) of the Bankruptcy Code as to Interests in Class 9 and Class 10, if necessary. In such event, there is no assurance that the requirements of such provisions would be satisfied, and the Debtors reserve the right, in their sole discretion, not to seek to confirm the Plan.

## B. Summary of Classes and Treatment of Claims and Interests

The Plan divides holders of Claims against and Interests in the Debtors into ten separate classes. The classes, and the estimated percentage recovery for each class under the Plan, is provided in the table below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.

**PLEASE NOTE THAT THE PLAN, IF CONFIRMED, PROPOSES TO PAY ALL HOLDERS OF GENERAL UNSECURED CLAIMS IN CASH THE FULL AMOUNT OF SUCH CLAIMS IN THE ORDINARY COURSE OF BUSINESS.**

**[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]**

## SUMMARY OF CLASSIFICATION UNDER THE PLAN

| CLASS | STATUS/ ENTITLED TO VOTE? | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|
| Class 1 Claims — Priority Claims | Unimpaired Not Entitled to Vote | 100% |
| Class 2 Claims — First Lien Term Loan Claims | Impaired Entitled to Vote | 100% |
| Class 3 Claims — First Lien Revolver Claims | Impaired Entitled to Vote | 100% |
| Class 4 Claims — Second Lien Claims | Impaired Entitled to Vote | 15%[3] |
| Class 5 Claims — Other Secured Claims | Unimpaired Not Entitled to Vote | 100% |
| Class 6 Claims — General Unsecured Claims | Unimpaired Not Entitled to Vote | 100% |
| Class 7 Claims — Intercompany Claims | Unimpaired Not Entitled to Vote | 100% |
| Class 8 Interests — Subsidiary Debtor Equity Interests | Unimpaired Not Entitled to Vote | 100% |
| Class 9 Interests — Holdings Equity Interests | Impaired Deemed to have Rejected Plan Not Entitled to Vote | 0% |
| Class 10 Interests — Holdings Investor Equity Interests | Impaired Deemed to have Accepted Plan Not Entitled to Vote | 0%[4] |

---

[3] The estimated percentage recovery does not take into account any accrued but unpaid interest and fees. Interest on the second lien debt was due on January 29, 2010 in the amount of $3.6 million, which was not paid.

[4] If requested by the Debtors, Class 10 Interests will retain such Interests in lieu of receiving certain Stock in connection with Second Lien Lender Elections and the Equity Commitment made by certain of the LLC Shareholders. Otherwise, such Interests will be extinguished.

# SUMMARY OF TREATMENT UNDER THE PLAN

**Class 1 Claims — Priority Claims.** Unless otherwise agreed by the holder of a Priority Claim and the applicable Debtor or Reorganized Debtor, each holder of a Priority Claim shall receive, in full satisfaction of its Priority Claim, Cash equal to the amount of such Priority Claim on the later of (a) the Effective Date and (b) the date on which a Priority Claim would be due and payable in the ordinary course of business. Class 1 Claims are unimpaired and shall be deemed to have accepted the Plan.

**Class 2 Claims — First Lien Term Loan Claims.** On the Effective Date, in full settlement of the First Lien Term Loan Claims and all Obligations (as defined in the First Lien Credit Agreement) in respect of the First Lien Term Loans, including all interest accruing during the pendency of the Chapter 11 Cases and all fees, costs and expenses, owing thereunder, the First Lien Term Loan Claims shall be treated as provided in the Amended and Restated Credit Agreement and other related amended and restated First Lien Loan Documents; including, without limitation, that all interest, fees, expenses and indemnification obligations (including, without limitation, all reasonable fees and expenses incurred by the First Lien Administrative Agent's legal counsel and financial advisor) of the Debtors under the First Lien Loan Documents in respect of the First Lien Term Loans accrued, or otherwise incurred, and outstanding as of the day immediately preceding the Effective Date shall be paid in full on the Effective Date and all Interest Periods (as defined in the First Lien Credit Agreement) shall be reset as of the Effective Date.

All defaults or events of default under the First Lien Loan Documents shall be fully waived as of the Effective Date, and any acceleration of the Obligations (as defined in the First Lien Credit Agreement) due and owing under the First Lien Loan Documents shall be de-accelerated.

As of the Effective Date, each of the First Lien Term Loan Lenders shall be deemed to have executed the Amended and Restated Credit Agreement and the amended and restated First Lien Loan Documents. Class 2 Claims are impaired under the Plan, and each holder of a Class 2 Claim is entitled to vote on the Plan.

**Class 3 Claims — First Lien Revolver Claims.** On the Effective Date, in full settlement of the First Lien Revolver Claims, and all Obligations (as defined in the First Lien Credit Agreement) in respect of the First Lien Revolver Loans, including all interest accruing during the pendency of the Chapter 11 Cases and all fees, costs and expenses, owing thereunder, the First Lien Revolver Claims shall be treated as provided in the Amended and Restated Credit Agreement and other related amended and restated First Lien Loan Documents including, without limitation, that all interest, fees, expenses and indemnification obligations (including, without limitation, all reasonable fees and expenses incurred by the First Lien Administrative Agent's legal counsel and financial advisor) of the Debtors under the First Lien Loan Documents in respect of the First Lien Revolver Loans accrued, or otherwise incurred, and outstanding as of the day immediately preceding the Effective Date shall be paid in full on the Effective Date and all Interest Periods (as defined in the First Lien Credit Agreement) shall be reset as of the Effective Date.

All defaults or events of default under the First Lien Loan Documents shall be fully waived as of the Effective Date, and any acceleration of the Obligations (as defined in the First Lien Credit Agreement) due and owing under the First Lien Loan Documents shall be de-accelerated.

Pursuant to the Amended and Restated Credit Agreement, on or about the Effective Date, the Rollover Revolving Lenders (as defined in the Amended and Restated Credit Agreement) shall receive a paydown in Cash, without a permanent reduction in the Revolving Facility Commitments (as defined in the Amended and Restated Credit Agreement), in an amount as required in the Amended and Restated Credit Agreement.

Class 3 Claims are impaired under the Plan, and each holder of a Class 3 Claim is entitled to vote on the Plan.

**Class 4 — Second Lien Claims.** On the Effective Date, in full settlement of the Second Lien Claims, Second Lien Lenders shall receive, in accordance with their Second Lien Lender Elections and Section 3.1 of the Plan, Cash or Stock of Reorganized Holdings (valuing such Stock in the same manner as the Stock offered in the Rights Offering) of a value equal to 15% of the principal amount of their Second Lien Claims as of the Petition Date, excluding any accrued but unpaid interest, fees or other charges. All Class 4 Claims also shall be entitled to participate in the Rights Offering pursuant to their Second Lien Lender Elections and Section 3.1 of the Plan; provided, however, the Equity Investors shall be deemed to have elected to receive all of their Second Lien Distributions in the form of Stock of Reorganized Holdings. Class 4 Claims are impaired under the Plan, and each holder of a Class 4 Claim is entitled to vote on the Plan.

**Class 5 Claims — Other Secured Claims.** On the Effective Date, each Other Secured Claim shall be Reinstated. Class 5 Claims are unimpaired under the Plan, and each holder of a Class 5 Claim shall be deemed to have accepted the Plan.

**Class 6 Claims — General Unsecured Claims.** Each holder of a General Unsecured Claim, shall receive, in the ordinary course of business and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transaction, Cash in an amount equal to such Claim. Class 6 Claims are unimpaired under the Plan, and each holder of a Class 6 Claim shall be deemed to have accepted the Plan.

**Class 7 Claims — Intercompany Claims.** On the Effective Date, Intercompany Claims shall be Reinstated. Class 7 Claims are unimpaired, and each holder of a Class 7 Claim shall be deemed to have accepted the Plan.

**Class 8 Interests — Subsidiary Debtor Equity Interests.** On the Effective Date, Subsidiary Debtor Equity Interests shall be Reinstated. Class 8 Interests are unimpaired under the Plan, and each holder of a Class 8 Interest shall be deemed to have accepted the Plan.

**Class 9 Interests — Holdings Equity Interests.** On the Effective Date, the Holdings Equity Interests shall be extinguished and no consideration shall be paid or distributed on account of Class 9 Interests. Each holder of a Class 9 Interest shall be deemed to have rejected the Plan.

CHI-1738748v2

**Class 10 Interests — Holdings Investor Equity Interests.** On the Effective Date, the holders of the Holdings Investor Equity Interests shall, if requested by the Debtors, retain such Interests in lieu of receiving Stock in connection with the Second Lien Lender Elections of the LLC Shareholders and the Equity Commitment. Such retained Interests shall be valued in the same manner as the Stock offered in the Rights Offering. Otherwise, such Interests shall be extinguished. Class 10 Interests are impaired under the Plan, but each holder of a Class 10 Interest shall be deemed to have accepted the Plan.

### C. Voting on and Confirmation of the Plan

#### 1. Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only classes of claims against or equity interests in a debtor that are "<u>impaired</u>" under the terms of a plan are entitled to vote to accept or reject a plan. A class is "<u>impaired</u>" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity. Classes of claims and interests that are not impaired under the terms of a plan are not entitled to vote on such plan and are conclusively presumed to have accepted the plan. The classification of Claims and Interests under the Plan is summarized, together with an indication of whether each class of Claims or Interests is impaired or unimpaired, in Section II.B. above. Under the terms of the Plan, only holders of Claims in Classes 2, 3 and 4 are impaired and entitled to vote on the Plan.

Please carefully follow all of the instructions contained on the Ballot or Ballots provided to you with this Disclosure Statement if you are entitled to vote on the Plan. All Ballots must be completed and returned in accordance with the instructions provided. **The record date for voting purposes has been established as 5:00 p.m. New York City time on January 19, 2010 (the "<u>Record Date</u>").**

**To be counted, your Ballot or Ballots must be <u>received</u> by the Voting Deadline by the Voting Agent by one of the following means:**

<u>Hand Delivery or Mail</u>

Penton Media Ballot Processing
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245

<u>Electronic Mail</u>: PentonInfo@kccllc.com

<u>Facsimile</u>: (310) 751-1851

It is of the utmost importance to the Debtors that you vote promptly to accept the Plan. If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call the Voting Agent at 877-499-4513. Ballots may also be obtained by First Lien Lenders by accessing https://services.intralinks.com/login/, and by Second Lien Lenders by accessing the Intralinks site with the Second Lien Administrative Agent titled: "Penton Media,

Inc. Second Lien Credit Agreement." **Holders of First Lien Term Loan Claims, First Lien Revolver Claims and Second Lien Claims who executed the Lock-Up Agreement in support of the Plan <u>must</u> still execute Ballots in favor of the Plan for purposes of confirming the Plan.**

**Votes cannot be transmitted orally.** Accordingly, you must return your signed and completed Ballot, by electronic mail, facsimile, hand delivery, overnight service or regular U.S. mail promptly, so that it is **<u>received</u>** by the Voting Agent on or before the Voting Deadline.

If any of Classes 2, 3 or 4 vote to reject the Plan, (a) the Debtors may seek to satisfy the requirements for Confirmation of the Plan under the cramdown provisions of section 1129(b) of the Bankruptcy Code and, if required, may amend the Plan to conform to the standards of such section or (b) the Plan may be modified or withdrawn with respect to a particular Debtor, without affecting the Plan as to other Debtors, or in its entirety. Further, if any of Classes 2, 3 or 4 vote to reject the Plan, the Debtors reserve the right, subject to the terms of the Lock-Up Agreement, to seek to not confirm the Plan or to not commence the Chapter 11 Cases.

Holders of Claims in Classes 2, 3 or 4 may withdraw or modify their executed Ballots by delivering (or having their nominee deliver) to the Voting Agent, prior to the Voting Deadline, a subsequent properly completed and duly executed Ballot. After the Voting Deadline, withdrawals of or modifications to executed Ballots will not be permitted unless expressly agreed to by the Debtors in writing. After commencement of the Chapter 11 Cases, if commenced, withdrawal or revocation of votes accepting or rejecting the Plan may be effected only in accordance with the Bankruptcy Code, the Bankruptcy Rules or the Lock-Up Agreement.

## 2.    Special Ballot Elections for Second Lien Lenders

Second Lien Lenders, subject to the terms set forth below, are entitled on their Ballots to make their Second Lien Lender Elections to elect (1) whether, and the extent to which, they would like to receive their Second Lien Distributions in Cash, or alternatively in the Stock of Reorganized Holdings; and (2) whether, and the extent to which, they would like to participate in the Rights Offering.

In connection with the Lock-Up Agreement, Second Lien Lenders were previously asked to make their Second Lien Lender Elections, and the Lock-Up Agreement provided that all Second Lien Lender Elections made therein would be binding on such Second Lien Lenders and no further Second Lien Lender Elections would be permitted; provided, however, that a Non-Investor Second Lien Lender would be entitled on its Ballot to adjust its Second Lien Lender Election only by either (i) increasing the amount of Cash it elected to receive on account of its Second Lien Lender Claim or (ii) choosing to decrease its participation in the Rights Offering.

As such, any Second Lien Lender that has not made a Second Lien Lender Election as of the date hereof in a Lock-Up Agreement is entitled to make such an Election on its Ballot. In addition, any Non-Investor Second Lien Lender is entitled on its Ballot to adjust a previously made Second Lien Lender Election by either (i) increasing the amount of Cash it elects to receive on account of its Second Lien Lender Claim or (ii) choosing to decrease its participation in the Rights Offering. The Ballots that Second Lien Lenders are receiving with this Disclosure

Statement provide for such elections or adjustments in elections. Any Second Lien Lender Elections on Ballots by Second Lien Lenders that are inconsistent with any prior Second Lien Lender Election will be disregarded unless modified consistent with the provisions hereof, the Plan, and the voting instructions included with the Ballots.

**If the Debtors do not receive a timely and proper Second Lien Lender Election from any Second Lien Lender entitled to make such an election by the Voting Deadline, such Second Lien Lender shall be deemed to have elected to (i) receive, on account of its Second Lien Claim, its entire distribution in Cash and (ii) not participate in the Rights Offering.**

**If the Debtors do not receive by the Voting Deadline a timely and proper adjustment to a Second Lien Lender Election made by a Non-Investor Second Lien Lender that either increases the amount of Cash it elects to receive on account of its Second Lien Lender Claim or (ii) chooses to decrease its participation in the Rights Offering, the initial Second Lien Lender Election of such Non-Investor Second Lien Lender will be implemented by the Plan.**

### 3.  Hearing on the Disclosure Statement and Confirmation of the Plan

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code. If the Debtors determine to commence the Chapter 11 Cases, they will schedule, and provide notice of, the Confirmation Hearing after the Petition Date. The Debtors anticipate scheduling the Confirmation Hearing as soon as practicable after the Petition Date. At the Confirmation Hearing, in addition to seeking to confirm the Plan, the Debtors also intend to seek approval of the Disclosure Statement and the solicitation process. The Debtors expect that the Confirmation Hearing will be held in the usual courtroom of the United States Bankruptcy Judge assigned to the Chapter 11 Cases at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

Any objection to the Disclosure Statement, the solicitation process or Confirmation must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector. Any such objections must be filed with the Bankruptcy Court and served upon the persons designated in the notice of the Confirmation Hearing and in the manner and by the deadline described therein.

A detailed description of the requirements for confirmation of the Plan is contained in Section VII of this Disclosure Statement.

### 4.  Conditions Precedent to the Effective Date

Effectiveness of the Plan is subject to certain conditions that must be satisfied before the Plan can be consummated. The Effective Date will not occur, and the Plan will not be consummated, unless and until the following conditions have been satisfied or duly waived pursuant to Section 4.2 of the Plan:

- The Bankruptcy Court (a) shall have entered the Confirmation Order in form and substance acceptable to the Debtors, the Equity Investors and the First Lien Administrative Agent, and (b) such Confirmation Order shall be a Final Order.

- The documents effectuating the Rights Offering shall be in form and substance acceptable to the Debtors and the First Lien Administrative Agent, shall have been executed by the Debtors and the Equity Investors and the Rights Offering has been closed.

- The Interest Rate Hedge Waiver shall be in form and substance acceptable to the Debtors and the First Lien Administrative Agent and be in full force and effect.

- The Non-Investor Second Lien Lenders shall have made, or under the Plan shall be deemed to have made, Second Lien Lender Elections for Cash on account of no less than $42.7 million in principal amount of their Second Lien Claims.

- All conditions precedent to the effectiveness of, and the initial borrowings under, the Amended and Restated Credit Agreement shall be satisfied or waived, in each case in accordance with the terms and conditions of the Amended and Restated Credit Agreement.

### 5. Waiver of Conditions to the Effective Date

Section 4.2 of the Plan provides that the conditions to the Effective Date set forth in Section 4.1 of the Plan may be waived, in whole or in part, by the Debtors with the prior written consent of (a) the Equity Investors and (b) the First Lien Administrative Agent (with the consent of the Required Lenders as defined in the Amended and Restated Credit Agreement) without notice or an order of the Bankruptcy Court.

### D. Effect of Nonoccurrence of Conditions to the Effective Date

If the conditions precedent in Section 4.1 of the Plan have not been satisfied or waived in the manner provided in Section 4.2 of the Plan by the date that is thirty (30) days after the Confirmation Date, then: (a) the Confirmation Order will be of no further force or effect; (b) the Plan will be null and void in all respects, including with respect to (i) the discharge of Claims pursuant to section 1141 of the Bankruptcy Code, (ii) the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases, as applicable and (iii) the releases described in Section 3.5.3 of the Plan; and (c) nothing contained in the Plan will (i) constitute a waiver or release of any claims by or against, or any Interest in, any Debtor or (ii) prejudice in any manner the rights of the Debtors or any other party in interest.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right (with the prior written consent of the First Lien Administrative Agent) to alter, amend or modify the Plan before the Effective Date.

### III.    THE DEBTORS' BUSINESSES

The Debtors are one of the leading business-to-business media and information companies in the United States, delivering proprietary business content to owners, operators, managers and professionals in such industries as agriculture, natural products, manufacturing, technology, aviation and financial services.  The Debtors provide a diverse platform of media products across 15 industry clusters, including: publishing 113 business magazines, hosting approximately 35 trade shows, conferences and roadshows and providing electronic media offerings, including websites, electronic newsletters, web conferences and other web-based media products.  The Debtors' products are subscribed to by about 6 million business professionals.  Historical financial information for the Debtors' last two fiscal years is attached hereto as Exhibit III.

On November 1, 2006, Prism Business Media Holdings, Inc. entered into a definitive agreement to acquire Penton Media, Inc. for an aggregate consideration payable to Holdings' stockholders of $194.2 million.  The total value of the transaction, including the assumption or repayment of debt at closing and transaction fees, was approximately $530 million (the "Acquisition").  The Acquisition closed in February, 2007.  The combination of the Prism and Penton companies created one of the largest business-to-business media companies in the United States.  Following the Acquisition, Prism Business Media Holdings, Inc. and Prism Business Media, Inc. became Penton Business Media Holdings, Inc. and Penton Business Media, Inc., respectively.  Penton Business Media, Inc. and Penton Media, Inc. are the Debtors' principal operating entities.

In support of the Acquisition, Penton Media, Inc. and Prism Business Media, Inc., as borrowers, and Prism Business Media Holdings, Inc. and certain subsidiary loan parties as guarantors, obtained the following secured financing, which is described in greater detail below:

- an $80 million first lien revolving credit facility

- a $620 million first lien term loan

- a $266 million second lien term loan

Following the Acquisition, the Debtors had a total capitalization in excess of $1.1 billion.  Since the time of the Acquisition, the revolving credit facility has been used to fund working capital and for general corporate purposes.  The first and second lien term loans were used to fund the Acquisition, pay fees and expenses and refinance existing company debt.

The result of the Acquisition was to significantly expand the post-Acquisition company's diversity and presence among industry clusters, build greater presence in certain strategic markets and provide greater exposure to certain higher-growth industry clusters, including natural products.  The Acquisition also resulted in operating efficiencies and significant cost savings in the way of headcount reductions, vendor savings due to enhanced purchase volumes and eliminating duplicative operating facilities.

The Debtors' primary industry clusters include:

## PENTON MEDIA PRIMARY INDUSTRY CLUSTERS

| Agriculture | Information Technology |
|---|---|
| Automotive, Trucking and Aviation | Lifestyle |
| Commercial Real Estate and Finance | Manufacturing & Supply Chain |
| Design Engineering | Marketing & Meetings |
| Digital Media and Communication | Mechanical Systems |
| Electrical Systems, Energy & Construction | Public Infrastructure |
| Electronics | Wealth Management |
| Food and Food Service | |

The Debtors deliver content through an integrated product offering including publications, exhibitions and digital media.

### Publications

The Debtors produce 113 specialized business magazines that are published periodically throughout the year, primarily in the United States, with a monthly cumulative circulation of more than five million.

The Debtors' publications are routinely recognized for the quality of their editorial content, amassing more than 260 publication awards since 2000. The Debtors' #1 or #2 ranked titles represent approximately 75% of their service markets. The Debtors' publications generate revenues primarily from the sale of advertising space and are chiefly distributed through opt-in qualified subscribers free of charge in the Debtors' target industries. The Debtors also publish print and online industry directories and buyers' guides, which are respected sources of purchasing information for professionals in the markets the Debtors serve. The publishing division leverages its powerful print brands to develop content for and drive customers to the Debtors' exhibitions and digital businesses.

### Digital: Websites, Electronic Newsletters, Web Conferences

Online media has continued to expand rapidly as marketers shift spending into digital marketing strategies that compliment their print marketing strategies or integrate into broad, multi-media marketing programs. In step with these trends, the Debtors' digital product line is the fastest growing part of the Debtors' business, and will continue to be developed as the Debtors look to the future. The Debtors' digital portfolio includes websites, branded newsletters, Web conferences, topic-specific micro sites, digital magazines and electronic books.

Websites are the most significant source of revenue for the Debtors in the digital segment. As the Debtors continue expanding their digital product line, they continue aggressively building

vertical search capabilities into appropriate websites and developing dedicated vertical search websites. Vertical search capabilities allow users to execute productive searches for professional information that is specific to their targeted vertical markets, eliminating wasted time in sifting through extensive, unrelated search results that are produced by general search engine websites.

In addition to websites, in the fiscal year 2009, the Debtors produced branded newsletters, conducted numerous conferences and published digital magazines, microsites and electronic books. These products are designed to provide timely and focused information to highly targeted professionals, and typically are sponsored by advertisers interested in delivering marketing information to these professionals because of their product/service purchasing or specifying responsibilities. Revenue in the digital business segment is derived primarily from web and email advertising, but also includes webcasts, email list rental and sales. The Debtors also have a growing digital custom-publishing business producing e-letters, websites, web events and on-line education for sponsoring companies.

The Debtors recognize the future of the business-to-business media industry, like many others, is dependent on maximizing technological advances. To that end, the Debtors intend to grow their digital products over the next five years, to help offset expected declines in print.

**Exhibitions: Tradeshows, Conferences and Roadshows**

The Debtors produce approximately 35 exhibitions, including tradeshows, conferences and roadshows, which attract professionals and managers in the industries that the Debtors serve who have purchasing and specifying responsibility. The Debtors' tradeshows include extensive conference programs, which provide a forum for the exchange and dissemination of information relevant to attendees' professional roles and responsibilities.

Tradeshows and conferences allow exhibiting and sponsoring customers to prospect and sell directly to qualified buyers, offer educational opportunities to attendees, and foster networking, which assists in building desired relationships between buyers and sellers in the Debtors' targeted markets.

The Debtors derive revenue from exhibitions primarily through fees paid for booth space, attendee fees and exhibitor sponsorships of promotional media, with sponsorship fees representing the greatest source of revenue in this segment.

**Custom Media/Data Products**

The Debtors' custom media business provides customers with integrated media and marketing solutions designed to address customers' specific business needs and opportunities. Specific products include sponsored magazines, newsletters, websites, eBooks, internal communications programs for corporations, catalogs, education and training materials and custom communications. The Debtors also offer a variety of custom data products that their customers use in their direct marketing and promotional efforts, including article reprints and electronic re-use rights of editorial content, industry directories and rental use of magazine subscriber and event attendee databases.

## IV.    CAPITAL STRUCTURE[5]

### A.    First Lien Indebtedness

In connection with the Acquisition, the Debtors entered into that certain First Lien Credit Agreement (the "First Lien Credit Agreement") dated as of February 1, 2007 among Penton Media, Inc. and Prism Business Media Inc. (as borrowers, the "Borrowers"), Prism Business Media Holdings Inc. and certain related subsidiaries (as guarantors), General Electric Capital Corporation (as administrative agent) and the other First Lien Lenders party thereto.  The First Lien Credit Agreement, all amendments thereto and all security agreements and instruments related thereto are collectively referred to herein as the "First Lien Loan Documents".

The loans under the First Lien Credit Agreement consist of:

- an $80 million first lien revolving credit facility (the "First Lien Revolver"); and

- a $620 million first lien term loan (the "First Lien Term Loan" and together with the First Lien Revolver, collectively, the "First Lien Loans").

As of the Petition Date, the principal amount outstanding in respect of the First Lien Loans is projected to be approximately $668 million, exclusive of accrued and unpaid interest, fees and expenses of the First Lien Lenders (the amount of the First Lien Revolver is approximately $65 million).  Debtor Penton Business Media Holdings, Inc. and its other Debtor subsidiaries (other than the Borrowers) executed guaranties of the First Lien Obligations.  The obligations owing under the First Lien Credit Agreement and related guaranties are secured by first priority liens and security interests in substantially all of the tangible and intangible assets of the Debtors, with the exception of certain cash and copyrights, pursuant to a First Lien Collateral Agreement dated February 1, 2007.  Absent the Amended and Restated Credit Agreement, the First Lien Loans are due to mature in February 2013.

In August, 2009, a potential non-compliance event occurred under the First Lien Credit Agreement with respect to the total debt-to-EBITDA and first lien debt-to-EBITDA leverage covenant for the second quarter ending June 30, 2009.  The potential non-compliance event was cured on August 21, 2009 by the Debtors' equity sponsors with a capital infusion of $13.7 million, which was funded from a $22.5 million dividend paid in June, 2009.  The Debtors would have been in non-compliance with the same leverage ratio covenant under the First Lien Credit Agreement for the third quarter ending September 30, 2009, except that on November 25, 2009, the Debtors and the Required Lenders (as defined in the First Lien Credit Agreement) entered into an agreement (the "Consent and Amendment Agreement") pursuant to which the First Lien Lenders waived such potential non-compliance event under the First Lien Credit Agreement subject to numerous conditions.

---

[5] Nothing in this Article IV is an admission as to the proper characterization of the transactions and liabilities discussed herein.

The Consent and Amendment Agreement added numerous conditions, and amendments to the First Lien Credit Agreement, including a requirement that the Debtors either commence prepackaged bankruptcy proceedings, or consummate an out of court restructuring of their balance sheets on the terms contemplated in the Plan, by February 3, 2010. This date was later extended by the parties to February 8, 2010, and then again to February 10, 2010. The Consent and Amendment Agreement also added to the First Lien Credit Agreement additional restrictions on the Debtors' ability to incur indebtedness, grant liens on their assets, enter into sale leaseback transactions and investments, carry out sales of assets and issue dividends. As part of the Lock-Up Agreement, the First Lien Lenders also agreed that the non-compliance by the Debtors of the Financial Performance Covenants (as defined in the First Lien Credit Agreement) for the reporting periods ending December 31, 2009 and March 31, 2010 would not be a termination event under the Lock-Up Agreement.

The First Lien Credit Agreement will be completely amended and restated as provided in the Amended and Restated Credit Agreement described in Section VI.B below.

**B.  Second Lien Indebtedness**

In addition to the First Lien Loans, at the time of the Acquisition, the Debtors incurred $266 million in second lien indebtedness under the Second Lien Credit Agreement (the "Second Lien Credit Agreement") dated as of February 1, 2007 among Penton Media, Inc. and Prism Business Media Inc. (as borrowers), Prism Business Media Holdings Inc. and certain related Debtor subsidiaries (as guarantors), General Electric Capital Corporation (as administrative agent) and the Second Lien Lenders party thereto. The Second Lien Credit Agreement, all amendments thereto and all security agreements and instruments related thereto are collectively referred to herein as the "Second Lien Loan Documents". Wells Fargo Bank, N.A. became successor agent to General Electric Capital Corporation in November, 2009.

The obligations owing under the Second Lien Documents, inclusive of all accrued but unpaid interest and fees, is projected on the Petition Date to be approximately $269.6 million. The obligations owing under the Second Lien Credit Agreement and related guaranties are secured by second priority liens and security interests in the same collateral that secures the First Lien Loans pursuant to a Second Lien Collateral Agreement dated February 1, 2007. In connection with the First and Second Lien Credit Agreements, the First and Second Lien Lenders executed an intercreditor agreement dated February 1, 2007.

Between February, 2007 and May, 2009, the Debtors' equity sponsors, including various MidOcean and Wasserstein Funds, acquired collectively approximately 57.7% of the indebtedness outstanding under the Second Lien Credit Agreement. As Second Lien Lenders, substantially all of these equity sponsors have executed the Lock-Up Agreement in support of the Plan and have elected therein to receive their Second Lien Distributions under the Plan in the form of Stock of Reorganized Holdings.

## C.     Equity Ownership

As of the Petition Date, the following entities (the "LLC Shareholders") are projected to have the following percentage interests in Penton Business Media Holdings, LLC, which, in turn, owns 99.96% of the Stock of Holdings:

| Holder | Percentage Ownership |
|---|---|
| MidOcean Funds | 50.00% |
| Wasserstein Funds | 34.07% |
| Lexington Partners | 4.27% |
| Blackrock Kelso Capital Corporation | 5.83% |
| Apollo Investment Corporation | 5.83% |

Holdings owns 100% of the Stock of both Debtors Penton Business Media, Inc. and Penton Media, Inc., who, in turn, collectively own directly or indirectly 100% of the Stock in each of the Debtor subsidiaries.

## V.     EVENTS LEADING TO THE DEBTORS' CHAPTER 11 FILING

Over the past year, the global economy has suffered a prolonged recession, the impact of which has been felt in virtually every key part of the United States economy, including business-to-business media spending. In this environment, the Debtors have faced a challenging operating environment, like many other business-to-business media companies.

This global economic downturn has amplified and accelerated already existing cyclical and structural shifts in the industry, and in particular, a decline in advertising spending and a shift from print to digital and other alternative and emerging media. Indeed, business-to-business media spending is expected to have declined approximately 12.5% during 2009, with spending in print projected to have declined approximately 28%[6]. And although the business-to-business media industry is generally expected to recover, print media — the Debtors' primary source of revenue — is expected to experience a permanent downsizing due to the emergence of new media.

As the business-to-business media industry has continued to soften during the global recession of the last two years, the Debtors' customers have significantly cut advertising budgets, substantially impacting the Debtors' revenues, which declined 7.5% between 2007 and 2008 and are expected to decline 26.2% between 2008 and 2009. Additionally, the Debtors are operating

---

[6] Source: Outsell, Inc.

with a levered capital structure, resulting in significant interest expense — approximately $65 million per year — that continues to erode the Debtors' operating performance.

In the face of these difficult operating conditions and the Debtors' leveraged position, the equity owners installed a new chief executive officer in November 2008. Sharon Rowlands, formerly President and CEO of Thomson Financial Corporation, a leading financial services information company, reorganized the Debtors' businesses along the 15 market clusters and devised a five-year growth plan to decrease the Debtors' dependence on print advertising while growing digital revenue streams. Since the beginning of 2009, the Debtors revised their operating strategy and business plan, implemented cost reduction measures and repositioned themselves to optimize shifting industry trends. These efforts, however, have not been sufficient to address the Debtors' difficult financial position in light of their expectation that a full recovery in the business media industry may still take some time.

In order to avoid the impact of a "free-fall" bankruptcy process and avoid disruptions to the Debtors' business operations, the Debtors, the Equity Investors and the First and Second Lien Lenders have engaged in constructive negotiations leading to the development of the Plan, and its related agreements, including the Amended and Restated Credit Agreement, the Rights Offering and the Equity Commitment by the Equity Investors.

## VI. RESTRUCTURING AND PLAN OF REORGANIZATION

The Debtors' reorganization is a combination of (i) realigning the Debtors' business consistent with industry trends and reducing operating costs and (ii) restructuring the Debtors' balance sheet by amending the existing First Lien Credit Agreement and discharging the obligations owed to the Second Lien Lenders.

### A. Business Realignment & Cost Reduction Efforts

The business-to-business media industry has undergone a shift in dynamic, as digital media overtakes print media in terms of demand and growth. Although print media will for the foreseeable future comprise the Debtors' primary source of revenue, the Debtors have begun shifting the focus of their business on improving existing technologies and developing further digital capabilities in response to shifting market trends. Over the next five years, the Debtors intend to shift revenues from majority print to majority non-print and higher value added products, such as custom media and use-paid content.

The Debtors have also shifted their businesses from a channel-based to a customer/market-based structure, which will be critical for asset leverage and future growth. The Debtors initiated key transformational activities across many key aspects of their businesses with a particular focus on audience development, editorial content, production, sales, facilities and distribution.

Additionally, the Debtors remain extremely proactive on process reviews and identifying opportunities to effectuate further cost savings. The Debtors' cost savings and realignment actions have permanently reduced their operating cost base, and the Debtors expect to benefit from increased operating leverage as revenue increases in the coming years.

**B.    Amended and Restated Credit Agreement**

The Plan will give effect to the Amended and Restated Credit Agreement attached to the Plan as <u>Exhibit I</u>.  As part of the Amended and Restated Credit Agreement, certain of the First Lien Lenders under the First Lien Revolver have agreed to continue extending commitments under the First Lien Revolver after the Effective Date of the Plan in an amount equal to no less than $42,656,250, which such amount may be adjusted from time to time in accordance with the Amended and Restated Credit Agreement.

The following is a summary of certain key terms under the Amended and Restated Credit Agreement, but does not cover all of the amended terms of the First Lien Loan Documents. Reference should be made to <u>Exhibit I</u> to the Plan for the definitive terms of the Amended and Restated Credit Agreement and parties are encouraged to read the Amended and Restated Credit Agreement in its entirety.  In the event of any variation between the terms of the Amended and Restated Credit Agreement and the summary set forth herein, the Amended and Restated Credit Agreement will control.

## First Lien Amendments[7]

| Applicable Provision | Current First Lien Credit Agreement | Amended and Restated Credit Agreement |
|---|---|---|
| **Maturity** | February 1, 2013 | August 1, 2014 |
| **Term Loan** | $602,950,000 | $625,293,750[8] |
| **Revolver Facility** | $80.0 million | $42,656,250[9] |
| **Pricing** | • LIBOR plus 2.25% | • LIBOR plus 3.00%<br><br>• 1% Payment-in-Kind Interest accrues through February 1, 2013, with a toggle feature<br><br>• 2% Payment-in-Kind Interest accrues from February 1, 2013 through August 1, 2014, with a toggle feature |
| **LIBOR Floor** | None | 1.00% |
| **Financial Covenants** | • Maximum First Lien Leverage Ratio<br><br>• Maximum Total Leverage<br><br>• Minimum Interest Coverage Ratio | • Minimum Liquidity beginning in the first month after closing<br><br>• Minimum EBITDA beginning in the first quarter of 2011 |
| **Extension Fee** | N/A | If the Amended and Restated Credit Agreement has not been refinanced on or prior to August 1, 2014, a fee of 0.5% shall accrue from February 1, 2013 through, and be payable to the Lenders on, August 1, 2014. |
| **Events of Default** | N/A | Substantially the same as under the existing |

---

[7] Capitalized terms set forth in the description below and not otherwise defined in this Disclosure Statement will have the meanings set forth in the Amended and Restated Credit Agreement.

[8] This figure excludes the March 31, 2010 amortization payment under the Amended and Restated Credit Agreement.

[9] The amount of the revolver commitment may be adjusted from time to time in accordance with the Amended and Restated Credit Agreement.

| | | |
|---|---|---|
| | | First Lien Credit Agreement, with certain modifications, including those set forth below:<br><br>The cure right in the Existing Credit Agreement will be replaced with the following:<br><br>EBITDA Cure.  To cure a potential breach of the minimum EBITDA covenant, Holdings may contribute proceeds of Permitted Cure Securities or cash contribution to its capital to the Borrowers an amount not to exceed $5.0 million during the term of the Credit Facilities, which shall increase EBITDA by such amount contributed, provided that the Borrowers use such contribution to prepay the outstanding Loans.  Such cure may only be used twice in any period of four consecutive fiscal quarters.<br><br>Liquidity Cure.  To cure a potential breach of the Minimum Liquidity covenant, Holdings may contribute proceeds of Permitted Cure Securities or cash contribution to its capital to the Borrowers an amount not to exceed $10.0 million during the term of the Credit Facilities and the Borrowers may retain such contribution to fund working capital needs and for other general corporate purposes.  For purposes of clarity, such cure may be used as many times as desired, subject to the $10.0 million limit. |
| **Conditions Precedent** | N/A | Conditions to the Amended and Restated Credit Agreement include:<br><br>• The confirmation, on or before April 4, 2010, of the Plan, and effectiveness by May 4, 2010.<br><br>• After giving effect to the Transactions (as defined in the Lock-Up Agreement), including all payments to effectuate the Plan and all fees and expenses in connection therewith, the Debtors shall have Available Unused Commitments of all Revolving Facility Lenders, cash and Permitted |

| | | Investments in an amount not less than $40.0 million. |
| | | • There shall have been made an equity investment in Holdings in an amount not less than $38.9 million or such greater amount required to be invested pursuant to the Lock-Up Agreement and the Equity Commitment Letter, which shall in turn be contributed to the Borrowers, on the terms and subject to the conditions acceptable to the Administrative Agent and the Required Lenders. The Equity Investors shall own not less than 51% of Reorganized Holdings on a fully diluted basis after giving effect to the Plan but prior to any management incentive plan; <u>provided</u> that in the event the Second Lien Lenders participate in the Rights Offering and as a result thereof and due to their election to receive either cash or Stock as their Second Lien Distributions, the foregoing 51% threshold will be reduced to match the actual percentage held by the Equity Investors after giving effect to such elections but in any event not less than 42.5%. |
| | | • The Bankruptcy Court shall have entered an order or orders, in form and substance reasonably satisfactory to the Debtors, the Administrative Agent and Required Lenders, confirming the Plan and such Confirmation Order shall have become a Final Order. |

## C. Rights Offering

In connection with the Plan, the Debtors will affect the Rights Offering to all Second Lien Lenders, backstopped by the Equity Commitment in a cash amount of between $38.9 and $51.2 million, depending on the Second Lien Lender Elections.

$32.5 million of the proceeds from the Rights Offering will be retained by the Debtors for liquidity and to fund transaction costs, while the remainder — between $6.4 and $18.7 million — will be used to fund cash distributions to Second Lien Lenders under the Plan, depending on the Second Lien Lender Elections. The Equity Investors have agreed as part of their Second Lien Lender Elections to receive their Second Lien Distributions in Stock of Reorganized Holdings.

The Stock received on account of the second lien debt and Stock received pursuant to the Rights Offering will be valued the same for all investors.

The Equity Commitment is subject to (i) the satisfaction (and not waiver) of the conditions set forth in Section 4.02 of the Amended and Restated Credit Agreement other than those related to equity contributions and (ii) the confirmation and effectiveness of the Plan.

As part of the Equity Commitment, the Debtors have agreed to reimburse the Equity Investors for (i) the reasonable fees and expenses of one law firm retained to represent all Equity Investors in connection with the Equity Commitment incurred on or after December 14, 2009 and (ii) any out-of-pocket legal fees and expenses incurred in connection with any litigation, contested matters, adversary proceedings or negotiations necessitated by such litigation, contested matter or adversary proceedings, relating to the Equity Commitment, provided that in no event will the aggregate reimbursement exceed an aggregate of $300,000 if the Plan is not confirmed and does not become effective. The Debtors' obligations to reimburse the Equity Investors in this regard will remain effective whether or not any of the transactions contemplated in the Plan are consummated or any definitive legal documentation is executed, provided that the period for any reimbursement will end upon any termination of the Lock-Up Agreement.

The obligations of the Equity Investors in connection with the Equity Commitment will terminate without further action (i) upon the occurrence of the Termination Date (as defined in the Lock-Up Agreement) or (ii) upon the vote or other action of the Equity Investors, unless the Debtors have obtained an order of the Bankruptcy Court on or prior to the twentieth calendar day after the Petition Date approving the Debtors' assumption of their reimbursement obligations under the Equity Commitment Letter.

The Plan provides for, among others, releases of the Equity Investors as set forth in Section 3.5.3 of the Plan. The Equity Investors will not, however, be entitled to a fee for backstopping the Rights Offering.

The purchase price for shares of the Stock of the Reorganized Debtors — for purposes of the Rights Offering only — is presently estimated to be $20.38 per share (the "Purchase Price"). The Purchase Price will be the same for all investors, including the Equity Investors.

Second Lien Lenders who are Qualified Investors on December 14, 2009 ("Eligible Second Lien Lenders") will be eligible to purchase common Stock of Holdings pursuant to the exercise of Rights at the Purchase Price. A "Qualified Investor" is a "qualified institutional buyer" or "accredited investor" within the meaning of applicable securities laws. Rights will not be transferable and each Second Lien Lender that exercises its Rights will be required to represent that it is so acting on its own account.

The Debtors will have the right to cause the Class 10 Interest holder (or the LLC Shareholders, on its behalf) either to purchase newly issued shares of Holdings common Stock in connection with the Rights Offering or to make capital contributions in respect of presently issued and outstanding shares of Holdings common Stock (the "Outstanding Shares"), if the Debtors determine (in their discretion) that so doing is desirable from a structural perspective. In either such case, the amount paid for newly issued shares of Holdings common Stock or

contributed in respect of the Outstanding Shares will be the same so that, giving effect to the transactions, the value paid or contributed in respect of all shares of Holdings common Stock and any Outstanding Shares is the same.

Excluding the Rights Offering, Second Lien Lenders, including the Debtors' equity investors, will receive between 29.2% and 46.3% of the Stock in Reorganized Holdings, depending on the Second Lien Lender Elections. The Debtors' equity sponsors will receive no less than 29.2% of the Stock of Reorganized Holdings in connection with their Second Lien Distributions. Under the Rights Offering, the Debtors' equity investors will receive, directly or indirectly, between 28.5% and 70.8% of the Stock in Reorganized Holdings, depending on the Second Lien Lender Elections; and the Non-Investor Second Lien Lenders will receive under the Rights Offering between 0% and 33.3% of the Stock of Reorganized Holdings.

All Stock of Reorganized Holdings received by Second Lien Lenders in connection with the Plan and the Rights Offering, and all Stock of Reorganized Holdings retained under the Plan, will be subject to the Shareholders' Agreement. See Section VI.F.

In structuring the transactions under the Plan, the Debtors, with the advice of Rothschild, their financial advisor, concluded that the "implied total enterprise value" of the Debtors based on the recapitalization transaction in the Plan is the appropriate approach to valuation in connection with the Debtors.

Under the Rights Offering, between $38.9 million and $51.2 million will be invested for between 53.7% and 70.8% of the Stock of Reorganized Holdings, implying a total equity value of $72.4 million. The following is a summary of the implied total enterprise value of the Debtors based on the transactions contemplated under the Plan, assuming an Effective Date of March 31, 2010:

| | Minimum cash election [1] | | 100% cash election [2] | |
|---|---|---|---|---|
| | Full RO participation | No RO participation | Full RO participation | No RO participation |
| Equity Investors equity investment | $20.6 | $38.9 | $27.2 | $51.2 |
| Rights offering equity investment | 18.3 | - | 24.1 | - |
| Equity consideration to Second Lien Lenders | 33.5 | 33.5 | 21.2 | 21.2 |
| **Implied total equity value [3]** | **$72.4** | **$72.4** | **$72.4** | **$72.4** |
| Total First Lien debt [4] | $666.3 | $666.3 | $666.3 | $666.3 |
| Less: Projected balance Sheet Cash | (17.9) | (17.9) | (17.9) | (17.9) |
| Less: Equity investment proceeds (Net) [5] | (29.0) | (29.0) | (29.0) | (29.0) |
| **Pro Forma net debt** | **619.5** | **619.5** | **619.5** | **619.5** |
| **Setup Value** | **$691.9** | **$691.9** | **$691.9** | **$691.9** |

(1) Reflects minimum (34%) cash election by Non-Investor Second Lien Lenders
(2) Reflects 100% Cash Election by Non-Investor Second Lien Lenders
(3) Implied equity value is equal in all cases
(4) This figure includes the March 31, 2010 amortization payment under the Amended and Restated Credit Agreement
(5) Net of transaction fees

THE FOREGOING VALUATION IS BASED SOLELY UPON THE IMPLIED VALUE OF THE TRANSACTION CONTEMPLATED BY THE PLAN AND THE LOCK- UP AGREEMENT AND ASSUMES THAT SUCH TRANSACTION CLOSES. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE IMPLIED VALUATION REFLECTED ABOVE WOULD BE REALIZED IF THE TRANSACTION CONTEMPLATED BY THE PLAN AND THE LOCK-UP AGREEMENT DOES NOT CLOSE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

THE CALCULATIONS OF VALUE SET FORTH HEREIN REPRESENT IMPLIED VALUES AND ASSUME THE CLOSING OF THE TRANSACTION CONTEMPLATED BY THE PLAN AND THE LOCK-UP AGREEMENT AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE VALUE STATED HEREIN DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-EFFECTIVE DATE MARKET VALUE. THE CALCULATIONS OF VALUE DO NOT CONFORM TO THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE OF THE APPRAISAL FOUNDATION.

### D. Interest Rate Hedge Waiver

Under the Plan, the Debtors may, prior to or for three business days after the Petition Date, execute Interest Rate Hedge Waivers with counterparties (the "Swap Counterparties") to the Debtors' Secured Swap Agreements. Under the Interest Rate Hedge Waivers, the Swap Counterparties would agree to waive certain defaults and termination events under their respective Secured Swap Agreements, including as a result of the Chapter 11 Cases, and that such Secured Swap Agreements will remain in full force and effect. Under the Interest Rate Hedge Waivers, certain of the Swap Counterparties have additionally agreed to vote in favor of, and to generally support, the Plan and the transactions contemplated thereunder. The Interest Rate Hedge Waivers would allow the respective Secured Swap Agreements to remain in place and thus allow the Debtors to hedge against variability in the interest rates provided under the Amended and Restated Credit Agreement. If a Swap Counterparty does not execute an Interest Rate Hedge Waiver, under the Plan the obligations of the Debtors to the Swap Counterparty become first lien term loans that receive the treatment provided for in Class 2 under the Plan.

### E. Management Incentive Program

The Debtors anticipate that after the Effective Date, Reorganized Holdings will implement the Management Incentive Plan, which is an equity incentive plan for management that will reserve for management up to 10% of the fully-diluted outstanding Stock of Reorganized Holdings. A form of the Management Incentive Plan is attached to the Plan as Exhibit IV.

### F. Shareholders' Agreement

The Shareholders' Agreement gives the LLC the right to designate six of the seven members of the Board of Directors of Reorganized Holdings and approve any action requiring the approval of its Board or stockholders. The Shareholders' Agreement also includes

restrictions on transfer, as well as drag-along, tag-along and preemptive rights. In addition, if Reorganized Holdings seeks capital and LLC agrees to invest its pro-rata share, Non-Investor Second Lien Lenders who elect Stock under their Second Lien Lender Elections or elect to participate in the Rights Offering will have to invest their pro-rata share, subject to certain limitations as set forth in the Shareholders' Agreement.

A copy of the form of Shareholders' Agreement is attached as <u>Exhibit III</u> to the Plan. The foregoing description of the Shareholders' Agreement is a condensed summary of its terms thereof. Second Lien Lenders who may be considering electing to receive Stock or to participate in the Rights Offering are urged to review the full text of <u>Exhibit III</u> to the Plan.

## VII. REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### A. Requirements of Section 1129(a) of the Bankruptcy Code

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan otherwise complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

- disclosure regarding the Plan has been made that is required by section 1125 of the Bankruptcy Code;

- the disclosures required under section 1129(a)(5) concerning the identity and affiliations of persons who will serve as officers, directors and voting trustees of the successors to the Debtors have been made;

- the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to creditors or interest holders on account of such Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in such Class has accepted the Plan.

- the Plan has been accepted by the requisite votes of creditors and equity interest holders, except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code;

- at least one Class of Claims that is impaired under the Plan has voted to accept the Plan, without including any acceptance of the Plan by any insider;

- the Plan is feasible;

- all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date; and

- the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time prior to Confirmation pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the applicable Debtor has obligated itself to provide such benefits.

## B. Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as all of the other requirements for confirmation set forth in section 1129(a) of the Bankruptcy Code have been met and the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

### 1. Fair and Equitable

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors and equity interest holders as follows:

Secured Creditors. A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides: (a) that each of the holders of the secured claims included in the rejecting class (i) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity and (ii) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (b) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (c) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (a) or (b) of this paragraph.

Unsecured Creditors. A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that: (a) each holder of a claim included in the rejecting class receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (b) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan on account of their existing interests.

Holders of Interests. A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides that: (a) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (i) any fixed liquidation preference to which such holder is entitled; (ii) the fixed redemption price to which such holder is entitled or (iii) the value of the interest; or (b) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan.

In the event the Debtors commence the Chapter 11 Cases but have not received sufficient votes in favor of the Plan from the holders of Claims in any of Classes 2, 3 and 4 for such classes to have accepted the Plan, the Debtors reserve the right to seek confirmation through cramdown, modify the Plan or to determine, in their sole discretion, not to seek to confirm the Plan. The Debtors will be seeking to confirm the Plan pursuant to the cramdown provisions of section 1129(b) of the Bankruptcy Code as to Interests in Class 9 and Class 10, if necessary.

## 2. "Unfair Discrimination"

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, or any discrimination among the classes is determined not to be unfair by the Bankruptcy Court.

## C. Best Interests of Creditors Test; Liquidation Analysis

Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any such impaired Class who has not voted to accept the Plan. Accordingly, if an impaired Class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of such impaired Class a recovery on account of the member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the applicable Debtor or Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

As noted above, Classes 2, 3, 4, 9 and 10 are impaired under the Plan. To estimate what members of Classes 2, 3, 4, 9 and 10 would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Chapter 11 Cases were converted to a chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of a Debtor would consist of the net proceeds received from the disposition of the Debtor's assets plus any cash held by the Debtors.

The information contained in Exhibit II hereto provides a summary of the Liquidation Values of the Debtors' interests in property, assuming a chapter 7 liquidation in which one or more trustees appointed by the Bankruptcy Court would liquidate each Debtors' properties and interests. The Liquidation Values have been prepared solely for use in this Disclosure Statement and do not represent values that are appropriate for any other purpose. Nothing in this analysis is intended to be or constitutes a concession by or admission of any Debtor for any purpose.

In summary, the Debtors believe that a chapter 7 liquidation of each of the Debtors' Estates would result in diminution in the value to be realized by holders of Claims, as compared to the proposed distributions under the Plan. Specifically, in a liquidation, the Debtors believe that holders of Claims in (i) Classes 2 and 3 would receive between 5.7% and 13.4% of the face amount of their Claims; (ii) holders of Claims in Class 4 would receive between 1.1% and 1.2% of the face amount of their Claims; and (iii) holders of Interests in Classes 9 and 10 would receive no consideration on account of their Interests. Consequently, the Debtors believe that the Plan will provide at least the value that such classes would receive in a chapter 7 liquidation of the Debtors.

### D. Feasibility

In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which requires that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. The Debtors believe that the Reorganized Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization or liquidation.

To support their belief in the Plan's feasibility, the Debtors have prepared the projections for Reorganized Debtors, as set forth in <u>Exhibit III</u> attached to this Disclosure Statement (the "<u>Projections</u>")

The Projections were not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants ("<u>AICPA</u>"), the Financial Accounting Standards Board (the "<u>FASB</u>") or the rules and regulations of the SEC. Furthermore, the Projections have not been audited, reviewed or subjected to any procedures designed to provide any level of assurance by the Debtors' independent certified public accountants.

While presented with numerical specificity, the Projections are based upon a variety of estimates and assumptions, which, while considered reasonable by management, may not be realized, and are subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the control of the Debtors' management. Consequently, the Projections should not be regarded as a representation or warranty by the Debtors, or any other person, as to the accuracy of the Projections, or that the Projections will be realized. Actual results may vary materially from those presented in these Projections.

## VIII. RISK FACTORS

Prior to voting on the Plan, each holder of a Claim entitled to vote should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation. See Article XIV for a discussion of certain tax considerations and Article XV for discussion of federal and state securities law issues.

## A.    Risks In Connection with the Chapter 11 Cases

### 1.    Risk of Non-Confirmation of the Plan

Even if all impaired Classes accept or are deemed to accept the Plan, the Plan may still not be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code, which sets forth the requirements for Confirmation, requires, among other things: (a) that Confirmation not be followed by a need for further reorganization or liquidation (i.e., that the plan is "feasible"); (b) that the value of distributions to dissenting holders not be less than the value of distributions to such holders if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (c) that the Plan and the Debtors otherwise comply with the applicable provisions of the Bankruptcy Code.  Although the Debtors believe that the Plan will meet all of the applicable requirements, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    The Bankruptcy Court May Find the Plan Solicitation to be Inadequate

Typically, a plan of reorganization is filed and votes to accept or reject the plan are solicited after the filing of a petition commencing a bankruptcy case and after bankruptcy court approval of a disclosure statement that describes the plan that is submitted to creditors for a vote.  Nevertheless, a debtor may solicit votes prior to the commencement of a bankruptcy case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b).  Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote;

- the time prescribed for voting is not unreasonably short; and

- the solicitation of votes is in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in such solicitation or, if no such law, rule or regulation exists, votes be solicited only after the disclosure of "adequate information" as required by the Bankruptcy Code.

Section 1125(a)(1) of the Bankruptcy Code describes adequate information as information of a kind and in sufficient detail as would enable a hypothetical reasonable investor typical of holders of claims and interests to make an informed judgment about the plan, taking into consideration such investor's ability to obtain relevant information from sources other than a debtor's disclosure under section 1125 of the Bankruptcy Code.  With regard to solicitation of votes prior to the commencement of a bankruptcy case, if a bankruptcy court concludes that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code or Bankruptcy Rule 3018(b) have not been met, then a bankruptcy court could deem such votes invalid, whereupon the plan could not be confirmed without a resolicitation of votes to accept or reject the plan.  The Debtors cannot guarantee that the Bankruptcy Court will conclude that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018 have been met with respect to the Plan solicitation process.

### 3. Delays in Confirmation or Effective Date

Any delay in Confirmation or the effectiveness of the Plan could result in, among other things, increased Administrative Claims. Increased Administrative Claims and any other negative effects of a delay in Confirmation or the effectiveness of the Plan could endanger the ultimate approval of the Plan by the Bankruptcy Court.

### 4. Nonconsensual Confirmation

Pursuant to the "cramdown" provisions of section 1129 of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan at the Debtors' request if, excluding the acceptance of any "insider," at least one impaired Class has accepted the Plan and the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not accepted the Plan.

The Debtors reserve the right to modify the terms of the Plan, as necessary, to seek Confirmation without the acceptance of all impaired Classes. Such modification could result in less favorable treatment for non-accepting Classes of Claims than the treatment currently provided for in the Plan. Further, in the event an impaired Class of Claims fails to approve the Plan, the Debtors may determine, in their sole discretion, not to seek Confirmation of the Plan or to file for chapter 11.

### 5. Conditions Precedent to the Effectiveness of the Plan

Even if confirmed, the Plan may still not go effective if the conditions to effectiveness set forth in section 4.1 of the Plan are not satisfied, or waived by the Debtors, the Equity Investors and the First Lien Administrative Agent (with the consent of the Required Lenders as defined in the Amended and Restated Credit Agreement) pursuant to Section 4.2 of the Plan. See Section II.C.4. to this Disclosure Statement for a description of the conditions to the effectiveness of the Plan.

### 6. Timing of Distributions Under the Plan

If the Debtors commence the Chapter 11 Cases and the Plan is confirmed, the date of the distributions to be made pursuant to the Plan would be delayed until after the Plan is confirmed by the Bankruptcy Court and becomes effective by its terms. The distribution can be delayed until the Confirmation Order becomes a Final Order, which would occur after the expiration of fourteen days from the entry of the Confirmation Order, and may be delayed for a substantially longer period in the event of an appeal of the Confirmation Order by a party in interest.

## B. Risks Associated With the Debtors' Businesses

### 1. Projections

The Projections are inherently uncertain and are dependent upon the successful implementation of the Reorganized Debtors' business plan and the reliability of the assumptions and estimates contained in the Reorganized Debtors' business plan. The Projections reflect numerous assumptions and estimates, including Confirmation and consummation of the Plan in

accordance with its terms, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions and other matters, most of which are beyond the control of the Reorganized Debtors and some of which may not materialize. The Projections are necessarily speculative in nature and one or more of the assumptions and estimates underlying the Projections may prove to be incorrect.  Accordingly, the Debtors' financial condition and results of operations following consummation of the Plan may vary significantly from those set forth in the Projections.

Projecting financial results several years into the future is inherently difficult because all of the potential contingencies cannot be anticipated.  Unanticipated events and circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of the Reorganized Debtors.  Therefore, the actual results achieved throughout the periods covered by the Projections may vary from the projected results.  These variations may be material and adverse.  Consequently, the Projections should not be regarded as a representation by the Debtors, their advisors or any other person that the Projections will be achieved.  You are cautioned not to place undue reliance on the Projections.

## 2.      Secured Debt

As of the March 31, 2010, assuming the Effective Date has occurred, the Reorganized Debtors expect to have total secured indebtedness of approximately $625 million.[10]  The Reorganized Debtors' secured indebtedness could have important consequences to their business, including:

- Limiting cash flow available for general corporate purposes, including capital expenditures, because a substantial portion of the Reorganized Debtors' cash flow from operations must be dedicated to servicing their debt;

- Limiting the Reorganized Debtors' ability to obtain additional debt financing in the future for working capital, capital expenditures or acquisitions;

- Making the Reorganized Debtors more vulnerable to an extended recessionary period, or downturn in the general economy; and

- Limiting the Reorganized Debtors' flexibility in reacting to competitive and other changes in their industry.

---

[10]   This figure includes the March 31, 2010 amortization payment due under the Amended and Restated Credit Agreement.  This amount does not include the secured obligation of the Reorganized Debtors under the Secured Swap Agreements.  The amount of the First Lien Term Loan Claims may increase as of the Effective Date to the extent that Swap Counterparties do not execute Interest Rate Hedge Waivers and if the obligations under the applicable Secured Swap Agreements crystallize, in which case, any amounts owing under the Secured Swap Agreements will become part of the First Lien Term Loan Claims.  To the extent Swap Counterparties do execute Interest Rate Hedge Waivers, the Reorganized Debtors' obligations thereunder would constitute additional contingent secured indebtedness.

The foregoing risk factors would be potentially heightened should the Reorganized Debtors incur additional level of indebtedness beyond their current levels. There is no certainty that the Reorganized Debtors will be able to refinance their secured indebtedness when it matures.

### 3. Increases in Interest Rates

The Secured Swap Agreements, should they become subject to an Interest Rate Hedge Waiver, will expire in 2011, at which time the interest rates on the Reorganized Debtors' secured indebtedness will fluctuate with the markets. Given the high levels of the Reorganized Debtors' secured indebtedness, any significant increases in interest rates after the expiration of the Secured Swap Agreements could have a substantial adverse affect on the Reorganized Debtors' liquidity.

### 4. Dependence on Advertising Revenues

For the years ended December 31, 2009, 2008, and 2007 nearly 60% of the Reorganized Debtors' revenues came from advertising in their publications. Advertising revenues fluctuate with general economic cycles, and any material decline in these revenues could have a material adverse effect on the Reorganized Debtors' business, the results of their operations and their financial condition. Historically, advertising revenues have increased during economic recoveries and decreased during both general economic downturns and regional economic recessions. In a general economic downturn or a recession, advertisers reduce their advertising budgets, intensify their attempts to negotiate lower advertising rates and pay outstanding invoices more slowly. The Reorganized Debtors experienced some of these effects in 2008 and 2009. If a recovery in spending on marketing in traditional business-to-business media does not take place, the Reorganized Debtors' results of operations may be adversely affected.

### 5. Inability to Transform the Company's Products to Provide Additional Digital Products

If the Reorganized Debtors are not able to effectively transform their portfolio in order to provide innovative digital solutions for their customers and the Reorganized Debtors' publishing revenues continue to decline at a pace greater than the growth of their digital revenues, the results of the Reorganized Debtors' results of operations and cash flows may be adversely affected.

### 6. New Product Launches or Acquired Products May Reduce Earnings or Generate Losses

The Reorganized Debtors' future success will depend in part on their ability to continue offering new products and services that gain market acceptance by addressing the needs of specific audience groups within the Reorganized Debtors' targeted industries. The Reorganized Debtors' efforts to introduce new or to integrate acquired products may not be successful or profitable. Costs related to the development of new products and services are expensed as incurred, and therefore, the Reorganized Debtors' profitability from year-to-year may be adversely affected by the number, timing and scope of new product launches.

### 7. Success of Tradeshows and Conferences Dependent on Desirable Dates and Locations

The Reorganized Debtors compete for desirable dates and venues for their tradeshows and conferences. If this competition intensifies, the Reorganized Debtors may be unable to schedule important events, thus potentially adversely affecting the Reorganized Debtors' profitability and future success in this business segment. Additionally, because tradeshows and conferences are held on pre-scheduled dates at specific locations, the success of a particular tradeshow or conference depends upon events outside of the event producer's control, such as natural catastrophes, labor strikes and transportation shutdowns.

A significant portion of the Reorganized Debtors' revenues and operating margins are generated from their Natural Products Expo East and Natural Products Expo West tradeshows. A major decline in the performance of these tradeshows would significantly reduce the Reorganized Debtors' revenues and operating income.

### 8. Product Revenues Vary Based on Timing of Customer Product Launches

Revenues from tradeshows, conferences, roadshows, and publishing may fluctuate based on the spending patterns of the Reorganized Debtors' customers. Many of the Reorganized Debtors' large customers concentrate their advertising spending on or participation in tradeshows and roadshows around major product launches. Consequently, a significant portion of the Reorganized Debtors' revenues are subject to uncertainty based on the timing of customer product launches.

### 9. Reliance on Vendors

The Reorganized Debtors rely on certain principal vendors and their ability or willingness to sell products and provide services on favorable terms. Such vendors include printing and publishing companies, paper suppliers, the United States Postal Service, web development providers, and fulfillment and software suppliers. If any of these vendors discontinue or temporarily terminate its services and the Reorganized Debtors are unable to find adequate alternative sources, the Reorganized Debtors may experience increased prices, or interruptions and delays in services, which in turn would adversely affect the Reorganized Debtors' business.

### 10. Increases in Paper or Postage Costs May Adversely Affect Business

Paper and postage are necessary expenses relating to the Reorganized Debtors' print products and magazine distribution, which, in 2009 accounted for approximately 13% of their total operating expenses. The Reorganized Debtors do not use forward contracts, and their paper supply arrangements provide for price adjustments to reflect prevailing market prices. Significant increases in paper prices or in postage prices, which the Reorganized Debtors may not be able to pass on to their customers, may have an adverse effect on the Reorganized Debtors' business.

11. **Dependence on Key Personnel**

The Reorganized Debtors benefit from the leadership and experience of their senior management team and other key employees, and the Reorganized Debtors will depend on such employees' continued services in order to successfully implement their business strategy. Although the Reorganized Debtors have employment agreements with their CEO and CFO, they and other key personnel may not remain employed with the Reorganized Debtors. The loss of a number of key personnel could have a material adverse affect on the Reorganized Debtors' business.

## IX. MEANS FOR IMPLEMENTATION OF THE PLAN

### A. Rights Offering, Second Lien Lender Equity Elections and Revolving Commitments

In connection with the Plan, the Debtors will affect the Rights Offering to all Second Lien Lenders, backstopped by the Equity Commitment from the Equity Investors in a Cash amount of between $38.9 and $51.2 million, depending on the Second Lien Lender Elections.

$32.5 million of the proceeds from the Rights Offering (and/or Equity Commitment, as applicable) will be retained by the Debtors for liquidity, and to fund transaction costs, while the remainder — between $6.4 and $18.7 million — will be used to fund the Second Lien Distributions made in Cash under the Plan, depending on the Second Lien Lender Elections. On or around the Effective Date, certain of the new funds will be used to pay down a portion of the first lien revolving loan pursuant to the Amended and Restated Credit Agreement.

As additional liquidity to fund the Reorganized Debtors' post-Effective Date operations, the Reorganized Debtors will as of the Effective Date have access to $42,656,250 in revolving commitments under the Amended and Restated Credit Agreement, as such amount may be adjusted from time to time in accordance therewith.

The Rights Offering and the Amended and Restated Credit Agreement are discussed in greater detail in Sections VI.B and VI.C hereof.

### B. Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors

Each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of a corporation or other relevant entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law. As of the Effective Date, all property of the Estate of a Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest in such Reorganized Debtor, free and clear of all Claims, liens, charges, other encumbrances, Interests and other interests, except with respect to First Lien Revolver Claims, First Lien Term Loan Claims and Reinstated Claims. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the

Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.

### C. Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs; Other Agreements

#### 1. Certificates of Incorporation and Bylaws

As of the Effective Date, the certificates of incorporation and the bylaws of Reorganized Holdings will be substantially in the forms set forth in Exhibits VI and VII to the Plan, respectively. The certificates of incorporation and bylaws of each Reorganized Debtor, among other things, will prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, each Reorganized Debtor may amend and restate its certificates of incorporation or bylaws as permitted by applicable state law, subject to the terms and conditions of such constituent documents. On the Effective Date, or as soon thereafter as is practicable, each Reorganized Debtor will file such certificate of incorporation with the secretary of state or similar office of the state in which such Reorganized Debtor is incorporated or organized, to the extent required by and in accordance with the applicable corporate law of such state.

#### 2. Directors and Officers of the Reorganized Debtors

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as set forth on Exhibit VIII of the Plan, the initial officers of each of the Reorganized Debtors will consist of the officers of such Debtor immediately prior to the Effective Date and the initial board of directors of each of the Reorganized Debtors will consist of the board of directors immediately prior to the Effective Date. Each such director and officer will serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the terms of the certificate of incorporation and bylaws of the applicable Reorganized Debtor and state law.

#### 3. Employment-Related Agreements and Compensation Programs

As of the Effective Date, each of the Reorganized Debtors will have authority to: (i) maintain, reinstate, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with its active and retired directors, officers and employees, subject to the terms and conditions of any such agreement and applicable non-bankruptcy law; (ii) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active and retired employees; and (iii) enter into and implement the Management Incentive Plan. From and after the Effective Date, the Amended and Restated Credit Agreement provides for restrictions on cash dividends and distributions that the Debtors may pay or make on or in respect of Stock, subject to certain exceptions, including without limitation up to $5.0 million per fiscal year of permitted cash dividends and distributions the proceeds of which is used to purchase or redeem Stock and options held by directors, officers

and other employees of the Debtors as more fully described in the Amended and Restated Credit Agreement.

From and after the Effective Date, the Reorganized Debtors will continue to administer and pay the Claims arising before the Petition Date under the Debtors' workers' compensation programs in accordance with their prepetition practices and procedures.

### 4. Other Agreements

Consummation of the Plan is not intended to and will not constitute a change in ownership or change of control, as defined in any employment or other agreement or plan in effect on the Effective Date to which a Debtor is a party. In addition, notwithstanding anything to the contrary in the Plan, no provision in any contract, agreement or other document with the Debtors that is rendered unenforceable against the Debtors or the Reorganized Debtors pursuant to sections 541(c), 363(l) or 365(e)(1) of the Bankruptcy Code, or any analogous decisional law, will be enforceable against the Debtors or Reorganized Debtors as a result of the Plan, or the Confirmation Order.

### 5. Plan Transactions Approved and Effective as of the Effective Date

The adoption of new or amended and restated certificates of incorporation and bylaws for each Reorganized Debtor; the initial selection of directors and officers for each Reorganized Debtor; the effectuation of the Rights Offering; the entry into the Amended and Restated Credit Agreement, the Shareholders' Agreement and the Interest Rate Hedge Waiver; the distribution of Cash pursuant to the Plan; the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing; the adoption, execution and implementation of employment, retirement and indemnification agreements, incentive compensation programs, retirement income plans, welfare benefit plans and other employee plans and related agreements and the other matters provided for under the Plan involving the corporate structure of the Debtors or Reorganized Debtors or corporate action to be taken by or required of a Debtor or Reorganized Debtor will occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and are hereby authorized and approved in all respects and for all purposes without any requirement of further action by the stockholders or directors of the Debtors or the Reorganized Debtors.

### D. Assumption of Pension Plans; Retiree Welfare Benefits

On the Effective Date, each applicable Reorganized Debtor will assume the unexpired pension plans to which it is a party. The applicable Debtors will continue to sponsor and administer the pension plans, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082 and administer the pension plans in accordance with their terms and the provisions of ERISA and the Internal Revenue Code of 1986. Furthermore, nothing in the Plan will be construed as discharging, releasing or relieving the Debtors or the Debtors' successors from any liability imposed under any law or regulatory provision with respect to the pension plans. Neither the PBGC, the pension plans nor any participant or beneficiary of the pension plans will be enjoined or precluded, from and after the Effective Date, from enforcing such liability with respect to the pension plans.

From and after the Effective Date, the applicable Debtors will continue to pay all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, for the duration of the period that the applicable Debtors have obligated themselves to provide such benefits, in accordance with the terms of the retiree benefit plans or other agreements governing the payment of such benefits, subject to any rights of the Debtors to amend, modify or terminate such benefits under the terms of the applicable retiree benefits plan, other agreement or applicable nonbankruptcy law.

### E. Preservation of Rights of Action; Settlement of Claims and Releases

#### 1. Preservation of Rights of Action by the Reorganized Debtors; Recovery Actions

Except as otherwise expressly provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, including the releases provided for under Section 3.5.3 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will have vested in them as of the Effective Date, and the Reorganized Debtors will retain and may enforce, any claims, demands, rights, defenses and causes of action that the Debtor or the Estate may hold against any entity. Each Reorganized Debtor or its successor may pursue such retained claims, demands, rights, defenses or causes of action, as appropriate, in accordance with the best interests of such Reorganized Debtor or its successor holding such claims, demands, rights, defenses or causes of action, and may settle such claims after the Effective Date without notice to parties in interest or approval of the Bankruptcy Court. Notwithstanding the foregoing, as of the Effective Date, the Debtors will waive and release all Recovery Actions.

#### 2. Comprehensive Settlement of Claims and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Section 3.5.3 of the Plan, will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Claim (other than Claims Reinstated hereunder) or any distribution to be made pursuant to the Plan on account of any such Claim (other than Claims Reinstated hereunder). The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, Reorganized Debtors, Estates and their respective property and Claim holders and is fair, equitable and reasonable.

#### 3. Releases

- **General Releases by Debtors and Reorganized Debtors**

**As of the Effective Date the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all entities who may purport to claim by, through, for or because of them shall forever**

release, waive and discharge all Liabilities that they have, or had against any Released Party except with respect to any obligations arising under the Plan. Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of (i) any Released Party in respect of any express contractual obligation of any such Released Party in effect following substantial consummation of the Plan or (ii) solely in the case of Released Parties who are directors, officers and employees of the Debtors, intentional fraud or theft; it being understood that prospective or forward-looking guidance or projections prepared or released by such parties shall be deemed not to constitute intentional fraud or theft.

- **General Releases by Holders of Claims or Interests**

As of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the cash, contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim or Interest (solely in its capacity as such) who votes in favor of the Plan, to the fullest extent permissible under law, shall be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the exhibits to the Plan, the Disclosure Statement, the First Lien Loan Documents, the Second Lien Loan Documents, or the Secured Swap Agreement that such entity has, had or may have against any Released Party or any employees, agents or partners of the Debtors (which release shall be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code), except with respect to any obligations arising under the Plan, the Amended and Restated Credit Agreement, the "Loan Documents" (as defined in the Amended and Restated Credit Agreement), a Secured Swap Agreement subject to an Interest Rate Hedge Waiver (and only to the extent provided in such Interest Rate Hedge Waiver), or as a result of any act, event, injury, omission, transaction, or agreement arising after the Effective Date (other than Liabilities relating to such act, event, injury, omission, transaction or agreement first arising or occurring prior to the Effective Date); provided, however, that the foregoing provisions shall have no effect on the liability of any entity that would otherwise result from any unknown act as of the Effective Date, to the extent that such act is determined in a Final Order to have constituted willful misconduct.

- **Injunction Related to Releases**

The Confirmation Order shall permanently enjoin the commencement or prosecution by any entity or Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liabilities, rights of contribution or rights of indemnification released pursuant to the Plan, including pursuant to the releases in Section 3.5.3 of the Plan.

## F. Reinstatement and Continuation of Insurance Policies

From and after the Effective Date, each of the Debtors' insurance policies in existence as of the Effective Date will be reinstated and continued in accordance with their terms and, to the extent applicable, will be deemed assumed by the applicable Reorganized Debtor pursuant to

section 365 of the Bankruptcy Code and Article V of the Plan. Nothing in the Plan will affect, impair or prejudice the rights of the insurance carriers or the Reorganized Debtors under the insurance policies in any manner, and such insurance carriers and Reorganized Debtors will retain all rights and defenses under such insurance policies, and such insurance policies will apply to, and be enforceable by and against, the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

### G. Cancellation of Instruments, Securities and Other Documentation

On the Effective Date and concurrently with the applicable distributions made pursuant to Article II of the Plan, the Second Lien Loan Documents will be deemed canceled and of no further force and effect against the Debtors, without any further action on the part of any Debtor. From and after the Effective Date, the holders of Second Lien Claims will have no rights against the Debtors or Reorganized Debtors arising from or relating to such interests, instruments and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan.

### H. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The President and Chief Executive Officer, the Chief Financial Officer, any Vice President or the Secretary of each Debtor or Reorganized Debtor will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. The Secretary or any Assistant Secretary of each Debtor or Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions. Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax or similar Tax: (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) the execution and delivery of any documents in the Rights Offering, the Amended and Restated Credit Agreement, the Shareholders' Agreement or the Interest Rate Hedge Waiver; (4) the issuance of any Stock; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the foregoing or pursuant to the Plan.

## X. EFFECT OF CONFIRMATION

### A. Discharge of Claims

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. From and after the Effective Date, the Debtors will be discharged from any and all Claims that arose prior to the Effective Date, subject to the obligations of the Debtors under the Plan.

## B. Injunctions

As of the Effective Date, except with respect to the obligations of the Reorganized Debtors under the Plan or the Confirmation Order, all entities and Persons that have held, currently hold or may hold any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or Liabilities that are discharged or released will be permanently enjoined from taking any of the following enforcement actions against the Debtors, the Reorganized Debtors or any of their respective property on account of any such discharged or released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or Liabilities: (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, levying, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any Debtor or Reorganized Debtor; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

## C. Exculpation

From and after the Effective Date, the Released Parties, the Debtors and Reorganized Debtors, and any employees, agents or partners of the Debtors, will neither have nor incur any liability to any entity, and no holder of a Claim or Interest, no other party in interest and none of their respective Representatives, will have any right of action against any Debtor, Reorganized Debtor, any employee, agents or partners of the Debtors or Released Party, for any act taken or omitted to be taken in connection with, related to or arising out of the Chapter 11 Cases or the consideration, formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the exhibits to the Plan, the Disclosure Statement, any transaction proposed in connection with the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken, in connection therewith; provided, however, that the foregoing provisions will have no effect on: (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; or (b) the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in Final Order to have constituted willful misconduct or gross negligence.

## D. Termination of Certain Subordination Rights

The classification and manner of satisfying Claims under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, sections 510(a) and 510(c) of the Bankruptcy Code or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any distribution made pursuant to the Plan. All subordination rights that a holder of a Claim, other than a holder of a Claim Reinstated hereunder, may have with respect to any distribution to be made pursuant to the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined. Accordingly, distributions pursuant to the Plan will not be subject to payment to a beneficiary of such

terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

### E.  Dissolution of Any Creditors' Committee

On the Effective Date, the Creditors' Committee, if one has been appointed, will dissolve, and the members of the Creditors' Committee and their respective Professionals will cease to have any role arising from or related to the Chapter 11 Cases.  The Professionals retained by the Creditors' Committee and the respective members thereof will not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for reasonable fees for services rendered, and actual and necessary expenses incurred in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed and served after the Effective Date pursuant to Section 2.1.1.c of the Plan.

## XI.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.  Executory Contracts and Unexpired Leases to Be Assumed

#### 1.  Assumption Generally

Except as otherwise provided in the Plan or <u>Exhibit IX</u> to the Plan, or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, or in a motion pending before the Bankruptcy Court seeking authority to reject an Executory Contract or Unexpired Lease or in a Final Order of the Bankruptcy Court, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Debtors will be deemed to assume each Executory Contract or Unexpired Lease.  Without limiting the foregoing, on the Effective Date, the Debtors will assume all employment contracts without modification.

#### 2.  Assumption Procedures

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption by the Debtors of Executory Contracts and Unexpired Leases pursuant to Section 5.1 of the Plan as of the Effective Date, except for Executory Contracts and Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease filed on or prior to the Effective Date, (d) are listed on <u>Exhibit IX</u> to the Plan or (e) are designated for rejection as provided in Section 5.1.2 of the Plan.

### B.  Payments Related to the Assumption of Executory Contracts and Unexpired Leases

The amount of any cure claim necessary to assume any Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the applicable Debtor or Reorganized Debtor:  (1) by payment of such cure claim in Cash on the later of the Effective Date, and the date on which a disputed cure claim is resolved by agreement of the parties or by an order of the Bankruptcy Court; or

(2) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. Any management fees and/or Cash payments that may be owing from the Debtors to the Equity Investors as a cure payment in connection with the assumption of any management or other agreement between the Debtors and the Equity Investors will accrue and be paid on the terms and conditions provided for in the Amended and Restated Credit Agreement.

As of the Effective Date, and after payment of any necessary cure amounts owing to contract or lease counterparties pursuant to section 365 of the Bankruptcy Code, all contract and lease counterparties will be forever barred and estopped from asserting or claiming against the Debtors or Reorganized Debtors that any additional amounts are due or other defaults exist, that conditions to assumption and/or assignment must be satisfied under such Executory Contracts or Unexpired Leases or that there is any objection or defense to assumption and/or assignment of such Executory Contracts and Unexpired Leases.

Any provision in any Executory Contract or Unexpired Lease to be assumed under the Plan that purports to declare a breach, default, or right to payment or modification as a result of an assignment or change of control in respect of the Debtors or Reorganized Debtors, or as a result of the Chapter 11 Cases, is unenforceable, and all Executory Contracts and Unexpired Leases to be assumed under the Plan will remain in full force and effect, subject only to payment of the appropriate cure amount, if any. No sections or provisions of any Executory Contract or Unexpired Lease that purport to provide for additional payments, penalties, charges, rent acceleration or other financial accommodations in favor of the non-debtor third party thereto will have any force and effect with respect to the Chapter 11 Cases or the transactions contemplated by the Plan, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code and/or applicable case law.

### C.  Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by a Debtor will be performed by such Debtor or Reorganized Debtor in the ordinary course of its business. Accordingly, such contracts and leases will survive and remain unaffected by entry of the Confirmation Order.

### D.  Rejection of Executory Contracts and Unexpired Leases

The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejection of each Executory Contract or Unexpired Lease listed on <u>Exhibit IX</u> to the Plan pursuant to section 365 of the Bankruptcy Code as of the Effective Date. Any Claim arising from the rejection of any Executory Contract or Unexpired Lease will be considered a General Unsecured Claim pursuant to section 365 of the Bankruptcy Code, and, subject to allowance, paid in accordance with Section 5.6 of the Plan.

### E.  Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise will not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors under such Executory Contracts or Unexpired Leases.

Notwithstanding any applicable nonbankruptcy law to the contrary, the Debtors and Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations on goods or services previously purchased by the contracting Debtors or Reorganized Debtors from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

### F. Bar Date for and Payment of Rejection Damages

Except as otherwise provided in a Final Order approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court on or before 28 days after the Effective Date. Any Claims not filed within such time period will be forever barred from receiving a distribution from the Debtors, the Reorganized Debtors or the Estates.

The Debtors reserve the right to object to, settle, compromise or otherwise resolve any Claim filed on account of a rejected Executory Contract or Unexpired Lease. Undisputed Claims for rejection damages filed in connection with a rejected Executory Contract or Unexpired Lease will be paid in Cash on the later of (i) 60 days following the Effective Date or (ii) ten Business Days following the date such Claim becomes an undisputed Claim.

### G. Obligations to Insure and Indemnify Directors, Officers and Employees

Any and all directors and officers liability and fiduciary (including ERISA) insurance or tail policies in existence as of the Effective Date will be reinstated and continued in accordance with their terms and, to the extent applicable, will be deemed assumed or assumed and assigned by the applicable Debtor or Reorganized Debtor, pursuant to section 365 of the Bankruptcy Code and the Plan. Each insurance carrier under such policies will continue to honor and administer the policies with respect to the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors prior to the Effective Date.

The obligations of each Debtor or Reorganized Debtor to indemnify any Person who is serving or served as one of its directors, officers or employees as of the Petition Date by reason of such Person's prior or future service in such a capacity or as a director, officer or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation, by-laws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor, will be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

## XII. PROVISIONS GOVERNING DISTRIBUTIONS

### A. Distributions for Claims as of the Effective Date

Except as otherwise provided in Article VI of the Plan, distributions to be made on the Effective Date to holders of Claims as provided by Article II of the Plan will be deemed made on

the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (1) 30 days after the Effective Date; or (2) with respect to any particular Claim, such later date when the applicable conditions of Section 6.2.2 of the Plan (regarding undeliverable distributions) or Section 6.5 of the Plan (regarding the surrender of instruments evidencing a Claim or Interest) are satisfied.

### B. Delivery of Distributions and Undeliverable or Unclaimed Distributions to Holders of Claims in Class 4

#### 1. Distribution Procedures

On the Effective Date, the Debtors will distribute to the Second Lien Administrative Agent, and the Second Lien Administrative Agent will distribute to the Non-Investor Second Lien Lenders who are record holders of Class 4 Claims as of the Distribution Record Date, Cash consistent with the Second Lien Elections and pursuant to Article II of the Plan. The Debtors will make all distributions on the Effective Date to holders of Class 4 Claims who have elected to receive Stock under the Plan. The Second Lien Administrative Agent will cooperate with the Debtors as necessary to effectuate the distributions to the holders of Class 4 Claims who have elected to receive Stock under the Plan, including, without limitation, providing all necessary identifying information of such holders. On the Effective Date, the Debtors will pay all reasonable out-of-pocket expenses of the Second Lien Administrative Agent, including reasonable professionals' fees, incurred through the Effective Date of the Plan.

No fractional shares of Stock will be distributed under this Plan. To the extent any holder of a Claim would be entitled to receive a fractional share of Stock hereunder, the Debtors will round upward the number of shares due to that holder to the nearest whole share.

The Debtors, the Reorganized Debtors and the Second Lien Administrative Agent, as applicable, will only be required to act and make distributions in accordance with the terms of the Plan. Such parties will have no (A) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (B) obligation or liability for distributions under the Plan to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or who does not otherwise comply with the terms of the Plan.

#### 2. Undeliverable Distributions

- **Holding of Undeliverable Distributions**

The Reorganized Debtors and the Second Lien Administrative Agent will make one attempt to make the distributions contemplated hereunder in accordance with the procedures set forth herein. Any distributions returned to the Reorganized Debtors, including such distributions returned to the Reorganized Debtors by the Second Lien Administrative Agent, or distributions that are otherwise undeliverable, will remain in the possession of the applicable Reorganized Debtor until such time as (1) the Claim becomes available for distribution or (2) such Claim holder has waived the right to recovery under Section 6.2.2.b of the Plan.

- **Failure to Claim Undeliverable Distributions**

Any holder of an undeliverable distribution that does not assert a claim to such holder's distribution in writing so that it is received by the Debtors at the address set forth in Section 9.3.1 of the Plan within 180 days after the Effective Date will have its claim for such undeliverable distribution discharged and will be forever barred from asserting any such claim against the Reorganized Debtors or their respective property.

## C.    Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Debtors and the Reorganized Debtors (or their disbursing agent) will comply with all Tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. Each of the Debtors and Reorganized Debtors (or their disbursing agent), as applicable, will be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

Notwithstanding any other provision of the Plan, each entity receiving a distribution pursuant to the Plan will have the sole and exclusive responsibility for the satisfying and paying of any Tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding and other Tax obligations.

## D.    Distribution Record Date

As of the Distribution Record Date, the transfer registers for Second Lien Claims will be closed. The Debtors will have no obligation to recognize the transfer or sale of any Second Lien Claim that occurs after the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders who are holders of such Claims on the Distribution Record Date.

Except as otherwise provided in a Final Order , the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

## E.    Surrender of Canceled Instruments

As a condition precedent to receiving any distribution pursuant to the Plan on account of a Second Lien Claim, the holder of such Claim must tender to the Debtors, or Reorganized Debtors, as applicable, the applicable instruments evidencing such Claim or an affidavit of loss and indemnity satisfactory to the Debtors, or Reorganized Debtors, in their sole discretion, together with any letter of transmittal required by the Debtors, or Reorganized Debtors. Pending such surrender, any distributions pursuant to the Plan on account of such Second Lien Claim will be treated as an undeliverable distribution pursuant to Section 6.2.2 of the Plan. Any holder of a Second Lien Claim that fails to surrender or is deemed not to have surrendered the applicable instruments within 90 days after the Effective Date will have its right to distributions pursuant to

the Plan on account thereof discharged and will be forever barred from asserting any such Claim against the Reorganized Debtors or their respective property. In such case, any property held for distribution on account thereof will be treated pursuant to the provisions set forth in Section 6.2.2.b of the Plan.

### F.  Setoffs

Except with respect to claims of a Debtor or Reorganized Debtor expressly released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Claim and the payments or distributions to be made on account of the Claim the claims, rights and causes of action of any nature that the applicable Debtor or Reorganized Debtor may hold against the holder of the Claim; provided, however, that the failure to effect a setoff will not constitute a waiver or release by the applicable Debtor or Reorganized Debtor of any claims, rights and causes of action that the Debtor or Reorganized Debtor may possess against the Claim holder.

### G.  Disputed Claims

Except as provided for in the Plan with respect to holders of rejection damage claims under Executory Contracts or Unexpired Leases, holders of Claims will not be required to file a proof of Claim, and no parties should file a proof of Claim. The Debtors do not intend to object to the allowance of such Filed Claims, although they reserve the right to do so. The Debtors intend to make distributions to holders of Claims entitled to a distribution of property under the Plan as provided in the Plan, or as otherwise agreed by the Debtors and the applicable holders of such Claims. Holders of Claims Reinstated pursuant to the Plan as well as holders of Claims in Classes 1 and 6, and Priority Tax Claims, will be paid or otherwise resolved in the ordinary course of business, as provided herein. Although the Debtors intend to resolve any disputes regarding the amount of all Claims consensually or through judicial means outside the Bankruptcy Court, the Debtors nevertheless may, in their discretion, file with the Bankruptcy Court any motion or adversary proceeding to determine the amount of any Claim.

The Debtors or the Reorganized Debtors, as applicable, will have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims. The Debtors and the Reorganized Debtors may resolve, settle, compromise and pay any Claims in Classes 1 and 6, Priority Tax Claims, or Claims Reinstated hereunder in the ordinary course of business without approval of the Bankruptcy Court.

### H.  Allocation Between Principal and Accrued Interest

To the extent applicable, all distributions to a holder of a Second Lien Claim will apply first to the principal amount of such Second Lien Claim until such principal amount is paid in full and then to any interest accrued on such Second Lien Claim as of the Petition Date and thereafter, to the extent the Debtors' Estates are sufficient to satisfy such principal and interest accrued as of the Petition Date, to any interest accrued on such Second Lien Claim from the Petition Date through the Effective Date, until paid in full.

## XIII.  ADMINISTRATIVE CONSOLIDATION AND CASE CLOSING

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration the rights of holders of Claims and Interests, whether arising under contract, law or equity, that a holder of a Claim or Interest may have against each of the Debtors.  Holders of Claims or Interests against more than one Debtor are classified in consolidated classes of Claims against and Interests in all Debtors for administrative convenience with respect to voting and the making of distributions on account of Claims and Interests pursuant to the Plan.  The Confirmation Order will approve this administrative consolidation.

Such administrative consolidation will not affect:  (1) the legal and corporate structures of the Debtors; (2) pre- and post-Effective Date guarantees, liens and security interests that are required to be maintained (a) in connection with contracts or leases that were entered into during the Chapter 11 Cases or Executory Contracts and Unexpired Leases that have been or will be assumed or (b) pursuant to the Plan (including with respect to Reinstated Claims); (3) Interests between and among the Debtors; (4) distributions from any insurance policies or proceeds of such policies; or (5) the revesting of assets in the separate Reorganized Debtors.  In addition, such administrative consolidation will not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code.

The Plan serves as a motion seeking entry of an order consolidating the Estates for administrative purposes only, as set forth above and the closing of the Chapter 11 Cases for the Subsidiary Debtors.  Unless an objection to such consolidation or case closing is made in writing by any creditor affected by the Plan, filed with the Bankruptcy Court and served on the Notice Parties on or before the Plan objection deadline as established by the Bankruptcy Court, the consolidation and case closing order (which may be the Confirmation Order) may be entered by the Bankruptcy Court.  In the event any such objections are timely filed, a hearing with respect thereto will occur at or before the Confirmation Hearing.

## XIV.  FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

### A.  General

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW.  THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE (THE "IRC"), TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT.  CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN IMPORTANT RESPECTS, UNCERTAIN.  NO RULING HAS

BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "<u>IRS</u>"); NO OPINION HAS BEEN REQUESTED FROM DEBTORS' COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.  FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX EXEMPT ORGANIZATIONS AND NON-U.S. TAXPAYERS.  IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL OR NON-U.S. TAX CONSEQUENCES.

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST.  HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER OF A CLAIM OR AN INTEREST IS HEREBY NOTIFIED THAT (1) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM OR AN INTEREST FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER OF A CLAIM OR AN INTEREST UNDER THE INTERNAL REVENUE CODE; (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN; AND (3) A HOLDER OF A CLAIM OR AN INTEREST SHOULD SEEK ADVICE BASED UPON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

B.     U.S. Federal Income Tax Consequences to the Debtors

The Debtors had consolidated net operating loss carryforwards ("<u>NOLs</u>") for U.S. federal income tax purposes of approximately $311.6 million as of September 30, 2009.

As discussed below, the Debtors' NOLs may be significantly reduced or eliminated and their other tax attributes reduced as a result of the Plan.  In addition, an "ownership change" would limit the Reorganized Debtors' use of any surviving NOLs, and possibly any built-in losses.

1.     Cancellation of Debt Income

Generally, the discharge of a debt by a debtor for an amount less than its adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of indebtedness ("<u>COD</u>") income.  Satisfaction of the Second

Lien Claims with Cash or Stock of Reorganized Holdings will generate COD income of approximately $233 million. The modifications to the first lien term loan and revolver effected by the Amended and Restated Credit Agreement could also result in the Debtors' realization of COD income if the first lien debt, modified or unmodified, is "publicly traded" within the meaning of the applicable Treasury Regulations, in which event the amount of COD income triggered would depend on the trading prices for the first lien debt.

A bankruptcy debtor can generally exclude COD income from its taxable income if the related discharge is granted pursuant to a plan of reorganization approved by the court. The Plan, if approved, will enable the Debtors to exclude their COD income on the basis of this exclusion.

If a bankruptcy debtor excludes COD income, however, it must reduce its tax attributes. Tax attributes subject to reduction include: (a) NOLs; (b) most credit carryforwards, including the general business credit and the minimum tax credit; (c) capital losses and capital loss carryforwards; (d) the tax basis of the debtor's depreciable and nondepreciable assets, but not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the aggregate of the debtor's liabilities immediately after the discharge; and (e) foreign tax credit carryforwards. A debtor may elect to avoid the prescribed order of attribute reduction and instead reduce the basis of certain property first.

In the case of affiliated corporations filing a consolidated return (such as the Debtors), the attribute reduction rules apply first to the separate attributes of or allocable to the particular corporation whose debt is being discharged, and then, if necessary, to certain attributes of other members of the group. Accordingly, COD income of a debtor would result first in the reduction of any consolidated NOLs and other attributes, including asset basis, attributable to such debtor, and then, if necessary, of consolidated NOLs attributable to other members of the consolidated group, after use of any such NOLs to determine the consolidated group's taxable income for the tax year in which the debt is discharged.

As an alternative to exclusion and attribute reduction, taxpayers realizing COD income in 2009 or 2010 may elect to recognize it ratably over a five-year period beginning in 2014 and ending in 2018. This election may be made on a debt-by-debt basis. The Debtors have not yet determined whether they will elect to defer their COD income under this new provision or instead have the exclusion and attribute reduction rules described above apply.

### 2. Interest and Original Issue Discount Under the Amended and Restated Credit Agreement

The interest payable in cash under the Amended and Restated Credit Agreement will constitute payments of qualified stated interest ("QSI") and will be deductible by the Debtors as accrued.

The obligations under the Amended and Restated Credit Agreement will also be treated as being issued with original issue discount ("OID"). In general, OID is the excess, if any, of all payments due under the debt instrument other than QSI over the instrument's "issue price." If the issue price of the obligations under the Amended and Restated Credit Agreement is their principal amount, the obligations will have OID equal to the aggregate amount of PIK interest

payable over the term of the obligations. If the First Lien Term Loan Claims and/or First Lien Revolver Claims, or the obligations under the Amended and Restated Credit Agreement, are publicly traded, and if they trade at a discount to their face amounts, the obligations will have additional OID in an amount equal to the discount. In either event, the Debtors will generally be allowed to deduct OID over the term of the instrument in advance of the Debtors' payment of the cash constituting that interest.

Notwithstanding the foregoing, the extension fee potentially payable under the Amended and Restated Credit Agreement may subject the associated obligations to the rules applicable to "contingent payment debt instruments" (discussed below in Section XIV.C.2.b with respect to holders of First Lien Term Loan Claims and/or First Lien Revolver Claims).

### 3. Limitation on NOL Carryforwards

Section 382 of the IRC limits the amount of NOLs a corporate taxpayer can utilize in the years following an "ownership change." An ownership change generally is defined as a cumulative owner shift, among the corporation's 5% or greater shareholders, of more than 50% over a three-year testing period. The Debtors do not expect that the satisfaction of the Second Lien Claims with Stock of Reorganized Holdings or the issuance of Stock of Reorganized Holdings pursuant to the Rights Offering will themselves cause an ownership change. However, the owner shifts attributable to the exchange and Rights Offering could combine with owner shifts that occur after effectiveness of the Plan to produce an ownership change. In addition, a worthless stock deduction claimed by a 50% or greater shareholder that retains its interest in the Debtors would cause an ownership change.

If an ownership change were to occur, any Debtor NOLs that survived the attribute reduction described in the previous section would be subject to an annual limitation on use equal to the product of the Debtors' stock value (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate" announced by the IRS (4.14% for ownership changes occurring in January 2010). Any unused portion of the annual limitation generally would be available for use in subsequent years. The annual limitation would be increased if the Debtors have net unrealized built-in gains (i.e., gains economically accrued but unrecognized at the time of the ownership change) in excess of a threshold amount. A correlative rule would apply if the Debtors have net unrealized built-in losses (i.e., losses economically accrued but unrecognized as of the date of the ownership change) in excess of a threshold amount and limit their ability to deduct their built-in losses (in addition to their NOLs) following an ownership change. It is not certain whether the Debtors will be in a net unrealized built-in gain position or a net unrealized built-in loss position as of the Effective Date.

### 4. Alternative Minimum Tax

In general, a U.S. federal alternative minimum tax ("<u>AMT</u>") is imposed on a corporation's alternative minimum taxable income ("<u>AMTI</u>") at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation might otherwise be able to offset all of its taxable income for regular U.S.

federal income tax purposes by available NOLs, a corporation is generally entitled to offset no more than 90% of its AMTI with NOLs (as recomputed for AMT purposes). Accordingly, usage of the Debtors' NOLs by the Reorganized Debtors may be subject to limitations for AMT purposes in addition to any other limitations that may apply.

In addition, if a corporation (or a consolidated group) undergoes an ownership change and is in a net unrealized built-in loss position on the date of the ownership change, the corporation's (or group's) aggregate tax basis in its assets may be reduced for certain AMT purposes to reflect the fair market value of such assets as of the ownership change date. Accordingly, if the Debtors are in a net unrealized built-in loss position on the Effective Date, for AMT purposes the tax benefits attributable to basis in assets may be reduced.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

### 5. Accrued Interest

To the extent that the consideration issued to holders of Claims pursuant to the Plan is attributable to accrued but unpaid interest, the Debtors should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the Debtors have not already deducted such amount. The Debtors should not have COD income from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that the payment of such interest would have given rise to a deduction.

### C. U.S. Federal Income Tax Consequences to Holders of Claims

### 1. In General

The federal income tax consequences of the Plan to a holder of a Claim will depend, in part, on whether the Claim constitutes a "tax security" for federal income tax purposes, what type of consideration was received in exchange for the Claim, whether the holder reports income on the accrual or cash basis, whether the holder has taken a bad debt deduction or worthless security deduction with respect to the Claim and whether the holder receives distributions under the Plan in more than one taxable year.

There is no precise definition of the term "security" under the federal income tax law. Rather, all facts and circumstances pertaining to the origin and character of a claim are relevant in determining whether it is a security. Nevertheless, courts generally have held that a debt instrument having a term of less than five years will not be considered a tax security, while corporate debt evidenced by a written instrument and having an original maturity of ten years or more will be considered a tax security. It is uncertain whether the First Lien Term Loan Claims, the First Lien Revolver Claims, the Second Lien Claims, or the obligations under the Amended and Restated Credit Agreement will be considered securities for U.S. federal income tax purposes, and holders are advised to consult their tax advisors with respect to this issue.

2.    **Holders of First Lien Term Loan Claims and First Lien Revolver Claims (Class 2 and Class 3)**

a.    Deemed Exchange of First Lien Term Loan Claims and/or First Lien Revolver Claims for Obligations Under Amended and Restated Credit Agreement

The Amended and Restated Credit Agreement will effect a "significant modification" (as defined under applicable Treasury Regulations) of the first lien term loan and revolver, such that for U.S. federal income tax purposes a holder of First Lien Term Loan Claims and/or First Lien Revolver Claims will be deemed to exchange those Claims for obligations under the Amended and Restated Credit Agreement.

If a holder's First Lien Term Loan Claims and/or First Lien Revolver Claims are treated as securities, and the obligations under the Amended and Restated Credit Agreement are treated as securities, then the exchange of such Claims for such obligations should be treated as a tax-free recapitalization under the IRC.  In general, the holder should as a result recognize neither gain nor loss on the exchange, except that the holder may recognize interest income to the extent of accrued but unpaid interest on the First Lien Term Loan Claims and/or First Lien Revolver Claims.  The holder's tax basis in the obligations under the Amended and Restated Credit Agreement received should equal the holder's tax basis in the First Lien Term Loan Claims and/or First Lien Revolver Claims deemed to have been exchanged for them, and the holder's holding period for the obligations under the Amended and Restated Credit Agreement received should include the holder's holding period for the Claims deemed exchanged, except that the tax basis of any portion of the obligations under the Amended and Restated Credit Agreement treated as received in satisfaction of accrued interest should equal the amount of that accrued interest, and the holding period for such portion should not include the holder's holding period for the First Lien Term Loan Claims and/or First Lien Revolver Claims.

If a holder's First Lien Term Loan Claims and/or First Lien Revolver Claims are not treated as securities, or the obligations under the Amended and Restated Credit Agreement are not treated as securities, the holder should be treated as exchanging those Claims for obligations under the Amended and Restated Credit Agreement in a fully taxable exchange.  In that case, the holder should recognize gain or loss equal to the difference between (1) the issue price as of the Effective Date of the obligations under the Amended and Restated Credit Agreement received (except to the extent allocable to any Claim for accrued but unpaid interest) and (2) the holder's tax basis in the First Lien Term Loan Claims and/or First Lien Revolver Claims surrendered (other than any Claims for accrued but unpaid interest).  If the obligations under the Amended and Restated Credit Agreement are considered "publicly traded" within the meaning of applicable Treasury Regulations, the issue price for this purpose should be the fair market value of the obligations received.  If the obligations under the Amended and Restated Credit Agreement are not considered "publicly traded" within the meaning of applicable Treasury Regulations, the issue price should be the stated principal amount of those obligations (i.e., the aggregate amount of all payments due under those obligations, excluding stated interest).

In general, any such gain or loss should be long-term capital gain or loss if the First Lien Term Loan Claims and/or First Lien Revolver Claims constitute capital assets in the hands of

that holder and the holder has held those Claims for more than one year, unless the holder had previously claimed a bad debt or worthless securities deduction or the holder had accrued market discount (discussed below) with respect to those Claims. There are limitations on the deductibility of losses applicable to both corporate and noncorporate taxpayers that should be considered by each holder in consultation with its tax advisor. The holder's tax basis in the obligations under the Amended and Restated Credit Agreement should equal the issue price of those obligations (as set forth in the preceding paragraph) as of the Effective Date. The holder's holding period for the obligations under the Amended and Restated Credit Agreement should begin on the day following the Effective Date.

b.      Interest and Certain Other Payments Under the Amended and Restated Credit Agreement

The interest payable in cash under the Amended and Restated Credit Agreement will constitute payments of QSI and will generally be taxable to a holder of obligations under the Amended and Restated Credit Agreement as ordinary income at the time the payments are received or accrued, in accordance with the holder's regular method of tax accounting.

The obligations under the Amended and Restated Credit Agreement will also be treated as being issued with OID. As discussed above, OID is the excess, if any, of all payments due under the debt instrument other than QSI over the instrument's "issue price." If the issue price of the obligations under the Amended and Restated Credit Agreement is their principal amount, the obligations will have OID equal to the aggregate amount of PIK interest payable over the term of the obligations. If the First Lien Term Loan Claims and/or First Lien Revolver Claims, or the obligations under the Amended and Restated Credit Agreement, are publicly traded, and if they trade at a discount to their face amounts, the obligations will have additional OID in an amount equal to the discount. In either event, a holder will be required to recognize OID as ordinary income over the term of the modified first lien debt, generally in advance of the holder's receipt of the cash constituting that interest.

Notwithstanding the foregoing, the extension fee potentially payable under the Amended and Restated Credit Agreement may subject the associated obligations to the rules applicable to "contingent payment debt instruments," in which event a holder would be required to take payments received under the Amended and Restated Credit Agreement into account under one of two methods. If either the First Lien Term Loan Claims and/or First Lien Revolver Claims, or the obligations under the Amended and Restated Credit Agreement, are publicly traded, the holder would be required to use the noncontingent bond method prescribed by section 1.1275-4(b) of the Treasury Regulations. If neither the First Lien Term Loan Claims and/or First Lien Revolver Claims, nor the obligations under the Amended and Restated Credit Agreement, are publicly traded, the holder would be required to use the separate component method prescribed by section 1.1275-4(c) of the Treasury Regulations.

The rules for accruing OID generally, and the noncontingent bond method and the separate component method in particular, are complex. Each holder of First Lien Term Loan Claims and/or First Lien Revolver Claims is urged to consult its tax advisor with respect to the timing of the income recognized on the obligations under the Amended and Restated Credit Agreement.

### 3. Holders of Second Lien Claims (Class 4)

#### a. Exchange of Second Lien Claims for Cash

If a holder of Second Lien Claims elects to receive Cash on account of its Second Lien Claims, the holder should recognize gain or loss equal to the difference between (1) the amount of the Cash received (except to the extent allocable to any Claim for accrued but unpaid interest) and (2) the holder's tax basis in the Second Lien Claims surrendered (other than any Claims for accrued but unpaid interest). In general, any such gain or loss should be long-term capital gain or loss if the Second Lien Claims constitute capital assets in the hands of the holder and the holder has held such Claims for more than one year, unless the holder had previously claimed a bad debt or worthless securities deduction or the holder had accrued market discount (discussed below) with respect to such Claims. There are limitations on the deductibility of losses applicable to both corporate and noncorporate taxpayers that should be considered by each holder in consultation with a tax advisor.

#### b. Exchange of Second Lien Claims for Stock of Reorganized Holdings

If a holder of Second Lien Claims elects to receive Stock of Reorganized Holdings on account of its Second Lien Claims, the holder should be treated as exchanging its Second Lien Claims for Stock of Reorganized Holdings in a fully taxable exchange. The exchange should not be a recapitalization because the second lien debt is an obligation of Holdings' operating subsidiaries, not of Holdings itself; a recapitalization generally involves the exchange of securities in the same corporation.

The holder should recognize gain or loss equal to the difference between (1) the fair market value as of the Effective Date of the Stock of Reorganized Holdings received (except to the extent allocable to any Claims for accrued but unpaid interest) and (2) that holder's tax basis in the Second Lien Claims surrendered (other than any Claims for accrued but unpaid interest). In general, any such gain or loss should be long-term capital gain or loss if the Second Lien Claims constitute capital assets in the hands of that holder and the holder has held such Claims for more than one year, unless the holder had previously claimed a bad debt or worthless securities deduction or the holder had accrued market discount (discussed below) with respect to such Claims. There are limitations on the deductibility of losses applicable to both corporate and noncorporate taxpayers that should be considered by each holder in consultation with a tax advisor. The holder's tax basis in the Stock of Reorganized Holdings received should equal its fair market value as of the Effective Date. The holder's holding period for the Stock of Reorganized Holdings should begin on the day following the Effective Date.

#### c. Participation in Rights Offering

Any Second Lien Lender that elects to participate in the Rights Offering should take a tax basis in the Stock of Reorganized Holdings received as a result of such participation in an amount equal to the amount of Cash contributed by that Second Lien Lender on account of its participation in the Rights Offering. Any Second Lien Lender that elects to participate in the Rights Offering should generally increase the tax basis in any Stock of Reorganized Holdings

retained (directly or indirectly) as a result of such participation in an amount equal to the amount of Cash contributed by that Second Lien Lender on account of its participation in the Rights Offering.

### 4.    Certain Other Tax Considerations for Holders of Claims

#### a.    Accrued but Unpaid Interest

In general, a Claim holder that was not previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be required to take such amount into income as taxable interest upon receiving a distribution with respect to such interest.  A Claim holder that was previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan.  The Plan provides that, to the extent applicable, all distributions to a holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim as of the Petition Date and thereafter, if any, to the extent the Debtors' Estates are sufficient to satisfy such principal and interest accrued as of the Petition Date, to any interest accrued on such Claim from the Petition Date through the Effective Date, until paid in full.  There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such holder is properly allocable to pre-Petition Date interest.  Each holder of a Claim on which interest has accrued is urged to consult its tax advisor regarding the tax treatment of its distributions under the Plan and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

#### b.    Reinstatement of Claims

Holders of Claims that will be reinstated generally would not recognize gain, loss or other taxable income upon the reinstatement of their Claims under the Plan.  Taxable income, however, may be recognized by those holders if they are considered to receive interest, damages or other income in connection with the reinstatement or if the reinstatement is considered for tax purposes to involve a significant modification of the Claim.

#### c.    Bad Debt and/or Worthless Securities Deduction

A holder who, under the Plan, receives on account of a Claim or Interest an amount less than the holder's tax basis in the Claim or Interest may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the IRC or a worthless securities deduction under section 165 of the IRC.  The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed.  Holders of Claims and/or Interests, therefore, are urged to consult their tax advisors with respect to their ability to take such a bad debt or worthless securities deduction.

#### d.    Market Discount

A holder that acquires a debt instrument at a "market discount" generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of

"accrued market discount" not previously included in income by the holder (i.e., as a result of an election to amortize the market discount into income on a current basis). However, special rules apply to the disposition of a market discount instrument in certain types of transactions in which gain or loss is not recognized for U.S. federal income tax purposes, such as tax-free recapitalizations.

e.  Information Reporting and Backup Withholding

All distributions under the Plan will be subject to applicable U.S. federal income tax reporting and withholding. The IRC imposes "backup withholding" (currently at a rate of 28%) on certain "reportable" payments to certain taxpayers, including payments of interest. Under the IRC's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional U.S. federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax. A holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

5.  **Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## XV.  APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS

### A.  Solicitation of Votes Prior to Commencement of the Chapter 11 Cases

The Debtors relied on section 4(2) of the Securities Act of 1933, as amended (the "Securities Act"), and, to the extent applicable, Regulation D promulgated thereunder and, with respect to state securities laws, section 18 of the Securities Act, to exempt from the registration requirements of the Securities Act the offer of Stock of Reorganized Holdings to be issued to Second Lien Lenders and the Equity Investors pursuant to the Plan and the Rights Offering. In the Shareholders' Agreement, each purchaser of Stock is required to make certain representations on which the Debtors will rely to confirm the availability of these exemptions from registration.

## B. Post-Commencement Offers and Sales Pursuant to Section 1145 of the Bankruptcy Code

### 1. Initial Offer and Sale of Stock

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state securities laws if three principal requirements are satisfied: (1) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (2) the recipients of the securities must hold a claim against, or an interest in, the debtor or such affiliate; and (3) the securities must be issued entirely in exchange for the recipient's claims against or interests in the debtor, or principally in such exchange and partly in exchange for cash or property.  In addition, section 1145(a)(2) of the Bankruptcy Code exempts the offer of a security through any warrant, option, right to purchase or conversion privilege that is sold in the manner specified in section 1145(a)(1) of the Bankruptcy Code and the sale of a security upon the exercise of such a warrant, option, right or privilege.  The Debtors believe that the offer and sale of the Stock under the Plan satisfy the requirements of section 1145 of the Bankruptcy Code and, therefore, are exempt from registration under the Securities Act and state securities laws.

### 2. Resales of Stock

The Shareholders' Agreement generally prohibits the resale of Stock received pursuant to the Plan or purchased in the Rights Offering, subject to certain exemptions.  Even if the exemptions apply, resales of Stock are subject to compliance with certain restrictions imposed under the securities laws.  The shares of Stock of Reorganized Holdings issued pursuant to the exercise of rights in the Rights Offering or pursuant to the backstop commitment will be "restricted securities" within the meaning of Rule 144 under the Securities Act and may not be resold without registration under the Securities Act unless resold pursuant to an exemption from registration.  In general, resales and subsequent transactions in the Stock will be exempt from registration under the Securities Act pursuant to section 4(1) of the Securities Act, unless the holder thereof is deemed to be an "underwriter" with respect to such securities, an "affiliate" of the issuer of such securities or a "dealer."  In general, there are four types of "underwriters":

- persons who purchase a claim against, an interest in, or a claim for administrative expense against the debtor with a view to distributing any security received in exchange for such a claim or interest ("accumulators");

- persons who offer to sell securities offered under a plan for the holders of such securities ("distributors");

- persons who offer to buy securities from the holders of such securities, if the offer to buy is (1) with a view to distributing such securities and (2) made under a distribution agreement; and

- a person who is an "issuer" with respect to the securities, any "affiliate" of the issuer (which means any person directly or indirectly through one or more

intermediaries controlling, controlled by or under common control with the issuer) or any "dealer" (meaning a person who engages either for all or part of such person's time, directly or indirectly, as agent, broker or principal in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person).

Whether or not any particular person would be deemed to be an "underwriter," an "affiliate" or a "dealer" depends upon various facts and circumstances applicable to that person. Second Lien Lenders should consult their own counsel with respect to these matters.

In connection with prior bankruptcy cases, the staff of the SEC has indicated that, depending on the circumstances, resales by accumulators and distributors of securities distributed under a plan of reorganization could be exempt from registration under the Securities Act if they are effected in "ordinary trading transactions." The SEC staff has indicated in this context that a transaction may be considered an "ordinary trading transaction" if it is made on an exchange or in the over-the-counter market and does not involve any of the following factors:

- either (1) concerted action by the recipients of securities issued under a plan in connection with the sale of such securities or (2) concerted action by distributors on behalf of one or more such recipients in connection with such sales;

- the use of informational documents concerning the offering of the securities prepared or used to assist in the resale of such securities, other than a bankruptcy court-approved disclosure statement and supplements thereto and documents filed with the SEC pursuant to the Securities Exchange Act of 1934, as amended; or

- the payment of special compensation to brokers and dealers in connection with the sale of such securities designed as a special incentive to the resale of such securities (other than the compensation that would be paid pursuant to arm's-length negotiations between a seller and a broker or dealer, each acting unilaterally, not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer).

In addition, for any "affiliate" of an issuer deemed to be an underwriter, Rule 144 under the Securities Act provides an exemption from registration under the Securities Act for certain limited public resales of unrestricted securities.

**THE DEBTORS HAVE NOT SOUGHT THE VIEW OF THE SEC ON THIS MATTER AND, THEREFORE, NO ASSURANCE CAN BE GIVEN REGARDING THE PROPER APPLICATION OF THE "ORDINARY TRADING TRANSACTION" EXEMPTION DESCRIBED ABOVE. ANY PERSONS INTENDING TO RELY ON SUCH EXEMPTION ARE URGED TO CONSULT THEIR OWN COUNSEL AS TO THE APPLICABILITY THEREOF TO ANY PARTICULAR CIRCUMSTANCES, AS WELL AS THE RESTRICTIONS ON TRANSFER INCLUDED IN THE SHAREHOLDERS' AGREEMENT TO WHICH ALL STOCKHOLDERS MUST BECOME PARTIES.**

### 3. Subsequent Transfers Under State Law

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the Stock.

## XVI. ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof.

## XVII. RECOMMENDATION AND CONCLUSION

The Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all holders of Claims in Classes 2, 3 and 4 to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

**[Remainder of Page Intentionally Left Blank]**

Dated:  February 4, 2010

Respectfully submitted,

PENTON BUSINESS MEDIA HOLDINGS, INC, on its own behalf and on behalf of each affiliate Debtor


By:     _____/s/ Sharon Rowlands_____
Name:  Sharon Rowlands
Title:   Chief Executive Officer

COUNSEL:

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Lisa G. Laukitis (NY I.D. LG 9248)

- and -

JONES DAY
77 West Wacker
Chicago, Illinois  60603
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
Brad B. Erens (IL I.D. 6206864)
Robert E. Krebs (IL I.D. 6277819)
David A. Hall (IL I.D. 6280151)

PROPOSED ATTORNEYS FOR DEBTORS

**DISCLOSURE STATEMENT EXHIBIT I**

**JOINT PREPACKAGED PLAN OF REORGANIZATION
OF PENTON BUSINESS MEDIA HOLDINGS, INC. AND ITS DEBTOR SUBSIDIARIES**

CHI-1738748v2

**IMPORTANT:  A BANKRUPTCY CASE HAS NOT BEEN COMMENCED
AS OF THE DATE OF THE DISTRIBUTION OF THIS DOCUMENT**

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ----------------------------------------------------------------- x | | Chapter 11 |
| | : | |
| In re | : | Case No. 10-_____ (___) |
| | : | |
| PENTON BUSINESS MEDIA HOLDINGS, INC., et al., | : | (Jointly Administered) |
| | : | |
| Debtors. | : | |
| | : | |
| | : | |
| ----------------------------------------------------------------- x | | |

**Penton Business Media Holdings, Inc.
Penton Media, Inc.
Penton Business Media, Inc.
Duke Investments, Inc.
Duke Communications International, Inc.
DVGM & Associates
Internet World Media, Inc.
Penton Business Media Internet, Inc.
Penton Business Media Publications, Inc.**

**FIRST AMENDED JOINT PREPACKAGED PLAN
OF REORGANIZATION OF PENTON BUSINESS
MEDIA HOLDINGS, INC. AND ITS DEBTOR
SUBSIDIARIES**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Lisa G. Laukitis (NY I.D. LG 9248)

- and -

JONES DAY
77 West Wacker
Chicago, Illinois  60603
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
Brad B. Erens (IL I.D. 6206864)
Robert E. Krebs (IL I.D. 6277819)
David A. Hall (IL I.D. 6280151)

February 4, 2010

PROPOSED ATTORNEYS FOR DEBTORS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION AND
   COMPUTATION OF TIME ................................................................. 1
  1.1 Defined Terms ........................................................................... 1
  1.2 Rules of Interpretation and Computation of Time ................................. 9

ARTICLE II. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........ 9
  2.1 Unclassified Claims ..................................................................... 10
  2.2 Classified Claims and Interests ........................................................ 11
  2.3 Special Provisions Regarding the Treatment of Secondary Liability
    Claims; Maximum Recovery ........................................................... 13
  2.4 Postpetition Interest on Claims ........................................................ 13

ARTICLE III. MEANS FOR IMPLEMENTATION OF THE PLAN ............................... 14
  3.1 Rights Offering, Second Lien Lender Equity Elections and Revolving
    Commitments ............................................................................ 14
  3.2 Continued Corporate Existence and Vesting of Assets in the Reorganized
    Debtors ................................................................................... 15
  3.3 Corporate Governance, Directors and Officers, Employment-Related
    Agreements and Compensation Programs; Other Agreements ..................... 15
  3.4 Assumption of Pension Plans; Retiree Welfare Benefits ........................... 17
  3.5 Preservation of Rights of Action; Settlement of Claims and Releases ............ 17
  3.6 Reinstatement and Continuation of Insurance Policies ............................ 19
  3.7 Cancellation of Instruments, Securities and Other Documentation .............. 19
  3.8 Effectuating Documents; Further Transactions; Exemption from Certain
    Transfer Taxes .......................................................................... 19

ARTICLE IV. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN;
    EFFECT OF CONFIRMATION ......................................................... 20
  4.1 Conditions Precedent to the Effective Date ......................................... 20
  4.2 Waiver of Conditions to the Effective Date .......................................... 20
  4.3 Effect of Nonoccurrence of Conditions to the Effective Date ..................... 20
  4.4 Discharge of Claims .................................................................... 21
  4.5 Injunctions .............................................................................. 21
  4.6 Exculpation .............................................................................. 21
  4.7 Termination of Certain Subordination Rights ....................................... 22
  4.8 Dissolution of Any Creditors' Committee ........................................... 22

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
    LEASES .................................................................................. 22
  5.1 Executory Contracts and Unexpired Leases to Be Assumed ...................... 22
  5.2 Payments Related to the Assumption of Executory Contracts and
    Unexpired Leases ....................................................................... 23
  5.3 Contracts and Leases Entered Into After the Petition Date ........................ 23

5.4     Rejection of Executory Contracts and Unexpired Leases .................................... 24
5.5     Pre-existing Obligations to the Debtors Under Executory Contracts and
        Unexpired Leases................................................................................................. 24
5.6     Bar Date for and Payment of Rejection Damages................................................ 24
5.7     Obligations to Insure and Indemnify Directors, Officers and Employees .......... 24

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 25

6.1     Distributions for Claims as of the Effective Date ............................................... 25
6.2     Delivery of Distributions and Undeliverable or Unclaimed Distributions to
        Holders of Claims in Class 4 .............................................................................. 25
6.3     Compliance with Tax Requirements .................................................................... 26
6.4     Distribution Record Date...................................................................................... 26
6.5     Surrender of Canceled Instruments ..................................................................... 27
6.6     Setoffs................................................................................................................... 27
6.7     Disputed Claims ................................................................................................... 27
6.8     Allocation Between Principal and Accrued Interest ............................................ 28

ARTICLE VII. ADMINISTRATIVE CONSOLIDATION; CLOSING OF SUBSIDIARY
        CASES................................................................................................................... 28

ARTICLE VIII. RETENTION OF JURISDICTION ................................................................ 29

ARTICLE IX. MISCELLANEOUS PROVISIONS................................................................... 30

9.1     Modification of the Plan....................................................................................... 30
9.2     Successors and Assigns........................................................................................ 30
9.3     Service of Documents .......................................................................................... 31

## TABLE OF EXHIBITS[1]

Exhibit I            Amended and Restated Credit Agreement

Exhibit II           Equity Commitment Letter

Exhibit III          Shareholders' Agreement

Exhibit IV           Interest Rate Hedge Waiver

Exhibit V            Form of Management Incentive Plan

---

[1]     The Debtors reserve the right to modify, amend, supplement, restate or withdraw any of the Exhibits; provided,
        however, that Exhibits I, II, III, IV and VI shall not be modified, amended, supplemented, restated or
        withdrawn without the prior written consent of the First Lien Administrative Agent.

Exhibit VI        Lock-Up Agreement

Exhibit VII       Certificate of Incorporation (or Comparable Constituent Documents) of
                  Reorganized Holdings and Form for Reorganized Subsidiary Debtors

Exhibit VIII      Bylaws (or Comparable Constituent Documents) of Reorganized Holdings
                  and Form for Reorganized Subsidiary Debtors

Exhibit IX        Initial Directors and Officers of Reorganized Holdings and Each
                  Reorganized Subsidiary Debtor

Exhibit X         Executory Contracts and Unexpired Leases to Be Rejected

# INTRODUCTION

Penton Business Media Holdings, Inc., a Delaware corporation ("Holdings") and the other above-captioned debtors (collectively, the "Debtors") propose the following joint prepackaged Plan of reorganization pursuant to section 1121(a) of title 11 of the Bankruptcy Code (as defined below) for the resolution of the outstanding claims against and equity interests in the Debtors.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code (as defined below).  Reference is made to the Disclosure Statement (as defined below) distributed contemporaneously herewith, for a discussion of the Debtors' history, business and projections, and for a summary and analysis of the Plan.  There also are other agreements and documents, which will be filed with the Bankruptcy Court (as defined below), that are referenced in the Plan or the Disclosure Statement and that will be available for review.

ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019 AND IN THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION
## AND COMPUTATION OF TIME

### 1.1     Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.      **"Administrative Claim"** means a Claim against a Debtor or its Estate arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration in the Chapter 11 Cases that is entitled to priority or superpriority under sections 364(c)(1), 503(b), 503(c), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, all reasonable fees and expenses incurred by the First Lien Administrative Agent's Professionals and the Second Lien Administrative Agent's Professionals.

2.      **"Amended and Restated Credit Agreement"** means the Amended and Restated Credit Agreement attached hereto as Exhibit I.

3.      **"Bankruptcy Code"** means title 11 of the United States Code, as now in effect or hereafter amended, as applicable to the Chapter 11 Cases.

4.      **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York.

5.       **"Bankruptcy Rules"** means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

6.       **"Business Day"** means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

7.       **"Cash"** means legal tender of the United States of America and equivalents thereof.

8.       **"Chapter 11 Cases"** means the cases commenced under chapter 11 of the Bankruptcy Code by the Debtors in the Bankruptcy Court.

9.       **"Claim"** means a claim (as defined in section 101(5) of the Bankruptcy Code) against a Debtor, including an Administrative Claim.

10.       **"Class"** means a class of Claims or Interests, as described in Article II.

11.       **"Confirmation"** means the entry of the Confirmation Order on the docket of the Bankruptcy Court.

12.       **"Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

13.       **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

14.       **"Creditors' Committee"** means the statutory official committee of unsecured creditors, if any, that may be appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as such committee may be reconstituted from time to time.

15.       **"Debtors"** shall have the meaning assigned to such term in the introductory paragraph of the Plan.

16.       **"Disclosure Statement"** means the First Amended Disclosure Statement of First Amended Joint Prepackaged Plan of Reorganization for Penton Business Media Holdings, Inc. and its Debtor Subsidiaries, of even date herewith (including all exhibits and schedules thereto or referenced therein), that describes the Plan and has been prepared and distributed by the Debtors, as plan proponents, pursuant to section 1125(g) of the Bankruptcy Code, as the same may be amended, modified or supplemented.

17.       **"Distribution Record Date"** means 5:00 p.m. (New York City Time) on the Confirmation Date.

18.       **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1301-1461.

19.     **"Effective Date"** means a day, as determined by the Debtors, that is the Business Day after all conditions to the Effective Date in Section 4.1 have been met or waived in accordance with Section 4.2.

20.     **"Equity Commitment"** means the commitment of the Equity Investors to provide a backstop to the Rights Offering in a Cash amount of between $38.9 and $51.2 million pursuant to the terms and conditions set forth in the Equity Commitment Letter.

21.     **"Equity Commitment Letter"** means the Equity Commitment Letter attached hereto as Exhibit II.

22.     **"Equity Investors"** means Wasserstein Partners, L.P. or its affiliates and MidOcean Partners III, L.P. or its affiliates.

23.     **"Estate"** means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

24.     **"Executory Contract or Unexpired Lease"** means a contract or lease to which a Debtor is a party that is subject to assumption, assumption and assignment or rejection under section 365 of the Bankruptcy Code, including any modifications, amendments, addenda or supplements thereto.  The term Executory Contract or Unexpired Lease specifically includes any Real Property Executory Contract or Unexpired Lease.

25.     **"Fee Claim"** means a Claim under sections 328, 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation of a Professional or other entity for services rendered or expenses incurred in the Chapter 11 Cases.

26.     **"File"**, **"Filed"** or **"Filing"** means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

27.     **"Final Order"** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a stay, new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari or move for a stay, new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a "Final Order."

28.     **"First Lien Administrative Agent"** means General Electric Capital Corporation, as administrative agent under the First Lien Credit Agreement, and any predecessor or successor thereto.

29.     **"First Lien Credit Agreement"** means the First Lien Credit Agreement, dated as of February 1, 2007, among the Debtors, the First Lien Administrative Agent, and the other First Lien Lenders party thereto, as amended by that certain Consent and Amendment Agreement, dated as of November 24, 2009, that certain Amendment No. 2, dated as of December 23, 2009, that certain Amendment No. 3, dated as of January 15, 2010, that certain Amendment No. 4 dated as of January 29, 2010, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

30.     **"First Lien Lenders"** means, collectively, (a) the First Lien Revolver Lenders and First Lien Term Loan Lenders and (b) any agent or arrangers named in the First Lien Loan Documents, including the First Lien Administrative Agent, and their respective predecessors and permitted successors or assigns.

31.     **"First Lien Loan Documents"** means collectively: (a) the First Lien Credit Agreement, and (b) all Loan Documents (as defined in the First Lien Credit Agreement and as amended, restated, amended and restated, supplemented or otherwise modified from time to time).

32.     **"First Lien Parties"** means the First Lien Lenders, the First Lien Administrative Agent, and any officers, directors, and employees thereof.

33.     **"First Lien Revolver Claim"** means any Claim against a Debtor in respect of a First Lien Revolver Loan advanced to the Debtors under the First Lien Credit Agreement.

34.     **"First Lien Revolver Lenders"** means those parties identified as "Revolving Facility Lenders" under the First Lien Credit Agreement and their respective predecessors and permitted successors and assigns.

35.     **"First Lien Revolver Loans"** means Revolving Facility Loans (as defined in the First Lien Credit Agreement) advanced by the First Lien Revolver Lenders under the First Lien Credit Agreement.

36.     **"First Lien Term Loan Claim"** means any Claim against a Debtor (i) in respect of a First Lien Term Loan advanced to the Debtors under the First Lien Credit Agreement or (ii) evidenced by a Secured Swap Agreement not subject to an Interest Rate Hedge Waiver.

37.     **"First Lien Term Loan Lenders"** means those parties identified as "Term Lenders" under the First Lien Credit Agreement and their respective predecessors and permitted successors and assigns.

38.     **"First Lien Term Loans"** means the Term Loans (as defined in the First Lien Credit Agreement) advanced by the First Lien Term Loan Lenders under the First Lien Credit Agreement.

39.     **"General Unsecured Claim"** means any Claim that is not an Administrative Claim, Priority Claim, Priority Tax Claim, First Lien Revolver Claim, First Lien Term Loan Claim, Second Lien Claim, Other Secured Claim or Intercompany Claim.

CHI-1740947v1

40.     **"Holdings"** shall have the meaning assigned to such term in the introductory paragraph of the Plan.

41.     **"Holdings Equity Interests"** means the Interests in Holdings, other than the Holdings Investor Equity Interests, as of the Effective Date.

42.     **"Holdings Investor Equity Interests"** means the common stock of Holdings held by LLC as of the Effective Date.

43.     **"Intercompany Claim"** means any Claim of any Debtor against another Debtor.

44.     **"Interest"** means the rights of any holder of the Stock of any Debtor and the rights of any entity to purchase or demand the issuance of any of the Stock of any Debtor, including:  (a) redemption, conversion, exchange, voting, participation and dividend rights; (b) liquidation preferences; and (c) stock options and warrants.

45.     **"Interest Rate Hedge Waiver"** means an agreement, in the form attached hereto as Exhibit IV, among the Debtors and any counterparty to a Secured Swap Agreement designated in writing by the Debtors within three business days of the Petition Date pursuant to which such counterparty agrees (1) to waive any defaults and termination rights under such Secured Swap Agreement, including as a result of the Chapter 11 Cases, occurring through the Effective Date and (2) that such Secured Swap Agreement shall remain in full force and effect as of such date.

46.     **"LLC"** means Penton Business Media Holdings, LLC.

47.     **"LLC Shareholders"** means the holders of the common stock of LLC as of the Effective Date or their Permitted Transferees (as defined in the Amended and Restated Stockholders Agreement of LLC dated as of February 1, 2007).

48.     **"Liabilities"** means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Recovery Actions, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction or agreement.

49.     **"Lock-Up Agreement"** means the Restructuring Support Agreement, dated as of January 20, 2010, among the Debtors, certain First Lien Lenders, certain Second Lien Lenders and the Equity Investors, attached hereto as Exhibit VI.

50.     **"Management Incentive Plan"** means a management incentive program for the Debtors, the principal terms of which are set forth as Exhibit V hereto.

51.     **"Non-Investor Second Lien Lender"** means a Second Lien Lender not a party to the Equity Commitment Letter.

52.     **"Notice Parties"** shall have the meaning assigned to such term in Section 2.1.1.c.

CHI-1740947v1

53.     **"Ordinary Course Professionals Order"** means any order entered by the Bankruptcy Court authorizing the Debtors to retain, employ and pay professionals and service providers, as specified in the order, which are not materially involved in the administration of the Chapter 11 Cases.

54.     **"Other Secured Claim"** means a Secured Claim other than a First Lien Revolver Claim, First Lien Term Loan Claim or Second Lien Claim.

55.     **"PBGC"** means the Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation and an agency of the United States that administers the defined benefit pension plan termination insurance program under Title IV of ERISA.

56.     **"Person"** means any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity.

57.     **"Petition Date"** means the date on which the Debtors file their petitions for relief commencing the Chapter 11 Cases.

58.     **"Plan"** means this joint prepackaged plan of reorganization, and all Exhibits attached hereto or referenced herein, as the same may be amended, modified or supplemented.

59.     **"Priority Claim"** means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Claim or a Priority Tax Claim.

60.     **"Priority Tax Claim"** means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

61.     **"Professional"** means any professional employed in the Chapter 11 Cases pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code, or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

62.     **"Real Property Executory Contract or Unexpired Lease"** means, collectively, an Executory Contract or Unexpired Lease relating to a Debtor's interest in real property and any Executory Contract or Unexpired Lease granting rights or interests related to or appurtenant to the applicable real property, including (a) all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement or operating agreements, vault, tunnel or bridge agreements or franchises, development rights, and any other interests in real estate or rights *in rem* related to the applicable real property, and (b) any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such contract or lease.

63.     **"Recovery Actions"** means, collectively and individually, preference actions, fraudulent conveyance actions and other claims or causes of action under sections 510, 544, 545, 546, 547, 548, 549, 550 and 553 of the Bankruptcy Code and other similar state law claims and causes of action.

CHI-1740947v1

64.     **"Reinstated"** means rendering a Claim unimpaired within the meaning of section 1124 of the Bankruptcy Code in the manner chosen by the Debtors.

65.     **"Released Parties"** means, collectively and individually, the Debtors' Representatives, the Creditors' Committee (if any) and its members (solely in their capacity as such), the First Lien Parties, the Second Lien Parties, LLC, the LLC Shareholders, counterparties to an executed Interest Rate Hedge Waiver and the Representatives of each of the foregoing (in each instance, solely in their capacities as such).

66.     **"Reorganized …"** means, when used in reference to a particular Debtor, such Debtor on and after the Effective Date.

67.     **"Representatives"** means, with respect to any entity, any officer, director, affiliate, subsidiary, attorney, advisor, investment banker, financial advisor, accountant or other professional of such entity, in each case in such capacity; <u>provided</u>, <u>however</u>, that with respect to the Debtors only, the foregoing applies to only those "Representatives" serving on or after the Petition Date.

68.     **"Rights Offering"** means a rights offering to the Second Lien Lenders with respect to the Stock of Reorganized Holdings that will be effectuated as set forth in the Equity Commitment Letter.

69.     **"Second Lien Administrative Agent"** means Wells Fargo Bank, N.A. as administrative agent under the Second Lien Credit Agreement, and any predecessor or successor thereto.

70.     **"Second Lien Claims"** means any Claim against a Debtor under, or evidenced by, the Second Lien Credit Agreement.

71.     **"Second Lien Credit Agreement"** means the Second Lien Credit Agreement, dated as of February 1, 2007, among the Debtors, the Second Lien Administrative Agent, and the other Second Lien Lenders party thereto as further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

72.     **"Second Lien Distributions"** means the distributions to Second Lien Lenders under the Plan on account of the Second Lien Claims.

73.     **"Second Lien Lender Elections"** means the elections of Second Lien Lenders to (1) receive either Cash or Stock as their Second Lien Distributions and (2) participate in the Rights Offering, which Second Lien Lender Elections have been made in connection with the Lock-Up Agreement, or, if a Second Lien Lender has not made such election in connection with a Lock-Up Agreement, will be made by a Second Lien Lender on its Plan ballot, or, if no such election is properly and timely made on a Plan ballot, shall be deemed made pursuant to Section 3.1.

74.     **"Second Lien Lenders"** means, collectively, those entities identified as "Lenders" under the Second Lien Loan Documents and their respective predecessors and permitted successors and assigns.

75.     **"Second Lien Loan Documents"** means, collectively: (a) the Second Lien Credit Agreement; and (b) the Loan Documents (as defined in the Second Lien Credit Agreement and as amended, restated, amended and restated, supplemented or otherwise modified from time to time).

76.     **"Second Lien Parties"** means the Second Lien Lenders, the Second Lien Administrative Agent, and any officers, directors and employees thereof.

77.     **"Secondary Liability Claim"** means a Claim that arises from a Debtor being liable as a guarantor of, or otherwise being jointly, severally or secondarily liable for, any contractual, tort, guaranty or other obligation of another Debtor, including any Claim based on: (a) vicarious liability; (b) liabilities arising out of piercing the corporate veil, alter ego liability or similar legal theories; (c) guaranties of collection, payments or performance; (d) indemnity bonds, obligations to indemnify or obligations to hold harmless; (e) performance bonds; (f) contingent liabilities arising out of contractual obligations or out of undertakings (including any assignment or transfer) with respect to leases, operating agreements or other similar obligations made or given by a Debtor or relating to the obligations or performance of another Debtor; (g) several liability of a member of a consolidated (or equivalent) group of corporations for Taxes of other members of the group or of the entire group; or (h) any other joint or several liability, including Claims for indemnification or contribution, that any Debtor may have in respect of any obligation that is the basis of a Claim.

78.     **"Secured Claim"** means a Claim that is secured by a lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code.

79.     **"Secured Swap Agreement"** has the meaning set forth in the First Lien Credit Agreement.

80.     **"Shareholders' Agreement"** means that agreement binding on all holders of the Stock of Reorganized Holdings as of the Effective Date in the form attached as Exhibit III.

81.     **"Stock"** means, when used with reference to a particular Debtor, the common stock, preferred stock, membership interests or partnership interests or similar ownership interests of such Debtor, including options, warrants or rights to acquire or convert any such interests, issued by such Debtor and outstanding immediately prior to the Petition Date.

82.     **"Subsidiary Debtor"** means any Debtor other than Holdings.

83.     **"Subsidiary Debtor Equity Interests"** means, as to a particular Subsidiary Debtor, any Interests in such Debtor.

84.     **"Tax"** means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal,

## 1.2 Rules of Interpretation and Computation of Time

### 1.2.1 Rules of Interpretation

For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan, Confirmation Order or otherwise; (d) any reference to an entity as a holder of a Claim or Interest includes that entity's permitted successors, assigns and affiliates; (e) all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) subject to the provisions of any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to the extent not inconsistent with any other provision of this Section 1.2.1.

### 1.2.2 Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

## ARTICLE II.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in Section 2.1, are not classified herein. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest satisfies the description of that Class and is classified in a Class or Classes to the extent that any remainder of the Claim or Interest satisfies the description of such other Class or Classes.

## 2.1    Unclassified Claims

### 2.1.1    Payment of Administrative Claims

#### a.    Statutory Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash equal to the amount of such Administrative Claims. All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the applicable Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

#### b.    Trade or Other Ordinary Course Liabilities

Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), Administrative Claims arising under Executory Contracts and Unexpired Leases and Administrative Claims which are Intercompany Claims, will be paid by the applicable Reorganized Debtor, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims, without further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court. Holders of the foregoing Administrative Claims will not be required to File or serve any request for payment of such Administrative Claims. Any Administrative Claims that are Filed contrary to this Section shall be deemed disallowed and expunged, subject to their resolution and satisfaction in the ordinary course outside these Chapter 11 Cases.

#### c.    Professional Compensation

Professionals or other entities asserting a Fee Claim for services rendered on or before the Effective Date must File and serve on the parties identified in Section 9.3 (the "Notice Parties") and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 28 days after the Effective Date; provided, however, that any party who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered on or before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order). Objections to any Fee Claim must be Filed and served on the Notice Parties and the requesting party no later than 49 days after the Effective Date. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

CHI-1740947v1

### 2.1.2   Payment of Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of a Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, Cash equal to the amount of such Priority Tax Claim on the later of (i) the Effective Date and (ii) the date on which a Priority Tax Claim would be due and payable in the ordinary course of business.

### 2.2   Classified Claims and Interests

**2.2.1   Class 1 Claims — Priority Claims**.  Unless otherwise agreed by the holder of a Priority Claim and the applicable Debtor or Reorganized Debtor, each holder of a Priority Claim will receive, in full satisfaction of its Priority Claim, Cash equal to the amount of such Priority Claim on the later of (i) the Effective Date and (ii) the date on which a Priority Claim would be due and payable in the ordinary course of business.  Class 1 Claims are unimpaired and will be deemed to have accepted the Plan.

**2.2.2   Class 2 Claims — First Lien Term Loan Claims**.  On the Effective Date, in full settlement of the First Lien Term Loan Claims and all Obligations (as defined in the First Lien Credit Agreement) in respect of the First Lien Term Loans, including all interest accruing during the pendency of the Chapter 11 Cases and all fees, costs and expenses, owing thereunder, the First Lien Term Loan Claims shall be treated as provided for in the Amended and Restated Credit Agreement and other related amended and restated First Lien Loan Documents; including, without limitation, that all interest, fees, expenses and indemnification obligations (including, without limitation, all reasonable fees and expenses incurred by the First Lien Administrative Agent's legal counsel and financial advisor) of the Debtors under the First Lien Loan Documents in respect of the First Lien Term Loans accrued, or otherwise incurred, and outstanding as of the day immediately preceding the Effective Date shall be paid in full on the Effective Date and all Interest Periods (as defined in the First Lien Credit Agreement) shall be reset as of the Effective Date.

All defaults or events of default under the First Lien Loan Documents shall be fully waived as of the Effective Date, and any acceleration of the Obligations (as defined in the First Lien Credit Agreement) due and owing under the First Lien Loan Documents shall be de-accelerated.

As of the Effective Date, each of the First Lien Term Loan Lenders shall be deemed to have executed the Amended and Restated Credit Agreement and the amended and restated First Lien Loan Documents.  Class 2 Claims are impaired under the Plan, and each holder of a Class 2 Claim is entitled to vote on the Plan.

**2.2.3   Class 3 Claims — First Lien Revolver Claims.**  On the Effective Date, in full settlement of the First Lien Revolver Claims, and all Obligations (as defined in the First Lien Credit Agreement) in respect of the First Lien Revolver Loans, including all interest accruing during the pendency of the Chapter 11 Cases and all fees, costs and expenses, owing thereunder, the First Lien Revolver Claims shall be treated as provided for in the Amended and Restated Credit Agreement and other related amended and restated First Lien Loan Documents including, without limitation, that all interest, fees, expenses and indemnification obligations (including, without limitation, all reasonable fees and expenses incurred by the First Lien Administrative Agent's legal counsel and financial

advisor) of the Debtors under the First Lien Loan Documents in respect of the First Lien Revolver Loans accrued, or otherwise incurred, and outstanding as of the day immediately preceding the Effective Date shall be paid in full on the Effective Date and all Interest Periods (as defined in the First Lien Credit Agreement) shall be reset as of the Effective Date.

All defaults or events of default under the First Lien Loan Documents shall be fully waived as of the Effective Date, and any acceleration of the Obligations (as defined in the First Lien Credit Agreement) due and owing under the First Lien Loan Documents shall be de-accelerated.

Pursuant to the Amended and Restated Credit Agreement, on or about the Effective Date, the Rollover Revolving Lenders (as defined in the Amended and Restated Credit Agreement) shall receive a paydown in Cash, without a permanent reduction in the Revolving Facility Commitments (as defined in the Amended and Restated Credit Agreement), in an amount as required in the Amended and Restated Credit Agreement.

Class 3 Claims are impaired under the Plan, and each holder of a Class 3 Claim is entitled to vote on the Plan.

**2.2.4  Class 4 Claims — Second Lien Claims**.  On the Effective Date, in full settlement of the Second Lien Claims, Second Lien Lenders will receive, in accordance with their Second Lien Lender Elections and Section 3.1, Cash or Stock of Reorganized Holdings (valuing such Stock in the same manner as the Stock offered in the Rights Offering) of a value equal to 15% of the principal amount of their Second Lien Claims as of the Petition Date, excluding any accrued but unpaid interest, fees or other charges.  All Class 4 Claims also will be entitled to participate in the Rights Offering pursuant to their Second Lien Lender Elections, and Section 3.1 hereof; provided, however, the Equity Investors shall be deemed to have elected to receive all of their Second Lien Distributions in the form of Stock of Reorganized Holdings.  Class 4 Claims are impaired under the Plan, and each holder of a Class 4 Claim is entitled to vote on the Plan.

**2.2.5  Class 5 Claims — Other Secured Claims**.  On the Effective Date, each Other Secured Claim shall be Reinstated.  Class 5 Claims are unimpaired under the Plan, and each holder of a Class 5 Claim shall be deemed to have accepted the Plan.

**2.2.6  Class 6 Claims — General Unsecured Claims**.  Each holder of a General Unsecured Claim, shall receive, in the ordinary course of business and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transaction, Cash in an amount equal to such Claim.  Class 6 Claims are unimpaired under the Plan, and each holder of a Class 6 Claim shall be deemed to have accepted the Plan.

**2.2.7  Class 7 Claims — Intercompany Claims**.  On the Effective Date, Intercompany Claims shall be Reinstated.  Class 7 Claims are unimpaired, and each holder of a Class 7 Claim shall be deemed to have accepted the Plan.

**2.2.8  Class 8 Interests — Subsidiary Debtor Equity Interests**.  On the Effective Date, Subsidiary Debtor Equity Interests shall be Reinstated.  Class 8 Interests are unimpaired under the Plan, and each holder of a Class 8 Interest shall be deemed to have accepted the Plan.

**2.2.9  Class 9 Interests — Holdings Equity Interests**.  On the Effective Date, the Holdings Equity Interests shall be extinguished and no consideration shall be paid or distributed on account of Class 9 Interests.  Each holder of a Class 9 Interest shall be deemed to have rejected the Plan.

**2.2.10  Class 10 Interests — Holdings Investor Equity Interests**.  On the Effective Date, the holders of the Holdings Investor Equity Interests shall, if requested by the Debtors, retain such Interests in lieu of receiving certain Stock in connection with the Second Lien Lender Elections of the LLC Shareholders and the Equity Commitment.  Such retained Interests shall be valued in the same manner as the Stock offered in the Rights Offering.  Otherwise, such Interests shall be extinguished.  Class 10 Interests are impaired under the Plan, but each holder of a Class 10 Interest shall be deemed to have accepted the Plan.

**2.3  Special Provisions Regarding the Treatment of Secondary Liability Claims; Maximum Recovery**

The classification and treatment of Claims under the Plan take into consideration all Secondary Liability Claims.  On the Effective Date, Secondary Liability Claims will be treated as follows:

1.  The Secondary Liability Claims arising from or related to (i) any Claims Reinstated hereunder, or (ii) any Debtor's joint or several liability for the obligations under any Executory Contract or Unexpired Lease that is being assumed or deemed assumed by another Debtor or under any Executory Contract or Unexpired Lease that is being assumed by and assigned to another Debtor will be Reinstated.

2.  Holders of Secondary Liability Claims against any Debtor with respect to Second Lien Claims will be entitled to a single recovery under the Plan in respect of the Liabilities related to such Secondary Liability Claim and will be deemed satisfied in full by the satisfaction of the related underlying Claim pursuant to the Plan.  Notwithstanding the existence of a Secondary Liability Claim, no multiple recovery on account of any Claim against any Debtor will be provided or permitted under the Plan.  Notwithstanding any provision hereof to the contrary, holders of Secondary Liability Claims against a Debtor may not receive in the aggregate from all Debtors more than 100% of the principal amount of the underlying Claim giving rise to such multiple Claims.

**2.4  Postpetition Interest on Claims**

Except with respect to First Lien Revolver Claims and First Lien Term Loan Claims, or as required by applicable bankruptcy law with respect to any Other Secured Claim, postpetition interest shall not be paid on account of any Claim.

CHI-1740947v1

# ARTICLE III.
## MEANS FOR IMPLEMENTATION OF THE PLAN

**3.1     Rights Offering, Second Lien Lender Equity Elections and Revolving Commitments**

In connection with the Plan, the Debtors will effectuate the Rights Offering to all Second Lien Lenders, with an Equity Commitment from the Equity Investors in a Cash amount of between $38.9 and $51.2 million, depending on the Second Lien Lender Elections.

$32.5 million of the proceeds from the Rights Offering (and/or Equity Commitment, as applicable) will be retained by the Debtors for liquidity and to fund transaction costs, while the remainder — between $6.4 and $18.7 million — will be used to fund the Second Lien Distributions made in Cash under the Plan, depending on the Second Lien Lender Elections.  All Stock of Reorganized Holdings received by Second Lien Lenders in connection with the Plan and the Rights Offering, and all stock of Reorganized Holdings retained by the Equity Investors, directly or indirectly, under the Plan, shall be subject to the Shareholders' Agreement.

The Debtors will have the right to cause Class 10 Interest holders either to purchase newly issued shares of Holdings common stock in connection with the Rights Offering or to make capital contributions in respect of presently issued and outstanding shares of common stock (the "Outstanding Shares") if it determines (in its discretion) that so doing is desirable from a structural perspective.  In either such case, the amount paid for newly issued shares of Holdings common stock or contributed in respect of the Outstanding Shares shall be the same so that, giving effect to the transactions herein contemplated, the value paid or contributed in respect of all shares of Holdings common stock and any Outstanding Shares is the same.

All Second Lien Lender Elections shall be binding on the Second Lien Lenders making such elections and the Second Lien Lender Elections shall be implemented by the Plan; provided, however, that a Non-Investor Second Lien Lender shall be entitled on its Plan ballot to adjust its Second Lien Lender Election by (i) choosing to receive more Cash on account of its Second Lien Distribution, rather than Stock or (ii) choosing to decrease its participation in the Rights Offering.

If a Second Lien Lender has not made a Second Lien Lender Election prior to the voting record date established for the Plan, it shall be entitled to make such an election on its Plan ballot. If, pursuant to the solicitation procedures established in connection with the Plan, the Debtors do not receive a timely and proper Second Lien Lender Election from any such Second Lien Lender, that Second Lien Lender shall be deemed to have elected to (i) receive Cash as its Second Lien Distribution and (ii) not participate in the Rights Offering.

As additional liquidity to fund the Reorganized Debtors' post-Effective Date operations, the Reorganized Debtors will as of the Effective Date have access to no less than $42,656,250 in revolving commitments under the Amended and Restated Credit Agreement, as such amount may be adjusted from time to time in accordance therewith.

**3.2     Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors**

Each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of a corporation or other relevant entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law.  As of the Effective Date, all property of the Estate of a Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest in such Reorganized Debtor, free and clear of all Claims, liens, charges, other encumbrances, Interests and other interests, except with respect to First Lien Revolver Claims, First Lien Term Loan Claims and Reinstated Claims.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.

**3.3     Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs; Other Agreements**

**3.3.1    Certificates of Incorporation and Bylaws**

As of the Effective Date, the certificates of incorporation and the bylaws (or comparable constituent documents) of the Reorganized Debtors will be substantially in the forms set forth in Exhibits VII and VIII, respectively.  The certificates of incorporation and bylaws (or comparable constituent documents) of each Reorganized Debtor, among other things, will prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, each Reorganized Debtor may amend and restate its certificates of incorporation or bylaws (or comparable constituent documents) as permitted by applicable state law, subject to the terms and conditions of such constituent documents.  On the Effective Date, or as soon thereafter as is practicable, each Reorganized Debtor shall file such certificate of incorporation (or comparable constituent documents) with the secretary of state or similar office of the state in which such Reorganized Debtor is incorporated or organized, to the extent required by and in accordance with the applicable corporate law of such state.

**3.3.2    Directors and Officers of the Reorganized Debtors**

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as set forth on Exhibit IX, the initial officers of each of the Reorganized Debtors will consist of the officers of such Debtor immediately prior to the Effective Date and the initial board of directors of each of the Reorganized Debtors will consist of the board of directors immediately prior to the Effective Date.  Each such director and officer will serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the terms of the certificate of incorporation and bylaws (or comparable constituent documents) of the applicable Reorganized Debtor and state law.

### 3.3.3 Employment-Related Agreements and Compensation Programs

a.      As of the Effective Date, each of the Reorganized Debtors will have authority to:  (i) maintain, reinstate, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with its active and retired directors, officers and employees, subject to the terms and conditions of any such agreement and applicable non-bankruptcy law; (ii) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active and retired employees; and (iii) enter into and implement the Management Incentive Plan; provided, however, that any Cash payments made under the Management Incentive Plan shall be no greater than as provided for in the Form of Management Incentive Plan attached hereto as Exhibit V, unless agreed to in writing by the First Lien Administrative Agent.

b.      From and after the Effective Date, the Reorganized Debtors will continue to administer and pay the Claims arising before the Petition Date under the Debtors' workers' compensation programs in accordance with their prepetition practices and procedures.

### 3.3.4   Other Agreements

Consummation of the Plan is not intended to and shall not constitute a change in ownership or change of control, as defined in any employment or other agreement or plan in effect on the Effective Date to which a Debtor is a party.  In addition, notwithstanding anything to the contrary in the Plan, no provision in any contract, agreement or other document with the Debtors that is rendered unenforceable against the Debtors or the Reorganized Debtors pursuant to sections 541(c), 363(l) or 365(e)(1) of the Bankruptcy Code, or any analogous decisional law, shall be enforceable against the Debtors or Reorganized Debtors as a result of the Plan, or the Confirmation Order.

### 3.3.5   Plan Transactions Approved and Effective as of the Effective Date

The adoption of new or amended and restated certificates of incorporation and bylaws (or comparable constituent documents) for each Reorganized Debtor; the initial selection of directors and officers for each Reorganized Debtor; the effectuation of the Rights Offering; the entry into the Amended and Restated Credit Agreement, the Shareholders' Agreement and the Interest Rate Hedge Waiver; the distribution of Cash pursuant to the Plan; the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing; the adoption, execution and implementation of employment, retirement and indemnification agreements, incentive compensation programs, retirement income plans, welfare benefit plans and other employee plans and related agreements and the other matters provided for under the Plan involving the corporate structure of the Debtors or Reorganized Debtors or corporate action to be taken by or required of a Debtor or Reorganized Debtor will occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and are hereby authorized and approved in all respects and for all purposes without any requirement of further action by the stockholders or directors of the Debtors or the Reorganized Debtors.

CHI-1740947v1

**3.4    Assumption of Pension Plans; Retiree Welfare Benefits**

**3.4.1**    On the Effective Date, each applicable Reorganized Debtor shall assume the unexpired pension plans to which it is a party.  The applicable Debtors will continue to sponsor and administer the pension plans, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082 and administer the pension plans in accordance with their terms and the provisions of ERISA and the Internal Revenue Code of 1986.  Furthermore, nothing in the Plan shall be construed as discharging, releasing or relieving the Debtors or the Debtors' successors from any liability imposed under any law or regulatory provision with respect to the pension plans.  Neither the PBGC, the pension plans nor any participant or beneficiary of the pension plans shall be enjoined or precluded, from and after the Effective Date, from enforcing such liability with respect to the pension plans.

**3.4.2**    From and after the Effective Date, the applicable Debtors will continue to pay all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, for the duration of the period that the applicable Debtors have obligated themselves to provide such benefits, in accordance with the terms of the retiree benefit plans or other agreements governing the payment of such benefits, subject to any rights of the Debtors to amend, modify or terminate such benefits under the terms of the applicable retiree benefits plan, other agreement or applicable nonbankruptcy law.

**3.5    Preservation of Rights of Action; Settlement of Claims and Releases**

**3.5.1    Preservation of Rights of Action by the Reorganized Debtors; Recovery Actions**

Except as otherwise expressly provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, including the releases provided for under Section 3.5.3 hereof, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will have vested in them as of the Effective Date, and the Reorganized Debtors will retain and may enforce, any claims, demands, rights, defenses and causes of action that the Debtor or the Estate may hold against any entity.  Each Reorganized Debtor or its successor may pursue such retained claims, demands, rights, defenses or causes of action, as appropriate, in accordance with the best interests of such Reorganized Debtor or its successor holding such claims, demands, rights, defenses or causes of action, and may settle such claims after the Effective Date without notice to parties in interest or approval of the Bankruptcy Court.  Notwithstanding the foregoing, as of the Effective Date, the Debtors shall waive and release all Recovery Actions.

**3.5.2    Comprehensive Settlement of Claims and Controversies**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Section 3.5.3, will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Claim (other than Claims Reinstated hereunder) or any distribution to be made pursuant to the Plan on account of any such Claim (other than Claims Reinstated hereunder).  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of

the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, Reorganized Debtors, Estates and their respective property and Claim holders and is fair, equitable and reasonable.

### 3.5.3  Releases

#### a.  General Releases by Debtors and Reorganized Debtors

**As of the Effective Date the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all entities who may purport to claim by, through, for or because of them will forever release, waive and discharge all Liabilities that they have, or had against any Released Party except with respect to any obligations arising under the Plan.  Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of (i) any Released Party in respect of any express contractual obligation of any such Released Party in effect following substantial consummation of the Plan or (ii) solely in the case of Released Parties that are directors, officers and employees of the Debtors, intentional fraud or theft; it being understood that prospective or forward-looking guidance or projections prepared or released by such parties shall be deemed not to constitute intentional fraud or theft.**

#### b.  General Releases by Holders of Claims or Interests

**As of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the cash, contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim or Interest (solely in its capacity as such) that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the exhibits to the Plan, the Disclosure Statement, the First Lien Loan Documents, the Second Lien Loan Documents, or the Secured Swap Agreement that such entity has, had or may have against any Released Party or any employees, agents or partners of the Debtors (which release will be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code), except with respect to any obligations arising under the Plan, the Amended and Restated Credit Agreement, the "Loan Documents" (as defined in the Amended and Restated Credit Agreement), a Secured Swap Agreement subject to an Interest Rate Hedge Waiver (and only to the extent provided in such Interest Rate Hedge Waiver), or as a result of any act, event, injury, omission, transaction, or agreement arising after the Effective Date (other than Liabilities relating to such act, event, injury, omission, transaction or agreement first arising or occurring prior to the Effective Date); provided, however, that the foregoing provisions will have no effect on the liability of any entity that would otherwise result from any unknown act as of the Effective Date, to the extent that such act is determined in a Final Order to have constituted willful misconduct.**

### c. Injunction Related to Releases

**The Confirmation Order will permanently enjoin the commencement or prosecution by any entity or Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liabilities, rights of contribution or rights of indemnification released pursuant to the Plan, including pursuant to the releases in this Section 3.5.3.**

## 3.6 Reinstatement and Continuation of Insurance Policies

From and after the Effective Date, each of the Debtors' insurance policies in existence as of the Effective Date shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. Nothing in the Plan shall affect, impair or prejudice the rights of the insurance carriers or the Reorganized Debtors under the insurance policies in any manner, and such insurance carriers and Reorganized Debtors shall retain all rights and defenses under such insurance policies, and such insurance policies shall apply to, and be enforceable by and against, the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

## 3.7 Cancellation of Instruments, Securities and Other Documentation

On the Effective Date and concurrently with the applicable distributions made pursuant to Article II, the Second Lien Loan Documents will be deemed canceled and of no further force and effect against the Debtors, without any further action on the part of any Debtor. From and after the Effective Date, the holders of Second Lien Claims shall have no rights against the Debtors or Reorganized Debtors arising from or relating to such interests, instruments and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan.

## 3.8 Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The President and Chief Executive Officer, the Chief Financial Officer, any Vice President or the Secretary of each Debtor or Reorganized Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. The Secretary or any Assistant Secretary of each Debtor or Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions. Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax or similar Tax: (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) the execution and delivery of any documents in the Rights Offering, the Amended and Restated Credit Agreement, the Shareholders' Agreement or the Interest Rate Hedge Waiver; (4) the issuance of any Stock; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements,

agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the foregoing or pursuant to the Plan.

**ARTICLE IV.**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN; EFFECT OF CONFIRMATION**

**4.1     Conditions Precedent to the Effective Date**

The Effective Date will not occur, and the Plan will not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Section 4.2:

**4.1.1**     The Bankruptcy Court (i) shall have entered the Confirmation Order in form and substance acceptable to the Debtors, the Equity Investors and the First Lien Administrative Agent, and (ii) such Confirmation Order shall be a Final Order.

**4.1.2**     The documents effectuating the Rights Offering shall be in form and substance acceptable to the Debtors and the First Lien Administrative Agent, shall have been executed by the Debtors and the Equity Investors and the Rights Offering has been closed.

**4.1.3**     The Interest Rate Hedge Waiver shall be in form and substance acceptable to the Debtors and the First Lien Administrative Agent and be in full force and effect.

**4.1.4**     The Non-Investor Second Lien Lenders shall have made, or under the Plan shall be deemed to have made, Second Lien Lender Elections for Cash on account of no less than $42.7 million in principal amount of their Second Lien Claims.

**4.1.5**     All conditions precedent to the effectiveness of, and the initial borrowings under, the Amended and Restated Credit Agreement shall be satisfied or waived, in each case in accordance with the terms and conditions of the Amended and Restated Credit Agreement.

**4.2     Waiver of Conditions to the Effective Date**

The conditions to the Effective Date set forth in Section 4.1 may be waived, in whole or in part, by the Debtors with the prior written consent of (i) the Equity Investors and (ii) the First Lien Administrative Agent (with the consent of the Required Lenders as defined in the Amended and Restated Credit Agreement) without notice or an order of the Bankruptcy Court.

**4.3     Effect of Nonoccurrence of Conditions to the Effective Date**

If the conditions precedent in Section 4.1 hereof have not been satisfied or waived in the manner provided in Section 4.2 hereof by the date that is thirty (30) days after the Confirmation Date, then:  (1) the Confirmation Order shall be of no further force or effect; (2) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 1141 of the Bankruptcy Code, (b) the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases, as applicable and (c) the releases described in Section 3.5.3; and (3) nothing contained in the Plan will (a) constitute a waiver or

release of any claims by or against, or any Interest in, any Debtor or (b) prejudice in any manner the rights of the Debtors or any other party in interest.

## 4.4    Discharge of Claims

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date.  From and after the Effective Date, the Debtors shall be discharged from any and all Claims that arose prior to the Effective Date, subject to the obligations of the Debtors under the Plan.

## 4.5    Injunctions

**As of the Effective Date, except with respect to the obligations of the Reorganized Debtors under the Plan or the Confirmation Order, all entities and Persons that have held, currently hold or may hold any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or Liabilities that are discharged or released will be permanently enjoined from taking any of the following enforcement actions against the Debtors, the Reorganized Debtors or any of their respective property on account of any such discharged or released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or Liabilities:  (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, levying, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any Debtor or Reorganized Debtor; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

## 4.6    Exculpation

From and after the Effective Date, the Released Parties, the Debtors and Reorganized Debtors, and any employees, agents or partners of the Debtors, will neither have nor incur any liability to any entity, and no holder of a Claim or Interest, no other party in interest and none of their respective Representatives, shall have any right of action against any Debtor, Reorganized Debtor, any employee, agents or partners of the Debtors or Released Party, for any act taken or omitted to be taken in connection with, related to or arising out of the Chapter 11 Cases or the consideration, formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the exhibits to the Plan, the Disclosure Statement, any transaction proposed in connection with the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken, in connection therewith; provided, however, that the foregoing provisions will have no effect on: (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; or (b) the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in Final Order to have constituted willful misconduct or gross negligence.

CHI-1740947v1

**4.7** **Termination of Certain Subordination Rights**

The classification and manner of satisfying Claims under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, sections 510(a) and 510(c) of the Bankruptcy Code or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any distribution made pursuant to the Plan. All subordination rights that a holder of a Claim, other than a holder of a Claim Reinstated hereunder, may have with respect to any distribution to be made pursuant to the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined. Accordingly, distributions pursuant to the Plan will not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

**4.8** **Dissolution of Any Creditors' Committee**

On the Effective Date, the Creditors' Committee, if one has been appointed, will dissolve, and the members of the Creditors' Committee and their respective Professionals will cease to have any role arising from or related to the Chapter 11 Cases. The Professionals retained by the Creditors' Committee and the respective members thereof will not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for reasonable fees for services rendered, and actual and necessary expenses incurred in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed and served after the Effective Date pursuant to Section 2.1.1.c.

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS**
**AND UNEXPIRED LEASES**

**5.1** **Executory Contracts and Unexpired Leases to Be Assumed**

**5.1.1** **Assumption Generally**

Except as otherwise provided in the Plan or Exhibit X to the Plan, or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, or in a motion pending before the Bankruptcy Court seeking authority to reject an Executory Contract or Unexpired Lease or in a Final Order of the Bankruptcy Court, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Debtors will be deemed to assume each Executory Contract or Unexpired Lease. Without limiting the foregoing, on the Effective Date, the Debtors shall assume all employment contracts without modification.

**5.1.2** **Assumption Procedures**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption by the Debtors of Executory Contracts and Unexpired Leases pursuant to this Section 5.1 as of the Effective Date, except for Executory Contracts and Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such

Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease filed on or prior to the Effective Date, (d) are listed on Exhibit X or (e) are designated for rejection as provided in this Section.

**5.2     Payments Related to the Assumption of Executory Contracts and Unexpired Leases**

The amount of any cure claim necessary to assume any Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the applicable Debtor or Reorganized Debtor:  (1) by payment of such cure claim in Cash on the later of the Effective Date, and the date on which a disputed cure claim is resolved by agreement of the parties or by an order of the Bankruptcy Court; or (2) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.  Any management fees and/or Cash payments that may be owing from the Debtors to the Equity Investors as a cure payment in connection with the assumption of any management or other agreement between the Debtors and the Equity Investors shall accrue and be paid on the terms and conditions provided for in the Amended and Restated Credit Agreement.

As of the Effective Date, and after payment of any necessary cure amounts owing to contract or lease counterparties pursuant to section 365 of the Bankruptcy Code, all contract and lease counterparties shall be forever barred and estopped from asserting or claiming against the Debtors or Reorganized Debtors that any additional amounts are due or other defaults exist, that conditions to assumption and/or assignment must be satisfied under such Executory Contracts or Unexpired Leases or that there is any objection or defense to assumption and/or assignment of such Executory Contracts and Unexpired Leases.

Any provision in any Executory Contract or Unexpired Lease to be assumed under the Plan that purports to declare a breach, default, or right to payment or modification as a result of an assignment or change of control in respect of the Debtors or Reorganized Debtors, or as a result of the Chapter 11 Cases, is unenforceable, and all Executory Contracts and Unexpired Leases to be assumed under the Plan shall remain in full force and effect, subject only to payment of the appropriate cure amount, if any.  No sections or provisions of any Executory Contract or Unexpired Lease that purport to provide for additional payments, penalties, charges, rent acceleration or other financial accommodations in favor of the non-debtor third party thereto shall have any force and effect with respect to the Chapter 11 Cases or the transactions contemplated by the Plan, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code and/or applicable case law.

**5.3     Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by a Debtor will be performed by such Debtor or Reorganized Debtor in the ordinary course of its business.  Accordingly, such contracts and leases will survive and remain unaffected by entry of the Confirmation Order.

**5.4      Rejection of Executory Contracts and Unexpired Leases**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejection of each Executory Contract or Unexpired Lease listed on Exhibit X pursuant to section 365 of the Bankruptcy Code as of the Effective Date.  Any Claim arising from the rejection of any Executory Contract or Unexpired Lease will be considered a General Unsecured Claim pursuant to section 365 of the Bankruptcy Code, and, subject to allowance, paid in accordance with Section 5.6.

**5.5      Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors under such Executory Contracts or Unexpired Leases.  Notwithstanding any applicable nonbankruptcy law to the contrary, the Debtors and Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations on goods or services previously purchased by the contracting Debtors or Reorganized Debtors from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

**5.6      Bar Date for and Payment of Rejection Damages**

**5.6.1**   Except as otherwise provided in a Final Order  approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court on or before 28 days after the Effective Date.  Any Claims not Filed within such time period will be forever barred from receiving a distribution from the Debtors, the Reorganized Debtors or the Estates.

**5.6.2**   The Debtors reserve the right to object to, settle, compromise or otherwise resolve any Claim filed on account of a rejected Executory Contract or Unexpired Lease.  Undisputed Claims for rejection damages filed in connection with a rejected Executory Contract or Unexpired Lease shall be paid in Cash on the later of (i) 60 days following the Effective Date or (ii) ten Business Days following the date such Claim becomes an undisputed Claim.

**5.7      Obligations to Insure and Indemnify Directors, Officers and Employees**

**5.7.1**   Any and all directors and officers liability and fiduciary (including ERISA) insurance or tail policies in existence as of the Effective Date shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed or assumed and assigned by the applicable Debtor or Reorganized Debtor, pursuant to section 365 of the Bankruptcy Code and the Plan.  Each insurance carrier under such policies shall continue to honor and administer the policies with respect to the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors prior to the Effective Date.

**5.7.2**   The obligations of each Debtor or Reorganized Debtor to indemnify any Person who is serving or served as one of its directors, officers or employees as of the Petition Date by

reason of such Person's prior or future service in such a capacity or as a director, officer or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation, by-laws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor, will be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### 6.1 Distributions for Claims as of the Effective Date

Except as otherwise provided in this Article VI, distributions to be made on the Effective Date to holders of Claims as provided by Article II shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (1) 30 days after the Effective Date; or (2) with respect to any particular Claim, such later date when the applicable conditions of Section 6.2.2 (regarding undeliverable distributions) or Section 6.5 (regarding the surrender of instruments evidencing a Claim or Interest) are satisfied.

### 6.2 Delivery of Distributions and Undeliverable or Unclaimed Distributions to Holders of Claims in Class 4

#### 6.2.1 Distribution Procedures

a. On the Effective Date, the Debtors shall distribute to the Second Lien Administrative Agent, and the Second Lien Administrative Agent shall distribute to the Non-Investor Second Lien Lenders who are record holders of Class 4 Claims as of the Distribution Record Date, Cash consistent with the Second Lien Elections and pursuant to Article II of this Plan. The Debtors shall make all distributions on the Effective Date to holders of Class 4 Claims who have elected to receive Stock under the Plan. The Second Lien Administrative Agent shall cooperate with the Debtors as necessary to effectuate the distributions to the holders of Class 4 Claims who have elected to receive Stock under the Plan, including, without limitation, providing all necessary identifying information of such holders. On the Effective Date, the Debtors shall pay all reasonable out-of-pocket expenses of the Second Lien Administrative Agent, including reasonable professionals' fees, incurred through the Effective Date of the Plan.

b. No fractional shares of Stock shall be distributed under this Plan. To the extent any holder of a Claim would be entitled to receive a fractional share of Stock hereunder, the Debtors shall round upward the number of shares due to that holder to the nearest whole share.

c. The Debtors, and the Reorganized Debtors, as applicable, shall only be required to act and make distributions in accordance with the terms of the Plan. Such parties shall have no (A) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (B) obligation or liability

for distributions under the Plan to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or who does not otherwise comply with the terms of the Plan.

### 6.2.2 Undeliverable Distributions

#### a. Holding of Undeliverable Distributions

The Reorganized Debtors shall make one attempt to make the distributions contemplated hereunder in accordance with the procedures set forth herein. Any distributions returned to the Reorganized Debtors, or distributions that are otherwise undeliverable, will remain in the possession of the applicable Reorganized Debtor until such time as (1) the Claim becomes available for distribution or (2) such Claim holder has waived the right to recovery under Section 6.2.2.b.

#### b. Failure to Claim Undeliverable Distributions

Any holder of an undeliverable distribution that does not assert a claim to such holder's distribution in writing so that it is received by the Debtors at the address set forth in Section 9.3.1 within 180 days after the Effective Date shall have its claim for such undeliverable distribution discharged and will be forever barred from asserting any such claim against the Reorganized Debtors or their respective property.

### 6.3 Compliance with Tax Requirements

**6.3.1** In connection with the Plan, to the extent applicable, the Debtors and the Reorganized Debtors (or their disbursing agent) will comply with all Tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. Each of the Debtors and Reorganized Debtors (or their disbursing agent), as applicable, will be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

**6.3.2** Notwithstanding any other provision of the Plan, each entity receiving a distribution pursuant to the Plan will have the sole and exclusive responsibility for the satisfying and paying of any Tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding and other Tax obligations.

### 6.4 Distribution Record Date

**6.4.1** As of the Distribution Record Date, the transfer registers for Second Lien Claims will be closed. The Debtors will have no obligation to recognize the transfer or sale of any Second Lien Claim that occurs after the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders who are holders of such Claims on the Distribution Record Date.

**6.4.2** Except as otherwise provided in a Final Order , the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided

by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

## 6.5    Surrender of Canceled Instruments

As a condition precedent to receiving any distribution pursuant to the Plan on account of a Second Lien Claim, the holder of such Claim must tender to the Debtors, or Reorganized Debtors, as applicable, the applicable instruments evidencing such Claim or an affidavit of loss and indemnity satisfactory to the Debtors, or Reorganized Debtors, in their sole discretion, together with any letter of transmittal required by the Debtors, or Reorganized Debtors.  Pending such surrender, any distributions pursuant to the Plan on account of such Second Lien Claim shall be treated as an undeliverable distribution pursuant to Section 6.2.2 of this Plan.  Any holder of a Second Lien Claim that fails to surrender or is deemed not to have surrendered the applicable instruments within 90 days after the Effective Date will have its right to distributions pursuant to the Plan on account thereof discharged and will be forever barred from asserting any such Claim against the Reorganized Debtors or their respective property.  In such case, any property held for distribution on account thereof will be treated pursuant to the provisions set forth in Section 6.2.2.b.

## 6.6    Setoffs

Except with respect to claims of a Debtor or Reorganized Debtor expressly released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Claim and the payments or distributions to be made on account of the Claim the claims, rights and causes of action of any nature that the applicable Debtor or Reorganized Debtor may hold against the holder of the Claim; *provided*, *however*, that the failure to effect a setoff will not constitute a waiver or release by the applicable Debtor or Reorganized Debtor of any claims, rights and causes of action that the Debtor or Reorganized Debtor may possess against the Claim holder.

## 6.7    Disputed Claims

Except as provided for in the Plan with respect to holders of rejection damage claims under Executory Contracts or Unexpired Leases, holders of Claims shall not be required to File a proof of Claim, and no parties should File a proof of Claim.  The Debtors do not intend to object to the allowance of such Filed Claims, although they reserve the right to do so.  The Debtors intend to make distributions to holders of Claims entitled to a distribution of property under the Plan as provided in the Plan, or as otherwise agreed by the Debtors and the applicable holders of such Claims.  Holders of Claims Reinstated pursuant to the Plan as well as holders of Claims in Classes 1 and 6, and Priority Tax Claims, will be paid or otherwise resolved in the ordinary course of business, as provided herein.  Although the Debtors intend to resolve any disputes regarding the amount of all Claims consensually or through judicial means outside the Bankruptcy Court, the Debtors nevertheless may, in their discretion, file with the Bankruptcy Court any motion or adversary proceeding to determine the amount of any Claim.

The Debtors or the Reorganized Debtors, as applicable, shall have the exclusive authority to File, settle, compromise, withdraw or litigate to judgment any objections to Claims. The Debtors and the Reorganized Debtors may resolve, settle, compromise and pay any Claims in Classes 1 and 6, Priority Tax Claims, or Claims Reinstated hereunder in the ordinary course of business without approval of the Bankruptcy Court.

**6.8     Allocation Between Principal and Accrued Interest**

To the extent applicable, all distributions to a holder of a Second Lien Claim shall apply first to the principal amount of such Second Lien Claim until such principal amount is paid in full and then to any interest accrued on such Second Lien Claim as of the Petition Date and thereafter, to the extent the Debtors' Estates are sufficient to satisfy such principal and interest accrued as of the Petition Date, to any interest accrued on such Second Lien Claim from the Petition Date through the Effective Date, until paid in full.

**ARTICLE VII.**
**ADMINISTRATIVE CONSOLIDATION; CLOSING OF SUBSIDIARY CASES**

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration the rights of holders of Claims and Interests, whether arising under contract, law or equity, that a holder of a Claim or Interest may have against each of the Debtors.  Holders of Claims or Interests against more than one Debtor are classified in consolidated classes of Claims against and Interests in all Debtors in Article II above for administrative convenience with respect to voting and the making of distributions on account of Claims and Interests pursuant to Article VI.  The Confirmation Order shall approve this administrative consolidation.

Such administrative consolidation shall not affect:  (1) the legal and corporate structures of the Debtors; (2) pre- and post-Effective Date guarantees, liens and security interests that are required to be maintained (a) in connection with contracts or leases that were entered into during the Chapter 11 Cases or Executory Contracts and Unexpired Leases that have been or will be assumed or (b) pursuant to the Plan (including with respect to Reinstated Claims); (3) Interests between and among the Debtors; (4) distributions from any insurance policies or proceeds of such policies; or (5) the revesting of assets in the separate Reorganized Debtors.  In addition, such administrative consolidation shall not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code.

This Plan serves as a motion seeking entry of an order consolidating the Estates for administrative purposes only, as set forth above and the closing of the Chapter 11 Cases for the Subsidiary Debtors.  Unless an objection to such consolidation or case closing is made in writing by any creditor affected by the Plan, filed with the Bankruptcy Court and served on the Notice Parties on or before the Plan objection deadline as established by the Bankruptcy Court, the consolidation and case closing order (which may be the Confirmation Order) may be entered by the Bankruptcy Court.  In the event any such objections are timely filed, a hearing with respect thereto shall occur at or before the hearing on confirmation of the Plan.

# ARTICLE VIII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

1.     Allow, disallow, estimate, determine, liquidate, reduce, classify, re–classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims or Interests;

2.     Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

3.     Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

4.     Ensure that distributions to holders of Claims are accomplished pursuant to the provisions of the Plan;

5.     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications Filed in the Bankruptcy Court involving any Debtor or any Reorganized Debtor that may be pending on the Effective Date or brought thereafter;

6.     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

7.     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document (other than, following the Effective Date, in connection with the Amended and Restated Credit Agreement and the Loan Documents (as defined in the Amended and Restated Credit Agreement)) that is entered into or delivered pursuant to the Plan or any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

8.     Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the

Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

9.      Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with respect to the consummation, implementation or enforcement of the Plan or the Confirmation Order;

10.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

11.      Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document (other than, following the Effective Date, in connection with the Amended and Restated Credit Agreement and the Loan Documents (as defined in the Amended and Restated Credit Agreement)) entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

12.      Enforce clarify or modify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

13.      Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any disputed Claims for Taxes;

14.      Recover all assets of the Debtors and their Estates, wherever located;

15.      Hear any other matter over which with the Bankruptcy Court has jurisdiction; and

16.      Enter a final decree closing the Chapter 11 Cases.

## ARTICLE IX.
## MISCELLANEOUS PROVISIONS

### 9.1      Modification of the Plan

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right (with the prior written consent of the First Lien Administrative Agent) to alter, amend or modify the Plan before its substantial consummation.

### 9.2      Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

**9.3    Service of Documents**

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to counsel to the Debtors, the Reorganized Debtors, the First Lien Lenders or the Second Lien Lenders must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

**9.3.1    The Debtors and the Reorganized Debtors**

Penton Business Media, Inc.
249 West 17th Street
Fourth Floor
New York, New York 10011
Attn.: Jean Clifton
Attn: Elise Zealand
Facsimile: 913-514-6431
Email:  Jean.Clifton@penton.com
          Elise.Zealand@penton.com

Jones Day
77 West Wacker Dr.
Chicago, Illinois  60601
Attn.: Brad B. Erens
Facsimile:  (312) 782-8585
bberens@jonesday.com

Jones Day
222 E. 41st Street
New York, New York 10017
Attn.: Lisa G. Laukitis
Facsimile: 212-755-7306
Email:  llaukitis@jonesday.com

**9.3.2    The First Lien Lenders**

General Electric Capital Corporation
2325 Lakeview Parkway
Suite 700
Alpharetta, Georgia 30009
Attn.: Penton Business Media Account Manager
Facsimile: 678-624-7903
Email: ellen.weaver@ge.com

General Electric Capital Corporation
201 Merritt 7

Norwalk, Connecticut 06851
Attn.: Counsel – Media and Communications
Facsimile: 203-956-4216
Email: Mark.O'Leary@ge.com

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn.: Gary Holtzer, Esq.
Facsimile: 212-310-8007
Email: gary.holtzer@weil.com

### 9.3.3    The Second Lien Lenders

Wells Fargo Bank, National Association
45 Broadway, 14th Floor
New York, NY  10006
Attn:  Michael D. Pinzon
Facsimile: 212-515-1576
Email: michael.d.pinzon@wellsfargo.com

Pillsbury Winthrop Shaw Pittman LLP
725 So. Figueroa Street, Suite 2800
Los Angeles, CA  90017
Attn:  William Freeman, Esq.
Facsimile: 213-629-1033
Email: bill.freeman@pillsburylaw.com

Dated:  February 4, 2010

Respectfully submitted,

PENTON BUSINESS MEDIA HOLDINGS,
INC, on its own behalf and on behalf of each
affiliate Debtor

By:  _____
Name:                  Sharon Rowlands
Title:                   Chief Executive Officer

**EXHIBIT I**

**$667,950,000[1]**

**AMENDED AND RESTATED CREDIT AGREEMENT**

**Dated as of [_____ __], 2010,**

**Among**

**PENTON MEDIA, INC.,**
**as a Borrower,**

**PENTON BUSINESS MEDIA, INC.,**
**as a Borrower,**

**PENTON BUSINESS MEDIA HOLDINGS, INC.,**
**as a Guarantor,**

**THE SUBSIDIARY LOAN PARTIES,**
**as Guarantors,**

**THE LENDERS PARTY HERETO,**

**GENERAL ELECTRIC CAPITAL CORPORATION,**
**as Administrative Agent,**

---

[1] Assumes $625,293,750.00 Term Loan and $42,656,250.00 Revolving Facility as if TD/UBS do not participate in the Revolving Facility under this Agreement and instead "term out" their "Revolving Facility Loans" under the Existing Credit Agreement; amounts to be confirmed and updated as of the Restatement Date.

If a swap counterparty is unwilling to leave the Secured Swap Agreements in place and amounts owing thereunder are crystallized on the effective date of the Plan, the Secured Swap Agreements will be placed in the same class as the Term Loans and such crystallized amounts will be treated as Term Loans under this Agreement. In such event, the amount of Term Loans on the Restatement Date shall be so increased and the amortization pursuant to Section 2.10 adjusted accordingly.

**TABLE OF CONTENTS**

ARTICLE I       Definitions..................................................................................................1

    Section 1.01.       Defined Terms ................................................................1
    Section 1.02.       Terms Generally ...........................................................37
    Section 1.03.       Effectuation of Transactions .........................................38
    Section 1.04.       Notices from Borrowers ...............................................38

ARTICLE II      The Credits................................................................................................38

    Section 2.01.       Existing Loans; Revolving Facility Commitments .............38
    Section 2.02.       Loans and Borrowings ..................................................39
    Section 2.03.       Requests for Borrowings ...............................................39
    Section 2.04.       Reserved .......................................................................40
    Section 2.05.       Letters of Credit............................................................40
    Section 2.06.       Funding of Borrowings .................................................45
    Section 2.07.       Interest Elections...........................................................45
    Section 2.08.       Termination and Reduction of Revolving Facility Commitments ...................46
    Section 2.09.       Repayment of Loans; Evidence of Debt...........................47
    Section 2.10.       Repayment of Term Loans and Revolving Facility Loans .............................48
    Section 2.11.       Prepayment of Loans.....................................................49
    Section 2.12.       Fees ..............................................................................50
    Section 2.13.       Interest..........................................................................51
    Section 2.14.       Alternate Rate of Interest...............................................52
    Section 2.15.       Increased Costs .............................................................52
    Section 2.16.       Break Funding Payments................................................53
    Section 2.17.       Taxes.............................................................................53
    Section 2.18.       Payments Generally; Pro Rata Treatment; Sharing of Set-offs....................55
    Section 2.19.       Mitigation Obligations; Replacement of Lenders .............57
    Section 2.20.       Illegality.......................................................................58
    Section 2.21.       Defaulting Lenders........................................................58
    Section 2.22.       Swap Related Reimbursement Obligations ......................60

ARTICLE III     Representations and Warranties ................................................................61

    Section 3.01.       Organization; Powers ....................................................61
    Section 3.02.       Authorization.................................................................62
    Section 3.03.       Enforceability ...............................................................62
    Section 3.04.       Governmental Approvals................................................62
    Section 3.05.       Financial Statements ......................................................62
    Section 3.06.       No Material Adverse Change or Material Adverse Effect............63
    Section 3.07.       Title to Properties; Possession Under Leases ..................63
    Section 3.08.       Subsidiaries ..................................................................64
    Section 3.09.       Litigation; Compliance with Laws ..................................64
    Section 3.10.       Federal Reserve Regulations ..........................................64
    Section 3.11.       Investment Company Act ...............................................65
    Section 3.12.       Use of Proceeds ............................................................65
    Section 3.13.       Tax Returns ...................................................................65
    Section 3.14.       No Material Misstatements .............................................65
    Section 3.15.       Employee Benefit Plans .................................................65
    Section 3.16.       Environmental Matters ...................................................66
    Section 3.17.       Security Documents........................................................66
    Section 3.18.       Real Property and Leased Premises ................................67
    Section 3.19.       Solvency........................................................................67

Section 3.20.    Labor Matters ..................................................................................68
Section 3.21.    Insurance .........................................................................................68
Section 3.22.    Reserved ..........................................................................................68
Section 3.23.    Senior Indebtedness ........................................................................68
Section 3.24.    Anti-Terrorism Law ........................................................................68
Section 3.25.    Deposit Accounts and Securities Accounts .....................................69

ARTICLE IV       Conditions of Lending ....................................................................69

Section 4.01.    All Credit Events .............................................................................69
Section 4.02.    First Credit Event ............................................................................70

ARTICLE V        Affirmative Covenants ....................................................................74

Section 5.01.    Existence; Businesses and Properties ..............................................74
Section 5.02.    Insurance .........................................................................................74
Section 5.03.    Taxes ................................................................................................75
Section 5.04.    Financial Statements, Reports, Etc. ................................................75
Section 5.05.    Litigation and Other Notices ..........................................................77
Section 5.06.    Compliance with Laws ....................................................................77
Section 5.07.    Maintaining Records; Access to Properties and Inspections...........77
Section 5.08.    Use of Proceeds ..............................................................................78
Section 5.09.    Compliance with Environmental Laws ............................................78
Section 5.10.    Further Assurances; Mortgages .......................................................78
Section 5.11.    Fiscal Year; Accounting ..................................................................80
Section 5.12.    Maintenance of Ratings ...................................................................80
Section 5.13.    Reserved ..........................................................................................80
Section 5.14.    Miscellaneous Business Covenants..................................................80
Section 5.15.    Deposit Accounts and Securities Accounts .....................................80
Section 5.16.    Post-Closing Collateral Matters ......................................................80

ARTICLE VI       Negative Covenants.........................................................................80

Section 6.01.    Indebtedness ....................................................................................81
Section 6.02.    Liens ................................................................................................83
Section 6.03.    Sale and Lease-Back Transactions...................................................86
Section 6.04.    Investments; Loans and Advances ...................................................86
Section 6.05.    Mergers, Consolidations, Sales of Assets and Acquisitions ............88
Section 6.06.    Dividends and Distributions ............................................................89
Section 6.07.    Transactions with Affiliates.............................................................90
Section 6.08.    Business of Holdings, the Borrowers and the Subsidiaries..............92
Section 6.09.    Limitation on Modifications of Indebtedness; Modifications of
                 Certificate of Incorporation, By-Laws and Certain Other Agreements;
                 etc ....................................................................................................92
Section 6.10.    Maximum Capital Expenditures ......................................................94
Section 6.11.    Minimum Liquidity..........................................................................95
Section 6.12.    Minimum EBITDA ..........................................................................95
Section 6.13.    Swap Agreements ............................................................................96
Section 6.14.    No Other "Designated Senior Indebtedness"...................................96

ARTICLE VII      Events of Default.............................................................................96

Section 7.01.    Events of Default .............................................................................96
Section 7.02.    Exclusion of Immaterial Subsidiaries..............................................99
Section 7.03.    Holdings' Right to Cure ...................................................................99

ARTICLE VIII    The Administrative Agent .................................................................. 100

    Section 8.01.    Appointment ........................................................................... 100
    Section 8.02.    Delegation of Duties .............................................................. 101
    Section 8.03.    Exculpatory Provisions .......................................................... 101
    Section 8.04.    Reliance by Administrative Agent ........................................ 102
    Section 8.05.    Notice of Default ................................................................... 102
    Section 8.06.    Non-Reliance on Administrative Agent and Other Lenders ......................... 102
    Section 8.07.    Indemnification ...................................................................... 103
    Section 8.08.    Administrative Agent in Its Individual Capacity ................... 103
    Section 8.09.    Successor Administrative Agent ............................................ 103
    Section 8.10.    Reserved ................................................................................. 103
    Section 8.11.    Reserved ................................................................................. 104

ARTICLE IX    Guaranty ................................................................................................ 104

    Section 9.01.    Guaranty; Limitation of Liability .......................................... 104
    Section 9.02.    Guaranty Absolute ................................................................. 104
    Section 9.03.    Waivers and Acknowledgments ............................................ 105
    Section 9.04.    Subrogation ............................................................................ 106
    Section 9.05.    Guaranty Supplements .......................................................... 107
    Section 9.06.    Subordination ......................................................................... 107
    Section 9.07.    Continuing Guaranty:  Assignments ..................................... 108

ARTICLE X    Miscellaneous ......................................................................................... 108

    Section 10.01.    Notices .................................................................................. 108
    Section 10.02.    Survival of Agreement ......................................................... 109
    Section 10.03.    Binding Effect ....................................................................... 109
    Section 10.04.    Successors and Assigns ........................................................ 109
    Section 10.05.    Expenses Indemnity .............................................................. 114
    Section 10.06.    Right of Set-off ..................................................................... 115
    Section 10.07.    Applicable Law ..................................................................... 115
    Section 10.08.    Waivers; Amendment ........................................................... 116
    Section 10.09.    Interest Rate Limitation ........................................................ 118
    Section 10.10.    Entire Agreement .................................................................. 118
    Section 10.11.    WAIVER OF JURY TRIAL ................................................. 118
    Section 10.12.    Severability ............................................................................ 118
    Section 10.13.    Counterparts .......................................................................... 118
    Section 10.14.    Headings ................................................................................ 119
    Section 10.15.    Jurisdiction; Consent to Service of Process ......................... 119
    Section 10.16.    Confidentiality ...................................................................... 119
    Section 10.17.    GECC Direct Website Communications ............................... 119
    Section 10.18.    Release of Liens and Guarantees .......................................... 121
    Section 10.19.    USA PATRIOT Act .............................................................. 121
    Section 10.20.    Joint and Several Liability .................................................... 121

Exhibits, Schedules and Annexes

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Form of Administrative Questionnaire |
| Exhibit C | Form of Borrowing Request |
| Exhibit D | Form of Interest Election Request |
| Exhibit E | Form of Collateral Agreement |
| Exhibit F | Form of Solvency Certificate |
| Exhibit G | Form of Guaranty Supplement |
| Exhibit H | Form of Account Control Agreement |
| | |
| Schedule 2.01 | Existing Loans; Revolving Facility Commitments |
| Schedule 3.04 | Governmental Approvals |
| Schedule 3.07(b) | Possession under Leases |
| Schedule 3.07(c) | Intellectual Property |
| Schedule 3.08(a) | Subsidiaries |
| Schedule 3.08(b) | Rights in Equity Interests in Holdings |
| Schedule 3.09 | Litigation |
| Schedule 3.13 | Taxes |
| Schedule 3.15(a)(iii) | Employee Benefit Plans |
| Schedule 3.16 | Environmental Matters |
| Schedule 3.18 | Owned Real Property |
| Schedule 3.20 | Labor Matters |
| Schedule 3.21 | Insurance |
| Schedule 3.25 | Deposit Accounts and Securities Accounts |
| Schedule 5.15 | Deposit Accounts and Securities Accounts Covered by Account Control Agreements |
| Schedule 5.16 | Post-Closing Collateral Matters |
| Schedule 6.01 | Indebtedness |
| Schedule 6.02(a) | Liens |
| Schedule 6.04 | Investments |
| Schedule 6.07 | Transactions with Affiliates |
| **[Schedule 6.13** | **Secured Swap Agreements]** |
| | |
| Annex I | Restatement Date EBITDA |
| Annex II | Existing Letters of Credit |

# AMENDED AND RESTATED CREDIT AGREEMENT

AMENDED AND RESTATED CREDIT AGREEMENT, dated as of **[____, __]**, 2010 (this "<u>Agreement</u>"), among PENTON MEDIA, INC., a Delaware corporation (the "<u>Company</u>" and a "<u>Borrower</u>"), PENTON BUSINESS MEDIA, INC. (f/k/a PRISM BUSINESS MEDIA INC.), a Delaware corporation (a "<u>Borrower</u>" and, together with the Company, the "<u>Borrowers</u>"), PENTON BUSINESS MEDIA HOLDINGS, INC. (f/k/a PRISM BUSINESS MEDIA HOLDINGS INC.), a Delaware corporation ("<u>Holdings</u>"), the SUBSIDIARY LOAN PARTIES (as such term and other capitalized terms used but not defined in this Agreement, is defined in <u>Section 1.01</u> hereof) party hereto from time to time, the LENDERS party hereto from time to time, and GENERAL ELECTRIC CAPITAL CORPORATION ((in its individual capacity and in its capacity as a Swap Related L/C provider, "<u>GECC</u>") and as administrative agent (in such capacity, the "<u>Administrative Agent</u>")).

## RECITALS

**WHEREAS,** the Loan Parties, the Lenders and the Administrative Agent are parties to, *inter alia,* that certain First Lien Credit Agreement, dated as of February 1, 2007 (as amended by that certain Consent and Amendment Agreement, dated as of November 24, 2009, that certain Amendment No. 2, dated as of December 23, 2009, that certain Amendment No. 3, dated as of January 15, 2010, that certain Amendment No. 4, dated as of January 29, 2010, and that certain Amendment No. 5, dated as of February 8, 2010, as further amended, restated, amended and restated, supplemented, or otherwise modified immediately prior to the date hereof, the "<u>Existing Credit Agreement</u>");

**WHEREAS,** in order to effectuate a comprehensive reorganization and recapitalization (the "<u>Restructuring</u>") of Holdings, the Borrowers and certain of the Borrowers' subsidiaries (collectively, the "<u>Debtors</u>"), the Debtors (a) commenced Chapter 11 Case Nos. **[_____], [as administratively consolidated as Chapter 11 Case No. [___]]** (collectively, the "<u>Bankruptcy Case</u>") by filing voluntary petitions for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") on **[_____, __]** 2010 (the "<u>Commencement Date</u>"), and (b) duly filed the Plan, Disclosure Statement and other related documents and motions with the Bankruptcy Court;

**WHEREAS,** as part of the Restructuring implemented by the Plan, which was confirmed by the Bankruptcy Court on **[_____ __, 2010]**, the Borrowers, Holdings, the other Loan Parties, Lenders and Administrative Agent have agreed to amend and restate the Existing Credit Agreement in its entirety, to, among other things, (a) re-evidence, ratify and reaffirm the Obligations that shall be repayable hereafter in accordance with the respective terms and provisions hereof and (b) set forth the terms and conditions under which Lenders will from time to time hereafter make further loans or extensions of credit, as the case may be, to or for the account of the Borrowers;

**WHEREAS,** it is the intention of the Borrowers, Holdings, Lenders and Administrative Agent that this Agreement be given in renewal and rearrangement of, and in substitution (but not in payment) for, the Existing Credit Agreement and shall not constitute a novation thereof, but that the Existing Credit Agreement be amended and restated in its entirety as set forth herein; and

**WHEREAS**, these recitals shall be construed as part of this Agreement.

Accordingly, the parties hereto hereby agree as follows:

## ARTICLE I

*Definitions*

SECTION 1.01.  <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings specified below:

"<u>ABR</u>" shall mean, at any time, a rate per annum equal to the highest of (a) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent), (b) the sum of 0.5% per annum and the Federal Funds Effective Rate and (c) 1.00% plus the higher of 1.00% or the three month Adjusted LIBO Rate. Any change in the ABR due to a change in the rate derived from clause (a) above or the Federal Funds Effective Rate shall be effective as of the opening of business on the effective day of such change in the rate derived from clause (a) above or the Federal Funds Effective Rate, respectively.

"<u>ABR Borrowing</u>" shall mean a Borrowing comprised of ABR Loans.

"<u>ABR Loan</u>" shall mean any ABR Term Loan or ABR Revolving Loan.

"<u>ABR Revolving Borrowing</u>" shall mean a Borrowing comprised of ABR Revolving Loans.

"<u>ABR Revolving Loan</u>" shall mean any Revolving Facility Loan bearing interest at a rate determined by reference to the ABR in accordance with the provisions of Article II.

"<u>ABR Term Loan</u>" shall mean any Term Loan bearing interest at a rate determined by reference to the ABR in accordance with the provisions of Article II.

"<u>Account Control Agreement</u>" shall mean, as applicable (a) a control agreement with respect to Deposit Accounts of each Loan Party (but not including any Trust Fund Accounts or Zero Balance Disbursement Accounts), among such Loan Party, the bank at which such Deposit Accounts are held and the Administrative Agent, substantially in the form annexed as <u>Exhibit H</u> hereto or otherwise in form and substance satisfactory to the Administrative Agent, or (b) a control agreement with respect to Securities Accounts of each Loan Party, among such Loan Party, the securities intermediary with which such Securities Accounts are held and the Administrative Agent, in form and substance satisfactory to the Administrative Agent.

"<u>Additional Guarantor</u>" shall have the meaning assigned to such term in <u>Section 9.05</u>.

"<u>Adjusted LIBO Rate</u>" shall mean, with respect to any Eurocurrency Borrowing for any Interest Period, an interest rate per annum equal to (a) the LIBO Rate in effect for such Interest Period divided by (b) one minus the Statutory Reserves applicable to such Eurocurrency Borrowing, if any.

"<u>Administrative Agent</u>" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Administrative Agent Fees</u>" shall have the meaning assigned to such term in <u>Section 2.12(c)</u>.

"<u>Administrative Questionnaire</u>" shall mean an Administrative Questionnaire in the form of <u>Exhibit B</u>.

"<u>Affected Lender</u>" shall have the meaning assigned to such term in <u>Section 2.20</u>.

"**Affiliate**" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified; provided, however, neither the Administrative Agent nor any Lender shall be deemed to be an Affiliate of any Loan Party solely by virtue of its being the Administrative Agent or a Lender under this Agreement.

"**Agent Parties**" shall have the meaning assigned to such term in Section 10.17(c).

"**Aggregate Transaction Costs**" shall mean, collectively, the Transaction Costs and the Integration Transaction Costs.

"**Agreement**" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Anti-Terrorism Laws**" shall have the meaning assigned to such term in Section 3.24.

"**Applicable Margin**" shall mean for any day (a) with respect to any Term Loan, 4.00% per annum in the case of any Eurocurrency Loan and 3.00% per annum in the case of any ABR Loan and (b) with respect to any Revolving Facility Loan, 4.00% per annum in the case of any Eurocurrency Loan and 3.00% per annum in the case of any ABR Loan; provided that after February 1, 2013 the percentages set forth above shall each be increased by 1.00% per annum.

"**Approved Fund**" shall have the meaning assigned to such term in Section 10.04(b).

"**Assignee**" shall have the meaning assigned to such term in Section 10.04(b).

"**Assignment and Acceptance**" shall mean an assignment and acceptance entered into by a Lender and an Assignee, and accepted by the Administrative Agent and the Borrowers (if required by such assignment and acceptance), in the form of Exhibit A or such other form as shall be approved by the Administrative Agent.

"**Availability Period**" shall mean the period from and including the Restatement Date to but excluding the earlier of the Revolving Facility Maturity Date and the date of termination of the Revolving Facility Commitments.

"**Available Cash**" shall mean, with respect to any person, all cash, short term investments and other Permitted Investments, excluding (a) amounts constituting Net Proceeds required to be applied to the Loans pursuant to Section 2.11 and (b) Restricted Cash.

"**Available Excess Cash Flow Amount**" shall mean, at any date of determination, an amount equal to (a) the sum of the amounts of Excess Cash Flow for all Excess Cash Flow Periods ending on or prior to the date of determination, minus (b) the sum at the time of determination of (i) the aggregate amount of prepayments required to be made pursuant to Section 2.11(c) through the date of determination (provided that, in the case of any Excess Cash Flow Period in respect of which the amount of Excess Cash Flow shall have been calculated as contemplated by Section 5.04(d) but the prepayment required pursuant to Section 2.11(c) is not yet due and payable in accordance with the provisions of Section 2.11(c) as of the date of determination, then the amount of prepayments that will be so required to be made in respect of such Excess Cash Flow shall be deemed to be made for purposes of this clause (i)) and (ii) the aggregate amount of Voluntary Prepayments made since the Restatement Date through the date of determination.

"**Available Specified Basket Amount**" shall mean, on any date of determination, an amount equal to (a) the Available Excess Cash Flow Amount on such date, plus (b) the aggregate amount of proceeds received after the Restatement Date and prior to such date that would have constituted Net Proceeds pursuant to clause (a) of the definition thereof except for the operation of clause (x) or (y) of the

second proviso thereof (the "<u>Below-Threshold Asset Sale Proceeds</u>"), <u>plus</u> (c) except as otherwise provided in this Agreement, the cumulative amount of cash proceeds from the sale of Equity Interests in Holdings and other Junior Capital after the Restatement Date (which proceeds have been contributed as Junior Capital to the capital of either Borrower), <u>minus</u> (d) any amounts thereof used to make Investments pursuant to <u>Section 6.04(b)(z)</u> after the Restatement Date and on or prior to such date, <u>minus</u> (e) any amounts thereof used to make Investments pursuant to <u>Section 6.04(j)(iii)</u> after the Restatement Date and on or prior to such date, <u>minus</u> (f) any amounts used under <u>Section 6.09(b)(i)(y)</u> to repurchase Holdings Subordinated Debt; <u>provided</u>, <u>however</u>, for purposes of <u>Section 6.09(b)(i)(y)</u>, the calculation of the Available Specified Basket Amount shall not include any Below-Threshold Asset Sale Proceeds except to the extent they are used as contemplated in clauses (d) and (e) above.

"<u>Available Unused Commitment</u>" shall mean, with respect to a Revolving Facility Lender at any time, an amount equal to the amount by which (a) the Revolving Facility Commitment of such Revolving Facility Lender at such time exceeds (b) the Revolving Facility Credit Exposure of such Revolving Facility Lender at such time.

"<u>Bankruptcy Case</u>" shall have the meaning assigned to such term in the recitals of this Agreement.

"<u>Bankruptcy Code</u>" shall have the meaning assigned to such term in the recitals of this Agreement.

"<u>Bankruptcy Court</u>" shall have the meaning assigned to such term in the recitals of this Agreement.

"<u>Bankruptcy Law</u>" shall have the meaning assigned to such term in <u>Section 7.01(h)</u>.

"<u>Below-Threshold Asset Sale Proceeds</u>" shall have the meaning assigned to such term in the definition of the term "Available Specified Basket Amount".

"<u>Beneficially Own</u>" and "<u>Beneficial Ownership</u>" shall have the meaning ascribed to beneficial ownership (and correlative terms such as "beneficially own") under Rules 13d-3 and 13d-5 of the Exchange Act.

"<u>Benefit Plan</u>" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code and in respect of which Holdings, either Borrower, any Subsidiary or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"<u>Board</u>" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"<u>Borrower</u>" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Borrowing</u>" shall mean a group of Loans of a single Type under a single Facility and made on a single date and, in the case of Eurocurrency Loans, as to which a single Interest Period is in effect.

"<u>Borrowing Minimum</u>" shall mean $1.0 million.

"<u>Borrowing Multiple</u>" shall mean $250,000.

"Borrowing Request" shall mean a request by a Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C.

"Budget" shall have the meaning assigned to such term in Section 5.04(f).

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that when used in connection with a Eurocurrency Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in deposits in Dollars in the London interbank market.

"Capital Expenditures" shall mean, for any person in respect of any period, the aggregate of all expenditures incurred by such person during such period that, in accordance with GAAP, are or should be classified as capital expenditures, including Capital Lease Obligations incurred, provided, however, that Capital Expenditures for the Borrowers and the Subsidiaries shall not include:

> (a) expenditures to the extent they are made with proceeds of the issuance of Equity Interests in Holdings after the Restatement Date to the Permitted Investors or with funds that would have constituted Net Proceeds under clause (a) of the definition of the term "Net Proceeds" (but that will not constitute Net Proceeds as a result of the first proviso to such clause (a)),

> (b) expenditures of proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other property to the extent such expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets or properties useful in the business of the Borrowers and the Subsidiaries within 12 months of receipt of such proceeds,

> (c) interest capitalized during such period,

> (d) expenditures that are accounted for as capital expenditures of such person and that actually are paid for by a third party (excluding Holdings, either Borrower or any Subsidiary thereof) and for which neither Holdings, either Borrower nor any Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other person (whether before, during or after such period),

> (e) the book value of any asset owned by such person prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of such person reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period, provided that (i) any expenditure necessary in order to permit such asset to be reused shall be included as a Capital Expenditure during the period that such expenditure actually is made and (ii) such book value shall have been included in Capital Expenditures when such asset was originally acquired,

> (f) the purchase price of equipment purchased during such period to the extent the consideration therefor consists of any combination of (i) used or surplus equipment traded in at the time of such purchase and (ii) the proceeds of a reasonably concurrent sale of used or surplus equipment, in each case, in the ordinary course of business,

> (g) expenditures that are accounted for as capital expenditures in connection with transactions constituting Permitted Business Acquisitions,

> (h) expenditures to the extent they are financed with the proceeds of a disposition of used, obsolete, worn out or surplus equipment or property in the ordinary course of

business or a disposition that would require a prepayment of Term Borrowings pursuant to <u>Section 2.11(b)</u> with Net Proceeds of the type described in clause (a) of the definition of such term but for the provisos at the end of clause (a) of such definition,

(i) expenditures to the extent they are financed with the proceeds of an issuance of Junior Capital not later than six months after the receipt of such proceeds by Holdings or either Borrower, except to the extent that such proceeds are included in any determination of the Available Specified Basket Amount, or

(j) Integration Transaction Costs that are accounted for as capital expenditures.

"<u>Capital Lease Obligations</u>" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such person under GAAP and, for purposes hereof, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"<u>Cash Election</u>" shall have the meaning assigned to such term in <u>Section 2.13</u>.

"<u>Cash Interest Expense</u>" shall mean, with respect to Holdings and the Subsidiaries on a consolidated basis for any period, Interest Expense for such period, less the sum of (a) pay-in-kind Interest Expense or other non-cash Interest Expense (including as a result of the effects of purchase accounting and the PIK Interest), (b) to the extent included in Interest Expense, the amortization of any financing fees paid by, or on behalf of, either Borrower or any Subsidiary, including such fees paid in connection with the Transactions, (c) the amortization of debt discounts, if any, or fees in respect of Swap Agreements and (d) cash interest income of the Borrowers and their Subsidiaries for such period; <u>provided</u> that Cash Interest Expense shall exclude any one-time financing fees, including those paid in connection with the Transactions or any amendment of this Agreement.

"<u>Cash Management Obligations</u>" shall mean obligations owed by any Loan Party to any Lender or Affiliate of any Lender in respect of any overdraft and related liabilities arising from treasury and cash management services or any automated clearing house transfer of funds.

A "<u>Change in Control</u>" shall mean:

(a) the acquisition of record ownership by any person other than Holdings of any Equity Interests in the Borrowers other than preferred Equity Interests not entitled to ordinary voting rights,

(b) prior to a Qualified IPO, (i) the failure by the Permitted Investors to Beneficially Own, directly or indirectly, Equity Interests in Holdings representing at least 40% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in Holdings (free and clear of any Liens) or (ii) any other person or group of persons (as such terms are used in the Exchange Act and the rules of the SEC thereunder as in effect on the date hereof) not referenced in clause (i) Beneficially Owning, directly or indirectly, a greater percentage of the voting Equity Interests in Holdings than the persons referenced in clause (i),

(c) after a Qualified IPO, (i) the acquisition of Beneficial Ownership, directly or indirectly, by any person or group (within the meaning of the Exchange Act and the rules of the SEC thereunder as in effect on the date hereof), other than the Permitted Investors, of Equity Interests representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in Holdings and (ii) the Beneficial Ownership,

directly or indirectly, by the Permitted Investors of Equity Interests in Holdings representing in the aggregate a lesser percentage of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in Holdings than such person or group,

(d)     occupation of a majority of the seats (other than vacant seats or seats held by management which have limited voting rights with respect to actions of the board of directors) on the board of directors (or equivalent governing body) of Holdings by Persons who were not nominated or appointed by the board of directors (or equivalent governing body) of Holdings or by Wasserstein and/or MidOcean, directly or indirectly (including pursuant to any agreement among equity holders of Holdings), or

(e)     the occurrence of a "Change of Control", "Change in Control" or similar circumstance under any other Material Indebtedness.

**[Notwithstanding anything to the contrary contained herein, the Permitted Investors (other than Wasserstein or MidOcean) shall only be deemed to Beneficially Own Equity Interests in Holdings to the extent Wasserstein or MidOcean has control over the voting of such Equity Interests of a Holding Vehicle (as defined in the definition of "Permitted Investors") on all matters (including election of directors) pursuant to the Stockholders Agreement and, as a result of such control, Wasserstein or MidOcean controls the voting of all Equity Interests in Holdings owned by any such Holding Vehicle on all matters, including the election of directors.]²**

"Change in Law" shall mean (a) the adoption of any law, rule or regulation after the Restatement Date, (b) any change in law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Restatement Date or (c) compliance by any Lender or Issuing Bank (or, for purposes of Section 2.15(b), by any Lending Office of such Lender or by such Lender's or Issuing Bank's holding company, if any) with any written request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Restatement Date.

"Charges" shall have the meaning assigned to such term in Section 10.09.

"Closing Date" shall mean February 1, 2007.

"Code" shall mean the Internal Revenue Code of 1986.

"Collateral" shall mean all the "Collateral" as defined in any Security Document and shall also include the Mortgaged Properties.

"Collateral Agreement" shall mean the Amended and Restated Collateral Agreement, substantially in the form of Exhibit E, among Holdings, each Borrower, each Subsidiary Loan Party and the Administrative Agent.

"Collateral and Guarantee Requirement" shall mean the requirement that:

(a)     on the Restatement Date, the Administrative Agent shall have received (i) from Holdings, each Borrower and each Subsidiary Loan Party, a counterpart of the Collateral Agreement (or, in the case of Subsidiary Loan Parties, a supplement thereto) duly executed and delivered on behalf of such person and (ii) an Acknowledgment and Consent in the form attached to the Collateral Agreement, executed and delivered by each issuer of Pledged Collateral (as defined in the Collateral Agreement), if any, that is a Subsidiary that is not a Loan Party;

---

² Subject to review of Stockholders Agreement.

(b)        on the Restatement Date or as otherwise provided in the Collateral Agreement, the Administrative Agent shall have received (i) a pledge of all the issued and outstanding Equity Interests in (A) each Borrower and (B) each Domestic Subsidiary (other than any Immaterial Subsidiary) owned on the Restatement Date directly by or on behalf of either Borrower or any Subsidiary Loan Party; (ii) a pledge of 66% of the outstanding Equity Interests in each "first tier" Foreign Subsidiary (other than any such Foreign Subsidiary that is an Immaterial Subsidiary) directly owned by Holdings, a Borrower or a Subsidiary Loan Party; and (iii) all certificates or other instruments (if any) representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)        on the Restatement Date, all Indebtedness of Holdings, either Borrower or any Subsidiary having, in the case of each instance of Indebtedness, an aggregate principal amount in excess of $2.0 million (other than (i) intercompany current liabilities incurred in the ordinary course of business in connection with the cash management operations of Holdings and its Subsidiaries or (ii) to the extent that a pledge of such promissory note or instrument would violate applicable law) that is owing to any Loan Party shall be evidenced by a promissory note or an instrument and shall have been pledged pursuant to the Collateral Agreement, and the Administrative Agent shall have received all such promissory notes or instruments, together with note powers or other instruments of transfer with respect thereto endorsed in blank;

(d)        in the case of any person that becomes a Subsidiary Loan Party after the Restatement Date, the Administrative Agent shall have received a Guaranty Supplement and supplements to the Collateral Agreement, in the form specified therein, in each case duly delivered on behalf of such Subsidiary Loan Party;

(e)        in the case of any person that becomes a "first tier" Foreign Subsidiary (other than any such Foreign Subsidiary that is an Immaterial Subsidiary) directly owned by Holdings, a Borrower or a Subsidiary Loan Party after the Restatement Date, the Administrative Agent shall have received, as promptly as practicable following a request by the Administrative Agent, a Foreign Pledge Agreement, duly executed and delivered on behalf of such Foreign Subsidiary and the direct parent company of such Foreign Subsidiary;

(f)        after the Restatement Date, (i) all the outstanding Equity Interests in any person that becomes a Subsidiary Loan Party after the Restatement Date and (ii) subject to Section 5.10(g), all the Equity Interests that are acquired by a Loan Party after the Restatement Date having an aggregate fair market value in excess of $4.0 million shall have been pledged pursuant to the Collateral Agreement (provided that in no event shall more than 66% of the issued and outstanding Equity Interests in any "first tier" Foreign Subsidiary directly owned by such Loan Party be pledged to secure Obligations of any Loan Party, and in no event shall any of the issued and outstanding Equity Interests in any Foreign Subsidiary that is not a "first tier" Foreign Subsidiary be pledged to secure Obligations of any Loan Party), and the Administrative Agent shall have received all certificates or other instruments (if any) representing such Equity Interests, together with stock powers or other instruments of transfer with respect thereto endorsed in blank;

(g)        except as disclosed on Schedule 3.04 or as otherwise contemplated by any Security Document, all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to create the Liens intended to be created by the Security Documents (in each case, including any supplements thereto) and perfect such Liens to the extent required by, and with the priority required by, the Security Documents, shall have been filed, registered or recorded or delivered to the Administrative Agent for filing, registration or the recording concurrently with, or promptly following, the execution and delivery of each such Security Document;

(h)        except as disclosed on Schedule 3.04 or as otherwise contemplated by any Security Document (and other than any consents or approvals the failure of which to obtain could not reasonably be expected to adversely affect the validity or enforceability of any Security Document or the rights and remedies of the Administrative Agent and the Lenders thereunder), each Loan Party shall have obtained all consents and approvals required to be obtained by it in connection with (i) the execution and delivery of all Security Documents (or supplements thereto) to which it is a party and the granting by it of the Liens thereunder and (ii) the performance of its obligations thereunder; and

(i)        if, after the Restatement Date, the Domestic Subsidiaries that are excluded from the Collateral and Guarantee Requirement because they are Immaterial Subsidiaries comprise in the aggregate more than 5% of Consolidated Total Assets as of the end of the most recently ended fiscal quarter of Holdings or more than 5% of EBITDA for the period of four consecutive fiscal quarters as of the end of the most recently ended fiscal quarter of Holdings, then Holdings and the Borrowers shall, not later than 45 days after the date by which financial statements for such quarter are required to be delivered pursuant to this Agreement, cause one or more of the Borrowers' Domestic Subsidiaries to become additional Subsidiary Loan Parties (notwithstanding that such Domestic Subsidiaries are, individually, Immaterial Subsidiaries) in accordance with paragraph (d) above such that the foregoing condition ceases to be true.

"Commencement Date" shall have the meaning assigned to such term in the recitals of this Agreement.

"Communications" shall have the meaning assigned to such term in Section 10.17(a).

"Company" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Conduit Lender" shall mean any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument; provided that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender, and provided further that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to Section 2.15, 2.16, 2.17 or 10.05 than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender or (b) be deemed to have any Revolving Facility Commitment.

"Confirmation Order" shall have the meaning assigned to such term in Section 4.02(q).

"Consolidated Debt" at any date shall mean the sum of (without duplication) (a) all Indebtedness of Holdings and the Subsidiaries consisting of Capital Lease Obligations and Indebtedness of Holdings and the Subsidiaries for borrowed money (other than (i) Junior Indebtedness to the extent incurred by Holdings and (ii) Letters of Credit and other letters of credit to the extent undrawn) and (b) Indebtedness in respect of the deferred purchase price of property or services of the Borrowers and their Subsidiaries to the extent in the case of clause (b) such Indebtedness appears or should appear on the consolidated balance sheet of Holdings in accordance with GAAP determined on a consolidated basis on such date.

"Consolidated Net Income" shall mean, with respect to any person for any period, the aggregate of the Net Income of such person and its subsidiaries for such period, on a consolidated basis; provided, however, that, without duplication,

(a)     any net after-tax (i) extraordinary gains or losses (less all fees and expenses relating thereto), (ii) nonrecurring, one-time costs or (iii) unusual gains or losses or income or expenses (less all fees and expenses relating thereto) including in the case of clauses (i) and (iii), without limitation, any severance expenses, and fees, expenses or charges related to any offering of Equity Interests in Holdings or either Borrower, any Investment, acquisition or Indebtedness permitted to be incurred hereunder (in each case, whether or not successful), including any such documented out-of-pocket fees, expenses, charges or change in control payments related to the Transactions and any other Aggregate Transaction Costs shall be excluded,

(b)     any net after-tax income or loss from discontinued operations and any net after-tax gain or loss on disposal of discontinued operations shall be excluded,

(c)     any net after-tax gain or loss (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by the board of directors (or equivalent governing body) of either Borrower) shall be excluded,

(d)     any net after-tax income or loss (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of indebtedness shall be excluded,

(e)     (i) the Net Income for such period of (A) for purposes of computing the Available Specified Basket Amount only, any Subsidiary (other than a Loan Party) to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of that income is not at the time permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, statute, rule or governmental regulation applicable to such Subsidiary or its stockholders (which has not been legally waived) and (B) any person accrued prior to the date it becomes a Subsidiary of such person or (other than in the case of one Subsidiary merging into or consolidating with another Subsidiary) is merged into or consolidated with such person or any Subsidiary of such person or the date that such other person's assets are acquired by such person or any Subsidiary of such person, in the case of each of clause (A) and (B), shall be excluded and (ii) the Net Income for such period of any person that is not a subsidiary of such person, or that is accounted for by the equity method of accounting, shall be included only to the extent of the amount of only of dividends or distributions or other payments (including any ordinary course dividend, distribution or other payment) paid in cash (or to the extent converted into cash) to the referent person or a subsidiary thereof in respect of such period,

(f)     Consolidated Net Income for such period shall not include the cumulative effect of a change in accounting principles during such period,

(g)     (i) any increase in amortization or depreciation or any one-time non-cash charges resulting from purchase accounting or (ii) any impact of purchase accounting for deferred revenues, in the case of either (i) or (ii), in connection with the Transactions or any acquisition that is consummated after the Restatement Date shall be excluded,

(h)     any non-cash impairment charges resulting from the application of Statement of Financial Accounting Standards No. 142 and 144, and the amortization of intangibles arising pursuant to No. 141, shall be excluded, and

(i)     any non-cash compensation expenses realized from grants of stock appreciation or similar rights, stock options or other rights to officers, directors and employees of such person or any of its subsidiaries shall be excluded.

"Consolidated Total Assets" shall mean, as of any date, the total assets of Holdings and the consolidated Subsidiaries, determined in accordance with GAAP, as set forth on the consolidated balance sheet of Holdings as of such date.

"Consolidated Total Debt" at any date shall mean Consolidated Debt on such date less the unrestricted cash, short term investments and other Permitted Investments of Holdings and its Subsidiaries on such date to the extent such cash, short term investments and other Permitted Investments are subject to an Account Control Agreement.

"Contract Value" shall mean, for each Swap Agreement, on any date of determination, an amount reasonably determined by the Administrative Agent equal to the amount, if any, that would be payable by Holdings or any of its Subsidiaries to its counterparty to such Swap Agreement, as if (a) such Swap Agreement were being terminated early on such date of determination due to a "Termination Event" or similar event, (b) Holdings or its Subsidiary, as applicable, were the sole "Affected Party" or sole person subject to the circumstances resulting in such event, and (c) the Administrative Agent were the sole party determining such payment amount.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Control Investment Affiliate" shall mean with respect to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized primarily for the purpose of making or managing equity or debt investments in one or more companies. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Credit Event" shall have the meaning assigned to such term in Article IV.

"Current Assets" shall mean, with respect to the Borrowers and the Subsidiaries on a consolidated basis at any date of determination, all assets (other than cash and Permitted Investments or other cash equivalents) that would, in accordance with GAAP, be classified on a consolidated balance sheet of Holdings and the Subsidiaries as current assets at such date of determination, other than amounts related to current or deferred Taxes based on income or profits.

"Current Liabilities" shall mean, with respect to Holdings and its Subsidiaries on a consolidated basis at any date of determination, all liabilities that would, in accordance with GAAP, be classified on a consolidated balance sheet of Holdings and the Subsidiaries as current liabilities at such date of determination, other than (a) the current portion of any Indebtedness, (b) accruals of Interest Expense (excluding Interest Expense that is due and unpaid), (c) accruals for current or deferred Taxes based on income or profits, (d) accruals, if any, of Aggregate Transaction Costs, (e) accruals of any costs or expenses related to (i) severance or termination of employees prior to the Restatement Date or (ii) bonuses, pension and other post-retirement benefit obligations, (f) accruals for add-backs to EBITDA included in clauses (a)(iv) through (a)(xii) of the definition of such term and (g) accruals for deferred revenues.

"Debtor" shall have the meaning assigned to such term in the recitals of this Agreement.

"Debt Service" shall mean, with respect to the Borrowers and the Subsidiaries on a consolidated basis for any period, Cash Interest Expense for such period plus scheduled principal amortization of all Indebtedness for such period.

"Default" shall mean any event or condition that upon notice, lapse of time or both would constitute an Event of Default.

"Defaulting Lender" shall mean any Lender (a) that has failed to fund any payments required to be made by it under the this Agreement within two (2) Business Days after any such payment is due, (b) that has given oral or written notice to either Borrower, the Administrative Agent or any Lender or has otherwise publicly announced that such Lender believes it will fail to fund payments required to be made by it or fund all purchases of participations required to be funded by it under this Agreement and the other Loan Documents, (c) as to which the Administrative Agent has a good faith belief that such Lender has defaulted in fulfilling its obligations (as a lender, agent or letter of credit issuer) under one or more other syndicated credit facilities or (d) with respect to which one or more Lender-Related Distress Events has occurred with respect to such Person or any Person that directly or indirectly Controls such Lender and the Administrative Agent has determined that such Lender may become a Defaulting Lender.

"Deferred Amount" shall have the meaning assigned to such term in the definition of "Required Percentage".

"Deferred Payment Date" shall have the meaning assigned to such term in the definition of "Required Percentage".

"Deposit Account" shall mean a demand, time, savings, passbook or similar account maintained with a Person engaged in the business of banking, including a savings bank, savings and loan association, credit union or trust company.

"Disclosure Statement" shall mean that certain Disclosure Statement for Joint Prepackaged Plan of Reorganization for Penton Media Holdings, Inc. and its Debtor Subsidiaries dated [_____ __], 2010.

"Dollars" or "$" shall mean lawful money of the United States of America.

"Domestic Subsidiary" shall mean any Subsidiary that is not a Foreign Subsidiary.

"EBITDA" shall mean, with respect to Holdings and the Subsidiaries on a consolidated basis for any period, the Consolidated Net Income of Holdings and the Subsidiaries for such period plus (a) the sum of (in each case without duplication and to the extent the respective amounts described in subclauses (i) through (xii) of this clause (a) reduced such Consolidated Net Income for the respective period for which EBITDA is being determined):

     (i)     provision for Taxes based on income, profits or capital of Holdings and the Subsidiaries for such period, including, without limitation, state, franchise and similar taxes of the Borrowers during such period,

     (ii)     Interest Expense of Holdings and the Subsidiaries for such period (net of interest income of Holdings and its Subsidiaries for such period),

     (iii)     depreciation and amortization expenses of Holdings and the Subsidiaries for such period,

     (iv)     business optimization expenses and restructuring charges and reserves (which, for the avoidance of doubt, shall include retention, severance, systems establishment cost, one-time corporate establishment costs, excess pension charges, contract termination costs (including future lease commitments) and costs to consolidate facilities and relocate employees) (A) that would be includable in pro forma financial statements prepared in accordance with Regulation S-X under the Securities Act or (B) that would not be includable in pro forma financial statements

prepared in accordance with Regulation S-X in an amount not to exceed the lesser of ten percent (10%) of EBITDA for such period (as determined prior to giving effect to any amount added to Consolidated Net Income in calculating EBITDA for such period pursuant to this subclause (iv)(B) of this clause (a)) and $5.0 million; provided that with respect to each business optimization expense or restructuring charge or reserve, the Borrowers shall have delivered to the Administrative Agent an officers' certificate specifying and quantifying such expense, charge or reserve and stating that such expense, charge or reserve is a business optimization expense or restructuring charge or reserve, as the case may be,

(v)     any other non-cash charges (including, without limitation, non-cash charges relating to the implementation of FASB 133); provided that, for purposes of this subclause (v) of this clause (a), any non-cash charges or losses shall be treated as cash charges or losses in any subsequent period during which cash disbursements attributable thereto are made,

(vi)    the amount of management, consulting, monitoring, transaction and advisory fees and related expenses paid to the Permitted Investors (or any accruals related to such fees and related expenses) during such period; provided that (for purposes of calculating EBITDA only and without affecting any other provision hereof that relates to the payment of any such fee), such amount shall not exceed in any four quarter period the sum of (A) $2.0 million; provided that any amounts payable pursuant to Section 6.07(c)(i) shall accrue until the First Lien Leverage Ratio is less than 6.50 to 1.00 and thereafter may be paid in cash in an amount in any fiscal year equal to the lesser of such accrued amount and $2.0 million plus (B) reasonable out-of-pocket costs and expenses related thereto,

(vii)   Aggregate Transaction Costs,

(viii)  charges relating to (A) losses associated with cancelled or discontinued products, and (B) all other nonrecurring, one-time costs and expenses to the extent, in the case of clause (B), acceptable to the Administrative Agent,

(ix)    transaction costs associated with Permitted Business Acquisitions (whether or not successful),

(x)     severance costs not added back pursuant to clause (iv) above,

(xi)    charges related to any underfunded Benefit Plans, and

(xii)   costs, expenses and charges of Holdings and the Subsidiaries (in an amount not to exceed $2.0 million for each of the fiscal years ending 2010 and 2011) associated with transformational investments, including without limitation digital initiatives investments and, in each case, as set forth in the Budget with supporting detail reasonably satisfactory to the Administrative Agent;

provided that in the event of an annual recurring trade show with revenues in excess of $200,000 that due to the timing in the occurrence thereof (A) occurs twice in such period, the impact of the earlier recurring trade show shall be deducted or (B) does not occur in such period, the impact of the most recent trade show shall be included; provided further that not more than one such specific annual recurring trade show shall occur in any period.

minus (b) (without duplication and to the extent the amounts described in this clause (b) increased such Consolidated Net Income for the respective period for which EBITDA is being determined) all non-cash items increasing Consolidated Net Income of Holdings and the Subsidiaries for such period (but excluding any such items (i) in respect of which cash was received in a prior period or will be received in a future period and (ii) which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges in any prior period.

"EBITDA Cure Amount" shall have the meaning assigned to such term in Section 7.03(a).

"EBITDA Cure Right" shall have the meaning assigned to such term in Section 7.03(a).

"environment" shall mean ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources such as flora and fauna, the workplace or as otherwise defined in any Environmental Law.

"Environmental Laws" shall mean all applicable laws (including common law), rules, regulations, codes, ordinances, orders, decrees or judgments, promulgated or entered into by or with any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of, or actual or alleged exposure to, any Hazardous Material or to occupational health and safety (to the extent relating to the environment or Hazardous Materials).

"Equity Interests" of any person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interests in (however designated) equity of such person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with Holdings, a Borrower or a Subsidiary, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" shall mean (a) any Reportable Event; (b) the existence with respect to any Benefit Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Benefit Plan, the failure to make by its due date a required installment under Section 412(m) of the Code with respect to any Benefit Plan or the failure to make any required contribution to a Multiemployer Plan; (d) the incurrence by Holdings, a Borrower, a Subsidiary or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Benefit Plan; (e) the receipt by Holdings, a Borrower, a Subsidiary or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Benefit Plan or to appoint a trustee to administer any Benefit Plan under Section 4042 of ERISA; (f) the incurrence by Holdings, a Borrower, a Subsidiary or any ERISA Affiliate of any liability with respect to a withdrawal or partial withdrawal from any Benefit Plan or Multiemployer Plan; or (g) the receipt by Holdings, a Borrower, a Subsidiary or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Holdings, a Borrower, a Subsidiary or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Eurocurrency Borrowing" shall mean a Borrowing comprised of Eurocurrency Loans.

"Eurocurrency Loan" shall mean any Eurocurrency Term Loan or Eurocurrency Revolving Loan.

"Eurocurrency Revolving Borrowing" shall mean a Borrowing comprised of Eurocurrency Revolving Loans.

"Eurocurrency Revolving Loan" shall mean any Revolving Facility Loan bearing interest at a rate determined by reference to the Adjusted LIBO Rate in accordance with the provisions of Article II.

"Eurocurrency Term Loan" shall mean any Term Loan bearing interest at a rate determined by reference to the Adjusted LIBO Rate in accordance with the provisions of Article II.

"Event of Default" shall have the meaning assigned to such term in Section 7.01.

"Excess Cash Flow" shall mean, with respect to the Borrowers and their Subsidiaries on a consolidated basis for any Excess Cash Flow Period, an amount (in any case not less than zero) equal to (a) EBITDA of Holdings and its Subsidiaries on a consolidated basis for such Excess Cash Flow Period, minus, without duplication, (b) the sum of

(i)      Debt Service for such Excess Cash Flow Period,

(ii)      the amount of any voluntary prepayment permitted hereunder of term Indebtedness during such Excess Cash Flow Period (other than Voluntary Prepayments) to the extent not financed, or intended to be financed, using the proceeds of the incurrence of Indebtedness, so long as the amount of such prepayment is not already reflected in Debt Service,

(iii)      (A) Capital Expenditures by the Borrowers and the Subsidiaries on a consolidated basis during such Excess Cash Flow Period that are paid in cash to the extent permitted hereunder and (B) the aggregate consideration paid in cash during the Excess Cash Flow Period in respect of acquisitions (including Permitted Business Acquisitions) permitted hereunder, provided any such payment under this clause (iii) was not deducted in the calculation of Excess Cash Flow in a previous excess Cash Flow Period under clause (iv) below.

(iv)      Capital Expenditures or acquisition consideration referred to in clause (iii)(B) above that, in each case, either Borrower or any Subsidiary shall, during such Excess Cash Flow Period, become obligated to make but that are not made during such Excess Cash Flow Period, provided that Holdings shall deliver a certificate to the Administrative Agent not later than 90 days after the end of such Excess Cash Flow Period, signed by a Responsible Officer of any Borrower and certifying that such (x) Capital Expenditures or such acquisition consideration, as applicable, and the delivery of the related equipment or acquisition closing, as applicable, will be made in the following Excess Cash Flow Period and (y) such Capital Expenditures or acquisition consideration will not be financed with proceeds of Indebtedness other than Revolving Loans, the issuance of Equity Interests by or capital contributions to Holdings, or amounts that would constitute Net Proceeds under clause (a) of the definition of such term if not so spent,

(v)      all Taxes paid by the Borrowers or Holdings during such Excess Cash Flow Period or that will be paid within six months after the close of such Excess Cash Flow Period (provided that any amount so deducted in respect of Taxes that will be paid after the close of such Excess Cash Flow Period shall not be deducted again in a subsequent Excess Cash Flow Period),

(vi)      an amount equal to any increase in Working Capital of the Borrowers and their Subsidiaries for such Excess Cash Flow Period,

(vii)      cash expenditures made in respect of Swap Agreements during such Excess Cash Flow Period, to the extent not reflected in the computation of EBITDA or Interest Expense,

(viii)      permitted dividends or distributions or repurchases of its Equity Interests paid in cash by either Borrower during such Excess Cash Flow Period and permitted dividends or distributions paid by any Subsidiary to any person other than Holdings, either Borrower or any of

the Subsidiaries during such Excess Cash Flow Period, in each case in accordance with Section 6.06,

(ix)     amounts paid in cash during such Excess Cash Flow Period on account of (x) items that were accounted for as non-cash reductions of Net Income in determining Consolidated Net Income or as non-cash reductions of Consolidated Net Income in determining EBITDA of Holdings and its Subsidiaries in a prior Excess Cash Flow Period and (y) reserves or accruals established in purchase accounting,

(x)     to the extent not deducted in the computation of Net Proceeds in respect of any asset disposition or condemnation giving rise thereto, the amount of any mandatory prepayment of Indebtedness (other than Indebtedness created hereunder or under any other Loan Document), together with any interest, premium or penalties required to be paid (and actually paid) in connection therewith; provided that amounts deducted under this clause (x) shall not exceed the amount of EBITDA attributed to such asset disposition or condemnation,

(xi)     any amounts paid in cash during such Excess Cash Flow Period on account of (A) severance, termination, and pensions and other post-retirement benefit obligations and (B) any underfunded Benefit Plans,

(xii)     any amounts paid in cash during such Excess Cash Flow Period on account of restructuring and Integration Transaction Costs,

(xiii)     any amounts paid in cash during such Excess Cash Flow Period on account of Unit Purchase Costs, and

(xiv)     the amount related to items that were added to or not deducted from Net Income in calculating Consolidated Net Income or were added to or not deducted from Consolidated Net Income in calculating EBITDA to the extent either (A) such items represented a cash payment (which had not reduced Excess Cash Flow upon the accrual thereof in a prior Excess Cash Flow Period), or an accrual for a cash payment, by the Borrowers and their Subsidiaries or (B) such items did not represent cash received by the Borrowers and their Subsidiaries, in each case on a consolidated basis during such Excess Cash Flow Period,

plus, without duplication, (c) the sum of

(i)     an amount equal to any decrease in Working Capital for such Excess Cash Flow Period,

(ii)     all proceeds received during such Excess Cash Flow Period of Capital Lease Obligations, purchase money Indebtedness, Sale and Lease-Back Transactions pursuant to Section 6.03 and any other Indebtedness, in each case to the extent used to finance any Capital Expenditure (other than Indebtedness under this Agreement),

(iii)     all amounts referred to in clause (b)(iii) above to the extent funded with the proceeds of the issuance of Equity Interests in, or capital contributions to, Holdings after the Restatement Date (to the extent not previously used to prepay Indebtedness (other than Revolving Facility Loans), make any investment or capital expenditure or otherwise for any purpose in each case resulting in a deduction to Excess Cash Flow in any prior Excess Cash Flow Period) or any amount that would have constituted Net Proceeds under clause (a) of the definition of the term "Net Proceeds" if not so spent, in each case to the extent there is a corresponding deduction from Excess Cash Flow above,

(iv)     to the extent any permitted Capital Expenditures or acquisitions referred to in clause (b)(iv) above and the delivery of the related equipment do not occur in the following Excess Cash Flow Period of Holdings specified in the certificate of Holdings provided pursuant to clause (b)(iv) above, the amount of such Capital Expenditures or acquisitions that were not so made in such following Excess Cash Flow Period (and that were certified under clause (b)(iv) above as expenditures or acquisitions to be made in such following Excess Cash Flow Period), or to the extent any such Capital Expenditures or acquisitions were financed from sources referenced in clause (b)(iv)(y),

(v)     cash payments received in respect of Swap Agreements during such Excess Cash Flow Period to the extent (A) not included in the computation of EBITDA or (B) such payments do not reduce Cash Interest Expense,

(vi)     any extraordinary or nonrecurring gain realized in cash during such Excess Cash Flow Period (except to the extent such gain consists of Net Proceeds subject to Section 2.11(b)),

(vii)     [Reserved], and

(viii)     the amount related to items that were deducted from or not added to Net Income in connection with calculating Consolidated Net Income or were deducted from or not added to Consolidated Net Income in calculating EBITDA to the extent either (A) such items represented cash received by either Borrower or any Subsidiary or (B) such items do not represent cash paid by either Borrower or any Subsidiary, in each case on a consolidated basis during such Excess Cash Flow Period.

"Excess Cash Flow Period" shall mean each fiscal year of Holdings commencing with the 2010 fiscal year.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Indebtedness" shall mean all Indebtedness permitted to be incurred under Section 6.01.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender, any Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of a Loan Party hereunder, (a) income taxes imposed on (or measured by) its net income (or franchise taxes imposed in lieu of net income taxes) by the United States of America (or any state or political subdivision thereof) or the jurisdiction (or political subdivision thereof) under the laws of which such recipient is organized, in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located or any other jurisdiction (or political subdivision thereof) as a result of such recipient engaging in a trade or business in such jurisdiction for tax purposes, (b) any branch profits tax or any similar tax that is imposed by any jurisdiction described in clause (a) above and (c) any withholding tax imposed by the United States that (x) is in effect and would apply to amounts payable hereunder to such recipient at the time such recipient becomes a party hereto or, in the case of a Lender, the designation of a new Lending Office except to the extent that such recipient (or its assignor, if any) was entitled, at the time of designation of a new Lending Office or assignment, to receive additional amounts from a Loan Party with respect to any withholding tax pursuant to Section 2.17(a) or (c) or (y) is attributable to such recipient's failure to comply with Section 2.17(e) or (f) with respect to such payment.

"Executive Order" shall have the meaning assigned to such term in Section 3.24.

"Existing Credit Agreement" shall have the meaning assigned to such term in the recitals of this Agreement.

"Existing Letters of Credit" shall mean those letters of credit identified on Annex II hereto.

"Existing Loans" shall have the meaning assigned to such term in Section 2.01(a).

"Existing Revolving Facility Loans" shall mean the "Revolving Facility Loans" as defined in the Existing Credit Agreement of the "Revolving Lenders" under the Existing Credit Agreement immediately prior to the Restatement Date, in the aggregate outstanding principal balance of [**$65,000,000**].[3]

"Existing Term Loans" shall mean the "Term Loans" as defined in the Existing Credit Agreement immediately prior to the Restatement Date, in an aggregate outstanding principal amount of [**$602,950,000**].[4]

"Extension Fee" shall have the meaning assigned to such term in Section 2.12(d).

"Facility" shall mean the respective facility and commitments utilized in making Loans and credit extensions hereunder, it being understood that as of the date of this Agreement there are two Facilities, i.e., the Term Facility and the Revolving Facility.

"Federal Funds Effective Rate" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" shall mean that certain Amended and Restated Fee Letter dated January 20, 2010 by and among Holdings, the Borrowers and GECC.

"Fees" shall mean the Revolving Credit Commitment Fees, the L/C Participation Fees, the Issuing Bank Fees, Administrative Agent Fees and the Extension Fee.

"Final Order" shall mean an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Bankruptcy Case or the docket of any other court of competent jurisdiction, that (i) has not been reversed, stayed, vacated, modified or amended, and as to which the time to appeal or seek certiorari or move for a stay, new trial, reargument or rehearing has expired, and (ii) no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, which in the case of such appeal, petition or other proceeding in this clause (ii) makes it inadvisable in the sole judgment of the Administrative Agent to consummate the Restructuring.

"Financial Officer" of any person shall mean the Chief Financial Officer, principal accounting officer, Treasurer, Assistant Treasurer or Controller of such person.

---

[3] Amounts to be confirmed and updated as of the Restatement Date.

[4] Amounts to be confirmed and updated as of the Restatement Date.

"<u>Financial Performance Covenants</u>" shall mean the covenants of Holdings set forth in Sections 6.11 and 6.12.

"<u>First Lien Debt</u>" at any date shall mean the sum (without duplication) of all Consolidated Total Debt of Holdings and the Subsidiaries secured by a first priority security interest in any assets of Holdings or any of the Subsidiaries, including in any event any such Indebtedness outstanding under this Agreement.

"<u>First Lien Leverage Ratio</u>" shall mean, on any date, the ratio of (a) First Lien Debt as of such date to (b) EBITDA for the relevant Test Period, all determined on a consolidated basis in accordance with GAAP; <u>provided</u> that EBITDA shall be determined for the respective Test Period on a Pro Forma Basis (except as noted).

"<u>Foreign Lender</u>" shall mean any Lender, Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of a Loan Party hereunder, that is organized in or under the laws of a jurisdiction other than the United States of America or otherwise not a "United States person" within the meaning of Section 7701(a)(30) of the Code.  For purposes of this definition, the United States of America, each state thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"<u>Foreign Pledge Agreement</u>" shall mean a pledge agreement with respect to the Pledged Collateral that constitutes Equity Interests in a "first tier" Foreign Subsidiary (other than any such Foreign Subsidiary that is an Immaterial Subsidiary), in form and substance reasonably satisfactory to the Administrative Agent; <u>provided</u> that in no event shall more than 66% of the issued and outstanding Equity Interests in such Foreign Subsidiary be pledged to secure Obligations of any Loan Party.

"<u>Foreign Subsidiary</u>" shall mean any Subsidiary that is incorporated or organized under the laws of any jurisdiction other than the United States of America, any State thereof or the District of Columbia.

"<u>GAAP</u>" shall mean generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis, subject to the provisions of Section 1.02.

"<u>GECC</u>" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Governmental Authority</u>" shall mean any federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory or legislative body.

"<u>Guarantee</u>" of or by any person (the "<u>guarantor</u>") shall mean (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep well, to purchase assets, goods, securities or services, to take-or-pay or otherwise) or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part) or (v) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation, or (b) any Lien on any assets of

the guarantor securing any Indebtedness (or any existing right, contingent or otherwise, of the holder of Indebtedness to be secured by such a Lien) of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor; provided, however, that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Restatement Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement.

"Guaranteed Obligations" shall have the meaning assigned to such term in Section 9.01.

"guarantor" shall have the meaning assigned to such term in the definition of the term "Guarantee".

"Guarantor" shall mean each of Holdings and each Subsidiary Loan Party in its capacity as guarantor pursuant to the Loan Party Guaranty.

"Guaranty Supplement" shall have the meaning assigned to such term in Section 9.05.

"Hazardous Materials" shall mean all pollutants, contaminants, wastes, chemicals, materials, substances and constituents of any nature which are subject to regulation by any Governmental Authority or which would reasonably be likely to give rise to liability under any Environmental Law, including, without limitation, explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas.

"Holdings" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Holdings Subordinated Debt" shall mean Permitted Debt Securities of Holdings (a) the rights to payment in respect of which are subordinated to the Obligations and guarantees thereof under the Loan Documents in a manner reasonably satisfactory to, and which contains covenants, defaults and other provisions reasonably satisfactory to, the Administrative Agent and (b) the aggregate principal amount of which does not exceed $60.0 million at any time outstanding.

"Identified Acquisition" shall have the meaning assigned to such term in the definition of "Required Percentage".

"Immaterial Subsidiary" shall mean, at any time, any Subsidiary that (a) contributed 2.5% or less of EBITDA for the period of four fiscal quarters most recently ended on or prior to the date of determination, and (b) had consolidated assets representing 2.5% or less of Consolidated Total Assets on the last day of the most recent fiscal quarter ended on or prior to the date of determination.

"Indebtedness" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet prepared in accordance with GAAP, (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person, (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (other than current trade liabilities and current intercompany liabilities (but not any refinancings, extensions, renewals or replacements thereof) incurred in the ordinary course of business and maturing within 365 days after the incurrence thereof), to the extent that the same would be required to be shown as a long term liability on a balance sheet prepared in accordance with GAAP, (e) all Guarantees by such person of Indebtedness of others, (f) all Capital Lease Obligations of such person, (g) the Contract Value, on the date Indebtedness of such person is being determined, in respect of outstanding Swap Agreements, (h) the principal component of all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit and (i) the principal component of all obligations of such person in respect of bankers' acceptances. The Indebtedness

of any person shall include the Indebtedness of any partnership in which such person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such person in respect thereof.

"Indemnified Taxes" shall mean all Taxes other than Excluded Taxes.

"Indemnitee" shall have the meaning assigned to such term in Section 10.05(b).

"Information" shall have the meaning assigned to such term in Section 3.14(a).

"Insolvency or Liquidation Proceeding" shall mean:

(a)     any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Loan Party;

(b)     any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Loan Party or with respect to a material portion of their respective assets;

(c)     any liquidation, dissolution, reorganization or winding up of any Loan Party whether voluntary or involuntary and whether or not involving insolvency or bankruptcy (other than as expressly permitted under this Agreement); or

(d)     any general assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Loan Party.

"Integration Transaction" shall mean the transactions and other restructuring activities occurring in connection with the consolidation and integration of the operations of the Borrowers.

"Integration Transaction Costs" shall mean costs and expenses incurred by Holdings, the Borrowers and the Subsidiaries in connection with the Integration Transaction in an amount not to exceed $15.0 million in the aggregate from and after the Closing Date through the term of this Agreement (excluding from such $15.0 million limit costs in connection with the Integration Transaction that are accounted for as capital expenditures).

"Interest Election Request" shall mean a request by the Borrowers, substantially in the form of Exhibit D hereto to convert or continue a Term Borrowing or Revolving Facility Borrowing in accordance with Section 2.07.

"Interest Expense" shall mean, with respect to any person for any period, the sum of (a) gross interest expense of such person for such period on a consolidated basis, including (i) the amortization of debt discounts, (ii) the amortization of all fees (including fees with respect to Swap Agreements) payable in connection with the incurrence of Indebtedness to the extent included in interest expense and (iii) the portion of any payments or accruals with respect to Capital Lease Obligations allocable to interest expense and (b) capitalized interest of such person.  For purposes of the foregoing, gross interest expense shall be determined after giving effect to any net payments made or received and costs incurred by the Borrowers and the Subsidiaries with respect to Swap Agreements.

"Interest Payment Date" shall mean, (a) with respect to any Eurocurrency Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurocurrency Borrowing with an Interest Period of more than three months' duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing and, in addition, the date of any refinancing or conversion of such Borrowing

with or to a Borrowing of a different Type and (b) with respect to any ABR Loan, the last Business Day of March, June, September and December of each year.

"Interest Period" shall mean, as to any Eurocurrency Borrowing, the period commencing on the date of such Borrowing or on the last day of the immediately preceding Interest Period applicable to such Borrowing, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is 1, 2, 3 or 6 months thereafter (or 9 or 12 months, if at the time of the relevant Borrowing, all relevant Lenders provide consent thereto), as the Borrowers may elect, or the date any Eurocurrency Borrowing is converted to an ABR Borrowing in accordance with Section 2.07 or repaid or prepaid in accordance with Section 2.09, 2.10 or 2.11; provided, that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"Investment" shall have the meaning assigned to such term in Section 6.04.

"Issuing Bank" shall mean (a) GECC, acting through any of its Affiliates or branches, (b) Wachovia and (c) each other Issuing Bank designated pursuant to Section 2.05(k) and (d) with respect to Existing Letters of Credit only, each issuer of Existing Letters of Credit, in each case in its capacity as an issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.05(i). An Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"Issuing Bank Fees" shall have the meaning assigned to such term in Section 2.12(b).

"Junior Capital" shall mean any Qualified Capital Stock of Holdings or either Borrower and any Junior Indebtedness.

"Junior Indebtedness" shall mean Indebtedness of Holdings or either Borrower that (a) is unsecured and expressly subordinated to the prior payment in full in cash of the Obligations (and the related Guarantees) on terms reasonably satisfactory to the Administrative Agent, (b) provides that interest in respect of such Indebtedness shall be payable solely in kind, (c) has a final maturity date that is not earlier than the date that is 91 days after the Term Facility Maturity Date and has no scheduled payments of principal thereon (including pursuant to a sinking fund obligation) or mandatory redemption obligations prior to such final maturity date and (d) is subject to covenants, events of default and remedies that are reasonably satisfactory to the Administrative Agent.

"L/C Disbursement" shall mean a payment or disbursement made by an Issuing Bank pursuant to a Letter of Credit.

"L/C Participation Fee" shall have the meaning assigned to such term in Section 2.12(b).

"Lender" shall mean each of the Lenders under the Existing Credit Agreement (other than any such person that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with Section 10.04), as well as any person that becomes a "Lender" hereunder in accordance with Section 10.04.

"Lender-Related Distress Event" shall mean, with respect to any Lender or any Person that directly or indirectly Controls such Lender (each a "Distressed Person"), (a) a voluntary or involuntary case with respect to such Distressed Person under the Bankruptcy Code or any Bankruptcy Law, (b) a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any

substantial part of such Distressed Persons' assets, (c) such Distressed Person or any Person that directly or indirectly Controls such Distressed Person is subject to a forced liquidation, merger, sale or other change of majority control supported in whole or in part by guaranties or other support (including, without limitation, the nationalization or assumption of majority ownership or operating control) by the United States government or other Governmental Authority, or (d) such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt.

"<u>Lending Office</u>" shall mean, as to any Lender, the applicable branch, office or Affiliate of such Lender designated by such Lender to make Loans.

"<u>Letter of Credit</u>" shall mean any letter of credit issued pursuant to <u>Section 2.05</u> and any Existing Letter of Credit.

"<u>LIBO Rate</u>" shall mean with respect to any Interest Period for any Eurocurrency Loan, the higher of (a) 1.00% and (b) the rate determined by the Administrative Agent to be the offered rate for deposits in Dollars for the applicable Interest Period appearing on Reuters Screen LIBOR 01 Page as of 11:00 a.m. (London, England time) two (2) Business Days prior to the first day in such Interest Period. If no such offered rate exists, such rate will be the rate of interest per annum as determined by the Administrative Agent at which deposits of Dollars in immediately available funds are offered at 11:00 a.m. (London, England time) two (2) Business Days prior to the first day in such Interest Period by major financial institutions reasonably satisfactory to Administrative Agent on the London interbank market for such Interest Period for the applicable principal amount on such date of determination.

"<u>Lien</u>" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities (other than securities representing an interest in a joint venture that is not a Subsidiary), any purchase option, call or similar right of a third party with respect to such securities to the extent having an effect equivalent to that of a security interest in such securities.

"<u>Liquidity Cure Amount</u>" shall have the meaning assigned to such term in <u>Section 7.03(c)</u>.

"<u>Liquidity Cure Right</u>" shall have the meaning assigned to such term in <u>Section 7.03(c)</u>.

"<u>Loan Document Obligations</u>" shall mean, without duplication, (a) the due and punctual payment by the Borrowers of (i) the unpaid principal of and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans made to the Borrowers, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) each payment required to be made by the Borrowers under this Agreement in respect of any Letter of Credit, when and as due, including payments in respect of reimbursement of disbursements, interest thereon (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) and obligations to provide cash collateral and (iii) all other monetary obligations (including, without limitation, Swap Related Reimbursement Obligations) of the Borrowers to any of the Secured Parties under this Agreement and each of the other Loan Documents, including obligations to pay fees, expense and reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of the Borrowers under or pursuant to this Agreement and each of the other Loan Documents and (c) the due and punctual payment

and performance of all the covenants, agreements, obligations and liabilities of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding).

"Loan Documents" shall mean this Agreement, the Letters of Credit, the Security Documents, any Note, each Guaranty Supplement and the Fee Letter.

"Loan Parties" shall mean Holdings, the Borrowers and the Subsidiary Loan Parties.

"Loan Party Guaranty" shall mean the guaranty set forth in Article IX of this Agreement.

"Loans" shall mean the Term Loans and the Revolving Facility Loans.

"Local Time" shall mean New York City time.

"Majority Lenders" of any Facility shall mean, at any time, Lenders under such Facility having Loans and, in the case of the Revolving Facility, unused Revolving Facility Commitments, representing more than 50% of the sum of all Loans outstanding under such Facility and, in the case of the Revolving Facility, unused Revolving Facility Commitments, at such time.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Material Adverse Effect" shall mean a material adverse effect on the business, property, operations or condition of Holdings and its Subsidiaries, taken as a whole.

"Material Indebtedness" shall mean Indebtedness (other than the Loans and Letters of Credit) of any one or more of Holdings, either Borrower or any Subsidiary outstanding in an aggregate principal amount (which in the case of Swap Agreements shall mean the Contract Value thereof) exceeding $10.0 million.

"Maximum Rate" shall have the meaning assigned to such term in Section 10.09.

"MidOcean" shall mean the collective reference to MidOcean Partners III, L.P. and any Control Investment Affiliates thereof.

"Minimum EBITDA" shall have the meaning assigned to such term in Section 6.12.

"Minimum Liquidity" shall have the meaning assigned to such term in Section 6.11.

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgaged Properties" shall mean the owned real properties of the Loan Parties encumbered by a Mortgage pursuant to Section 5.10.

"Mortgages" shall have the meaning assigned to such term in Section 5.10.

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which either Borrower, Holdings or any Subsidiary or any ERISA Affiliate (other than one considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Code Section 414) is making or accruing an obligation to make contributions, or has within any of the preceding six plan years made or accrued an obligation to make contributions.

"Net Income" shall mean, with respect to any person, the net income (loss) of such person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends.

"Net Proceeds" shall mean:

(a)     100% of the cash proceeds actually received by Holdings, either Borrower or any of their Subsidiaries (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but only as and when received) from any loss, damage, destruction or condemnation of, or any sale, transfer or other disposition (including any sale and leaseback of assets and any mortgage or lease of real property) to any person of any asset or assets of Holdings, either Borrower or any Subsidiary (other than those pursuant to Section 6.05(a), (b), (c), (d) (except as contemplated by Section 6.03(b)(ii)), (e), (f), (h), (i) or (j)), net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, required debt payments and required payments of other obligations relating to the applicable asset (other than pursuant hereto or pursuant to any Permitted Debt Securities or any Permitted Refinancing Indebtedness in respect thereof), other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith and (ii) Taxes paid or payable as a result thereof (taking into account any reduction in tax liability resulting from any operating losses and net operating loss carryforwards and similar tax attributes which may effect a reduction in the payment of actual taxes), provided that, except in the case of the sale, transfer or other disposition (including by means of condemnation or a casualty event) of an asset or group of related assets resulting in Net Proceeds in excess of $15.0 million, if no Event of Default exists and Holdings or a Borrower shall deliver a certificate of a Responsible Officer of Holdings or such Borrower to the Administrative Agent promptly following receipt of any such proceeds setting forth Holdings' or the Borrowers' intention to use any portion of such proceeds to acquire, maintain, develop, construct, improve, upgrade or repair assets useful in the business of Holdings, the Borrowers and the Subsidiaries, to pay Integration Transaction Costs or to make other Permitted Business Acquisitions, in each case within 12 months of such receipt, such portion of such proceeds shall not constitute Net Proceeds except to the extent not so used or not contractually committed to be so used within such 12-month period (it being understood that if any portion of such proceeds are not so used within such 12-month period because such amount is contractually committed to be used and subsequent to such date such contract is terminated or expires without such portion being so used, or if in any event any portion of such proceeds are not so used within 6 months after the end of such 12-month period such remaining portion shall constitute Net Proceeds as of the date of such termination or expiration without giving effect to this proviso), provided further that (x) no proceeds realized in a single transaction or series of related transactions shall constitute Net Proceeds unless such proceeds shall exceed $1.5 million and (y) no proceeds shall constitute Net Proceeds in any fiscal year until the aggregate amount of all such proceeds in such fiscal year shall exceed $7.5 million, and

(b)     100% of the cash proceeds from the incurrence, issuance or sale by Holdings, either Borrower or any of their Subsidiaries of any Indebtedness (other than Excluded Indebtedness), net of all taxes and fees (including investment banking fees), commissions, costs and other expenses, in each case incurred in connection with such issuance or sale.

For purposes of calculating the amount of Net Proceeds, fees, commissions and other costs and expenses payable to Holdings or either Borrower or any Affiliate of any of them shall be disregarded, except for financial advisory fees customary in type and amount paid to Permitted Investors.

"Non-Consenting Lender" shall have the meaning assigned to such term in Section 2.19(c).

"Non-Rollover Revolving Lenders" shall mean UBS and TD.

"Note" shall have the meaning assigned to such term in Section 2.09(e).

"Obligations" shall mean, without duplication, (a) the Loan Document Obligations, (b) the due and punctual payment and performance of all obligations of each Loan Party under each Secured Swap Agreement and (c) the due and punctual payment and performance of all obligations of the Borrowers and any of the other Loan Parties in respect of overdrafts and related liabilities owed to the Administrative Agent or a Lender or any of its Affiliates and arising from cash management services (including treasury, depository, overdraft, credit or debit card, electronic funds transfer, ACH services and other cash management arrangements).

"Other Taxes" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, the Loan Documents, and any and all interest and penalties related thereto.

"Participant" shall have the meaning assigned to such term in Section 10.04(c).

"PBGC" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Perfection Certificate" shall mean a certificate in the form of Exhibit II to the Collateral Agreement or any other form approved by the Administrative Agent.

"Permitted Asset Swap" shall mean any transfer of property or assets by either Borrower or any of its Subsidiaries in which at least 90% of the consideration received by the transferor consists of properties or assets (other than cash) that will be used in a business or business activity permitted under Section 6.08(b); provided, however, that the aggregate fair market value of the property or assets being transferred by the Borrowers or such Subsidiary is not greater than the aggregate fair market value of the property or assets received by the Borrowers or such Subsidiary in such exchange; provided further, however, that such market value of the property or assets being transferred or received by the Borrowers or such Subsidiary shall be made in good faith by the board of directors (or equivalent governing body) of the Borrowers.

"Permitted Business Acquisition" shall mean any acquisition by the Borrowers or any Subsidiary of all or substantially all the assets of, or all the outstanding Equity Interests (other than directors' qualifying shares) in, a person or a division or line of business of a person (or any subsequent investment made in a person, division or line of business previously acquired in a Permitted Business Acquisition) if (a) such acquisition was not preceded by, or effected pursuant to, an unsolicited or hostile offer by the acquirer or an Affiliate of the acquirer (it being understood that such acquirer or Affiliate may initiate discussions with respect to a proposed acquisition), (b) immediately after giving effect thereto: (i) no Event of Default shall have occurred and be continuing or would result therefrom; (ii) all transactions related thereto shall be consummated in all material respects in accordance with applicable laws and the Borrowers shall have used commercially reasonable efforts to cause the purchase agreement relating thereto to permit the Lien of the Collateral Agreement thereon; (iii) (A) Holdings and its Subsidiaries shall be in compliance, on a Pro Forma Basis after giving effect to such acquisition and any Indebtedness incurred or assumed in connection therewith, with the Financial Performance Covenants recomputed as at the last day of the most recently ended fiscal quarter of Holdings and its Subsidiaries for which financial statements are available, and the Borrowers shall have delivered to the Administrative Agent a certificate of a Responsible Officer of Holdings to such effect, together with all financial information for such Subsidiary

or assets that is reasonably requested by the Administrative Agent and available to the Borrowers, and (B) any acquired or newly formed Subsidiary shall not be liable for any Indebtedness (except for Indebtedness permitted by Section 6.01); (iv) the First Lien Leverage Ratio calculated on a Pro Forma Basis (but without giving effect to such Permitted Business Acquisition) (for this purpose, referred to herein below as the baseline First Lien Leverage Ratio) is (A) greater than 3.50 to 1.00, the First Lien Leverage Ratio after giving effect to such Permitted Business Acquisition on a Pro Forma Basis shall not exceed the aforementioned baseline First Lien Leverage Ratio or (B) less than or equal to 3.50 to 1.00, the First Lien Leverage Ratio after giving effect to such Permitted Business Acquisition on a Pro Forma Basis shall be less than or equal to 3.50 to 1.00; and (v) the sum of the Available Unused Commitments plus the Available Cash of the Borrowers and the Subsidiaries shall be no less than $7.5 million and (c) the aggregate amount expended by the Borrowers and the Subsidiaries in connection with any such acquisitions or investments that do not constitute acquisitions of or investments in persons whose principal assets and business are located within the United States of America and is organized under laws of a jurisdiction within the United States of America (or a division or line of business of such a person) shall not exceed $25.0 million in the aggregate from the Restatement Date through the term of this Agreement (which said amount shall include the portion of any acquisition or investment in a person organized under the laws of a jurisdiction within the United States of America applicable to the assets of such person located outside of the United States of America, based on the relative value thereof).

"Permitted Cure Security" shall mean (a) an equity security of Holdings having no mandatory redemption, repurchase or similar requirements prior to 91 days after the Term Facility Maturity Date, and upon which all dividends or distributions (if any) shall, prior to 91 days after the Term Facility Maturity Date, be payable solely in additional shares of such equity security and (b) any Junior Indebtedness of Holdings.

"Permitted Debt Securities" shall mean (a) unsecured subordinated notes issued by the Borrowers or Holdings and (b) other unsecured subordinated indebtedness of the Borrowers or Holdings, in each case (i) the terms of which (A) do not provide for any scheduled repayment, mandatory redemption or sinking fund obligation prior to the date that is six months after the Term Facility Maturity Date and (B) provide for subordination of payments in respect of such notes to the Obligations and guarantees thereof under the Loan Documents in a manner reasonably satisfactory to the Administrative Agent, (ii) the covenants, events of default, Subsidiary guarantees and other terms of which are reasonably satisfactory to the Administrative Agent and (iii) in respect of which no Subsidiary of either Borrower that is not an obligor under the Loan Documents is an obligor and (iv) the proceeds of which are used to finance a Permitted Business Acquisition or to pay or prepay Loans; provided that interest in respect of such Indebtedness shall be payable solely in kind so long as the First Lien Leverage Ratio would be greater than 3.50 to 1.00.

"Permitted Investments" shall mean:

(a)      direct obligations of the United States of America or any member of the European Union or any agency thereof or obligations guaranteed by the United States of America or any member of the European Union or any agency thereof, in each case with maturities not exceeding two years;

(b)      time deposit accounts, certificates of deposit and money market deposits maturing within 180 days of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America having capital, surplus and undivided profits in excess of $250.0 million and whose long-term debt, or whose parent holding company's long-term debt, is rated A (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(c)      repurchase obligations with a term of not more than 180 days for underlying securities of the types described in clause (a) above entered into with a bank meeting the qualifications described in clause (b) above;

(d)      commercial paper, maturing not more than one year after the date of acquisition, issued by a corporation organized and in existence under the laws of the United States of America or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of P-1 (or higher) according to Moody's, or A-1 (or higher) according to S&P;

(e)      securities with maturities of two years or less from the date of acquisition issued or fully guaranteed by any State, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A by S&P or A by Moody's;

(f)      shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (e) above;

(g)      money market funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5.0 billion;

(h)      time deposit accounts, certificates of deposit and money market deposits in an aggregate face amount not in excess of 1/2 of 1% of the total assets of Holdings and the Subsidiaries, on a consolidated basis, as of the end of Holdings' most recently completed fiscal year; and

(i)      other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments of a type analogous to the foregoing.

"Permitted Investors" shall mean (a) Wasserstein, (b) MidOcean **[and (c) those persons whose Equity Interests in a person whose principal asset is Equity Interests in Holdings held directly by such person (such person, a "Holding Vehicle") are bound by the Stockholders Agreement so long as, in the case of clause (c) above, Wasserstein or MidOcean has control over the voting of such Equity Interests of a Holding Vehicle on all matters (including election of directors) pursuant to the Stockholders Agreement and, as a result of such control, Wasserstein or MidOcean controls the voting of all Equity Interests in Holdings owned by any such Holding Vehicle on all matters, including the election of directors]**.[5]

"Permitted Refinancing Indebtedness" shall mean any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, repay, replace, defease or refund (collectively, to "Refinance") the Indebtedness being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Indebtedness); provided that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced (plus unpaid accrued interest and premium thereon and underwriting discounts, fees, commissions and expenses), (b) the average life to maturity of such Permitted Refinancing Indebtedness is greater than or equal to the average life to maturity of the Indebtedness being Refinanced or (if shorter) the Term Loans, (c) if the Indebtedness being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing Indebtedness shall be subordinated in right of payment to such Obligations and shall contain covenants,

---

[5] Subject to review of Stockholders Agreement.

events of default and other provisions on terms, taken as a whole, at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being Refinanced, (d) no Permitted Refinancing Indebtedness shall have obligors or contingent obligors that were not obligors or contingent obligors (and would not have been required to become obligors or contingent obligors) in respect of the Indebtedness being Refinanced and (e) if the Indebtedness being Refinanced is (or would have been required to be) secured by any collateral (whether equally and ratably with, or junior to, the Secured Parties or otherwise), such Permitted Refinancing Indebtedness may be secured by such collateral (including in respect of working capital facilities of Foreign Subsidiaries otherwise permitted under this Agreement only, any collateral pursuant to after-acquired property clauses to the extent any such collateral secured the Indebtedness being Refinanced) on terms no less favorable to the Secured Parties than those contained in the documentation governing the Indebtedness being Refinanced; and provided further, that with respect to a Refinancing of (x) Permitted Debt Securities, such Permitted Refinancing Indebtedness shall (i) be subordinated to the guarantee by Holdings and the Subsidiary Loan Parties of the Facilities and (ii) be otherwise on terms not materially less favorable, taken as a whole, to the Lenders than those contained in the documentation governing the Indebtedness being refinanced, (y) Permitted Debt Securities, such Permitted Refinancing Indebtedness shall meet the requirements of clauses (i), (ii) and (iii) of the definition of "Permitted Debt Securities" and (z) Indebtedness that is subordinated in right of payment to the Obligations under this Agreement, any guarantees of such Permitted Refinancing Indebtedness permitted under clause (d) above shall be subordinated in right of payment to the Obligations on terms not materially less favorable to the Lenders than the subordination provisions applicable to the guarantees issued in connection with the Indebtedness being refinanced.

"person" or "Person" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company, individual or family trust, or other organization (whether or not a legal entity), or any government or any agency or political subdivision thereof (including any Governmental Authority).

"PIK Election" shall have the meaning assigned to such term in Section 2.13(d).

"PIK Interest" shall mean interest payable in kind pursuant to a PIK Election.

"PIK Percentage" shall mean (a) during the period from the Restatement Date through and including February 1, 2013, 1.00% per annum and (b) after February 1, 2013, 2.00% per annum.

"Plan" shall mean that certain Joint Prepackaged Plan of Reorganization for Penton Media Holdings, Inc. and its Debtor Subsidiaries dated [_____ __], 2010.

"Platform" shall have the meaning assigned to such term in Section 10.17(b).

"Pledged Collateral" shall have the meaning assigned to such term in the Collateral Agreement.

"Post-Petition Interest" shall have the meaning assigned to such term in Section 9.06(b).

"primary obligor" shall have the meaning assigned to such term in the definition of the term "Guarantee".

"Pro Forma Basis" shall mean, as to any person, for any events as described below that occur subsequent to the commencement of a period for which the financial effect of such events is being calculated, and giving effect to the events for which such calculation is being made, such calculation as will give pro forma effect to such events as if such events occurred on the first day of the four consecutive fiscal quarter period ended on or before the occurrence of such event for which financial statements are available (the "Reference Period"): (a) in making any determination of EBITDA, pro forma effect shall be given to any asset disposition, to any asset acquisition, any discontinued operation or any operational change (or any

similar transaction or transactions that require a waiver or consent of the Required Lenders pursuant to Section 6.04 or 6.05), in each case that occurred during the Reference Period (or, in the case of determinations made pursuant to the definition of the term "Permitted Business Acquisition", occurring during the Reference Period or thereafter and through and including the date upon which the respective Permitted Business Acquisition is consummated) and (b) in making any determination on a Pro Forma Basis, (i) all Indebtedness (including Indebtedness incurred or assumed and for which the financial effect is being calculated, whether incurred under this Agreement or otherwise) incurred or permanently repaid during the Reference Period (or, in the case of determinations made pursuant to the definition of the term "Permitted Business Acquisition", occurring during the Reference Period or thereafter and through and including the date upon which the respective Permitted Business Acquisition is consummated) shall be deemed to have been incurred or repaid at the beginning of such period (with, in the case of any revolving Indebtedness, the amount thereof incurred during the Reference Period (or, in the case of determinations made pursuant to the definition of the term "Permitted Business Acquisition", the amount incurred during the Reference Period or thereafter and through and including the date upon which the respective Permitted Business Acquisition is consummated) being deemed to be the amount thereof outstanding on the relevant date of determination after giving effect to all borrowings thereunder made or to be made on such date) and (ii) Interest Expense of such person attributable to interest on any Indebtedness, for which pro forma effect is being given as provided in preceding clause (i), bearing floating interest rates shall be computed on a pro forma basis utilizing the rate which is or would be in effect with respect to such Indebtedness as at the relevant date of determination as if such rate had been actually in effect during the period for which pro forma effect is being given.

Pro forma calculations made pursuant to the definition of the term "Pro Forma Basis" shall be determined in good faith by a Responsible Officer of either Borrower and, for any fiscal period ending on or prior to the first anniversary of an asset acquisition, asset disposition, discontinued operation or operational change (or any similar transaction or transactions that require a waiver or consent of the Required Lenders pursuant to Section 6.04 or 6.05), may include adjustments to reflect operating expense reductions and other operating improvements or synergies reasonably expected to result from such asset acquisition, asset disposition, discontinued operation or operational change (or other similar transaction or transactions), for purposes of determining compliance with the Financial Performance Covenants and achievement of other financial measures provided for herein, as follows: (x) such adjustments shall reflect demonstrable operating expense reductions and other demonstrable operating improvements or synergies that would be includable in pro forma financial statements prepared in accordance with Regulation S-X under the Securities Act; and (y) such adjustments may reflect additional operating expense reductions and other additional operating improvements and synergies that would not be includable in pro forma financial statements prepared in accordance with Regulation S-X but for which substantially all of the steps necessary for the realization thereof have been taken or are reasonably anticipated by the Borrowers to be taken in the next 12 month period following the consummation thereof and, are estimated on a good faith basis by the Borrowers; provided, however, that the aggregate amount of any such adjustments pursuant to clause (y) above shall not exceed the lesser of 10% of EBITDA in any fiscal year and $5.0 million, and provided further, such adjustments shall not include items to the extent the benefit thereof has been realized in the relevant period or to the extent such adjustment is otherwise already reflected in the calculation of EBITDA. The Borrowers shall deliver to the Administrative Agent a certificate of a Financial Officer of either Borrower setting forth such demonstrable or additional operating expense reductions and other operating improvements or synergies and information and calculations supporting them in reasonable detail.

"Pro Forma Financial Statements" shall have the meaning assigned to such term in Section 3.05(a).

"**Projections**" shall mean the projections of Holdings, the Borrowers and the Subsidiaries dated **[December 14, 2009]**[6] and any other projections and any forward-looking statements (including statements with respect to booked business) of such entities furnished to the Lenders or the Administrative Agent by or on behalf of Holdings, either Borrower or any of the Subsidiaries.

"**Qualified Capital Stock**" shall mean any Equity Interest in any Person that does not by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable) or upon the happening of any event (a) provide for scheduled payments of dividends in cash, (b) become mandatorily redeemable (other than pursuant to customary provisions relating to redemption upon a change of control or sale of assets) pursuant to a sinking fund obligation or otherwise prior to the date that is 91 days after the Term Facility Maturity Date, (c) become convertible or exchangeable at the option of the holder thereof for Indebtedness (other than Junior Indebtedness) or Equity Interests that are not Qualified Capital Stock, or (d) contain any maintenance covenants or other covenants adverse to the Lenders or remedies (other than voting rights and increases in dividends).

"**Qualified IPO**" shall mean an underwritten public offering of the Equity Interests in Holdings which generates gross proceeds to Holdings of at least $50.0 million.

"**Reference Period**" shall have the meaning assigned to such term in the definition of the term "Pro Forma Basis".

"**Refinance**" shall have the meaning assigned to such term in the definition of the term "Permitted Refinancing Indebtedness", and "Refinanced" shall have a meaning correlative thereto.

"**Register**" shall have the meaning assigned to such term in Section 10.04(b)(iv).

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Parties**" shall mean, with respect to any specified person, such person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such person and such person's Affiliates.

"**Release**" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the environment.

"**Remaining Present Value**" shall mean, as of any date with respect to any lease, the present value as of such date of the scheduled future lease payments with respect to such lease, determined with a discount rate equal to a market rate of interest for such lease reasonably determined at the time such lease was entered into.

"**Reorganized Holdings**" shall mean Holdings on and after the Effective Date of the Plan.

"**Reportable Event**" shall mean any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043(a) of ERISA has been waived, with respect to a Benefit Plan (other than a

---

[6] To be updated, but shall not include payments in respect of Secured Swap Agreements greater than as provided under the Secured Swap Agreements in effect on December 14, 2009.

Benefit Plan maintained by an ERISA Affiliate that is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code).

"Required Lenders" shall mean, at any time, Lenders having (a) Loans outstanding, (b) Revolving L/C Exposures, and (c) Available Unused Commitments, that, taken together, represent more than 50% of the sum of (x) all Loans outstanding, (y) the Revolving L/C Exposure, and (z) all Available Unused Commitments at such time. The Loans, Revolving L/C Exposures, and Available Unused Commitment of any Defaulting Lender and of any Restricted Person shall be disregarded in determining Required Lenders at any time, and such Defaulting Lender or Restricted Person shall not have any voting or consent rights under or with respect to any Loan Document as more particularly described in Section 2.21 and Section 10.08, respectively.

"Required Percentage" shall mean, with respect to an Excess Cash Flow Period, 75%; provided that to the extent the Required Percentage for such Excess Cash Flow Period is 75%, and if the Borrowers shall have entered into a written letter of intent or a definitive agreement for one or more Permitted Business Acquisitions on or prior to the applicable Excess Cash Flow payment date (each, an "Identified Acquisition"), then 25% of the Excess Cash Flow for such Excess Cash Flow Period (the "Deferred Amount") may be allocated to be reinvested in one or more Identified Acquisitions and not be required to be applied against Borrowers as provided in Section 2.11(c) so long as (a) no Default or Event of Default shall have occurred and is continuing on such Excess Cash Flow payment date or the date of such reinvestment, (b) the Deferred Amount is reinvested in such Identified Acquisitions within 180 days of the date on which an Excess Cash Flow prepayment is required (the "Deferred Payment Date") and (c) a Responsible Officer of Holdings or any Borrower shall have delivered to the Administrative Agent a certificate setting forth the Borrowers' intention to use all or any portion of the Deferred Amount in connection with such Identified Acquisitions; provided, however, that any portion of the Deferred Amount not reinvested in an Identified Acquisition (whether as purchase price therefor, paid prior to closing or allocated as a post-closing purchase price adjustment, or as fees and expenses incurred in connection therewith) shall be used to prepay the Loans on the date that is 5 Business Days after the earlier of the Deferred Payment Date and the date of termination of, or when the Loan Parties are no longer pursuing, any Identified Acquisition. Notwithstanding the foregoing, (a) if the First Lien Leverage Ratio at the end of such Excess Cash Flow Period is greater than 2.25 to 1.00 but less than or equal to 3.75 to 1,00, "Required Percentage" shall be 25%, and (b) if the First Lien Leverage Ratio at the end of such Excess Cash Flow Period is less than or equal to 2.25 to 1.00, "Required Percentage" shall be 0%.

"Responsible Officer" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement.

"Restatement Date" shall mean **[_____ __, 2010]**.

"Restatement Date Pro Forma EBITDA" shall have the meaning assigned to such term in Section 3.05(a).

"Restricted Cash" shall mean all cash and Permitted Investments that are subject to Liens (other than Liens created under the Loan Documents).

"Restricted Person" shall mean (a) MidOcean and Wasserstein and (b) any any other person which, together with any of its Affiliates (including any fund under common fund management), owns, beneficially or of record, more than 15% of the Equity Interests of Holdings, the Borrowers or any direct or indirect parent thereof.

"Restructuring" shall have the meaning assigned to such term in the recitals of this Agreement.

"Restructuring Support Agreement" shall mean that certain Restructuring Support Agreement dated as of January 20, 2010 among Holdings, the Borrowers, the Administrative Agent, the Consenting Holders (as defined therein), the Second Lien Agent (as defined therein) and the Equity Investors (as defined therein).

"Revolving Credit Commitment Fee" shall have the meaning assigned to such term in Section 2.12(a).

"Revolving Credit Commitment Fee Rate" shall mean a rate equal to 0.50% per annum.

"Revolving Facility" shall mean the Revolving Facility Commitments and the extensions of credit made hereunder by the Revolving Facility Lenders.

"Revolving Facility Borrowing" shall mean a Borrowing comprised of Revolving Facility Loans.

"Revolving Facility Commitment" shall mean, with respect to each Revolving Facility Lender, the commitment of such Revolving Facility Lender to make Revolving Facility Loans pursuant to Section 2.01, expressed as an amount representing the maximum aggregate permitted amount of such Revolving Facility Lender's Revolving Facility Credit Exposure hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.08, (b) reduced or increased from time to time pursuant to assignments by or to such Lender under Section 10.04, (c) increased from time to time by the amount of any PIK Interest added to the principal amount of any Revolving Facility Loan and (d) decreased from time to time by the amount of any payment or prepayment of any PIK Interest.  The initial amount of each Revolving Facility Lender's Revolving Facility Commitment is set forth on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Revolving Facility Lender shall have assumed its Revolving Facility Commitment, as applicable.  The aggregate amount of the Revolving Facility Commitments on the Restatement Date is **[$42,656,250.00]**[7].

"Revolving Facility Credit Exposure" shall mean, at any time, the sum of (a) the aggregate principal amount of the Revolving Facility Loans outstanding at such time and (b) the Revolving L/C Exposure at such time.  The Revolving Facility Credit Exposure of any Revolving Facility Lender at any time shall be the sum of (x) the aggregate principal amount of such Revolving Facility Lender's Revolving Facility Loans outstanding at such time and (y) such Revolving Facility Lender's Revolving L/C Exposure at such time.

"Revolving Facility Lender" shall mean a Lender with a Revolving Facility Commitment and/or with outstanding Revolving Facility Loans.

"Revolving Facility Loan" shall mean a Loan made by a Revolving Facility Lender pursuant to Section 2.01(b) and the amount of any PIK Interest added to the Revolving Facility Loans pursuant to Section 2.13.

"Revolving Facility Maturity Date" shall mean August 1, 2014.

"Revolving Facility Percentage" shall mean, with respect to any Revolving Facility Lender, the percentage of the total Revolving Facility Commitments represented by such Lender's Revolving Facility Commitment (or if the Revolving Facility Commitments have terminated or expired, based upon the Revolving Facility Commitments most recently in effect) giving effect to any assignments pursuant to Section 10.04; provided that except as expressly set forth herein, in the case of a Defaulting Lender, such Defaulting Lender's Revolving Facility Commitment shall be disregarded in the calculation.

---

[7] Amounts to be confirmed and updated as of the Restatement Date.  See footnote 1.

"Revolving L/C Exposure" shall mean at any time the sum of (a) the aggregate undrawn amount of all Letters of Credit outstanding at such time and (b) the aggregate principal amount of all L/C Disbursements that have not yet been reimbursed at such time. The Revolving L/C Exposure of any Revolving Facility Lender at any time shall mean its Revolving Facility Percentage of the aggregate Revolving L/C Exposure at such time.

"Rollover Revolving Lenders" shall mean the Revolving Facility Lenders as defined in the Existing Credit Agreement other than UBS and TD.

"S&P" shall mean Standard & Poor's Ratings Group, Inc.

"Sale and Lease-Back Transaction" shall have the meaning assigned to such term in Section 6.03.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Secured Parties" shall mean the "Secured Parties" as defined in the Collateral Agreement.

"Secured Swap Agreement" shall mean each Swap Agreement (a) that is in effect on the Restatement Date with a counterparty that is the Administrative Agent or a Lender or an Affiliate of the Administrative Agent or a Lender as of the Restatement Date and set forth on Schedule 6.13, or (b) that is entered into after the Restatement Date with any counterparty that is the Administrative Agent or a Lender or an Affiliate of the Administrative Agent or a Lender at the time such Swap Agreement is entered into.

"Securities Account" shall have the meaning assigned to such term in Article 8 of the Uniform Commercial Code.

"Securities Act" shall mean the Securities Act of 1933.

"Security Documents" shall mean the Mortgages, the Collateral Agreement, all Account Control Agreements, the Foreign Pledge Agreements and each of the security agreements, mortgages and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.10.

"Statutory Reserves" shall mean the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate, or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board). Eurocurrency Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Stockholders Agreement" shall mean the **[Amended and Restated Stockholders Agreement by and among (a) Prism Business Media Holdings LLC (formerly known as PBI Media Holdings LLC), a Delaware limited liability company, (b) USEP II Co-Investment Partners, LLC, a Delaware limited liability company, U.S. Equity Partners II, L.P., a Delaware limited partnership, U.S. Equity Partners II (U.S. Parallel), L.P., a Delaware limited partnership, and U.S. Equity Partners H (Offshore), L.P., a Delaware limited partnership, (c) Co- Investment Partners, L.P., a Delaware limited partnership, and (d) MidOcean Partners III, L.P., a Delaware limited partnership, MidOcean Partners III-A, L.P., a Cayman Islands limited partnership, MidOcean Partners III-D,**

**L.P., a Cayman Islands limited partnership, and MidOcean-Penton, L.P., a Delaware limited partnership, and certain additional investors, as amended from time to time.]**[8]

"Subordinated Intercompany Debt" shall have the meaning assigned to such term in Section 6.01(e).

"Subordinated Obligations" shall have the meaning assigned to such term in Section 9.06.

"subsidiary" shall mean, with respect to any person (herein referred to as the "parent"), any corporation, partnership, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, directly or indirectly, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" shall mean, unless the context otherwise requires, a subsidiary of Holdings.

"Subsidiary Loan Party" shall mean (a) each Wholly Owned Subsidiary of a Borrower that is not (i) a Foreign Subsidiary or (ii) an Immaterial Subsidiary (except as otherwise provided in clause (i) of the definition of "Collateral and Guarantee Requirement") and (b) each Domestic Subsidiary of a Borrower or the Subsidiaries that guarantees any Indebtedness of a Borrower or any of the Subsidiaries.

"Supermajority Lenders" shall mean, at any time, Lenders having (a) Loans outstanding, (b) Revolving L/C Exposures, and (c) Available Unused Commitments, that, taken together, represent more than 66 2/3% of the sum of (x) all Loans outstanding, (y) the Revolving L/C Exposure, and (z) all Available Unused Commitments at such time. The Loans, Revolving L/C Exposures, and Available Unused Commitment of any Defaulting Lender and of any Restricted Person shall be disregarded in determining Supermajority Lenders at any time.

"Swap Agreement" shall mean any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions (including, without limitation, such agreements arranged by GECC, GE Corporate Financial Services, Inc. or any other Affiliate of GECC), provided that no phantom stock or other employee benefit plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdings, either Borrower or any of the Subsidiaries shall be a Swap Agreement.

"Swap Related L/C" shall mean a letter of credit or other credit enhancement provided by GECC to the extent supporting the payment obligations by a Borrower or the Borrowers under an interest rate protection or hedging agreement or transaction (including, but not limited to, interest rate swaps, caps, collars, floors and similar transactions) designed to protect or manage exposure to the fluctuations in the interest rates applicable to any of the Loans, and which agreement or transaction such Borrower or the Borrowers entered into as the result of a specific referral pursuant to which GECC, GE Corporate Financial Services, Inc. or any other Affiliate of GECC had arranged for such Borrower or Borrowers to enter into such agreement or transaction. The term includes a Swap Related L/C as it may be increased from time to time fully to support such Borrower's or any other Loan Party's payment obligations under any and all such interest rate protection or hedging agreements or transactions.

---

[8] Subject to review.

"<u>Swap Related Reimbursement Obligations</u>" shall have the meaning ascribed to it in <u>Section 2.22</u>.

"<u>Taxes</u>" shall mean any and all present or future taxes, levies, imposts, duties (including stamp duties), deductions, charges (including ad valorem charges) or withholdings imposed by any Governmental Authority and any and all interest and penalties related thereto.

"<u>TD</u>" shall mean Toronto Dominion (Texas) LLC.

"<u>Term Borrowing</u>" shall mean a Borrowing comprised of Term Loans.

"<u>Term Facility</u>" shall mean the "Term Loans" and the "Revolving Facility Loans" of the Non-Rollover Revolving Lenders, in each case made under the Existing Credit Agreement and continued hereunder pursuant to <u>Section 2.01</u> and increased by the amount of PIK Interest added to the principal amount of the Term Loans pursuant to the PIK Elections.

"<u>Term Facility Maturity Date</u>" shall mean August 1, 2014.

"<u>Term Lender</u>" shall mean a Lender with an outstanding Term Loan.

"<u>Term Loan Installment Date</u>" shall have the meaning assigned to such term in <u>Section 2.10(a)</u>.

"<u>Term Loans</u>" shall mean the "Term Loans" made by the Term Lenders and the "Revolving Facility Loans" of the Non-Rollover Revolving Lenders, in each case made to the Borrowers under the Existing Credit Agreement as increased by the amount of any PIK Interest added to the principal amount of the Term Loans pursuant to PIK Elections.  The aggregate amount of the Term Loans on the Restatement Date is **[$625,293,750.00]**.[9]  For purposes of clarity, UBS and TD made "Revolving Facility Loans" under the Existing Credit Agreement in the amounts of $14,218,750 and $8,125,000, respectively, which amounts comprise a portion of the Term Loans hereunder.

"<u>Test Period</u>" shall mean, on any date of determination, the period of four consecutive fiscal quarters (taken as one accounting period) of Holdings (a) then most recently ended for which financial statements are available or (b) in the case of calculations pursuant to <u>Section 6.11</u> or <u>6.12</u>, ended on the last day of the fiscal quarter in question.

"<u>Transaction Costs</u>" shall mean fees and expenses payable or otherwise borne by Loan Parties in connection with the Transactions occurring on or about the Restatement Date.

"<u>Transaction Documents</u>" shall mean the Restructuring Support Agreement (and any documents and agreements entered into in connection therewith) and the Loan Documents.

"<u>Transactions</u>" shall mean, collectively, the transactions to occur pursuant to the Transaction Documents, including (a) the "Transactions" (as defined in the Restructuring Support Agreement); (b) the execution and delivery of the Loan Documents and the initial borrowings hereunder; and (c) the payment of the Transaction Costs.

"<u>Trust Funds</u>" shall mean any cash and Permitted Investments constituting (a) accrued and unpaid compensation of Holdings' or any of its subsidiaries' employees (including salaries, wages and benefits arising under any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) that is currently maintained or contributed to by Holdings or any of its subsidiaries), (b) all taxes required to be

---

[9] Amounts to be confirmed and updated as of the Restatement Date.  See footnote 1.

collected or withheld and paid over to a taxing authority (including, without limitation, payroll taxes and federal and state withholding taxes (including the employer's share thereof)) and (c) other trust or fiduciary funds, in all cases for which Holdings or any of its subsidiaries, or any of their respective directors, officers or employees would have or would reasonably be expected to have, criminal or personal liability for the failure to pay or remit such amounts to the appropriate recipient.

"Trust Fund Accounts" shall mean all Deposit Accounts and/or Securities Accounts of any Loan Party containing only Trust Funds.

"Type", when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "Rate" shall include the Adjusted LIBO Rate and the ABR.

"UBS" shall mean UBS Loan Finance LLC.

"USA PATRIOT Act" shall mean The Uniting and Strengthening America by Providing Adequate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"Voluntary Prepayments" shall mean (a) any voluntary prepayment of Term Loans pursuant to Section 2.11(a) in any year to the extent such prepayment reduces the scheduled installments of principal due in respect of Term Loans as set forth in Section 2.10(a) in any subsequent year and (b) any voluntary prepayment of Revolving Facility Loans pursuant to Section 2.11(a) to the extent that the Revolving Facility Commitments are substantially concurrently reduced voluntarily in an equal amount pursuant to Section 2.08(b) or reduced mandatorily in an equal amount pursuant to Section 2.08(c).

"Wachovia" shall mean Wachovia Bank, National Association **[now known as Wells Fargo Bank, N.A.]**.

"Wasserstein" shall mean the collective reference to Wasserstein Partners, L.P. and any other Control Investment Affiliates thereof.

"Weil" shall have the meaning assigned to such term in Section 4.02(h).

"Wholly Owned Subsidiary" of any person shall mean a subsidiary of such person, all of the outstanding Equity Interests in which (other than directors' qualifying shares or nominee or other similar shares (including shares issued to foreign nationals) required pursuant to applicable law) are owned by such person or another Wholly Owned Subsidiary of such person.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part 1 of Subtitle E of Title IV of ERISA.

"Working Capital" shall mean, with respect to the Borrowers and the Subsidiaries on a consolidated basis at any date of determination, the amount of Current Assets at such date of determination minus the amount of Current Liabilities at such date of determination; provided that, for purposes of calculating Excess Cash Flow, increases or decreases in Working Capital shall be calculated without regard to any changes in the amounts of Current Assets or Current Liabilities as a result of (a) any reclassification in accordance with GAAP of assets or liabilities, as applicable, between current and noncurrent, (b) the effects of purchase accounting or (c) the effect of fluctuations in the amount of accrued or contingent obligations under Swap Agreements.

"Zero Balance Disbursement Accounts" shall mean a Deposit Account the sole purpose of which is to make disbursements of funds and which shall contain no cash from time to time but rather shall debit funds contained in another Deposit Account.

SECTION 1.02.  Terms Generally.  The definitions set forth or referred to in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  All references herein to Articles, Sections, Exhibits, Schedules and Annexes shall be deemed references to Articles and Sections of, and Exhibits, Schedules and Annexes to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document or other agreement or instrument shall mean such Loan Document, agreement or instrument as amended, restated, amended and restated, supplemented or otherwise modified from time to time.  Any reference to any statute, law, rule or regulation herein shall, unless otherwise specified, refer to such statute, law, rule or regulation as amended, modified, supplemented or replaced from time to time, together with all rules, regulations and interpretations thereunder or related thereto.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrowers notify the Administrative Agent that the Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Restatement Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; provided further that if an amendment is requested by the Borrowers, the Administrative Agent or the Required Lenders, then the Borrowers, the Administrative Agent and the Lenders shall negotiate in good faith to enter into such an amendment (but without obligation to do so).  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Loan Party or any subsidiary of any Loan Party at "fair value", as defined therein.

SECTION 1.03.  Effectuation of Transactions.  Each of the representations and warranties of Holdings, the Borrowers and the other Loan Parties contained in this Agreement (and all corresponding definitions) are made after giving effect to the Transactions, unless the context otherwise requires.

SECTION 1.04.  Notices from Borrowers.  In the event certain notices or certificates required hereunder are set forth as being delivered by "the Borrowers", the Administrative Agent may elect, in its sole discretion, to have such notice or certificates delivered only by a Borrower.  Any notice, election, representation, warranty, agreement or undertaking by or on behalf of the Borrowers by such Borrower shall be deemed for all purposes to have been made by both Borrowers and shall be binding and enforceable against the Borrowers to the same extent as if made directly by both Borrowers.

ARTICLE II

*The Credits*

SECTION 2.01.  Existing Loans; Revolving Facility Commitments.

(a)      Each of Holdings, the Borrowers, each Lender and the Administrative Agent hereby confirms and acknowledges that each Lender has heretofore made Existing

Revolving Facility Loans and/or Existing Term Loans (collectively, "Existing Loans"), the aggregate outstanding principal amount of which is **[$667,950,000[10]]**, which amount consists of **[$65,000,000[11]]** in Existing Revolving Loans and **[$602,950,000[12]]** in Existing Term Loans, in each case as further detailed on Schedule 2.01. The Loan Parties agree, ratify and confirm that the Existing Loans, together with all accrued and unpaid interest thereon, are due and owing to Lenders and are not subject to any offset, counterclaims or defenses of any kind or nature. As of the Restatement Date and after giving effect to the Plan, the Existing Term Loans shall constitute "Term Loans" under this Agreement, the outstanding principal amount of the Existing Revolving Facility Loans of the Non-Rollover Revolving Lenders shall constitute Term Loans under this Agreement and the Existing Revolving Facility Loans of the Rollover Revolving Lenders shall constitute "Revolving Loans" under this Agreement. Term Loan amounts repaid or prepaid may not be reborrowed.

(b)     Subject to the terms and conditions set forth herein, each Lender with a Revolving Facility Commitment agrees to make Revolving Facility Loans to the Borrowers from time to time during the Availability Period in an aggregate principal amount that will not result in (i) such Lender's Revolving Facility Credit Exposure exceeding such Lender's Revolving Facility Commitment or (ii) the Revolving Facility Credit Exposure exceeding the total Revolving Facility Commitments. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrowers may borrow, prepay and reborrow Revolving Facility Loans.

SECTION 2.02.  Loans and Borrowings.  (a) Each Loan shall be made as part of a Borrowing consisting of Loans under the same Facility and of the same Type made by the Lenders ratably in accordance with their respective Revolving Facility Commitments or outstanding Term Loans under the applicable Facility; provided, however, that Revolving Facility Loans shall be made by the Revolving Facility Lenders ratably in accordance with their respective Revolving Facility Percentages on the date such Loans are made hereunder; provided further that the proviso set forth in the definition of Revolving Facility Percentages shall not be applicable to the making of Revolving Facility Loans representing PIK Interest. The failure of any Lender to make any Loan or any other payment required to be made by it hereunder shall not relieve any other Lender of its obligations hereunder; provided that the Revolving Facility Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)     Subject to Section 2.14, each Borrowing shall be comprised entirely of ABR Loans or Eurocurrency Loans as the Borrowers may request in accordance herewith. Each Lender at its option may make any ABR Loan or Eurocurrency Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement and such Lender shall not be entitled to any amounts payable under Section 2.15 or 2.17 solely in respect of increased costs resulting from such exercise and existing at the time of such exercise.

(c)     At the commencement of each Interest Period for any Eurocurrency Revolving Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum. At the time that each ABR Revolving Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum; provided that an

---

[10] Amounts to be confirmed and updated as of the Restatement Date. See footnote 1.

[11] Amounts to be confirmed and updated as of the Restatement Date.

[12] Amounts to be confirmed and updated as of the Restatement Date. See footnote 1.

ABR Revolving Borrowing may be in an aggregate amount that is equal to the entire unused balance of the Revolving Facility Commitments or that is required to finance the reimbursement of an L/C Disbursement as contemplated by Section 2.05(e). Borrowings of more than one Type and under more than one Facility may be outstanding at the same time; provided that there shall not at any time be more than a total of 12 Eurocurrency Borrowings outstanding.

(d) Notwithstanding any other provision of this Agreement, the Borrowers shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Revolving Facility Maturity Date or the Term Facility Maturity Date, as applicable.

SECTION 2.03. Requests for Borrowings. To request a Revolving Facility Borrowing and/or a Term Borrowing (other than a Borrowing of amounts constituting PIK Interest), the Borrowers shall notify the Administrative Agent of such request in writing or by telephone (a) in the case of a Eurocurrency Borrowing, not later than 12:00 noon, Local Time, three Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 12:00 noon, Local Time, one Business Day before the date of the proposed Borrowing; provided that the first Eurocurrency Borrowing may be requested no earlier than the third Business Day after the Restatement Date. Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly (but in any event within one (1) Business Day) by hand delivery or fax to the Administrative Agent of a written Borrowing Request in a form approved by the Administrative Agent and signed by the Borrowers. Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i) whether such Borrowing is to be a Borrowing of Revolving Facility Loans or Term Loans;

(ii) the aggregate amount of the requested Borrowing;

(iii) the date of such Borrowing, which shall be a Business Day;

(iv) whether such Borrowing is to be an ABR Borrowing or a Eurocurrency Borrowing;

(v) in the case of a Eurocurrency Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(vi) the location and number of the Borrowers' account to which funds are to be disbursed.

If no election as to the Type of Revolving Borrowing is specified, then the requested Revolving Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Eurocurrency Borrowing, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing. The initial Borrowings shall be set forth in the Borrowing Request delivered pursuant to Section 4.02(t).

SECTION 2.04. Reserved.

SECTION 2.05. Letters of Credit. (a) General. Subject to the terms and conditions set forth herein, either Borrower may request the issuance of Letters of Credit for its own account in a form reasonably acceptable to the applicable Issuing Bank, at any time and from time to time during the Availability Period and prior to the date that is thirty days prior to the Revolving Facility Maturity Date. In

the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by either Borrower to, or entered into by such Borrower with, an Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.  In addition, for purposes of clarity, the Existing Letters of Credit shall become subject to this Agreement on the Restatement Date and constitute Letters of Credit under the Loan Documents, it being understood that each Revolving Facility Lender shall have a pro rata participation in such Letters of Credit.

(b)      Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions.  To request the issuance of a Letter of Credit (or the amendment, renewal (other than an automatic renewal in accordance with paragraph (c) of this Section 2.05) or extension of an outstanding Letter of Credit), a Borrower shall hand deliver or fax (or transmit by electronic communication, if arrangements for doing so have been approved by the applicable Issuing Bank) to the Administrative Agent (and the applicable Issuing Bank if Borrower is so instructed by the Administrative Agent) not later than 11:00 a.m., Local Time, on the third Business Day preceding the requested date of issuance, amendment, renewal or extension a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) of this Section 2.05), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to issue, amend, renew or extend such Letter of Credit.  If requested by the applicable Issuing Bank, such Borrower also shall submit a letter of credit application on such Issuing Bank's standard form and/or any other documents that an Issuing Bank generally uses or requires in the ordinary course of its business in connection with any request for a Letter of Credit.  Upon satisfaction or waiver (in accordance with Section 10.08) of the conditions set forth in Section 4.01, the Issuing Bank shall issue or extend the requested Letter of Credit in accordance with the Issuing Lender's standard operating procedures.  A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit, the Borrowers shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension (i) the Revolving L/C Exposure shall not exceed $20.0 million and (ii) the Revolving Facility Credit Exposure shall not exceed the total Revolving Facility Commitments.  If (x) any Lender is a Defaulting Lender and (y) the reallocation of that Defaulting Lender's Letter of Credit obligations to the other Revolving Facility Lenders is not permitted under Section 2.21, then no Letters of Credit may be issued or renewed unless the Defaulting Lender has been replaced in accordance with Section 2.19, the Letter of Credit obligations of that Defaulting Lender have been cash collateralized as set forth in Section 2.21, or the Revolving Facility Commitments of the other Lenders have been increased by an amount sufficient to satisfy the Administrative Agent that all future Letter of Credit obligations will be covered by all Revolving Facility Lenders who are not Defaulting Lenders.

(c)      Expiration Date.  Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (ii) the date that is five Business Days prior to the Revolving Facility Maturity Date; provided that any Letter of Credit with a one-year tenor may provide for the automatic renewal thereof for additional one-year periods (which, in no event, shall extend beyond the date referred to in clause (ii) of this paragraph (c) unless otherwise agreed by the Issuing Bank and the Administrative Agent).

(d)      Participations.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the applicable Issuing Bank or the Revolving Facility Lenders, such Issuing Bank hereby grants to each Revolving Facility Lender, and each Revolving Facility Lender hereby acquires from such

Issuing Bank, a participation in such Letter of Credit equal to such Revolving Facility Lender's Revolving Facility Percentage of the aggregate amount available to be drawn under such Letter of Credit. In consideration and in furtherance of the foregoing, each Revolving Facility Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the applicable Issuing Bank, such Revolving Facility Lender's Revolving Facility Percentage of each L/C Disbursement made by such Issuing Bank and not reimbursed by the applicable Borrower on the date due as provided in paragraph (e) of this Section 2.05, or of any reimbursement payment required to be refunded to such Borrower for any reason. Each Revolving Facility Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or reduction or termination of the Revolving Facility Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)     <u>Reimbursement</u>.  If the applicable Issuing Bank shall make any L/C Disbursement in respect of a Letter of Credit, the Borrowers shall reimburse such L/C Disbursement by paying to the Administrative Agent an amount equal to such L/C Disbursement not later than 2:00 p.m., Local Time, on (i) the Business Day that the Borrowers receive notice under paragraph (g) of this Section 2.05 of such L/C Disbursement, if such notice is received on such day prior to 10:00 a.m., Local Time, or (ii) if clause (i) does not apply, the Business Day immediately following the date the Borrowers receive such notice, provided that the Borrowers may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.03 that such payment be financed with an ABR Revolving Borrowing in an equivalent amount and, to the extent so financed, the Borrowers' obligation to make such payment shall be discharged and replaced by the resulting ABR Revolving Borrowing. If the Borrowers fail to reimburse any L/C Disbursement when due, or if any such payment is returned or assigned (by virtue of a bankruptcy proceeding or otherwise) then the Administrative Agent shall promptly notify the applicable Issuing Bank and each other Revolving Facility Lender of the applicable L/C Disbursement, the payment then due from the Borrowers in respect thereof and, in the case of a Revolving Facility Lender, such Lender's Revolving Facility Percentage thereof. Promptly following receipt of such notice, each Revolving Facility Lender shall pay to the Administrative Agent its Revolving Facility Percentage of the payment then due from the Borrowers in the same manner as provided in Section 2.06 with respect to Loans made by such Lender (and Section 2.06 shall apply, mutatis mutandis, to the payment obligations of the Revolving Facility Lenders), and the Administrative Agent shall promptly pay to the applicable Issuing Bank the amounts so received by it from the Revolving Facility Lenders. If any Revolving Facility Lender is a Defaulting Lender, that Defaulting Lender's Letter of Credit obligations shall be reallocated to and assumed by the other Revolving Facility Lenders pro rata in accordance with their respective Revolving Facility Percentage of the Revolving Facility Loans (calculated as if the Defaulting Lender's Revolving Facility Percentage was reduced to zero and each other Revolving Facility Lender's Revolving Facility Percentage had been increased proportionately). Upon receipt of the notice from the Administrative Agent, each Revolving Facility Lender that is not a Defaulting Lender shall pay to the Administrative Agent for the account of such Issuing Bank its pro rata share of such increased amount of the Letter of Credit obligations that from time to time remain outstanding; provided that no Revolving Facility Lender shall be required to fund any amount which would result in the sum of its outstanding Revolving Facility Loans and outstanding Revolving L/C Exposure to exceeding its Revolving Facility Commitment. Promptly following receipt by the Administrative Agent of any payment from the Borrowers pursuant to this paragraph, the Administrative Agent shall distribute such payment to the applicable Issuing Bank or, to the extent that Revolving Facility Lenders have made payments pursuant to this paragraph to reimburse such Issuing Bank, then to such Lenders and such Issuing Bank as their interests may appear. Any payment made by a Revolving Facility Lender pursuant to this paragraph to reimburse an Issuing Bank for any L/C Disbursement (other than the funding of an ABR Revolving Loan as

contemplated above) shall not constitute a Loan and shall not relieve the Borrowers of their obligation to reimburse such L/C Disbursement.

(f)     Obligations Absolute.  The obligation of the Borrowers to reimburse L/C Disbursements as provided in paragraph (e) of this Section 2.05, and the obligation of the Revolving Facility Lenders to reimburse L/C Disbursements as provided in such paragraph (e), shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the applicable Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.05, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrowers' obligations hereunder.  Neither the Administrative Agent, the Lenders nor any Issuing Bank, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of such Issuing Bank, or any of the circumstances referred to in clauses (i), (ii) or (iii) of the first sentence; provided that the foregoing shall not be construed to excuse the applicable Issuing Bank from liability to the Borrowers to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrowers to the extent permitted by applicable law) suffered by the Borrowers that are determined by a court of competent jurisdiction to have been caused by (x) such Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof or (y) such Issuing Bank's refusal to issue a Letter of Credit in accordance with the terms of this Agreement.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the applicable Issuing Bank, such Issuing Bank shall be deemed to have exercised care in each such determination and each refusal to issue a Letter of Credit.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the applicable Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)     Disbursement Procedures.  The applicable Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  Such Issuing Bank shall promptly notify the Administrative Agent and the Borrowers by telephone (confirmed by fax) of such demand for payment and whether such Issuing Bank has made or will make a L/C Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrowers of their obligation to reimburse such Issuing Bank or the Revolving Facility Lenders with respect to any such L/C Disbursement.

(h)     Interim Interest.  If an Issuing Bank shall make any L/C Disbursement, then, unless the Borrowers shall reimburse such L/C Disbursement in full on the date such L/C Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such L/C Disbursement is made to but excluding the date that the Borrowers

reimburse such L/C Disbursement, at the rate per annum then applicable to ABR Revolving Loans; provided that, if such L/C Disbursement is not reimbursed by the Borrowers when due pursuant to paragraph (e) of this Section 2.05, then Section 2.13(c) shall apply. Interest accrued pursuant to this paragraph shall be for the account of the applicable Issuing Bank, except that interest accrued on and after the date of payment by any Revolving Facility Lender pursuant to paragraph (e) of this Section 2.05 to reimburse such Issuing Bank shall be for the account of such Revolving Facility Lender to the extent of such payment, and shall be paid in cash.

(i)        Replacement of an Issuing Bank.  An Issuing Bank may be replaced at any time by written agreement among the Borrowers, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank.  The Administrative Agent shall notify the Lenders of any such replacement of an Issuing Bank.  At the time any such replacement shall become effective, the Borrowers shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 2.12.  From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of the replaced Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require.  After the replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of such Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement but shall not be required to issue additional Letters of Credit.

(j)        Cash Collateralization.  If any Event of Default shall occur and be continuing, in the case of an Event of Default described in Section 7.01(h) or (i), on the Business Day or in the case of any other Event of Default (subject to Section 7.01), on the third Business Day, in each case, following the date on which the Borrowers receive notice from the Administrative Agent (or, if the maturity of the Loans has been accelerated, from (i) the Administrative Agent or (ii) Revolving Facility Lenders with Revolving L/C Exposure representing greater than 50% of the total Revolving L/C Exposure) demanding the deposit of cash collateral pursuant to this paragraph, the Borrowers shall deposit in an account with or at the direction of the Administrative Agent and in the name of the Administrative Agent and for the benefit of the Lenders, an amount in cash equal to the Revolving L/C Exposure as of such date plus any accrued and unpaid interest thereon; provided that upon the occurrence of any Event of Default with respect to either Borrower described in clause (h) or (i) of Section 7.01, the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind.  Each such deposit pursuant to this paragraph shall be held by the Administrative Agent as collateral for the payment and performance of the obligations of the Borrowers under this Agreement.  The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account.  Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of (x) for so long as an Event of Default shall be continuing, the Administrative Agent and (y) at any other time, the Borrowers, in each case, in Permitted Investments and at the risk and expense of the Borrowers, such deposits shall not bear interest.  Interest or profits, if any, on such investments shall accumulate in such account.  Moneys in such account shall be applied by the Administrative Agent to reimburse each Issuing Bank for L/C Disbursements for which such Issuing Bank has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrowers for the Revolving L/C Exposure at such time or, if the maturity of the Loans has been accelerated (but subject to the consent of Revolving Facility Lenders with Revolving L/C Exposure representing greater than 50% of the total Revolving L/C Exposure), be applied to satisfy other obligations of the Borrowers under this Agreement.  If the Borrowers are required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of

Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrowers within three Business Days after all Events of Default have been cured or waived.

(k)      Additional Issuing Banks.  From time to time, the Borrowers may by notice to the Administrative Agent designate an additional Lender (in addition to GECC and Wachovia) which agrees (in its sole discretion) to act in such capacity and is reasonably satisfactory to the Administrative Agent as an Issuing Bank.  Such additional Issuing Bank shall execute a counterpart of this Agreement upon the approval of the Administrative Agent (which approval shall not be unreasonably withheld) and shall thereafter be an Issuing Bank hereunder for all purposes.

(l)      Reporting.  Unless otherwise requested by the Administrative Agent, each Issuing Bank shall (i) provide to the Administrative Agent copies of any notice received from the Borrowers pursuant to Section 2.05(b) no later than the next Business Day after receipt thereof and (ii) report in writing to the Administrative Agent (A) on or prior to each Business Day on which such Issuing Bank expects to issue, amend, renew or extend any Letter of Credit, the date of such issuance, amendment, renewal or extension, and the aggregate face amount of the Letters of Credit to be issued, amended, renewed or extended by it and outstanding after giving effect to such issuance, amendment, renewal or extension occurred (and whether the amount thereof changed), and the Issuing Bank shall be permitted to issue, amend, renew or extend such Letter of Credit if the Administrative Agent shall not have advised the Issuing Bank that such issuance, amendment renewal or extension would not be in conformity with the requirements of this Agreement, (B) on each Business Day on which such Issuing Bank makes any L/C Disbursement, the date of such L/C Disbursement and the amount of such L/C Disbursement and (C) on any other Business Day, such other information as the Administrative Agent shall reasonably request, including but not limited to prompt verification of such information as may be requested by the Administrative Agent.

SECTION 2.06.  Funding of Borrowings.  (a) Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 noon, Local Time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  The Administrative Agent will make such Loans available to the Borrowers by promptly crediting the amounts so received, in like funds, to an account designated by the Borrowers in the applicable Borrowing Request; provided that ABR Revolving Loans made to finance the reimbursement of a L/C Disbursement and reimbursements as provided in Section 2.05(e) shall be remitted by the Administrative Agent to the applicable Issuing Bank.

(b)      Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section 2.06 and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand (without duplication) such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation for the first Business Day and thereafter at the interest rate applicable to such Loan or (ii) in the case of the Borrowers, the interest rate applicable to the Borrowing.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

(c)     This <u>Section 2.06</u> shall not apply to Loans arising as a result of a PIK Election.

SECTION 2.07.  <u>Interest Elections</u>.  (a) Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurocurrency Borrowing, shall have an initial Interest Period as specified in the Borrowing Request. Each Borrowing on the Restatement Date shall be an ABR Borrowing.  Thereafter, the Borrowers may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurocurrency Borrowing, may elect Interest Periods therefor, all as provided in this <u>Section. 2.07</u>; <u>provided </u> that the first Interest Election Request may be delivered no earlier than the third Business Day after the Restatement Date.  The Borrowers may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     To make an election pursuant to this <u>Section 2.07</u>, the Borrowers shall notify the Administrative Agent of such election in writing by the time that a Borrowing Request would be required under <u>Section 2.03</u> if the Borrowers were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such written Interest Election Request shall be irrevocable.

(c)     Each written Interest Election Request shall specify the following information in compliance with <u>Section 2.02</u>:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or a Eurocurrency Borrowing; and

(iv)     if the resulting Borrowing is a Eurocurrency Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurocurrency Borrowing but does not specify an Interest Period, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.  The Loans representing the payment of PIK Interest shall be of the Type and, in the case of Eurocurrency Loans, with a like Interest Period, as the majority in dollar amount of the underlying Loans as to which the PIK Election is made.

(d)     Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender to which such Interest Election Request relates of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     If the Borrowers fail to deliver a timely Interest Election Request with respect to a Eurocurrency Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the

written request (including a request through electronic means) of the Required Lenders, so notifies the Borrowers, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurocurrency Borrowing and (ii) unless repaid, each Eurocurrency Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.08. <u>Termination and Reduction of Revolving Facility Commitments</u>. (a) Unless previously terminated, the Revolving Facility Commitments shall terminate on the Revolving Facility Maturity Date.

(b)        The Borrowers may, at their option, at any time terminate, or from time to time reduce, the Revolving Facility Commitments; <u>provided</u> that (i) each reduction of the Revolving Facility Commitments shall be in an amount that is an integral multiple of $250,000 and not less than $1.0 million (or, if less, the remaining amount of the Revolving Facility Commitments) and (ii) the Borrowers shall not terminate or reduce the Revolving Facility Commitments if, after giving effect to any concurrent prepayment of the Revolving Facility Loans in accordance with <u>Section 2.11</u>, the Revolving Facility Credit Exposure would exceed the total Revolving Facility Commitments.

(c)        Upon any prepayment of the Revolving Facility Loans representing PIK Interest, the Revolving Facility Commitment shall be reduced in an amount equal to the amount of such prepayment.

(d)        The Borrowers shall notify the Administrative Agent of any election to terminate or reduce the Revolving Facility Commitments under paragraph (b) of this <u>Section 2.08</u> at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the applicable Lenders of the contents thereof.  Each notice delivered by the Borrowers pursuant to this <u>Section 2.08</u> shall be irrevocable; <u>provided</u> that a notice of termination of the Revolving Facility Commitments delivered by the Borrowers may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrowers (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  Any termination or reduction of the Revolving Facility Commitments shall be permanent.  Each reduction of the Revolving Facility Commitments under the Revolving Facility shall be made ratably among the Revolving Facility Lenders in accordance with their respective Revolving Facility Commitments.

SECTION 2.09. <u>Repayment of Loans; Evidence of Debt</u>. (a) The Borrowers hereby unconditionally promise to pay (i) to the Administrative Agent for the account of each Revolving Facility Lender the then unpaid principal amount of each Revolving Facility Loan to the Borrowers on the Revolving Facility Maturity Date and (ii) to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Term Loan of such Lender as provided in <u>Section 2.10</u>.

(b)        Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder and the amount of each Loan representing the payment of PIK Interest.

(c)        The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Facility and Type thereof and the Interest Period (if any) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder, (iii) whether such Loan

represents the payment of PIK Interest and (iv) any amount received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this <u>Section 2.09</u> shall be prima facie evidence of the existence and amounts of the obligations recorded therein; <u>provided</u> that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms of this Agreement.

(e)    Except as set forth in the last sentence of this paragraph (e), any Lender may request that Loans made by it be evidenced by a promissory note (as amended, endorsed or otherwise modified from time to time, a "<u>Note</u>").  In such event, the Borrowers shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent and the Borrowers.  Thereafter, the Loans evidenced by such Note and interest thereon shall at all times (including after assignment pursuant to <u>Section 10.04</u>) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).  No Notes will be issued in respect of PIK Interest.

SECTION 2.10.   <u>Repayment of Term Loans and Revolving Facility Loans</u>.  (a) Subject to the other paragraphs of this <u>Section 2.10</u>, the Borrowers shall repay Term Borrowings on each date set forth below, or if any such date is not a Business Day, on the next preceding Business Day, in the aggregate principal amount set forth below opposite such date (each such date being referred to as a "<u>Term Loan Installment Date</u>"):

| Date | Amount of Term Borrowings to be Repaid |
| --- | --- |
| March 31, 2010 | $ 1,605,860[13] |
| June 30, 2010 | $1,605,860 |
| September 30, 2010 | $1,605,860 |
| December 31, 2010 | $1,605,860 |
| March 31, 2011 | $1,605,860 |
| June 30, 2011 | $1,605,860 |
| September 30, 2011 | $1,605,860 |
| December 31, 2011 | $1,605,860 |
| March 31, 2012 | $1,605,860 |
| June 30, 2012 | $1,605,860 |
| September 30, 2012 | $1,605,860 |
| December 31, 2012 | $1,605,860 |
| March 31, 2013 | $1,605,860 |
| June 30, 2013 | $1,605,860 |
| September 30, 2013 | $1,605,860 |
| December 31, 2013 | $1,605,860 |
| March 31, 2014 | $1,605,860 |
| June 30, 2014 | $1,605,860 |
| Term Facility Maturity Date | Outstanding principal amount |

---

[13] Assumes TD and UBS are termed out.  If the Secured Swap Agreements are crystallized per footnote 1 the amortization will be adjusted accordingly.

<u>provided</u> that the final principal repayment installment of the Term Loans shall be repaid on the Term Facility Maturity Date and in any event shall be in an amount equal to the aggregate principal amount of all Term Loans outstanding on such date.

(b)     To the extent not previously paid, outstanding Revolving Facility Loans shall be due and payable on the Revolving Facility Maturity Date.

(c)     Prepayment of the Borrowings from:

(i)     Net Proceeds pursuant to <u>Section 2.11(b)</u> and Excess Cash Flow pursuant to <u>Section 2.11(c)</u> shall be applied <u>first</u> to the Term Borrowings on a pro rata basis, with the application thereof (A) in direct order to the unpaid amounts due on the next succeeding eight Term Loan Installment Dates, and (B) on a pro rata basis (based on the amount of such amortization payments) to the then remaining scheduled amortization payments in respect of such Term Borrowings, <u>second</u>, to the Revolving Facility Borrowings representing the payment of PIK Interest pro rata to such Borrowings until such Revolving Facility Borrowings are paid in full with a reduction of the Revolving Facility Commitments as set forth in <u>Section 2.08(c)</u>, <u>third</u>, to the other Revolving Facility Borrowings (but without a permanent reduction in the Revolving Facility Commitments), and <u>fourth</u>, after the Revolving Facility Loans have been repaid in full, to cash collateralize all Letters of Credit in a manner consistent with the requirements of <u>Section 2.05</u>, and

(ii)     any optional prepayments of the Term Loans pursuant to <u>Section 2.11(a)</u> shall be applied to the remaining installments thereof as directed by the Borrowers; <u>provided</u> that if the Borrowers prepay Term Loans representing PIK Interest, the Borrowers shall apply such amount to Term Loans to be paid on the Term Facility Maturity Date.

(d)     Prior to any optional prepayment of any Borrowing under any Facility hereunder, the Borrowers shall notify the Administrative Agent by telephone (confirmed by fax) of such prepayment not later than 12:00 p.m., Local Time, (i) in the case of prepayments of an ABR Borrowing, one Business Day before the scheduled date of such repayment and (ii) in the case of prepayments of a Eurocurrency Borrowing, three Business Days before the scheduled date of such repayment.  Each repayment of a Borrowing shall specify if it is a prepayment of Loans representing the payment of PIK Interest or other Loans and (x) in the case of the Revolving Facility, shall be applied to the Revolving Facility Loans included in the repaid Borrowing such that each Revolving Facility Lender receives its ratable share of such repayment (based upon the respective Revolving Facility Credit Exposures of the Revolving Facility Lenders at the time of such repayment) and (y) in all other cases, shall be applied first to Term Loans that are ABR Loans to the full extent thereof before application to Term Loans that are Eurocurrency Loans in a manner that minimizes the amount of any payments required to be made by the Borrowers pursuant to <u>Section 2.16</u> (except in the case of a prepayment of Term Loans pursuant to <u>Section 2.11(b)</u>, <u>(c)</u>, or <u>(d)</u>).  Repayments of Borrowings (other than repayments of ABR Revolving Borrowings that are not made in connection with the termination or permanent reduction of the Revolving Facility Commitments) shall be accompanied by accrued interest on the amount repaid.

(e)     In connection with any mandatory prepayments by the Borrowers of the Term Loans pursuant to <u>Section 2.11(b)</u> or <u>(c)</u>, such prepayments shall be applied on a pro rata basis to the then outstanding Term Loans being prepaid irrespective of whether such outstanding Term Loans are ABR Loans or Eurocurrency Loans <u>provided</u> that the amount of such mandatory prepayment shall be applied first to Term Loans that are ABR Loans to the full extent thereof

before application to Term Loans that are Eurocurrency Loans in a manner that minimizes the amount of any payments required to be made by the Borrowers pursuant to Section 2.16.

SECTION 2.11. <u>Prepayment of Loans</u>. (a) The Borrowers shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty (but subject to <u>Section 2.16</u>), in an aggregate principal amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum or, if less, the amount outstanding, subject to prior notice in accordance with <u>Section 2.10(d)</u>; <u>provided</u> that if the Borrowers desire to prepay any Loans representing the payment of PIK Interest, such prepayment shall be applied pro rata to the Term Loans and Revolving Facility Loans representing the payment of PIK Interest with a reduction of the Revolving Facility Commitment as set forth in Section 2.08(c).

(b) Holdings and the Borrowers shall apply all Net Proceeds promptly upon receipt thereof to prepay Borrowings in accordance with paragraphs (c) and (d) of <u>Section 2.10.</u>

(c) Not later than 115 days after the end of each Excess Cash Flow Period, the Borrowers shall prepay Borrowings in an amount equal to the excess, if any, of (i) an amount equal to the Required Percentage of Excess Cash Flow for such Excess Cash Flow Period over (ii) the aggregate amount of Voluntary Prepayments made during such Excess Cash Flow Period. Prepayments pursuant to the immediately preceding sentence shall be made in accordance with paragraphs (c) and (d) of <u>Section 2.10</u>.

(d) Holdings and the Borrowers shall apply the EBITDA Cure Amount promptly upon receipt by the Borrowers in accordance with <u>Section 7.03(b)</u> to be applied as set forth in <u>Section 7.03(b)</u>.

(e) Not later than three (3) Business Days after the end of each fiscal month, the Borrowers shall repay Revolving Facility Loans in an amount equal to the lesser of (i) the Revolving Facility Loans then outstanding and (ii) the amount by which (x) the aggregate amount of cash and Permitted Investments of Holdings and its subsidiaries (less any amounts that are held by the Administrative Agent or any Issuing Lender as cash collateral pursuant to <u>Section 2.21(c)(ii)</u>), in each case based on the relevant depository's reported balances as of the last day of such fiscal month, exceeds (y) $20.0 million. Any repayment pursuant to this paragraph (e) shall be applied to repay Revolving Facility Loans (other than those representing the payment of PIK Interest) pro rata to such Loans (without a permanent reduction in the Revolving Facility Commitments).

SECTION 2.12. <u>Fees</u>. (a) The Borrowers agree to pay to each Lender, through the Administrative Agent, on the last Business Day of March, June, September and December in each year, and on the date on which the Revolving Facility Commitments of all the Lenders shall be terminated as provided herein, a commitment fee (a "<u>Revolving Credit Commitment Fee</u>") on the daily amount of the Available Unused Commitment of such Lender during the preceding quarter (or other period commencing with the Restatement Date or ending with the date on which the last of the Revolving Facility Commitments of such Lender shall be terminated) at the Revolving Credit Commitment Fee Rate. All Revolving Credit Commitment Fees shall be computed on the basis of the actual number of days elapsed in a year of 360 days. The Revolving Credit Commitment Fee due to each Lender shall commence to accrue on the Restatement Date and shall cease to accrue on the date on which the last of the Revolving Facility Commitments of such Lender shall be terminated as provided herein.

(b) The Borrowers from time to time agree to pay (i) to each Revolving Facility Lender, through the Administrative Agent, on the last Business Day of March, June, September and December of each year and on the date on which the Revolving Facility Commitments of all the Lenders shall be terminated as provided herein, a fee (an "<u>L/C</u>

Participation Fee") on such Lender's Revolving Facility Percentage of the daily aggregate Revolving L/C Exposure (excluding the portion thereof attributable to unreimbursed L/C Disbursements), during the preceding quarter (or shorter period commencing with the Restatement Date or ending with the Revolving Facility Maturity Date or the date on which the Revolving Facility Commitments shall be terminated) at the rate per annum equal to 3.00% and (ii) to each Issuing Bank, for its own account, (x) on the last Business Day of March, June, September and December of each year and on the date on which the Revolving Facility Commitments of all the Lenders shall be terminated as provided herein, a fronting fee in respect of each Letter of Credit issued by such Issuing Bank for the period from and including the date of issuance of such Letter of Credit to and including the termination of such Letter of Credit, computed at a rate equal to a percentage per annum to be agreed upon of the daily average stated amount of such Letter of Credit, plus (y) in connection with the issuance, amendment or transfer of any such Letter of Credit or any L/C Disbursement thereunder, such Issuing Bank's customary documentary and processing charges (collectively, "Issuing Bank Fees").  All L/C Participation Fees and Issuing Bank Fees that are payable on a per annum basis shall be computed on the basis of the actual number of days elapsed in a year of 360 days.

(c)     The Borrowers agree to pay to the Administrative Agent, for the account of the Administrative Agent, the agency fees set forth in the Fee Letter, as amended, restated, supplemented or otherwise modified from time to time, at the times and in the amount specified therein (the "Administrative Agent Fees").

(d)     The Borrowers agree to pay to each Lender through the Administrative Agent, on August 1, 2014, an extension fee (an "Extension Fee") in an amount equal to 0.50% per annum of the daily outstanding principal amount of the Loans for the period commencing February 1, 2013 through and including August 1, 2014; provided that if the Revolving Facility Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document (other than obligations for taxes, costs, indemnification, reimbursements, damages and other contingent liabilities in respect of which no claim or demand for payment has been made or, in the case of indemnifications, no notice been given) shall have been paid in full and all Letters of Credit have been canceled or have expired (or have been cash collateralized in a manner consistent with the requirements of Section 2.05 or backstopped with a letter of credit having terms and conditions reasonably satisfactory to the applicable Issuing Banks) and all amounts drawn thereunder have been reimbursed in full, then the Extension Fee shall not be due and owing.

(e)     All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders, except that Issuing Bank Fees shall be paid directly to the applicable Issuing Banks.  Once paid, none of the Fees shall be refundable under any circumstances.

SECTION 2.13.  Interest. (a) The Loans comprising each ABR Borrowing shall bear interest at the ABR plus the Applicable Margin.

(b)     The Loans comprising each Eurocurrency Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c)     Notwithstanding the foregoing, if any principal of or interest on any Loan or any Fees or other amount payable by the Borrowers hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise or if Holdings or either of the Borrowers is in default in respect of any of the Financial Performance Covenants, then, in each case, all outstanding amounts of interest, Loans and any Fees and other amount payable by the Borrowers hereunder shall bear interest, after as well as before judgment, at a rate per annum

equal to 2.0% above the rate otherwise applicable thereto (or, in the event that there is no applicable rate, 2.0% per annum in excess of the rate otherwise applicable to Revolving Facility Loans maintained as ABR Loans from time to time); <u>provided</u> that this paragraph (c) shall not apply to any Event of Default that has been waived by the Lenders pursuant to <u>Section 10.08</u>.

(d) Accrued interest on each Loan shall be payable, in cash, in arrears (i) on each Interest Payment Date for such Loan, (ii) in the case of Revolving Facility Loans, upon termination of the Revolving Facility Commitments and (iii) in the case of the Term Loans, on the Term Facility Maturity Date; <u>provided</u> that (i) interest accrued pursuant to paragraph (c) of this <u>Section 2.13</u> shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Revolving Loan not representing the payment of PIK Interest prior to the end of the Availability Period, as to which a payment of interest shall only be made on the next succeeding Interest Payment Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurocurrency Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion. Notwithstanding the foregoing, a portion of the interest due on each Interest Payment Date pursuant to paragraph (a) and paragraph (b) of this <u>Section 2.13</u>, in an amount equal to the PIK Percentage, shall be paid on such Interest Payment Date by adding such interest to the outstanding principal amount of the Loans under the relevant Facility and which PIK Interest shall thereafter be a Loan of the same Type (and with respect to Eurocurrency Loans with the same remaining Interest Period as the majority in dollar amount of the underlying Loans) (the "<u>PIK Election</u>"); <u>provided</u> that (x) at the option of the Borrowers, on written notice to the Administrative Agent 5 Business Days prior to any Interest Payment Date, the Borrowers may elect to pay the PIK Percentage for such Interest Period in cash and (y) if the Borrowers do not specify whether all interest with respect to a Borrowing will be paid in cash (a "<u>Cash Election</u>"), then the Borrowers shall be deemed to have selected a PIK Election with respect to such Borrowing.

(e) All interest hereunder shall be computed on the basis of a year of 360 days, and in the case of ABR Loans shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable ABR, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.14. <u>Alternate Rate of Interest</u>. If prior to the commencement of any Interest Period for a Eurocurrency Borrowing:

(a) the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; or

(b) the Administrative Agent is advised by the Required Lenders or the Majority Lenders under the Revolving Facility that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period; then the Administrative Agent shall give written notice thereof to the Borrowers and the Lenders as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurocurrency Borrowing shall be ineffective and such Borrowing shall be converted to or continued as on the last day of the Interest Period applicable thereto an ABR Borrowing, and (ii) if any Borrowing Request requests a Eurocurrency Borrowing, such Borrowing shall be made as an ABR Borrowing.

SECTION 2.15. <u>Increased Costs</u>. (a) If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate) or Issuing Bank; or

(ii) impose on any Lender or Issuing Bank or the London interbank market any other condition affecting this Agreement or Eurocurrency Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurocurrency Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or Issuing Bank of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender or Issuing Bank hereunder (whether of principal, interest or otherwise), then the Borrowers will pay to such Lender or Issuing Bank, as applicable, such additional amount or amounts as will compensate such Lender or Issuing Bank, as applicable, for such additional costs incurred or reduction suffered.

(b) If any Lender or Issuing Bank determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or Issuing Bank's capital or on the capital of such Lender's or Issuing Bank's holding company or applicable Lending Office, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such Issuing Bank, to a level below that which such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company or applicable Lending Office could have achieved but for such Change in Law (taking into consideration such Lender's or such Issuing Bank's policies and the policies of such Lender's or such Issuing Bank's holding company with respect to capital adequacy), then from time to time the Borrowers shall pay to such Lender or such Issuing Bank, as applicable, such additional amount or amounts as will compensate such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company or applicable Lending Office for any such reduction suffered.

(c) A certificate of a Lender or an Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or Issuing Bank or its holding company, as applicable, as specified in paragraph (a) or (b) of this <u>Section 2.15</u> shall be delivered to the Borrowers and shall be conclusive absent manifest error. The Borrowers shall pay such Lender or Issuing Bank, as applicable, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d) Promptly after any Lender or any Issuing Bank has determined that it will make a request for increased compensation pursuant to this <u>Section 2.15</u>, such Lender or Issuing Bank shall notify the Borrowers thereof. Failure or delay on the part of any Lender or Issuing Bank to demand compensation pursuant to this <u>Section 2.15</u> shall not constitute a waiver of such Lender's or Issuing Bank's right to demand such compensation; <u>provided</u> that the Borrowers shall not be required to compensate a Lender or an Issuing Bank pursuant to this <u>Section 2.15</u> for any increased costs or reductions incurred more than 180 days prior to the date that such Lender or Issuing Bank, as applicable, notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's or Issuing Bank's intention to claim compensation therefor; <u>provided</u> <u>further</u> that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended, to include the period of retroactive effect thereof.

SECTION 2.16.  Break Funding Payments.  In the event of (a) the payment of any principal of any Eurocurrency Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurocurrency Loan on the date specified in any notice delivered pursuant hereto or (d) the assignment of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrowers pursuant to Section 2.19, then, in any such event, the Borrowers shall compensate each Lender for the loss, cost and expense attributable to such event.  In the case of a Eurocurrency Loan, such loss, cost or expense to any Lender shall be deemed to be the amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue a Eurocurrency Loan, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for deposits in dollars of a comparable amount and period from other banks in the Eurodollar market.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrowers and shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

SECTION 2.17.  Taxes.  (a) Any and all payments by or on account of any obligation of any Loan Party hereunder shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if a Loan Party shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.17(a) or (c)) the Administrative Agent, any Lender or any Issuing Bank, as applicable, receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Loan Party shall make such deductions and (iii) such Loan Party shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     In addition, the Loan Parties shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     Each Loan Party shall indemnify the Administrative Agent, each Lender and each Issuing Bank, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent, such Lender or such Issuing Bank, as applicable, on or with respect to any payment by or on account of any obligation of such Loan Party hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto.  A certificate as to the amount of such payment or liability, prepared in good faith and delivered to such Loan Party by a Lender or an Issuing Bank, or by the Administrative Agent on its own behalf or on behalf of a Lender or an Issuing Bank, shall be conclusive absent manifest error.

(d)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by a Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Any Lender, Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of a Loan Party hereunder that is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which the Borrowers are

located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrowers (with a copy to the Administrative Agent), to the extent such recipient is legally entitled to do so, at the time or times prescribed by applicable law (including, for the avoidance of doubt, regulations), such properly completed and executed documentation prescribed by applicable law (including, for the avoidance of doubt, regulations) as may reasonably be requested by the Borrowers to permit such payments to be made without such withholding Tax or at a reduced rate; provided that no Lender, Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of a Loan Party hereunder shall have any obligation under this paragraph (e) with respect to any withholding Tax imposed by any jurisdiction other than the United States if in the reasonable judgment of such recipient such compliance would subject such recipient to any material unreimbursed cost or expense or would otherwise be prejudicial to such recipient in any material respect.

(f)        Each Foreign Lender shall deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) on the date on which such Foreign Lender becomes a Lender, Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of a Loan Party under this Agreement and from time to time thereafter as may reasonably be requested by the Borrowers, whichever of the following is applicable:  (i) duly completed and executed copies of Internal Revenue Service Form W-8BEN (or any subsequent versions thereof or successors thereto), claiming eligibility for benefits of an income tax treaty to which the United States of America is a party, (ii) duly completed and executed copies of Internal Revenue Service Form W-8ECI (or any subsequent versions thereof or successors thereto), (iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 871(h) or 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of any Borrower within the meaning of section 871(h)(3) or 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed and executed copies of Internal Revenue Service Form W-8BEN (or any subsequent versions thereof or successors thereto) and/or (iv) any other form (including Internal Revenue Service Form W-8IMY) prescribed by applicable law (including, for the avoidance of doubt, regulations) as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law (including, for the avoidance of doubt, regulations) to permit the Borrowers to determine the withholding or deduction required to be made.  A Foreign Lender shall deliver such forms promptly upon the invalidity of any form previously delivered by such Foreign Lender resulting from a change in facts regarding such Foreign Lender (including lending through an Affiliate, branch or Lending Office in another jurisdiction).  Each Foreign Lender shall promptly notify the Borrowers at any time it determines that it is no longer in a position to provide any previously delivered certificate, documentation other form of certification adopted by the United States of America or other taxing authorities for such purpose.  In addition, each Lender, Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of a Loan Party under this Agreement that is not a Foreign Lender shall deliver to the Borrowers and the Administrative Agent two copies of Internal Revenue Service Form W-9 (or any subsequent versions thereof or successors thereto) on or before the date such recipient becomes a party and upon the expiration of any form previously delivered by such recipient.  Notwithstanding any other provision of this paragraph, a recipient shall not be required to deliver any form pursuant to this paragraph that such recipient is not legally able to deliver.

(g)        If the Administrative Agent, Lender, Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of a Loan Party under this Agreement receives a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Loan Party or with respect to which such Loan Party has paid additional amounts, it shall promptly pay over such refund to such Loan Party (but only to the extent of

indemnity payments and additional amounts paid, by such Loan Party under this <u>Section 2.17</u> giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender (including any Taxes imposed with respect to such refund) as is determined by the Administrative Agent or Lender in good faith and in its sole discretion, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); <u>provided</u> that such Loan Party, upon the request of the Administrative Agent, Lender, Issuing Bank or any other recipient agrees to repay as soon as reasonably practicable the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent, Lender, Issuing Bank or any other recipient in the event the Administrative Agent, Lender, Issuing Bank or any other recipient is required to repay such refund to such Governmental Authority. This <u>Section 2.17(g)</u> shall not be construed to require the Administrative Agent, Lender, Issuing Bank or any other recipient to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the Loan Parties or any other person.

      SECTION 2.18.  <u>Payments Generally; Pro Rata Treatment; Sharing of Set-offs</u>.  (a) Unless otherwise specified, the Borrowers shall make each payment required to be made by them hereunder (whether of principal, interest, fees or reimbursement of L/C Disbursements, or of amounts payable under <u>Sections 2.15</u>, <u>2.16</u>, <u>2.17</u>, <u>2.22</u> or otherwise) prior to 2:00 p.m., Local Time, on the date when due, in immediately available funds, without condition or deduction for any defense, recoupment, set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent to (i) account no. 50 279 791, ABA no. 021 001 033, held at Deutsche Bank Trust Company America, 60 Wall Street, New York, New York 10005, under the account name "General Electric Capital Corporation", with reference to "CF8687PG / Penton Media Inc" or (ii) such other account designated to the Borrowers by the Administrative Agent, except payments to be made directly to the applicable Issuing Bank as expressly provided herein and except that payments pursuant to <u>Sections 2.15</u>, <u>2.16</u>, <u>2.17</u> and <u>10.05</u> shall be made directly to the persons entitled thereto.  The Administrative Agent hereunder shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in Dollars.  Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

      (b)    At any time after an Event of Default or if insufficient funds are received by and available to the Administrative Agent from the Borrowers to pay fully all amounts of principal, unreimbursed L/C Disbursements, interest, fees and other amounts then due from the Borrowers hereunder, all such payments or funds received hereunder shall be applied (i) <u>first</u>, towards the payment of all expenses and fees due to the Administrative Agent, (ii) <u>second</u>, towards payment of (A) interest on the Loans and (B) the unpaid Swap Related Reimbursement Obligations then due from the Borrowers hereunder, ratably among the parties entitled thereto in accordance with the amounts of such interest then due to such parties, and (iii) <u>third</u>, towards payment of principal on the Loans, unreimbursed L/C Disbursements and other Obligations then due from the Borrowers hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal on the Loans, unreimbursed L/C Disbursements and other Obligations then due to such parties.

      (c)    If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Term Loans, Revolving Facility Loans or participations in L/C Disbursements resulting in such Lender

receiving payment of a greater proportion of the aggregate amount of its Term Loans, Revolving Facility Loans and participations in L/C Disbursements and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Term Loans, Revolving Facility Loans and participations in L/C Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Term Loans, Revolving Facility Loans and participations in L/C Disbursements; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph (c) shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in L/C Disbursements to any assignee or participant, other than to the Borrowers or any Subsidiary (as to which the provisions of this paragraph (c) shall apply).  If a Defaulting Lender receives any such payment as described in the previous sentence such Lender shall turn over such payments to the Administrative Agent in an amount that would satisfy the requirements set forth in Section 2.21.  The Borrowers consent to the foregoing and agree, to the extent they may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrowers rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers in the amount of such participation.

(d)      Unless the Administrative Agent shall have received notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the applicable Issuing Bank hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the applicable Issuing Bank, as applicable, the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or the applicable Issuing Bank, as applicable, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)      If any Lender shall fail to make any payment required to be made by it pursuant to this Agreement (including Section 2.05(d) or (e), Section 2.06, Section 2.18(c) or (d) and Section 8.07), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid in the manner set forth in Section 2.21.

SECTION 2.19.  Mitigation Obligations; Replacement of Lenders.  (a) If any Lender requests compensation under Section 2.15, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17, as applicable, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If any Lender requests compensation under Section 2.15, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, or if any Lender is a Defaulting Lender, or becomes an Affected Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 10.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrowers shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and funded participations in L/C Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, including any amounts payable under Section 2.16, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.15 or payments required to be made pursuant to Section 2.17, such assignment will result in a reduction in such compensation or payments, and (iv) notwithstanding the foregoing, with respect to a Lender that is a Defaulting Lender, the Borrowers or the Administrative Agent may obtain a replacement lender for such Defaulting Lender and execute an Assignment and Acceptance on behalf of such Defaulting Lender at any time and without prior notice to such Defaulting Lender and cause its Loan and Revolving Facility Commitments to be sold at par.   Nothing in this Section 2.19 shall be deemed to prejudice any rights that the Borrowers may have against any Lender that is a Defaulting Lender.

(c)     If any Lender (such Lender, a "Non-Consenting Lender") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of Section 10.08 requires the consent of all of the Lenders affected and with respect to which the Required Lenders shall have granted their consent, then the Borrowers shall have the right (unless such Non-Consenting Lender grants such consent) to replace such Non-Consenting Lender by requiring such Non-Consenting Lender to assign all or a portion of its Loans and/or its Revolving Facility Commitments hereunder to one or more assignees reasonably acceptable to the Administrative Agent, provided that:  (a) all Loan Document Obligations of the Borrowers owing to such Non-Consenting Lender being replaced shall be paid in full to such Non-Consenting Lender concurrently with such assignment, (b) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon, (c) in connection with any such assignment the Borrowers, Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with Section 10.04, (d) the replacement Lender shall pay the processing and recordation fee referred to in Section 10.04(b)(ii)(B), if applicable in accordance with the terms of such Section 10.04(b)(ii)(B) and (e) the replacement Lender shall grant its consent with respect to the applicable proposed amendment, waiver, discharge or termination.  Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 2.19(c).

SECTION 2.20.   Illegality.  If any Lender reasonably determines that any change in law has made it unlawful, or that any Governmental Authority has asserted after the Restatement Date that it is unlawful, for any Lender or its applicable Lending Office to make or maintain any Eurocurrency Loans, then, on notice thereof by such Lender to the Borrowers through the Administrative Agent (at which time such Lender shall be deemed an "Affected Lender"), any obligations of such Affected Lender to make or continue Eurocurrency Loans or to convert ABR Borrowings to Eurocurrency Borrowings shall be suspended until such Affected Lender notifies the Administrative Agent and the Borrowers that the circumstances giving rise to such determination no longer exist.   Upon receipt of such notice, the

Borrowers shall upon demand from such Affected Lender (with a copy to the Administrative Agent), either convert all Eurocurrency Borrowings of such Affected Lender to ABR Borrowings, either on the last day of the Interest Period therefor, if such Affected Lender may lawfully continue to maintain such Eurocurrency Borrowings to such day, or immediately, if such Affected Lender may not lawfully continue to maintain such Loans. Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

SECTION 2.21. <u>Defaulting Lenders</u>. Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a) fees shall cease to accrue on the unfunded portion of the Revolving Facility Commitment of such Defaulting Lender pursuant to <u>Section 2.12(a)</u>;

(b) the Revolving Facility Commitment, Revolving Facility Credit Exposure and Term Loans of such Defaulting Lender shall not be included in determining whether all Lenders, the Required Lenders or the Majority Lenders, as applicable, have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to <u>Section 10.08</u>); <u>provided</u> that any waiver, amendment or modification requiring the consent of all Lenders, each Lender directly affected thereby, each Lender adversely affected thereby or each affected Lender, which affects such Defaulting Lender differently than other affected Lenders shall require the consent of such Defaulting Lender;

(c) if any Revolving L/C Exposure exists at the time a Lender becomes a Defaulting Lender then:

(i) all or any part of such Revolving L/C Exposure shall be reallocated among the non-Defaulting Lenders in accordance with their respective Revolving Facility Percentages but only to the extent the sum of all non-Defaulting Lenders' Revolving Facility Credit Exposures plus such Defaulting Lender's Revolving L/C Exposure does not exceed the aggregate of all non-Defaulting Lenders' Revolving Facility Commitments; and

(ii) if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Borrowers shall within 5 Business Days following notice by the Administrative Agent cash collateralize such Defaulting Lender's Revolving L/C Exposure (after giving effect to any partial reallocation pursuant to clause (i) above) in accordance with the procedures set forth in <u>Section 2.05(j)</u> and for so long as any such Revolving L/C Exposure is outstanding;

(iii) if the Borrowers cash collateralize any portion of such Defaulting Lender's Revolving L/C Exposure pursuant to this <u>Section 2.21(c)</u>, the Borrowers shall not be required to pay any fees to such Defaulting Lender pursuant to <u>Section 2.12(b)</u> with respect to such Defaulting Lender's Revolving L/C Exposure during the period such Defaulting Lender's Revolving L/C Exposure is cash collateralized;

(iv) if the Revolving L/C Exposure of the Defaulting Lenders is reallocated to non-Defaulting Lenders pursuant to this <u>Section 2.21(c)</u>, then the fees payable to the Lenders pursuant to <u>Sections 2.12(a)</u> and <u>(b)</u> shall be adjusted in accordance with such non-Defaulting Lenders' Revolving Facility Percentages; or

(v)     if any Defaulting Lender's Revolving L/C Exposure is neither cash collateralized nor reallocated pursuant to this Section 2.21(c), then, without prejudice to any rights or remedies of the applicable Issuing Bank or any Lender hereunder, all letter of credit fees payable under Section 2.12(b) with respect to such Defaulting Lender's Revolving L/C Exposure shall be payable to the applicable Issuing Bank until such Revolving L/C Exposure is cash collateralized and/or reallocated;

(d)     so long as any Lender is a Defaulting Lender, no Issuing Bank shall be required to issue, extend, create, incur, amend, make or increase any Letter of Credit, unless it is satisfied that the related exposure will be 100% covered by the Revolving Facility Commitments of the non-Defaulting Lenders and/or cash collateral will be provided by the Borrowers in accordance with Section 2.21(c)(ii), and participating interests in any such newly issued, extended, created, incurred, made or increased Letter of Credit shall be allocated among non-Defaulting Lenders in a manner consistent with Section 2.21(c)(i) (and Defaulting Lenders shall not participate therein); and

(e)     any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Lender pursuant to Section 2.18(c) but excluding Section 2.19(b)) shall, in lieu of being distributed to such Defaulting Lender, be retained by the Administrative Agent in a segregated, non-interest-bearing account and, subject to any applicable requirements of law, be applied at such time or times as may be determined by the Administrative Agent first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, pro rata, to the payment of any amounts owing by such Defaulting Lender to the applicable Issuing Bank hereunder; third, if so determined by the Administrative Agent or requested by an Issuing Bank, to be held in such account as cash collateral for future funding obligations of the Defaulting Lender of any participating interest in any Letter of Credit; fourth, to the funding of any Revolving Facility Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fifth, if so determined by the Administrative Agent and the Borrowers, held in such account as cash collateral for future funding obligations of the Defaulting Lender of any Revolving Facility Loans under this Agreement; sixth, to the payment of any amounts owing to the Lenders or the Issuing Banks as a result of any judgment of a court of competent jurisdiction obtained by any Lender or any Issuing Bank against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; seventh, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and eighth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction.

In the event that the Administrative Agent, the Borrowers and the Issuing Banks each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Revolving L/C Exposure of the Lenders shall be readjusted to reflect the inclusion of such Lender's Revolving Facility Commitment and on such date such Lender shall purchase at par such of the Revolving Facility Loans of the other Lenders as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Revolving Facility Loans in accordance with its Applicable Percentage.  This Section 2.21 shall not be the exclusive remedy of the Borrowers with respect to any Lender Party that is a Defaulting Lender.

SECTION 2.22.  Swap Related Reimbursement Obligations.

(a)     Borrowers agree to reimburse GECC in immediately available funds in the amount of any payment made by GECC under a Swap Related L/C (such reimbursement

obligation, whether contingent upon payment by GECC under the Swap Related L/C or otherwise, being herein called a "Swap Related Reimbursement Obligation").  No Swap Related Reimbursement Obligation for any Swap Related L/C may exceed the amount of the payment obligations owed by Borrowers under the interest rate protection or hedging agreement or transaction supported by the Swap Related L/C.

(b)     A Swap Related Reimbursement Obligation shall be due and payable by Borrowers within one (1) Business Day after the date on which the related payment is made by GECC under the Swap Related L/C.

(c)     Any Swap Related Reimbursement Obligation shall, during the period in which it is unpaid, bear interest at the rate per annum equal to the Adjusted LIBO Rate plus one percent (1%), as if the unpaid amount of the Swap Related Reimbursement Obligation were a Eurocurrency Loan, and not at any otherwise applicable rate as provided in Section 2.13(c).  Such interest shall be payable upon demand.   The following additional provisions apply to the calculation and charging of interest on Swap Related Reimbursement Obligations by reference to the Adjusted LIBO Rate:

(i)     The Adjusted LIBO Rate shall be determined for each successive one-month Interest Period during which the Swap Related Reimbursement Obligation is unpaid, notwithstanding the occurrence of any Event of Default and even if the Interest Period were to extend beyond the later of the Revolving Facility Maturity Date or the Term Facility Maturity Date.

(ii)    If a Swap Related Reimbursement Obligation is paid during a monthly period for which the Adjusted LIBO Rate is determined, interest shall be pro-rated and charged for the portion of the monthly period during which the Swap Related Reimbursement Obligation was unpaid.  Section 2.16 shall not apply to any payment of a Swap Related Reimbursement Obligation during the monthly period.

(iii)   Notwithstanding the second sentence of the definition of "LIBO Rate", if the LIBO Rate is no longer available from Dow Jones Market Telerate, the LIBO Rate with respect to Swap Related Reimbursement Obligations shall be determined by GECC from such financial reporting service or other information available to GECC as in GECC's reasonable discretion indicates GECC's cost of funds.

(d)     Except as provided in the foregoing provisions of this Section 2.22 and in Section 10.05. Borrowers shall not be obligated to pay to GECC or any of its Affiliates any letter of credit fee, or any other fees, charges or expenses, in respect of a Swap Related L/C or arranging for any interest rate protection or hedging agreement or transaction supported by the Swap Related L/C.  GECC and its Affiliates shall look to the beneficiary of a Swap Related L/C for payment of any such letter of credit fees or other fees, charges or expenses and such beneficiary may factor such fees, charges, or expenses into the pricing of any interest rate protection or hedging arrangement or transaction supported by the Swap Related L/C.

(e)     If any Swap Related L/C is revocable prior to its scheduled expiry date, GECC agrees not to revoke the Swap Related L/C unless:  (1) the Revolving Facility Maturity Date and the Term Facility Maturity Date have occurred, or (2) an Event of Default has occurred.

(f)     GECC or any of its Affiliates shall be permitted to (i) provide confidential or other information furnished to it by any of the Loan Parties (including, without limitation, copies of any documents and information in or referred to in the closing checklist,

financial statements and compliance certificates) to a beneficiary or potential beneficiary of a Swap Related L/C and (ii) receive confidential or other information from the beneficiary or potential beneficiary relating to any agreement or transaction supported or to be supported by the Swap Related L/C. However, no confidential information shall be provided to any Person under this paragraph unless the Person has agreed to comply with the covenant substantially as contained in <u>Section 10.16</u>.

## ARTICLE III

### *Representations and Warranties*

Each of Holdings and each Borrower represents and warrants to each of the Lenders that (it being understood and agreed that the representations and warranties made on the Restatement Date are deemed to be made concurrently with the Transactions):

SECTION 3.01. <u>Organization; Powers</u>. Each of Holdings, each Borrower and each of the Subsidiaries (a) is a limited partnership, limited liability company or corporation duly organized, validly existing and in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of any jurisdiction of organization outside the United States) under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted, (c) is qualified to do business in each jurisdiction where such qualification is required, except where the failure so to qualify could not reasonably be expected to have a material adverse effect on the business, property, operations or condition of the Borrowers and their Subsidiaries, taken as a whole, or the validity or enforceability of any of the Loan Documents or the rights and remedies of the Administrative Agent and the Lenders thereunder, and (d) has the power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Borrowers, to borrow and otherwise obtain credit hereunder.

SECTION 3.02. <u>Authorization</u>. The execution, delivery and performance by Holdings, each Borrower and each of the Subsidiary Loan Parties of each of the Loan Documents to which it is a party, and the borrowings hereunder and the transactions forming a part of the Transactions (a) have been duly authorized by all corporate, stockholder, limited partnership or limited liability company action required to be obtained by Holdings, such Borrower and such Subsidiary Loan Parties and (b) will not (i) violate (A) any provision of (x) applicable law, statute, rule or regulation in any material respect, or (y) of the certificate or articles of incorporation or other constitutive documents or by-laws of Holdings, any such Borrower or any such Subsidiary Loan Party, (B) any applicable order of any court or any rule, regulation or order of any Governmental Authority in any material respect or (C) any provision of any indenture or other debt agreement or any certificate of designation for preferred stock, or any other material agreement or other material instrument to which Holdings, any such Borrower or any such Subsidiary Loan Party is a party or by which any of them or any of their property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, give rise to a right of or result in any cancellation or acceleration of any right or obligation (including any payment) or to a loss of a material benefit under any such indenture, certificate of designation for preferred stock, agreement or other instrument, or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by Holdings, any such Borrower or any such Subsidiary Loan Party, other than the Liens created by the Loan Documents and Liens permitted by <u>Section 6.02</u>.

SECTION 3.03. <u>Enforceability</u>. This Agreement has been duly executed and delivered by Holdings and the Borrowers and constitutes, and each other Loan Document when executed and delivered by each Loan Party that is party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against each such Loan Party in accordance with its terms, subject to (a) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (b) general principles of equity (regardless of whether such

enforceability is considered in a proceeding in equity or at law) and (c) implied covenants of good faith and fair dealing.

SECTION 3.04.  Governmental Approvals.  No action, consent or approval of, registration or filing with or any other action by any Governmental Authority is or will be required in connection with the Transactions, except for (a) the filing of Uniform Commercial Code financing statements, (b) filings with the United States Patent and Trademark Office and the United States Copyright Office and comparable offices in foreign jurisdictions and equivalent filings in foreign jurisdictions, (c) recordation of the Mortgages, (d) such as have been made or obtained and are in full force and effect, (e) such actions, consents, approvals, registrations or filings the failure to be obtained or made which could not reasonably be expected to have a material adverse effect on the business, property, operations or condition of the Borrowers and their Subsidiaries, taken as a whole, or the validity or enforceability of any of the Loan Documents or the rights and remedies of the Administrative Agent and the Lenders thereunder and (f) filings or other actions listed on Schedule 3.04.

SECTION 3.05.  Financial Statements.  (a) The unaudited pro forma consolidated balance sheet as of December 31, 2009 and related statements of income of Holdings and its Subsidiaries (including the notes thereto) (the "Pro Forma Financial Statements") for the twelve-month period ending December 31, 2009, and a calculation of pro forma EBITDA (the "Restatement Date Pro Forma EBITDA") for the twelve-month period ending December 31, 2009, copies of which have heretofore been furnished to each Lender, have been prepared giving effect (as if such events had occurred on such date, with respect to such balance sheet, or on the first day of the relevant period, with respect to such other financial statements) to the Transactions.  Each of the Pro Forma Financial Statements and the calculation of Restatement Date Pro Forma EBITDA has been prepared in good faith based on assumptions believed by the Borrowers to have been reasonable as of the date of delivery thereof (it being understood that such assumptions are based on good faith estimates of certain items and that the actual amount of such items on the Restatement Date is subject to change), and presents fairly in all material respects on a pro forma basis the estimated financial position of the Borrowers and their consolidated Subsidiaries for the period and as of date indicated, as applicable, assuming that the Transactions had actually occurred at such date.

(b)  The audited consolidated balance sheets of Holdings as at December 31, 2008 and 2007, and the audited consolidated statements of income and cash flows for such fiscal years and reported on by and accompanied by a report from PricewaterhouseCoopers, copies of which have heretofore been furnished to each Lender, present fairly in all material respects the consolidated financial position of Holdings for such periods and as at such dates and the consolidated results of operations and cash flows of the Holdings for the years then ended.

(c)  The unaudited interim consolidated balance sheet of Holdings as at [September 30, 2009[14]], presents fairly in all material respects the consolidated financial condition of the Holdings as at such date (subject to normal year-end audit adjustments). All such financial statements have been prepared in accordance with GAAP applied consistently throughout the periods involved (subject to (i) normal year-end adjustments and (ii) the absence of notes, except as approved by the aforementioned firm of accountants and disclosed therein). Except as disclosed on Schedule 6.01 or as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, neither Holdings or either Borrower has any material Guarantees, contingent or other liabilities and liabilities for taxes, or any long-term leases or unusual forward or long-term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in

---

[14] To be updated for later financial statements if available.  Q409 financials to be provided if Restatement Date occurs after February 15, 2010.

the most recent financial statements referred to in this paragraph or in the Pro Forma Financial Statements.

SECTION 3.06.  No Material Adverse Change or Material Adverse Effect.  Since September 30, 2009, there has been no event, development or circumstance that has had or would reasonably be expected to have a Material Adverse Effect (it being understood that for purposes of this Section 3.06, neither the commencement of, nor any event, development or circumstance arising pursuant to, the Bankruptcy Case, shall be deemed to have a Material Adverse Effect).

SECTION 3.07.  Title to Properties; Possession Under Leases.  (a) Each of Holdings, the Borrowers and the Subsidiaries has good and insurable fee simple title to, or valid leasehold interests in, or easements or other limited property interests in, all its real properties (including all Mortgaged Properties) and has good and valid title to its personal property and assets, in each case, except for defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except where the failure to have such title could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All such properties and assets are free and clear of Liens, other than Liens expressly permitted by Section 6.02 or arising by operation of law.

(b)      Each of Holdings, the Borrowers and the Subsidiaries has complied with all obligations under all leases to which it is a party, except where the failure to comply would not reasonably be expected to have Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect could not reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 3.07(b), each of Holdings, each of the Borrowers and each of the Subsidiaries enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)      Each of Holdings, the Borrowers and the Subsidiaries owns or possesses, or is licensed or otherwise has the right to use, all patents, trademarks, service marks, trade names and copyrights and all licenses and rights with respect to the foregoing, necessary for the present conduct of its business, without any conflict (of which the Borrowers have been notified in writing) with the rights of others, and free from any burdensome restrictions on the present conduct of the Borrowers, except where the failure to have such rights or where such conflicts and restrictions could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or except as set forth on Schedule 3.07(c).

SECTION 3.08.  Subsidiaries.  (a) Schedule 3.08(a) sets forth as of the Restatement Date the name and jurisdiction of incorporation, formation or organization of each subsidiary of Holdings and, as to each such subsidiary, the percentage of each class of outstanding Equity Interests owned by Holdings or by any such subsidiary.  **[As of the Restatement Date the only Immaterial Subsidiaries are Canadian Redbook Inc., Penton Media France SAS, Penton Media, S. de R.L. de C.V. and Penton Media Australia Pty. Ltd.][15]**

(b)      As of the Restatement Date, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than directors' qualifying shares) of any nature relating to any Equity Interests in Holdings, the Borrowers or any of the Subsidiaries, except as set forth on Schedule 3.08(b).

---

[15] Penton to update.

SECTION 3.09.  Litigation; Compliance with Laws.  (a) Except as set forth on Schedule 3.09, there are no actions, suits, investigations or proceedings at law or in equity or by or on behalf of any Governmental Authority or in arbitration now pending against, or to the knowledge of Holdings or either Borrower either threatened in writing against or affecting, Holdings or either Borrower or any of the Subsidiaries or any business, property or rights of any such person (i) that involve any Loan Document or the Transactions or (ii) that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)      None of Holdings, the Borrowers, the Subsidiaries or their respective properties or assets is in violation of (nor will the continued operation of their material properties and assets as currently conducted violate) any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permit, but excluding any Environmental Laws, which are subject to Section 3.16) or any restriction of record or agreement affecting any Mortgaged Property, or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.10.  Federal Reserve Regulations.  (a) None of Holdings, the Borrowers and the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

(b)      No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund indebtedness originally incurred for such purpose, or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation U or Regulation X.

SECTION 3.11.  Investment Company Act.  None of Holdings, the Borrowers and the Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.12.  Use of Proceeds.  The Borrowers will use the proceeds of the Revolving Facility Loans and may request the issuance of Letters of Credit to finance the working capital needs and general corporate purposes (including Permitted Business Acquisitions and to pay Transaction Costs not paid on the Restatement Date).

SECTION 3.13.  Tax Returns.  Except as set forth on Schedule 3.13:

(a)      Each of Holdings, the Borrowers and the Subsidiaries has filed or caused to be filed all U.S. federal, state, local and non-U.S. Tax returns required to have been filed by it that are material to such companies, taken as a whole, and each such Tax return is true and correct in all material respects;

(b)      Each of Holdings, the Borrowers and the Subsidiaries has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in paragraph (a) and all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due) with respect to all periods or portions thereof ending on or before the Restatement Date (except Taxes or assessments that are being contested in good faith by appropriate proceedings in accordance with Section 5.03 and for which Holdings, either Borrower or any of the Subsidiaries (as the case may be) has set aside on its books adequate reserves in accordance with GAAP), which Taxes, if not paid or adequately provided for, could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and

(c)     Other than as could not be, individually or in the aggregate, reasonably expected to have a Material Adverse Effect, with respect to each of Holdings, the Borrowers and the Subsidiaries, there are no claims being asserted in writing with respect to any Taxes.

SECTION 3.14.  No Material Misstatements.  (a) All written information (other than the Projections, estimates and information of a general economic nature) (the "Information") concerning Holdings, the Borrowers, the Subsidiaries and the Transactions included in the Plan and the Disclosure Statement or otherwise prepared by or on behalf of the foregoing or their representatives and made available to any Lenders or the Administrative Agent in connection with the Transactions, when taken as a whole, was true and correct in all material respects, as of the date such Information was furnished to the Lenders and as of the Restatement Date, and did not contain any untrue statement of a material fact as of any such date or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made.

(b)     The Projections furnished to the Administrative Agent or the Lenders prior to the Restatement Date (i) have been prepared in good faith based upon assumptions believed by Holdings to be reasonable as of the date thereof, as of the date the Projections were furnished to the Administrative Agent or the Lenders and as of the Restatement Date (it being understood that actual results may vary materially from the Projections) and (ii) as of the Restatement Date, have not been modified in any material respect by the Holdings except as may have been previously disclosed in writing to the Administrative Agent.

SECTION 3.15.  Employee Benefit Plans.  (a) Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect:  (i) each of the Borrowers, Holdings, the Subsidiaries and the ERISA Affiliates is in compliance with the applicable provisions of ERISA and the provisions of the Code relating to Benefit Plans and the regulations and published interpretations thereunder; (ii) no Reportable Event has occurred during the past five years as to which either Borrower, Holdings, any of their Subsidiaries or any ERISA Affiliate was required to file a report with the PBGC, other than reports that have been filed; (iii) except as set forth in Schedule 3.15(a)(iii), the present value of all benefit liabilities under each Benefit Plan of the Borrowers, Holdings, their Subsidiaries and the ERISA Affiliates (based on those assumptions used to fund such Benefit Plan), as of the last annual valuation date applicable thereto for which a valuation is available, does not exceed the value of the assets of such Benefit Plan, and the present value of all benefit liabilities of all underfunded Benefit Plans (based on those assumptions used to fund each such Benefit Plan) as of the last annual valuation dates applicable thereto for which valuations are available, does not exceed the value of the assets of all such underfunded Benefit Plans; (iv) no ERISA Event has occurred or is reasonably expected to occur; and (v) none of the Borrowers, Holdings, the Subsidiaries and the ERISA Affiliates has received any written notification that any Multiemployer Plan is in reorganization or has been terminated within the meaning of Title IV of ERISA, or has knowledge that any Multiemployer Plan is reasonably expected to be in reorganization or to be terminated.

(b)     Each of Holdings, the Borrowers and the Subsidiaries is in compliance (i) with all applicable provisions of law and all applicable regulations and published interpretations thereunder with respect to any employee pension benefit plan or other employee benefit plan governed by the laws of a jurisdiction other than the United States and (ii) with the terms of any such plan, except, in each case, for such noncompliance that could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.16.  Environmental Matters.  Except as disclosed on Schedule 3.16 or as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (a) no written notice of violation, request for information, order, complaint or assertion of penalty has been received by Holdings or any of its Subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or, to either Borrower's knowledge, threatened which allege a violation of or liability under any Environmental Laws, in each case relating to Holdings or any of its Subsidiaries, (b)

each Borrower and each of its Subsidiaries has all permits necessary for its operations to comply with all applicable Environmental Laws and is, and during the term of all applicable statutes of limitation, has been, in compliance with the terms of such permits and with all other applicable Environmental Laws, (c) no Hazardous Material is located at any property currently owned, operated or leased by Holdings or any of its Subsidiaries in quantities or concentrations that would reasonably be expected to give rise to any liability or obligation of Holdings or any of its Subsidiaries under any Environmental Laws, and no Hazardous Material has been generated by or on behalf of Holdings or any of its Subsidiaries that has been transported to or Released at or from any location in a manner that would reasonably be expected to give rise to any liability or obligation of Holdings or any of its Subsidiaries under any Environmental Laws, and (d) there is no material acquisition agreement to which Holdings or any of its Subsidiaries is a party in which Holdings or any of its Subsidiaries has assumed or undertaken responsibility for any known or reasonably likely liability or obligation of any other person arising under or relating to Environmental Laws, which in any such case has not been made available to the Administrative Agent prior to the date hereof.

SECTION 3.17.  Security Documents.  (a) The Collateral Agreement is effective to create in favor of the Administrative Agent (for the benefit of the Secured Parties) a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  In the case of the Pledged Collateral described in the Collateral Agreement, when certificates or promissory notes, as applicable, representing such Pledged Collateral are delivered to the Administrative Agent, and in the case of the other Collateral described in the Collateral Agreement (other than immaterial registered copyrights and copyright applications), when financing statements and other filings attached as Schedule 5 to the Perfection Certificate are filed in the offices specified on Schedule 6 of the Perfection Certificate, the Administrative Agent (for the benefit of the Secured Parties) shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and, subject to Section 9-315 of the New York Uniform Commercial Code; the proceeds thereof, as security for the Obligations to the extent perfection can be obtained by filing Uniform Commercial Code financing statements, in each case prior and superior in right to any other person (except, in the case of Collateral other than Pledged Collateral, Liens expressly permitted by Section 6.02 (other than Liens having priority by operation of law).

(b)     When the Collateral Agreement or a summary thereof is properly filed in the United States Copyright Office, the Administrative Agent (for the benefit of the Secured Parties) shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties thereunder in the Collateral consisting of material registered copyrights and copyright applications, in each case prior and superior in right to any other person (it being understood that subsequent recordings in the United States Copyright Office may be necessary to perfect a lien on material registered copyrights and copyright applications acquired by the grantors after the Restatement Date).

(c)     Each Foreign Pledge Agreement, if any, shall be effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.

(d)     Any Mortgages executed and delivered pursuant to Section 5.10 shall be effective to create in favor of the Administrative Agent (for the benefit of the Secured Parties) a legal, valid and enforceable Lien on all of the Loan Parties' right, title and interest in and to the Mortgaged Property thereunder and the proceeds thereof, and when such Mortgages are filed or recorded in the proper real estate filing or recording offices, the Administrative Agent (for the benefit of the Secured Parties) shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Mortgaged Property and, to the extent applicable, subject to Section 9-315 of the Uniform Commercial Code, the proceeds thereof, in each case prior and superior in right to any other Person, other than with respect to the rights of a Person pursuant to Liens expressly permitted by Section 6.02 and Liens having priority by operation of law.

SECTION 3.18.  <u>Real Property and Leased Premises</u>.  (a) Except as set forth on <u>Schedule 3.18</u>, none of Holdings, either Borrower or any Subsidiary owns in fee any real property as of the Restatement Date.

(b)  Section 2 of the Perfection Certificate lists completely and correctly as of the Restatement Date all material real property leased by Holdings, the Borrowers and the Subsidiary Loan Parties and the addresses thereof.

SECTION 3.19.  <u>Solvency</u>.  (a) Immediately after giving effect to the Transactions on the Restatement Date and immediately following the making of each Loan and after giving effect to the application of the proceeds of each Loan, (i) the fair value of the assets of the Borrowers (collectively) and Holdings, the Borrowers and their Subsidiaries on a consolidated basis, at a fair valuation, will exceed the debts and liabilities, direct, subordinated, contingent or otherwise, of the Borrowers (collectively) and Holdings, the Borrowers and their Subsidiaries on a consolidated basis, respectively; (ii) the present fair saleable value of the property of the Borrowers (collectively) and Holdings, the Borrowers and their Subsidiaries on a consolidated basis will be greater than the amount that will be required to pay the probable liability of the Borrowers (collectively) and Holdings, the Borrowers and their Subsidiaries on a consolidated basis, respectively, on their debts and other liabilities, direct, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) the Borrowers (collectively) and Holdings, the Borrowers and their Subsidiaries on a consolidated basis will be able to pay their debts and liabilities, direct, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iv) the Borrowers (collectively) and Holdings, the Borrowers and their Subsidiaries on a consolidated basis will not have unreasonably small capital with which to conduct the businesses in which they are engaged as such businesses are now conducted and are proposed to be conducted following the Restatement Date.

(b)  Neither Holdings nor either Borrower intends to, and neither Holdings nor either Borrower believes that it or any of its subsidiaries will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing and amounts of cash to be received by it or any such subsidiary and the timing and amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness of any such subsidiary.

SECTION 3.20.  <u>Labor Matters</u>.  Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes pending or threatened against Holdings, either Borrower or any of the Subsidiaries; (b) the hours worked and payments made to employees of Holdings, either Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters; and (c) all payments due from Holdings, either Borrower or any of the Subsidiaries or for which any claim may be made against Holdings, either Borrower or any of the Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of Holdings, such Borrower or such Subsidiary to the extent required by GAAP.  Except (i) as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect or (ii) as set forth on <u>Schedule 3.20</u>, the consummation of the Transactions will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement to which Holdings, either Borrower or any of the Subsidiaries (or any predecessor) is a party or by which Holdings, either Borrower or any of the Subsidiaries (or any predecessor) is bound.

SECTION 3.21.  <u>Insurance</u>.  <u>Schedule 3.21</u> sets forth a true, complete and correct description of all material insurance maintained by or on behalf of Holdings, the Borrowers or the Subsidiaries as of the Restatement Date.  As of such date, such insurance is in full force and effect.  The Borrowers believe that the insurance maintained by or on behalf of Holdings, the Borrowers and the Subsidiaries is adequate and is comparable to insurance carried by similarly situated companies engaged in the same or similar businesses operating in the same or similar locations.

SECTION 3.22.   Reserved.

SECTION 3.23.   Senior Indebtedness.  The Obligations do and will constitute "Senior Debt" and "Designated Senior Debt" under and as defined in any subordinated indebtedness, including any Junior Indebtedness and any Permitted Debt Securities.

SECTION 3.24.   Anti-Terrorism Law.

(a)   No Loan Party is in violation of any requirements of any Governmental Authority (including any and all laws, judgments, orders, decrees, ordinances, rules, regulations, statutes or case law) relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the USA Patriot Act.

(b)   No Loan Party is any of the following:

(i)   a person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)   a person owned or controlled by, or acting for or on behalf of, any person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)   a person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)   a person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)   a person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or any replacement website or other replacement official publication of such list.

(c)   No Loan Party (i) to its knowledge conducts any material part of its business or engages in making or receiving any material contribution of funds, goods or services to or for the benefit of any person described in paragraph (b) above, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law in violation of such Executive Order.

SECTION 3.25.   Deposit Accounts and Securities Accounts.  As of the Restatement Date, neither Holdings, the Borrowers, or any other Loan Party has any Deposit Accounts or Securities Accounts except as set forth on Schedule 3.25.

ARTICLE IV

*Conditions of Lending*

The obligations of (a) the Lenders to make Loans and (b) any Issuing Bank to issue Letters of Credit or increase the stated amounts of or extend, amend or renew Letters of Credit hereunder (each, a "Credit Event") are subject to the satisfaction of the following conditions:

SECTION 4.01.  <u>All Credit Events</u>.  On the date of each Borrowing (other than a Borrowing representing the payment of PIK Interest; it being understood that PIK Elections may only be made in accordance with Article II) and on the date of each issuance, amendment, extension or renewal of a Letter of Credit:

(a)     The Administrative Agent shall have received, in the case of such Borrowing, a Borrowing Request as required by <u>Section 4.02(t)</u> or <u>Section 2.03</u>, as applicable (or a Borrowing Request shall have been deemed given in accordance with the last paragraph of <u>Section 2.03)</u> or, in the case of the issuance of a Letter of Credit, the applicable Issuing Bank and the Administrative Agent shall have received a notice requesting the issuance of such Letter of Credit as required by <u>Section 2.05(b)</u>.

(b)     The representations and warranties set forth in Article III hereof shall be true and correct in all material respects (or if such representation is qualified by a materiality standard, shall be true and correct in all respects) as of such date (other than an amendment, extension or renewal of a Letter of Credit without any increase in the stated amount of such Letter of Credit), with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects (or if such representation is qualified by a materiality standard, shall be true and correct in all respects) as of such earlier date).

(c)     At the time of and immediately after such Borrowing or issuance, amendment, extension or renewal of a Letter of Credit (other than an amendment, extension or renewal of a Letter of Credit without any increase in the stated amount of such Letter of Credit), as applicable, no Event of Default or Default shall have occurred and be continuing.

(d)     After giving effect to any Loan and the use of proceeds thereof, the cash and Permitted Investments of Holdings and its subsidiaries (less any amounts that are held by the Administrative Agent or any Issuing Lender as cash collateral pursuant to <u>Section 2.21(c)(ii)</u>), in each case based on the relevant depository's reported balances as of the Business Day immediately preceding the Borrowing Request, shall not exceed $20.0 million.

Each Borrowing and each issuance, amendment, extension or renewal of a Letter of Credit shall be deemed to constitute a representation and warranty by each Borrower on the date of such Borrowing, issuance, amendment, extension or renewal as applicable, that the conditions specified in paragraphs (b) and (c) of this <u>Section 4.01</u> shall have been satisfied on such date in accordance with the terms of such paragraphs.

SECTION 4.02.  <u>First Credit Event</u>.  On the Restatement Date:

(a)     The Administrative Agent (or its counsel) shall have received from the Administrative Agent, each Loan Party hereto, each Issuing Bank and the Revolving Facility Lenders, either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include fax transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(b)     The Administrative Agent shall have received, on behalf of itself, the Lenders and each Issuing Bank, a favorable written opinion of Jones Day, special counsel for Holdings and the Borrowers (i) dated the Restatement Date, (ii) addressed to each Issuing Bank, the Administrative Agent and the Lenders and (iii) in form and substance reasonably satisfactory to the Administrative Agent and covering such other matters relating to the Loan Documents and the Transactions as the Administrative Agent shall reasonably request, and each of Holdings and each Borrower hereby instructs its counsel to deliver such opinions.

(c)     The Administrative Agent shall have received in the case of each Loan Party each of the items referred to in clauses (i), (ii), (iii) and (iv) below:

(i)     a copy of the certificate or articles of incorporation, certificate of limited partnership or certificate of formation, including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State (or other similar official) of the jurisdiction of its organization, and a certificate as to the good standing (to the extent such concept or a similar concept exists under the laws of such jurisdiction) of each such Loan Party as of a recent date from such Secretary of State (or other similar official);

(ii)     a certificate of the secretary or assistant secretary or similar officer of each Loan Party dated the Restatement Date and certifying:

(A)     that attached thereto is a true and complete copy of the by-laws (or limited partnership agreement, limited liability company agreement or other equivalent governing documents) of such Loan Party as in effect on the Restatement Date and at all times since a date prior to the date of the resolutions described in clause (B) below,

(B)     that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors (or equivalent governing body) of such Loan Party (or its managing general partner or managing member) authorizing the execution, delivery and performance of the Loan Documents to which such person is a party and, in the case of the Borrowers, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect on the Restatement Date,

(C)     that the certificate or articles of incorporation, certificate of limited partnership or certificate of formation of such Loan Party has not been amended since the date of the last amendment thereto disclosed pursuant to clause (i) above,

(D)     as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party and

(E)     as to the absence of any pending proceeding for the dissolution or liquidation of such Loan Party or, to the knowledge of such person, threatening the existence of such Loan Party;

(iii)     a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary or similar officer executing the certificate pursuant to clause (ii) above; and

(iv)     such other documents as the Administrative Agent, the Lenders and any Issuing Bank on the Restatement Date may reasonably request (including without limitation, tax identification numbers and addresses).

(d)     The Collateral and Guarantee Requirement shall have been satisfied and the Administrative Agent shall have received a completed Perfection Certificate dated the

Restatement Date and signed by a Responsible Officer of Holdings and each Borrower, together with all attachments contemplated thereby, and the results of a search of the Uniform Commercial Code (or equivalent) filings made with respect to the Loan Parties in the jurisdictions contemplated by the Perfection Certificate and copies of the financing statements (or similar documents) disclosed by such search and evidence reasonably satisfactory to the Administrative Agent that the Liens indicated by such financing statements (or similar documents) are permitted by Section 6.02 or have been released (or authorized for release in a manner satisfactory of the Administrative Agent).

(e)     The Lenders shall have received the financial statements referred to in Section 3.05 and the Projections **[in form and substance reasonably acceptable to the Administrative Agent]**.[16]

(f)     The Lenders shall have received a solvency certificate substantially in the form of Exhibit F and signed by the Chief Financial Officer of Holdings confirming the solvency of Holdings, the Borrowers and their Subsidiaries on a consolidated basis after giving effect to the Transactions on the Restatement Date.

(g)     All requisite governmental authorities and third parties shall have approved or consented to the Transactions and the other transactions contemplated hereby to the extent required and material, and all applicable waiting periods shall have expired and there shall be no litigation, governmental, administrative or judicial action that has restrained or prevented the Transactions.

(h)     All accrued fees and expenses of the Lenders and the Administrative Agent (including the fees and expenses of Weil, Gotshal & Manges LLP ("Weil"), counsel to the Administrative Agent, and Conway Del Genio Gries & Co., financial advisors to Weil and including any local counsel), in each case which have been invoiced, shall have been paid.

(i)     The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.02 and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a customary lender's loss payable endorsement and to name the Administrative Agent as additional insured, in form and substance reasonably satisfactory to the Administrative Agent.

(j)     The Administrative Agent shall have received Account Control Agreements duly executed by the proper parties.

(k)     All representations and warranties of each Loan Party set forth in the Restructuring Support Agreement shall have been true and correct in all material respects (or if such representation is qualified by a materiality standard, shall be true and correct in all respects) as of the time such representations and warranties were made and shall be true and correct in all material respects (or if such representation is qualified by a materiality standard, shall be true and correct in all respects) as of the Restatement Date as if such representations and warranties were made on and as of such date, unless stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects (or if such representation is qualified by a materiality standard, shall be true and correct in all respects) as of such earlier date.

(l)     The Plan shall be confirmed by the Bankruptcy Court on or before April **[4]**, 2010 and shall become effective on or before May **[4]**, 2010.

---

[16] To be deleted upon receipt of acceptable updated Projections.

(m)      As of the end of the fiscal month immediately preceding and each fiscal month following the Commencement Date, EBITDA (as defined in the Existing Credit Agreement) for the period of twelve consecutive months ending on the last day of such fiscal month shall have been no less than $75.0 million, the calculation of which is set forth on Annex I; provided that, for avoidance of doubt, EBITDA shall be calculated to give effect to Cure Amounts (as defined in the Existing Credit Agreement) made in respect of the fiscal quarter ending June 30, 2009 and otherwise be determined for such period on a Pro Forma Basis.

(n)      After giving effect to the Transactions, including all payments to effectuate the Plan and payment of all fees and expenses in connection therewith, the Loan Parties and their subsidiaries shall have cash, Available Unused Commitments of all Revolving Facility Lenders and Permitted Investments in an amount not less than **[$40.0 million]**.[17]

(o)      The Secured Swap Agreements shall (i) continue as in effect on the date of the Restructuring Support Agreement or (ii) be crystallized as a secured term loan and paid over the period from the Restatement Date to a date no earlier than the end of each original term of the respective Secured Swap Agreements and in an amount per fiscal quarter no greater than as set forth in the Projections, and such crystallized amount shall remain as a secured obligation in the same manner as in the Existing Credit Agreement and, in each case, subject to conditions reasonably acceptable to the Administrative Agent and the Required Lenders.[18]

(p)      There shall have been made an equity investment in Holdings in an amount not less than $38.9 million or such greater amount required to be invested pursuant to the Restructuring Support Agreement and the Equity Commitment Letter (as defined in the Restructuring Support Agreement), which shall in turn be contributed to the Borrowers, on the terms and subject to the conditions reasonably acceptable to the Administrative Agent and the Required Lenders (it being understood that that the terms and conditions set forth in the Equity Commitment Letter are acceptable). The Equity Investors (as defined in the Restructuring Support Agreement) shall own not less than 51% of Reorganized Holdings on a fully diluted basis after giving effect to the Plan but prior to any management incentive plan; provided that in the event the lenders under the Second Lien Credit Agreement (as defined in the Existing Credit Agreement) participate in the Rights Offering (as defined in the Plan) and a result thereof and due to their election to receive cash or Stock (as defined in the Plan) as their Second Lien Distributions (as defined in the Plan), the foregoing 51% threshold will be reduced to match the actual percentage held by the Equity Investors after giving effect to such elections but not in any event less than 42.5% (prior to any management incentive plan).

(q)      The Bankruptcy Court shall have entered an order or orders, in form and substance reasonably satisfactory to the Loan Parties, the Administrative Agent and Required Lenders, confirming the Plan (the "Confirmation Order"), and such Confirmation Order shall have become a Final Order.  Without limitation, the Confirmation Order shall authorize and approve the Facilities (including the full amount of the Facilities) and the making of Loans hereunder, the continuation of the security interests in connection therewith, and the payment of all fees provided for pursuant to and in respect of the Facilities.

---

[17] This amount will be, as of the Restatement Date, adjusted downward to account for cash payments made on or after February 1, 2010 in respect of (i) accrued interest under the Existing Credit Agreement, (ii) break funding payments under Section 2.16 of the Existing Credit Agreement and (iii) Secured Swap Agreements.

[18] See footnote 1.

(r)     The effective date of the Plan shall occur simultaneously with the Restatement Date and the Plan shall be effective without waiver by any of the Loan Parties that are party to the Bankruptcy Case of any condition of the Plan or any related transaction (with the exception of such transactions contemplated by the terms of the Plan to occur after the effective date of the Plan), and each of the Transaction Documents shall be reasonably satisfactory to the Administrative Agent.

(s)     The interest, fees, expenses and indemnification obligations of the Loan Parties under the Existing Credit Agreement shall have been paid as accrued and payable on a current basis during the continuation of the Bankruptcy Case and shall be paid in full on the Restatement Date as of the day immediately preceding the Restatement Date and all Interest Periods (as defined in and under the Existing Credit Agreement) shall be reset as of the Effective Date.

(t)     The Administrative Agent shall have received a Borrowing Request specifying the aggregate amount of Term Borrowings and Revolving Facility Borrowings on the Restatement Date, after giving effect to Section 4.01(d) on the Restatement Date.

(u)     The Administrative Agent shall have received a list of all persons who own or will own, beneficially or of record, as of the effective date of the Plan, any Equity Interests in Holdings, the Borrowers or any direct or indirect parent thereof, which list shall indicate the persons therein constituting Restricted Persons.

The Administrative Agent and each Lender, shall be deemed to have acknowledged receipt of and consented to and approved each Loan Document and each other document required to be approved by the Administrative Agent or Lender, as applicable, on the Restatement Date once approved by the Administrative Agent and/or the relevant Lenders.

ARTICLE V

*Affirmative Covenants*

Each of Holdings and each Borrower covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Revolving Facility Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document (other than obligations for taxes, costs, indemnifications, reimbursements, damages and other contingent liabilities in respect of which no claim or demand for payment has been made or, in the case of indemnifications, no notice been given) shall have been paid in full and all Letters of Credit have been canceled or have expired and all amounts drawn thereunder have been reimbursed in full (or have been cash collateralized in a manner consistent with the requirements of Section 2.05 or backstopped with a letter of credit having terms and conditions reasonably satisfactory to the applicable Issuing Banks), unless the Required Lenders shall otherwise consent in writing, each Borrower (and Holdings to the extent specifically applicable to it) will, and each Borrower will cause each of its subsidiaries to:

SECTION 5.01.  Existence; Businesses and Properties.  (a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except, in the case of a Subsidiary of a Borrower, where the failure to do so would not reasonably be expected to have a material adverse effect on the business, property, operations or condition of the Borrowers and their Subsidiaries, taken as a whole, or the validity or enforceability of any of the Loan Documents or the rights and remedies of the Administrative Agent and the Lenders thereunder, and except as otherwise expressly permitted under Section 6.05, and except for the liquidation or dissolution of Subsidiaries if the assets of such Subsidiaries to the extent they exceed estimated liabilities are acquired by a Borrower or a Wholly Owned Subsidiary of a Borrower in such liquidation or dissolution; provided that Subsidiary Loan Parties

may not be liquidated into Subsidiaries that are not Loan Parties and Domestic Subsidiaries may not be liquidated into Foreign Subsidiaries.

(b)     Except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, do or cause to be done all things necessary to (i) lawfully obtain, preserve, renew, extend and keep in full force and effect the permits, franchises, authorizations, patents, trademarks, service marks, trade names, copyrights, licenses and rights with respect thereto necessary to the normal conduct of its business, and (ii) at all times maintain and preserve all property necessary to the normal conduct of its business and keep such property in satisfactory repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted at all times (in each case except as expressly permitted by this Agreement).

SECTION 5.02.  Insurance.  (a) Maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by similarly situated companies engaged in the same or similar businesses operating in the same or similar locations and shall cause the Administrative Agent to be listed as a co-loss payee on property and casualty policies and as an additional insured on liability policies.

(b)     If at any time the real property constituting any Mortgage Property is located in a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such reasonable total amount as the Administrative Agent may from time to time reasonably require, and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973.

SECTION 5.03.  Taxes.  Pay and discharge promptly when due all material Taxes, imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims which, if unpaid, might give rise to a Lien (other than a Lien permitted under Section 6.02) upon such properties or any part thereof; provided, however, that such payment and discharge shall not be required with respect to any such Tax or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings, and Holdings, the affected Borrower or the affected Subsidiary, as applicable, shall have set aside on its books reserves in accordance with GAAP with respect thereto.

SECTION 5.04.  Financial Statements, Reports, Etc.  Furnish to the Administrative Agent (which will promptly furnish such information to the Lenders):

(a)     within 110 days after the end of each fiscal year (commencing with the fiscal year ended December 31, 2009, in which case will be delivered within 110 days thereafter or, if later, within 30 days following the Restatement Date), a consolidated balance sheet and related statements of operations, cash flows and owners' equity showing the financial position of Holdings and its Subsidiaries as of the close of such fiscal year and the consolidated results of its operations during such year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of operations, cash flows and owners' equity shall be audited by PriceWaterhouseCoopers or other independent public accountants of recognized national standing and accompanied by an opinion of such accountants (which opinion shall be (commencing with the opinion delivered for the fiscal year ending December 31, 2011) without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP (it being understood that the delivery by Holdings of annual reports on Form 10-K of

Holdings and its consolidated Subsidiaries shall satisfy the requirements of this Section 5.04(a) to the extent such annual reports include the information specified herein);

(b)        within 45 days after the end of each of the first three fiscal quarters of each fiscal year (commencing with the first fiscal quarter of 2010), a consolidated balance sheet and related statements of operations and cash flows showing the financial position of Holdings and its subsidiaries as of the close of such fiscal quarter and the consolidated results of its operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer of Holdings on behalf of Holdings as fairly presenting, in all material respects, the financial position and results of operations of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes) (it being understood that the delivery by Holdings of quarterly reports on Form 10-Q of Holdings and its consolidated Subsidiaries shall satisfy the requirements of this Section 5.04(b) to the extent such quarterly reports include the information specified herein);

(c)        Within 30 days of the end of each of the first two months of each fiscal quarter (commencing with the fiscal month ending **[_____ __, 2010]**) through the date that is 18 months after the Restatement Date, an unaudited consolidated balance sheet and related statements of operations and cash flows showing the financial position of Holdings and its subsidiaries as of the close of such fiscal month and the consolidated results of its operations during the first two months of such fiscal quarter and the then-elapsed portion of the fiscal year, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer of Holdings on behalf of Holdings as fairly presenting, in all material respects, the financial position and results of operations of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes except as set forth in clause (i) of the proviso hereto); provided that it is understood that (i) such financial statements reflect internal operating results (with footnotes noting exceptions) and therefore may not reflect items such as quarter-end or year-end accruals, adjustments or reclassifications including but not limited to: period-end accruals, reserves, pension adjustments, IBNR adjustment, options or other non-cash compensation adjustment, impairment adjustments, fair value of derivatives, the tax provision and adjustments to valuation reserves and other reserves (including but not limited to bad debt reserves, reserves for inventory obsolescence), certain billing adjustments, certain current/non-current classifications of assets and liabilities, the results of account reconciliations, the change in valuation of certain assets and liabilities and adjustments typically booked by Holdings on a quarterly or annual basis, and as otherwise noted therein and (ii) Indebtedness is accounted for on a historical cost basis;

(d)        a certificate of a Financial Officer of Holdings (i) concurrently with any delivery of financial statements under paragraphs (a), (b) or (c) above, certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (ii) concurrently with any delivery of financial statements under paragraph (a), (b) or (c) above, commencing with the fiscal **[quarter/month]** ending **[_____ __]**, 2010, setting forth computations in detail reasonably satisfactory to the Administrative Agent demonstrating compliance with the relevant Financial Performance Covenants and (iii) concurrently with any delivery of financial statements under paragraph (a) above, (A) to the extent reasonably available (commencing with the financial statements for the 2010 fiscal year), a certificate of the accounting firm opining on or certifying such statements stating whether they obtained knowledge during the course of their examination of such statements of any Default or Event of Default (which certificate may be limited to accounting matters and disclaims responsibility for legal

interpretations) and (B) a certificate of a Financial Officer of Holdings (1) commencing with the fiscal year 2009, setting forth the amount, if any, of Excess Cash Flow for such fiscal year and the amount of the Available Specified Basket Amount as of the date of such certificate, in each case together with the calculation thereof in reasonable detail and (2) certifying a list of names of all Immaterial Subsidiaries being excluded from the Collateral and Guarantee Requirement, that each Subsidiary set forth on such list individually qualifies as an Immaterial Subsidiary and that all such Domestic Subsidiaries listed as Immaterial Subsidiaries in the aggregate comprise less than 5% of Consolidated Total Assets at the end of the period to which such financial statements relate and less than 5% of EBITDA for the period to which such financial statements relate;

(e)      promptly after the same become publicly available, copies of all periodic and other publicly available reports, proxy statements and, to the extent requested by the Administrative Agent, other materials filed by Holdings, either Borrower or any of the Subsidiaries with the SEC, or after an initial public offering, distributed to its stockholders generally, as applicable;

(f)      within 90 days after the beginning of each fiscal year, a detailed consolidated quarterly budget for such fiscal year (including a projected consolidated balance sheet of each Borrower and its Subsidiaries as of the end of such fiscal year, and the related consolidated statements of projected cash flow and projected income) and, as soon as available, significant revisions, if any, of such budget and quarterly projections with respect to such fiscal year (to the extent that such revisions have been approved by the applicable Borrower's board of directors (or equivalent governing body)), including a description of underlying assumptions with respect thereto (collectively, the "Budget"), which Budget shall in each case be accompanied by the statement of a Financial Officer of each Borrower to the effect that, to the best of his or her knowledge, the Budget is a reasonable estimate for the period covered thereby;

(g)      upon the reasonable request of the Administrative Agent, deliver an updated Perfection Certificate (or, to the extent such request relates to specified information contained in the Perfection Certificate, such information) reflecting all changes since the date of the information most recently received pursuant to this paragraph (g) or Section 5.10(f);

(h)      promptly, a copy of all final reports submitted to the board of directors (or equivalent governing body) or any committee thereof of any of Holdings, either Borrower or any Subsidiary in connection with any material interim or special audit made by independent accountants of the books of Holdings, either such Borrower or any such Subsidiary;

(i)      promptly following a request therefor, all documentation and other information that the Administrative Agent reasonably requests on its behalf or on behalf of any Lender in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act; and

(j)      promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Holdings, either Borrower or any of the Subsidiaries, or compliance with the terms of any Loan Document, as in each case the Administrative Agent may reasonably request (for itself or on behalf of any Lender).

      SECTION 5.05. <u>Litigation and Other Notices</u>. Furnish to the Administrative Agent written notice of the following promptly after any Responsible Officer of Holdings or either Borrower obtains actual knowledge thereof:

(a)      any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) proposed to be taken with respect thereto;

(b)　　the filing or commencement of, or any written threat or notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority or in arbitration, against Holdings, either Borrower or any of the Subsidiaries as to which an adverse determination is reasonably probable and which, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(c)　　the occurrence of any ERISA Event that, together with all other ERISA Events that have occurred, could reasonably be expected to have a Material Adverse Effect; and

(d)　　any other development specific to Holdings, either Borrower or any of the Subsidiaries that is not a matter of general public knowledge and that has had, or could reasonably be expected to have, a Material Adverse Effect.

SECTION 5.06.　__Compliance with Laws__.　Comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; <u>provided</u> that this __Section 5.06__ shall not apply to Environmental Laws, which are the subject of __Section 5.09__, or to laws related to Taxes, which are the subject of __Section 5.03__.

SECTION 5.07.　__Maintaining Records; Access to Properties and Inspections__.　Maintain all financial records in a manner sufficient to permit the preparation of consolidated financial statements in accordance with GAAP and permit any persons designated by the Administrative Agent or, upon the occurrence and during the continuance of an Event of Default, any Lender to visit and inspect the financial records and the properties of Holdings, either Borrower or any of the Subsidiaries at reasonable times, upon reasonable prior notice to Holdings or either Borrower, and as often as reasonably requested (but in no event more than once a year in the absence of an Event of Default) and to make extracts from and copies of such financial records, and permit any persons designated by the Administrative Agent or, upon the occurrence and during the continuance of an Event of Default, any Lender upon reasonable prior notice to Holdings or either Borrower to discuss the affairs, finances and condition of Holdings, either Borrower or any of the Subsidiaries with the officers thereof and independent accountants therefor (subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract), all at the expense of the Borrowers; __provided__ that the Borrowers shall have the right to have one or more of its designees present during any discussions with its independent accountants.　To the extent practicable and so long as no Event of Default has occurred and is continuing, the Lenders agree to use commercially reasonable efforts to coordinate and otherwise to conduct their visits and inspections so as to avoid creating unreasonable burdens upon management of the Borrowers and their Subsidiaries.

SECTION 5.08.　__Use of Proceeds__.　Use the proceeds of the Loans and request issuance of Letters of Credit to finance working capital needs and general corporate purposes (including Permitted Business Acquisitions and to pay Transaction Costs not paid on the Restatement Date).

SECTION 5.09.　__Compliance with Environmental Laws__.　Comply, and make reasonable efforts to cause all lessees and other persons occupying its properties to comply, with all Environmental Laws applicable to its operations and properties; and obtain and renew all authorizations and permits required pursuant to Environmental Law for its operations and properties, in each case in accordance with Environmental Laws, except, in each case with respect to this __Section 5.09__, to the extent the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.10.　__Further Assurances; Mortgages__.　(a) Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, Mortgages and other documents and recordings of Liens in stock registries), that may be required under any applicable law, or that the Administrative Agent may reasonably request, to cause the Collateral and Guarantee Requirement to be and

remain satisfied, all at the expense of the Loan Parties and provide to the Administrative Agent, from time to time upon reasonable request, evidence reasonably satisfactory to the Administrative Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)        If any asset (including any real property (other than real property covered by paragraph (c) below) or improvements thereto or any interest therein) that has an individual fair market value in an amount greater than $4.0 million is acquired by Holdings, either Borrower or any other Loan Party after the Restatement Date or owned by an entity at the time it becomes a Subsidiary Loan Party (in each case other than assets constituting Collateral under a Security Document that become subject to the Lien of such Security Document upon acquisition thereof), cause such asset to be subjected to a Lien securing the Obligations and take, and cause the Subsidiary Loan Parties to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect such Liens, including actions described in paragraph (a) of this <u>Section 5.10</u> all at the expense of the Loan Parties, subject to paragraph (g) below.

(c)        Grant and cause each of the Subsidiary Loan Parties to grant to the Administrative Agent security interests and mortgages in such owned real property of the Borrowers or any such Subsidiary Loan Parties acquired after the Restatement Date and having a value at the time of acquisition in excess of $4.0 million pursuant to documentation in such form as is reasonably satisfactory to the Administrative Agent (each, a "<u>Mortgage</u>") and constituting valid and enforceable Liens subject to no other Liens except as are permitted by <u>Section 6.02</u>, at the time of perfection thereof, record or file, and cause each such Subsidiary to record or file, the Mortgage or instruments related thereto in such manner and in such places as is required by law to establish, perfect, preserve and protect the Liens in favor of the Administrative Agent required to be granted pursuant to the Mortgages and pay, and cause each such Subsidiary to pay, in full, all Taxes, fees and other charges payable in connection therewith, in each case subject to paragraph (g) below. Unless otherwise waived by the Administrative Agent, with respect to each such Mortgage, the Borrowers shall deliver to the Administrative Agent contemporaneously therewith (i) a policy or policies or marked-up unconditional binder of title insurance or foreign equivalent thereof, as applicable, paid for by the Borrowers, issued by a nationally recognized title insurance company insuring the Lien of each such Mortgage as a valid first Lien on the Mortgaged Property described therein, free of any other Liens except as permitted by <u>Section 6.02</u>, together with such endorsements, coinsurance and reinsurance as the Administrative Agent may reasonably request, (ii) a survey of any Mortgaged Property (and all improvements thereon), or foreign equivalent thereof, as applicable, which is (w) dated (or redated) not earlier than six months prior to the date of delivery thereof unless there shall have occurred within six months prior to such date of delivery any exterior construction on the site of such Mortgaged Property, in which event such survey shall be dated (or redated) after the completion of such construction or if such construction shall not have been completed as of such date of delivery, not earlier than 20 days prior to such date of delivery, (x) certified by the surveyor (in a manner reasonably acceptable to the Administrative Agent) to the Administrative Agent and the title insurance company insuring the Mortgage, (y) complying in all respects with the minimum detail requirements of the American Land Title Association as such requirements are in effect on the date of preparation of such survey and (z) sufficient for such title insurance company to remove all standard survey exceptions from the title insurance policy relating to such Mortgaged Property or otherwise reasonably acceptable to the Administrative Agent and (iii) the legal opinions of local U.S. counsel in the state where such real property is located, in form and substance reasonably satisfactory to the Administrative Agent.

(d)        If any additional direct or indirect Subsidiary of Holdings is formed or acquired after the Restatement Date and if such Subsidiary is not an Immaterial Subsidiary, within five Business Days after the date such Subsidiary is formed or acquired, notify the Administrative Agent and the Lenders thereof and, within 20 Business Days after the date such Subsidiary is formed or acquired or such longer period as the Administrative Agent shall agree, cause the

Collateral and Guarantee Requirement (if applicable) to be satisfied with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Loan Party.

(e)        If any additional Foreign Subsidiary of Holdings is formed or acquired after the Restatement Date and if such Subsidiary is a "first tier" Foreign Subsidiary and is not an Immaterial Subsidiary, within five Business Days after the date such Foreign Subsidiary is formed or acquired, notify the Administrative Agent and the Lenders thereof and, within 20 Business Days after the date such Foreign Subsidiary is formed or acquired or such longer period as the Administrative Agent shall reasonably agree, cause the Collateral and Guarantee Requirement (if applicable) to be satisfied with respect to any Equity Interest in such Foreign Subsidiary owned by or on behalf of any Loan Party.

(f)        (i) Furnish to the Administrative Agent prompt written notice of any change in (A) any Loan Party's corporate or organization name, (B) any Loan Party's organizational form or (C) any Loan Party's organizational identification number; provided that the Borrowers shall not effect or permit any such change unless all filings have been made, or will have been made within any applicable statutory period, under the Uniform Commercial Code or otherwise that are required in order for the Administrative Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral for the benefit of the Secured Parties and (ii) promptly notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

(g)        The Collateral and Guarantee Requirement and the other provisions of this Section 5.10 need not be satisfied with respect to (i) any real property held by the Borrowers or any of their Subsidiaries as a lessee under a lease, (ii) any Equity Interests acquired after the Restatement Date in accordance with this Agreement if, and to the extent that, and for so long as (A) doing so would violate applicable law or a contractual obligation binding on such Equity Interests and (B) such law or obligation existed at the time of the acquisition thereof and was not created or made binding on such Equity Interests in contemplation of or in connection with the acquisition of such Subsidiary, and (iii) any assets acquired after the Restatement Date, to the extent that, and for so long as, taking such actions would violate a contractual obligation binding on such assets that existed at the time of the acquisition thereof and was not created or made binding on such assets in contemplation or in connection with the acquisition of such assets (except in the case of assets acquired with Indebtedness permitted pursuant to Section 6.01(i) that is secured by a Lien permitted pursuant to Section 6.02(i)); provided that, upon the reasonable request of the Administrative Agent, Holdings and the Borrowers shall, and shall cause any applicable Subsidiary to, use commercially reasonable efforts to have waived or eliminated any contractual obligation of the types described in clauses (ii) and (iii) above.

SECTION 5.11.   Fiscal Year; Accounting.  In the case of Holdings and the Borrowers, cause their fiscal year to end on December 31.

SECTION 5.12.   Maintenance of Ratings.   The Borrowers will at all times use commercially reasonable efforts to maintain ratings issued by Moody's and S&P with respect to their senior secured debt and maintain their corporate rating from S&P and their corporate family rating from Moody's.

SECTION 5.13.   **Reserved**.

SECTION 5.14.   Miscellaneous Business Covenants.  Each Borrower will and will cause each of its respective Subsidiaries to:  (a) maintain entity records and books of account separate from those of any other entity, including Holdings, which is an Affiliate of such entity; (b) not commingle its funds or assets with those of any other entity, including Holdings, which is an Affiliate of such entity; and (c)

provide that the board of directors or other analogous governing body of such entity will hold all appropriate meetings to authorize and approve such entity's actions.

SECTION 5.15. Deposit Accounts and Securities Accounts. Neither Holdings, the Borrowers or any other Loan Party has any Deposit Accounts into which cash is deposited by or on behalf of Holdings, the Borrowers or any other Loan Party or in which cash is maintained other than the Deposit Accounts which are either (a) subject to an Account Control Agreement in full force and effect and which, as of the Restatement Date, are listed on Schedule 5.15 or (b) are the Trust Fund Accounts or Zero Balance Disbursement Accounts. Neither Holdings, the Borrowers nor any other Loan Party has any Securities Accounts other than the Securities Accounts which are each subject to an Account Control Agreement in full force and effect and which, as of the Restatement Date, are listed on Schedule 5.15.

SECTION 5.16. Post-Closing Collateral Matters. Each Borrower shall execute and deliver the documents and complete the tasks set forth on Schedule 5.16, in each case within the time limits specified on such schedule.

ARTICLE VI

*Negative Covenants*

Each of Holdings and each Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Revolving Facility Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document (other than obligations for taxes, costs, indemnifications, reimbursements, damages and other contingent liabilities in respect of which no claim or demand for payment has been made or, in the case of indemnifications, no notice been given) have been paid in full and all Letters of Credit have been canceled or have expired and all amounts drawn thereunder have been reimbursed in full (or have been cash collateralized in a manner consistent with the requirements of Section 2.05 or backstopped with a letter of credit having terms and conditions reasonably satisfactory to the applicable Issuing Banks), unless the Required Lenders shall otherwise consent in writing, neither Holdings nor either Borrower will, nor will they permit any of the Subsidiaries to:

SECTION 6.01. Indebtedness. Incur, create, assume or permit to exist any Indebtedness, except:

(a)     Indebtedness existing on the Restatement Date and set forth on Schedule 6.01 and any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness (other than intercompany indebtedness Refinanced with Indebtedness owed to a person not affiliated with either Borrower or any Subsidiary);

(b)     Indebtedness created hereunder and under the other Loan Documents;

(c)     Indebtedness of either Borrower or any Subsidiary pursuant to Swap Agreements permitted by Section 6.13;

(d)     Indebtedness owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance to either Borrower or any Subsidiary, pursuant to reimbursement or indemnification obligations to such person, provided that upon the incurrence of Indebtedness with respect to reimbursement obligations regarding workers' compensation claims, such obligations are reimbursed not later than 60 days following such incurrence;

(e)     Indebtedness of either Borrower to any Subsidiary and of any Subsidiary to either Borrower or any other Subsidiary, underlined provided that (i) Indebtedness of any Subsidiary that is not a Subsidiary Loan Party to the Loan Parties shall be subject to Section 6.04(b) and (ii) Indebtedness of either Borrower to any Subsidiary and Indebtedness of any other Loan Party to any Subsidiary that is not a Subsidiary Loan Party (the "Subordinated Intercompany Debt") shall be subordinated to the Obligations on terms reasonably satisfactory to the Administrative Agent;

(f)     Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds, financial assurances and completion guarantees and similar obligations, in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(g)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services in the ordinary course of business, provided that (i) such Indebtedness (other than credit or purchase cards) is extinguished within ten Business Days of its incurrence and (ii) such Indebtedness in respect of credit or purchase cards is extinguished within 60 days from its incurrence;

(h)     (i) Indebtedness of a Subsidiary acquired after the Restatement Date or a person merged into or consolidated with either Borrower or any Subsidiary after the Restatement Date and Indebtedness assumed in connection with the acquisition of assets, which Indebtedness in each case, exists at the time of such acquisition, merger or consolidation and is not created in contemplation of such event and where such acquisition, merger or consolidation is permitted by this Agreement and (ii) any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness, provided that the aggregate principal amount of such Indebtedness referred to in clause (i) above at the time of, and after giving effect to, such acquisition, merger or consolidation, such assumption (together with Indebtedness outstanding pursuant to this paragraph (h), paragraph (i) of this Section 6.01 and the Remaining Present Value of outstanding leases permitted under Section 6.03), would not exceed $15.0 million and provided further that if the First Lien Leverage Ratio calculated on a Pro Forma Basis (but without giving effect to such merger or acquisition) (for this purpose, referred to herein below as the baseline First Lien Leverage Ratio) is (x) greater than 3.50 to 1.00, the First Lien Leverage Ratio after giving effect to such merger or acquisition on a Pro Forma Basis shall not exceed aforementioned baseline First Lien Leverage Ratio or (y) less than or equal to 3.50 to 1.00, the First Lien Leverage Ratio after giving effect to such merger or acquisition on a Pro Forma Basis shall be less than or equal to 3.50 to 1.00.

(i)     Capital Lease Obligations, mortgage financings and purchase money Indebtedness incurred by either Borrower or any Subsidiary prior to or within 270 days after the acquisition, lease or improvement of the respective asset permitted under this Agreement in order to finance such acquisition or improvement, and any Permitted Refinancing Indebtedness in respect thereof, in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof (together with Indebtedness outstanding pursuant to paragraph (h) of this Section 6.01, this paragraph (i) and the Remaining Present Value of leases permitted under Section 6.03)) would not exceed $15.0 million;

(j)     Capital Lease Obligations incurred by either Borrower or any Subsidiary in respect of any Sale and Lease-Back Transaction that is permitted under Section 6.03;

(k)     other Indebtedness of either Borrower or any Subsidiary, in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof, would not exceed $15.0 million;

(l)    Reserved.

(m)    Guarantees (i) by either Borrower or any Subsidiary Loan Party of any Indebtedness of either Borrower or any Subsidiary Loan Party permitted to be incurred under this Agreement, (ii) by either Borrower or any Subsidiary Loan Party of Indebtedness otherwise permitted hereunder of any Subsidiary that is not a Subsidiary Loan Party to the extent such Guarantees are permitted by Section 6.04(b), (iii) by any Foreign Subsidiary of Indebtedness of another Foreign Subsidiary, and (iv) by either Borrower or any Subsidiary Loan Party of Indebtedness of Foreign Subsidiaries incurred for working capital purposes in the ordinary course of business on ordinary business terms so long as such Indebtedness is permitted to be incurred under Section 6.01(a) or (s); provided that Guarantees by either Borrower or any Subsidiary Loan Party under this Section 6.01(m) of any other Indebtedness of a person that is subordinated to other Indebtedness of such person shall be expressly subordinated to the Obligations to substantially the same extent as the obligation of such other person to repay the guaranteed Indebtedness is subordinated to such other Indebtedness of such person;

(n)    Indebtedness arising from agreements of either Borrower or any Subsidiary providing for indemnification, adjustment of purchase or acquisition price or similar obligations, in each case, incurred or assumed in connection with the acquisition or disposition of any business, assets or a Subsidiary, other than Guarantees of Indebtedness incurred by any person acquiring all or any portion of such business, assets or a Subsidiary for the purpose of financing such acquisition;

(o)    letters of credit or bank guarantees (other than Letters of Credit issued pursuant to Section 2.05) having an aggregate face amount not in excess of $2.5 million;

(p)    Indebtedness supported by a Letter of Credit, in a principal amount not in excess of the stated amount of such Letter of Credit;

(q)    Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(r)    unsecured Indebtedness consisting of Permitted Debt Securities and Permitted Refinancing Indebtedness in respect thereof (limited, in the case of Holdings, to the Holdings Subordinated Debt), provided that Holdings and its Subsidiaries shall be in compliance, on a Pro Forma Basis after giving effect to the incurrence of such Indebtedness, with the Financial Performance Covenants recomputed as at the last day of the most recently ended fiscal quarter of Holdings and its Subsidiaries for which financial statements are available, and Holdings shall have delivered to the Administrative Agent a certificate of a Responsible Officer of Holdings to such effect;

(s)    Indebtedness of Foreign Subsidiaries in an aggregate amount not to exceed $10.0 million outstanding at any time;

(t)    all premium (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in paragraphs (a) through (s) above;

(u)    Cash Management Obligations and other Indebtedness in respect of netting services, overdraft protection and similar arrangements, in each case, in connection with cash management and deposit accounts, and

(v)    Junior Indebtedness.

SECTION 6.02. <u>Liens</u>.    Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests, evidences of Indebtedness or other securities of any person, including either Borrower and any Subsidiary) at the time owned by it or on any income or revenues or rights in respect of any thereof, except:

(a)    Liens on property or assets of the Borrowers and the Subsidiaries existing on the Restatement Date and set forth on Schedule 6.02(a) or, to the extent not listed in such Schedule, where such property or assets have a fair market value that does not exceed $1.5 million in the aggregate; <u>provided</u> that such Liens shall secure only those obligations that they secure on the Restatement Date (and extensions, renewals and refinancings of such obligations permitted by <u>Section 6.01(a)</u>) and shall not subsequently apply to any other property or assets of either Borrower or any Subsidiary;

(b)    any Lien created under the Loan Documents or permitted in respect of any Mortgaged Property by the terms of the applicable Mortgage;

(c)    any Lien on any property or asset of either Borrower or any Subsidiary securing Indebtedness or Permitted Refinancing Indebtedness permitted by <u>Section 6.01(h)</u>, <u>provided</u> that such Lien (i) does not apply to any other property or assets of either Borrower or any of the Subsidiaries not securing such Indebtedness at the date of the acquisition of such property or asset (other than after acquired property subjected to a Lien securing Indebtedness and other obligations incurred prior to such date and which Indebtedness and other obligations are permitted hereunder that require a pledge of after acquired property, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition), (ii) such Lien is not created in contemplation of or in connection with such acquisition and (iii) in the case of a Lien securing Permitted Refinancing Indebtedness, any such Lien is permitted, subject to compliance with clause (e) of the definition of the term "Permitted Refinancing Indebtedness";

(d)    Liens for Taxes, assessments or other governmental charges or levies not yet delinquent or that are being contested in compliance with <u>Section 5.03</u>;

(e)    landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction or other like Liens arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, either Borrower or any Subsidiary shall have set aside on its books reserves in accordance with GAAP;

(f)    (i) pledges and deposits made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other social security laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations and (ii) pledges and deposits securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit, bank guarantees or similar instruments for the benefit of) insurance carriers providing property, casualty or liability insurance to either Borrower or any Subsidiary;

(g)    deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, trade contracts, and other obligations of a like nature (including letters of credit, bank guarantees or similar instruments in lieu of any such bonds or to support the issuance thereof) incurred in the ordinary course of business, including those incurred pursuant to Environmental Law in the ordinary course of business;

(h)    zoning restrictions, easements, trackage rights, leases (other than Capital Lease Obligations), licenses, special assessments, rights-of-way, restrictions on use of real property and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of either Borrower or any Subsidiary;

(i)    purchase money security interests in equipment or other property or improvements thereto hereafter acquired (or, in the case of improvements, constructed) by either Borrower or any Subsidiary (including the interests of vendors and lessors under conditional sale and title retention agreements); provided that (i) such security interests secure Indebtedness permitted by Section 6.01(i) (including any Permitted Refinancing Indebtedness in respect thereof), (ii) such security interests are incurred, and the Indebtedness secured thereby is created, within 270 days after such acquisition or completion of construction, (iii) the Indebtedness secured thereby does not exceed 100% of the cost of such equipment or other property or improvements at the time of such acquisition or construction, including transaction costs incurred by either Borrower or any Subsidiary in connection with such acquisition or construction and (iv) such security interests do not apply to any other property or assets of either Borrower or any Subsidiary (other than to accessions to such equipment or other property or improvements but not to other parts of the property to which any such improvements are made); provided further that individual financings of equipment provided by a single lender or group of co-lenders may be cross-collateralized to other financings of equipment provided solely by such lender or group of co-lenders so long as all such financing are permitted under Section 6.01(i);

(j)    Liens arising out of capitalized lease transactions permitted under Section 6.03, so long as such Liens attach only to the property sold and being leased in such transaction and any accessions thereto or proceeds thereof and related property;

(k)    Liens securing judgments that do not constitute an Event of Default under Section 7.01(j);

(l)    Liens disclosed by the title insurance policies delivered pursuant to Section 5.10 and any replacement, extension or renewal of any such Lien; provided that such replacement, extension or renewal Lien shall not cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal; provided further that the Indebtedness and other obligations secured by such replacement, extension or renewal Lien are permitted by this Agreement;

(m)    any interest or title of a lessor or sublessor under any leases or subleases entered into by either Borrower or any Subsidiary in the ordinary course of business;

(n)    Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of either Borrower or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of either Borrower or any Subsidiary or (iii) relating to purchase orders and other agreements entered into with customers of either Borrower or any Subsidiary in the ordinary course of business;

(o)    Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(p)    Liens securing obligations in respect of trade-related letters of credit permitted under Section 6.01(o) and covering the goods (or the documents of title in respect of such goods) financed by such letters of credit and the proceeds and products thereof;

(q)     licenses or sublicenses of intellectual property granted in the ordinary course of business;

(r)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(s)     Liens solely on any cash earnest money deposits made by either Borrower or any of the Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(t)     Liens with respect to property or assets of any Foreign Subsidiary securing Indebtedness of a Foreign Subsidiary solely to the extent permitted under Section 6.01(s);

(u)     other Liens with respect to property or assets of either Borrower or any Subsidiary; provided that no default shall have occurred and be continuing as of the date such Lien is created or incurred and the amount of the Indebtedness or other obligations secured by such Liens does not exceed $5.0 million at any time;

(v)     Liens arising from precautionary UCC financing statements regarding operating leases;

(w)     Liens on equity interests in joint ventures securing obligations of such joint venture; and

(x)     Liens on securities that are the subject of repurchase agreements constituting Permitted Investments under clause (c) of the definition thereof.

SECTION 6.03.  Sale and Lease-Back Transactions.   Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and substantially contemporaneously rent or lease from the transferee such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "Sale and Lease-Back Transaction"), provided that a Sale and Lease-Back Transaction shall be permitted (a) with respect to property (i) owned by either Borrower or any Domestic Subsidiary that is acquired after the Restatement Date so long as such Sale and Lease-Back Transaction is consummated within 270 days of the acquisition of such property or (ii) owned by any Foreign Subsidiary regardless of when such property was acquired or (b) with respect to any property owned by either Borrower or any Domestic Subsidiary, (i) if at the time the lease in connection therewith is entered into, and after giving effect to the entering into of such lease, the Remaining Present Value of such lease would not exceed $5.0 million and (ii) if such Sale and Lease-Back Transaction is of property owned by either Borrower or any Domestic Subsidiary as of the Restatement Date, the Net Proceeds therefrom (to the extent exceeding $5.0 million after the Restatement Date) are used to prepay the Term Loans to the extent required by Section 2.11(b).

SECTION 6.04.  Investments; Loans and Advances.   Purchase, hold or acquire any Equity Interests, evidences of Indebtedness or other securities of, make or permit to exist any loans or advances to or Guarantees of the obligations of, or make or permit to exist any investment or any other interest in (each, an "Investment"), any other person, except:

(a)     the Transactions;

(b)     (i) Investments by Holdings, either Borrower or any Subsidiary in the Equity Interests in the other Borrower or any Subsidiary; (ii) intercompany loans from Holdings, either Borrower or any Subsidiary to the other Borrower or any Subsidiary; and (iii) Guarantees by Holdings, either Borrower or any Subsidiary Loan Party of Indebtedness otherwise expressly

permitted hereunder of Holdings, the other Borrower or any Subsidiary; _provided_ that the sum of (A) Investments (valued at the time of the making thereof and without giving effect to any write-downs or write-offs thereof) after the Restatement Date by the Loan Parties pursuant to clause (i) of this paragraph (b) in Subsidiaries that are not Subsidiary Loan Parties, _plus_ (B) net intercompany loans after the Restatement Date by Loan Parties to Subsidiaries that are not Subsidiary Loan Parties pursuant to clause (ii) of this paragraph (b), _plus_ (C) Guarantees by Loan Parties of Indebtedness after the Restatement Date of Subsidiaries that are not Subsidiary Loan Parties pursuant to clause (iii) of this paragraph (b), shall not exceed an aggregate net amount equal to (x) $5.0 million (_plus_ any return of capital actually received in cash by the relevant investors in respect of Investments theretofore made by them pursuant to this paragraph (b)); _plus_ (y) the cash proceeds received after the Restatement Date from the sale of Equity Interests in Holdings which are in turn contributed to the Borrowers (which amount shall not be includable in the determination of the Available Specified Basket Amount), _plus_ (z) when the First Lien Leverage Ratio is less than 5.00 to 1.00, the portion, if any, of the Available Specified Basket Amount on the date of such election that the Borrowers elect to apply to this Section 6.04(b)(z); and _provided_ _further_ that intercompany current liabilities incurred in the ordinary course of business in connection with the cash management operations of the Borrowers and the Subsidiaries shall not be included in calculating the limitation in this paragraph at any time;

(c) Permitted Investments and investments that were Permitted Investments when made;

(d) Investments arising out of the receipt by either Borrower or any Subsidiary of non- cash consideration for the sale of assets permitted under Section 6.05;

(e) (i) loans and advances to employees or consultants of either Borrower or any Subsidiary in the ordinary course of business not to exceed $5.0 million in the aggregate at any time outstanding (calculated without regard to write-downs or write-offs thereof other than loans that are forgiven under such Borrower or Subsidiary's loan forgiveness program) and (ii) advances of payroll payments and expenses to employees in the ordinary course of business;

(f) accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business and any assets or securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers made in the ordinary course of business;

(g) Swap Agreements permitted pursuant to Section 6.13;

(h) Investments existing on, or contractually committed as of, the Restatement Date and set forth on Schedule 6.04;

(i) Investments resulting from pledges and deposits referred to in Section 6.02(f) and (g);

(j) other Investments made after the Restatement Date by either Borrower or any Subsidiary in an aggregate amount (valued at the time of the making thereof, and without giving effect to any write-downs or write- offs thereof) not to exceed (i) $15.0 million in the aggregate _plus_ (ii) any returns of capital actually received in cash by the relevant investor in respect of investments theretofore made by it pursuant to this paragraph (j) _plus_ (iii) when the First Lien Leverage Ratio calculated on a Pro Forma Basis (but without giving effect to such Investment) is less than 5.00 to 1.00, the portion, if any, of the Available Specified Basket Amount on the date of such election that the Borrowers elect to apply to this Section 6.04(j)(iii);

(k)     Investments constituting Permitted Business Acquisitions;

(l)     intercompany loans between Foreign Subsidiaries and Guarantees permitted by Section 6.01(m) (other than clause (ii) thereof);

(m)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business;

(n)     Investments of a Subsidiary acquired after the Restatement Date or of a person merged into either Borrower or merged into or consolidated with a Subsidiary in accordance with Section 6.05 after the Restatement Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(o)     acquisitions by either Borrower of obligations of one or more officers, directors, managers or employees of Holdings, the Borrowers or their Subsidiaries in connection with such officer's, director's, manager's or employee's acquisition of Equity Interests in Holdings, so long as no cash is actually advanced by either Borrower or any of the Subsidiaries to such officers, directors, managers or employees in connection with the acquisition of any such obligations;

(p)     Guarantees by either Borrower or any Subsidiary of operating leases (other than Capital Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into by either Borrower or any Subsidiary in the ordinary course of business; and

(q)     in addition to the Investments otherwise permitted by this Section 6.04, any Investment by either Borrower or any Subsidiary to the extent it is financed with the proceeds of an issuance of Junior Capital not later than six months after the receipt of such proceeds by Holdings or either Borrower (and, in the case of any proceeds of any issuance of Junior Capital by Holdings, which proceeds shall have been contributed by Holdings to either Borrower as Junior Capital), except to the extent that such proceeds are included in any determination of the Available Specified Basket Amount.

SECTION 6.05.   Mergers, Consolidations, Sales of Assets and Acquisitions.   Merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of related transactions) all or any part of its assets (whether now owned or hereafter acquired), or issue, sell, transfer or otherwise dispose of any Equity Interests in either Borrower or any Subsidiary (other than by either Borrower to Holdings, by either Borrower or a Subsidiary to the other Borrower or any Subsidiary Loan Party or by any Foreign Subsidiary to another Foreign Subsidiary), or purchase, lease or otherwise acquire (in one transaction or a series of related transactions) all or substantially all of the assets of any other person, or a division of line of business of any other person, except that this Section 6.05 shall not prohibit:

(a)     (i) the purchase and sale of inventory in the ordinary course of business by either Borrower or any Subsidiary, (ii) the acquisition or lease of any other asset in the ordinary course of business by either Borrower or any Subsidiary, (iii) the sale of surplus, obsolete or worn out equipment or other property in the ordinary course of business by either Borrower or any Subsidiary or (iv) the sale of Permitted Investments in the ordinary course of business;

(b)     if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing, (i) the merger of any Subsidiary into either Borrower in a transaction in which either Borrower is the surviving or resulting entity, (ii)

the merger or consolidation of (A) either Borrower into or with the other Borrower, with a Borrower being the surviving entity, or (B) any Subsidiary into or with any Subsidiary Loan Party in a transaction in which the surviving or resulting entity is a Subsidiary Loan Party and, in the case of each of clauses (i) and (ii) of this paragraph (b), no person other than either Borrower or Subsidiary Loan Party receives any consideration pursuant thereto, (iii) the merger or consolidation of any Subsidiary that is not a Subsidiary Loan Party into or with any other Subsidiary that is not a Subsidiary Loan Party or (iv) the liquidation or dissolution or change in form of entity of any Subsidiary (other than either Borrower) if the Borrowers determine in good faith that such liquidation, dissolution or change in form is in the best interests of the Borrowers and is not materially disadvantageous to the Lenders;

(c)     sales, transfers, leases or other dispositions to a Borrower or a Subsidiary (upon voluntary liquidation or otherwise); provided that any sales, transfers, leases or other dispositions by a Loan Party to a Subsidiary that is not a Subsidiary Loan Party shall be made in compliance with Section 6.07; provided further that the aggregate gross proceeds of any sales, transfers, leases or other dispositions by a Loan Party to a Subsidiary that is not a Subsidiary Loan Party in reliance upon this paragraph (c) shall not exceed, in any fiscal year of the Borrowers, $7.5 million;

(d)     Sale and Lease-Back Transactions permitted by Section 6.03;

(e)     Investments permitted by Section 6.04 (it being understood that any Investment permitted by paragraphs (j), (k) or (q) of Section 6.04 may be structured as a merger, consolidation or asset purchase); Liens permitted by Section 6.02; Capital Expenditures permitted by Section 6.10; and dividends, distributions, redemptions and repurchases permitted by Section 6.06;

(f)     the sale of defaulted receivables in the ordinary course of business and not as part of an accounts receivables financing transaction;

(g)     sales, transfers, leases or other dispositions of assets by either Borrower or any Subsidiary not otherwise permitted by this Section 6.05; provided that no Default shall have occurred and be continuing and the aggregate gross proceeds (including non-cash proceeds) of any or all assets sold, transferred, leased or otherwise disposed of in reliance upon this paragraph (g) shall not exceed $75.0 million from the Restatement Date through the term of this Agreement; provided further that the Net Proceeds thereof are applied in accordance with Section 2.11(b);

(h)     sales, transfers, leases or other dispositions by either Borrower or any Subsidiary of assets that were acquired in connection with an acquisition permitted hereunder (including Permitted Business Acquisitions); provided that any such sale, transfer, lease or other disposition shall be made or contractually committed to be made within 270 days of the date such assets were acquired by such Borrower or such Subsidiary;

(i)     any merger or consolidation in connection with a Permitted Business Acquisition, provided that following any such merger or consolidation (i) involving a Borrower, such Borrower is the surviving or resulting entity, (ii) involving a Domestic Subsidiary, the surviving or resulting entity shall be a Subsidiary Loan Party that is a Wholly Owned Subsidiary and (iii) involving a Foreign Subsidiary, the surviving or resulting entity shall be a Wholly Owned Subsidiary;

(j)     licensing and cross-licensing arrangements involving any technology or other intellectual property of either Borrower or any Subsidiary in the ordinary course of business;

(k)        sales, leases or other dispositions of inventory of either Borrower and its Subsidiaries determined by the management of such Borrower to be no longer useful or necessary in the operation of the business of such Borrower or any of its Subsidiaries;

(l)        Permitted Asset Swaps; and

(m)        the issuance of Junior Capital by Holdings or either Borrower.

Notwithstanding anything to the contrary contained in <u>Section 6.05</u> above, (a) no sale, transfer or other disposition of assets in excess of $2.0 million shall be permitted by this <u>Section 6.05</u> (other than sales, transfers, leases or other dispositions to Loan Parties pursuant to paragraph (c) of this <u>Section 6.05</u>) unless such disposition is for fair market value, (b) no sale, transfer or other disposition of assets shall be permitted by paragraph (a) or (d) of this <u>Section 6.05</u> unless such disposition is for at least 75% cash consideration and (c) no sale, transfer or other disposition of assets in excess of $2.0 million shall be permitted by paragraph (g) or (h) of this <u>Section 6.05</u> unless such disposition is for at least 75% cash consideration; <u>provided</u> that for purposes of clauses (b) and (c) of this paragraph, (i) the amount (up to $5.0 million) of any secured Indebtedness or other Indebtedness of a Subsidiary that is not a Loan Party (as shown on such Borrower's or such Subsidiary's most recent balance sheet or in the notes thereto) that is assumed by the transferee of any such assets and (ii) the amount (up to $5.0 million) of any trade-in value applied to the purchase price of any replacement assets acquired in connection with such sale transfer or disposition shall be deemed to be cash.

SECTION 6.06.   <u>Dividends and Distributions</u>.  Declare or pay, directly or indirectly, any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests (other than dividends and distributions on Equity Interests payable solely by the issuance of additional Equity Interests in the person paying such dividends or distributions) or directly or indirectly redeem, purchase, retire or otherwise acquire for value (or permit any Subsidiary to purchase or acquire) any of its Equity Interests or set aside any amount for any such purpose (other than through the issuance of additional Equity Interests in the person redeeming, purchasing, retiring or acquiring such shares); <u>provided</u>, <u>however</u>, that:

(a)        any Subsidiary of either Borrower may declare and pay dividends to, repurchase its Equity Interests from or make other distributions to such Borrower or to any Wholly Owned Subsidiary of such Borrower (or, in the case of non-Wholly Owned Subsidiaries, to such Borrower or any Subsidiary that is a direct or indirect parent of such Subsidiary and to each other owner of Equity Interests in such Subsidiary on a <u>pro rata</u> basis (or more favorable basis from the perspective of such Borrower or such Subsidiary) based on their relative ownership interests);

(b)        either Borrower may declare and pay dividends or make other distributions to Holdings in respect of (i) overhead, legal, accounting and other professional fees and expenses, (ii) fees and expenses related to any equity offering, investment or acquisition permitted hereunder (whether or not successful), (iii) other fees and expenses reasonably required in connection with the maintenance of its existence and its ownership of such Borrower and in order to permit Holdings to make payments permitted by <u>Section 6.07(b)</u> and <u>(c)</u>, and (iv) taxes that are due and payable by Holdings and the Borrowers as part of a consolidated group;

(c)        the Borrowers may declare and pay dividends or make other distributions to Holdings the proceeds of which are used to purchase or redeem the Equity Interests in Holdings (including related stock appreciation rights or similar securities) held by then present or former directors, consultants, officers or employees of Holdings, either Borrower or any of the Subsidiaries or by any Benefit Plan in connection with such person's death, disability, retirement or termination of employment or under the terms of any such Benefit Plan or any other agreement under which such shares of stock or related rights were issued, <u>provided</u> that the aggregate amount of such purchases or redemptions under this paragraph (c) shall not exceed in

any fiscal year $5.0 million (plus the amount of net proceeds (i) received by Holdings during such calendar year from sales of Equity Interests of Holdings to directors, consultants, officers or employees of Holdings, either Borrower or any Subsidiary in connection with permitted employee compensation and incentive arrangements and (ii) of any key-man life insurance policies received during such calendar year), which, if not used in any year, may be carried forward to any subsequent calendar year;

(d)    non-cash repurchases of Equity Interests deemed to occur upon exercise of stock options or similar Equity Interests if such repurchased Equity Interests represent a portion of the exercise price of such options shall be permitted;

(e)    the Borrowers may pay dividends or make distributions to Holdings to allow Holdings (i) to repurchase Holdings Subordinated Debt to the extent that such repurchase is otherwise permitted pursuant to Section 6.09(b)(i) and the proceeds of such dividend or distribution are promptly applied to such repurchase and (ii) to pay the expenses of the Permitted Investors to the extent provided therefor in the Restructuring Support Agreement and the Equity Commitment Letter (as defined in the Restructuring Support Agreement).

SECTION 6.07.  Transactions with Affiliates.  (a) Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction with, any of its Affiliates or any known direct or indirect holder of 10% or more of any class of capital stock of Holdings, unless such transaction is (i) otherwise required under this Agreement or (ii) upon terms no less favorable to Holdings, such Borrower or such Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate; provided that this clause (ii) shall not apply to (A) the payment to the Permitted Investors of the monitoring and management fees referred to in paragraph (c) of this Section 6.07 or (B) the indemnification of directors of Holdings, the Borrowers and the Subsidiaries in accordance with customary practice.

(b)    The foregoing paragraph (a) shall not prohibit, to the extent otherwise permitted under this Agreement,

(A)    any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the board of directors (or equivalent governing body) of Holdings,

(B)    loans or advances to employees or consultants of Holdings, either Borrower or any of the Subsidiaries in accordance with Section 6.04(e) (including any loan forgiveness program in respect of such loans or advances),

(C)    transactions among Holdings, the Borrowers and the Subsidiary Loan Parties and transactions among the Subsidiary Loan Parties otherwise permitted by this Agreement,

(D)    the payment of fees and indemnities to directors, officers, consultants and employees of Holdings, the Borrowers and the Subsidiaries in the ordinary course of business,

(E)    transactions pursuant to the Transaction Documents and permitted agreements in existence on the Restatement Date and set forth on Schedule 6.07 or any amendment

thereto to the extent such amendment is not adverse to the Lenders in any material respect,

(F) (A) any employment or severance agreements or arrangements entered into by either Borrower or any of the Subsidiaries in the ordinary course of business, (B) any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with employees, officers or directors, and (C) any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees, and any reasonable employment contract or arrangement and transactions pursuant thereto,

(G) dividends, distributions, redemptions and repurchases permitted under Section 6.06,

(H) any purchase by Holdings of or contributions to, the equity capital of the Borrowers; provided that any Equity Interests in the Borrowers purchased by Holdings shall be pledged to the Administrative Agent on behalf of the Lenders pursuant to the Collateral Agreement,

(I) payments by either Borrower or any of the Subsidiaries to the Permitted Investors made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including in connection with acquisitions or divestitures, which payments are approved by the majority of the board of directors (or equivalent governing body) of such Borrower, in good faith, provided that the amount thereof does not exceed the amount specified in paragraph (c) below,

(J) subject to paragraph (c) below, the payment of all fees, expenses, bonuses and awards related to the Transactions contemplated by the Transaction Documents, including fees to the Permitted Investors,

(K) the issuance and sale of Junior Capital, or

(L) transactions with joint ventures for the purchase or sale of goods and services entered into in the ordinary course of business.

(c) Make any payment of or on account of monitoring or management or similar fees payable to the Permitted Investors in an aggregate amount in any fiscal year in excess of the sum of (i) $2.0 million; provided that any amounts payable pursuant to this clause (c)(i) shall accrue until the First Lien Leverage Ratio is less than 6.50 to 1.00 and thereafter may be paid in cash in an amount in any fiscal year equal to the lesser of such accrued amount and $2.0 million plus (ii) reasonable out-of-pocket costs and expenses related thereto.

SECTION 6.08. Business of Holdings, the Borrowers and the Subsidiaries. Notwithstanding any other provisions hereof, engage at any time in any business or business activity other than:

(a)     in the case of Holdings, (i) ownership and acquisition of Equity Interests in the Borrowers, together with activities directly related thereto, (ii) performance of its obligations under and in connection with the Loan Documents and the other agreements contemplated hereby and thereby, (iii) actions incidental to the consummation of the Transactions, (iv) the incurrence of and performance of its obligations related to Indebtedness and Guarantees incurred by Holdings after the Restatement Date and permitted hereunder, (v) actions required by law to maintain its existence, (vi) the payment of dividends permitted hereunder and taxes, (vii) the issuance of Equity Interests and other Junior Capital and (viii) activities incidental to its maintenance and continuance and to the foregoing activities, or

(b)     in the case of either Borrower and any Subsidiary, any business or business activity conducted by any of them on the Restatement Date and any business or business activities incidental or related thereto, or any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

Notwithstanding anything to the contrary contained in herein, (i) Holdings shall at all times own directly 100% of the Equity Interests (other than preferred Equity Interest not entitled to ordinary voting rights) of each Borrower and (ii) Holdings shall not sell, dispose of, grant a Lien on or otherwise transfer such Equity Interests in either Borrower (other than Liens created by the Security Documents).

SECTION 6.09.  <u>Limitation on Modifications of Indebtedness; Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; etc.</u> (a) Amend or modify in any manner materially adverse to the Lenders, or grant any waiver or release under or terminate in any manner (if such granting or termination shall be materially adverse to the Lenders), the articles or certificate of incorporation or by-laws or limited liability company operating agreement of Holdings, either Borrower or any of the Subsidiaries.

(b)     (A) Make, or agree to make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of any Permitted Debt Securities or any Permitted Refinancing Indebtedness in respect thereof, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Permitted Debt Securities or any Permitted Refinancing Indebtedness in respect thereof (except for Refinancings permitted by <u>Section 6.01(r)</u>), except for payments of regularly scheduled interest, and, to the extent this Agreement is then in effect, principal on the scheduled maturity date thereof; <u>provided</u>, <u>however</u>, that either Borrower may at any time and from time to time repurchase, redeem, repay, acquire, cancel or terminate all or any portion of the Permitted Debt Securities with the proceeds contributed to such Borrower by Holdings as Junior Capital from the issuance, sale or exchange by Holdings of its Junior Capital or with the proceeds of the substantially contemporaneous issuance of Junior Capital by such Borrower, so long as such proceeds are not included in any determination of the Available Specified Basket Amount, and do not constitute Permitted Cure Securities the proceeds of which are applied as contemplated by <u>Section 7.03</u>; <u>provided further</u> that Holdings Subordinated Debt may be repurchased so long as (x) immediately prior to and immediately after giving effect to such repurchase, no Default or Event of Default shall have occurred and be continuing and (y) the aggregate principal amount of such repurchases shall not exceed the aggregate Available Specified Basket Amount; <u>provided</u> that, after giving effect to such repurchase, the First Lien Leverage Ratio is not more than 3.50 to 1.00.

(ii)     Amend or modify, or permit the amendment or modification of, any provision of any Junior Capital, any Permitted Debt Securities or any Permitted Refinancing Indebtedness in respect thereof, or any agreement (including any document relating to any Permitted Debt Securities or any Permitted Refinancing Indebtedness in respect thereof) relating thereto, other than amendments or modifications that are not more onerous on either

Borrower, any of the Subsidiaries or Holdings or materially adverse to Lenders and that do not affect the subordination provisions thereof (if any) in a manner adverse to the Lenders.

(c)        Permit any Subsidiary to enter into any agreement or instrument that by its terms restricts (i) the payment of dividends or distributions or the making of cash advances to (or the repayment of cash advances from) Holdings, either Borrower or any Subsidiary that is a direct or indirect parent of any Subsidiary or (ii) the granting of Liens pursuant to the Security Documents, in each case other than those arising under any Loan Document, except, in each case, restrictions existing by reason of:

(A)        restrictions imposed by applicable law;

(B)        contractual encumbrances or restrictions in effect on the Restatement Date or contained in any agreements related to any Permitted Refinancing Indebtedness incurred to Refinance any Indebtedness existing on the Restatement Date that does not expand the scope of any such encumbrance or restriction, or any such encumbrances or restrictions in any agreements relating to any Permitted Debt Securities issued after the Restatement Date or Permitted Refinancing Indebtedness in respect thereof so long as the scope of such encumbrance or restriction is no more expansive in any material respect than any such encumbrance or restriction in effect on the Restatement Date, or any agreement (regardless of whether such agreement is in effect on the Restatement Date) providing for the subordination of Subordinated Intercompany Debt;

(C)        any restriction on a Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of all or substantially all the Equity Interests or assets of a Subsidiary pending the closing of such sale or disposition;

(D)        customary provisions in joint venture agreements and other similar agreements applicable to joint ventures entered into in the ordinary course of business;

(E)        any restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

(F)        customary provisions contained in leases or licenses of intellectual property and other similar agreements entered into in the ordinary course of business;

(G)        customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(H)        customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(I)        customary restrictions and conditions contained in any agreement relating to the sale of any asset permitted under Section 6.05 pending the consummation of such sale;

(J)     customary restrictions and conditions contained in the document relating to any Lien, so long as (1) such Lien is permitted under Section 6.02 and such restrictions or conditions relate only to the specific asset subject to such Lien, and (2) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 6.09;

(K)     customary net worth provisions contained in real property leases entered into by Subsidiaries of a Borrower, so long as a Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrowers and their Subsidiaries to meet their ongoing obligations;

(L)     any agreement in effect at the time such subsidiary becomes a Subsidiary, so long as such agreement was not entered into in contemplation of such person becoming a Subsidiary; or

(M)     restrictions contained in any documents documenting Indebtedness of any Foreign Subsidiary permitted hereunder.

SECTION 6.10.   Maximum Capital Expenditures.   (a) No Borrower will, nor will it permit any Subsidiary to, incur or make any Capital Expenditures during any fiscal year, in an aggregate amount for the Borrowers and their Subsidiaries exceeding $10.0 million.

(b)     The amount of Capital Expenditures permitted to be made in respect of any fiscal year shall be increased by the unused amount of Capital Expenditures that were permitted to be made during the immediately preceding fiscal year pursuant to Section 6.10(a). Capital Expenditures in any fiscal year shall be deemed to use, first, any amount carried forward to such fiscal year pursuant to this Section 6.10(b), and second, the amount for such fiscal year set forth in Section 6.10(a).

(c)     The amount of Capital Expenditures permitted to be made in respect of any fiscal year shall be increased, after the consummation of any Permitted Business Acquisition, in an amount equal to 110% of the average annual amount of capital expenditures made by the person or business so acquired, as shown in the financial statements of such person or business, during the two fiscal years preceding such acquisition,

(d)     Incur Integration Transaction Costs that are accounted for as capital expenditures in an aggregate amount exceeding $7.5 million since the Closing Date and through the term of this Agreement.

SECTION 6.11.   Minimum Liquidity.   Permit the aggregate amount of cash, Available Unused Commitments of all Revolving Facility Lenders and Permitted Investments as of the end of any fiscal month (the "Minimum Liquidity") (commencing with the first month ended after the Restatement Date) to be less than $15.0 million; provided that it shall not be considered a breach of this Section 6.11 if the Minimum Liquidity is (a) at least $12.5 million for two months in any period of 12 months and (b) at least $10.0 million for one month in the same period of 12 months; provided further that the Minimum Liquidity shall not be less than $15.0 million in any two consecutive months.  Within three (3) Business Days after the end of each fiscal month, Holdings and Borrower shall report to the Administrative Agent the amount of Minimum Liquidity as at the end of such fiscal month.

SECTION 6.12.   Minimum EBITDA. Permit EBITDA for any period of four fiscal quarters ending on the last day of any fiscal quarter to be less than the amount set forth opposite such fiscal quarter below ("Minimum EBITDA"):

| Fiscal Quarter Ending | Amount |
|---|---|
| March 31, 2011 | $45,778,000 |
| June 30, 2011 | $46,877,000 |
| September 30, 2011 | $48,124,000 |
| December 31, 2011 | $51,720,000 |
| March 31, 2012 | $56,835,000 |
| June 30, 2012 | $59,791,000 |
| September 30, 2012 | $62,037,000 |
| December 31, 2012 | $63,309,000 |
| March 31, 2013 | $65,678,000 |
| June 30, 2013 | $68,048,000 |
| September 30, 2013 | $70,417,000 |
| December 31, 2013 | $72,786,000 |
| March 31, 2014 | $75,334,000 |
| June 30, 2014 and thereafter | $77,881,000 |

SECTION 6.13.  <u>Swap Agreements</u>.  Enter into any Swap Agreement, other than (a) Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which either Borrower or any of their respective subsidiaries is exposed in the conduct of its business or the management of its liabilities (including, without limitation, raw material, supply costs and currency risks), **[and (b) Secured Swap Agreements existing on the Restatement Date and set forth on Schedule 6.13.]**[19]

SECTION 6.14.  <u>No Other "Designated Senior Indebtedness"</u>.  Except for Indebtedness permitted under the provisions of <u>Section 6.01(h)</u>, no Borrower shall designate, or permit the designation of, any Indebtedness (other than under this Agreement and the Loan Documents) as "Designated Senior Indebtedness" or any other similar term for the purpose of the definition of the same or the subordination provisions contained in any indenture governing the Permitted Debt Securities that are senior subordinated notes or any Permitted Refinancing thereof or any Junior Indebtedness.

ARTICLE VII

*Events of Default*

---

[19] To be included if existing Secured Swap Agreements remain in place.

SECTION 7.01.  Events of Default.  In case of the occurrence of any of the following events (each, an "Event of Default"):

(a)        any representation or warranty made or deemed made by Holdings, either Borrower or any other Loan Party in any Loan Document, or in any certificate or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made pursuant to the terms of the Loan Documents or furnished by Holdings, either Borrower or any other Loan Party;

(b)        default shall be made in the payment of any principal of any Loan or the reimbursement with respect to any L/C Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)        default shall be made in the payment of any interest on any Loan or on any L/C Disbursement or in the payment of any Fee or any other amount (other than an amount referred to in paragraph (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of five Business Days;

(d)        default shall be made in the due observance or performance by Holdings, either Borrower or any of the Subsidiaries of any covenant, condition or agreement contained in Section 5.01(a) (with respect to Holdings or either Borrower), Section 5.05(a), Section 5.08, Section 5.15 or in Article VI;

(e)        default shall be made in the due observance or performance by Holdings, either Borrower or any of the Subsidiaries of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraphs (b), (c) and (d) above) and such default shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent or the Required Lenders to the Borrowers;

(f)        (i) any event or condition occurs that (A) results in any Material Indebtedness becoming due prior to its scheduled maturity or (B) enables or permits (with all applicable grace periods having expired) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity or (ii) Holdings, either Borrower or any of the Subsidiaries shall fail to pay the principal of any Material Indebtedness at the stated final maturity thereof; provided that this paragraph (f) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness if such sale or transfer is permitted hereunder;

(g)        there shall have occurred a Change in Control;

(h)        an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of Holdings, either Borrower or any of the Subsidiaries, or of a substantial part of the property or assets of Holdings, either Borrower or any Subsidiary, under the Bankruptcy Code, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law (collectively, "Bankruptcy Law"), (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings, either Borrower or any of the Subsidiaries or for a substantial part of the property or assets of Holdings, either Borrower or any of the Subsidiaries or (iii) the winding-up or liquidation of Holdings, either Borrower or any Subsidiary (except, in the case of any Subsidiary, in a transaction permitted by Section 6.05); and such proceeding or petition shall

continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)     Holdings, either Borrower or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking relief under the Bankruptcy Code, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in paragraph (h) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings, either Borrower or any of the Subsidiaries or for a substantial part of the property or assets of Holdings, either Borrower or any Subsidiary, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) become unable or admit in writing its inability or fail generally to pay its debts as they become due;

(j)     the failure by Holdings, either Borrower or any Subsidiary to pay one or more final judgments aggregating in excess of $10.0 million (to the extent not covered by third-party insurance as to which the insurer has been notified of such judgment and does not deny coverage), which judgments are not discharged or effectively waived or stayed for a period of 45 consecutive days, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of Holdings, either Borrower or any Subsidiary to enforce any such judgment;

(k)     (i) a Reportable Event or Reportable Events shall have occurred with respect to any Benefit Plan or a trustee shall be appointed by a United States district court to administer any Benefit Plan, (ii) the PBGC shall institute proceedings (including giving notice of intent thereof) to terminate any Benefit Plan or Benefit Plans, (iii) Holdings, either Borrower or any Subsidiary or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such person does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner, (iv) Holdings, either Borrower or any Subsidiary or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA or (v) Holdings, either Borrower or any Subsidiary shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Benefit Plan; and in each case in clauses (i) through (v) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect; or

(l)     (i) any Loan Document shall for any reason be asserted in writing by Holdings, either Borrower or any Subsidiary not to be a legal, valid and binding obligation of any party thereto, (ii) any security interest purported to be created by any Security Document and to extend to assets that are not immaterial to Holdings, the Borrowers and the Subsidiaries on a consolidated basis shall cease to be, or shall be asserted in writing by Holdings, the Borrowers or any other Loan Party not to be, a valid and perfected security interest (perfected as or having the priority required by this Agreement or the relevant Security Document and subject to such limitations and restrictions as are set forth herein and therein) in the securities, assets or properties covered thereby, except to the extent any such loss of perfection or priority results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Agreement or to file Uniform Commercial Code continuation statements or take the actions described on <u>Schedule 3.04</u> and except to the extent that such loss is covered by a lender's title insurance policy as to which the insurer has been notified of such loss and does not deny coverage and the Administrative Agent shall be reasonably satisfied with the credit of such insurer, (iii) the Guarantees of Holdings, the Borrowers or the Subsidiary Loan Parties of any of the Obligations shall cease to be in full force and effect (other

than in accordance with the terms of Article IX), or shall be asserted in writing by Holdings or either Borrower or any Subsidiary Loan Party not to be in effect or not to be legal, valid and binding obligations, or (iv) the Obligations shall cease to constitute senior indebtedness under the instruments, agreements and documents evidencing or governing any Permitted Debt Securities or any Permitted Refinancing Indebtedness in respect thereof, or such subordination provisions shall be invalidated or otherwise cease (in each case so long as such indenture, instrument, agreement or document, as the case may be, are or is then in effect), or shall be asserted in writing by Holdings, either Borrower or any Subsidiary Loan Party to be invalid or to cease to be legal, valid and binding obligations of the parties thereto, enforceable in accordance with their terms;

then, and in every such event (other than an event with respect to either Borrower described in paragraph (h) or (i) above), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, upon notice to the Borrowers, take any or all of the following actions, at the same or different times: (x) terminate forthwith the Revolving Facility Commitments in whole or in part, (y) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of each Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by each Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding and (z) if the Loans have been (or concurrently with the loans being) declared due and payable pursuant to clause (y) above, demand cash collateral pursuant to Section 2.05(j); and in any event with respect to either Borrower described in paragraph (h) or (i) above, the Revolving Facility Commitments shall automatically immediately terminate, the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of each Borrower accrued hereunder and under any other Loan Document, shall automatically immediately become due and payable and the Administrative Agent shall be deemed to have made a demand for cash collateral to the full extent permitted under Section 2.05(j), without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by each Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding.

SECTION 7.02.  Exclusion of Immaterial Subsidiaries.  Solely for the purposes of determining whether an Event of Default has occurred under paragraph (h) or (i) of Section 7.01, any reference in any such paragraph to any Subsidiary shall be deemed not to include any Immaterial Subsidiary that is not a Loan Party affected by any event or circumstance referred to in any such paragraph.

SECTION 7.03.  Holdings' Right to Cure.

(a)  Notwithstanding anything to the contrary contained in Section 7.01, in the event that Holdings and the Borrowers fail (or, but for the operation of this Section 7.03, would fail) to comply with the Minimum EBITDA financial covenant set forth in Section 6.12, until the expiration of the 10th day subsequent to the date the certificate calculating compliance with Section 6.12 is required to be delivered pursuant to Section 5.04(c), Holdings shall have the right to issue Permitted Cure Securities for cash or otherwise receive cash contributions to the capital of Holdings and, in each case, to contribute any such cash to the capital of the Borrowers (collectively, the "EBITDA Cure Right"), and upon the receipt by any Borrower of such cash (the "EBITDA Cure Amount") pursuant to the exercise by Holdings of such EBITDA Cure Right, compliance with Section 6.12 shall be recalculated giving effect to the following pro forma adjustments:

(A)  EBITDA shall be increased, solely for the purpose of measuring compliance with Section 6.12 and not for any

other purpose under this Agreement, by an amount equal to the EBITDA Cure Amount; and

(B)     If, after giving effect to the foregoing recalculations, Holdings and the Borrowers shall then be in compliance with the requirements of Section 6.12, the Borrowers shall be deemed to have satisfied the requirements of Section 6.12 as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default under Section 6.12 that had occurred shall be deemed cured for this purposes of the Agreement.

(b)     Notwithstanding anything herein to the contrary, (i) in each four-fiscal-quarter period there shall be at least two fiscal quarters in which the EBITDA Cure Right is not exercised, (ii) for purposes of this Section 7.03, the EBITDA Cure Amount shall be no greater than the amount required for purposes of complying with Section 6.12 and in no circumstances shall the cumulative EBITDA Cure Amount in respect of the EBITDA Cure Right over the term of the Facilities exceed $5.0 million and (iii) within 5 Business Days, the EBITDA Cure Amount associated with such exercise of the EBITDA Cure Right shall be applied as follows (w) first, to the Term Borrowings on a pro rata basis, with the application thereof in direct order to the unpaid amounts due on the next succeeding eight Term Loan Installment Dates and thereafter on a pro rata basis (based on the amount of amortization payments, the then remaining scheduled amortization payments in respect of such Term Borrowings, (x) second, to repay Revolving Facility Loans representing the payment of PIK Interest pro rata to such Loans until such Loans are paid in full (with a permanent reduction in the Revolving Facility Commitments), (y) third, to repay other Revolving Facility Loans (but without a permanent reduction in the Revolving Facility Commitments) pro rata to such Loans and (z) fourth, after the Revolving Facility Loans have been repaid in full, to cash collateralize all Letters of Credit in the manner consistent with the requirements of Section 2.05.

(c)     Notwithstanding anything to the contrary contained in Section 7.01, in the event that Holdings and the Borrowers fail (or, but for the operation of this Section 7.03, would fail) to comply with the requirements of the Minimum Liquidity financial covenant set forth in Section 6.11, Holdings shall have the right, at any time to issue Permitted Cure Securities for cash or otherwise receive cash contributions to the capital of Holdings and, in each case, to contribute any such cash to the capital of the Borrowers (collectively, the "Liquidity Cure Right"), and upon the receipt by any Borrower of such cash (the "Liquidity Cure Amount") pursuant to the exercise by Holdings of such Liquidity Cure Right, compliance with Section 6.11 shall be recalculated giving effect to the following pro forma adjustments:

(i)     Minimum Liquidity shall be increased by an amount equal to the Liquidity Cure Amount and compliance with the requirements of Section 6.11 shall be measured against Minimum Liquidity thereby adjusted.

(ii)     If, after giving effect to the foregoing recalculations, the Borrowers shall then be in compliance with the requirements of Section 6.11, the Borrowers shall be deemed to have satisfied the requirements of Section 6.11 as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default under Section 6.11 that had occurred shall be deemed cured for this purposes of the Agreement.

(d)     Notwithstanding anything herein to the contrary, (i) for purposes of this Section 7.03, in no circumstances shall the Liquidity Cure Amount exceed $10.0 million over the

term of the Facilities, and (ii) in respect of each exercise of the Liquidity Cure Right, the entirety of the Liquidity Cure Amount associated with such exercise may be maintained by Holdings or the Borrowers and used to fund working capital needs and for other general corporate purposes.

(e)     For purposes of clarity, in the event of a breach of both the Minimum EBITDA and Minimum Liquidity covenants, sufficient funds must be contributed to separately cure each such financial covenant.

## ARTICLE VIII

### *The Administrative Agent*

SECTION 8.01.  <u>Appointment</u>.  Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to (a) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Loan Party, (b) take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, and (c) exercise such other powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing sentence, the Administrative Agent shall have the sole and exclusive right and authority (to the exclusion of the Lenders and Issuing Banks), and is hereby authorized, to (t) act as the disbursing and collecting agent for the Lenders and the Issuing Banks with respect to all payments and collections arising in connection with the Loan Documents (including in any proceeding described in <u>Section 7.01(h)</u> or any other bankruptcy, insolvency or similar proceeding), and each Person making any payment in connection with any Loan Document to any Secured Party is hereby authorized to make such payment to the Administrative Agent, (u) file and prove claims and file other documents necessary or desirable to allow the claims of the Lenders with respect to any Obligation in any proceeding described in <u>Section 7.01(h)</u> or any other bankruptcy, insolvency or similar proceeding (but not to vote, consent or otherwise act on behalf of such Lender), (v) act as collateral agent for each Secured Party for purposes of the perfection of all Liens created by such agreements and all other purposes stated therein, (w) manage, supervise and otherwise deal with the Collateral, (x) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (y) except as may be otherwise specified in any Loan Document, exercise all remedies given to the Administrative Agent and the other Secured Parties with respect to the Collateral, whether under the Loan Documents, applicable Requirements of Law or otherwise and (z) execute any amendment, consent or waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver; <u>provided</u>, <u>however</u>, that the Administrative Agent hereby appoints, authorizes and directs each Lender, Issuing Bank and any other Secured Party to act as collateral sub-agent for the Administrative Agent, the Lenders and the Issuing Banks for purposes of the perfection of all Liens with respect to the Collateral, including any deposit account maintained by a Loan Party with, and cash and Permitted Investments held by, such Lender, Issuing Bank or Secured Party, and may further authorize and direct the Lenders, the Issuing Banks and Secured Parties to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the Collateral subject thereto to the Administrative Agent, and each Lender, Issuing Bank and Secured Party hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.  Without limiting the generality of the foregoing, the Administrative Agent is hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents.

SECTION 8.02.  Delegation of Duties.  The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

SECTION 8.03.  Exculpatory Provisions.  The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Neither the Administrative Agent nor any of its respective officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such person's own gross negligence or willful misconduct), (ii) responsible in any manner to any of the Lenders for (or have any duty to ascertain or acquire into any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder.  The Administrative Agent shall not (x) be subject to any fiduciary or other implied duties regardless of whether a Default has occurred and is continuing (y) except as expressly set forth in the Loan Documents, have any duty to disclose, nor shall the Administrative Agent be liable for the failure to disclose, any information relating to Holdings, either Borrower or any Subsidiary that is communicated to or obtained by the bank serving as Administrative Agent or any of its affiliates in any capacity.  The Administrative Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

SECTION 8.04.  Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, fax, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons and upon advice and statements of legal counsel (including counsel to Holdings, the Borrowers and/or the Lenders), independent accountants and other experts selected by the Administrative Agent.  The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

SECTION 8.05.  Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received notice from a Lender, Holdings or either Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders); provided that unless and until the Administrative Agent shall have received such

directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

SECTION 8.06.   <u>Non-Reliance on Administrative Agent and Other Lenders</u>.   Each Lender expressly acknowledges that neither the Administrative Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by the Administrative Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender.   Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates.   Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

SECTION 8.07.   <u>Indemnification</u>.   The Lenders agree to indemnify the Administrative Agent and each of the Administrative Agent's Related Parties in its capacity as such (to the extent not reimbursed by Holdings or the Borrowers and without limiting the obligation of Holdings or the Borrowers to do so), each in an amount equal to its pro rata share (based on the Revolving Facility Commitments, the principal amounts of its applicable outstanding Loans and participations in L/C Disbursements, as applicable) thereof, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against the Administrative Agent and each of the Administrative Agent's Related Parties in any way relating to or arising out of, the Revolving Facility Commitments, the Loans, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent under or in connection with any of the foregoing; <u>provided</u> that no Lender shall be liable to the Administrative Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the Administrative Agent's gross negligence or willful misconduct.   The agreements in this <u>Section 8.07</u> shall survive the payment of the Loans and all other amounts payable hereunder.

SECTION 8.08.   <u>Administrative Agent in Its Individual Capacity</u>.   The Administrative Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though the Administrative Agent were not the Administrative Agent.   With respect to its Loans made or renewed by it and with respect to any Letter of Credit issued or participated in by it, the Administrative Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" shall include the Administrative Agent in its individual capacity.

SECTION 8.09.   <u>Successor Administrative Agent</u>.   The Administrative Agent may resign as Administrative Agent upon 30 days' notice to the Lenders and the Borrowers.   If the Administrative

Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Supermajority Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default under <u>Sections 7.01(b)</u>, <u>(c)</u>, <u>(h)</u> or <u>(i)</u> shall have occurred and be continuing) be subject to approval by the Borrowers (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "<u>Administrative Agent</u>" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent by the date that is 30 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Supermajority Lenders appoint a successor agent as provided for above (<u>provided</u> that the retiring Administrative Agent may continue to maintain Collateral and perform services as Administrative Agent hereunder, including those relating to distributing payments to be made to Lenders hereunder, if it so elects pending the appointment of a successor administrative agent). After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Article VIII shall inure to its benefit and to the benefit of its officers, directors, employees, agents, attorneys-in-fact and affiliates as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.

SECTION 8.10.  <u>Reserved</u>.

SECTION 8.11.  <u>Reserved</u>.

ARTICLE IX

*Guaranty*

SECTION 9.01.  <u>Guaranty; Limitation of Liability</u>.  (a) Each of Holdings and each Subsidiary Loan Party, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees the punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Loan Party now or hereafter existing (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Obligations being the "<u>Guaranteed Obligations</u>"), and agrees to pay any and all expenses (including, without limitation, fees and expenses of counsel) incurred by the Administrative Agent or any other Secured Party in enforcing any rights under this Loan Party Guaranty or any other Loan Document. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan Party to any Secured Party under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Loan Party.

(b)      Each Guarantor, and by its acceptance of this Guaranty, the Administrative Agent and each other Secured Party, hereby confirms that it is the intention of all such Persons that this Guaranty and the Obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Obligations of each Subsidiary Loan Party hereunder. To effectuate the foregoing intention, the Administrative Agent, the other Secured Parties and the Guarantors hereby irrevocably agree that the Obligations of each Subsidiary Loan Party under this Loan Party Guaranty at any time shall be limited to the maximum amount as will

result in the Obligations of such Guarantor under this Loan Party Guaranty not constituting a fraudulent transfer or conveyance.

(c)     Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to any Secured Party under this Loan Party Guaranty or any other guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor and each other guarantor so as to maximize the aggregate amount paid to the Secured Parties under or in respect of the Loan Documents and the Guaranteed Obligations.

SECTION 9.02.  Guaranty Absolute.  Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents or other applicable documents governing such Guaranteed Obligations, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of any Secured Party with respect thereto.  The Obligations of each Guarantor under or in respect of this Loan Party Guaranty are independent of the Guaranteed Obligations or any other Obligations of any other Loan Party, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Loan Party Guaranty, irrespective of whether any action is brought against either Borrower or any other Loan Party or whether either Borrower or any other Loan Party is joined in any such action or actions.  This Loan Party Guaranty is a guaranty of payment and not of collection.  The liability of each Guarantor under this Loan Party Guaranty shall be irrevocable, absolute and unconditional irrespective of and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)     any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto or any other agreement or instrument relating to the Guaranteed Obligations;

(b)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or any of its Subsidiaries or otherwise;

(c)     any taking, exchange, release or non-perfection of any Collateral or any other collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d)     any manner of application of Collateral or any other collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral or any other collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Loan Documents or any other assets of any Loan Party or any of its Subsidiaries;

(e)     any change, restructuring or termination of the corporate structure or existence of any Loan Party or any of its Subsidiaries;

(f)     any failure of any Secured Party to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to such Secured Party (each Guarantor waiving any duty on the part of any Secured Party to disclose such information);

(g)  the failure of any other Person to execute or deliver this Agreement, any Guaranty Supplement or any other guaranty or agreement or the release or reduction of liability of any Guarantor or other guarantor or surety with respect to the Guaranteed Obligations; or

(h)  any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by any Secured Party that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by any Secured Party or any other Person upon the insolvency, bankruptcy or reorganization of either Borrower or any other Loan Party or otherwise, all as though such payment had not been made.

SECTION 9.03.  <u>Waivers and Acknowledgments.</u>  (a) Each Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and this Loan Party Guaranty and any requirement that any Secured Party protect, secure, perfect or insure any Lien or any property subject thereto or exhaust any right or take any action against any Loan Party or any other Person or any Collateral.

(b)  Each Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Loan Party Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(c)  Each Guarantor hereby unconditionally and irrevocably waives (i) any defense arising by reason of any claim or defense based upon an election of remedies by any Secured Party that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Loan Parties, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Obligations of such Guarantor hereunder.

(d)  Each Guarantor acknowledges that the Administrative Agent may, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Loan Party Guaranty, foreclose under any mortgage by nonjudicial sale, and each Guarantor hereby waives any defense to the recovery by the Administrative Agent and the other Secured Parties against such Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable law.

(e)  Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of any Secured Party to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by such Secured Party.

(f)  Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in <u>Section 9.02</u> and this <u>Section 9.03</u> are knowingly made in contemplation of such benefits.

SECTION 9.04.  <u>Subrogation.</u>  Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against either Borrower, any

other Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Loan Party Guaranty or any other Loan Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Secured Party against either Borrower, any other Loan Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from either Borrower, any other Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Loan Party Guaranty shall have been paid in full in cash, all Letters of Credit and all Secured Swap Agreements shall have expired or been terminated and the Revolving Facility Commitments shall have expired or been terminated. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the latest of (a) the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Loan Party Guaranty, (b) the termination of all Revolving Facility Commitments hereunder, and (c) the latest date of expiration or termination of all Letters of Credit and all Secured Swap Agreements, such amount shall be received and held in trust for the benefit of the Secured Parties, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Administrative Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Loan Party Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Loan Party Guaranty thereafter arising. If (i) any Guarantor shall make payment to any Secured Party of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Loan Party Guaranty shall have been paid in full in cash, (iii) each of the Term Facility Maturity Date and the Revolving Facility Maturity Date shall have occurred and (iv) all Letters of Credit and all Secured Swap Agreements shall have expired or been terminated, the Secured Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Loan Party Guaranty.

SECTION 9.05.  <u>Guaranty Supplements</u>.  Upon the execution and delivery by any Person of a guaranty supplement in substantially the form of <u>Exhibit G</u> hereto (each, a "<u>Guaranty Supplement</u>"), (a) such Person shall be referred to as an "<u>Additional Guarantor</u>" and shall become and be a Guarantor hereunder, and each reference in this Loan Party Guaranty to a "Guarantor" shall also mean and be a reference to such Additional Guarantor, and each reference in any other Loan Document to a "Loan Party Guarantor" shall also mean and be a reference to such Additional Guarantor, and (b) each reference herein to "this Guaranty," "hereunder," "hereof" or words of like import referring to this Loan Party Guaranty, and each reference in any other Loan Document to the "Loan Party Guaranty," "thereunder," "thereof" or words of like import referring to this Loan Party Guaranty, shall mean and be a reference to this Loan Party Guaranty as supplemented by such Guaranty Supplement.

SECTION 9.06.  <u>Subordination</u>.  Each Guarantor hereby subordinates any and all debts, liabilities and other Obligations owed to such Guarantor by each other Loan Party (the "<u>Subordinated Obligations</u>") to the Guaranteed Obligations to the extent and in the manner hereinafter set forth in this <u>Section 9.06</u>:

(a)     <u>Prohibited Payments, Etc</u>.  Except during the continuance of an Event of Default, each Guarantor may receive regularly scheduled payments from any other Loan Party on account of the Subordinated Obligations.  After the occurrence and during the continuance of any or any Event of Default, however, unless the Required Lenders otherwise agree, no Guarantor shall demand, accept or take any action to collect any payment on account of the Subordinated Obligations.

(b)     Prior Payment of Guaranteed Obligations.   In any proceeding under any Bankruptcy Law relating to any other Loan Party, each Guarantor agrees that the Secured Parties shall be entitled to receive payment in full in cash of all Guaranteed Obligations (including all interest and expenses accruing after the commencement of a proceeding under any Bankruptcy Law, whether or not constituting an allowed claim in such proceeding ("Post-Petition Interest")) before such Guarantor receives payment of any Subordinated Obligations.

(c)     Turn-Over.   After the occurrence and during the continuance of any Event of Default, each Guarantor shall, if the Administrative Agent so requests, collect, enforce and receive payments on account of the Subordinated Obligations as trustee for the Secured Parties and deliver such payments to the Administrative Agent on account of the Guaranteed Obligations (including all Post-Petition Interest), together with any necessary endorsements or other instruments of transfer, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty.

(d)     Administrative Agent Authorization.   After the occurrence and during the continuance of any Event of Default, the Administrative Agent is authorized and empowered (but without any obligation to so do), in its discretion, (i) in the name of each Guarantor, to collect and enforce, and to submit claims in respect of, the Subordinated Obligations and to apply any amounts received thereon to the Guaranteed Obligations (including any and all Post-Petition Interest), and (ii) to require each Guarantor (A) to collect and enforce, and to submit claims in respect of, the Subordinated Obligations and (B) to pay any amounts received on such obligations to the Administrative Agent for application to the Guaranteed Obligations (including any and all Post-Petition Interest).

SECTION 9.07.   Continuing Guaranty; Assignments.   This Loan Party Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the latest of (i) the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Loan Party Guaranty, (ii) the termination of all Revolving Facility Commitments hereunder and (iii) the latest date of expiration or termination of all Letters of Credit, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Lenders and their successors, transferees and assigns. Without limiting the generality of clause (c) of the immediately preceding sentence, any Secured Party may assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Revolving Facility Commitments, the Loans and extensions of credit owing to it and any Note or Notes held by it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Secured Party herein or otherwise, in each case as and to the extent provided in Section 10.04.  No Guarantor shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Secured Parties.

ARTICLE X

*Miscellaneous*

SECTION 10.01. Notices.   (a) Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(i)     if to Holdings or any other Loan Party, to 249 West 17th Street, Fourth Floor, New York, New York 10011, Attention: Jean Clifton, Chief Financial Officer, Fax No. (913) 514-6431, and Attention: Elise Zealand, General Counsel, Fax No. (913) 514-3963, with a copy (which shall not constitute notice) to Jones Day, 222 E. 41st Street, New York, NY 10017, Attention: Joseph T. McKernan, Fax No. (212) 755-7306;

(ii)     if to the Administrative Agent, to General Electric Capital Corporation, 2325 Lakeview Parkway, Suite 700, Alpharetta, Georgia 30009, Attention:  Penton Business Media Account Manager, Fax No. (678) 624-7903, and Attention:  Counsel — Media and Communications, Fax No. (203) 956-4216, with a copy (which shall not constitute notice) to Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, TX 75201, Attention:  Angela L. Fontana, Fax No. (214) 746-7777;

(iii)     if to an Issuing Bank, to it at the address or fax number set forth separately in writing; and

(iv)     if to a Lender, to it at the address or fax number set forth on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Lender becomes a party hereto.

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender.  Each of the Administrative Agent and each Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided further that approval of such procedures may be limited to particular notices or communications.  In any event, the Administrative Agent shall not have any liability with respect to electronic transmissions.

(c)     All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service, sent by fax or (to the extent permitted by paragraph (b) above) electronic means or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 10.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 10.01.  The Administrative Agent may conclusively rely on any telephone notices given to it.

(d)     Any party hereto may change its address or fax number for notices and other communications hereunder by notice to the other parties hereto.

SECTION 10.02.  Survival of Agreement.  All covenants, agreements, representations and warranties made by the Loan Parties herein, in the other Loan Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and each Issuing Bank and shall survive the making by the Lenders of the Loans, the execution and delivery of the Loan Documents and the issuance of the Letters of Credit, regardless of any investigation made by such persons or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or L/C Disbursement or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Revolving Facility Commitments have not been terminated.  Without prejudice to the survival of any other agreements contained herein, indemnification and reimbursement obligations contained herein (including pursuant to Sections 2.15, 2.17 and 10.05) shall survive the payment in full of the principal and interest hereunder, the expiration of the Letters of Credit, the termination of the Revolving Facility Commitments or this Agreement, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, any Lender or the Issuing Bank.

SECTION 10.03. <u>Binding Effect</u>.  This Agreement shall become effective when it shall have been executed by Holdings, each Borrower, the other Loan Parties and the Administrative Agent and when the Administrative Agent shall have received copies hereof, which, when taken together, bear the signatures of each of the Rollover Revolving Lenders party hereto and thereafter shall be binding upon and inure to the benefit of Holdings, each Borrower, the other Loan Parties, each Issuing Bank, the Administrative Agent and each Lender and their respective permitted successors and assigns.

SECTION 10.04. <u>Successors and Assigns</u>.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any affiliate of the Issuing Bank that issues any Letter of Credit), except that (i) neither Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by a Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this <u>Section 10.04</u>.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in paragraph (c) of this <u>Section 10.04</u>), and, to the extent expressly contemplated hereby, the Related Parties of the Administrative Agent, the Issuing Bank and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (each, an "<u>Assignee</u>") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Facility Commitments and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)      the Borrowers, <u>provided</u> that no consent of the Borrowers shall be required (1) for an assignment to a Lender, an affiliate of a Lender or an Approved Fund (as defined below) or (2) if an Event of Default under Section 7.01(b), <u>(c)</u>, <u>(h)</u> or <u>(i)</u> has occurred and is continuing, any other person;

(B)      the Administrative Agent, <u>provided</u> that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund; and

(C)      the Issuing Bank, <u>provided</u> that no consent of the Issuing Bank shall be required for an assignment of all or any portion of a Term Loan.

(ii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment to a Lender, an affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Revolving Facility Commitments or Loans under any Facility, the amount of the Revolving Facility Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1.0 million in the case of Term Loans or Revolving Facility Loans and Revolving Facility Commitments, unless each of the Borrowers and the

Administrative Agent otherwise consent, provided that (1) no such consent of the Borrowers shall be required if an Event of Default under Section 7.01(b), (c), (h)    or (i) has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(B)    the parties to each assignment shall electronically execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually) and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent, and no more than one such fee shall be payable in connection with simultaneous assignments to or by two or more Approved Funds);

(C)    the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and all applicable tax forms;

(D)    if a prospective Assignee or any of its Affiliates owns, beneficially or of record, any Equity Interests in Holdings, the Borrowers or any direct or indirect parent thereof, then such prospective Assignee shall be required to disclose such information to the Administrative Agent in a written certification (which may be contained in the Assignment and Acceptance); and

(E)    notwithstanding the foregoing, any assignment by or to a Defaulting Lender shall be subject to the Administrative Agent's prior written consent in all instances.

For the purposes of this Section 10.04, "Approved Fund" means any person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (x) a Lender, (y) an Affiliate of a Lender or (z) an entity or an Affiliate of an entity that administers, advises or manages a Lender.  Nothing in this Section 10.04 shall prohibit the assignment of Loans to the Restricted Persons.

All parties hereto agree that (A) assignments to the Restricted Persons shall not be construed as violating pro rata, optional redemption or any other provisions hereof and (B) the Restricted Persons may receive their respective pro rata shares of amounts distributed under this Agreement to the extent they are entitled to such amounts as any other Lender would be and agree that such receipt shall not violate any pro rata sharing provision contained in this Agreement or any other Loan Document.  It is understood and agreed by all parties hereto that the Restricted Persons that may from time to time be a Lender shall have no rights under any Loan Document to receive any information deliverable to the Lenders by the Administrative Agent or its advisors (unless the Administrative Agent shall otherwise agree or the same is also made available to Holdings or the Subsidiaries or their advisors) or to attend or participate in any meetings exclusively of the Administrative Agent, Lenders and/or their advisors (unless the Administrative Agent shall otherwise agree or Holdings or any of the Subsidiaries or their advisors are permitted to attend or participate and then only for such portion or portions in which Holdings, the Subsidiaries or their advisors participate).

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(v) below, from and after the effective date specified in each Assignment and Acceptance the Assignee thereunder shall be a party hereto and,

to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of <u>Sections 2.15</u>, <u>2.16</u>, *2.17* and <u>10.05</u>, as well as any Fees accrued for its account and not yet paid). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this <u>Section 10.04</u> shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this <u>Section 10.04</u>.

(iv) The Administrative Agent, acting for this purpose as an agent of each Borrower shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, Revolving Facility Commitments, and the principal amount of the Loans and Revolving L/C Exposure owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent, the Issuing Bank and the Lenders may treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by either Borrower, the Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v) Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, the Assignee's completed Administrative Questionnaire (unless the Assignee shall already be a Lender hereunder) and any applicable tax forms, the processing and recordation fee referred to in paragraph (b) of this <u>Section 10.04</u>, if applicable, and any written consent to such assignment required by paragraph (b)(i) of this <u>Section 10.04</u>, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment, whether or not evidenced by a promissory note, shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph (b)(v).

(c) (i) Any Lender may, without the consent of the Borrowers, the Issuing Bank or the Administrative Agent, sell participations to one or more banks or other entities (a "<u>Participant</u>") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Revolving Facility Commitments and the Loans owing to it); <u>provided</u> that (w) such Lender's obligations under this Agreement shall remain unchanged, (x) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (y) the Borrowers, the Administrative Agent, the Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (z) prior to the sale of a participation to a Restricted Person, the selling Lender shall identify the prospective Participant to the Administrative Agent. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents; <u>provided</u> that (x) unless such person is a Restricted Person, such agreement may

provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to clauses (i), (ii), (iii), (iv), (v) or (vi) of the first proviso to <u>Section 10.08(b)</u> (it being understood that if such Participant is a Restricted Person, then in the case of any amendment, modification or waiver that requires the consent of a Lender directly affected thereby pursuant to clauses (i), (ii), (iii) and (iv) of the first proviso to <u>Section 10.08(b)</u>, such person shall be deemed to have assigned such consent right to the Administrative Agent and the Administrative Agent shall exercise such consent in the manner reflected by the Majority Lenders of the relevant Facility; <u>provided</u> that in no event shall the Administrative Agent's exercise of such right (I) increase the Revolving Facility Commitments of such Restricted Person or (II) treat such Required Person disproportionately to such Majority Lenders) and (2) directly affects such Participant and (y) no other agreement with respect to such Participant's right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents may exist between such Lender and such Participant. Except as provided in the foregoing sentence, no Participant designated as a Restricted Person shall have any right to vote with respect to any matter under the Loan Documents. Subject to paragraph (c)(ii) of this <u>Section 10.04</u>, each Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 2.15</u>, <u>2.16</u> and <u>2.17</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this <u>Section 10.04</u>. To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 10.06</u> as though it were a Lender; <u>provided</u> that such Participant shall be subject to <u>Section 2.18(c)</u> as though it were a Lender.

(ii)    A Participant shall not be entitled to receive any greater payment under <u>Section 2.15</u>, <u>2.16</u> or <u>2.17</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrowers' prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of <u>Section 2.17</u> to the extent such Participant fails to comply with <u>Section 2.17(e)</u> and <u>(f)</u> as though it were a Lender.

(d)    Any Lender may at any time, without the consent of or notice to the Administrative Agent or the Borrowers, pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this <u>Section 10.04</u> shall not apply to any such pledge or assignment of a security interest; <u>provided</u> that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)    The Borrowers, upon receipt of written notice from the relevant Lender, agree to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (d) above.

(f)    Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrowers or the Administrative Agent. Each of Holdings, each Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; <u>provided</u>, <u>however</u>, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto and each Loan Party

for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance.

(g)    If the Borrowers wish to replace the Loans under any Facility or the Revolving Facility Commitment with Loans or a Revolving Facility Commitment having different terms, they shall have the option (at the sole cost and expense of the Borrowers), with the consent of the Administrative Agent and subject to at least three Business Days' advance notice to the Lenders under such Facility, instead of prepaying the Loans or reducing or terminating the Revolving Facility Commitments to be replaced, to (i) require the Lenders under such Facility to assign such Loans or Revolving Facility Commitments to the Administrative Agent or its designees and (ii) amend the terms thereof in accordance with Section 10.08 (with such replacement, if applicable, being deemed to have been made pursuant to Section 10.08(d)). Pursuant to any such assignment, all Loans and Revolving Facility Commitments to be replaced shall be purchased at par (allocated among the Lenders under such Facility in the same manner as would be required if such Loans were being optionally prepaid or such Revolving Facility Commitments were being optionally reduced or terminated by the Borrowers), accompanied by payment of any accrued interest and fees thereon (including any premium required pursuant to Section 2.11(a)) and any amounts owing pursuant to Section 10.05(b). By receiving such purchase price, the Lenders under such Facility shall automatically be deemed to have assigned the Loans under such Facility or the Revolving Facility Commitments pursuant to the terms of the Assignment and Acceptance, and accordingly no other action by such Lenders shall be required in connection therewith.   The provisions of this paragraph (g) are intended to facilitate the maintenance of the perfection and priority of existing security interests in the Collateral during any such replacement.

(h)    Notwithstanding the foregoing, nothing contained in this Section 10.04 shall require the consent of any party for GECC to assign any of its rights in respect of any Swap Related Reimbursement Obligation.

SECTION 10.05. Expenses Indemnity.  (a) Each Borrower agrees to pay all reasonable out-of-pocket expenses (including Other Taxes) incurred by the Administrative Agent in connection with the preparation of this Agreement and the other Loan Documents, or by the Administrative Agent in connection with the syndication of the Revolving Facility Commitments or the administration of this Agreement (including expenses incurred in connection with due diligence and initial and ongoing Collateral examination and the reasonable fees, disbursements and charges for no more than one counsel in each jurisdiction where Collateral is located) or in connection with the administration of this Agreement and any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the Transactions hereby contemplated shall be consummated) or incurred by the Administrative Agent or any Lender in connection with the enforcement or protection of their rights in connection with this Agreement and the other Loan Documents, in connection with the Loans made or the Letters of Credit issued hereunder, including the reasonable fees, charges and disbursements of Weil, counsel for the Administrative Agent, and, if necessary, the reasonable fees, charges and disbursements of one local counsel per jurisdiction).

(b)    Each Borrower agrees to indemnify the Administrative Agent, each Issuing Bank, each Lender and each of their respective Affiliates, successors and assigns and the directors, trustees, officers, employees, advisors, controlling persons and agents of each of the foregoing (each such person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees, charges and disbursements, incurred by or asserted against any Indemnitee arising out of in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto and thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated

hereby, (ii) the use of the proceeds of the Loans or the use of any Letter of Credit or (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any of either Borrower, Holdings or any affiliate thereof or any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available (1) to the extent that such losses, claims, damages, liabilities or related expenses (2) are determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted by reason of the gross negligence or willful misconduct of such Indemnitee, (3) arise out of any claim, litigation, investigation or proceeding brought by such Indemnitee against another Indemnitee (other than any such claim, litigation, investigation or proceeding brought by or against the Administrative Agent, or any Issuing Bank, acting in their respective capacities as Administrative Agent or Issuing Bank) that does not involve any act or omission of either Borrower or any of its Affiliates or (4) result from the material breach by such Indemnitee of this Agreement or any other Loan Document or (ii) for any settlement entered into by such Indemnitee without the Borrowers' consent (such consent not to be unreasonably withheld or delayed).  Subject to and without limiting the generality of the foregoing sentence, each Borrower agrees to indemnify each Indemnitee against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel or consultant fees, charges and disbursements (limited to not more than one counsel, plus, if necessary, one local counsel per jurisdiction), incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (A) any claim related in any way to Environmental Laws and Holdings, either Borrower or any of their Subsidiaries, or (B) any actual or alleged presence, Release or threatened Release of Hazardous Materials at, under, on or from any Property, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or any of its Related Parties.  Each Borrower shall indemnify the Indemnitees from and against any final judgment for the plaintiff in any proceeding referred to in this Section 10.05, subject to Borrowers' right in this Section 10.05 to claim an exemption from such indemnity obligations.  No Borrower shall, without the prior written consent of any Indemnitee, effect any settlement of any pending or threatened proceeding in respect of which such Indemnitee is or could have been a party and indemnity could have been sought hereunder by such Indemnitee unless such settlement (i) includes an unconditional release of such Indemnitee from all liability or claims that are the subject matter of such proceeding and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any Indemnitee.  None of the Indemnitees (or any of their respective affiliates) shall be responsible or liable to the Permitted Investors, Holdings, either Borrower or any of their respective subsidiaries, Affiliates or stockholders or any other person or entity for any special, indirect, consequential or punitive damages, which may be alleged as a result of the Facilities or the Transactions.  The provisions of this Section 10.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations, the termination of the Revolving Facility Commitments, the expiration of any Letters of Credit, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, any Issuing Bank or any Lender.  All amounts due under this Section 10.05 shall be payable on written demand therefor accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

(c)     Except as expressly provided in Section 10.05(a) with respect to Other Taxes, which shall not be duplicative with any amounts paid pursuant to Section 2.17, this Section 10.05 shall not apply to Taxes.

SECTION 10.06. Right of Set-off.  If an Event of Default shall have occurred and be continuing, each Lender and each Issuing Bank is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or

demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or such Issuing Bank to or for the credit or the account of Holdings, either Borrower or any Subsidiary against any of and all the obligations of Holdings or each Borrower now or hereafter existing under this Agreement or any other Loan Document held by such Lender or such Issuing Bank, irrespective of whether or not such Lender or such Issuing Bank shall have made any demand under this Agreement or such other Loan Document and although the obligations may be unmatured. The rights of each Lender and each Issuing Bank under this <u>Section 10.06</u> are in addition to other rights and remedies (including other rights of set-off) that such Lender or such Issuing Bank may have.

SECTION 10.07. <u>Applicable Law</u>. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN LETTERS OF CREDIT AND AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK. EACH LETTER OF CREDIT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OR RULES DESIGNATED IN SUCH LETTER OF CREDIT, OR IF NO SUCH LAWS OR RULES ARE DESIGNATED, THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS MOST RECENTLY PUBLISHED AND IN EFFECT, ON THE DATE SUCH LETTER OF CREDIT WAS ISSUED, BY THE INTERNATIONAL CHAMBER OF COMMERCE (THE "UNIFORM CUSTOMS") AND, AS TO MATTERS NOT GOVERNED BY THE UNIFORM CUSTOMS, THE LAWS OF THE STATE OF NEW YORK.

SECTION 10.08. <u>Waivers; Amendment</u>. (a) No failure or delay of the Administrative Agent, any Issuing Bank or any Lender in exercising any right or power hereunder or under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, each Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by Holdings, either Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on Holdings, either Borrower or any other Loan Party in any case shall entitle such person to any other or further notice or demand in similar or other circumstances.

(b) Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by (1) Holdings, the Borrowers and the Required Lenders or (2) Holdings, the Borrowers and the Administrative Agent (with the prior written consent of the Required Lenders) and (y) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by each party thereto and the Administrative Agent and consented to by the Required Lenders; <u>provided</u>, <u>however</u>, that no such agreement shall

(i) decrease or forgive the principal amount of, or extend the final maturity of, or decrease the rate of interest on, any Loan or any L/C Disbursement, or extend the stated expiration of any Letter of Credit beyond the Revolving Facility Maturity Date, without the prior written consent of each Lender directly affected thereby,

(ii) increase or extend the Revolving Facility Commitment of any Lender or decrease the Revolving Credit Commitment Fees or L/C Participation Fees or other fees of any Lender without the prior written consent of such Lender (it being understood that waivers or modifications of conditions

precedent, covenants, Defaults or Events of Default, a mandatory reduction in the aggregate Revolving Facility Commitments or an increase in the PIK Percentage shall not constitute an increase of the Revolving Facility Commitments of any Lender),

(iii) extend or waive any Term Loan Installment Date or reduce the amount due on any Term Loan Installment Date or extend any date on which payment of interest on any Loan or any L/C Disbursement or any Fees is due, without the prior written consent of each Lender adversely affected thereby,

(iv) amend or modify the provisions of Section 2.18(b) or (c) or 2.10(d) or (e) of this Agreement or Section 5.02 of the Collateral Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby, without the prior written consent of each Lender adversely affected thereby (it being understood that additional extensions of credit permitted hereunder or consented to by the Required Lenders and constituting (x) term loans may share payments ratably with the Term Facility and (y) additional revolving facility loans and commitments may share payments ratably with the Revolving Credit Facility),

(v) amend or modify the provisions of this Section 10.08, Section 10.04(a)(i) or the definition of the terms "Required Lenders", "Majority Lenders", "Supermajority Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the prior written consent of each Lender adversely affected thereby (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Loans and Revolving Facility Commitments are included on the Restatement Date and Majority Lenders on substantially the same basis as the Term Loans or Revolving Facility, as applicable, are included on the Restatement Date),

(vi) release all or substantially all the Collateral or release all or substantially all of the value of the Guarantees under Article IX of this Agreement, unless, in the case of a Subsidiary Loan Party, all or substantially all the Equity Interests in such Subsidiary Loan Party is sold or otherwise disposed of in a transaction permitted by this Agreement, without the prior written consent of each Lender;

provided further that (i) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or an Issuing Bank hereunder without the prior written consent of the Administrative Agent or such Issuing Bank acting as such at the effective date of such agreement, (ii) when a Defaulting Lender shall exist, Section 2.21 shall control with respect to voting of such Lender that is a Defaulting Lender and (iii) (A) the Loans and/or Revolving Facility Commitments held by a Restricted Person shall be deemed not to be outstanding solely for purposes of this Section 10.08(b) or any other vote under the Loan Documents and shall not be entitled to a vote with respect to any matter in respect of the Loan Documents whether under this Section 10.08(b) or otherwise (it being understood that with respect to any amendment, modification or waiver that requires the consent of a Lender directly affected thereby pursuant to clauses (i), (ii), (iii) and (iv) of the first proviso to Section 10.08(b), a Restricted Person shall be deemed to have assigned such consent right to the Administrative Agent and the Administrative Agent shall exercise such consent in the manner reflected by the Majority Lenders of the relevant Facility; provided that in no event shall the Administrative Agent's exercise of such right (1) increase the Revolving Facility Commitments of such Restricted Person or (2) treat such Required Person disproportionately to such

Majority Lenders) and (B) in the event of any Insolvency or Liquidation Proceeding of any Loan Party, any vote that the Loans and/or Commitments held by a Restricted Person may be entitled to cast, including but not limited to any vote under the Bankruptcy Code or any other Bankruptcy Law (or claims), shall be deemed assigned for all purposes to the Administrative Agent which shall cast such vote in the same proportion as those cast by the remaining Lenders. Each Lender shall be bound by any waiver, amendment or modification authorized by this Section 10.08 and any consent by any Lender pursuant to this Section 10.08 shall bind any assignee of such Lender. Furthermore, no amendment, modification, termination or waiver affecting the rights or rights or duties of GECC in respect of any Swap Related Reimbursement Obligations, under this Agreement or any other Loan Document, including any release of any Guarantee, Loan Party Guaranty or Collateral requiring a writing signed by all Lenders, shall be effective unless in writing and signed by GECC. Each Lender that casts a vote with respect to any matter in respect of the Loan Documents whether under this Section 10.08(b) or otherwise shall certify to the Administrative Agent at the time of such vote that it is not a Restricted Person (and that any Participant entitled to vote, if any, is not a Restricted Person).

(c)    Without the consent of any Lender or Issuing Bank, the Loan Parties and the Administrative Agent may (in their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment, modification or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law.

(d)    Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent, Holdings and the Borrowers (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the Revolving Facility Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders (including modifications described in Section 10.08(b)(iv) and (v) above).

(e)    If a new or existing Revolving Facility Lender commits to provide a Revolving Facility Commitment in an amount of up to $22,343,750.00 (bringing the total Revolving Facility Commitments up to $65 million (or such lesser amount as reduced by any permanent reductions in the Revolving Facility Commitments since the Restatement Date)) and the entire incremental amount is drawn and pays down outstanding Term Loans on a pro rata basis, no amendment fee will be charged to make necessary modifications to this Agreement; provided that any such amendment shall otherwise be subject to approval pursuant to this Section 10.08.

SECTION 10.09. Interest Rate Limitation.    Notwithstanding anything herein to the contrary, if at any time the applicable interest rate on any Loan or participation in any L/C Disbursement, together with all fees and charges that are treated as interest under applicable law (collectively, the "Charges"), as provided for herein or in any other document executed in connection herewith, or otherwise contracted for, charged, received, taken or reserved by any Lender or any Issuing Bank, shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by such Lender in accordance with applicable law, the rate of interest payable hereunder, together with all Charges payable to such Lender or such Issuing Bank, shall be limited to the Maximum Rate, provided that such excess amount shall be paid to such Lender or such Issuing Bank on subsequent payment dates to the extent not exceeding the legal limitation.

SECTION 10.10. <u>Entire Agreement</u>.  This Agreement, the other Loan Documents and the agreements regarding certain Fees referred to herein constitute the entire contract between the parties relative to the subject matter hereof.  Any previous agreement among or representations from the parties or their Affiliates with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Notwithstanding the foregoing, the Fee Letter shall survive the execution and delivery of this Agreement and remain in full force and effect.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any party other than the parties hereto and thereto, and their respective successors and assigns permitted hereunder, any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 10.11. <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.11</u>.

SECTION 10.12. <u>Severability</u>.  In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 10.13. <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one contract, and shall become effective as provided in <u>Section 10.03</u>. Delivery of an executed counterpart to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed original.

SECTION 10.14. <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 10.15. <u>Jurisdiction; Consent to Service of Process</u>.  (a) Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, and for purposes of enforcement of Collateral security or related matters, the courts of the jurisdiction where such Collateral is located, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in such New York State or, to the extent permitted by law, in such federal court (or to the extent relating to enforcement of collateral security, such courts of the jurisdiction where the Collateral is located).  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now

or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

SECTION 10.16. <u>Confidentiality</u>. Each of the Lenders, each Issuing Bank and the Administrative Agent agrees that it shall maintain in confidence any information relating to Holdings, the Borrowers and the other Loan Parties furnished to it by or on behalf of Holdings, the Borrowers or the other Loan Parties (other than information that (a) has become generally available to the public other than as a result of a disclosure by such party, (b) has been independently developed by such Lender, such Issuing Bank or the Administrative Agent without violating this <u>Section 10.16</u> or (c) was available to such Lender, such Issuing Bank or the Administrative Agent from a third party having, to such person's knowledge, no obligations of confidentiality to Holdings, either Borrower or any other Loan Party) and shall not reveal the same other than to its directors, trustees, officers, employees and advisors with a need to know or to any person that approves or administers the Loans on behalf of such Lender (so long as each such person shall have been instructed to keep the same confidential in accordance with this <u>Section 10.16</u>), except: (A) to the extent necessary to comply with law or any legal process or the requirements or requests of any Governmental Authority, self-regulatory authorities (including the National Association of Insurance Commissioners) or of any securities exchange on which securities of the disclosing party or any Affiliate of the disclosing party are listed or traded, (B) as part of the reporting or review procedures to, or examinations by, or requests received from Governmental Authorities or self-regulatory authorities, including the National Association of Insurance Commissioners or the National Association of Securities Dealers, Inc., (C) to its parent companies, Affiliates or auditors (so long as each such person shall have been instructed to keep the same confidential in accordance with this <u>Section 10.16</u>), (D) in order to enforce its rights under any Loan Document in a legal proceeding, (E) to any pledgee under <u>Section 10.04(d)</u> or any other prospective assignee of, or prospective Participant in, any of its rights under this Agreement (so long as such person shall have been instructed to keep the same confidential in accordance with this <u>Section 10.16</u>), (F) to any direct or indirect contractual counterparty in Swap Agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this <u>Section 10.16</u>) and (G) with the consent of the Borrowers.

SECTION 10.17. <u>GECC Direct Website Communications</u>.

(a) <u>Delivery</u>. (i) Each Loan Party hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to this Agreement and any other Loan Document, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (A) relates to a request for a new, or a conversion of an existing, borrowing or other extension of credit (including any election of an interest rate or interest period relating thereto), (B) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (C) provides notice of any Default or Event of Default under this Agreement or (D) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing or other extension of credit hereunder (all such non-excluded communications collectively, the "Communications"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent if so requested by the Administrative Agent. Each Loan Party agrees to provide the Communications to the Administrative Agent in the manner specified in this Agreement and any other Loan Document unless the Administrative Agent notifies such Loan Party that delivery by electronic/soft medium is sufficient. Nothing in this <u>Section 10.17</u> shall prejudice the right of the Administrative Agent or any Lender or any Loan Party to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document.

(ii)     The Administrative Agent agrees that receipt of the Communications by the Administrative Agent at its e-mail address specified from time to time by the Administrative Agent shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform (as defined below) shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees (A) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (B) that the foregoing notice may be sent to such e-mail address.

(b)     <u>Posting</u>.  Each Loan Party further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on Intralinks or a substantially similar electronic transmission system (the "<u>Platform</u>").

(c)     <u>Platform</u>.  The Platform is provided "as is" and "as available".  The Agent Parties (as defined below) do not warrant the accuracy or completeness of the Communications, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform.  In no event shall the Administrative Agent or any of its affiliates or any of their respective officers, directors, employees, agents, advisors or representatives (collectively, "<u>Agent Parties</u>") have any liability to the Loan Parties, any Lender or any other person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of communications through the internet, except to the extent the liability of any Agent Party is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Agent Party's gross negligence or willful misconduct.

SECTION 10.18. <u>Release of Liens and Guarantees</u>.  In the event that any Loan Party conveys, sells, leases, assigns, transfers or otherwise disposes of all or any portion of any of the Equity Interests or assets of any Subsidiary Loan Party to a person that is not (and is not required to become) a Loan Party in a transaction not prohibited by <u>Section 6.05</u>, the Administrative Agent shall promptly (and the Lenders hereby authorize the Administrative Agent to) take such action and execute any such documents as may be reasonably requested by Holdings or the Borrowers and at the Borrowers' expense to release any Liens created by any Loan Document in respect of such Equity Interests or assets, and, in the case of a disposition of the Equity Interests in any Subsidiary Loan Party in a transaction permitted by <u>Section 6.05</u> and as a result of which such Subsidiary Loan Party would cease to be a Subsidiary, terminate such Subsidiary Loan Party's obligations under its Guarantee.  Any representation, warranty or covenant contained in any Loan Document relating to any such Equity Interests, asset or subsidiary of Holdings shall no longer be deemed to be made from and after the time such Equity Interests or asset is so conveyed, sold, leased, assigned, transferred or disposed of.

SECTION 10.19. <u>USA PATRIOT Act</u>.  Each Lender hereby notifies each Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of each Borrower and other information that will allow such Lender to identify each Borrower in accordance with the USA PATRIOT Act.

SECTION 10.20. <u>Joint and Several Liability</u>.  The Borrowers shall be jointly and severally liable for all amounts due to the Administrative Agent and Lenders under this Agreement and the other Loan Documents, regardless of which Borrower actually receives the proceeds of the Loans or the manner in which the Administrative Agent or Lender accounts for the Loans on its books and records.  Each Borrower's Obligations, and each Borrower's Obligations arising as a result of the joint and several liabilities of the Borrowers hereunder, shall be separate and distinct obligations, but all such Obligations shall be primary obligations of each Borrower.  Each Borrower's Obligations arising as a result of the joint and several liability of the Borrowers hereunder shall, to the fullest extent permitted by law, be continuing, absolute and unconditional irrespective of (a) the validity, regularity or enforceability, avoidance or subordination of the Obligations of the other Borrower or of any Loan Document evidencing all or any part of the Obligations of the other Borrower, or of any other collateral security therefor or guaranty or right of offset with respect thereto at any time or from time to time held by the Administrative Agent or any other Secured Party, (b) any defense, set-off or counterclaim which may at any time be available to or be asserted by the other Borrower against the Administrative Agent or any other Secured Party, (c) the absence of notice of the creation, renewal, extension or accrual of any of the Obligations, (d) the absence of any attempt to collect the Obligations from the other Borrower or any other security therefor, or the absence of any other action to enforce the same or to exercise any right of offset, (e) the waiver, consent, extension, forbearance or granting of any indulgence by the Administrative Agent and the Required Lenders with respect to any provision of any instrument evidencing the Obligations of the other Borrowers, or any part thereof, or any other agreement now or hereafter executed by the other Borrower and delivered to the Administrative Agent and the Lenders, (f) the failure by Administrative Agent to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or Collateral of the other Borrower, (g) any election in any proceeding instituted under the Bankruptcy Code of the application of Section 1111(b)(2) of the Bankruptcy Code, (h) any borrowing or grant of a security interest by the other Borrower, as debtor-in-possession under Section 364 of the Bankruptcy Code, (i) the disallowance of all or any portion of any claim by the Administrative Agent or Lender for the repayment of the Obligations of the other Borrowers under Section 502 of the Bankruptcy Code or (j) any other circumstances whatsoever (with or without notice to or knowledge of any of the Borrowers) which might constitute a legal or equitable discharge or defense of the other Borrower in bankruptcy or in any other instance.  With respect to each Borrower's Obligations arising as a result of the joint and several liability of the Borrowers under this Agreement and the other Loan Documents, each Borrower waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon any of the Borrowers with respect to the Obligations.  With respect to each Borrower's Obligations arising as a result of the joint and several liability of the Borrowers under this Agreement and the other Loan Documents, each Borrower waives, until the Obligations shall have been paid in full in immediately available funds and this Agreement and the other Loan Documents shall have been terminated, any right to enforce any right of subrogation or any remedy which such Borrower now has or may hereafter have against such Borrower, any endorser or any guarantor of all or any part of the Obligations, and any benefit of, and any right to participate in, any security or collateral given to the Administrative Agent or Lender to secure payment of the Obligations or any other liability of the Borrowers to the Administrative Agent or Lender.  Upon and during the continuance of any Event of Default, the Administrative Agent or any other Secured Party may proceed directly and at once, without notice, to pursue its rights and remedies against any Borrower to collect and recover the full amount, or any portion of the Obligations, without first proceeding against, or making a similar demand on, any other Borrower or any other Person, or against any security or collateral for the Obligations (or exercising any right of offset with respect thereto), and any failure by the Administrative Agent or any other Secured Party to make a similar demand on, or to pursue its rights and remedies or to collect and recover the Obligations from, any other Borrower or any other Person, or against any security or collateral for the Obligations or right of offset, shall not relieve any Borrower of any obligation or liability hereunder, and shall not impair or effect the rights and remedies, whether express, implied or available as a matter of law, of the Administrative Agent or any other Secured Party against any Borrower.  Without limiting the generality of any other waiver contained herein, each Borrower waives any right to require the Administrative Agent or any other Secured Party to:  (i) proceed against any other Borrower or any other Person; (ii) proceed against or exhaust any collateral including, without limitation, the Collateral; or (iii) pursue any other right or remedy for such Borrower's benefit.  Each Borrower agrees that the

Administrative Agent and each other Secured Party may proceed against such Borrower with respect to the Obligations without taking any actions against any other Borrower or any other Person and without proceeding against or exhausting any collateral including, without limitation, the Collateral. Each Borrower agrees that each of the Administrative Agent and the other Secured Parties may unqualifiedly exercise in its sole discretion any or all rights and remedies available to it against any other Borrower without impairing the Administrative Agent's or such other Secured Party's rights and remedies in enforcing the Loan Documents, under which such Borrower's liabilities shall remain independent and unconditional. Each Borrower agrees and acknowledges that the Administrative Agent's or any other Secured Party's exercise of certain of such rights or remedies may affect or eliminate such Borrower's right of subrogation or recovery against the other Borrower and that such Borrower may incur a partially or totally nonreimbursable liability in performing under the Loan Documents. Without limiting the generality of any other waivers hereunder, each Borrower expressly waives any statutory or other right that such Borrower might otherwise have to: (A) limit such Borrower's liability after a nonjudicial foreclosure sale to the difference between the Obligations and the fair market value of the property or interests sold at such nonjudicial foreclosure sale or to any other extent; (B) otherwise limit the Administrative Agent's or any other Secured Party's right to recover a deficiency judgment after any foreclosure sale; or (C) require the Administrative Agent or any other Secured Party to exhaust its collateral before the Administrative Agent or any Secured Party may obtain a personal judgment for any deficiency. Without limiting the generality of any other waiver contained herein, each Borrower waives all rights and defenses that such Borrower may have because any other Borrower's Obligations are (or may be) secured by real property. This means, among other things, (i) the Administrative Agent or any other Secured Party may collect from such Borrower without first foreclosing on any real or personal property collateral pledged by any other Borrower, and (ii) if the Administrative Agent forecloses on any real property collateral pledged by any Borrower, (A) the amount of the Obligations may be reduced only by that portion of the price for which that collateral is sold at a foreclosure sale, even if the collateral is worth more than the sale price and (B) the Administrative Agent and the other Secured Parties may collect from such Borrower even if the Administrative Agent, by foreclosing on the real property collateral, has destroyed any right such Borrower may have to collect from any other Borrower. The foregoing waiver is an unconditional and irrevocable waiver of any rights and defenses any Borrower may have because any other Borrower's Obligations are secured by real property. Without limiting the generality of any other waiver contained herein, each Borrower waives all rights and defenses arising out of an election of remedies by the Administrative Agent or any other Secured Party, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for any Obligation has destroyed such Borrower's rights of subrogation and reimbursement against any other Borrower by operation of applicable law or otherwise. Without limiting the generality of the foregoing, each Borrower expressly and irrevocably waives, to the fullest extent permitted by applicable law, any and all rights and defenses including, without limitation, any rights of indemnification and contribution which might otherwise be available to such Borrower under applicable law or otherwise; provided that notwithstanding the foregoing, any such rights of indemnification and contribution shall be waived only until the Obligations shall have been paid in full in immediately available funds and the Agreement shall have been terminated. Each Borrower consents and agrees that the Administrative Agent shall be under no obligation to marshal any assets in favor of such Borrower or against or in payment of any or all of the Obligations.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

PENTON MEDIA, INC., as Borrower

By: _____
    Name:
    Title:

PENTON BUSINESS MEDIA, INC., as Borrower

By: _____
    Name:
    Title:

PENTON BUSINESS MEDIA HOLDINGS, INC., as Holdings and as a Guarantor

By: _____
    Name:
    Title:

PENTON BUSINESS MEDIA INTERNET, INC.,
as a Guarantor


By: _____
      Name:
      Title:

PENTON BUSINESS MEDIA PUBLICATIONS,
INC., as a Guarantor


By: _____
      Name:
      Title:

INTERNET WORLD MEDIA, INC.,
as a Guarantor


By: _____
      Name:
      Title:

DVGM & ASSOCIATES, as a Guarantor


By: _____
      Name:
      Title:

DUKE INVESTMENTS, INC., as a Guarantor


By: _____
      Name:
      Title:

DUKE COMMUNICATIONS INTERNATIONAL,
INC., as a Guarantor


By: _____
      Name:
      Title:

GENERAL ELECTRIC CAPITAL
CORPORATION,
as Lender, as Issuing Bank, as Swap Related L/C
provider and as Administrative Agent


By: _____
            Name:  Ellen Weaver
            Title:    Duly Authorized Signatory

_____,
as Lender


By: _____
Name:
Title:

**<u>EXHIBIT II</u>**

February 4, 2010


Penton Business Media Holdings, Inc.
249 W. 17th Street
New York, NY 10011

Re:    <u>Equity Commitment Letter</u>

Ladies & Gentlemen:

        In connection with the reorganization of Penton Business Media Holdings Inc. ("<u>Holdings</u>"), Penton Business Media, Inc., Penton Media, Inc. and certain subsidiaries (collectively, the "<u>Debtors</u>") pursuant to the Restructuring Support Agreement, dated as of the date hereof, among the Debtors, General Electric Capital Corporation, as administrative agent under the First Lien Credit Agreement (the "<u>Administrative Agent</u>"), the other First Lien Lenders party thereto, Wells Fargo Bank, National Association, as administrative agent under the Second Lien Credit Agreement, the other Second Lien Lenders party thereto and MidOcean Partners III, L.P. and Wasserstein Partners, L.P. (each, an "<u>Equity Investor</u>" and collectively, the "<u>Equity Investors</u>") and the documents attached thereto (collectively, the "<u>Lock-Up Agreement</u>"), this letter confirms the agreement of the Equity Investors to invest in Holdings, including by backstopping a rights offering (the "<u>Rights Offering</u>"), directly or through an entity formed solely to invest in and own common stock of Holdings, in each case for aggregate proceeds of between $38.9 million and $51.2 million on the terms and subject to the conditions herein and in the Rights Offering Term Sheet attached as Exhibit A to the Lock-Up Agreement (the "<u>Equity Commitment</u>"). (Terms used in this letter but not defined herein shall have the meaning ascribed to them in the Rights Offering Term Sheet or the Lock-Up Agreement.)

        Each Equity Investor agrees (i) to elect to receive all of their Second Lien Distributions (as defined in the Plan) in the form of common stock of Holdings (the "<u>Common Stock</u>") pursuant to the Plan, and to cause entities controlled by it to make such elections, and (ii) in the event that other Second Lien Lenders fail to exercise their Rights in full, to purchase its respective Backstop Percentage (as defined below) of Common Stock not so purchased, in each case on the terms and subject to the conditions set forth herein, in the Rights Offering Term Sheet and in the Lock-Up Agreement. For purposes hereof, the "<u>Backstop Percentages</u>" are set forth on the signature page hereto.

        The Equity Investors' commitment set forth in the immediately preceding paragraph is subject to (i) the satisfaction (and not waiver) of the conditions set forth in Section 4.02 of the Amended and Restated Credit Agreement (attached to the Lock-Up Agreement) other than those related to equity contributions and (ii) the confirmation and

effectiveness of the Plan (as defined in the Lock-Up Agreement).  The parties hereto recognize that the consent or approval of the Equity Investors is required in respect of various matters under the Lock-Up Agreement, and that the decision whether to so consent or approve any such matter could result in the failure of the Plan to be consummated.  No such exercise or failure to exercise such rights will be deemed to constitute a breach of this letter agreement or give rise to any liability or obligations on the part of the Equity Investors or any other person, including without limitation under any implied duty of good faith or other legal theory.

The Debtors agree to reimburse the Equity Investors for (i) the reasonable fees and expenses of one law firm retained to represent all Equity Investors in connection with the Equity Commitment incurred on or after December 14, 2009 and (ii) any out-of-pocket legal fees and expenses incurred in connection with any litigation, contested matters, adversary proceedings or negotiations necessitated by such litigation, contested matter or adversary proceedings, relating to the Equity Commitment or the Lock-Up Agreement or any attachment thereto, provided that in no event will the aggregate reimbursement under this paragraph exceed an aggregate of $300,000 if the Plan is not confirmed and does not become effective.  The obligations of the Debtors under this paragraph will remain effective whether or not any of the transactions contemplated in this letter are consummated or any definitive legal documentation is executed and notwithstanding any termination of this letter, provided that the period for any reimbursement will end upon any termination of the Lock-Up Agreement.

The Plan will provide that upon effectiveness, each Debtor and each of their successors and assigns (including, without limitation, any receiver or trustee, collectively, the "Releasors") will forever acquit, waive, release and discharge each Equity Investor and each of their respective affiliates (other than any Debtor), successors and assigns and the directors, trustees, officers, employees, advisors, controlling persons and agents of each (collectively, the "Releasees") of and from any and all claims (including, without limitation, any liabilities, damages, demands and causes of action to the extent arising therefrom) whatsoever, in law or in equity, whether known or unknown, which the Releasors ever had, have now, or hereinafter can, shall or may have against any Releasee by reason of (i) any matter arising on or prior to the effective date of the Plan, out of the Lock-Up Agreement, the First Lien Credit Agreement, the Second Credit Agreement, this letter or in their capacity as equity holders in any of the Debtors and (ii) any and all other actions or omissions relating in any way thereto done or omitted to be done on or prior to the date hereof, unless such matter, action, or omission was a result of fraud, gross negligence or willful misconduct on the part of a Releasee or resulted from a breach of this letter by any Releasee.

The obligations of the Equity Investors shall terminate without further action (i) upon the occurrence of the Termination Date (as defined in the Lock-Up Agreement) or (ii) upon the vote or other action of the Equity Investors, unless the Debtors shall have obtained an order of the Bankruptcy Court (as defined in the Lock-Up Agreement) on or prior to the twentieth calendar day after the Petition Date (as defined in the Plan) approving the Debtors' assumption of their reimbursement obligations hereunder.

The obligations of the Equity Investors hereunder are several and not joint.

This letter, (i) shall be governed, except to the extent that the Bankruptcy Code is applicable, by the laws of the State of New York, without giving effect to the conflict of laws provisions thereof, (ii) shall not be assignable by the Debtors without the prior written consent of the Equity Investors and the Administrative Agent (and any purported assignment without such consent shall be null and void), (iii) shall not be assignable by the Equity Investors unless (a) the Equity Investors continue to be liable for any assigned obligations, (b) the Equity Investors will continue to control voting power over a majority of the outstanding equity shares of Holdings and beneficially own an economic interest in over 51% of the outstanding equity shares of Holdings after the effective date of the Plan but prior to any management incentive plan; provided that in the event the Second Lien Lenders participate in the Rights Offering and as a result thereof and due to their election to receive either cash or Stock (as defined in the Plan), the foregoing 51% threshold will be reduced to match the actual percentage held by the Equity Investors after giving effect to such elections but in any event not less than 42.5% (prior to any management incentive plan) and (c) any assignee has been submitted to the Administrative Agent for any customary background checks required for applicable regulatory purposes and has met the regulatory requirement related to such background check, and (iv) is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto, including without limitation any creditor of any Debtor and (v) may not be amended or waived except by an instrument in writing signed by (x) the Debtors, (y) the Equity Investors and (z) the Administrative Agent.

This letter supercedes the Equity Commitment Letter, dated as of January 20, 2010, among the parties hereto.

This letter may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Very truly yours,

WASSERSTEIN PARTNERS, L.P.
(on behalf of certain funds and managed accounts)


By: _____
Name: _____
Title: _____
Backstop Percentage:   ___%


MIDOCEAN PARTNERS III, L.P.
(on behalf of certain funds and managed accounts)

By: _____
Name: _____
Title: _____
Backstop Percentage:   ___%

Agreed and accepted as of
the date set forth above:

PENTON MEDIA, INC.
PENTON BUSINESS MEDIA, INC.
PENTON BUSINESS MEDIA HOLDINGS, INC.
PENTON BUSINESS MEDIA PUBLICATIONS, INC.
PENTON BUSINESS MEDIA INTERNET, INC.
INTERNET WORLD MEDIA, INC.
DUKE INVESTMENTS, INC.
DUKE COMMUNICATIONS INTERNATIONAL, INC.
DVGM & ASSOCIATES


By: _____
      Name:
      Title:

# EXHIBIT III

# FORM OF
# STOCKHOLDERS AGREEMENT

This STOCKHOLDERS AGREEMENT (this "<u>Agreement</u>") is made and entered into as of_____ __, 2010, by and among (i) Penton Business Media Holdings, Inc., a Delaware corporation (the "<u>Company</u>"), (ii) Penton Business Media Holdings LLC, a Delaware limited liability company ("<u>Holdings LLC</u>"), and (iii) the other Persons identified as "Additional Stockholders" on the signature pages hereto (together, the "<u>Additional Stockholders</u>"). Capitalized terms used and not otherwise defined herein shall have the meanings given to such terms in Article I or in the provisions of this Agreement referenced therein.

## RECITALS

A. On _____, 2010, the Company commenced a voluntary reorganization case under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>").

B. On _____, 2010, the Company's chapter 11 plan of reorganization (the "<u>Plan</u>") was confirmed by the Bankruptcy Court.

C. As contemplated by the Plan, the Company conducted a rights offering (the "<u>Rights Offering</u>") of the Company's common stock, par value $0.01 per share (the "<u>Common Stock</u>").

D. Giving effect to the Rights Offering and the consummation of the Plan, the outstanding shares of Common Stock will be held of record by the Investors in the amounts set forth on <u>Schedule 5.2</u> to this Agreement.

E. The Investors and the Company wish to set forth certain agreements regarding, among other things, their relationships and their rights and obligations with respect to the ownership and Transfer of Common Stock.

NOW, THEREFORE, in consideration of the mutual promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

(a)     As used herein, the following terms have the following meanings when used herein with initial capital letters:

"<u>Additional Investors</u>" means collectively the Additional Stockholders and their Permitted Transferees, in each case only for so long as each such Person is a stockholder of the Company.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly Controls, is Controlled by, or is under common Control with such Person.

"Change in Control" means any transaction or series of transactions that results in any "person" or "group" (as such terms are used for purposes of Section 12(d) of the Exchange Act), other than Holdings LLC, obtaining "beneficial ownership" (as such term is defined in Rule 13d-3 of the Exchange Act) of a majority of the outstanding Common Stock.

"Company Person" means each direct stockholder, director or officer of the Company and their respective Affiliates.

"Compelled Sale Expenses" means all costs and expenses (including reasonable attorneys', management or advisory fees, including pursuant to the Management Agreement) incurred by or on behalf of the Company or Holdings LLC in connection with a Compelled Sale Offer.

"Confidential Information" means all intellectual property, documents, financial statements, records, business plans, reports and other information of whatever kind or nature, which has value to the Company, or which is treated by the Company as confidential and regardless of whether such information is marked "confidential", except such information that (i) is or becomes generally available to the public through no action of the party (including its limited partners, representatives, agents and Affiliates) to which such information was furnished or (ii) is or becomes available to the party to which it was furnished on a nonconfidential basis from a source, other than from the Company, its Affiliates or representatives, which the receiving party believes, after reasonable inquiry, was not prohibited from so disclosing such information by a contractual, legal or fiduciary obligation.

"Control" (including the terms "Controlled by" and "under common Control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies or affairs of a Person, whether through ownership of voting securities, by contract, as executor, trustee or otherwise.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Governmental Authority" means any government or political subdivision or regulatory authority, whether federal, state, local or foreign, or any agency or instrumentality of any such government or political subdivision or regulatory authority, or any federal, state, local or foreign court or arbitrator.

"Investor" means each of Holdings LLC, the Additional Stockholders, each other Person who becomes a party to this Agreement and each Permitted Transferee of any of the foregoing.

"Law" means any federal, state, local or foreign law, rule or regulation.

"Management Agreement" means the Amended and Restated Management Agreement among the Company, an Affiliate of MidOcean and an Affiliate of Wasserstein pursuant to which such Affiliates provide management services to the Company.

"MidOcean" means MidOcean Partners III, L.P., a Delaware limited partnership, or its Affiliates.

"Permitted Transferee" of a specified Person means (i) any Affiliate of such specified Person, (ii) any member, partner or shareholder of such specified Person in respect of (including by way of distribution) such member's, partner's or shareholder's ownership interest in respect of such specified Person, (iii) any employee, officer or director of such specified Person or its Affiliates, and (iv) in the case of a natural person, (A) the lineal descendants, heirs, executors, administrators, testamentary trustees, legatees or beneficiaries of such specified Person and (B) any trust, the beneficiaries of which, or a corporation, limited liability company or partnership, the shareholders, members or general or limited partners of which, include only such specified Person, such specified Person's spouse, members of such specified Person's immediate family or such specified Person's lineal descendants.

"Person" means any natural person, sole proprietorship, general partnership, limited partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, Governmental Authority, or any other organization, irrespective of whether it is a legal entity, and includes any successor (by merger or otherwise) of such entity.

"Public Offering" means any firm commitment, underwritten public offering of securities of the Company (or any successor to the Company) registered under the Securities Act.

"Qualified Public Offering" means an offer and sale of equity securities of the Company (including any successor thereto) to the public pursuant to which (i) the aggregate gross proceeds attributable to sales of equity securities for the account of the Company (including any successor thereto) exceed $75,000,000 (exclusive of expenses and underwriting commissions) and (ii) the equity securities covered by such registration statement are listed for trading on either the New York Stock Exchange or the NASDAQ National Market.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Subsidiary" means, with respect to any Person, any corporation, association, partnership, limited liability company or other business entity of which 50% or more of the total voting power of equity interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, representatives or trustees thereof is at the time owned or Controlled, directly or indirectly, by (1) such Person, (2) such Person and one or more Subsidiaries of such Person, or (3) one or more Subsidiaries of such Person.

"Third Party" means any Person other than the Company, Holdings LLC, an Additional Investor, or an Affiliate of any of the foregoing.

"Transfer" means any sale, assignment, pledge, hypothecation, encumbrance, disposition, transfer (including a transfer by will or intestate distribution), gift or attempt to create or grant a security interest in any security or interest therein or portion thereof, whether voluntary or involuntary, by operation of Law or otherwise; and the terms "Transferee," "Transferable," "Transferring" and "Transferred" have meanings correlative to the foregoing.

"Wasserstein" means Wasserstein Partners, L.P., a Delaware limited partnership or its Affiliates.

(b)  In addition, the following terms shall have meanings given to such terms in the Sections of this Agreement referenced below:

| Term | Section |
|---|---|
| Additional Stockholders | Preamble |
| Agreement | Preamble |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Board | 2.2(m) |
| Co Sale Option | 4.1(b) |
| Common Stock | Recitals |
| Company | Preamble |
| Compelled Sale Notice | 4.2(b) |
| Compelled Sale Offer | 4.2(a) |
| Co-Sale Acceptance Notice | 4.1(b) |
| Co-Sale Election Period | 4.1(b) |
| Co-Sale Notice | 4.1(b) |
| Co-Sale Participant | 4.1(b) |
| Disclosure Statement | 2.2(j) |
| General Enforceability Exceptions | 2.1 |
| Holdings Directors | 6.4(ii)(A) |
| Holdings LLC | Preamble |
| Management Director | 6.4(ii)(C) |
| New York Court | 7.7(a) |
| Offeror | 4.1(a) |
| Other Investor | 4.2(a) |
| Partial Selling Investor | 4.1(b) |
| PE Observer | 6.4(vii) |
| Plan | Recitals |
| Preemptive Holders | 5.1(a) |
| Preemptive Offer | 5.1(a) |
| Preemptive Offer Period | 5.1(a) |
| Preemptive Securities | 5.1(a) |
| Reoffer Period | 5.1(c) |
| Rights Offering | Recitals |
| Subsidiary Board | 6.4(viii) |
| Termination Event | 6.3 |
| Transaction Offer | 4.1(a) |

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES

2.1 <u>Representations and Warranties of the Company</u>.  The Company represents and warrants to each Investor that the Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.  The Company has all requisite corporate power and authority to make, execute, deliver and perform its obligations pursuant to this Agreement without any required consent or approval that has not already been obtained and such actions do not conflict with the Company's constituent documents or any Law, order, judgment or decree.  This Agreement has been duly authorized, executed and delivered by the Company and constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with the terms hereof, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, liquidation, fraudulent conveyance and other similar Laws and principles of equity affecting creditors' rights and remedies generally (collectively, the "<u>General Enforceability Exceptions</u>").

2.2 <u>Representations and Warranties of Each Investor</u>.  Each Investor severally (and not jointly) represents and warrants as to itself to the Company and each other Investor that:

(a) If a corporation, such Investor is validly existing and in good standing under the laws of the state of its incorporation and has the requisite corporate power and authority to enter into this Agreement and to perform its obligations herein.

(b) If a partnership or limited liability company, such Investor is duly organized, validly existing and in good standing under the laws of the state of its formation and has the requisite power and authority to enter into this Agreement and to perform its obligations herein.

(c) If a natural person, such Investor is legally competent to enter into this Agreement and to perform its obligations herein.

(d) Such Investor's address set forth on the signature page is true, correct and complete.

(e) This Agreement has been duly authorized, executed and delivered by such Investor and constitutes a legal, valid and binding obligation of such Investor, enforceable against such Investor in accordance with the terms hereof, subject to the General Enforceability Exceptions.

(f) Such Investor acquired the Common Stock for his, her or its own account, for investment and not with a view to the distribution thereof or any interest therein in violation of the Securities Act or applicable state securities laws.

(g) Such Investor understands that (i) the Common Stock has not been registered under the Securities Act or applicable state securities laws and (ii) the Common Stock must be held by such Investor indefinitely unless a subsequent Transfer thereof is registered under the Securities Act and applicable state securities laws or is exempt from such registration.

(h)     Such Investor further understands that the exemption from registration afforded by Rule 144 (the provisions of which are known to such Investor) promulgated under the Securities Act ("Rule 144") depends on the satisfaction of various conditions, none of which is satisfied by the Company as of the date hereof and that the Company has no obligation to satisfy such conditions.

(i)     Such Investor is (i) an "accredited investor" (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) or (ii) in the case of any Investor who is a natural person, has a preexisting personal or business relationship with the Company, its Subsidiaries or certain other Investors which is of a nature and duration sufficient to make such Investor aware of the character, business acumen and general business and financial circumstances of the Company and/or such Investors.

(j)     Such Investor has read the Disclosure Statement of the Company prepared in connection with the Plan and the Rights Offering (the "Disclosure Statement") and has had an opportunity to ask questions of, and receive answers from, a Person or Persons acting on behalf of the Company, concerning the terms and conditions of this investment, and answers have been provided to all of such questions to the full satisfaction of such Investor.  Such Investor has such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the risks and merits of this investment and to suffer a complete loss of his, her or its investment.

(k)     Such Investor has no need for liquidity in his, her or its investment in the Common Stock.  Such Investor can bear the economic risk of investment in the Common Stock and has such knowledge and experience in financial or business matters to be capable of evaluating the merits and risks of the investment in the Common Stock.  Such Investor has consulted with his, her or its professional, tax and legal advisors with respect to the federal, state, local and foreign income tax consequences of such Investor's participation as an Investor of the Company.

(l)     Such Investor understands that there is no public market for the Common Stock and that the Transferability of the Common Stock is restricted.

(m)     Such Investor has not granted and is not a party to any proxy, voting trust or other agreement which is inconsistent with or conflicts with the provisions of this Agreement without the prior consent of the board of directors of the Company (the "Board"); and no Investor shall grant any proxy or become party to any voting trust or other agreement which is inconsistent with or conflicts with the provisions of this Agreement without the prior consent of the Board.

(n)     The execution, delivery and performance by such Investor of this Agreement, the consummation of the transactions contemplated hereby, and the compliance by such Investor with the provisions hereof, will not (i) conflict with or result in a breach of any provision of the certificate of incorporation, bylaws, operating agreement, formation agreement, trust certificate, partnership agreement or any other organizational document of such Investor, (ii) violate or conflict with or constitute (with notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under (in each case in any manner

which would prevent the Investor from effecting the transactions contemplated hereby), or result in the creation of any encumbrance upon such Investor's Common Stock pursuant to, the terms, conditions or provisions of any material note, bond, lease, mortgage, indenture, license, agreement or other instrument or obligation to which such Investor is a party or by which such Investor or such Investor's properties or assets are bound or (iii) violate any provision of Law or any order, judgment, award, writ, injunction or decree applicable to such Investor or any of such Investor's properties or assets.

(o)     No permit, authorization, consent or approval of or by, or notification of or filing with, any Person is required in connection with the execution, delivery or performance by such Investor of this Agreement.

(p)     Holdings LLC has rights hereunder in respect of the Company which the Additional Stockholders do not have and Holdings LLC may exercise those rights in a manner it determines to be in its best interests regardless of the effects thereof on Additional Stockholders, subject only to the terms hereof and, if and to the extent applicable in any particular circumstances, applicable law.

## ARTICLE 3
## RESTRICTIONS ON TRANSFERS

3.1     <u>General Restrictions on Transfers</u>.

(a)     <u>Restrictions on Transfer</u>.  For so long as Holdings LLC beneficially owns at least 30% of the outstanding Common Stock, no Investor may Transfer any Common Stock without the prior written consent of Holdings LLC.  Notwithstanding the foregoing, but subject to Section 3.1(b), the prohibitions in the immediately preceding sentence shall not apply to (i) any Transfer by any Investor to the extent permitted by Article 4 and (ii) Transfers to Permitted Transferees of such Persons so long as such Permitted Transferees execute and become bound by this Agreement pursuant to documentation reasonably satisfactory to Holdings LLC and the Company.  The Company will not recognize any Transfer of any Common Stock unless such Transfer is made in full compliance with all provisions of this Agreement and all Laws of applicable Governmental Authorities, and any purported Transfer that is not in such full compliance shall be null and void.  Any Transferee of any Common Stock must agree in writing to become a party to, and to be bound by the provisions of this Agreement pursuant to documentation reasonably satisfactory to Holdings LLC and the Company.

(b)     <u>Securities Laws Restrictions</u>.  Notwithstanding anything to the contrary contained herein, but subject to the express written waiver by the Board in the exercise of its good faith and reasonable judgment, no Investor may Transfer any Common Stock without the registration of the Transfer of such Common Stock under the Securities Act or pursuant to any applicable exemption therefrom.  If the proposed Transfer is to be pursuant to an exemption from the registration requirements of the Securities Act,  the Company may request that the transferee obtain and provide to the Company a legal opinion of outside counsel or other evidence that such proposed Transfer is exempt from the registration requirements under the Securities Act and applicable state securities laws as the Board deems reasonably appropriate in light of the facts and circumstances relating to such proposed Transfer, together with such representations,

warranties and indemnifications from the Transferor and the Transferee as the Board deems reasonably appropriate to confirm the accuracy of the facts and circumstances that are the basis for any such opinion or other assurances and to protect the Company and the other Investors of the Company from any liability resulting from any such Transfer.

3.2    Legend.  Each certificate representing any Common Stock will bear the following legend in addition to any other legend required under applicable Law:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR STATE SECURITIES LAWS OR AN OPINION OF COUNSEL, SATISFACTORY TO THE COMPANY, THAT SUCH REGISTRATION IS NOT REQUIRED."

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF A STOCKHOLDERS AGREEMENT BY AND AMONG THE COMPANY AND CERTAIN OTHER SIGNATORIES THERETO, A COPY OF WHICH AGREEMENT IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY.  THE SALE, TRANSFER OR OTHER DISPOSITION OF THE SECURITIES IS SUBJECT TO THE TERMS OF SUCH AGREEMENT AND THE SECURITIES ARE TRANSFERABLE ONLY UPON PROOF OF COMPLIANCE THEREWITH."

3.3    Notation.  A notation will be made in the appropriate transfer records of the Company with respect to the restrictions on Transfer of the Common Stock described in this Agreement.

## ARTICLE 4
## CO-SALE, DRAG ALONG AND OTHER RIGHTS

4.1    Co-Sale Rights.

(a)    The parties hereby acknowledge and agree that Holdings LLC will have no obligation to transfer Common Stock it beneficially owns pursuant to any proposal by any Person, including the Company.  However, in the event that Holdings LLC receives a bona fide written offer from a Third Party (the "Offeror") to purchase any Common Stock it owns (a "Transaction Offer") and provided that Holdings LLC has not exercised its right under Section 4.2(a) with respect to such Transaction Offer, Holdings LLC may, if it desires to pursue such

transaction, Transfer such Common Stock only pursuant to and in accordance with the following provisions of this Section 4.1.

(b)     In no event later than five (5) business days after the Transaction Offer has been agreed in writing by Holdings LLC, Holdings LLC will notify (the "Co-Sale Notice") the Additional Stockholders of their right to participate in the Transaction Offer with respect to any Common Stock (the "Co Sale Option").  The Co-Sale Notice shall contain a reasonably detailed description of the price and general terms of the Transaction Offer.  Each of the Additional Stockholders receiving a Co-Sale Notice will have the right to exercise its Co-Sale Option by giving written notice of its election to participate (the "Co-Sale Acceptance Notice") to Holdings LLC within twenty (20) calendar days after its receipt of the Co-Sale Notice (the "Co-Sale Election Period").  Any Person who delivers a Co-Sale Acceptance Notice as provided herein is referred to herein as a "Co-Sale Participant".  Each Co-Sale Acceptance Notice will indicate the maximum number of shares of Common Stock subject thereto which the Co-Sale Participant giving such notice wishes to sell.  Any Person who fails to deliver a Co-Sale Acceptance Notice in respect of any Transaction Offer within the Co-Sale Election Period will have no rights under this Section 4.1 in respect of such Transaction Offer.  In the event any of the Additional Stockholders (other than Holdings LLC) elects not to sell the maximum number of shares of Common Stock permitted to be sold under the applicable Co-Sale Notice (a "Partial Selling Investor"), Holdings LLC may elect to sell up to a number of additional shares of Common Stock equal to the number of such Partial Selling Investor's unsold allocation of shares of Common Stock.

(c)     Each Co-Sale Participant shall have the right to sell a portion of its shares of Common Stock pursuant to the Transaction Offer which is equal to or less than the product obtained by multiplying (i) the total number of shares of Common Stock available for sale to the Offeror subject to the Transaction Offer by (ii) a fraction, the numerator of which is the total number of outstanding shares of Common Stock owned by such Co-Sale Participant, and the denominator of which is the total number of outstanding shares of Common Stock, in each case on the date of the Co-Sale Notice.

(d)     Holdings LLC shall promptly notify each Co-Sale Participant of the number of shares of Common Stock owned by such Co-Sale Participant that will be included in the sale and the date on which the Transaction Offer will be consummated, which will be no later than thirty (30) business days after the end of the Co-Sale Election Period.

(e)     Each Co-Sale Participant may effect its participation in any Transaction Offer hereunder by delivery to the Offeror, or to Holdings LLC for delivery to the Offeror, of one or more instruments or certificates, properly endorsed for Transfer, representing the shares of Common Stock such Co-Sale Participant elects to sell therein.  Each such Co-Sale Participant will, severally and not jointly, make the same representations and warranties, provide the same indemnities and agree to the same covenants and other terms as Holdings LLC provides and agrees to in connection with the Transaction Offer; provided that, (i) indemnification of the Offeror by Holdings LLC and each Co-Sale Participant will be several and not joint based on the relative gross sale proceeds received by each such Person and will be limited to the gross sale proceeds received by each such Person from the sale of shares of Common Stock pursuant to the Co-Sale Option, and (ii) neither Holdings LLC nor any Co-Sale Participant will be responsible

for the representations and warranties that pertain solely to any other Investor (and not the Company) or such other Investor's shares of Common Stock (such as such Investor's good standing, authority, ownership of shares of Common Stock, etc.). At the time of consummation of the Transaction Offer, the Offeror will remit directly to each Co-Sale Participant the sale proceeds from the consummation of the transaction described in the Transaction Offer less each Co-Sale Participant's pro rata share of costs and expenses (including reasonable attorneys' and other management or advisory fees, including pursuant to the Management Agreement) incurred by the Company or Holdings LLC in connection with the consummation of the transactions described in the Transaction Offer. No shares of Common Stock may be purchased by the Offeror from Holdings LLC unless the Offeror simultaneously purchases from each Co-Sale Participant all of the shares of Common Stock that such Co-Sale Participant has properly elected to sell pursuant to this Section 4.1.

(f)     Any shares of Common Stock owned by Holdings LLC which are the subject of a Transaction Offer that Holdings LLC desires to Transfer following compliance with this Section 4.1 may be sold to the Offeror only during the period specified in Section 4.1(d) and only on terms no more favorable to Holdings LLC than those contained in the Co-Sale Notice. Promptly after such Transfer, Holdings LLC will notify the Company, which in turn will promptly notify each Co-Sale Participant, of the consummation thereof and will furnish such evidence of the completion and time of completion of the Transfer and of the terms thereof as may reasonably be requested by the Co-Sale Participants. In the event that the Transaction Offer is not consummated within the period required by this Section 4.1 or the Offeror fails to timely remit to Holdings LLC and the Co-Sale Participants the sale proceeds, the Transaction Offer will be deemed to lapse, and any Transfer of shares of Common Stock pursuant to such Transaction Offer will be deemed to be in violation of the provisions of this Agreement unless Holdings LLC once again complies with the provisions of this Section 4.1 with respect to such Transaction Offer.

(g)     Notwithstanding anything in this Section 4.1 to the contrary, there will be no liability on the part of Holdings LLC or any of its Affiliates to any holder of shares of Common Stock hereunder for the failure to consummate a Transaction Offer. It is understood that Holdings LLC, in its sole discretion, has the right to determine whether to effect a sale of any shares of Common Stock to any Person pursuant to this Section 4.1.

4.2     Drag-Along Rights Exercisable by Holdings LLC.

(a)     For as long as Holdings LLC beneficially owns, directly or indirectly, at least 30% of the Common Stock then outstanding, Holdings LLC shall have the right, in connection with a bona fide written offer (a "Compelled Sale Offer") by a Third Party (other than pursuant to a Public Offering) to purchase or acquire more than 30% of the outstanding Common Stock (whether pursuant to a purchase and sale of stock or a merger, consolidation, sale of assets or other form of transaction), to require each other Investor (each, an "Other Investor") to sell to such Third Party, for the same per share consideration and on substantially the same terms as Holdings LLC, a percentage of the Common Stock then owned by such Other Investor that is equal to the percentage of Common Stock that Holdings LLC has agreed to sell pursuant to the Compelled Sale Offer relative to the total number of shares of Common Stock then owned by Holdings LLC in the aggregate. The percentage of such Common Stock that

Holdings LLC has agreed to sell pursuant to the Compelled Sale Offer will be determined by the Board and shall be conclusive and binding on all parties hereto.

(b)     If Holdings LLC elects to exercise the right to compel a sale pursuant to this Section 4.2, Holdings LLC shall deliver written notice (the "Compelled Sale Notice") of the Compelled Sale Offer to the Company and the Company shall forward such written notice to the Other Investors and the Board no later than thirty (30) days prior to the proposed date of consummation of the transactions contemplated by the Compelled Sale Offer, setting forth the consideration (which shall be the same form of consideration and in the same proportion of different forms of consideration, if applicable, as set forth in the Compelled Sale Offer) and other material terms and conditions of the Compelled Sale Offer.  If the Compelled Sale Offer consists in whole or in part of consideration other than cash, Holdings LLC shall provide such information, to the extent reasonably available to it, relating to such consideration as the Company may reasonably request in order to evaluate such non cash consideration.  Without limiting or waiving the other rights of the Other Investors under this Agreement, the Other Investors shall (i) execute and deliver such documents as may be executed by Holdings LLC in connection with the Compelled Sale Offer, including written consents of stockholders, proxies, letters of transmittal, purchase agreements and stock powers, (ii) if applicable, vote in favor of, consent to and raise no objections against the Compelled Sale Offer or the process pursuant to which the Compelled Sale Offer was arranged, (iii) if applicable, waive any dissenter's, appraisal and other similar rights, (iv) bear their proportionate share based on relative gross sale proceeds received by such Other Investors of any escrows, holdbacks, indemnities or adjustments in purchase price as the same may be negotiated by Holdings LLC in connection with the Compelled Sale Offer, and (v) otherwise take all actions reasonably necessary to cause the consummation of the transactions contemplated by the Compelled Sale Offer.  Notwithstanding anything to the contrary in this Agreement, (i) indemnification of the Third Party purchaser by Holdings LLC and the Other Investors shall be several and not joint based on the relative gross sale proceeds received by each such Person and shall be limited to the gross sale proceeds received by each such Person in such transaction, and (ii) no Investor shall be responsible for the representations and warranties that pertain solely to any other Investor (and not the Company) or such other Investor's shares of Common Stock (such as such Investor's good standing, authority, ownership of shares of Common Stock, etc.).  For purposes of this Section 4.2, the term "consideration" shall not include (x) the repayment of any funds loaned by any Investor or any of their respective Affiliates or (y) any amounts due to any Investor for bona fide, arms' length services provided by an Investor or any of its Affiliates in accordance with any advisory, management or consulting agreement, including the Management Agreement.

(c)     The Other Investors shall deliver to the Company in escrow, not later than five (5) business days prior to the proposed date of consummation of the transactions contemplated by the Compelled Sale Offer, the certificate or certificates representing all of the shares of Common Stock owned by the Other Investors that are subject to the Compelled Sale Offer, duly endorsed for sale to the Third Party purchaser, together with a limited power-of-attorney authorizing their designee to Transfer such shares of Common Stock pursuant to the terms and conditions set forth in the Compelled Sale Offer.  If any Other Investor fails to deliver such certificates to the Company so endorsed, then, in addition to, and without limiting or affecting any other rights or remedies that Holdings LLC may have, the Company shall cause its books and records to show that the shares of Common Stock owned by such Other Investor are

subject to the provisions of this Section 4.2 and may be sold only to the Third Party purchaser upon payment of the purchase price without interest thereon and upon surrender for sale by such Other Investor.

(d)     Holdings LLC or, if applicable, the Company shall have ninety (90) business days from the date on which a definitive purchase agreement concerning the Compelled Sale Offer is fully executed and delivered to sell (or cause to be sold) to such Third Party, on substantially the terms set forth therein, all or any portion of the shares of Common Stock subject to the Compelled Sale Offer.  Promptly after consummation of any such sale pursuant to this Section 4.2 (including the delivery of the shares of Common Stock by the holders thereof), the Company shall notify the Other Investors of such consummation and shall remit to each such Investor the proceeds attributable to the sale of such Investor's shares of Common Stock, reduced by such Investor's pro rata portion of the Compelled Sale Expenses.  If any sale to a Third Party purchaser is not consummated by the expiration of the ninety (90) business day period referred to in this Section 4.2(d), then, without prejudice to the right of Holdings LLC to seek to compel a sale under this Section 4.2 in the future, the Company shall return to each Investor all certificates, if any, representing the shares of Common Stock of such Investor that were delivered by such Investor to the Company in accordance with Section 4.2(c) of this Agreement.

(e)     Notwithstanding anything in this Section 4.2 to the contrary, there shall be no liability on the part of Holdings LLC or any of its Affiliates to any holder of shares of Common Stock hereunder for the failure to consummate a Compelled Sale Offer.  It is understood that Holdings LLC, in its sole discretion, shall determine whether to effect a sale of any shares of Common Stock to any Person pursuant to this Section 4.2.

(f)     If any consideration that constitutes part of a Compelled Sale Offer consists of anything other than cash, then the value of such consideration shall be its fair market value as solely determined in good faith by the Board, except that any securities that constitute part of such consideration shall be valued as follows:

(A)     The method of valuation of securities not subject to restrictions on free marketability shall be as follows:

(i)     unless otherwise specified in a definitive agreement relating to such Compelled Sale Offer, if the securities are then traded on a national securities exchange or the Nasdaq National Market (or a similar national quotation system), then the value shall be deemed to be the average of the closing prices of the securities on such exchange or system over the thirty (30) day period ending three (3) days prior to the consummation of the Compelled Sale Offer; and

(ii)     if actively traded over-the-counter, then the value shall be deemed to be the average of the closing bid prices over the thirty (30) day period ending three (3) days prior to the consummation of the Compelled Sale Offer; and

(iii)    if there is no active public market, then the value shall be the fair market value thereof, solely determined in good faith by the Board.

(B)    The method of valuation of securities subject to investment letter or other restrictions on free marketability shall be determined in good faith by the Board.

(g)    Any determination by the Board under the preceding clause (f) shall be conclusive and binding on the parties hereto.

(h)    Except as provided in Section 4.2(d), costs and expenses incurred by any Investor on its own behalf shall not be considered costs of a Compelled Sale Offer and shall be paid solely by such Investor, as applicable.

## ARTICLE 5
## PREEMPTIVE RIGHTS

5.1    <u>Preemptive Rights</u>.  (a)  After the date of this Agreement, the Company shall not issue, sell or exchange, agree to issue, sell or exchange, or reserve or set aside for issuance, sale or exchange, any capital stock, securities convertible into capital stock, rights or options to acquire capital stock or profit sharing interests in the Company (collectively, the "<u>Preemptive Securities</u>"), unless the Company shall have first offered to sell to each of the Investors that is an "accredited  investor" (as defined in the Securities Act) (collectively, the "<u>Preemptive Holders</u>") such Preemptive Holder's Pro Rata Share (as defined below) of the Preemptive Securities, at a price and on such other terms as shall have been specified by the Company in writing delivered to each such Preemptive Holder (the "<u>Preemptive Offer</u>"), which Preemptive Offer shall be on terms not less favorable than those relating to the Company's proposed issuance, sale or exchange of Preemptive Securities and shall remain open and irrevocable for a period of twenty (20) calendar days from the date it is delivered by the Company (the "<u>Preemptive Offer Period</u>").

(b)    Notwithstanding the foregoing, Preemptive Securities shall not include (i) options or other equity securities issued to officers, directors or employees of the Company or any Subsidiary pursuant to an employee or consultant benefit plan approved by the Board where the primary purpose of such issuance is not to raise additional equity capital for the Company and any capital stock issued upon the exercise of any such options or other equity securities, (ii) equity securities issued by the Company as consideration in connection with the acquisition approved by the Board of another business by the Company or its Subsidiaries whether by merger, purchase of all or substantially all of the assets of such entity or otherwise, (iii) securities issued as a result of any split, distribution, reclassification or reorganization of the equity securities of the Company approved by the Board, (iv) any equity securities issued in connection with lending or leasing arrangements approved by the Board, or (v) any equity securities issued in a Public Offering.

(c)    Each Preemptive Holder may elect to purchase all or any portion of such Preemptive Holder's Pro Rata Share of the Preemptive Securities as specified in the Preemptive Offer at the price and on the terms specified therein by delivering written notice of such election

to the Company as soon as practicable but in any event before the expiration of the Preemptive Offer Period.  Each Preemptive Holder's "Pro Rata Share" of Preemptive Securities shall be the product of (x) the total number of Preemptive Securities and (y) a fraction, the numerator of which shall be the total number of shares of Common Stock then owned by such Preemptive Holder and the denominator of which shall be the total number of shares of Common Stock then outstanding.   Any Preemptive Securities not elected to be purchased by the end of the Preemptive Offer Period shall be reoffered for a five (5) calendar day period (the "Reoffer Period") by the Company to the Preemptive Holders who have elected to purchase their full Pro Rata Share of the Preemptive Securities pro rata based on the number of shares of Common Stock owned by such Preemptive Holders prior to the commencement of such offer (with subsequent reofferings in the same manner among interested Preemptive Holders until all requested Preemptive Securities have been purchased); provided that no Preemptive Holder will be required to purchase more than the number of Preemptive Securities such Preemptive Holder elects to purchase.   Any Preemptive Securities so offered which are not purchased by the Preemptive Holders pursuant to such offer may be sold by the Company at any time within one hundred twenty (120) calendar days following the termination of the Reoffer Period, but only on terms and conditions no more favorable to the purchasers than those set forth in the Preemptive Offer.   The Company will not offer, issue or sell any Preemptive Securities after such one hundred twenty (120) calendar day period without renewed compliance with this Section 5.1.

5.2    Contribution of Additional Equity Capital by Investors.   In the event the Company issues any Preemptive Securities and Holdings LLC has agreed to purchase its Pro Rata Share of such Preemptive Securities, each Investor agrees to purchase its Pro Rata Share of such Preemptive Securities; provided, however, that nothing in this Section 5.2 shall require any Investor to purchase an aggregate amount of Preemptive Securities in excess of its Pro Rata Share of 50% of the equity value of the Company as of the date of this Agreement as set forth in Section VI.C of the Disclosure Statement.   Each Investor's "Pro Rata Share" is set forth on Schedule 5.2 of this Agreement.   The price and terms of the Preemptive Securities shall be determined by the Board.

## ARTICLE 6
## INFORMATION RIGHTS; BOARD OF DIRECTORS

6.1    Information Rights.

(a)    At an Investor's request, the Company shall furnish to each Investor who does not own any securities (debt or otherwise) in a competitor of the Company (as determined by the Board in good faith) the following:

(i)    within sixty (60) calendar days after the end of each of the first three fiscal quarters of each fiscal year (commencing with the first fiscal quarter of 2010), an unaudited consolidated balance sheet and related statements of operations and cash flows showing the financial position of the Company and its subsidiaries as of the close of such fiscal quarter and the unaudited consolidated results of its operations during such fiscal quarter, and which unaudited

consolidated balance sheet and related statements of operations and cash flows shall be certified by the Company's chief financial officer or equivalent officer on behalf of the Company; and

(ii)     within one hundred twenty (120) calendar days after the end of each fiscal year (commencing with the fiscal year ended December 31, 2009, in which case it will be delivered within 120 days thereafter or, if later, within 30 days following the effective date of this Agreement), a consolidated balance sheet and related statements of operations, cash flows and owners' equity showing the financial position of the Company and its subsidiaries as of the close of such fiscal year and the consolidated results of its operations during such year, which consolidated balance sheet and related statements of operations, cash flows and owners' equity shall be audited by the Company's independent public accountants.

6.2     <u>Confidentiality</u>.  Any Person receiving any Confidential Information related to the Company or its Affiliates agrees to keep such Confidential Information confidential and not disclose such Confidential Information to any third party without the prior written consent of the Company (in its sole discretion); <u>provided</u> that nothing in this Agreement shall prevent such Person from disclosing such Confidential Information as required by Law, regulation or other legal process or to its limited partners or shareholders, representatives (including attorneys and accountants), agents and Affiliates or to Third Parties in connection with a possible Compelled Sale Offer pursuant to Section 4.2; <u>provided</u> such Persons agree to be bound by the provisions of this Section 6.2.

6.3     <u>Termination of Information and Inspection Covenants</u>.  The covenants set forth in Section 6.1 shall terminate and be of no further force or effect when the sale of securities pursuant to a Qualified Public Offering is consummated or when the Company first becomes subject to the periodic reporting requirements of Section 12(g) or 15(d) of the Exchange Act, whichever event (each, a "<u>Termination Event</u>") shall first occur.

6.4     <u>Board Representation</u>.  For so long as Holdings LLC owns at least 30% of the outstanding Common Stock, each Investor shall vote all of the voting securities of the Company (including the Common Stock) over which such Investor has voting control and shall take all other necessary or desirable actions within his or its control (whether in his or its capacity as an investor, director, member of a Board committee or officer of the Company or otherwise, and including attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents or resolutions in lieu of meetings), and the Company shall take all necessary or desirable actions within its control (including calling special Board and members' meetings) so that:

(i)     The authorized number of directors of the Board shall be established at seven (7) members;

(ii) (A) Six members of the Board shall be individuals designated in writing by Holdings LLC (the "<u>Holdings Directors</u>"); and

(B) The then-current CEO of the Company (or such other member of the Company's management selected by Holdings LLC) shall be elected to the Board (the "<u>Management Director</u>").

(iii) Two of the Holdings Directors shall be Co-Chairman of the Board.

(iv) Any Holdings Director shall be removed from the Board at the written request of the Investor who has the right to designate such Director;

(v) In the event any vacancy in the Board occurs for any reason, the vacancy shall be filled so that the Board will be comprised in accordance with the provisions of this Section 6.4;

(vi) Upon the expiration of the term of office of any director, his or her successor shall be elected for the term of one year each or until his or her successor has been elected or qualified, and subsequent successors of the director shall continue to be so elected;

(vii) In the event that none of the Holdings Directors is a full-time employee of any 20% or greater member of Holdings LLC, then any such member of Holdings LLC shall be entitled to appoint an observer to the Board (the "<u>PE Observer</u>") to attend all meetings of the Board and its committees. A PE Observer shall not have voting rights at any meetings of the Board or committee thereof, but shall have the right to receive notices of meetings, minutes, board or committee presentation books and the right to receive written reports with respect to the Board or any committee of the Board. Notwithstanding the foregoing, the Company may exclude any PE Observer from access to any portion of any material or meeting if the Company believes, upon advice of counsel to the Company, that such exclusion is reasonably necessary to preserve the Company's attorney-client privilege;

(viii) The composition of the Board of Directors of each of the Company's subsidiaries (each a "<u>Subsidiary Board</u>") shall

be the same as that of the Board or otherwise acceptable to Holdings LLC;

(ix) Unless otherwise waived by Holdings LLC, the composition of any Board committee of the Company or any of the Company's Subsidiaries shall include such number of Holdings Directors as is proportionate to the total number of directors on the Board;

(x) Except as otherwise provided by law, no quorum shall exist at any meeting of the Board or any Subsidiary Board unless such meeting (including a telephonic meeting): (x) is called in accordance with the governing document of such entity and (y) at least one Holdings Director designated by each 20% or greater member of Holdings LLC must participate; provided that if none of such Holdings Directors attends or participates in such meeting after receiving notice of such meeting in accordance with the applicable governing document, the Company or such Subsidiary, as applicable, shall reschedule such meeting to a later date and send notice to the directors designated by such non-participant of such rescheduled meeting and, if after receiving such notice of such rescheduled meeting none of such directors designated by the non-participant attends or participates in such rescheduled meeting, then such rescheduled meeting shall be a duly convened meeting notwithstanding the failure of any such directors to attend or participate in such meeting;

(xi) The Company shall not, and shall not cause any of its Subsidiaries to, take any of the actions set forth in Schedule 6.4 without the approval of the Board; and

(xii) All matters considered by the Board shall require the approval of at least two Holdings Directors designated by each 20% or greater member of Holdings LLC, who are employees of such 20% or greater member of Holdings LLC, that may be designated to the Board pursuant to this Section 6.4.

# ARTICLE 7
# MISCELLANEOUS

7.1    <u>Effectiveness, Amendment and Modification</u>.   This Agreement will become effective, without further action, upon the occurrence of the effective date of the Plan.   This Agreement may be amended or modified only with the written consent of the Company and Holdings LLC; <u>provided</u>, <u>however</u>, the written consent of a majority in interest of the Additional

Stockholders shall be required with respect to any such amendment or modification that adversely affects the rights of the Additional Stockholders hereunder or increases the liabilities or obligations of such Additional Stockholders, in either case in a manner differently than the effect thereof on Holdings LLC.  Any provision hereof may be waived only with the prior written consent of the Company, Holdings LLC and a majority in interest of the Additional Stockholders, or, as to any particular Investor, the particular Investor against which such waiver is to be enforced.  In the event of any such waiver of any provision of this Agreement, the remainder of this Agreement shall not be affected.  No course of dealing or course of conduct between or among any Persons having any interest in this Agreement shall be deemed effective to modify, amend or waive any part of this Agreement or any rights or obligations of any Person under or by reason of this Agreement.

7.2    Survival of Representations and Warranties.  Unless otherwise provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement will survive the execution and delivery of this Agreement.

7.3    Successors and Assigns; Entire Agreement.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and, except as provided herein, their respective successors and permitted assigns (including any Person to whom or to which any shares of Common Stock are Transferred as permitted under this Agreement).  Without limiting the generality or effect of any other provision hereof, Holdings LLC may assign its rights, and delegate its obligations hereunder to any Permitted Transferee or other Person who acquires a majority of the Common Stock beneficially owned by Holdings LLC in a transaction effected in compliance with Article IV hereof whereupon such Permitted Transferee will have and may exercise all of Holdings LLC's rights hereunder and shall be subject to all of Holdings LLC's obligations hereunder and, in such event, Holdings LLC will have the rights and obligations of an Additional Stockholder hereunder.  This Agreement supercedes any prior shareholders agreement to which the Company or any of its predecessors was a party and sets forth the entire agreement and understanding between the parties as to the subject matter hereof and merges and supersedes all prior discussions, agreements and understandings of any and every nature among them with respect to such subject matter.

7.4    Severability.  It is the desire and intent of the parties that the provisions of this Agreement be enforced to the fullest extent permissible under the law and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, in the event that any provision of this Agreement is determined by a court in any jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.  Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

7.5    Notices.  All notices provided for or permitted hereunder shall be made in writing by hand delivery, facsimile or air courier guaranteeing overnight delivery and addressed as

follows (or addressed at such other address for a party which has been designated by notice in writing by such party to the others in accordance with the provisions of this Section 7.5.):

    (a)    If to the Company, to it at:

> Penton Business Media Holdings, Inc.
> 249 West 17th Street, 4th Floor
> New York, NY 10011
> Attention:    CEO and General Counsel
> Facsimile No.:  (913) 514-6431

> with a copy to:

> Jones Day
> 222 E. 41st Street
> New York, New York 10017
> Attention:    Robert A. Profusek, Esq.
>                 Thomas W. Bark, Esq.
> Facsimile No.:  (212) 755-7306

    (b)    If to Holdings LLC, to it at:

> c/o Wasserstein & Co., LP
> 1301 Avenue of the Americas, 44th Floor
> New York, NY 10019
> Attention:    Anup Bagaria
>                 Michael Struble
> Facsimile No.:  (212) 702-5635

> and

> c/o MidOcean Partners III, L.P.
> 320 Park Avenue
> 12th Floor
> New York, NY 10026
> Attention:    Tyler Zachem
>                 Barrett Gilmer
> Facsimile No.: (212) 497-1376

    (c)    If to any Additional Stockholder, to the address noted below the name of such Additional Stockholder on the signature page to this Agreement

All such notices shall be deemed to have been duly given (i) when delivered by hand, if personally delivered, (ii) when confirmation of receipt is delivered by facsimile transmission, or (iii) on the next business day, if timely delivered to an air courier guaranteeing overnight delivery.

7.6     Governing Law.    The validity, performance, provisions and effect of this Agreement shall be governed by and construed in accordance with the internal law of the State of Delaware, without giving effect to principles of conflict of laws thereof.

7.7     Jurisdiction; Consent to Service of Process.

(a)     Each party to this Agreement hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the New York state court located in the Borough of Manhattan, City of New York or the United States District for the Southern District of New York (as applicable, a "New York Court"), and any appellate court from any such court, in any suit, action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment resulting from any such suit, action or proceeding, and each party hereby irrevocably and unconditionally agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in a New York Court.

(b)     It will be a condition precedent to each party's right to bring any such suit, action or proceeding that such suit, action or proceeding, in the first instance, be brought in a New York Court (unless such suit, action or proceeding is brought solely to obtain discovery or to enforce a judgment), and if a New York Court refuses to accept jurisdiction with respect thereto, such suit, action or proceeding may be brought in any other court with jurisdiction.

(c)     No party may move to (i) transfer any such suit, action or proceeding from a New York Court to another jurisdiction, (ii) consolidate any such suit, action or proceeding brought in a New York Court with a suit, action or proceeding in another jurisdiction unless such motion seeks solely and exclusively to consolidate such suit, action or proceeding in a New York Court, or (iii) dismiss any such suit, action or proceeding brought in a New York Court for the purpose of bringing or defending the same in another jurisdiction.

(d)     Each party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in a New York Court, (ii) the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in a New York Court, and (iii) the right to object, with respect to such suit, action or proceeding, that such court does not have jurisdiction over such party. Each party irrevocably consents to service of process in any manner permitted by law. Notwithstanding the foregoing, this Section 7.7 will not apply to any suit, action or proceeding by a Company Person seeking indemnification or contribution pursuant to this Agreement or otherwise in respect of a suit, action or proceeding against such Company Person by a third party if such suit, action or proceeding by such Company Person seeking indemnification or contribution is brought in the same court as the suit, action or proceeding against such Company Person.

7.8     WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT

LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7.9     Headings.  The headings in this Agreement are for convenience of reference only and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

7.10     Further Assurances.  Each party shall cooperate and take such action as may be reasonably requested by another party in order to carry out the provisions and purposes of this Agreement and the transactions contemplated hereby.

7.11     Termination.  Unless sooner terminated by the mutual agreement of the Company, Holdings LLC and a majority in interest of the Additional Stockholders, this Agreement shall terminate upon the earliest to occur of (i) the consummation of the sale of the Company's equity securities pursuant to a Qualified Public Offering, (ii) the date of the closing of a Compelled Sale Offer or Transaction Offer, following which either (A) none of the Investors owns any shares of Common Stock, (B) one Investor owns all of the shares of Common Stock, or (C) all of the Investors own, collectively, less than 90% of the total outstanding shares of Common Stock, and (iii) the agreement of the Company and Holdings LLC following the occurrence of another Termination Event.  If a party hereto ceases to own any shares of Common Stock or other rights to acquire shares of Common Stock, such party will no longer be deemed to be a party for purposes of this Agreement, and there shall be no further liability on the part of any such party, except for obligations arising under Section 6.2 (which shall survive indefinitely) and for liabilities arising from a breach of this Agreement or other actions by such party prior to such party ceasing to be a party to this Agreement.

7.12     Remedies.   If any party to this Agreement breaches or threatens to commit a breach of its obligations under this Agreement, any party injured or to be injured by such breach, in addition to being entitled to exercise all rights granted by law, including recovery of damages, will be entitled to specific performance of its rights under this Agreement.  The parties agree that the provisions of this Agreement shall be specifically enforceable, it being agreed by the parties that the remedy at law, including monetary damages, for the breach of such provisions may be inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is waived.

7.13     Expenses.  Each of the Company and each Investor shall bear its own respective expenses and legal fees incurred on behalf of each with respect to this Agreement and the transactions contemplated hereby.

7.14     Certain Interpretive Matters.

(a)     Unless the context otherwise requires: (i) all references to Sections or Articles are to Sections or Articles of this Agreement; (ii) each term defined in this Agreement has the meaning assigned to it; (iii) each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with generally accepted accounting principles; (iv) words in the singular include the plural and vice-versa; and (v) the term "including" means "including, without limitation".  All references to laws in this Agreement

shall include any applicable amendments thereunder.  All references to $ or dollar amounts shall be to lawful currency of the United States.  To the extent the term "day" or "days" is used, it shall mean calendar days (unless referred to as a "business day").

(b)     No provision of this Agreement shall be interpreted in favor of, or against, any of the parties hereto by reason of the extent to which any such party or its counsel participated in the drafting thereof or by reason of the extent to which any such provision is inconsistent with any prior draft hereof or thereof.

7.15    No Announcements.  No announcement regarding the transactions contemplated hereby shall be made by any party hereto in a press release, conference, advertisement, announcement, professional or trade publication, mass marketing material or otherwise to the general public without the prior written consent of the Company, except as required by Law, regulation or other legal process.

7.16    Counterparts.  This Agreement may be executed in any number of original or facsimile counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

*Signature Pages Follow*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

PENTON BUSINESS MEDIA HOLDINGS, INC.


By: _____
   Name:
   Title:

PENTON BUSINESS MEDIA HOLDINGS LLC


By: _____
   Name:
   Title:

**ADDITIONAL STOCKHOLDERS:**

# Schedule 6.4

## Matters Requiring Approval of the Company's Board of Directors

The Company shall not, and shall not cause any of its Subsidiaries to, take any of the actions set forth below without the approval of the Board.

<u>Financial Matters</u>:

1. Approve the annual budget (as approved, the "<u>Approved Budget</u>") and quarterly and annual financial statements of the Company (to the extent such financial statements are presented to the Board for approval).

2. Incur indebtedness for borrowed money (except trade payables incurred in the ordinary course of business) or create a mortgage, pledge or lien on any properties or assets of the Company as security for such indebtedness, other than indebtedness existing as of the date of this Agreement, or refinance any indebtedness outstanding as of the date of this Agreement.

3. Make any loan to, or investment in, any Person not set forth in the Approved Budget (other than the advancement of travel expenses to employees in the ordinary course of business).

<u>Material Company Transactions</u>:

1. Issue or authorize the issuance of any shares of Common Stock or securities convertible into or exercisable for shares of Common Stock (other than upon the exercise of options previously granted and approved by the Board).

2. Reclassify, combine, split, purchase or redeem any shares of Common Stock or securities convertible into or exercisable for shares of Common Stock, other than pursuant to agreements in effect as of the date of this Agreement.

3. Declare, set aside or pay any dividend or make any other distribution (whether in cash, stock or other property) with respect to any shares of Common Stock.

4. Enter into any agreement effecting, or contemplating the effecting of, a Change in Control or Public Offering of the Company's securities.

5. Acquire by merger, consolidation, business combination, purchase of stock or assets or otherwise any business or Person.

6. Sell, transfer or dispose of any properties or assets of the Company (i) not in the ordinary course of business or (ii) with a fair market value in excess of $250,000.

Employment Matters:

1. Hire or fire the Company's Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, General Counsel or any other employee of the Company reporting directly to the Company's Chief Executive Officer.

2. Enter into any employment or severance agreement with any person involving an annual expense in excess of $250,000.

3. Issue options or other equity incentives to any employee of the Company.

4. Enter into or adopt any new employee benefit plan or program or amend any existing employee benefit plan or program involving a cost that is not set forth in the Approved Budget.

5. Enter into any indemnification arrangements (including D&O insurance) with respect to any director, officer or employee of the Company.

Miscellaneous:

1. Make any material change in any accounting practices, principles, policies or methods, except as required by law.

2. Commence or settle any pending or threatened litigation, action or proceeding involving the Company or any of its directors, employees or agents involving an amount in excess of $250,000.

3. Enter into, amend or waive any right of the Company under, any agreement or arrangement with any Stockholder (other than employment arrangements entered into

in the ordinary course of business with any Stockholder who is also an employee of the Company).

4. Amend, or waive any right of the Company under this Agreement.

# **EXHIBIT IV**

January __, 2010

JPMorgan Chase Bank, N.A.
Attention: Legal Department – Derivatives Practice Group
270 Park Avenue
New York, New York 10017-2070

Ladies and Gentlemen:

Reference is made to (i) the 2002 Master Agreement, dated as of February 22, 2007 (together with the Schedule thereto and all Confirmations of Transactions entered into thereunder, the "Agreement"), between JPMorgan Chase Bank, N.A. ( "Party A") and Penton Media, Inc. and Penton Business Media Inc., as joint and several obligors (together, collectively, "Party B"), and (ii) the Restructuring Support Agreement (the "RSA"), dated as of January __, 2010, among Penton Business Media Holdings, Inc. ("Holdings"), Party A, certain other subsidiaries of Holdings party thereto, General Electric Capital Corporation, as administrative agent under the First Lien Credit Agreement (as defined therein), the consenting lenders under the First Lien Credit Agreement, Wells Fargo Bank, National Association, as administrative agent under the Second Lien Credit Agreement (as defined therein), the consenting lenders under the Second Lien Credit Agreement and the Equity Investors (as defined therein). Capitalized terms used and not defined herein have the meanings given to them in the Agreement.

Each of the entities constituting Party B have commenced a Chapter 11 case by filing a voluntary petition for reorganization under Chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 with the United States Bankruptcy Court for the Southern District of New York on January __, 2010. Such filing constitutes an Event of Default under Section 5(a)(vii) of the Agreement. Party A hereby waives such Event of Default. In addition, Party A hereby waives (1) any Event of Default under Section 5(a)(vi) of the Agreement in existence on the date hereof and (2) the Event of Default under Part 5(2) of the Schedule to the Agreement in existence on the date hereof.

Party A and Party B agree that the Agreement shall be amended and restated in its entirety as of the Restatement Date (as defined in the Credit Agreement referred to below), in the form of the Agreement as in effect as of the date hereof, with the following amendment:

Part 5(1) of the Schedule to the Agreement shall be amended to read as follows:

"(1) "Credit Agreement" means the Amended and Restated Credit Agreement, dated as of _____, 2010, among each Party B, the Guarantors from time to time party thereto, the Lenders from time to time party thereto and General Electrical Capital Corporation, as Administrative Agent, as further amended, supplemented or otherwise modified from time to time; provided that if the obligations under the Credit Agreement are paid in full, the Credit Agreement is otherwise terminated or cancelled, or Party A shall for any reason cease to remain a party thereto, Credit Agreement means the Credit Agreement as it existed immediately prior to

such event. Capitalized terms defined therein and not otherwise defined herein shall have the meanings assigned in the Credit Agreement."

Except for the amendment to the Agreement set forth above, all terms and conditions of the Agreement will continue in full force and effect in accordance with its provisions on the date hereof.

This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.

Party A reserves all rights under the Agreement and applicable law.

Very truly yours,

PENTON MEDIA, INC.,
as PARTY B

By: _____
      Name:
      Title:

PENTON BUSINESS MEDIA INC., as PARTY B

By: _____
      Name:
      Title:

Accepted and agreed to by the undersigned
as of the date first written above:

JPMORGAN CHASE BANK, N.A., as
PARTY A

By: _____
      Name:
      Title:

As of January __, 2010

UBS AG
677 Washington Boulevard
Stamford, CT  06901

Re: ISDA Master Agreement

Ladies and Gentlemen:

Reference is made to (i) the ISDA Master Agreement, dated February 22, 2007 (together with the Schedule and all Confirmations thereto, the "Agreement"), between UBS AG ("Party A") and Penton Media, Inc. and Penton Business Media Inc. (together, collectively, "Party B"), and (ii) the Restructuring Support Agreement (the "RSA"), dated as of January __, 2009, among Penton Business Media Holdings, Inc. ("Holdings"), Party A, certain other subsidiaries of Holdings party thereto, General Electric Capital Corporation, as administrative agent under the First Lien Credit Agreement (as defined therein), the consenting lenders under the First Lien Credit Agreement, Wells Fargo Bank, National Association, as administrative agent under the Second Lien Credit Agreement (as defined therein), the consenting lenders under the Second Lien Credit Agreement and the Equity Investors (as defined therein).  Capitalized terms used and not defined herein have the meanings given to them in the Agreement.

WAIVER

Party A hereby waives any and all Potential Events of Default, Events of Default or Termination Events (i) that exists as of the date hereof or (ii) that may occur (including, without limitation, Events of Default under Sections 5(a)(vi) (*Cross Default*), 5(a)(vii) (*Bankruptcy*), 5(a)(viii) (*Merger Without Assumption*) and Termination Events under Sections 5(b)(iv) (*Credit Event Upon Merger Default*) and 5(b)(v) (*Additional Termination Events*)) as a result (whether directly or indirectly through the operation of cross default and similar provisions) of the consummation of the Transactions (as defined in the RSA), including, without limitation, the commencement of Chapter 11 Cases (as defined in the RSA) and the effective date of the Plan (as defined in the RSA); provided, however, that, notwithstanding the foregoing, if the Termination Date (as defined in the RSA) occurs, such waiver shall be terminated and Party A may pursue any right or remedy under the Agreement or initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect its rights under the Agreement.  To the extent the parties to the Agreement have specified in the Schedule to the Agreement that the "Automatic Early Termination" provision of Section 6(a) applies to Party B, the parties hereto hereby agree to amend the Agreement to provide that the "Automatic Early Termination" provision of Section 6(a) will not apply to Party A or Party B.

SUPPORT OF REORGANIZATION

Prior to the Termination Date (as defined in the RSA), Party A agrees that (a) it will not (i) object to confirmation of the Plan or object to, or otherwise commence any proceeding to oppose, alter, delay or impede the Plan, (ii) vote for, consent to, support or participate in the formulation of any plan of reorganization other than the Plan, (iii) directly or indirectly seek, solicit, negotiate, support or engage in any discussions regarding any chapter 11 plan other than the Plan, or any sale or disposition of Party B and its affiliates (or all or substantially all of its assets or equity), or any dissolution, winding up, liquidation, merger, transaction, reorganization or restructuring of Party B and its affiliates, in any case if such action reasonably could be expected to prevent, delay or impede the successful implementation of the Transactions as contemplated by the Plan, (iv) object to the Solicitation (as defined in the RSA) or support any such objection by a third party, or (v) take any other action not required by law that is inconsistent with, or that would materially delay, the confirmation or consummation of the Plan; and (b) it will (i) so long as its vote has been solicited in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code agrees to (A) vote (or cause the voting of) its claims arising from (as the case may be) the indebtedness under the Agreement (the "Debt") and all related claims, rights and causes of action arising out of or in connection with or otherwise relating to such Debt to accept the Plan, by delivering its duly executed and completed ballot accepting such Plan on a timely basis following the commencement of the Solicitation, and agrees that the solicitation period may be as short as five (5) business days.

The Agreement, as specifically amended or waived hereby, is and shall continue to be in full force and effect. This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.

Very truly yours,

PENTON MEDIA, INC.,
as PARTY B

By: _____
     Name:
     Title:

PENTON BUSINESS MEDIA INC., as PARTY B

By: _____
     Name:
     Title:

Accepted and agreed to by the undersigned
as of the date first written above:

UBS AG, as PARTY A

By: _____
      Name:
      Title:


By:
      Name:
      Title:

As of January __, 2010

Credit Suisse International
One Cabot Square
London E14 4QJ
England

Re: ISDA Master Agreement

Ladies and Gentlemen:

Reference is made to (i) the ISDA Master Agreement, dated February 22, 2007 (together with the Schedule and all Confirmations thereto, the "Agreement"), between Credit Suisse International ( "Party A") and Penton Media, Inc. and Penton Business Media Inc. (together, collectively, "Party B"), and (ii) the Restructuring Support Agreement (the "RSA"), dated as of December 23, 2009, among Penton Business Media Holdings, Inc. ("Holdings"), Party A, certain other subsidiaries of Holdings party thereto, General Electric Capital Corporation, as administrative agent under the First Lien Credit Agreement (as defined therein), the consenting lenders under the First Lien Credit Agreement, Wells Fargo Bank, National Association, as administrative agent under the Second Lien Credit Agreement (as defined therein), the consenting lenders under the Second Lien Credit Agreement and the Equity Investors (as defined therein). Capitalized terms used and not defined herein have the meanings given to them in the Agreement.

## WAIVER

Party A hereby waives any and all Potential Events of Default or Events of Default that may occur under Sections 5(a)(vi) (*Cross Default*) or 5(a)(vii) (*Bankruptcy*), as a result (whether directly or indirectly through the operation of cross default and similar provisions) of the consummation of the Transactions (as defined in the RSA), including, without limitation, the commencement of Chapter 11 Cases (as defined in the RSA) and the effective date of the Plan (as defined in the RSA).

## AMENDMENT OF ISDA MASTER AGREEMENT

The parties hereto hereby agree that the Agreement is amended to provide that the "Automatic Early Termination" provision of Section 6(a) will not apply to Party A or Party B.

## SUPPORT OF REORGANIZATION

Subject to the compliance of Party B with the immediately following paragraph, Party A agrees that (a) it will not (i) object to confirmation of the Plan or object to, or otherwise commence any proceeding to oppose, alter, delay or impede the Plan, (ii) vote for, consent to, support or participate in the formulation of any plan of reorganization other than the Plan, (iii) directly or indirectly seek, solicit, negotiate,

support or engage in any discussions regarding any chapter 11 plan other than the Plan, or any sale or disposition of Party B and its affiliates (or all or substantially all of its assets or equity), or any dissolution, winding up, liquidation, merger, transaction, reorganization or restructuring of Party B and its affiliates, in any case if such action reasonably could be expected to prevent, delay or impede the successful implementation of the Transactions as contemplated by the Plan, (iv) object to the Solicitation (as defined in the RSA) or support any such objection by a third party, or (v) take any other action not required by law that is inconsistent with, or that would materially delay, the confirmation or consummation of the Plan; and (b) it will (i) so long as its vote has been solicited in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code agrees to (A) vote (or cause the voting of) its claims arising from (as the case may be) the indebtedness under the Agreement (the "Debt") and all related claims, rights and causes of action arising out of or in connection with or otherwise relating to such Debt to accept the Plan, by delivering its duly executed and completed ballot accepting such Plan on a timely basis following the commencement of the Solicitation, and agrees that the solicitation period may be as short as five (5) business days.

The Agreement, as specifically amended or waived hereby, is and shall continue to be in full force and effect. Parties hereto hereby agree that at all times prior to the consummation of the Plan, each will ensure that the Agreement and all existing transactions under the Agreement remain in full force and effect and are not terminated or rejected without the consent of other party (except in the case of an Event of Default with respect to the other party to the extent not waived hereunder), and that the obligations of Party B under the Agreement are and will, following consummation of the Plan, be secured and guaranteed equally and ratably in all respects and at all times with all obligations to First Lien Lenders (as defined in the RSA) under the Amended and Restated Credit Agreement (as defined in the RSA).

This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.

Very truly yours,

PENTON MEDIA, INC.,
as PARTY B

By: _____

    Name:
    Title:

PENTON BUSINESS MEDIA INC., as
PARTY B

By: _____

    Name:
    Title:

Accepted and agreed to by the undersigned
as of the date first written above:

CREDIT SUISSE INTERNATIONAL, as
PARTY A

By: _____

    Name:
    Title:

By: _____

    Name:
    Title:

# **EXHIBIT V**

**PENTON BUSINESS MEDIA HOLDINGS, INC.**
**AMENDED AND RESTATED EQUITY INCENTIVE PROGRAM**

The Program provides for the grant to selected Employees, directors, independent contractors, consultants and agents of Penton Business Media Holdings, Inc. (f/k/a Prism Business Media Holdings Inc.), a Delaware corporation or its subsidiaries (the "Company"), of Stock Awards. This Program amends and restates the Equity Incentive Program of Prism Business Media Holdings Inc. (the "Prior Program"), such that all outstanding Stock Awards previously issued under the Prior Program as of the date of the adoption of this Program shall, without further action, be automatically converted into Stock Awards under this Program as of the POR Effective Date and all Stock Award Agreements are cancelled or amended in accordance with the POR Board Action.

1. Definitions. Terms used herein and not otherwise defined herein will have the meanings specified in the Stock Award Agreement or as set forth below:

"Affiliate" means any parent corporation or subsidiary corporation of the Company, as those terms are defined in Sections 424(e) and (f), respectively, of the Code, whether now or hereafter existing.

"Board" means the Board of Directors of the Company.

"CEO" means the Company's Chief Executive Officer or another officer of the Company specifically authorized from time to time by the Company's Chief Executive Officer to exercise approval rights under the Program.

"Charter" means the Certificate of Incorporation and Bylaws of the Company, as may be amended from time to time.

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Committee" has the meaning ascribed thereto in Section 2(c).

"Common Stock" means the common stock of the Company.

"Compelled Sale Notice" has the meaning ascribed thereto in Section 5(b).

"Compelled Sale Offer" has the meaning ascribed thereto in Section 5(a).

"Continuous Service" means:

(a) in the case of a Grantee who is an Employee, that the service of such Grantee as an Employee of the Company or its Affiliates is not interrupted or terminated for any reason, including death or disability. The Board will have the power to determine in its sole discretion whether Continuous Service will be considered interrupted in the case of (i) any leave of absence, including sick leave, military leave,

maternity leave or any other personal leave, (ii) inter-company transfers between the Company, its Affiliates and their successors, and (iii) any transaction to which the Company is a party.  Notwithstanding the foregoing, (A) the service of an Employee will not be deemed to be interrupted for any period for which the Employee is eligible for payments under the long-term disability plan for executives of the Company generally (such period, a "Disability Period") and (B) any Disability Period will not count toward any period required to satisfy any vesting requirement under a Stock Award, except as approved by the Board in its sole discretion; and

(b) in the case of a Grantee who is not an Employee, such additional conditions as to forfeiture that the Board may determine in its sole discretion and set forth in the Grantee's Stock Award Agreement.

"Employee" means any natural person employed on a full-time basis by the Company or any Affiliate of the Company.  Neither service as a director or consultant, nor payment of a director's or consultant's fee, will be sufficient in and of themselves to constitute "employment" by the Company or any of its Affiliates.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Exercise Price" means the purchase price payable upon exercise of an Option.

"Fair Market Value" means, as of any given day, (a) the Public Market Value per share of Common Stock or (b) if the Common Stock is not traded or quoted on any Stock Exchange on the day as of which the determination of Fair Market Value is to be made pursuant to the Program, the amount determined solely and definitively by the Board to be the fair market value of a share of Common Stock in its sole discretion.

"Grantee" means any recipient of a Stock Award.

"Incentive Stock Options" means Options that are intended to qualify as "incentive stock options" under Section 422 of the Code or any successor provision.

"IPO" means the initial public offering of the Common Stock pursuant to a registration statement filed pursuant to the Securities Act.

"Majority Stockholder" has the meaning ascribed thereto in Section 5(a).

"Nasdaq" means the National Association of Securities Dealers, Inc. Automated Quotation System.

"Option" means the right to purchase Common Stock upon exercise of an option granted pursuant to this Program.

"Optionee" means the optionee named in an agreement evidencing an outstanding Option.

2

"Original Incentives" has the meaning ascribed thereto in Section 7(b).

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity.

"POR Effective Date" means the date on which the Company's Pan of Reorganization, dated _____ __, 2010, (the "POR") became effective in its Chapter 11 Case.

"Program" means this Equity Incentive Program.

"Public Market Value" means, as of any given day, the average of the per share closing price of the Common Stock on the Stock Exchange on which such stock is traded or quoted (or, in the case of shares traded or quoted on Nasdaq or on the over-the-counter market, the average of the closing bid and asked prices of such shares), in each case, for the five business days prior to but excluding the day the determination of Public Market Value is to be made pursuant to the Program.

"Repurchase Date" has the meaning ascribed thereto in Section 6(c).

"Repurchase Notice" has the meaning ascribed thereto in Section 6(b).

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Seller" has the meaning ascribed thereto in Section 6(c).

"Selling Stockholder" has the meaning ascribed thereto in Section 5(a).

"Stock Exchange" means the New York Stock Exchange, Nasdaq or any other national securities exchange or dealer quotation system.

"Subsidiary" of a Person means another Person whose results of operations are required by U.S. GAAP to be consolidated with the results of operations of the first Person.

"Successor Award" means Stock Awards made by the Board as contemplated by Section 3(b).

"Surrendered Stock" has the meaning ascribed thereto in Section 6(c).

"Third Party" means a Person who is not the Company or any of its Affiliates.

"Stock Award" means any right granted under the Program, including a grant of Common Stock and options to purchase Common Stock.

"Stock Award Agreement" means a written agreement between the Company and a holder of a Stock Award evidencing the terms and conditions of an individual

Stock Award grant. Each Stock Award Agreement will be subject to the terms and conditions of the Program. Unless otherwise determined by the Board, Stock Award Agreements will be in such form as the Board approves from time to time.

"U.S. GAAP" means accounting principles generally accepted in the United States.

2. Administration. (a) The Program will be administered by the Board unless and until the Board delegates administration to a Committee or the CEO as provided in Section 2(c).

(b) The Board will have the power, subject to, and within the limitations of, the express provisions of the Program:

(i) To determine from time to time which Persons will be granted Stock Awards; when and how each Stock Award will be granted; the number of Stock Awards; the class of stock to which such Stock Award is made; and the other terms of each Stock Award granted (which need not be identical), including the time or times when a Stock Award will vest or be exercisable;

(ii) To construe and interpret the Program, and to establish, amend and revoke rules and regulations for the Program's administration. The Board, in the exercise of this power, may (A) correct any defect, omission or inconsistency in the Program or in any Stock Award Agreement in a manner and to the extent it may deem necessary or expedient to make the Program fully effective (and it will be the sole and final judge of such expediency) and (B) make any other determination that the Board is authorized to make under the Program (including, without limitation, any determination under Section 4(b));

(iii) To amend the Program as provided in Section 7(j); and

(iv) Generally, to exercise such powers and to perform such acts as the Board deems necessary or expedient to promote the best interests of the Company which are not in conflict with the express terms of the Program.

(c) The Board may delegate administration of the Program to the CEO or one or more committees appointed by the Board from among its members (a "Committee"). The Committee will have, in connection with the administration of the Program, the powers theretofore possessed by the Board. The Board may abolish any Committee at any time and revert in the Board the administration of the Program.

(d) None of the directors or stockholders of the Company, the CEO or any other Person acting pursuant to authority delegated by the Board will be personally liable for any action or determination under the Program. Accordingly, by accepting a Stock Award, a Grantee will be deemed without further action to have irrevocably agreed that no claim or demand may be made hereunder or in respect of any Stock Award against any Person other than the Company itself.

4

(e) On _____ __, 2010, the Company commenced reorganization proceedings (the "Chapter 11 Case") including among other things filing the POR. Pursuant to the authority herein granted, Stock Award Agreements were amended, effective without future action, by action of the Board (the "POR Board Action") to provide for the cancellation of all Stock Awards so as to cancel them or adjust them, in either case, in such manner as the Board determined to be equitable in the circumstances to reflect the changes in the Company's capital structure effected by the POR.

3. Stock Awards. (a) Successor Awards. Any portion of a Stock Award that is forfeited for any reason may be awarded by the Board to another Grantee. Any such award is hereafter referred to as a "Successor Award." The provisions hereof applicable to Stock Awards will also apply to Successor Awards, and as used hereafter the term "Stock Awards" will include any Successor Awards and any Stock Award amended as herein contemplated, including without limitation, pursuant to the POR Board Action.

(b) Conditions Applicable to Stock Awards. All Stock Awards will be subject to the terms and conditions set forth in the Program and to such other conditions as are reflected in the Stock Award Agreement approved by the Board. The following provisions are also applicable to all Stock Awards:

(i) Requirement of Employment or other Engagement. If the Grantee's Continuous Service terminates prior to the fulfillment of the conditions for vesting or exercise of Stock Awards, as set forth in the specific Stock Award Agreement, all Stock Awards held by the Grantee that are still subject to vesting or that are not then exercisable will be forfeited and will be deemed without further action to have been immediately transferred to the Company. Such Stock Awards will revert to and again become available for issuance as Successor Awards under the Program in accordance with Section 3(b). However, the Board may provide for partial or complete exceptions to this requirement as it deems equitable.

(ii) Consideration. By accepting a Stock Award, a Grantee will be deemed without further action to have irrevocably agreed that he or she has not given any consideration (including, without limitation, past services or continued employment) for a Stock Award.

(c) Options. The Board may, from time to time and upon such terms and conditions as it may determine, authorize the granting of Options. Each such grant shall be subject to all of the requirements contained in the following provisions and such other terms as the Board shall determine:

(i) Each grant shall specify the number of shares of Common Stock to which it pertains, subject to the limitations set forth in this Program.

(ii) Each grant shall specify an Exercise Price per share, which, in the case of an Incentive Stock Option, may not be less than the Fair Market Value on

5

the Date of Grant, but otherwise may be more or less than the Fair Market Value on the Date of Grant. The Exercise Price shall be payable (x) in cash or by other consideration acceptable to the Company, (y) by the actual or constructive transfer to the Company of Common Stock owned by the Optionee for at least six months having a value at the time of exercise equal to the total Exercise Price or (z) by a combination of such methods of payment. Any grant may provide for deferred payment of the Exercise Price from the proceeds of sale through a broker on a date satisfactory to the Company of some or all of the Common Stock to which such exercise relates.

(iii)  Each grant shall specify the period or periods of Continuous Service by the Optionee with the Company that is or are necessary before the Options or installments thereof will become exercisable at or after grant and may provide for earlier exercise of the Option, including, without limitation, in the event of a change in control of the Company or similar event.

(iv)  Options granted under this Program may be (x) options that are intended to qualify under particular provisions of the Code, including, without limitation, Incentive Stock Options, (y) options that are not intended so to qualify under the Code or (z) combinations of the foregoing. Incentive Stock Options may only be granted to participants who meet the definition of "employees" under Section 3401(c) of the Code. To the extent required for "Incentive Stock Option" status under Section 422 of the Code, the aggregate Fair Market Value (determined as of the Date of Grant) of the Common Stock with respect to which Incentive Stock Options are exercisable for the first time by the Optionee during any calendar year under the Program and/or any other stock option plan of the Company (within the meaning of Section 424 of the Code) shall not exceed $100,000.

(v)  Except as otherwise determined by the Board, no Option shall be transferable by the Optionee except by will or the laws of descent and distribution. Except as otherwise determined by the Board, Options shall be exercisable during the Optionee's lifetime only by the Optionee or, in the event of the Optionee's legal incapacity to do so, the Optionee's guardian or legal representative acting on behalf of the Optionee in a fiduciary capacity under state law and court supervision.

(vi)  No Option shall be exercisable more than ten years after the later of the Date of Grant and the POR Effective Date.

(vii)  The Board may permit Optionees to elect to defer the issuance of Common Stock under this Plan pursuant to such rules, procedures, or programs as it may establish for purposes of this Plan. The Board also may provide that deferred issuances and settlements include the payment or crediting of dividend equivalents or interest on the deferral amounts.

6

       (viii)  Any grant may specify performance conditions that must be satisfied as a condition to the exercise or early exercise of the Option.

Nothing in this Section 3(c) limits the authority of the Board pursuant to any other provisions hereof in respect of any type of Stock Award other than Options.

    4.  <u>Stock Available for Stock Awards</u>.  (a)  <u>Stock Subject to Issuance or Transfer</u>. The aggregate number of shares of Common Stock that may be issued or transferred under the Program will be not more than 10% of the total number of shares outstanding immediately after the POR Effective Date (subject to adjustment as contemplated by Section 4(b)).  The number of shares of Common Stock available for Stock Awards at any given time will be reduced by the aggregate of all shares of Common Stock previously issued pursuant to the Program and may be increased by the Board with the approval or consent of holders of a majority of the then issued an outstanding Common Stock (whether at a stockholders meeting or otherwise).

    (b)  <u>Adjustments Upon Changes in Capitalization or Other Events</u>.  Subject to the other provisions of this Section 4(b), upon changes in the capitalization of the Company or the Common Stock, including, without limitation, by reason of a recapitalization, merger, consolidation, combination or exchange of shares, stock reorganization or liquidation or such other event as the Board determines to require action as hereafter provided, the number and class of stock available under the Program as to which Stock Awards may be made (both in the aggregate and to any one Grantee), the number and class of stock under each then-outstanding Stock Award or such other term of any Stock Award as the Board determines to require action as hereafter provided, will be correspondingly adjusted by the Board if and to the extent that the Board determines in its sole discretion that such adjustment is appropriate to equitably reflect such event. Notwithstanding the foregoing, upon changes in the capitalization of the Company or the Common Stock by reason of a stock dividend, stock split or reverse split, the number and class of stock available under the Program as to which Stock Awards may be made (both in the aggregate and to any one Grantee), and the number and class of stock under each then-outstanding Stock Award will be correspondingly adjusted.  In no event, however, will any change be required as the result of the Company's issuance of Common Stock hereunder or of Common or Preferred Stock or other equity securities to any Person in a transaction not otherwise described in this Section 4(b) for value determined by the Board in its sole discretion to constitute fair consideration therefor.

    5.  <u>Drag-Along Rights</u>.  (a)  In connection with a bona fide offer (a "<u>Compelled Sale Offer</u>") by a Third Party to purchase Common Stock or the equity securities of the direct or indirect stockholders of the Company (a "<u>Selling Stockholder</u>"), the holder of a majority of shares of Common Stock (on an as converted basis) (the "<u>Majority Stockholder</u>") may, but will not be required to, require each Grantee to sell to such Third Party the number of Stock Awards and/or Common Stock issued thereunder then held by such holder <u>multiplied by</u> a fraction, the numerator of which is the total number of shares of Common Stock then held directly or indirectly by such Selling Stockholder which the Selling Stockholder then desires to sell pursuant to such Compelled Sale

Offer and the denominator of which is the total number of shares of Common Stock then held directly or indirectly by such Selling Stockholder on an as converted basis.

(b)  If the Majority Stockholder elects to exercise the right to compel a sale pursuant to this Section 5, the Majority Stockholder will deliver written notice (the "Compelled Sale Notice") of the Compelled Sale Offer to the Company (on behalf of the holders of Common Stock) and the Company will forward such written notice to the Grantees no later than 15 days prior to the proposed date of consummation of the transactions contemplated by the Compelled Sale Offer, setting forth the consideration (which will be the same form of consideration as offered to the Selling Stockholder) and conditions thereof.  If the Compelled Sale Offer consists in whole or in part of consideration other than cash, the Selling Stockholder will provide such information, to the extent reasonably available to the Selling Stockholder, relating to such consideration as the Company (on behalf of the holders of Common Stock) may reasonably request in order to evaluate such non-cash consideration.  The Grantees (i) will be required to make representations, warranties, indemnifications and other covenants in the definitive documentation relating to the Compelled Sale Offer which are substantially similar to those made by the Selling Stockholder and which are otherwise required by the Third Party purchaser in the Compelled Sale Offer and (ii) will otherwise take all necessary action to cause consummation of the transactions contemplated by the Compelled Sale Offer.

(c)  Each Grantee will deliver to the Company in escrow, not later than five business days prior to the proposed date of consummation of the transactions contemplated by the Compelled Sale Offer, the certificate or certificates, if any, representing all of the Stock Awards and/or Common Stock owned by such holder that are subject to the Compelled Sale Offer, duly endorsed for sale to the Third Party purchaser, together with a limited power-of-attorney authorizing the Selling Stockholder to transfer such Stock Awards and/or Common Stock pursuant to the terms and conditions set forth in the Compelled Sale Offer. If any Grantee fails to deliver such certificates to the Company so endorsed, then, in addition to, and without limiting or affecting any other rights or remedies that the Selling Stockholder may have, the Company will cause the books and records of the Company to show that such Stock Awards and/or Common Stock are subject to the provisions of this Section 5 and may be sold only to the Third Party purchaser upon payment of the purchase price without interest thereon and upon surrender for sale by such holder.

(d)  The Selling Stockholder will have six months from the date of the Compelled Sale Notice to sell to such Third Party, on substantially the terms set forth therein, all or any portion of the Stock Awards and/or Common Stock subject to the Compelled Sale Offer.  Promptly after consummation of any such sale pursuant to this Section 5 (including the delivery of the Stock Awards and/or Common Stock by the holders thereof), the Company will notify the Grantees of such consummation and will remit to each such holder the proceeds (less the applicable Exercise Price and a pro rata portion of out-of-pocket expenses incurred by or on behalf of such Selling Stockholder in connection with such sale, if any) attributable to the sale of such holder's Stock Awards and/or Common Stock.  If any sale to a Third Party purchaser is not

8

consummated by the expiration of the six-month period referred to in this Section 5(d), then, without prejudice to the right of the Majority Stockholder to seek to compel a sale under this Section 5 in the future, the Company will return to each Grantee all certificates, if any, representing the Stock Awards and/or Common Stock of such holder that were delivered by such holder to the Company in accordance with Section 5(c).

(e)  Notwithstanding anything in this Section 5 to the contrary, there will be no liability on the part of the Majority Stockholder or the Selling Stockholder to any Grantee for the failure to consummate a Compelled Sale Offer.  It is understood that the Selling Stockholder, in its sole discretion, will determine whether to effect a sale of any Stock Awards to any Person pursuant to this Section 5.

6.  Repurchase of Stock Awards.  (a)  Upon any termination of a Grantee's Continuous Service with the Company for any reason or no reason, the Company may elect, at any time within one year after such termination (90 days in the case of any Grantee employed in the State of California), to require Grantee or Grantee's permitted successors or assigns to sell to the Company (or to the Company's designee), and Grantee or Grantee's permitted successors or assigns will sell, all or any portion of the vested Stock Awards and/or Common Stock issued thereunder owned by Grantee or Grantee's permitted successors or assigns in accordance with this Section 6.  The price at which such vested Stock Awards and/or Common Stock issued thereunder may be repurchased will be an amount equal to the product of (A) the Fair Market Value of such Common Stock issued or issuable thereunder as of the date of such termination of such Continuous Service less any applicable Exercise Price, multiplied by (B) the number of vested or exercisable Stock Awards and/or shares of Common Stock issued thereunder so repurchased.

(b)  If the Company elects to exercise its right to require Grantee or Grantee's permitted successors or assigns to sell vested or exercisable Stock Awards and/or Common Stock issued thereunder pursuant to this Section 6, the Company will deliver a written notice (a "Repurchase Notice") to Grantee or Grantee's permitted successor or assign to such effect.

(c)  The vested Stock Awards and/or Common Stock issued thereunder specified in the Repurchase Notice as being subject to repurchase (the "Surrendered Stock") will be surrendered for repurchase within 10 business days after the determination of the Fair Market Value (or the Public Market Value, if applicable) (the "Repurchase Date"). On the Repurchase Date, Grantee or Grantee's permitted successor or assign selling such Surrendered Stock (the "Seller") will (A) represent and warrant to the Company that the Seller has good and valid title to such Surrendered Stock free and clear of any liens, except as provided in this Agreement, and (B) deliver to the Company the certificate or certificates representing the Surrendered Stock owned by the Seller on such date against delivery by the Company of the repurchase amount to the Seller, in cash or check.  All certificates for Surrendered Stock will be duly endorsed in favor of the Company by the Seller in whose name such certificate or certificates is registered, or be accompanied by a duly executed stock or security assignment in favor of the Company, in each case, with the signature thereon guaranteed by a commercial bank

9

or trust company or a member of a national securities exchange or the National Association of Securities Dealers, Inc.  If any Seller fails to deliver such certificate or certificates to the Company within the time required, the Company will cause its books and records to show that the applicable Surrendered Stock is bound by the provisions of this Section 6 and that the Surrendered Stock, until transferred to the Company, will not be entitled to any proxy, dividend or other rights from the date by which such certificate or certificates should have been delivered to the Company.

(d)  The Company will have the right to resell any Surrendered Stock received from a Seller pursuant to this Section 6, whether or not the applicable repurchase price has been paid to such Seller; provided, however, that any such sale or other disposition by the Company of Surrendered Stock will not relieve the Company of its obligation to pay to the Seller the applicable repurchase price for such Surrendered Stock.

(e)  Upon any termination of Grantee's Continuous Service with the Company for any reason or no reason, all of Grantee's Stock Awards which are not then vested or exercisable will be forfeited and deemed canceled for no additional consideration.

7.  General Provisions. (a)  Prohibitions Against Transfer.  The Stock Awards and, prior to the Company's IPO, any Common Stock issued thereunder (or any interest therein), may not be assigned, sold, pledged or otherwise transferred except as expressly permitted herein or in the Stock Award Agreement.  The Board may, in its sole discretion, grant to or withhold from any Grantee rights to transfer or convey the Common Stock issued thereunder prior to the IPO and will not unreasonably withhold its approval of a Grantee's transfer of Common Stock issued thereunder to a trust established for charitable or estate planning purposes so long as (i) such Grantee is the sole trustee and, accordingly, has sole voting and other dispositive powers over the Common Stock issued thereunder to be so transferred and (ii) the terms of the trust expressly acknowledge and agree to the limitations herein and in the applicable Stock Award Agreement.  Each certificate for Common Stock and Stock Awards issued or transferred under a Stock Award will contain a legend giving appropriate notice of the restrictions applicable to the Common Stock and such Stock Award.  The Board may, in its sole discretion, require that such certificates be placed into escrow with the Company prior to an IPO.

(b)  Substitute Stock Awards.  The Board may make a Stock Award to an employee of another company who becomes eligible for the receipt of Stock Awards by reason of a merger, consolidation, acquisition of stock or property, share exchange, reorganization or liquidation involving the Company in substitution for a stock option, stock appreciation right, performance award or other equity award previously granted by such company (the "Original Incentives").  The terms and conditions of the substitute Stock Award may vary from the terms and conditions required by the Program and from those of the Original Incentives.  The Board will prescribe the exact provisions of the substitute Stock Awards, preserving the provisions of the Original Incentives to the extent required.

10

(c)  No Right to Employment.  The Program and the Stock Awards under it will not confer upon any Grantee the right to continue in the employment of the Company or affect in any way the right of the Company to terminate the employment of a Grantee at any time.

(d)  Severability.  If any provision of the Program or Stock Award Agreement, or any term or condition of any Stock Award granted or form executed or to be executed thereunder, or any application thereof to any Person or circumstances is invalid, such provision, term, condition or application will to that extent be void (or, in the discretion of the Board, such provision, term or condition may be amended so as to avoid such invalidity or failure), and will not affect other provisions, terms or conditions or applications thereof, and to this extent such provisions, terms and conditions are severable.

(e)  Effectiveness of Stock Award.  No Stock Award will be valid until a Stock Award Agreement is duly executed by the Company and the Grantee.  Thereafter, such Stock Award will be effective as of the effective date set forth in the Stock Award Agreement.

(f)  Compliance with Law.  The Program and the obligations of the Company hereunder will be subject to all applicable laws and to approvals by any governmental or regulatory agency as may be required.  Nothing herein will be deemed to require the Company to apply for or to obtain any listing, registration, qualification or other action to issue Common Stock or any other consideration thereunder.  The Company may require that certificates evidencing Stock Awards or Common Stock delivered pursuant to any Stock Award made hereunder bear a legend indicating that the sale, transfer or other disposition thereof by the holder is prohibited except in compliance with the Securities Act.  By accepting a Stock Award, a Grantee will be deemed to have represented and warranted that such person is acquiring the Stock Award and/or Common Stock subject to the Stock Award, as the case may be, for his or her own account for investment and not with any present intention of selling or otherwise distributing the same.

(g)  Governing Law.  The provisions of this Program will be governed and construed in accordance with the laws of the State of New York, without regard to its principles of conflict of laws.

(h)  Statutorily Required Withholding Taxes.  No Common Stock will be delivered under the Program to any Grantee or successor Grantee upon any grant of a Stock Award until such Grantee or successor Grantee has made arrangements acceptable to the Board for the satisfaction of any statutorily required foreign, federal, state, or local income and employment tax withholding obligations, including, without limitation, obligations incident to the receipt of Common Stock.  Upon grant of a Stock Award or such other time as to which withholding may be required by law, the Company will withhold or collect from Grantee an amount in cash sufficient to satisfy such tax obligations.  The Board may, in its discretion and subject to such rules as the Board may adopt, permit the Grantee to satisfy, in whole or in part, any withholding tax

11

obligation which may arise in connection with the grant of a Stock Award by surrendering to the Company, or by electing to have the Company withhold, Common Stock having a Fair Market Value equal to the amount of the withholding tax (but only to the extent that such action would not result in an accounting compensation charge for financial reporting purposes with respect to the Common Stock used to satisfy the statutorily required withholding unless otherwise determined by the Board) or provide that the Company will be responsible for all or a portion of such taxes.

(i) <u>Other Tax Matters</u>.  To the extent that any provision of this Program would prevent any Option that was intended to qualify as an Incentive Stock Option from qualifying as such, that provision shall be null and void with respect to such Option. Such provision, however, shall remain in effect for other Options and there shall be no further effect on any provision of this Program.  The Program is intended to comply with Section 409A of the Code and shall be construed and interpreted in accordance with such intent.  Grants under this Plan shall be treated in a manner that will comply with Section 409A of the Code, including proposed, temporary or final regulations or any other guidance issued by the Secretary of Treasury and the Internal Revenue Service with respect thereto (the "<u>Guidance</u>").  Any provision of the Program that would cause a grant or any other payment under the Program to fail to satisfy Section 409A of the Code shall have no force and effect until amended to comply with Code Section 409A (which amendment may be retroactive to the extent permitted by the Guidance). Notwithstanding the foregoing, nothing herein shall create any obligation by the Company to any participant should any grant or other payment fail to satisfy Section 409A of the Code.

(j) <u>Amendments</u>.  Without limiting the generality or effect of any other provision contained herein, including, without limitation, the authority granted to the Board pursuant to Section 2, the Program or the Stock Award Agreements collectively may be amended in any respect the Board deems necessary or advisable without the consent of any Grantee, <u>provided</u> that such amendment applies on substantially the same terms to all then-existing and any subsequently entered into Stock Award Agreements.  Any such amendment will be binding on the Company and all Grantees, and no Grantee will have any cause of action against the Company or any other Person for any action taken by such Person in reliance upon or as a result of such approval.

(k) <u>Rights as a Stockholder; Information</u>.  No holder of any Option, as such, will be entitled to vote or receive dividends or be deemed the holder of Common Stock or any other securities of the Company which may at any time be issuable upon the exercise hereof for any purpose, nor will anything contained herein be construed to confer upon the holder of any Option, as such, any of the rights of a stockholder of the Company (including, without limitation, the right to demand copies of any books and records of the Company) or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to receive notice of meetings, or to receive dividends or subscription rights or otherwise until the Option has been exercised and the shares of Common Stock or other securities of the Company issuable thereunder have become deliverable, as provided herein.

(l)  <u>Restricted Distributions</u>.  If the Company makes a dividend or distribution to its stockholders in respect of any Common Stock subject to this Agreement that has not vested (such Common Stock that has not vested as of the date of any such distribution being referred to as "<u>Unvested Stock</u>"), Grantee hereby authorizes the Company, in its sole discretion, to cause any amounts distributable to Grantee with respect to any of the Unvested Stock (the "<u>Restricted Distributions</u>") to be deposited by the Company into an escrow account administered by the Company or its designee for the benefit of Grantee (the "<u>Escrow Fund</u>").  Upon the subsequent vesting of any of the Unvested Stock, the Company shall cause the portion of the Restricted Distributions, if any, along with accrued interest, if any, then held in the Escrow Fund with respect to such subsequently vested Unvested Stock to be released from the Escrow Fund and paid to Grantee.  In the event that any of the Unvested Stock is subsequently forfeited, any Restricted Distributions held in the Escrow Fund, along with accrued interest, if any, with respect to such forfeited Unvested Stock shall be immediately forfeited to the Company without notice for no consideration.

NYI-3973112v5

# **EXHIBIT VI**

# RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (this "***Agreement***"), dated as of January 20, 2010, is entered into by and among Penton Business Media Holdings, Inc. (f/k/a Prism Business Media Holdings Inc.) ("***Holdings***"), Penton Media, Inc. ("***Penton***"), Penton Business Media, Inc. (f/k/a Prism Business Media Inc.) ("***Penton Business Media***"), certain other subsidiaries of Holdings identified on the signature pages hereto (together with Holdings, Penton and Penton Business Media, the "***Company***"), General Electric Capital Corporation, as administrative agent under the First Lien Credit Agreement (as defined below) (the "***Administrative Agent***"), the undersigned lenders party to the First Lien Credit Agreement, solely in their capacity as such lender to the extent and as set forth on the signature page hereto (the "***Consenting First Lien Debt Holders***"), Wells Fargo Bank, National Association, as administrative agent under the Second Lien Credit Agreement (as defined below) (the "***Second Lien Agent***"), the undersigned lenders party to the Second Lien Credit Agreement, solely in their capacity as such lender to the extent and as set forth on the signature page hereto (the "***Consenting Second Lien Debt Holders***" and, collectively with the Consenting First Lien Debt Holders, the "***Consenting Holders***" and each, a "***Consenting Holder***") and the persons identified on <u>Schedule I</u> attached hereto (the "***Equity Investors***" and each, an "***Equity Investor***"). The Company, the Administrative Agent, the Second Lien Agent, each Consenting Holder, each Equity Investor and each person that becomes a party hereto in accordance with the terms hereof are collectively referred to herein as the "***Parties***" and individually as a "***Party***." Capitalized terms not defined in this introduction or in the recitals to this Agreement shall have the meanings assigned thereto in <u>Section 1</u> hereof.

# RECITALS

**WHEREAS**, as of the Effective Date, the Company is a party to (i) that certain First Lien Credit Agreement, dated as of February 1, 2007, as amended by that certain Consent and Amendment Agreement, dated as of November 24, 2009, that certain Amendment No. 2, dated as of December 23, 2009 and that certain Amendment No. 3, dated as of January [___], 2010, by and among Holdings, Penton, Penton Business Media, certain other subsidiaries of Holdings, the Administrative Agent, and the lenders party thereto (the "***First Lien Lenders***") (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***First Lien Credit Agreement***") and (ii) that certain Second Lien Credit Agreement, dated as of February 1, 2007, by and among Holdings, Penton, Penton Business Media, certain other subsidiaries of Holdings, the Second Lien Agent, and the lenders party thereto (the "***Second Lien Lenders***") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Second Lien Credit Agreement***");

**WHEREAS**, as of the Effective Date, the Consenting First Lien Debt Holders hold at least 66 2/3%[1] of the aggregate principal amount of the First Lien Debt and the Consenting Second Lien Debt Holders hold at least 66 2/3% of the aggregate principal amount of the Second Lien Debt;

---

[1] Must include the New Revolving Lenders (as defined in <u>Section 4(d)(ii)</u>).

**WHEREAS**, the Company, the Consenting Holders and the Equity Investors wish to reorganize and recapitalize the Company (the restructuring and recapitalization transactions, collectively, the "***Transactions***") pursuant to the Plan;

**WHEREAS**, it is anticipated that the Transactions will be implemented through a solicitation of votes for the Plan accompanied with a copy of the Disclosure Statement (the "***Solicitation***") pursuant to Section 4(2) of the Securities Act of 1933, as amended (the "***Securities Act***"), and sections 1125, 1126 and 1145 of the Bankruptcy Code (as defined below);

**WHEREAS**, upon the successful conclusion of the Solicitation, the Company intends to commence voluntary reorganization cases (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") to effect the Transactions pursuant to the Plan;

**WHEREAS**, the Company intends to file the Plan and related disclosure statement (the "***Disclosure Statement***") and other related documents and motions as set forth herein on the Commencement Date;

**WHEREAS**, the Company intends to effectuate a rights offering (the "***Rights Offering***") with the Second Lien Lenders pursuant to the terms of the term sheet attached hereto as Exhibit A (as amended, supplemented or otherwise modified as provided in this Agreement, the "***Rights Offering Term Sheet***");

**WHEREAS**, the Equity Investors have agreed to provide a backstop to the Rights Offering in a cash amount of between $37.8 and $48.1 million pursuant to the terms and conditions set forth on the backstop commitment letter attached hereto as Exhibit B (the "***Equity Commitment Letter***") and the Rights Offering Term Sheet; and

**WHEREAS**, the Company intends to use its commercially reasonable efforts to obtain Bankruptcy Court approval of the Plan in accordance with the Bankruptcy Code and on terms consistent with this Agreement and each Consenting Holder and each Equity Investor intends to use its commercially reasonable efforts to cooperate in that regard.

**NOW, THEREFORE**, in consideration of the foregoing, the covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.      Definitions.  As used in this Agreement, the following terms shall have the meanings specified below.

"***Acceptable Cash Collateral Order***" shall have the meaning set forth in Section 6(c) hereof.

"***Amended and Restated Credit Agreement***" shall mean that certain Amended and Restated Credit Agreement, in the form attached hereto as Exhibit C, as the same may be amended, supplemented or otherwise modified as provided in this Agreement.

"***Approved Plan Documents***" shall have the meaning set forth in <u>Section 2(a)</u> hereof.

"***Approving First Lien Debt Holders***" shall mean the Consenting First Lien Debt Holders comprising holders owning more than 66 2/3% in aggregate principal amount of the First Lien Debt.

"***CDG***" shall have the meaning set forth in <u>Section 5(c)</u> hereof.

"***Claims***" shall have the meaning set forth in <u>Section 4(b)</u> hereof.

"***Commencement Date***" shall have the meaning set forth in <u>Section 6(c)</u> hereof.

"***Debt***" shall have the meaning set forth in <u>Section 4(b)</u> hereof.

"***Effective Date***" shall have the meaning set forth in <u>Section 10</u> hereof.

"***First Lien Debt***" shall have the meaning set forth in <u>Section 4(b)</u> hereof.

"***First Lien Required Lenders***" shall mean the Consenting First Lien Debt Holders consisting of "Required Lenders" (under and as defined in the First Lien Credit Agreement).

"***Joinder***" shall have the meaning set forth in <u>Section 4(e)</u> hereof.

"***Joining Party***" shall have the meaning set forth in <u>Section 4(e)</u> hereof.

"***MidOcean***" shall mean MidOcean Partners III, L.P. or its affiliates.

"***New Revolving Lender***" shall have the meaning set forth in <u>Section 4(d)(ii)</u> hereof.

"***Plan***" shall mean the Joint Prepackaged Plan of Reorganization for Penton Media Holdings, Inc. and its Subsidiary Debtors, in the form as attached hereto as <u>Exhibit D</u>, as the same may be amended, supplemented or otherwise modified as provided in this Agreement.

"***Plan Related Documents***" shall mean the Plan and all documents required to effectuate the Plan, including, but not limited to, (a) the Disclosure Statement, (b) the materials related to the Solicitation, (c) the proposed confirmation order and (d) any other documents or agreements filed with the Bankruptcy Court by the Company or at the Company's direction that are necessary to implement the Plan, including: (1) any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the Disclosure Statement; (2) the Amended and Restated Credit Agreement and such other definitive documentation (including, without limitation, security documents) as is necessary to consummate the Transactions; (3) the amended certificate of incorporation and bylaws for Holdings as reorganized; and (4) any registration rights agreement, in each case as amended, supplemented or otherwise modified.

"***Required Consenting Holders***" shall mean the First Lien Required Lenders and the Second Lien Required Lenders.

"**Second Lien Debt**" shall have the meaning set forth in <u>Section 4(b)</u> hereof.

"**Second Lien Required Lenders**" shall mean the Consenting Second Lien Debt Holders consisting of "Required Lenders" (under and as defined in the Second Lien Credit Agreement); <u>provided</u> that such Second Lien Required Lenders includes the principal amount of the Second Lien Debt held by MidOcean and Wasserstein (unless MidOcean and Wasserstein transfer their Second Lien Debt or related Claims to third parties in accordance with this Agreement).

"**Termination Date**" shall have the meaning set forth in <u>Section 6</u> hereof.

"**Transfer**" shall have the meaning set forth in <u>Section 4(e)</u> hereof.

"**Wasserstein**" shall mean Wasserstein Partners, L.P. or its affiliates.

"**Weil**" shall have the meaning set forth in <u>Section 5(c)</u> hereof.

2.     <u>Plan</u>.

(a)     The Consenting Holders and the Equity Investors acknowledge and agree that the terms and conditions set forth in the Plan are acceptable in all respects to the Consenting Holders, the Equity Investors and their respective counsel.  The Plan Related Documents shall contain the terms and conditions set forth in the Plan, the Amended and Restated Credit Agreement and the Rights Offering Term Sheet, be in form and substance reasonably acceptable in all respects to the Company, the Required Consenting Holders, the Administrative Agent, the Second Lien Agent, the Equity Investors and, to the extent set forth in <u>Section 4(d)(ii)</u> hereof, the New Revolving Lenders, and be consistent with this Agreement in all material respects (such Plan Related Documents, the "**Approved Plan Documents**").

(b)     The Plan, the other Approved Plan Documents (other than the Amended and Restated Credit Agreement and the Loan Documents (as defined in the Amended and Restated Credit Agreement)) and the Rights Offering Term Sheet may each be amended only upon written approval of (i) the Company, (ii) the Approving First Lien Debt Holders, (iii) the Second Lien Required Lenders, (iv) the Administrative Agent, (v) the Second Lien Agent, (vi) the Equity Investors and (vii) to the extent set forth in <u>Section 4(d)(ii)</u> hereof, the New Revolving Lenders.

(c)     The Amended and Restated Credit Agreement and the Loan Documents (as defined in the Amended and Restated Credit Agreement) may each be amended only upon written approval of (i) the Company, (ii) the Approving First Lien Debt Holders, (iii) the Administrative Agent, (iv) the Equity Investors and (v) to the extent set forth in <u>Section 4(d)(ii)</u> hereof, the New Revolving Lenders.

(d)     This Agreement may be amended (so long as any such amendment is consistent with each of the Plan, the Amended and Restated Credit Agreement, the other Approved Plan Documents and the Rights Offering Term Sheet) only upon written approval of (i) the Company, (ii) the Administrative Agent, (iii) the Second Lien Agent, (iv) the Required Consenting Holders and (v) the Equity Investors.

3. <u>Bankruptcy Process</u>. The Company hereby agrees to use commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable in accordance with the Bankruptcy Code, and on terms consistent with this Agreement, the Plan and the other Approved Plan Documents, and each Consenting Holder and each Equity Investor shall use its commercially reasonable efforts to cooperate in that regard; <u>provided</u>, <u>however</u>, that the Company, the Administrative Agent, the First Lien Required Lenders, the Second Lien Required Lenders and the Equity Investors may from time to time mutually agree in writing to further extend any time period or deadline set forth herein.

4. <u>Support of the Reorganization; Additional Covenants</u>.

(a) Prior to the Termination Date, no Consenting Holder, the Administrative Agent, the Second Lien Agent or any Equity Investor will (i) object to confirmation of the Plan or object to, or otherwise commence any proceeding to oppose, alter, delay or impede the Plan, the Amended and Restated Credit Agreement, the other Approved Plan Documents or the Rights Offering Term Sheet, (ii) vote for, consent to, support or participate in the formulation of any plan of reorganization other than the Plan, (iii) directly or indirectly seek, solicit, negotiate, support or engage in any discussions regarding any chapter 11 plan other than the Plan, or any sale or disposition of the Company (or all or substantially all of its assets or equity), or any dissolution, winding up, liquidation, merger, transaction, reorganization or restructuring of the Company, in any case if such action reasonably could be expected to prevent, delay or impede the successful implementation of the Transactions as contemplated by the Plan, the Amended and Restated Credit Agreement, the other Approved Plan Documents and the Rights Offering Term Sheet, (iv) object to the Solicitation or support any such objection by a third party, or (v) take any other action not required by law that is inconsistent with, or that would materially delay, the confirmation or consummation of the Plan.

(b) Unless the Termination Date has occurred, each Consenting Holder (i) so long as its vote has been solicited in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code, including but not limited to its receipt of the Disclosure Statement, agrees to (A) vote (or cause the voting of) its claims arising from (as the case may be) the indebtedness under the First Lien Credit Agreement (the "***First Lien Debt***") and the indebtedness under the Second Lien Credit Agreement (the "***Second Lien Debt***" and, together with the First Lien Debt, the "***Debt***") and all related claims, rights and causes of action arising out of or in connection with or otherwise relating to such Debt (collectively, the "***Claims***") to accept the Plan, by delivering its duly executed and completed ballot accepting such Plan on a timely basis following the commencement of the Solicitation, and agrees that the solicitation period may be as short as five (5) business days; <u>provided</u>, <u>however</u>, that such vote shall be immediately revoked and deemed void *ab initio* upon termination of this Agreement and written notice to the Company, pursuant to the terms hereof; and (B) not change or withdraw (or cause to be changed or withdrawn) such vote, and (ii) consents to the treatment of the Claims as set forth in the Plan. Notwithstanding anything contained herein to the contrary, other than as set forth in the preceding sentence, no Consenting Holder shall be required to file any pleadings or take any other action in support of the Plan that would require it to hire and pay for counsel to represent it unless the Company agrees (and is authorized and directed by the Bankruptcy Court) to pay the fees and expenses of such counsel.

(c)     Each Equity Investor hereby commits to make an equity investment in Holdings on the terms and subject to the conditions set forth in the Equity Commitment Letter and the Rights Offering Term Sheet.

(d)     Unless the Termination Date has occurred:

(i) each Consenting First Lien Debt Holder agrees that it shall vote or otherwise take reasonable actions to amend the First Lien Credit Agreement, effective upon the effective date of the Plan, in the manner contemplated by the Amended and Restated Credit Agreement and the other Approved Plan Documents; and

(ii) each Consenting First Lien Debt Holder, whose name is set forth on Schedule II hereto, by execution of this Agreement, hereby commits to make the "Revolving Facility Loans" under the Amended and Restated Credit Agreement in an amount equal to the Revolving Facility Commitment of such Consenting First Lien Debt Holder set forth on Schedule II (such person, a "*New Revolving Lender*"), in each case, on the terms, and subject to the conditions, set forth in the Amended and Restated Credit Agreement; provided, however, that if the Amended and Restated Credit Agreement or the Plan is amended and such amendment adversely affects any New Revolving Lender, the commitment of each such New Revolving Lender under this Section 4(d)(ii) shall be subject to such New Revolving Lender's consent to the applicable amendment.

(e)     Prior to the Termination Date, each Consenting Holder agrees that it shall not sell, transfer, assign or otherwise dispose (each such sale, transfer, assignment or disposition, a "*Transfer*") of any of the Debt or Claims, or any option therein or any right or interest (voting or otherwise) therein, unless the transferee (the "*Joining Party*") is a Consenting Holder or agrees in writing to be bound by all of the terms of this Agreement by executing a joinder (the "*Joinder*") in the form attached hereto as Exhibit E, without modification (such Joining Party, if any, to also be deemed to be a "*Consenting First Lien Debt Holder*" or "*Consenting Second Lien Debt Holder*," as the case may be, a "*Consenting Holder*" and a "*Party*" hereunder), and otherwise complies with the assignment provisions set forth in Section 10.04, respectively, of the First Lien Credit Agreement and the Second Lien Credit Agreement, as applicable. If a transferee of any of the Debt or Claims is not a Consenting Holder or does not execute a Joinder and comply with such assignment provisions upon the completion of such Transfer of the Debt or Claims, then such Transfer of the Debt, Claims or related option, right or interest shall be deemed void *ab initio*. This Agreement shall in no way be construed to preclude any Consenting Holder from acquiring additional Debt, Claims or equity interests in the Company; provided, however, that any such additional holdings shall automatically be deemed to be subject to all of the terms of this Agreement, without modification, and each such Consenting Holder agrees that such additional Debt, Claims or equity interests shall be subject to this Agreement and that it shall vote (or cause to be voted) any such additional Debt, Claims or equity interests entitled to vote on the Plan (in each case, to the extent still held by it or on its behalf at the time of such vote) in a manner consistent with this Section 4. Subject to the terms and conditions of any order of the Bankruptcy Court, unless the Termination Date has occurred, each Consenting Holder agrees to provide to the Administrative Agent, the Second Lien Agent and to Company's counsel (i) a copy of any Joinder and (ii) a notice of the Transfer or acquisition of any additional Debt, Claim or equity interest in the Company, in each case within three (3) business days of the consummation of such Transfer or acquisition. With respect to the aggregate principal amount

of any Debt or Claims held by the Joining Party upon consummation of a Transfer of such Debt or Claims, the Joining Party, by executing and delivering the Joinder, makes the representations and warranties of the Consenting Holders set forth in <u>Section 8</u> of this Agreement to each of the other Parties to this Agreement as of the date such Joinder is effective.

(f) Prior to the Termination Date, each Consenting Holder agrees that it shall not (i) pursue any right or remedy under the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable, or (ii) initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Debt, Claims or equity interests in the Company, other than to enforce this Agreement.

(g) Notwithstanding the foregoing, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and the Transactions and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the confirmation of the Plan or consummation of the Transactions pursuant to the Plan.

(h) Each Consenting Second Lien Debt Holder has indicated on its signature page hereto whether it (i) intends to elect Cash or Stock (each, as defined in the Plan) of Reorganized Holdings (as defined in the Plan) in respect of its Class 3 Claim (as set forth in the Plan) and (ii) will participate in the Rights Offering; <u>provided</u>, <u>however</u>, that each Consenting Second Lien Debt Holder hereby acknowledges and agrees that it may not purchase common stock of Reorganized Holdings (as defined in the Plan) under the Rights Offering or elect to receive Stock (as defined in the Plan) in respect to such claim pursuant to the Plan except and only to the extent indicated in the Second Lien Lender Elections (as defined in the Plan).

5. <u>Agreements of the Company</u>.

(a) <u>Additional Transaction Matters</u>. The Company hereby agrees (i) to use its reasonable best efforts to prepare or cause the preparation of the Plan and the other Plan Related Documents (other than the Amended and Restated Credit Agreement and the security and other documents related thereto, which shall be prepared by the Administrative Agent), (ii) to take all necessary and appropriate actions to achieve confirmation of the Plan and (iii) that it shall provide draft copies of all "first day" motions, and, to the extent reasonably practicable, all other motions, applications and other documents the Company intends to file with the Bankruptcy Court related to the Plan to counsel for the Administrative Agent, counsel for the Second Lien Agent and counsel for the Equity Investors as soon as reasonably practicable before such documents are filed with the Bankruptcy Court, and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing.

(b) <u>Commitment of the Company</u>. Subject to its fiduciary duties (as set forth in <u>Section 26</u> hereof), the Company agrees to use its commercially reasonable efforts to (i) obtain confirmation of the Plan by the Bankruptcy Court and consummate the Transactions pursuant to the Plan and all other actions contemplated under the Approved Plan Documents, (ii) take any and all necessary and appropriate actions in furtherance of the Transactions and the other actions contemplated under the Approved Plan Documents, (iii) obtain any and all required regulatory

approvals and material third-party approvals for the Transactions, and (iv) not take any actions inconsistent with this Agreement, the Plan, the Amended and Restated Credit Agreement, the other Approved Plan Documents, the Rights Offering Term Sheet, or the confirmation and consummation of the Plan.  Subject to its fiduciary duties (as set forth in Section 26 hereof), the Company shall not, directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to, or enter into any agreements relating to, any restructuring, plan of reorganization, dissolution, winding up, liquidation, reorganization, merger, transaction, sale, or disposition of the Company (or all or substantially all of its assets or equity) other than as set forth in the Plan, nor shall the Company solicit or direct any person or entity, including, without limitation, any member of the Company's board of directors or any holder of equity in the Company, to undertake any of the foregoing; provided, however, that the Company may agree to modifications to the Plan, the Amended and Restated Credit Agreement, any other Approved Plan Document, and the Rights Offering Term Sheet, as provided herein.

(c)     Advisors.  The Company shall pay all fees and expenses of (i) Weil, Gotshal & Manges LLP, counsel to the Administrative Agent ("**Weil**"), (ii) Conway Del Genio Gries & Co., LLC, financial advisors to Weil ("**CDG**") and (iii) Pillsbury Winthrop Shaw Pittman LLP ("**Pillsbury**"), counsel to the Second Lien Agent, which are due and owing prior to the Termination Date of this Agreement.

(d)     Reporting.  The Company shall comply with all reporting requirements under the First Lien Credit Agreement and the Second Lien Credit Agreement.

6.     Termination of Agreement.  This Agreement shall terminate automatically without any further action required by any Party hereto, unless extended by the Company, the Administrative Agent, the Second Lien Agent, the Required Consenting Holders and the Equity Investors, in writing, upon the earliest to occur of the following (the date and time of such termination, the "**Termination Date**"); provided, however that Section 6(b) below can be waived or extended, in part or in whole, by the Company, the Administrative Agent, the Required First Lien Lenders and the Equity Investors without the consent of any other Party hereto:

(a)     at 5:00 P.M. prevailing Eastern Time on January 22, 2010 unless the Company has commenced the Solicitation;

(b)     at 5:00 P.M. prevailing Eastern Time on January 29, 2010 if the Plan shall not have received the acceptances of at least 66 2/3% of the aggregate principal amount of the First Lien Debt and Second Lien Debt, respectively, and more than 50% of the number of holders of Claims in respect of the First Lien Debt and Second Lien Debt, respectively, in each case that vote on the Plan;

(c)     at 11:59 P.M. prevailing Eastern Time on February 3, 2010 unless the Company has commenced the Chapter 11 Cases (the "**Commencement Date**") in the Bankruptcy Court and has filed, and is pursuing confirmation of, the Plan, and has filed a motion for authority to use cash collateral with a proposed cash collateral order that, among other things, provides for customary replacement liens, current payment of interest on the First Lien Debt at the non-default rate and reimbursement of all of the Administrative Agent's costs and expenses under the First Lien Credit Agreement, including, without limitation, professionals' fees and

expenses, and otherwise in form and substance acceptable to the Administrative Agent and the First Lien Required Lenders (an "***Acceptable Cash Collateral Order***");

(d)      at any time after three (3) business days following the Commencement Date unless an Acceptable Cash Collateral Order has been entered by the Bankruptcy Court and remains unstayed and in full force and effect with no amendments or modifications other than any consented to in writing by the Administrative Agent and the First Lien Required Lenders;

(e)      at 5:00 P.M. prevailing Eastern Time on the date which is sixty (60) calendar days after the Commencement Date if the Plan has not been confirmed by the Bankruptcy Court on or before such date;

(f)      at 5:00 P.M. prevailing Eastern Time on the date which is thirty (30) calendar days following entry by the Bankruptcy Court of an order confirming the Plan if there has not occurred substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan on or before such date;

(g)      the filing by the Company of any motion or other request for relief seeking to (i) dismiss any of the Chapter 11 Cases, (ii) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) appoint a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

(h)      the entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, or (iv) making a finding of fraud, dishonesty or misconduct by any officer or director of the Company, regarding or relating to the Company;

(i)      the Company files, proposes or otherwise supports any plan other than the Plan or if the Company, in the exercise of its fiduciary duties (set forth in Section 26 hereof), takes any other action hereunder that is otherwise prohibited hereunder or refrains from taking any action that is otherwise required hereunder;

(j)      the material breach by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth in this Agreement, including the Company's obligations under Section 5 hereof, which material breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Administrative Agent;

(k)      the occurrence of any Default (as defined in the First Lien Credit Agreement) or Event of Default (as defined in the First Lien Credit Agreement) prior to the Commencement Date, which breach remains uncured or unwaived for a period of five (5) business days after the receipt by the Company of notice of such breach from the Administrative Agent (excluding any such Default or Event of Default as a result of a non-payment of any Second Lien Obligations (as defined in the First Lien Credit Agreement), cross default to the Second Lien Credit Agreement, solely as a result of noncompliance with the Financial Performance Covenants (as defined in the Second Lien Agreement), the filing of the Chapter 11

Cases or the noncompliance with the Financial Performance Covenants (as defined in the First Lien Credit Agreement) for the fiscal quarters ending December 31, 2009 and March 31, 2010);

(l)     the breach by any of the Consenting Holders of any of the undertakings, representations, warranties or covenants of such Consenting Holder(s) set forth in this Agreement that would have a material adverse impact on the Company or the consummation of the Transactions, which breach remains uncured for a period of ten (10) business days after the receipt by the Consenting Holder(s) of notice of such breach from the Company;

(m)     the withdrawal, amendment or modification by the Company of, or the filing by the Company of a pleading seeking to amend or modify, the Plan, which withdrawal, amendment, modification or pleading is materially inconsistent with the Plan (with such amendments and modifications as have been effected in accordance with the terms hereof) or is materially adverse to the Consenting Holders, in each case in a manner not acceptable to the Administrative Agent, the Second Lien Agent, the Required Consenting Holders and the Equity Investors, or if the Company files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement, the Plan or the other Approved Plan Documents (in each case with such amendments and modifications as have been effected in accordance with the terms hereof) and such motion or pleading has not been withdrawn prior to the earlier of (i) three (3) business days after the Company receives written notice from the Administrative Agent or the Second Lien Agent that such motion or pleading is inconsistent with this Agreement, the Plan or any other Approved Plan Document, as applicable, and (ii) the entry of an order of the Bankruptcy Court approving such motion;

(n)     the Company amends or modifies any Approved Plan Document after it is filed with the Bankruptcy Court, which amendment or modification is materially inconsistent with the Plan (in each case with such amendments and modifications as have been effected in accordance with the terms hereof) or not acceptable to the Administrative Agent, the Second Lien Agent, the Required Consenting Holders and the Equity Investors;

(o)     the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Plan in any material respect (in each case with such amendments and modifications as have been as have been effected in accordance with the terms hereof);

(p)     the issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any ruling, determination or order making illegal or otherwise restricting, preventing or enjoining the consummation of a material portion of the Transactions, including an order denying confirmation of the Plan, and such ruling, determination or order has not been vacated or reversed within five (5) business days of issuance; or

(q)     any payment by the Company or any of its affiliates of any amount in respect of the Second Lien Obligations (as defined in the First Lien Credit Agreement) except as set forth in <u>Section 5(c)</u> hereof or on the effective date of the Plan as described in the Plan or as otherwise contemplated under the Plan, without the written consent of the Administrative Agent.

Subject to <u>Section 13</u> hereof, upon termination of this Agreement, each Party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement

and shall have the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement. For the avoidance of doubt, the Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder for purposes of providing notice under this Agreement (and agree not to object to any non-breaching Party seeking, if necessary, to lift such automatic stay in connection with the giving any such notice).

7.      Good Faith Cooperation; Further Assurances; Transaction Documents. The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Transactions. Furthermore, each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement. Each Party hereby covenants and agrees (a) to negotiate in good faith the Plan Related Documents, each of which shall (i) contain the same economic terms as, and other terms consistent in all material respects with, the terms set forth in the Plan, the Amended and Restated Credit Agreement and the Rights Offering Term Sheet (as each may be amended, supplemented or otherwise modified as provided herein), (ii) be in form and substance reasonably acceptable in all respects to the Administrative Agent, the Second Lien Agent, the Required Consenting Holders and the Equity Investors, and (iii) be consistent with this Agreement in all material respects, and (b) to execute the Approved Plan Documents (to the extent such Party is a party thereto).

8.      Representations and Warranties. Each Party hereby represents and warrants to the other Parties (provided that the representations and warranties in clauses (e) and (f) below shall be given by the Consenting Holders only) that the following statements are true, correct and complete as of the date hereof and as of the date of any amendment of this Agreement approved by such Party:

(a)      Power and Authority; Authorization. It has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b)      No Conflicts. The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(c)      Governmental Consents. The execution, delivery and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any Federal, state or governmental authority or regulatory body other than the Bankruptcy Court.

(d)    Binding Obligation.  This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(e)    Compliance with Laws.  Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation and acceptance of the Plan, each Consenting Holder, on a several and not joint basis, acknowledges and agrees that, regardless of whether its Debt constitutes a "security" within the meaning of the Securities Act, (i) such Consenting Holder is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act or a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act and (ii) such Consenting Holder has information sufficient in order to enable it to make an informed decision such that, were this Agreement to be construed as or deemed to constitute such a solicitation and acceptance, such solicitation was in compliance with any applicable nonbankruptcy law governing the adequacy of disclosure in connection with such solicitation, or if there is not any such law, solicited after disclosure to such holder of "adequate information" as such term is defined in section 1125(a) of the Bankruptcy Code.

(f)    Ownership.  If such Party is a Consenting Holder, such Consenting Holder (i) either (A) is the sole legal and beneficial owner of the Debt set forth below its name on the signature page hereof and all related Claims, in each case free and clear of all claims, liens and encumbrances or (B) has investment or voting discretion with respect to such Debt and Claims and has the power and authority to bind the beneficial owner(s) of such Debt and Claims to the terms of this Agreement and (ii) such Consenting Holder has full power and authority to vote on and consent to such matters concerning such Debt and Claims and to Transfer such Debt and Claims.

9.    Amendments.  None of this Agreement, the Plan, the Amended and Restated Credit Agreement, the other Approved Plan Documents, or the Rights Offering Term Sheet may be amended, supplemented or otherwise modified except as set forth herein.

10.    Effectiveness.  Subject to the condition precedent set forth below, this Agreement shall become effective and binding on each Party upon the execution and receipt by the Company of signature pages signed by the Company, the Administrative Agent, the Equity Investors and the Consenting Holders holding at least 66 2/3% of the aggregate principal amount of the First Lien Debt (including all of the New Revolving Lenders) and at least 66 2/3% of the aggregate principal amount of the Second Lien Debt (the "***Effective Date***").  Delivery by telecopier or electronic mail of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart hereof.  Notwithstanding the foregoing, this Agreement shall become binding (i) on the Administrative Agent and the Consenting First Lien Debt Holders only upon the Company's payment to the Administrative Agent, for the account and benefit of the First Lien Lenders, of an amount equal to all fees and expenses of Weil and CDG due and owing as of the anticipated Effective Date and (ii) on the Second Lien Agent and the Consenting Second Lien Debt Holders only upon the Company's payment to the Second Lien Agent of an amount equal to all fees and expenses of Pillsbury due and owing as of the anticipated Effective Date (which fees and expenses shall be invoiced at least two (2) business days prior to the anticipated Effective Date).

11.     GOVERNING LAW; JURISDICTION; JURY TRIAL WAIVER.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, UPON THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.  THE PARTIES WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN THE PARTIES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

12.     Remedies. All remedies which are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to the non-breaching Party.  All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party or any other Party.

13.     Survival.  Notwithstanding (i) any Transfer of the Debt or Claims in accordance with Section 4(e) hereof or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Sections 5(c), 11, 12, 13, 22, 23 and 26 hereof shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties hereto in accordance with the terms hereof.

14.     Headings.  The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

15.     Successors and Assigns; Severability; Several Obligations.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives.  The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions

hereof or the continuing validity and enforceability of such provision in any other jurisdiction. The agreements, representations and obligations of the Consenting Holders under this Agreement are, in all respects, several and not joint.

16.     No Third Party Beneficiaries.  Unless otherwise expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third party beneficiary hereof.

17.     Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Plan, the other Approved Plan Documents or the Fee Letter (as defined in the Amended and Restated Credit Agreement).

18.     Counterparts.  This Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

19.     Consideration.  Other than as provided in the Plan and this Agreement, it is hereby acknowledged by the Parties that no payment or additional consideration shall be due or paid to any of the Consenting Holders for their agreement to vote in accordance with, and otherwise comply with the terms and conditions of, this Agreement.

20.     Notices.  All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Parties, and deemed given when delivered, if delivered by hand, or upon confirmation of transmission, if delivered by email and facsimile, during standard business hours (from 8:00 A.M. to 6:00 P.M. at the place of receipt) at the addresses and facsimile numbers set forth on Schedule III hereto.

21.     Rule of Interpretation; Calculation of Time Period.  Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include votes or voting on a plan of reorganization under the Bankruptcy Code.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto.  None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a business day, the period in question shall end on the next succeeding business day.

22.     Reservation of Rights.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Consenting Holder to protect and preserve its rights, remedies and interests, including its Claims against the Company.  Nothing herein shall be deemed an admission of any kind.  If the transactions contemplated herein are not consummated, or this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or

domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

23. <u>Publicity; Confidentiality</u>.

(a) The Parties agree that all press releases, public filings, public announcements or other communications or the transactions contemplated hereby and any amendments thereof with any news media relating to this Agreement shall be submitted and mutually acceptable to counsel for the Administrative Agent, counsel for the Second Lien Agent and counsel for the Company. The Company shall not (a) use the name of the Administrative Agent, the Second Lien Agent or any Consenting Holder in any press release without such Party's prior written consent or (b) disclose to any person, other than legal, accounting and financial advisors to the Company, the principal amount or percentage of Debt held by any Consenting Holder or any of its respective subsidiaries; <u>provided</u>, <u>however</u>, that the Company shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of Debt held by the Consenting Holders as a group. Notwithstanding the foregoing, the Consenting Holders and the Equity Investors hereby consent to the disclosure by the Company in the Plan, the Disclosure Statement, the other Approved Plan Documents and any required filings by the Company with the Bankruptcy Court or as otherwise required by law or regulation, of the execution, terms and contents of this Agreement.

(b) The Parties understand and acknowledge that, until publicly disclosed as herein contemplated, the terms of this Agreement and the exhibits hereto are confidential information, and the Parties agree to keep such information confidential and not use it for any purpose except as contemplated hereby or as reasonably necessary in the Chapter 11 Cases.

24. <u>Further Assurances</u>. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Plan and consummate the Transactions.

25. <u>Representation by Counsel</u>. Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

26. <u>Fiduciary Duties</u>. Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the Company or any directors or officers of the Company, in such person's capacity as a director or officer of the Company, to take any action, or to refrain from taking any action, that such person determines in good faith, after consultation with counsel, is inconsistent with its or their fiduciary obligations under applicable law, and no action or failure to take action, including, without limitation, any disclosure that the board of directors of Holdings so determines is required by its fiduciary duties pursuant to this <u>Section 26</u> shall be deemed to have been so required.

27. <u>Continued Banking Practices</u>. Notwithstanding anything herein to the contrary, each Consenting Holder, the First Lien Agent and the Second Lien Agent, and their respective

affiliates, may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to the Company or any affiliate of the Company or any other person, including, but not limited to, any person proposing or entering into a transaction related to or involving the Company or any affiliate thereof.

28.     Acknowledgement.  This Agreement and the Transactions are the product of negotiations among the Parties, together with their respective representatives.  This Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  The votes of the holders of claims against the Company will not be solicited until such holders who are entitled to vote on the Plan have received the Disclosure Statement and any other required materials related to the Solicitation.  In addition, this Agreement does not constitute an offer to issue or sell securities to any person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

29.     No Waiver.  The failure of any Party hereto to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party hereto with its obligations hereunder, and any custom or practice or the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such right, power or remedy or to demand such compliance.

30.     Conflicts Between the Plan, the Amended and Restated Credit Agreement, the other Approved Plan Documents, the Rights Offering Term Sheet and this Agreement.  In the event of any conflict among the terms and provisions in the Plan, the Rights Offering Term Sheet and this Agreement, as applicable, the terms and provisions of the Plan shall control.  In the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the Amended and Restated Credit Agreement or any other Approved Plan Document, the terms and provisions of the Amended and Restated Credit Agreement or relevant other Approved Plan Document, as applicable, shall control and govern. Nothing in this Section 30 shall affect, in any way, the requirements set forth herein for the amendment of the Plan, the Amended and Restated Credit Agreement, the other Approved Plan Documents, the Rights Offering Term Sheet or this Agreement.

* * * * *

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above.

PENTON MEDIA, INC.
PENTON BUSINESS MEDIA, INC.
PENTON BUSINESS MEDIA HOLDINGS, INC.
PENTON BUSINESS MEDIA
  PUBLICATIONS, INC.
PENTON BUSINESS MEDIA INTERNET, INC.
INTERNET WORLD MEDIA, INC.
DUKE INVESTMENTS, INC.
DUKE COMMUNICATIONS
  INTERNATIONAL, INC.
DVGM & ASSOCIATES


By:_____
   Name:
   Title:

**[CONSENTING SECOND LIEN DEBT HOLDERS]**


By:_____
Name:
Title:

| | |
|---|---|
| Address: | |
| Facsimile Number: | |
| Loans outstanding: | $_____ |


## CLASS 3 SECOND LIEN LENDER CLAIM DISTRIBUTION ELECTION

The Party listed on this signature page hereby irrevocably elects to receive as its distribution as a Class 3 creditor under the Plan, as set forth in the Plan:

$_____ of its Second Lien Debt Claim in Stock (as defined in the Plan) of Reorganized Holdings (as defined in the Plan).

If you choose to receive $0 of your Second Lien Debt Claim in Stock of Reorganized Holdings, or choose an amount of your Second Lien Debt Claim less than the full amount of such claim, the remainder of your Second Lien Debt Claim will be paid in cash.

**IF YOU DO NOT MAKE A SECOND LIEN LENDER CLAIM DISTRIBUTION ELECTION, YOU WILL BE DEEMED TO HAVE ELECTED TO RECEIVE CASH ON ACCOUNT OF YOUR SECOND LIEN DEBT CLAIM.**

## RIGHTS OFFERING ELECTION

The Party listed on this signature page hereby irrevocably elects as follows (**check one and initial your election**):

_____ Not to participate in the Rights Offering; or

_____ To participate in the amount of ___% of the Rights (as defined in the Rights Offering Term Sheet) to which it is entitled.

**IF YOU DO NOT MAKE A RIGHTS OFFERING ELECTION, YOU WILL BE DEEMED TO HAVE ELECTED <u>NOT</u> TO PARTICIPATE IN THE RIGHTS OFFERING.**

**[CONSENTING FIRST LIEN DEBT HOLDERS]**


By:_____
Name:
Title:

|  |  |
|---|---|
| Address: | |
| Facsimile Number: | |
| Existing Credit Agreement Revolving Facility Commitment: | $_____ |
| Term Loan outstanding: | $_____ |

**GENERAL ELECTRIC CAPITAL
CORPORATION, AS ADMINISTRATIVE
AGENT**


By:_____
Name:
Title:

|  |  |
|---|---|
| Address: | |
| Facsimile Number: | |

**WELLS FARGO BANK, NATIONAL ASSOCIATION, AS SECOND LIEN AGENT**

By: _____
Name:
Title:

| | |
|---|---|
| Address: | |
| Facsimile Number: | |

**MIDOCEAN PARTNERS III, L.P.**

By: _____
Name:
Title:

| | |
|---|---|
| Address: | |
| Facsimile Number: | |

**WASSERSTEIN PARTNERS, L.P.**

By:_____
Name:
Title:

| | |
|---|---|
| Address: | |
| Facsimile Number: | |

# **SCHEDULE I**

| **Equity Investors** |
|---|
| MidOcean Partners III, L.P. or its affiliates |
| Wasserstein Partners, L.P. or its affiliates |

## **SCHEDULE II**

### REVOLVING COMMITMENTS

| | |
|---|---|
| General Electric Capital Corporation | $12,187,500.00 |
| CIT Lending Services Corporation | $8,125,000.00 |
| JPMorgan Chase Bank, N.A. | $14,218,750.00 |
| The Governor and Company of the Bank of Ireland | $3,250,000.00 |
| Wells Fargo Foothill, Inc. | $812,500.00 |
| CSFB | $4,062,500.00 |
| Total: | $42,656,250.00 |

<u>**SCHEDULE III**</u>

NOTICE ADDRESSES

If to the Company:

Penton Business Media, Inc.
249 West 17th Street
Fourth Floor
New York, New York 10011
Attn.: Jean Clifton
Facsimile: 913-514-6431
Email:  Jean.Clifton@penton.com

with a copy to (which shall not constitute notice):

Jones Day
222 E. 41st Street
New York, New York 10017
Attn.: Robert A. Profusek
Facsimile: 212-755-7306
Email:  raprofusek@jonesday.com

If to the Administrative Agent or First Lien Required Lenders:

General Electric Capital Corporation
2325 Lakeview Parkway
Suite 700
Alpharetta, Georgia 30009
Attn.: Penton Business Media Account Manager
Facsimile: 678-624-7903
Email: ellen.weaver@ge.com

and to:

General Electric Capital Corporation
201 Merritt 7
Norwalk, Connecticut 06851
Attn.: Counsel – Media and Communications
Facsimile: 203-956-4216
Email: Mark.O'Leary@ge.com

with a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn.: Gary Holtzer, Esq.

Facsimile: 212-310-8007
Email: gary.holtzer@weil.com

If to the Second Lien Agent or the Second Lien Required Lenders:

Wells Fargo Bank, National Association
45 Broadway, 14th Floor
New York, NY  10006
Attn:  Michael D. Pinzon
Facsimile: 212-515-1576
Email: michael.d.pinzon@wellsfargo.com

with a copy to (which shall not constitute notice):

Pillsbury Winthrop Shaw Pittman LLP
725 So. Figueroa Street, Suite 2800
Los Angeles, CA  90017
Attn:  William Freeman, Esq.
Facsimile: 213-629-1033
Email: bill.freeman@pillsburylaw.com

If to any other Consenting Holder, at the address shown for such Consenting Holder on the applicable signature page hereto, to the attention of the person who has executed this Agreement on behalf of such Consenting Holder.

# AMENDMENT NO. 1 TO

# RESTRUCTURING SUPPORT AGREEMENT

This AMENDMENT NO. 1 TO RESTRUCTURING SUPPORT AGREEMENT (this "Agreement"), dated as of January 29, 2010, by and among Penton Business Media Holdings, Inc. (f/k/a Prism Business Media Holdings Inc.) ("Holdings"), Penton Media, Inc. ("Penton"), Penton Business Media, Inc. (f/k/a Prism Business Media Inc.) ("Penton Business Media"), certain other subsidiaries of Holdings identified on the signature pages hereto (together with Holdings, Penton and Penton Business Media, the "Company"), General Electric Capital Corporation, as administrative agent under the First Lien Credit Agreement (as defined in the RSA) (the "Administrative Agent"), the undersigned lenders party to the First Lien Credit Agreement and/or the Second Lien Credit Agreement (as defined in the RSA), solely in their capacity as such lender to the extent and as set forth on the signature page hereto (the "Required Consenting Holders"), Wells Fargo Bank, National Association, as administrative agent under the Second Lien Credit Agreement (the "Second Lien Agent"), MidOcean Partners III, L.P. ("MidOcean") and Wasserstein Partners, L.P. (together with MidOcean, the "Equity Investors").

## RECITALS

**WHEREAS**, the Company, the Administrative Agent, the Consenting Holders (as defined in the RSA), the Second Lien Agent and the Equity Investors have entered into that certain Restructuring Support Agreement, dated as of January 20, 2010 (the "RSA"; capitalized terms used herein and not defined herein shall have the meanings ascribed thereto in the RSA);

**WHEREAS**, subject to the terms and conditions hereof, Company, the Administrative Agent, the Required Consenting Holders, the Second Lien Agent and the Equity Investors have agreed to amend the RSA as described herein.

**NOW, THEREFORE**, in consideration of the foregoing, the covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.      Amendment to RSA.  The RSA is, effective as of the date hereof and subject to the satisfaction of the conditions precedent set forth in Section 4 of this Agreement, hereby amended as follows:

(a)      The proviso to the first sentence of Section 6 of the RSA is amended by deleting the words "Required First Lien" and adding the words "First Lien Required" in the place thereof;

(b)      Section 6(b) of the RSA is amended by deleting the words "January 29, 2010" and adding the words "February 8, 2010" in the place thereof;

(c)      Section 6(c) of the RSA is amended by deleting the words "February 3, 2010" and adding the words "February 8, 2010" in the place thereof; and

(d)     Section 6(e) of the RSA is amended by deleting the words "sixty (60)" and adding the words "fifty five (55)" in the place thereof.

2.     <u>Representations and Warranties</u>.  Each Party hereby represents and warrants to the other Parties (provided that the representations and warranties in clause (e) below shall be given by the Required Consenting Holders only) that the following statements are true, correct and complete as of the date hereof and as of the date of any amendment of this Agreement approved by such Party:

(a)     <u>Power and Authority; Authorization</u>.  It has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b)     <u>No Conflicts</u>.  The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(c)     <u>Governmental Consents</u>.  The execution, delivery and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any Federal, state or governmental authority or regulatory body other than the Bankruptcy Court.

(d)     <u>Binding Obligation</u>.  This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(e)     <u>Ownership</u>.  If such Party is a Required Consenting Holder, such Required Consenting Holder (i) either (A) is the sole legal and beneficial owner of the Debt set forth below its name on the signature page hereof and all related Claims, in each case free and clear of all claims, liens and encumbrances or (B) has investment or voting discretion with respect to such Debt and Claims and has the power and authority to bind the beneficial owner(s) of such Debt and Claims to the terms of this Agreement and (ii) such Required Consenting Holder has full power and authority to vote on and consent to such matters concerning such Debt and Claims and to Transfer such Debt and Claims.

3.     <u>Amendments</u>.  This Agreement may not be amended, supplemented or otherwise modified except as provided in the RSA.

4.     <u>Effectiveness</u>.  Subject to the condition precedent set forth below, this Agreement shall become effective and binding on each Party upon the execution and receipt by the

Company of signature pages signed by the Company, the Administrative Agent, the Second Lien Agent, the Equity Investors and the Required Consenting Holders (the "***Effective Date***"). Delivery by telecopier or electronic mail of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart hereof. Notwithstanding the foregoing, this Agreement shall become binding (i) on the Administrative Agent and the Consenting First Lien Debt Holders only upon the Company's payment to the Administrative Agent, for the account and benefit of the First Lien Lenders, of an amount equal to all fees and expenses of Weil and CDG due and owing as of the anticipated Effective Date and (ii) on the Second Lien Agent and the Consenting Second Lien Debt Holders only upon the Company's payment to the Second Lien Agent of an amount equal to all fees and expenses of Pillsbury due and owing as of the anticipated Effective Date (which fees and expenses shall be invoiced at least two (2) business days prior to the anticipated Effective Date).

5.      GOVERNING LAW; JURISDICTION; JURY TRIAL WAIVER.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, UPON THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.  THE PARTIES WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN THE PARTIES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

6.      Remedies. All remedies which are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to the non-breaching Party.  All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party or any other Party.

7.     Survival.  Notwithstanding the termination of the RSA in accordance with its terms, the agreements and obligations of the Parties in Sections 5, 6, 7, 14, 15 and 18 hereof shall survive such termination and shall continue in full force and effect for the benefit of the Parties hereto in accordance with the terms hereof.

8.     Headings.  The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

9.     Successors and Assigns; Severability; Several Obligations.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives.  The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction. The agreements, representations and obligations of the Consenting Holders under this Agreement are, in all respects, several and not joint.

10.    No Third Party Beneficiaries.  Unless otherwise expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third party beneficiary hereof.

11.    Entire Agreement.  The RSA, as amended by this Agreement, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Plan, the other Approved Plan Documents or the Fee Letter (as defined in the Amended and Restated Credit Agreement).

12.    Counterparts.  This Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

13.    Consideration.  Other than as provided in the Plan and this Agreement, it is hereby acknowledged by the Parties that no payment or additional consideration shall be due or paid to any of the Consenting Holders for their agreement to vote in accordance with, and otherwise comply with the terms and conditions of the RSA, as amended by this Agreement.

14.    Reservation of Rights.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Consenting Holder to protect and preserve its rights, remedies and interests, including its Claims against the Company.  Nothing herein shall be deemed an admission of any kind.  If the transactions contemplated herein are not consummated, or this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

15. <u>Publicity; Confidentiality</u>.

(a) The Parties agree that all press releases, public filings, public announcements or other communications or the transactions contemplated hereby and any amendments thereof with any news media relating to this Agreement shall be submitted and mutually acceptable to counsel for the Administrative Agent, counsel for the Second Lien Agent and counsel for the Company. The Company shall not (a) use the name of the Administrative Agent, the Second Lien Agent or any Consenting Holder in any press release without such Party's prior written consent or (b) disclose to any person, other than legal, accounting and financial advisors to the Company, the principal amount or percentage of Debt held by any Consenting Holder or any of its respective subsidiaries; <u>provided</u>, <u>however</u>, that the Company shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of Debt held by the Consenting Holders as a group. Notwithstanding the foregoing, the Consenting Holders and the Equity Investors hereby consent to the disclosure by the Company in the Plan, the Disclosure Statement, the other Approved Plan Documents and any required filings by the Company with the Bankruptcy Court or as otherwise required by law or regulation, of the execution, terms and contents of this Agreement.

(b) The Parties understand and acknowledge that, until publicly disclosed as herein contemplated, the terms of this Agreement and the exhibits hereto are confidential information, and the Parties agree to keep such information confidential and not use it for any purpose except as contemplated hereby or as reasonably necessary in the Chapter 11 Cases.

16. <u>Further Assurances</u>. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Plan and consummate the Transactions.

17. <u>Representation by Counsel</u>. Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

18. <u>Fiduciary Duties</u>. Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the Company or any directors or officers of the Company, in such person's capacity as a director or officer of the Company, to take any action, or to refrain from taking any action, that such person determines in good faith, after consultation with counsel, is inconsistent with its or their fiduciary obligations under applicable law, and no action or failure to take action, including, without limitation, any disclosure that the board of directors of Holdings so determines is required by its fiduciary duties pursuant to this <u>Section 18</u> shall be deemed to have been so required.

19. <u>Continued Banking Practices</u>. Notwithstanding anything herein to the contrary, each Consenting Holder, the First Lien Agent and the Second Lien Agent, and their respective affiliates, may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to the Company or any affiliate of

the Company or any other person, including, but not limited to, any person proposing or entering into a transaction related to or involving the Company or any affiliate thereof.

20. <u>Acknowledgement</u>. This Agreement and the Transactions are the product of negotiations among the Parties, together with their respective representatives. This Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. The votes of the holders of claims against the Company will not be solicited until such holders who are entitled to vote on the Plan have received the Disclosure Statement and any other required materials related to the Solicitation. In addition, this Agreement does not constitute an offer to issue or sell securities to any person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

21. <u>No Waiver</u>. The failure of any Party hereto to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party hereto with its obligations hereunder, and any custom or practice or the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such right, power or remedy or to demand such compliance.

\* \* \* \* \*

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above.

PENTON MEDIA, INC.
PENTON BUSINESS MEDIA, INC.
PENTON BUSINESS MEDIA HOLDINGS, INC.
PENTON BUSINESS MEDIA
 PUBLICATIONS, INC.
PENTON BUSINESS MEDIA INTERNET, INC.
INTERNET WORLD MEDIA, INC.
DUKE INVESTMENTS, INC.
DUKE COMMUNICATIONS
 INTERNATIONAL, INC.
DVGM & ASSOCIATES

By: _Jean B. Clifton_
Name: Jean B Clifton
Title: EVP CFO

Avenue Debt Opportunities LLC

[SECOND LIEN REQUIRED LENDERS]

By: _____
Name: Michael Strauble
Title: Vice President

Column Investments sarl

[SECOND LIEN REQUIRED LENDERS]-e

By: _____
Name: Tyler Zachem
Title:

**[SECOND LIEN REQUIRED LENDERS]**

BlackRock Kelso Capital Corporation
By: BlackRock Kelso Capital Advisors LLC,
    its Investment Advisor

By: _____

Name: Michael B. Lazar

Title: Chief Operating Officer

APOLLO INVESTMENT CORPORATION
By: Apollo Investment Management, L.P. as Advisor
By: ACC Management, LLC, as its General Partner

**[SECOND LIEN REQUIRED LENDERS]**

By: _____

Name: Justin Sendak

Title: Vice President

**SECOND LIEN REQUIRED LENDERS:**

**CREDIT SUISSE LOAN FUNDING LLC**

By: _____
Name: Michael Wotanowski
Title: Director

By: _____
Name:
Title: Gil Golan
Vice President

**FIRST LIEN REQUIRED LENDERS:**

**CREDIT SUISSE LOAN FUNDING LLC**

By:
Name:      Michael Wotanowski
Title:             Director

By:
Name:
Title:       Gil Golan
        Vice President

**FIRST LIEN REQUIRED LENDERS:**

**BLT V LLC**

By: _____
Name: Michael Wotanowski
Title: Authorized Signatory

CERBERUS SERIES FOUR HOLDINGS, LLC,
as a Lender
By: Cerberus Institutional Partners, L.P. – Series Four,
its Managing Member
By: Cerberus Institutional Associates, L.L.C.,
its General Partners

By:_____
Name:
Title:      **Philip Lindenbaum**
            **Authorized Signatory**

**GENERAL ELECTRIC CAPITAL
CORPORATION**

By: _____
Name: **Ellen Weaver**
Title: Duly Authorized Signatory

**CIT LENDING SERVICES CORP**

By: _____
Name: David Harnisch
Title: Managing Director

**CIT MIDDLE MARKET TRUST I**

By: _____

Name: Joel Harvill

Title: AVP

**CIT MIDDLE MARKET TRUST II**

By:_____
Name: Joel Harvill
Title: AVP

**Oppenheimer Senior Floating Rate Fund**

By: _____

Name: Bill Campbell

Title: AVP

**Oppenheimer Master Loan Fund, LLC**

By: _____

Name:   Bill Campbell

Title:      AVP

**HarbourView CLO 2006-1**

By: _____

Name:      Bill Campbell

Title:        AVP

JPMorgan Chase Bank, N.A., as First Lien Lender, but only with respect to that debt advised or managed by the Special Credits group. For the avoidance of doubt, any swap related indebtedness shall not be included herein, nor shall this apply to any securities, loans, other obligations or any other interests in Penton Business Media Holdings, Inc., or any affiliate thereof, that may be held, acquired or sold by, or any activities, services or businesses conducted or provided by, any other group or business unit within, or affiliate of JPMorgan Chase Bank, N.A.

By: _____

Name: Bruce S. Borden

Title:  Executive Director

**WELLS FARGO CAPITAL FINANCE, INC.**

By: _____
Name: Kevin Harbour
Title:   Vice President

**The Governor and Company of the Bank of Ireland**

By:_____
Name:      Carl Andresen
Title:       Director

By:_____
Name:      Ricardo Nunes
Title:       Vice President

**PENNANTPARK INVESTMENT CORPORATION**

By: _____
Name: Arthur Penn
Title: CEO

**[FIRST LIEN REQUIRED LENDERS]**

Landmark IX CDO LTD.

By: Aladdin Capital Management LLC as Manager

By: _____

Name: Alyse K

Title:

Alyse Kelly
Authorized Signatory

**[FIRST LIEN REQUIRED LENDERS]**

**LOOMIS SAYLES CLO I, LTD.**
As Lender

By: Loomis, Sayles & Company, L.P.,
     Its Collateral Manager

By: Loomis Sayles & Company, Incorporated,
     Its General Partner

By: _____
Name:   Mary McCarthy
Title:     Vice President

Eaton Vance CDO VIII, Ltd.
By: Eaton Vance Management
As Investment Advisor

By: _____
Name:
Title:   Michael B. Botthof
         Vice President

EATON VANCE INSTITUTIONAL SENIOR LOAN FUND
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

By: _____

Name:

Title:    Michael B. Botthof

          Vice President

**EATON VANCE**
**LIMITED DURATION INCOME FUND**
**BY: EATON VANCE MANAGEMENT**
**AS INVESTMENT ADVISOR**

By: _____
Name:
Title:    Michael B. Botthof
       Vice President

SENIOR DEBT PORTFOLIO
By: Boston Management and Research
as Investment Advisor

By: _____

Name:

Title: Michael B. Botthof

Vice President

EATON VANCE
VT FLOATING-RATE INCOME FUND
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

By: _____
Name:
Title:      Michael B. Botthof
            Vice President

**CANARAS SUMMIT CLO LTD**
By: Canaras Capital Management LLC
As Sub-Investment Adviser

By: _____
Name:
Title: Benjamin S. Steger, CFA®
Authorized Signatory

**SOLERA AÑEJO LIMITED**
By: Canaras Capital Management LLC
As Sub-Investment Adviser

By: _____
Name:
Title: Benjamin S. Steger, CFA®
       Authorized Signatory

**Green Island CBNA Loan Funding LLC**

By:_____

Name:

Title:      Adam Kaiser
         **ATTORNEY-IN-FACT**

**Clydesdale Strategic CLO I, Ltd.**

By: _Robert Hoffman_

Name:

Title: **ROBERT HOFFMAN
EXECUTIVE DIRECTOR**

**Clydesdale CLO 2006, Ltd.**

By: _Robert Hoffman_

Name:
Title:

ROBERT HOFFMAN
EXECUTIVE DIRECTOR

**Clydesdale CLO 2004, Ltd.**

By: _Robert Hoffman_

Name:

Title:
ROBERT HOFFMAN
EXECUTIVE DIRECTOR

**Centaurus Loan Trust**

By: _Robert Hoffman_

Name:
Title:

**ROBERT HOFFMAN
EXECUTIVE DIRECTOR**

**GSCP (NJ), L.P., on behalf of each of the following funds, in its capacity as Collateral Manager:**

**GSC PARTNERS CDO FUND IV, LIMITED**
**GSC PARTNERS CDO FUND V, LIMITED**
**GSC PARTNERS CDO FUND VII, LIMITED**

By: _____
Name: Ivo Turkedjiev
Title: Authorized Signatory


**GSC PARTNERS GEMINI FUND LIMITED**
By: GSCP (NJ), L.P., as Collateral Monitor
By: GSCP (NJ), INC., its General Partners

By: _____
Name: Ivo Turkedjiev
Title: Authorized Signatory


**GSC Investment Funding LLC**
By: GSCP (NJ), L.P., as Servicer
By: GSCP (NJ), Inc., its general partner

By: _____
Name: Ivo Turkedjiev
Title: Authorized Signatory

Nantucket CLO I Ltd
By: Fortis Investment Management USA, Inc.
As Attorney-in-Fact


By: _____
Name: Vanessa Ritter
Title: Vice President

**PPM Grayhawk, CLO, LTD.,**

By: _____
Name: Chris Kappas
Title: Managing Director

**GENERAL ELECTRIC CAPITAL CORPORATION, AS ADMINISTRATIVE AGENT**

By:_____

Name:

Title:     Ellen Weaver
          Duly Authorized Signatory

**WELLS FARGO BANK, NATIONAL ASSOCIATION, AS SECOND LIEN AGENT**

By:_____

Name:

Title:      Michael Pinzon
            Vice President

**MIDOCEAN PARTNERS III, L.P.**

By: _____

Name: Tyler Cochem

Title:

**WASSERSTEIN PARTNERS, L.P.**

By: _____
Name: Anop Bagaria
Title: Vice Chairman

# AMENDMENT NO. 2 TO

# RESTRUCTURING SUPPORT AGREEMENT

This AMENDMENT NO. 2 TO RESTRUCTURING SUPPORT AGREEMENT (this "***Agreement***"), dated as of February 8, 2010, by and among Penton Business Media Holdings, Inc. (f/k/a Prism Business Media Holdings Inc.) ("***Holdings***"), Penton Media, Inc. ("***Penton***"), Penton Business Media, Inc. (f/k/a Prism Business Media Inc.) ("***Penton Business Media***"), certain other subsidiaries of Holdings identified on the signature pages hereto (together with Holdings, Penton and Penton Business Media, the "***Company***"), General Electric Capital Corporation, as administrative agent under the First Lien Credit Agreement (as defined in the RSA) (the "***Administrative Agent***"), the undersigned lenders party to the First Lien Credit Agreement and/or the Second Lien Credit Agreement (as defined in the RSA), solely in their capacity as such lender to the extent and as set forth on the signature page hereto (the "***Required Consenting Holders***"), Wells Fargo Bank, National Association, as administrative agent under the Second Lien Credit Agreement (the "***Second Lien Agent***"), MidOcean Partners III, L.P. ("***MidOcean***") and Wasserstein Partners, L.P. (together with MidOcean, the "***Equity Investors***"). The Company, the Administrative Agent, each Required Consenting Holder, the Second Lien Agent and each Equity Investor are collectively referred to herein as the "***Parties***" and individually as a "***Party***".

## RECITALS

**WHEREAS**, the Company, the Administrative Agent, the Consenting Holders (as defined in the RSA), the Second Lien Agent and the Equity Investors have entered into that certain Restructuring Support Agreement, dated as of January 20, 2010, as amended by the Parties pursuant to that certain Amendment No. 1 to Restructuring Support Agreement, dated as of January 29, 2010 (as further amended, restated, amended and restated or modified through the date hereof, the "***RSA***"; capitalized terms used herein and not defined herein shall have the meanings ascribed thereto in the RSA);

**WHEREAS**, the Equity Investors have agreed to provide a backstop to the Rights Offering in a cash amount of between $38.9 and $51.2 million pursuant to the Equity Commitment Letter and the Rights Offering Term Sheet; and

**WHEREAS**, subject to the terms and conditions hereof, the Parties have agreed to amend the RSA as described herein.

**NOW, THEREFORE**, in consideration of the foregoing, the covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.     <u>Amendment to the RSA</u>.   The RSA is, effective as of the date hereof and subject to the satisfaction of the conditions precedent set forth in <u>Section 4</u> of this Agreement, hereby amended as follows:

(a)     Section 4(h) of the RSA is amended by deleting the words "Class 3 Claim" and adding the words "Class 4 Claim" in the place thereof;

(b)     Section 6(c) of the RSA is amended by deleting the words "February 8, 2010" and adding the words "February 10, 2010" in the place thereof; and

(c)     Section 6 of the RSA is amended by (i) deleting the word "or" at the end of clause (p), (ii) deleting the period (.) at the end of clause (q) and adding "; or" in the place thereof and (iii) adding the following as a new clause (r):

"(r) at 5:00 P.M. prevailing Eastern Time on February 8, 2010 if the Consenting Holders shall not have reaffirmed or been deemed to have reaffirmed support of the Plan, Amended and Restated Credit Agreement, Rights Offering Term Sheet and Equity Commitment Letter."

2.     <u>Representations and Warranties</u>.  Each Party hereby represents and warrants to the other Parties (provided that the representations and warranties in clause (e) below shall be given by the Required Consenting Holders only) that the following statements are true, correct and complete as of the date hereof and as of the date of any amendment of this Agreement approved by such Party:

(a)     <u>Power and Authority; Authorization</u>.  It has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b)     <u>No Conflicts</u>.  The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(c)     <u>Governmental Consents</u>.  The execution, delivery and performance by such Party of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any Federal, state or governmental authority or regulatory body other than the Bankruptcy Court.

(d)     <u>Binding Obligation</u>.  This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(e)     <u>Ownership</u>.  If such Party is a Required Consenting Holder, such Required Consenting Holder (i) either (A) is the sole legal and beneficial owner of the Debt set forth

below its name on the signature page hereof and all related Claims, in each case free and clear of all claims, liens and encumbrances or (B) has investment or voting discretion with respect to such Debt and Claims and has the power and authority to bind the beneficial owner(s) of such Debt and Claims to the terms of this Agreement and (ii) such Required Consenting Holder has full power and authority to vote on and consent to such matters concerning such Debt and Claims and to Transfer such Debt and Claims.

3.    Amendments.  This Agreement may not be amended, supplemented or otherwise modified except as provided in the RSA.

4.    Effectiveness.  Subject to the condition precedent set forth below, this Agreement shall become effective and binding on each Party upon the execution and receipt by the Company of (i) signature pages to this Agreement signed by the Company, the Administrative Agent, the Second Lien Agent, the Equity Investors and the Required Consenting Holders and (ii) by 5:00 P.M. prevailing Eastern Time on February 8, 2010, a sufficient number of (A) executed Joinder Agreements (in the form attached hereto as Exhibit A) or (B) ballots cast in support of the Plan, collectively, sufficient to constitute, when taken together with the existing Consenting Second Lien Debt Holders, support of the Plan by at least 66 ⅔% of the aggregate principal amount of the Second Lien Debt and more than 50% of the number of holders of Claims in respect of Second Lien Debt (the "***Effective Date***").  Delivery by telecopier or electronic mail of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart hereof.  Notwithstanding the foregoing, this Agreement shall become binding (i) on the Administrative Agent and the Consenting First Lien Debt Holders only upon the Company's payment to the Administrative Agent, for the account and benefit of the First Lien Lenders, of an amount equal to all fees and expenses of Weil and CDG due and owing as of the anticipated Effective Date and (ii) on the Second Lien Agent and the Consenting Second Lien Debt Holders only upon the Company's payment to the Second Lien Agent of an amount equal to all fees and expenses of Pillsbury due and owing as of the anticipated Effective Date (which fees and expenses shall be invoiced at least two (2) business days prior to the anticipated Effective Date).

5.    GOVERNING LAW; JURISDICTION; JURY TRIAL WAIVER.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  NOTWITHSTANDING THE FOREGOING CONSENT TO

JURISDICTION, UPON THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY. THE PARTIES WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN THE PARTIES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

6. _Remedies_. All remedies which are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to the non-breaching Party. All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party or any other Party.

7. _Survival_. Notwithstanding the termination of the RSA in accordance with its terms, the agreements and obligations of the Parties in Sections 5, 6, 7, 14, 15 and 18 hereof shall survive such termination and shall continue in full force and effect for the benefit of the Parties hereto in accordance with the terms hereof.

8. _Headings_. The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

9. _Successors and Assigns; Severability; Several Obligations_. This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives. The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction. The agreements, representations and obligations of the Required Consenting Holders under this Agreement are, in all respects, several and not joint.

10. _No Third Party Beneficiaries_. Unless otherwise expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third party beneficiary hereof.

11. _Entire Agreement_. The RSA, as amended by this Agreement, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Plan, the other Approved Plan Documents or the Fee Letter (as defined in the Amended and Restated Credit Agreement).

12. _Counterparts_. This Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and

delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

13. <u>Consideration</u>. Other than as provided in the Plan and this Agreement, it is hereby acknowledged by the Parties that no payment or additional consideration shall be due or paid to any of the Consenting Holders for their agreement to vote in accordance with, and otherwise comply with the terms and conditions of the RSA, as amended by this Agreement.

14. <u>Reservation of Rights</u>. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Consenting Holder to protect and preserve its rights, remedies and interests, including its Claims against the Company. Nothing herein shall be deemed an admission of any kind. If the transactions contemplated herein are not consummated, or this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

15. <u>Publicity; Confidentiality</u>.

(a) The Parties agree that all press releases, public filings, public announcements or other communications or the transactions contemplated hereby and any amendments thereof with any news media relating to this Agreement shall be submitted and mutually acceptable to counsel for the Administrative Agent, counsel for the Second Lien Agent and counsel for the Company. The Company shall not (a) use the name of the Administrative Agent, the Second Lien Agent or any Consenting Holder in any press release without such Party's prior written consent or (b) disclose to any person, other than legal, accounting and financial advisors to the Company, the principal amount or percentage of Debt held by any Consenting Holder or any of its respective subsidiaries; <u>provided</u>, <u>however</u>, that the Company shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of Debt held by the Consenting Holders as a group. Notwithstanding the foregoing, the Consenting Holders and the Equity Investors hereby consent to the disclosure by the Company in the Plan, the Disclosure Statement, the other Approved Plan Documents and any required filings by the Company with the Bankruptcy Court or as otherwise required by law or regulation, of the execution, terms and contents of this Agreement.

(b) The Parties understand and acknowledge that, until publicly disclosed as herein contemplated, the terms of this Agreement and the exhibits hereto are confidential information, and the Parties agree to keep such information confidential and not use it for any purpose except as contemplated hereby or as reasonably necessary in the Chapter 11 Cases.

16. <u>Further Assurances</u>. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Plan and consummate the Transactions.

17. <u>Representation by Counsel</u>. Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions

contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

18. <u>Fiduciary Duties</u>. Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the Company or any directors or officers of the Company, in such person's capacity as a director or officer of the Company, to take any action, or to refrain from taking any action, that such person determines in good faith, after consultation with counsel, is inconsistent with its or their fiduciary obligations under applicable law, and no action or failure to take action, including, without limitation, any disclosure that the board of directors of Holdings so determines is required by its fiduciary duties pursuant to this <u>Section 18</u> shall be deemed to have been so required.

19. <u>Continued Banking Practices</u>. Notwithstanding anything herein to the contrary, each Consenting Holder, the First Lien Agent and the Second Lien Agent, and their respective affiliates, may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to the Company or any affiliate of the Company or any other person, including, but not limited to, any person proposing or entering into a transaction related to or involving the Company or any affiliate thereof.

20. <u>Acknowledgement</u>. This Agreement and the Transactions are the product of negotiations among the Parties, together with their respective representatives. This Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. The votes of the holders of claims against the Company will not be solicited until such holders who are entitled to vote on the Plan have received the Disclosure Statement and any other required materials related to the Solicitation. In addition, this Agreement does not constitute an offer to issue or sell securities to any person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

21. <u>No Waiver</u>. The failure of any Party hereto to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party hereto with its obligations hereunder, and any custom or practice or the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such right, power or remedy or to demand such compliance.

\* \* \* \* \*

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above.

PENTON MEDIA, INC.
PENTON BUSINESS MEDIA, INC.
PENTON BUSINESS MEDIA HOLDINGS, INC.
PENTON BUSINESS MEDIA
  PUBLICATIONS, INC.
PENTON BUSINESS MEDIA INTERNET, INC.
INTERNET WORLD MEDIA, INC.
DUKE INVESTMENTS, INC.
DUKE COMMUNICATIONS
  INTERNATIONAL, INC.
DVGM & ASSOCIATES

By:_____
    Name:
    Title:

**[SECOND LIEN REQUIRED LENDERS]**

By: _____
Name:
Title:

**[FIRST LIEN REQUIRED LENDERS]**


By: _____
Name:
Title:

**GENERAL ELECTRIC CAPITAL CORPORATION, AS ADMINISTRATIVE AGENT**

By:_____
Name:
Title:

**WELLS FARGO BANK, NATIONAL ASSOCIATION, AS SECOND LIEN AGENT**


By: _____
Name:
Title:

**MIDOCEAN PARTNERS III, L.P.**

By: _____
Name:
Title:

**WASSERSTEIN PARTNERS, L.P.**


By:_____
Name:
Title:

## **Exhibit A**

JOINDER AGREEMENT

# **EXHIBIT VII**

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT
COPIES OF ALL DOCUMENTS FILED FROM AND INCLUDING THE RESTATED
CERTIFICATE OR A MERGER WITH A RESTATED CERTIFICATE ATTACHED OF
"PENTON BUSINESS MEDIA HOLDINGS, INC." AS RECEIVED AND FILED IN
THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

RESTATED CERTIFICATE, CHANGING ITS NAME FROM "PRISM BUSINESS
MEDIA HOLDINGS INC." TO "PENTON BUSINESS MEDIA HOLDINGS, INC.",
FILED THE TWENTY-FIRST DAY OF MARCH, A.D. 2007, AT 6:39 O'CLOCK
P.M.

CERTIFICATE OF CHANGE OF REGISTERED AGENT, FILED THE SIXTH
DAY OF MAY, A.D. 2008, AT 4:31 O'CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

**4011191  8100X**

**100040927**

AUTHENTICATION: *7759294*

DATE: *01-14-10*

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 06:38 PM 03/21/2007*
*FILED 06:39 PM 03/21/2007*
*SRV 070345802 - 4011191 FILE*

# FOURTH AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

## OF

## PRISM BUSINESS MEDIA HOLDINGS INC.

(Pursuant to Sections 228, 242 and 245 of the General
Corporation Law of the State of Delaware)

Prism Business Media Holdings Inc., a Delaware corporation (the "Corporation"),
hereby certifies that:

FIRST: The name of the Corporation is "Prism Business Media Holdings Inc."
The date of filing its original Certificate of Incorporation with the Secretary of State was
August 5, 2005, and its original name was PBI MEDIA HOLDINGS INC.

SECOND: This Fourth Amended and Restated Certificate of Incorporation (this
"Certificate") amends and restates in its entirety the Certificate of Incorporation of the
Corporation. This Certificate has been approved by the directors of the Corporation and
duly adopted by the stockholders in the manner and by the vote prescribed by Sections
228, 242 and 245 of the General Corporation Law of the State of Delaware.

THIRD: This Certificate will become effective immediately upon its filing with the
Secretary of State of the State of Delaware.

FOURTH: Upon the filing with the Secretary of State of the State of Delaware of
this Certificate, the Certificate of Incorporation of the Corporation will be amended and
restated in its entirety to read as follows:

\*　　\*　　\*　　\*　　\*

## FOURTH AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

### OF

### PENTON BUSINESS MEDIA HOLDINGS, INC.

FIRST:     The name of this corporation is Penton Business Media Holdings, Inc.

SECOND:     Its Registered Office and Registered Agent in the State of Delaware is Capitol Services, Inc., 615 South Dupont Highway, Kent County, Dover, DE 19901.

THIRD:     The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the Delaware General Corporation Law.

FOURTH:     The total authorized capital stock of the corporation is 2,000,000 shares of Common Stock, of which par value is $0.01 per share.

FIFTH:     The duration of the corporation shall be perpetual.

SIX:     The personal liability of all of the directors of the corporation is hereby eliminated to the fullest extent allowed as provided by the Delaware General Corporation Law, as the same may be supplemented and amended.

SEVENTH:     The corporation shall, to the fullest extent legally permissible under the provisions of the Delaware General Corporation Law, as the same may be amended and supplemented, have the power to indemnify and hold harmless any and all persons whom it shall have power to indemnify under said provisions from and against any and all liabilities (including expenses) imposed upon or reasonably incurred by such person in connection with any action, suit or other proceeding in which such person may be involved or with which such person may be threatened, or other matters referred to in or covered by said provisions both as to action in such person's official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a director or officer of the corporation. Such indemnification provided shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any Bylaw, agreement or resolution adopted by the shareholders entitled to vote thereon after notice.

EIGHTH:     The Bylaws may be altered, amended or repealed or new bylaws may be adopted by the stockholders or by the Board of Directors. The power of the Board of Directors to adopt, amend or repeal bylaws shall not divest or limit the power of the stockholders to adopt, amend or repeal bylaws.

Dated on this 15th day of March, 2007.

/s/ Anup Bagaria

# CERTIFICATE OF AMENDMENT

## OF

## FOURTH AMENDED AND RESTATED

## CERTIFICATE OF INCORPORATION

## OF

## PENTON BUSINESS MEDIA HOLDINGS, INC.

### a Delaware corporation

Pursuant to the provisions of Sections 242(a) and 303 of the General Corporation Law of the State of Delaware (the "GCLD"), the undersigned Penton Business Media Holdings, Inc. (the "Corporation") does hereby certify:

1.      The Fourth Amended and Restated Certificate of Incorporation of the Corporation is hereby amended by replacing Paragraph Fourth and adding Paragraph Ninth as follows:

FOURTH: The total authorized capital stock of the Corporation is [_____] shares of Common Stock, of which par value is $0.01 per share.

NINTH:  Subject to further amendments of this Fourth Amended and Restated Certificate of Incorporation of the Corporation, as provided by applicable law, the Corporation shall not issue any non-voting equity securities in violation of Section 1123(a)(6) of title 11 of the United States Code.

2.      This amendment to the Fourth Amended and Restated Certificate of Incorporation has been deemed approved without the need for Board of Directors or stockholder approval pursuant to Section 303 of the GCLD because it is adopted pursuant to the Joint Prepackaged Plan of Reorganization of the Corporation and certain of its subsidiaries, dated _____ __, 2010 as confirmed on _____ __, 2010 by the United States Bankruptcy Court for the Southern District of New York.

[Signature Page Follows]

IN WITNESS WHEREOF, I hereby sign my name and affirm that the statements made herein are true under the penalties of perjury, this [____] day of [_____], 2010.

PENTON BUSINESS MEDIA HOLDINGS, INC.

By:_____
Name:
Title:

# CERTIFICATE OF AMENDMENT

## OF

## SECOND AMENDED AND RESTATED

## CERTIFICATE OF INCORPORATION

## OF

## PENTON BUSINESS MEDIA, INC.

### a Delaware corporation

Pursuant to the provisions of Sections 242(a) and 303 of the General Corporation Law of the State of Delaware (the "GCLD"), the undersigned Penton Business Media, Inc. (the "Corporation") does hereby certify:

1.     The Second Amended and Restated Certificate of Incorporation of the Corporation is hereby amended by adding Paragraph Ninth as follows:

NINTH:  Subject to further amendments of this Second Amended and Restated Certificate of Incorporation of the Corporation, as provided by applicable law, the Corporation shall not issue any non-voting equity securities in violation of Section 1123(a)(6) of title 11 of the United States Code.

2.     This amendment to the Second Amended and Restated Certificate of Incorporation has been deemed approved without the need for Board of Directors or stockholder approval pursuant to Section 303 of the GCLD because it is adopted pursuant to the Joint Prepackaged Plan of Reorganization of the Corporation and certain of its affiliates, dated _____ __, 2010 as confirmed on _____ __, 2010 by the United States Bankruptcy Court for the Southern District of New York.

[Signature Page Follows]

IN WITNESS WHEREOF, I hereby sign my name and affirm that the statements made herein are true under the penalties of perjury, this [____] day of [_____], 2010.

PENTON BUSINESS MEDIA, INC.

By:_____
Name:
Title:

# CERTIFICATE OF AMENDMENT

## OF

## CERTIFICATE OF INCORPORATION

## OF

## PENTON MEDIA, INC.

### a Delaware corporation

Pursuant to the provisions of Sections 242(a) and 303 of the General Corporation Law of the State of Delaware (the "GCLD"), the undersigned Penton Media, Inc. (the "Corporation") does hereby certify:

1.      The Restated Certificate of Incorporation of the Corporation is hereby amended by adding Paragraph Eighth as follows:

EIGHTH:  Subject to further amendments of this Amended Certificate of Incorporation of the Corporation, as provided by applicable law, the Corporation shall not issue any non-voting equity securities in violation of Section 1123(a)(6) of title 11 of the United States Code.

2.      This amendment to the Certificate of Incorporation has been deemed approved without the need for Board of Directors or stockholder approval pursuant to Section 303 of the GCLD because it is adopted pursuant to the Joint Prepackaged Plan of Reorganization of the Corporation and certain of its affiliates, dated _____, 2010 as confirmed on _____ __, 2010 by the United States Bankruptcy Court for the Southern District of New York.

[Signature Page Follows]

IN WITNESS WHEREOF, I hereby sign my name and affirm that the statements made herein are true under the penalties of perjury, this [____] day of [_____], 2010.

PENTON MEDIA, INC.

By:_____
Name:
Title:

# CERTIFICATE OF AMENDMENT

## OF

## SECOND AMENDED AND RESTATED

## CERTIFICATE OF INCORPORATION

## OF

## PENTON BUSINESS MEDIA PUBLICATIONS, INC.

### a Delaware corporation

Pursuant to the provisions of Sections 242(a) and 303 of the General Corporation Law of the State of Delaware (the "GCLD"), the undersigned Penton Business Media Publications, Inc. (the "Corporation") does hereby certify:

1.     The Second Amended and Restated Certificate of Incorporation of the Corporation is hereby amended by adding Paragraph Ninth as follows:

NINTH:  Subject to further amendments of this Amended Certificate of Incorporation of the Corporation, as provided by applicable law, the Corporation shall not issue any non-voting equity securities in violation of Section 1123(a)(6) of title 11 of the United States Code.

2.     This amendment to the Second Amended and Restated Certificate of Incorporation has been deemed approved without the need for Board of Directors or stockholder approval pursuant to Section 303 of the GCLD because it is adopted pursuant to the Joint Prepackaged Plan of Reorganization of the Corporation and certain of its affiliates, dated _____ __, 2010 as confirmed on _____ __, 2010 by the United States Bankruptcy Court for the Southern District of New York.

[Signature Page Follows]

IN WITNESS WHEREOF, I hereby sign my name and affirm that the statements made herein are true under the penalties of perjury, this [___] day of [_____], 2010.

PENTON BUSINESS MEDIA
PUBLICATIONS, INC.

By: _____
Name:
Title:

# CERTIFICATE OF AMENDMENT

## OF

## SECOND AMENDED AND RESTATED

## CERTIFICATE OF INCORPORATION

## OF

## PENTON BUSINESS MEDIA INTERNET, INC.

### a Delaware corporation

Pursuant to the provisions of Sections 242(a) and 303 of the General Corporation Law of the State of Delaware (the "GCLD"), the undersigned Penton Business Media Internet, Inc. (the "Corporation") does hereby certify:

1.      The Second Amended and Restated Certificate of Incorporation of the Corporation is hereby amended by adding Paragraph Ninth as follows:

NINTH:  Subject to further amendments of this Amended Certificate of Incorporation of the Corporation, as provided by applicable law, the Corporation shall not issue any non-voting equity securities in violation of Section 1123(a)(6) of title 11 of the United States Code.

2.      This amendment to the Certificate of Incorporation has been deemed approved without the need for Board of Directors or stockholder approval pursuant to Section 303 of the GCLD because it is adopted pursuant to the Joint Prepackaged Plan of Reorganization of the Corporation and certain of its affiliates, dated _____ __, 2010 as confirmed on _____ __, 2010 by the United States Bankruptcy Court for the Southern District of New York.

[Signature Page Follows]

IN WITNESS WHEREOF, I hereby sign my name and affirm that the statements made herein are true under the penalties of perjury, this [___] day of [_____], 2010.

PENTON BUSINESS MEDIA INTERNET, INC.


By:_____
Name:
Title:

# CERTIFICATE OF AMENDMENT

## OF

## CERTIFICATE OF INCORPORATION

## OF

## INTERNET WORLD MEDIA, INC.

**a Delaware corporation**


Pursuant to the provisions of Sections 242(a) and 303 of the General Corporation Law of the State of Delaware (the "GCLD"), the undersigned Internet World Media, Inc. (the "Corporation") does hereby certify:

1.    The Certificate of Incorporation of the Corporation is hereby amended by adding Article VIII as follows:

Article VIII:  Subject to further amendments of this Amended Certificate of Incorporation of the Corporation, as provided by applicable law, the Corporation shall not issue any non-voting equity securities in violation of Section 1123(a)(6) of title 11 of the United States Code.

2.    This amendment to the Certificate of Incorporation has been deemed approved without the need for Board of Directors or stockholder approval pursuant to Section 303 of the GCLD because it is adopted pursuant to the Joint Prepackaged Plan of Reorganization of the Corporation and certain of its affiliates, dated _____ ___, 2010 as confirmed on _____ ___, 2010 by the United States Bankruptcy Court for the Southern District of New York.


[Signature Page Follows]

IN WITNESS WHEREOF, I hereby sign my name and affirm that the statements made herein are true under the penalties of perjury, this [\_\_\_] day of [_____], 2010.

INTERNET WORLD MEDIA, INC.


By:_____
Name:
Title:

# CERTIFICATE OF AMENDMENT

## OF

## ARTICLES OF INCORPORATION

## OF

## DVGM & ASSOCIATES

### a California corporation


Pursuant to the provisions of Sections 900 and 1400 of the Corporations Code of the State of California (the "CCA"), the undersigned DVGM & Associates (the "Corporation") does hereby certify:

1.      The Articles of Incorporation of the Corporation is hereby amended by adding Paragraph Eighth as follows:

EIGHTH:  Subject to further amendments of these Amended Articles of Incorporation of the Corporation, as provided by applicable law, the Corporation shall not issue any non-voting equity securities in violation of Section 1123(a)(6) of title 11 of the United States Code.

2.      This amendment to the Articles of Incorporation has been deemed approved without the need for Board of Directors or stockholder approval pursuant to Section 1400 of the CCA because it is adopted pursuant to the Joint Prepackaged Plan of Reorganization of the Corporation and certain of its affiliates, dated _____ __, 2010 as confirmed on _____ __, 2010 by the United States Bankruptcy Court for the Southern District of New York.


[Signature Page Follows]

IN WITNESS WHEREOF, I hereby sign my name and affirm that the statements made herein are true under the penalties of perjury, this [____] day of [_____], 2010.

DVGM & ASSOCIATES

By:_____
Name:
Title:

# CERTIFICATE OF AMENDMENT

## OF

## ARTICLES OF INCORPORATION

## OF

## DUKE COMMUNICATIONS INTERNATIONAL, INC.

### a Colorado corporation

Pursuant to the provisions of Sections 7-110-101 and 7-110-108 of the Colorado Business Corporations Act (the "CBCA"), the undersigned Duke Communications International, Inc. (the "Corporation") does hereby certify:

1.　　The Articles of Incorporation of the Corporation are hereby amended by adding Paragraph Eleventh as follows:

ELEVENTH:　Subject to further amendments of these Amended Articles of Incorporation of the Corporation, as provided by applicable law, the Corporation shall not issue any non-voting equity securities in violation of Section 1123(a)(6) of title 11 of the United States Code.

2.　　This amendment to the Articles of Incorporation has been deemed approved without the need for Board of Directors or stockholder approval pursuant to Section 7-110-108 of the CBCA because it is adopted pursuant to the Joint Prepackaged Plan of Reorganization of the Corporation and certain of its affiliates, dated _____ __, 2010 as confirmed on _____ __, 2010 by the United States Bankruptcy Court for the Southern District of New York.

[Signature Page Follows]

IN WITNESS WHEREOF, I hereby sign my name and affirm that the statements made herein are true under the penalties of perjury, this [____] day of [_____], 2010.

DUKE COMMUNICATIONS
INTERNATIONAL, INC.


By:_____
Name:
Title:

# CERTIFICATE OF AMENDMENT

## OF

## ARTICLES OF INCORPORATION

## OF

## DUKE INVESTMENTS, INC.

### a Colorado corporation

Pursuant to the provisions of Sections 7-110-101 and 7-110-108 of the Colorado Business Corporations Act (the "CBCA"), the undersigned Duke Investments, Inc. (the "Corporation") does hereby certify:

     1.    The Articles of Incorporation of the Corporation are hereby amended replacing Article Fourth and adding Article Eleventh as follows:

FOURTH: The corporation shall have authority to issue one thousand (1,000) shares of common voting stock with no par value.

ELEVENTH: Subject to further amendments of these Amended Articles of Incorporation of the Corporation, as provided by applicable law, the Corporation shall not issue any non-voting equity securities in violation of Section 1123(a)(6) of title 11 of the United States Code.

     2.    This amendment to the Articles of Incorporation has been deemed approved without the need for Board of Directors or stockholder approval pursuant to Section 7-110-108 of the CBCA because it is adopted pursuant to the Joint Prepackaged Plan of Reorganization of the Corporation and certain of its affiliates, dated _____ __, 2010 as confirmed on _____ __, 2010 by the United States Bankruptcy Court for the Southern District of New York.

[Signature Page Follows]

IN WITNESS WHEREOF, I hereby sign my name and affirm that the statements made herein are true under the penalties of perjury, this [____] day of [_____], 2010.

DUKE INVESTMENTS, INC.

By:_____
Name:
Title:

# EXHIBIT VIII

# PENTON BUSINESS MEDIA HOLDINGS, INC.

\* \* \* \* \*
## BYLAWS
\* \* \* \* \*

# ARTICLE I
## MEETINGS OF STOCKHOLDERS

Section 1.     All meetings of the stockholders for the election of directors or for any other purpose shall be held at such time and place, within or without the State of Delaware, as may be designated by the Board of Directors, or by the President or the Secretary in the absence of a designation by the Board of Directors, and stated in the notice of the meeting or in a duly executed waiver of notice thereof.

Section 2.     An annual meeting of the stockholders shall be held on such date as shall be designated from time to time by the Board of Directors, at which meeting the stockholders shall elect by a plurality vote the directors to succeed those whose terms expire and shall transact such other business as may properly be brought before the meeting.

Section 3.     Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by law or by Certificate of Incorporation, may be called by the Board of Directors or the President, and shall be called by the President at the request in writing of stockholders owning a majority in interest of the entire capital stock of the Corporation issued and outstanding and entitled to vote.  Such request shall be sent to the President and shall state the purpose or purposes of the proposed meeting.  Business transacted at any special meeting of stockholders shall be limited to the purpose or purposes stated in the notice.

Section 4.     The Board of Directors may, in its sole discretion, determine that a meeting of stockholders shall not be held at any place, but may instead be held solely by means of remote communication as authorized by Section 211(a)(2) of the General Corporation Law of Delaware.  If so authorized, and subject to such guidelines and procedures as the Board of Directors may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication, participate in a meeting of stockholders and be deemed present in person and vote at a meeting of stockholders whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (i) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (ii) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (iii) if any stockholder or proxyholder votes or takes other action at the meeting by means of

remote communication, a record of such vote or other action shall be maintained by the Corporation.

Section 5.    Written notice of every meeting of the stockholders, stating the place, date and hour of the meeting, the means of electronic communication, if any, by which stockholders may participate and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given not less than 10 nor more than 60 days before the date of the meeting to each stockholder entitled to vote at such meeting, except as otherwise provided herein or by law.  When a meeting is adjourned to another place, date or time, written notice need not be given of the adjourned meeting if the place, date and time thereof are announced at the meeting at which the adjournment is taken; provided, however, that if the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, written notice of the place, date and time of the adjourned meeting shall be given in conformity herewith.  At any adjourned meeting, any business may be transacted which might have been transacted at the original meeting.

Section 6.    The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least ten days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of at least ten days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

Section 7.    The holders of a majority of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by statute or by the Certificate of Incorporation.  When a quorum is present at any meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which by express provision of the statutes or of the Certificate of Incorporation, a different vote is required in which case such express provision shall govern and control the decision of such question.

Section 8.    Unless otherwise provided in the Certificate of Incorporation, each stockholder shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of the capital stock having voting power held by such stockholder, but no proxy shall be voted on after three years from its date, unless the proxy provides for a longer period.  Every proxy must be duly executed and filed with the Secretary of the Corporation.  A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by filing an instrument in writing revoking the proxy or another duly executed proxy bearing a later date with the Secretary of the Corporation.

Section 9.    Unless otherwise provided in the Certificate of Incorporation, any action required to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed and dated by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.  Stockholders may, unless the Certificate of Incorporation provides otherwise, act by written consent to elect directors; provided, however, that if such consent is less than unanimous, such action by written consent may be in lieu of holding an annual meeting only if all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action.

A telegram, cablegram or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes herein, provided that any such telegram, cablegram or other electronic transmission sets forth or is delivered with information from which the Corporation can determine (A) that the telegram, cablegram or other electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder or proxyholder and (B) the date on which such stockholder or proxyholder or authorized persons or persons transmitted such telegram, cablegram or other electronic transmission.  The date on which such telegram, cablegram or electronic transmission is transmitted shall be deemed to be the date on which such consent was signed.  No consent given by telegram, cablegram or electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper form shall be delivered in accordance with Section 228 of the General Corporation Law of Delaware, to the Corporation by delivery to its registered office in Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all such purposes for which the original writing could be used, provided that such copy,

facsimile or other reproduction shall be a complete reproduction of the entire original writing.

## ARTICLE II
## DIRECTORS

Section 1.    The Board of Directors will consist of one or more members, including a member designated as the Chairman of the Board.  The number of directors may be changed by resolution of the Board of Directors.  The directors shall be elected at the annual meeting of the stockholders, except as provided in Section 2 of this Article, and each director elected shall hold office until his successor is elected and qualified, except as otherwise required by law.  Directors need not be stockholders.  Any decrease in the authorized number of directors shall not be effective until the expiration of the term of the directors then in office, unless, at the time of such decrease, there shall be vacancies on the Board of Directors which are being eliminated by such decrease.

Section 2.    Vacancies and newly created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director, and the directors so chosen shall hold office until the next annual election and until their successors are duly elected and shall qualify, unless sooner displaced.  If there are no directors in office, then an election of directors may be held in the manner provided by statute.

Section 3.    The business and affairs of the corporation shall be managed by or under the direction of its Board of Directors which may exercise all such powers of the corporation and do all such lawful acts and things as are not by statute or by the certificate of incorporation or by these by-laws directed or required to be exercised or done by the stockholders.

## MEETINGS OF THE BOARD OF DIRECTORS

Section 4.    The Board of Directors of the Corporation may hold meetings, both regular and special, either within or without the State of Delaware under the leadership and direction of the Chairman of the Board.

Section 5.    Regular meetings of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by the Board of Directors.

Section 6.    Special meetings of the Board of Directors may be called by the President on one day's notice to each director, by whom such notice is not waived, and shall be called by the President or Secretary in like manner and on like notice on the written request of two directors unless the Board of Directors consists of only one director; in which case special meetings shall be called by the President or Secretary in like manner and on like notice on the written request of the sole director.

Section 7.    At all meetings of the Board of Directors, a majority of directors shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors, except as may be otherwise specifically provided by statute or by the Certificate of Incorporation.  If a quorum shall not be present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 8.    Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board of Directors or committee, as the case may be, consent thereto in writing or electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board of Directors or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 9.    Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or any committee, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

## COMMITTEES OF DIRECTORS

Section 10.    The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.

In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not the member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to the following matters: (i) approving or adopting, or recommending to the stockholders, any action or matter expressly required by the General Corporation Law of Delaware to be submitted to stockholders for approval or (ii) adopting, amending or repealing any Bylaw of the Corporation.  Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board of Directors.

Section 11.    Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

## COMPENSATION OF DIRECTORS

Section 12.    Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, the Board of Directors shall have the authority to fix the compensation of directors.  The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director.  No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.  Members of special or standing committees may be allowed like compensation for attending committee meetings.

## REMOVAL OF DIRECTORS

Section 13.    Unless otherwise restricted by the Certificate of Incorporation or bylaw, any director or the entire Board of Directors may be removed, with or without cause, by the holders of a majority of shares entitled to vote at an election of directors.

## ARTICLE III
## NOTICES

Section 1.    Whenever, under the provisions of the statutes or of the Certificate of Incorporation or of these Bylaws, notice is required to be given to any director or stockholder, it shall not be construed to mean personal notice, but such notice may be given in writing, by mail, addressed to such director or stockholder, at his address as it appears on the records of the Corporation, with postage thereon prepaid, and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail.    Notice to directors may also be given personally or by electronic transmission or facsimile telecommunication. Notice may also be given to stockholders by a form of electronic transmission in accordance with and subject to the provisions of Section 232 of the General Corporation Law of Delaware.

Section 2.    Whenever any notice is required to be given under the provisions of the statutes or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing, signed by the person or persons entitled to notice or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent thereto.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

## ARTICLE IV
## OFFICERS

Section 1.    The officers of the Corporation shall be chosen by the Board of Directors and shall be a President, a Chief Executive Officer, a Chief Financial Officer, a

Vice-President, a Secretary and a Treasurer. The Board of Directors may choose to leave any officer position vacant for any period of time it determines. The Board of Directors may also choose additional Vice-Presidents, and one or more Assistant Secretaries and Assistant Treasurers. Any number of offices may be held by the same person, unless the Certificate of Incorporation or these Bylaws otherwise provide.

Section 2.    The Board of Directors may appoint such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors.

Section 3.    The salaries of all officers and agents of the Corporation shall be fixed by the Board of Directors.

Section 4.    The officers of the Corporation shall hold office until their successors are chosen and qualified. Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors. Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors.

## THE PRESIDENT

Section 5.    The President shall preside at all meetings of the stockholders and the Board of Directors. The President shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## THE CHIEF EXECUTIVE OFFICER

Section 6.    The Chief Executive Officer shall have general and active management of the business of the Corporation and shall see that all orders and resolutions of the Board of Directors are carried into effect. The Chief Executive Officer shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## THE CHIEF FINANCIAL OFFICER

Section 7.    The Chief Financial Officer shall have general and active management of the finances of the Corporation. The Chief Financial Officer shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## THE VICE-PRESIDENTS

Section 8.    In the absence of the President or in the event of his inability or failure to act, the Vice-President (or in the event there be more than one Vice-President, the Vice-Presidents in the order designated by the directors, or in the absence of any designation, then in the order of their election) shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon

the President.  The Vice-Presidents shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## THE SECRETARY AND ASSISTANT SECRETARY

Section 9.    The Secretary shall attend all meetings of the Board of Directors and all meetings of the stockholders and record all the proceedings of the meetings of the Corporation and of the Board of Directors in a book to be kept for that purpose and shall perform like duties for the standing committees when required.  The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or President, under whose supervision the Secretary shall be.  The Secretary shall have custody of the corporate seal of the Corporation and the Secretary, or an Assistant Secretary, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by the signature of such Secretary or by the signature of such Assistant Secretary.  The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by the signature of such officer.

Section 10.    The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election) shall, in the absence of the Secretary or in the event of the Secretary's inability or failure to act, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## THE TREASURER AND ASSISTANT TREASURERS

Section 11.    The Treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors.

Section 12.    The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the President and the Board of Directors, at its regular meetings, or when the Board of Directors so requires, an account of all his transactions as Treasurer and of the financial condition of the Corporation.

Section 13.    The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election) shall, in the absence of the Treasurer or in the event of the Treasurer's inability or failure to act, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## ARTICLE V
## CERTIFICATES FOR SHARES

Section 1.    Certificates representing shares of stock of the Corporation shall be in such form as shall be determined by the Board of Directors, subject to applicable legal requirements.  Such certificates shall be numbered and their issuance recorded in the books of the Corporation, and such certificate shall exhibit the holder's name and the number of shares and shall be signed by, or in the name of the Corporation by, the President or a Vice-President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, of the Corporation and shall bear the corporate seal.  Any or all of the signatures and the seal of the Corporation, if any, upon such certificates may be facsimiles, engraved or printed.

Section 2.    Any of or all the signatures on a certificate may be facsimile.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer, transfer agent or registrar at the date of issue.

## LOST CERTIFICATES

Section 3.    The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed.  When authorizing such issue of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or his legal representative, to advertise the same in such manner as it shall require and/or to give the Corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

## TRANSFER OF STOCK

Section 4.    The shares of stock of the Corporation shall be transferred only upon the books of the Corporation by the holder thereof in person or by his or her attorney, upon surrender for cancellation of certificates for the same number of shares, with an assignment and power of transfer endorsed thereon or attached thereto, duly executed; with such proof of the authenticity of the signature as the Corporation or its agents may reasonably require.

## FIXING RECORD DATE

Section 5.    In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and

which record date shall not be more than 60 nor less than 10 days before the date of such meeting. If no record is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

Section 6.    In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to a Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

Section 7.    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

# ARTICLE VI
## GENERAL PROVISIONS

### DIVIDENDS

Section 1.    Dividends upon the capital stock of the Corporation, subject to the provisions of the Certificate of Incorporation, if any, may be declared by the Board of Directors at any regular or special meeting, pursuant to law.  Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation.

### FISCAL YEAR

Section 2.    The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

### SEAL

Section 3.    The Board of Directors may adopt a corporate seal and use the same by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

# ARTICLE VII
## INDEMNIFICATION

Section 1.    The Corporation shall indemnify its officers, directors, employees and agents to the extent permitted by the General Corporation Law of Delaware and as provided in the Certificate of Incorporation of the Corporation.

# ARTICLE VIII
## AMENDMENTS

Section 1.    The Bylaws of the Corporation may be altered, amended or repealed or new bylaws may be adopted by the stockholders or by the Board of Directors, when such power is conferred upon the Board of Directors by the Certificate of Incorporation.  The power of the Board of Directors to adopt, amend or repeal bylaws shall not divest or limit the power of the stockholders to adopt, amend or repeal bylaws.

# BYLAWS FOR SUBSIDIARIES OF PENTON BUSINESS MEDIA HOLDINGS, INC.

The current bylaws for the following subsidiaries will stay in place:

Penton Media, Inc.
Penton Business Media, Inc.
Duke Investments, Inc.
Duke Communications International, Inc.
DVGM & Associates
Internet World Media, Inc.
Penton Business Media Internet, Inc.
Penton Business Media Publications, Inc.

# EXHIBIT IX

## DIRECTORS AND OFFICERS
## OF
## PENTON BUSINESS MEDIA HOLDINGS, INC. AND SUBSIDIARIES

| Company | Directors | Officers |
|---|---|---|
| 1. Penton Business Media Holdings, Inc. | Anup Bagaria<br>Michael Struble<br>Tyler Zachem<br>Barrett Gilmer<br>Beverly Chell<br>Sharon Rowlands<br>William T. Kerr | Sharon Rowlands, CEO<br>Jean Clifton, CFO<br>Elise Zealand, General Counsel and Secretary |
| 2. Penton Media, Inc. | Anup Bagaria<br>Michael Struble<br>Tyler Zachem<br>Barrett Gilmer<br>Beverly Chell<br>Sharon Rowlands<br>William T. Kerr | Sharon Rowlands, CEO<br>Jean Clifton, CFO<br>Elise Zealand, General Counsel and Secretary |
| 3. Internet World Media, Inc. | Anup Bagaria<br>Tyler Zachem | Sharon Rowlands, CEO<br>Jean Clifton, CFO<br>Elise Zealand, General Counsel and |

| Company | Directors | Officers |
|---|---|---|
|  |  | Secretary |
| 4. Duke Investments, Inc. | Anup Bagaria<br>Tyler Zachem | Sharon Rowlands, CEO<br>Jean Clifton, CFO<br>Elise Zealand, General Counsel and Secretary |
| 5. Duke Communications International, Inc. | Anup Bagaria<br>Tyler Zachem | Sharon Rowlands, CEO<br>Jean Clifton, CFO<br>Elise Zealand, General Counsel and Secretary |
| 6. DVGM & Associates, Inc. | Anup Bagaria<br>Tyler Zachem | Sharon Rowlands, CEO<br>Jean Clifton, CFO<br>Elise Zealand, General Counsel and Secretary |

| Company | Directors | Officers |
|---------|-----------|----------|
| 7. Penton Business Media, Inc. | Anup Bagaria<br>Michael Struble<br>Tyler Zachem<br>Barrett Gilmer<br>Beverly Chell<br>Sharon Rowlands<br>William T. Kerr | Sharon Rowlands, CEO<br>Jean Clifton, CFO<br>Elise Zealand, General Counsel and Secretary |
| 8. Penton Business Media Internet, Inc. | Anup Bagaria<br>Michael Struble<br>Tyler Zachem<br>Barrett Gilmer<br>Beverly Chell<br>Sharon Rowlands<br>William T. Kerr | Sharon Rowlands, CEO<br>Jean Clifton, CFO<br>Elise Zealand, General Counsel and Secretary |

| Company | Directors | Officers |
|---|---|---|
| 9. Penton Business Media Publications, Inc. | Anup Bagaria<br><br>Michael Struble<br><br>Tyler Zachem<br><br>Barrett Gilmer<br><br>Beverly Chell<br><br>Sharon Rowlands<br><br>William T. Kerr | Sharon Rowlands, CEO<br><br>Jean Clifton, CFO<br><br>Elise Zealand, General Counsel and Secretary |

## DIRECTOR AND OFFICER BIOGRAPHIES

### Anup Bagaria

Mr. Bagaria is Vice Chairman of Wasserstein & Co. and a member of the Investment Committee. He joined Wasserstein & Co. in 1993. He was the senior partner responsible for ALM Media and Real Estate Media and currently oversees The Deal, Penton Media, Sportcraft and Wasserstein & Co.'s minority investment in Hanley Wood. He serves on the boards of numerous portfolio companies, including Penton Media. He is also the Chief Executive Officer of NY Magazine Holdings.

Mr. Bagaria received his B.S. from the Massachusetts Institute of Technology.

### Michael R. Struble

Mr. Struble is a Director at Wasserstein & Co. Since joining the Firm in 2003, he has primarily focused on Wasserstein & Co.'s publishing, online and other media investment activities. His historical and current investment responsibilities have included Penton Media, Hanley Wood, ALM Media, Real Estate Media and The Deal. Mr. Struble serves on the board of Penton Media. Prior to

joining the Firm, Mr. Struble worked at UBS in the Mergers & Acquisitions Group, where he focused primarily on media, consumer products and healthcare transactions.

Mr. Struble received his B.S. with honors from the University of Kansas in Business Administration.


**Tyler Zachem**

Tyler Zachem is a managing director for MidOcean Partners. Mr. Zachem joined MidOcean at its inception and focuses on investments in the Media and Communications and Business Services sectors. Prior to his current position as managing director with MidOcean Partners, Mr. Zachem was a managing director at DB Capital Partners. Previously, Mr. Zachem served as a partner at McCown De Leeuw & Co. and before that, he served in investment banking with McDonald & Company in Cleveland and as a consultant with McKinsey & Company. Mr. Zachem received his MBA from Harvard Business School, where he was awarded first year honors, and his BA magna cum laude, Phi Beta Kappa from the University of Rochester. Mr. Zachem serves on the board of Penton Media.


**Barrett Gilmer**

Barrett Gilmer is a vice preside for MidOcean Partners. Mr. Gilmer joined MidOcean as an associate in 2004 and focuses on investments in the Media and Communications sectors. Mr. Gilmer has been involved in the execution of MidOcean's investments in OneLink Communications, Thompson Publishing Group and Penton Media. Prior to joining MidOcean, Mr. Gilmer worked at Lehman Brothers in the M&A and leveraged finance groups. Mr. Gilmer received a B.A. in economics from Davidson College. Mr. Gilmer also serves on the board of directors of OneLink Communications. Mr. Gilmer serves on the board of Penton Media


**Beverly Chell**

Beverly Chell is a director of Penton Media Business Holdings, Inc. She currently serves as a consultant to PRIMEDIA Inc. From 1991 through November 2005, Ms. Chell was vice chairman, general counsel and secretary of to PRIMEDIA Inc. She also served as vice chairman and chief financial officer of to PRIMEDIA Inc. from December 2005 through June 2006.


**William T. Kerr**

William T. Kerr is a director of Penton Business Media Business Holdings, Inc. Mr. Kerr is also the Chair of Meredith Corporation,. From July 2004 to June 2006; Mr. Kerr served as Chair, President, and Chief Executive Officer of Meredith Corporation. Mr. Kerr is

also a director of Arbitron, Inc.; The Interpublic Group of Companies, Inc.; Principal Financial Group, Inc.; and Whirlpool Corporation.

## Sharon T. Rowlands

Sharon T. Rowlands has been the Chief Executive Officer of Penton Business Media Holdings, Inc. and its subsidiaries since October 7, 2008. Ms. Rowlands served as Chief Executive Officer of Thomson Financial, a subsidiary of Thomson Reuters Corporation and a strategic business unit of The Thomson Corporation PLC (formerly, Thomson Corp.) from April 2005 to April 2008. Ms. Rowlands also served as President of Thomson Financial from 2000 to April 2008 and also served as its Chief Operating Officer. She guided Thomson Financial through its transformation from a company of 45 disparate corporate entities to a global financial information and technology powerhouse. She changed the financial technology and information industry by creating a new business service model for Wall Street firms. Prior to Thomson Financial in the U.S., Ms. Rowlands served as Managing Director of Thomson Financial Database Group in Europe. Prior to joining Thomson Financial in 1996, she ran the North American operation of FT Information, and served as Managing Director of Extel Financial. She served in the financial information industry for more than 22 years. Prior to her career in the financial industry, she served for three years as a high school teacher and one year in trade publishing.

Ms. Rowlands has been a Director of Penton Business Media Holdings, Inc. since October 7, 2008. She has been Director of Junior Achievement of New York, Inc. since 2006. She has been Director of Automatic Data Processing, Inc. since April 30, 2008. She serves as a Director of American Business Media. She served as Member of Advisory Board at Ultimate Escapes. She served as Member of Advisory Board of Ultimate Resort, LLC. She served as Member of Global Board of Managers at Omgeo LLC until June 2008. In 2005, she received the Women's Bond Club Merit Award. Ms. Rowlands was graduated with a Bachelor of Arts Honors degree from Newcastle University and a Post Graduate teaching degree from the University of London's Goldsmiths College.

## Jean B. Clifton

Jean B. Clifton is Executive Vice President and Chief Financial Officer of Penton Business Media Holdings, Inc. and a member of Penton's Executive Committee.  Ms. Clifton joined Penton from Reader's Digest where she was Senior Vice President and Chief Financial Officer.  Prior to that, Ms. Clifton spent 20 years with Journal Register Company  serving as President and Chief Operating Officer, Executive Vice President and previously served as Chief Financial Officer and Treasurer.  She was also a member of Journal Register Company's Board of Directors.  Ms. Clifton has been an advisor to several media companies in the US and Asia.  Ms. Clifton is a CPA and began her financial career as an auditor at Arthur Young & Co.

Ms. Clifton received her bachelor's degree in business administration from the University of Michigan. A member of the American Institute of Certified Public Accountants, she has served on several Boards of Directors including, Journal Register Company, the board of trustees of the Newspaper Association of America Foundation and the boards of several non-profit organizations, including the American Red Cross and the Fresh Air Fund

**Elise Zealand**

Elise Zealand is the General Counsel and Secretary for Penton Business Media Holdings, Inc. Ms. Zealand joined Penton from Gibson, Dunn & Crutcher LLP, where she served as a senior associate. While at Gibson's New York office, her practice focused on the media and entertainment, publishing, and financial services industries, representing clients in a range of intellectual property and other commercial matters. Ms. Zealand joined Penton on February 11, 2008 and reports to CEO, Sharon Rowlands. She serves on Penton's Executive Committee.

Ms. Zealand's prior legal experience includes work as an associate at Manatt, Phelps and Phillips, LLP; Sullivan & Cromwell; and Cahill Gordon and Reindell LLP. She served as a law clerk to the U.S. District Court Judge William C. Conner, Senior District Judge, Southern District of New York.

Ms. Zealand received her bachelor's degree from Loyola College of Maryland and her law degree from Columbia Law School, where she was a James Kent Scholar, as well as the writing and research editor of the Columbia Journal of Law and Social Problems.

She began her career as a reporter, working first for The Cumberland Times-News and later for The Binghamton Press & Sun-Bulletin.

**EXHIBIT X**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE REJECTED**

**NONE**

**DISCLOSURE STATEMENT EXHIBIT II**

**LIQUIDATION ANALYSIS**

CHI-1738748v2

# Liquidation Analysis

## Summary of Estimated Asset Liquidation Values
## Liquidation as of 11/30/2009
*($ in millions)*

| | Book Value (Unaudited) | Estimated % Recovery | | Estimated Liquidation Value | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **Assets to be Liquidated** | | | | | |
| Cash [1] | $0.3 | 100.0% | 100.0% | 0.3 | 0.3 |
| Trade Accounts Receivable, net [2] | 46.7 | 40.0% | 65.0% | 18.7 | 30.4 |
| Inventories, net [3] | 4.9 | 25.1% | 47.2% | 1.2 | 2.3 |
| Deferred Tax Assets [4] | 0.9 | 0.0% | 0.0% | 0.0 | 0.0 |
| Prepayments, deposits and other [5] | 5.2 | 1.4% | 1.6% | 0.1 | 0.1 |
| Net Property & Equipment [6] | 16.2 | 2.5% | 7.9% | 0.4 | 1.3 |
| Goodwill and Other Intangibles, net [7] | 727.2 | 1.7% | 7.3% | 12.5 | 53.0 |
| Other Assets [8] | 3.1 | 0.0% | 0.0% | 0.0 | 0.0 |
| Deferred Financing Fees, net [9] | 10.5 | 0.0% | 0.0% | 0.0 | 0.0 |
| **Total** | **$814.9** | | | **$33.2** | **$87.4** |
| | | | | | |
| Cash [10] | $26.0 | 100.0% | 100.0% | $26.0 | $26.0 |
| Restricted Cash | 0.2 | 100.0% | 100.0% | 0.2 | 0.2 |
| **Total** | **$26.2** | | | **$26.2** | **$26.2** |
| | | | | | |
| **Total Assets** | **$841.1** | | | **$59.4** | **$113.6** |

Notes:

(1) Cash in control / blocked accounts as of 11/30/2009
(2) Estimated Liquidation Value of Trade Accounts Receivable
(3) Estimated Liquidation Value of Inventory
(4) Taxes are booked quarterly (balance as of 9/30)
(5) Estimated Liquidation Value of Prepayments, deposits and other
(6) Estimated Liquidation Value of Property & Equipment
(7) Estimated Liquidation Value of Goodwill and Other Intangibles - Third party conducts a review of Goodwill and Other Intangible annually on these assets. Management estimates that 4% to 17% of Other Intangible assets are recoverable, with the majority of value attributable to Indefinite Life Trade Names.  Recoverable value associated with goodwill is estimated to be zero.
(8) Estimated Liquidation Value of Other Assets
(9) Deferred Financing Fees are fees related to securing debt financing and are being amortized over the life on the loan in accordance with GAAP.  The Deferred Financing Fees are worthless in a liquidation scenario
(10) Cash in non-blocked accounts as of 11/30/2009

# Liquidation Analysis

## Summary of Estimated Asset Liquidation Values
## Liquidation as of 11/30/2009
*($ in millions)*

| | Estimated Claims | Estimated % Recovery Low | Estimated % Recovery High | Estimated Recovery Low | Estimated Recovery High |
|---|---|---|---|---|---|
| **Unrestricted Net Proceeds Available for Distribution** [1] | | | | $26.2 | $26.2 |
| | | | | | |
| **Less: Chapter 7 Administrative Claims** | | | | | |
| Management Incentive Program | 0.8 | 100.0% | 100.0% | $0.8 | $0.8 |
| Priority Tax Claims | 0.3 | 100.0% | 100.0% | 0.3 | 0.3 |
| 20 day goods | 0.6 | 100.0% | 100.0% | 0.6 | 0.6 |
| Professional Fees | 2.0 | 100.0% | 100.0% | 2.0 | 2.0 |
| Trustees Fees | 2.6 | 100.0% | 100.0% | 2.6 | 2.6 |
| Wind Down Costs - G&A | 4.8 | 100.0% | 100.0% | 4.8 | 4.8 |
| Wind Down Costs - Facilities | 1.2 | 100.0% | 100.0% | 1.2 | 1.2 |
| Final employee payment | 1.2 | 100.0% | 100.0% | 1.2 | 1.2 |
| Other Priority Claims | 1.9 | 100.0% | 100.0% | 1.9 | 1.9 |
| **Total Chapter 7 Administration Claims** | | | | $15.4 | $15.4 |
| | | | | | |
| **Unrestricted Net Proceeds Available After Chapter 7 Administrative Claims** [1] | | | | $10.8 | $10.8 |
| | | | | | |
| **Restricted Net Proceeds Available for Prepetition First Lien Debt** | | | | $33.2 | $87.4 |
| | | | | | |
| Less: Prepetition Revolving Credit Facility Claims [2] | 65.0 | 4.6% | 12.2% | 3.0 | 7.9 |
| Less: Prepetition First Lien Secured Debt Claims [2] [3] | 651.0 | 4.6% | 12.2% | 30.2 | 79.4 |
| | | | | | |
| **Restricted Net Proceeds Available After Prepetition First Lien Debt** | | | | $0.0 | $0.0 |
| | | | | | |
| **Net Proceeds Available After Application of Restricted Net Proceeds** | | | | $10.8 | $10.8 |

| | Low | High | Low | High | Low | High |
|---|---|---|---|---|---|---|
| Less: Prepetition Revolving Credit Facility Deficiency Claims [2] | 62.0 | 57.1 | 1.1% | 1.2% | 0.7 | 0.7 |
| Less: Prepetition First Lien Secured Debt Deficiency Claims [2] | 620.8 | 571.6 | 1.1% | 1.2% | 6.9 | 6.7 |
| Less: Prepetition Second Lien Secured Debt Claims [2] | 266.0 | 266.0 | 1.1% | 1.2% | 3.0 | 3.1 |
| Less: General Unsecured Claims | | | | | | |
| Trade Accounts Payable | 16.6 | | 1.1% | 1.2% | 0.2 | 0.2 |
| Accrued Compensation and Benefits | 4.0 | | 1.1% | 1.2% | 0.0 | 0.0 |
| Employee Obligations | 0.1 | | 1.1% | 1.2% | 0.0 | 0.0 |
| Owner's Management Fee | 0.5 | | 1.1% | 1.2% | 0.0 | 0.0 |
| | | | | | | |
| **Net Proceeds Available After Payments to Unsecured Creditors / Deficiency Claimants** | | | | | $0.0 | $0.0 |

(1) Excludes any copyright proceeds.
(2) Includes principal amount, excludes accrued interest.
(3) Reflects First Lien balance of $604.5 million and estimated hedge liability of $46.5 million

**DISCLOSURE STATEMENT EXHIBIT III**

**HISTORICAL FINANCIAL INFORMATION & PROJECTIONS**

CHI-1738748v2

<h1 style="text-align:center">Historical and Projected Financial Information</h1>

**A.      Introduction**

          This section provides summary information concerning the recent historical and projected financial performance of the Debtors.

          The projections assume an Effective Date of March 31, 2010, with allowed Claims treated in accordance with those provided for in the Plan.  Expenses incurred as a result of the reorganization cases are assumed to be paid on the Effective Date.  If the Debtors do not emerge from chapter 11 as currently scheduled, additional Administrative Expenses will be incurred until such time as a plan of reorganization is confirmed and becomes effective.  These Administrative Expenses could significantly impact the Debtors' cash flows.

          It is important to note that the projections described below may differ from actual performance and are highly dependent on significant assumptions concerning the future operations of the Debtors' businesses.  These assumptions include the growth of certain lines of business, labor and other operating costs, inflation, and the level of investment required for capital expenditures and working capital.  Please refer to Section VIII of the Disclosure Statement for a discussion of many of the factors that could have a material effect on the information provided in this section.

**B.      Projected Effective Date Balance Sheet and Summary Projected Operating Results**

          Outlined below are balance sheet and select income statement data for the Debtors, shown on a consolidated basis.  These include a projected consolidated balance sheet as of an assumed March 31, 2010 Effective Date and projected operating results for the three months ended March 31, 2010.

**Projected Balance Sheet as of March 31, 2010 ($ in thousands)** [1]

| Assets | Mar-10 Post-emergence |
|---|---|
| Cash and Cash Equivalents | $5,000 |
| Accounts Receivable | 48,987 |
| Inventories | 4,453 |
| Prepaid Expenses and Other | 4,554 |
| **Total Current Assets** | **62,995** |
| | |
| **Net PP&E** | **16,567** |
| | |
| Goodwill | 416,017 |
| Other Intangible Assets, net | 305,718 |
| Other Noncurrent Assets | 11,597 |
| Deferred Income Taxes | 859 |
| **Total Assets** | **$813,752** |
| | |
| **Liabilities & Equity** | |
| Accounts Payable | $13,724 |
| Accrued Expenses | 13,476 |
| Deferred Revenue | 33,270 |
| Management fee accrual | 500 |
| Fair value derivative instruments | 45,391 |
| **Total Current Liabilities** | **$106,361** |
| | |
| Deferred Income Taxes | 43,485 |
| Accrued pension liability | 14,761 |
| Other Long-Term Liabilities | 7,221 |
| | |
| Revolver | 786 |
| First Lien Term Loan | 623,688 |
| Second Lien Term Loan | - |
| **Total Debt** | **$624,474** |
| | |
| **Total Liabilities** | **$796,302** |
| | |
| New Equity | 32,500 |
| Common Equity | (15,050) |
| **Total Equity** | **$17,450** |
| | |
| **Total Liabilities + Equity** | **$813,752** |

(1) This balance sheet assumes a $42.7 million Revolving Credit facility. Does not include fresh start accounting adjustments regarding assumptions as to the reorganized equity value of the Reorganized Debtors, certain write-downs of their assets to fair market value and estimates of their liabilities as of the Effective Date. The Reorganized Debtors will be required to reflect such estimates or actual balances as of the Effective Date. Such determination will be based upon the fair value of its assets as of that date, which could be materially greater or lower than the values assumed in the foregoing estimates. Does not reflect the 2009 goodwill and intangible asset impairment adjustments.

**Summary Projected Operating Results for YTD in the Three Months Ended March 31, 2010 ($ in thousands)**

|                  | Mar-10    |
|------------------|-----------|
| Total Revenue    | $89,434   |
| Pro Forma EBITDA | $28,152   |

## C.    Historical and Projected Operating Performance

The following historical and projected financial performance and summary balance sheet items (the "Projections") reflect the operations of Penton Business Media Holdings, Inc. and its subsidiaries.

Historical information that is presented is derived from the audited GAAP financial statement of the Debtors. Although the presentation of the historical financial information does not conform to GAAP, the Debtors believe they provide a meaningful method of comparing historical periods to projected periods. Additionally, 2007 information reflects the pro forma effect of full year results for the Acquisition.

It is important to note that the Projections and estimates of value described below may differ from actual performance and are highly dependent on significant assumptions concerning the future operations of the Debtors' businesses. These assumptions include the growth of certain lines of business, labor and other operating costs, inflation, and the level of investment required for capital expenditures and working capital (see assumptions below). Please refer to Section VIII of the Disclosure Statement for a discussion of many of the factors that could have a material effect on the information provided in this section.

The Projections also assume that the Plan will be confirmed and consummated in accordance with its terms. Additionally, it assumes that there will be no material changes in the current regulatory environment that could have an unexpected impact on the Debtors' operations. The Projections assume an Effective Date of March 31, 2010, with allowed Claims treated in accordance with the Plan. Expenses incurred as a result of the reorganization cases are assumed to be paid upon the Effective Date of the Plan. If the Debtors do not emerge from chapter 11 by March 31, 2010, as assumed for purposes of this analysis, additional bankruptcy expenses will be incurred until such time as a plan of reorganization is confirmed and goes effective. These expenses could significantly impact the Debtors' results of operations and cash flows.

The Projections should be read in conjunction with the assumptions, qualifications and footnotes to the Projections set forth herein, the historical consolidated financial information (including the notes and schedules thereto) and the unaudited actual results reported in monthly and quarterly operating reports of the Debtors. The Projections were prepared by management in good faith based upon assumptions believed to be reasonable and applied in a manner consistent with past practice. The assumptions regarding the operations of the business leading to and after the assumed Effective Date were prepared in mid-fiscal year 2009 and were based, in part, on economic, competitive, and general business conditions prevailing at the time, as well as management's forecast for industry recovery and future performance.

The Debtors do not, as a matter of course, publicly disclose projections as to its future revenues, earnings, or cash flow. Accordingly, neither the Debtors, nor the Reorganized

Debtors intend to update or otherwise revise the Projections to reflect circumstances existing since their preparation, the occurrence of unanticipated events, or changes in general economic or industry conditions, even in the event that any or all of the underlying assumptions are shown to be in error.

The Projections were not prepared with a view towards complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants. The Projections have not been compiled, or prepared for examination or review, by the Debtors' independent auditors (who accordingly assume no responsibility for them).

While presented with numerical specificity, the Projections are based upon a variety of assumptions and are subject to significant business, economic, and competitive uncertainties and contingencies, many of which are beyond the control of the Debtors. These assumptions were based, in part, on economic, competitive, and general business conditions prevailing at the time the Projections were developed, as well as management's forecast for industry recovery and future performance. Consequently, the inclusion of the Projections herein should not be regarded as a representation by the Debtors (or any other person) that the Projections will be realized, and actual results may vary materially from those presented below. The industry in which the Debtors compete is highly competitive and the Debtors' earnings may be significantly adversely affected by changes in the competitive environment, changes in supply and demand dynamics, the price erosion of services provided, regulatory changes and future improvements in technology. Due to the fact that such Projections are subject to significant uncertainty and are based upon assumptions which may not prove to be correct, neither the Debtors nor any other person assumes any responsibility for their accuracy or completeness.

The following Projections do not include fresh start accounting adjustments regarding assumptions as to the reorganized equity value of the Reorganized Debtors', certain write-downs of its assets to fair market value and estimates of its liabilities as of the Effective Date. The Reorganized Debtors will be required to reflect such estimates or actual balances as of the Effective Date. Such determination will be based upon the fair value of their assets as of that date, which could be materially greater or lower than the values assumed in the foregoing estimates. Additionally, the Projections do not reflect the 2009 goodwill and intangible asset impairment adjustments.

………………………………………………………………………………………………

1.  *Unaudited Projected Free Cash Flow ($ in thousands)*

| | 2007A [1] | 2008A | 2009E | 2010P | 2011P | 2012P | 2013P | 2014P |
|---|---|---|---|---|---|---|---|---|
| **Total Revenue** | $440,715 | $407,525 | $300,809 | $289,450 | $301,675 | $322,209 | $343,749 | $366,907 |
| **Pro Forma EBITDA** [6] | $116,840 | $105,612 | $71,533 | $60,398 | $66,736 | $79,136 | $90,983 | $103,720 |
| Capex | | | (6,500) | (6,500) | (6,500) | (6,500) | (6,500) | (6,500) |
| EBITDA Adjustments | | | (7,113) | (3,000) | - | - | - | - |
| Restructuring / Severance | | | (7,257) | (1,105) | (1,105) | - | - | - |
| Cash taxes [4] | | | (911) | (800) | (800) | (800) | (800) | (800) |
| Change in Working capital / pension / other | | | (9,028) | (5,203) | (1,905) | (3,825) | (3,521) | (5,544) |
| **Free cash flow to Service Debt** | | | 40,724 | 43,790 | 56,426 | 68,011 | 80,163 | 90,876 |
| Less: Cash Interest expense [2] | | | (66,886) | (52,021) | (39,761) | (35,677) | (40,008) | (41,908) |
| Less: Scheduled amortization [3] | | | (6,200) | (6,423) | (6,423) | (1,606) | - | - |
| **Free cash flow post Debt Service** [5] | | | ($32,362) | ($14,654) | $10,242 | $30,728 | $40,155 | $48,968 |
| **PIK Interest** | | | $0 | $4,734 | $6,376 | $6,229 | $11,893 | $12,187 |
| **Capitalization** [7] | | | | | | | | |
| Revolver | | | $65,000 | $15,910 | $5,810 | $220 | $224 | $229 |
| First Lien Term Loan [3] | | | 602,950 | 623,548 | 623,359 | 620,278 | 609,121 | 591,187 |
| Second Lien Term Loan [2] | | | 266,000 | 0 | 0 | 0 | 0 | 0 |
| Cash Year End | | | 31,652 | 5,000 | 5,000 | 22,434 | 39,543 | 58,395 |

Notes:

(1) Results are pro forma for 12 months of Penton financials which was acquired on February 1, 2007

(2) Assumes elimination of Second Lien Term Loan in accordance with the Plan

(3) Excess Cash Flow payments are credited against the Scheduled Amortization

(4) Represents cash taxes; while the Debtors anticipate a low income tax obligation going forward, please refer to Article XIV of the Disclosure Statement which discusses taxes

(5) 2009 change in cash reflects operating changes only and does not include the impact of equity cure dividend

(6) Pro Forma EBITDA as defined by the Credit Agreement

(7) All balance sheet information reflects year end information and excludes hedge liabilities