JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Lisa G. Laukitis

 - and -

77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
Brad B. Erens
Robert E. Krebs
David A. Hall

Proposed Attorneys for Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                          :
In re                                                     :   Chapter 11
                                                          :
Penton Business Media Holdings, Inc., *et al.*,[1]        :   Case No. ___-_____ (___)
                                                          :
                            Debtors                       :   (Jointly Administered)
                                                          :
------------------------------------------------------------x

## MOTION OF THE DEBTORS FOR AN
## ORDER (I) AUTHORIZING USE OF CASH COLLATERAL,
## (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING
## THE AUTOMATIC STAY, AND (IV) SCHEDULING A FINAL HEARING

---

[1]     The Debtors are the following nine entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Penton Business Media Holdings, Inc. (9837); Penton Media, Inc. (5386); Penton Business Media, Inc. (1277); Duke Communications International, Inc. (7904); Duke Investments, Inc. (2160); DVGM & Associates (5363); Internet World Media, Inc. (5519); Penton Business Media Internet, Inc. (8290); and Penton Business Media Publications, Inc. (8292).

TO THE HONORABLE
UNITED STATES BANKRUPTCY JUDGE:

The above captioned debtors (collectively, the "<u>Debtors</u>"), hereby file this Motion pursuant to sections 105, 361, 362, 363 and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rule 4001-2 of the Local Bankruptcy Rules of the Southern District of New York (the "<u>Local Bankruptcy Rules</u>"), for an interim (the "<u>Interim Order</u>") and final order (the "<u>Final Order</u>"):

        a.        authorizing the Debtors' use of "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, "<u>Cash Collateral</u>") of their first and second lien lenders;

        b.        providing adequate protection to such secured parties as set forth herein for any diminution in value of their respective interests in their collateral, including Cash Collateral;

        c.        vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim and Final Order; and

        d.        scheduling a final hearing (the "<u>Final Hearing</u>") to consider the relief requested in the Motion for purposes of entry of the Final Order and approving the form of notice with respect to the Final Hearing.

The administrative agents for the Debtors' first and second lien lenders, at the direction of the "Required Lenders" for their respective syndicates, have consented to the entry of the Interim Order the form attached hereto and a Final Order in substantially the same form thereof.

In support of this Motion, the Debtors incorporate the statements contained in the Affidavit of Jean B. Clifton in Support of First-Day Pleadings (the "Clifton Affidavit") filed contemporaneously herewith, and further state as follows:

**Background**

1.      On the date hereof (the "Petition Date"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.[2]  The Debtors are one of the leading business-to-business media companies in the United States, delivering proprietary business information to owners, operators, managers and professionals in a number of industries.  The current company was formed in February 2007 out of the acquisition by Prism Business Media Holdings, Inc. of Penton Media, Inc., which created one of the largest business-to-business media companies in the United States.  The Debtors provide a diverse platform of media products across 15 industry clusters, including: publishing 113 trade magazines and associated web brands, hosting approximately 35 trade shows, conferences and roadshows and providing electronic media offerings, including websites, electronic newsletters, web conferences and other web-based media products.  The Debtors offer 25 data products and applications.  The Debtors' products reach more than 6 million business professionals.

2.      Prior to commencing these chapter 11 cases, the Debtors solicited and obtained the requisite votes to confirm a "pre-packaged" plan of reorganization (the "Plan").  On January 21, 2010, the Debtors distributed the Plan and related disclosure statement and commenced solicitation of votes on the Plan from their first lien lenders, Classes 2 and 3 under the Plan, and their second lien lenders, Class 4 under the Plan.  Classes 2, 3 and 4 are the only

---

[2]      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. § 1409.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

impaired classes under the Plan that are entitled to vote.  In connection with such solicitation, the Debtors established a voting record date of 5:00 p.m. eastern time on January 19, 2010 (the "Voting Record Date").  The Debtors also established a Plan voting deadline of 5:00 p.m. eastern time on January 28, 2010 (the "Voting Deadline"), which was subsequently extended on multiple occasions.  As set forth in the affidavit of Alison M. Tearnen attached as Exhibit A to the Motion of the Debtors for an Order (I) Scheduling a Combined Hearing to Approve Disclosure Statement and Confirm Plan of Reorganization, (II) Approving Form, Manner and Sufficiency of Notice of Such Combined Hearing and of the Commencement of These Chapter 11 Cases, (III) Approving Solicitation and Voting Procedures and (IV) Granting Related Relief filed contemporaneously herewith, the Debtors obtained the requisite votes for purposes of section 1129(a)(8) of the Bankruptcy Code from Classes 2, 3 and 4.  The Debtors filed the Plan and related disclosure statement on the Petition Date and, by means of a separate motion filed on the Petition Date, the Debtors seek approval of the disclosure statement and solicitation procedures and confirmation of the Plan as soon as practically possible.

## The Debtors' Capital Structure

3.    First Lien Credit Agreement.  The Debtors are party to that certain First Lien Credit Agreement, dated as of February 1, 2007 (as amended, the "First Lien Credit Agreement"), with General Electric Capital Corporation (the "Administrative Agent") and the other lenders party thereto (together with the Administrative Agent, the "First Lien Lenders").[3] The First Lien Credit Agreement provided the Debtors with: (a) an $80 million first lien revolving credit facility; and (b) a $620 million first lien term loan (the "First Lien Loans").

---

[3]    The First Lien Credit Agreement, all amendments thereto and all Security Documents (as defined in the First Lien Credit Agreement), all instruments related thereto and all Secured Swap Agreements (as defined in the First Lien Credit Agreement) are collectively referred to herein as the "First Lien Credit Documents".

4.      Secured Swap Agreements.  Pursuant to (a) that certain ISDA Master Agreement and Schedule to the 1992 ISDA Master Agreement, each dated as of February 22, 2007 between Penton Business and Credit Suisse International ("Credit Suisse"), (b) that certain ISDA Master Agreement and Amended and Restated Schedule to the Master Agreement, each dated as of February 22, 2007 between Penton Business and UBS AG ("UBS"), and (c) that certain ISDA 2002 Master Agreement and Schedule to the 2002 Master Agreement, each dated as of February 22, 2007 among Penton, Penton Business and JPMorgan Chase Bank, National Association ("JPMorgan" and, together with Credit Suisse and UBS, each a "Swap Counterparty" and collectively, the "Swap Counterparties"), the Swap Counterparties agreed to terms that would govern one or more Secured Swap Agreements (as defined in the First Lien Credit Agreement).  Each of these Secured Swap Agreements allow the Debtors to hedge against variability in the interest rates that the Debtors are subject to under the Prepetition Credit Documents (as defined below).

5.      First Lien Credit Agreement Obligations.  As of the Petition Date, the principal amount outstanding in respect of the First Lien Loans is approximately $668 million, of which approximately $65 million is the amount outstanding on the Debtors' first lien revolving loan.[4]

6.      Second Lien Credit Agreement.  The Debtors are party to that certain Second Lien Credit Agreement, dated as of February 1, 2007 (as amended, the "Second Lien Credit Agreement"), among Wells Fargo Bank, N.A., as successor to General Electric Capital

---

[4]      All amounts outstanding on the Petition Date in respect of the First Lien Loans, together with accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses and disbursements), reimbursement obligations, indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof to the extent and as provided for in the First Lien Credit Documents, and all obligations of the Debtors as of the Petition Date under the Secured Swap Agreements are referred to in the Interim Order as the "First Lien Obligations").

Corporation (the "Second Lien Administrative Agent", and together with the Administrative Agent, the "Prepetition Agents") and the other lenders party thereto (collectively, the "Second Lien Lenders", and together with the First Lien Lenders and the Swap Counterparties, the "Prepetition Secured Creditors").[5] The Second Lien Credit Agreement provided the Debtors with a $266 million second lien term loan (the "Second Lien Term Loan"). As of the Petition Date, the principal amount outstanding in respect of the Second Lien Term Loan is approximately $270 million, inclusive of accrued and unpaid interest, fees and expenses of the Second Lien Administrative Agent and Second Lien Lenders (collectively, the "Second Lien Obligations").

7. **Prepetition Liens and Prepetition Collateral.** Prior to the Petition Date, the Debtors granted security interests in and liens on substantially all of their existing and after acquired personal and real property, tangible and intangible assets, and the proceeds and products thereof (collectively, the "Prepetition Collateral") to: (a) with respect to the First Lien Obligations, the Administrative Agent, for itself, the First Lien Lenders and the Swap Counterparties (in each case, the "Prepetition First Liens"); and (b) with respect to the Second Lien Obligations, the Second Lien Administrative Agent, for itself and the Second Lien Lenders (in each case, the "Prepetition Second Liens", and together with the Prepetition First Liens, the "Prepetition Liens").[6] The Prepetition Second Liens are subordinate to the Prepetition First Liens in accordance with and subject to that certain Intercreditor Agreement described below.

---

[5]     The Second Lien Credit Agreement, all amendments thereto and all Security Documents (as defined in the Second Lien Credit Agreement) and instruments related thereto are collectively referred to herein as the "Second Lien Credit Documents", and together with the First Lien Credit Documents, the "Prepetition Credit Documents".

[6]     In their capacity as holders of their respective Prepetition First Liens, the First Lien Lenders and the Swap Counterparties shall be referred to collectively as the "Prepetition Senior Secured Creditors". In their capacity as holders of their respective Prepetition Second Liens, the Second Lien Lenders shall be referred to herein collectively as the "Prepetition Junior Lenders".

8.	<u>Intercreditor Agreement</u>.  The Administrative Agent (for itself and on behalf of the Prepetition Senior Secured Creditors), the Second Lien Administrative Agent (for itself and on behalf of the Second Lien Lenders) and the Debtors entered into that certain Intercreditor Agreement dated as of February 1, 2007 (the "<u>Intercreditor Agreement</u>").  Pursuant to the Intercreditor Agreement, the Prepetition First Liens are senior in all respects to the Prepetition Second Liens.  In addition, pursuant to the Intercreditor Agreement, the Second Lien Administrative Agent (for itself and on behalf of the Second Lien Lenders) consented in the event of a bankruptcy proceeding for the Debtors to the entry of a cash collateral and adequate protection order on certain terms.  In particular, under section 6.1 of the Intercreditor Agreement, if the First Lien Administrative Agent agrees to permit the use of Cash Collateral, then Second Lien Administrative Agent, on behalf of itself and the Second Lien Lenders, agrees that it will raise no objection to the use of Cash Collateral.

9.	Additionally, under section 6.1 of the Intercreditor Agreement, the Second Lien Administrative Agent has agreed to waive its rights to request adequate protection for use of the cash collateral in the event the Administrative Agent does not seek such relief.  If, however, the Administrative Agent is granted adequate protection for the use of cash collateral in the form of additional collateral, then the Second Lien Administrative Agent is permitted to seek adequate protection in the form of a lien on such additional collateral, which lien shall be subordinated to the lien of the Administrative Agent, on behalf of itself and the First Lien Lenders.  The Interim Order provides for such an adequate protection lien for the benefit of the Second Lien Administrative Agent.

## The Prepetition Agents' Liens in Cash

10.     Pursuant to the Prepetition Credit Documents, the Debtors granted liens to the Prepetition Agents in their cash and deposit accounts.  However, the Prepetition Agents did not perfect their security interests in all of such cash and deposit accounts as original collateral.  Nevertheless, the Prepetition Agents assert that they have a properly perfected lien in all cash as proceeds of other collateral.  Pursuant to sections 9-104, 9-312(b)(1) and 9-314(a) of the Uniform Commercial Code, for a lender to perfect a security interest in a deposit account that is not in the possession of the lender as original collateral, it must enter into a "deposit account control agreement" with the borrower that owns the deposit account and the relevant depository bank.  The Prepetition Agents have obtained control agreements from the Debtors on only a few of their deposit accounts.  Of the approximately $17.1 million in cash and cash equivalents of the Debtors as of the Petition Date, approximately $17.0 million was in deposit and securities accounts not subject to control agreements, the bulk of which is in one account that the Debtors use to hold excess funds (the "Excess Funds Account").  A significant amount of the cash in the Excess Funds Account originally arose as a result of funds borrowed by the Debtors on their first lien revolving loan.  The Prepetition Agents do not have as original collateral a perfected lien in borrowings from the first lien revolver.

11.     Notwithstanding the fact that the Prepetition Agents do not have a deposit control agreement in the Excess Funds Account, cash in that account may still be the cash collateral of the Prepetition Agents.  Pursuant to section 9-315(a)(2) of the Uniform Commercial Code, the Prepetition Agents may have a lien in the cash in the Excess Funds Account to the extent that such cash is "identifiable proceeds" of their other collateral, such as accounts receivable.  The cash in the Excess Funds Account is not itself "identifiable proceeds" of the

Prepetition Agents collateral, since some of such cash originally arose from borrowings by the Debtors on their first lien revolving loan. However, section 9-315(b)(2) of the Uniform Commercial Code permits the Prepetition Agents to assert that cash in the Excess Funds Account is the "identifiable proceeds" of their other collateral pursuant to "tracing methods" permitted under applicable law.

12. In determining whether proceeds may be "identifiable" by tracing under section 9-315(b), most courts require a creditor to trace proceeds using the so-called "Lowest Intermediate Balance Test" (the "LIB Test"). While the LIB Test is somewhat complicated, and may differ some from jurisdiction to jurisdiction, at base in many jurisdictions the LIB Test assumes that, when a deposit account contains both the proceeds of a lender's collateral and other cash, the lender's proceeds are deemed to be the last cash withdrawn from the account. As such, if the LIB Test applied in such fashion to the Excess Funds Account, funds withdrawn from that account would be deemed to have come from any non-cash collateral until the balance of the account were lower than the Prepetition Agents' cash collateral. Then, withdrawals would be deemed to be from the Prepetition Agents' cash collateral.

13. The Debtors have not performed a LIB Test analysis to help determine the extent to which, if any, the cash in the Excess Funds Account may constitute the Prepetition Agents' cash collateral under such a test. However, given the anticipated short duration of these chapter 11 cases, and because substantially all of the Debtors' Prepetition Secured Creditors have agreed to the terms of the Plan, the Debtors have agreed to treat all of their cash as Cash Collateral for the purposes of the Interim Order and a final order entered on this Motion (the "Orders"). Rather than undergo a costly perfection analysis, the Debtors will treat all cash as

Cash Collateral, reserving their right to assert at a later date, if for some reason one of the Orders terminates, that not all their cash actually is Cash Collateral.[7]

## The Proposed Terms of the Cash Collateral Order

14.     The ability of the Debtors to operate their businesses requires the use of cash that is Cash Collateral, or is deemed to be Cash Collateral, under the Orders, absent which immediate and irreparable harm would result to the Debtors, their estates and creditors, and the possibility for a successful chapter 11 case.  In the absence of the use of such Cash Collateral, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors, their estates and their creditors would occur.  The Debtors do not have sufficient available sources of financing to operate their businesses in the ordinary course or to maintain their property without the use of such Cash Collateral.  The relief requested in the Motion therefore is necessary for the continued operation of the Debtors' businesses and the preservation of their property.  The Prepetition Agents and the Debtors have negotiated at arm's length and in good faith regarding the Debtors' use of such Cash Collateral to fund the continued operation of the Debtors' businesses.  The principal terms of the Interim Order are summarized below:[8]

a.  **Term of Cash Collateral Use**.  Pursuant to the terms and conditions of the Orders, the Debtors shall use Cash Collateral for the period (the "Specified Period") from the Petition Date through the date that is the earliest to occur of:

i.  the expiration of the Remedies Notice Period (defined in the Interim Order as the period that ends five (5) business days after the Debtors receive notice of the occurrence of an Event of Default, except an Event of Default under Paragraph 14(e) of the Interim Order);

---

[7]     The Prepetition Agents are reserving their rights to contest any such assertion by the Debtors.

[8]     This summary of the Interim Order is intended only to assist the Court in understanding key aspects of the arrangement and is qualified in its entirety by reference to those orders.  All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the proposed Interim Order.

ii. the occurrence of the Event of Default set forth in Paragraph 14(e) of the Interim Order;

iii. the effective date of the plan of reorganization confirmed in these Cases; or

iv. May 3, 2010.

During the Remedies Notice Period, the Debtors may use Cash Collateral solely to meet payroll obligations in an amount not to exceed $4 million in the aggregate and to pay other expenses in the ordinary course of the Debtors' businesses that are critical to the preservation of the Debtors and their estates in an amount not to exceed $10 million in the aggregate.

b. **Senior Adequate Protection Liens**. As adequate protection of the interests of the Administrative Agent and the Prepetition Senior Secured Creditors against any Diminution in Value of such interest in the prepetition collateral (the "First Lien Diminution"), pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Debtors will grant, solely to the extent that there has been any Diminution in Value with respect to the Prepetition Collateral, to the Administrative Agent, for the benefit of itself and the First Lien Lenders, and to the Swap Counterparties, additional and replacement continuing valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens on (the "Senior Adequate Protection Liens") all presently owned and hereafter acquired assets of the Debtors and their estates, together with any proceeds thereof (the "Collateral").

c. **Junior Adequate Protection Liens**. As adequate protection of the interests of the Second Lien Administrative Agent and the Second Lien Lenders against any Diminution in Value of their interests, if any, in the Prepetition Collateral, pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Debtors will grant, solely to the extent that there has been any Diminution in Value in the interests of the Second Lien Lenders in the Prepetition Collateral, to the Second Lien Administrative Agent, for the benefit of itself and the Second Lien Lenders, additional and replacement continuing valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens on the Collateral (the "Junior Adequate Protection Liens", and together with the Senior Adequate Protection Liens, the "Adequate Protection Liens"). Upon the effective date of the Plan, the Second Lien Lenders shall be deemed to have waived the Junior Adequate Protection Liens.

d. **Protection of Adequate Protection Liens**. The Adequate Protection Liens shall be enforceable against any trustee or other estate representative appointed in the Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, "Successor Cases"). Except as provided in the Interim Order, the Adequate Protection Liens shall not be made subject to or *pari passu*

with any lien or security interest granted in the Cases or any Successor Cases. The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code. **The Adequate Protection Liens also shall not be subject to section 506(c) of the Bankruptcy Code.**

e. **Senior Adequate Protection Superpriority Claim**. As further adequate protection of the interests of the Administrative Agent and the Prepetition Senior Secured Creditors in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Administrative Agent and the Prepetition Senior Secured Creditors are being granted, to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "Senior Adequate Protection Superpriority Claim"). Subject at all times to the Lock-Up Agreement (as defined in the Plan) remaining in full force and effect (including, without limitation, all of the Termination Dates set forth in Section 6 therein), upon the Effective Date (as defined in the Plan) of the Plan, the Administrative Agent and the Prepetition Senior Secured Creditors shall be deemed to have waived the Senior Adequate Protection Superpriority Claim. The Senior Adequate Protection Claims shall be junior only to the Carve Out.

f. **Carve Out**. As used in the Interim Order, the "Carve Out" means the following expenses: (i) statutory fees payable to this Court or to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6); (ii) the accrued and unpaid professional fees and disbursements incurred for any professionals of the Debtors retained by final order of this Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) under sections 327, 328, 363 or 1102 of the Bankruptcy Code (the "Case Professionals") incurred prior to the Termination Declaration Date (whether or not the retention of such Case Professionals by the Debtors' estates pursuant to a final order or otherwise occurs prior to the Termination Declaration Date), to the extent allowed or later allowed by order of this Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) under sections 328, 330 and/or 331 of the Bankruptcy Code and any interim compensation procedures order (the "Allowed Professional Fees"); and (iii) after the Termination Declaration Date, the fees and expenses of Case Professionals in an amount not to exceed $500,000 (plus the amounts specified in (i) and (ii) hereof, the "Case Professionals Carve Out"). The Carve Out shall be senior in priority to the Prepetition First Liens, the Prepetition Second Liens, the Adequate Protection Liens and the Senior Adequate Protection Superpriority Claim. No payment of any Carve Out amount shall reduce any Prepetition Obligations.

g. **Senior Adequate Protection Payments**. The Debtors will make adequate protection payments to the Administrative Agent, for the benefit of itself and the First Lien Lenders, except in the case of clause (iii), where the payments will be made to the Swap Counterparty (in each case, the "Senior Adequate Protection Payments"), in the form of:

i.    payments of interest on the First Lien Obligations at the non-default rate set forth in the First Lien Credit Documents, any fees of the Administrative Agent and the First Lien Lenders (including, solely with respect to the First Lien Credit Documents, any reimbursement and letter of credit fees pursuant to the First Lien Credit Agreement, but not including the Revolving Credit Commitment Fee (as defined in Section 2.12(a) of the First Lien Credit Agreement)), payable at the times specified in the First Lien Credit Documents;

ii.    ongoing payment of the reasonable fees, costs and expenses of the Administrative Agent, including, without limitation, the reasonable fees and expenses of legal and other professionals retained by the Administrative Agent;

iii.    all payments when due and payable under the Secured Swap Agreements (which payments shall be made directly to the Swap Counterparties); and

iv.    break funding payments as described in Section 2.16 of the First Lien Credit Agreement.

h.    **Junior Adequate Protection Payments**.  The Debtors will make adequate protection payments to the Second Lien Administrative Agent, for the benefit of itself and the Second Lien Lenders (in each case, the "Junior Adequate Protection Payments", and together with the Senior Adequate Protection Payments, the "Adequate Protection Payments"), in the form of ongoing payment of the reasonable fees and expenses of legal and other professionals retained by the Second Lien Administrative Agent.

i.    **Covenants**.  During the term of the Orders, the Debtors shall:

i.    Deliver to the Administrative Agent on or before the close of business on the relevant dates provided in the First Lien Credit Agreement, all notices, reports, certificates or other documents as required by the First Lien Credit Agreement, in each case along with such supporting information as the Prepetition Agents may request;

ii.    Serve the Prepetition Agents and their respective counsel, with a copy of each monthly report filed by the Debtors in these Cases as required by the Court, the U.S. Trustee or applicable law;

iii.    Deliver to the Administrative Agent on or before February 26, 2010, a preliminary, unaudited consolidated balance sheet and related statements of operations of cash flows showing the financial position of Holdings and its subsidiaries as of the close of the fiscal quarter ended December 31, 2009, and the consolidated results of its operations during such fiscal quarter and the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail and which preliminary,

unaudited consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer (as defined in the First Lien Credit Agreement) of Holdings as fairly presenting on a preliminary basis, in all material respects, the financial position and results of operations of Holdings and its subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes);

iv.     Deliver to the Administrative Agent on or before the date that is 30 days after the end of each of the first two fiscal months of each fiscal quarter an unaudited consolidated balance sheet and related statements of operations and cash flows showing the financial position of Holdings and its subsidiaries as of the close of such fiscal month and the consolidated results of its operations during the first two months of such fiscal quarter and the then-elapsed portion of the fiscal year, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer of Holdings on behalf of Holdings as fairly presenting, in all material respects, the financial position and results of operations of Holdings and its Subsidiaries (as defined in the First Lien Credit Agreement) on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes except as set forth in clause (i) of the proviso hereto); provided that it is understood that (i) such financial statements reflect internal operating results (with footnotes noting exceptions) and therefore may not reflect items such as quarter-end or year-end accruals, adjustments or reclassifications including but not limited to: period-end accruals, reserves, pension adjustments, IBNR adjustment, options or other non-cash compensation adjustment, impairment adjustments, fair value of derivatives, the tax provision and adjustments to valuation reserves and other reserves (including but not limited to bad debt reserves, reserves for inventory obsolescence), certain billing adjustments, certain current/non-current classifications of assets and liabilities, the results of account reconciliations, the change in valuation of certain assets and liabilities and adjustments typically booked by Holdings on a quarterly or annual basis, and as otherwise noted therein and (ii) Indebtedness (as defined in the First Lien Credit Agreement) is accounted for on a historical cost basis;

v.      Not permit EBITDA (as defined in the First Lien Credit Agreement) for any period of twelve consecutive months ending on the last day of any fiscal month ("TTM EBITDA") to be less than (i) $77 million as of December 31, 2009 and (ii) $75 million thereafter; provided that, for the avoidance of doubt, EBITDA shall be calculated to give effect to Cure Amounts (as defined in the First Lien Credit Agreement) made in respect of the fiscal quarter ending June 30, 2009 and otherwise be determined for such period on a Pro Forma Basis (as defined in the First Lien Credit Agreement);

vi.    Within 30 days after the end of each of the first two fiscal months of each fiscal quarter and within 45 days after the end of the third fiscal month of each fiscal quarter (including the fourth fiscal quarter of each fiscal year), deliver to the Administrative Agent a report setting forth TTM EBITDA as at the close of such fiscal month, understanding that the report setting forth the TTM EBITDA for the fourth fiscal quarter will be unaudited and will be preliminary subject to normal year end adjustments;

vii.    Not permit the aggregate amount of cash and Permitted Investments (as defined in the First Lien Credit Agreement) of the Debtors (such amount, the "Minimum Cash") to be less than $10 million as of the last day of each fiscal month;

viii.    Deliver to the Administrative Agent (i) on or before the third business day of each month the aggregate balance of Minimum Cash for the preceding month and (ii) on the second business day of each week in which the report in clause (h)(i) is not due, the aggregate balance of Minimum Cash as at the close of the prior week; and

ix.    Deliver to the Administrative Agent all information regarding deposits, withdrawals and account balances of any account owned by any Loan Party from and after the Closing Date (as defined in the First Lien Credit Agreement), within five business days after such information may be requested in writing by the Administrative Agent from time to time.

j.    **Limitations on Use of Cash Collateral**.  As more fully set forth in paragraph 17 of the Interim Order, the Debtors may not use the Cash Collateral to finance any action, suit or proceeding, or engage in certain other activities, that are adverse to the Prepetition Secured Creditors.

k.    **Events of Default**.  The occurrence of any of the following events, unless waived in writing by the Administrative Agent with the consent of the Required Lenders (as defined in the First Lien Credit Agreement), shall constitute an event of default (collectively, the "Events of Default"):

i.    the obtaining after the Petition Date of credit or the incurring of indebtedness that is (i) secured by a security interest, mortgage or other lien on all or any portion of the Collateral which is equal or senior to any security interest, mortgage or other lien of the Prepetition Agents and the Prepetition Secured Creditors, or (ii) entitled to priority administrative status which is equal or senior to that granted to the Administrative Agent and Prepetition Senior Secured Creditors;

ii.    any Debtor seeking or the obtaining of authority for any Debtor to use Cash Collateral, except as authorized by the Interim Order or as otherwise agreed in writing by the Administrative Agent with the consent of the Required Lenders (as defined in the First Lien Credit Agreement);

iii.    the entry of an order by the Court, other than the Interim Order, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral with a value in excess of $2.0 million in the aggregate during the pendency of the Cases, or (ii) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a material adverse effect on the business, operations, property, assets, or condition, financial or otherwise, of the Debtors;

iv.    reversal, vacatur, or modification (without the express prior written consent of the Administrative Agent, in its sole discretion) of the Interim Order;

v.    dismissal of the Cases or conversion of the Cases to cases under chapter 7 of the Bankruptcy Code, or appointment of a chapter 11 trustee or examiner with enlarged powers or other responsible person;

vi.    upon written notice from the Administrative Agent, any material misrepresentation of a material fact made after the Petition Date by any of the Debtors or their agents to the Administrative Agent about the financial condition of the Debtors, or any of them, the nature, extent, location or quality of any Collateral, or the disposition or use of any Collateral, including Cash Collateral (it being understood that prospective or forward-looking guidance or projections shall not constitute material misrepresentations of material facts);

vii.    the sale after the Petition Date of any portion of any of the Debtors' assets that constitute Collateral with a value in excess of $2.5 million in the aggregate during the pendency of the Cases outside the ordinary course of business without the prior written consent of the Administrative Agent or an order of the Court;

viii.    upon written notice from the Administrative Agent, the material failure to make Senior Adequate Protection Payments or other payments to the Administrative Agent and Prepetition Senior Secured Creditors as set forth in the Interim Order when due;

ix.    the Debtors' failure to perform, after notice from the Administrative Agent, in any respect, any of the material terms, provisions, conditions, covenants, or obligations under the Interim Order; provided, however, that failure to perform under Paragraph 3 of the Interim Order shall constitute an Event of Default for which no notice is necessary; and

x. the failure to (i) maintain the Collateral and (ii) to insure the Collateral in the amounts and for the risks, and by the entities, required under the First Lien Credit Documents.

l. **Rights and Remedies Upon Event of Default**. Immediately upon the occurrence and during the continuation of an Event of Default, the Administrative Agent may declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (any such declaration, a "Termination Declaration"). The Termination Declaration shall be given by facsimile or other electronic means to counsel to the Debtors, counsel to the Administrative Agent, counsel to the Second Lien Administrative Agent and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date"). Except with respect to Paragraph 14(e) of the Interim Order, during the period that ends five (5) business days after the Termination Declaration Date (the "Remedies Notice Period"), the Debtors may request that this Court order the continued use of the Cash Collateral pursuant to the Interim Order or otherwise, subject to the rights of the Prepetition Agents and Prepetition Secured Creditors to oppose any such request by the Debtors for the continued use of the Cash Collateral. Immediately upon the expiration of the Specified Period, unless the Court orders otherwise, the Debtors shall no longer have the right to use Cash Collateral.

m. **Effect of and Survival of Order**. The Orders shall take effect and be enforceable as of the date entered and signed. The liens and security interests granted pursuant to the Orders shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Cases provided that such liens and security interests have not been released; (b) converting any of the Cases to cases under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; (d) discharging any Debtor; or (e) pursuant to which the Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions of the Orders, including the claims, liens, security interests and other protections granted to the Prepetition Agents and Prepetition Secured Creditors pursuant thereto, shall continue in the Cases, or in any Successor Cases, and shall maintain their priority as provided by the Orders until the indefeasible payment in full of the First Lien Obligations, notwithstanding the expiration of the Specified Period or any earlier termination of the Debtors' authorization to use Cash Collateral.

## Grounds for the Relief Requested

15. As described above, it is essential to the success of the Debtors' chapter 11 cases that the Debtors immediately obtain authority to use Cash Collateral. The preservation of estate assets and the Debtors' ability to maintain business operations through the short pendency

of the chapter 11 cases depends heavily upon expeditiously obtaining approval of the usage of Cash Collateral and the related relief requested herein.

16.     The Debtors' use of Cash Collateral, including the Debtors' proposal to provide adequate protection in connection with such use, is authorized pursuant to section 363(c) of the Bankruptcy Code.  Section 363(c) of the Bankruptcy Code provides as follows:

(1)     If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2)     The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless —

(a)     each entity that has an interest in such cash collateral consents; or

(b)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c).

17.     The proposed Orders, if approved, will provide the Debtors with the ability to use the Cash Collateral while providing the Prepetition Secured Creditors with adequate protection, as contemplated by sections 363(c)(2)(A) and 363(e) of the Bankruptcy Code.  Under section 361 of the Bankruptcy Code, adequate protection may be provided by, among other things, periodic cash payments, granting a lienholder an additional or replacement lien and granting other relief to the extent that the usage of the cash collateral results in a decrease in the value of such entity's interest in such property.  As discussed above, the proposed Orders provide for additional liens to protect the Prepetition Secured Creditors against any diminution in value of their respective interests in the Cash Collateral and the Debtors' other assets that constitute collateral.  In addition, in accordance with sections 503(b) and 507(b) of the Bankruptcy Code, the proposed Orders provide for a superpriority administrative expense claim

to protect the Prepetition Senior Secured Creditors if the replacement liens granted by the Orders prove inadequate to secure against any diminution in the value of the Administrative Agent's interest in the Cash Collateral.  Importantly, the Senior Adequate Protection Superpriority Claim, if any, and the Junior Adequate Protection Lien shall be deemed to have been waived upon the effective date of the Plan.

18.     For several reasons, the Debtors submit that the terms of the Orders are reasonable and beneficial to the Debtors' estates and creditors.  First, the Prepetition Agents have consented to the Debtors' use of Cash Collateral at the direction of their respective "Required Lenders" and have agreed to the terms of the Orders.  Second, the Orders will permit the Debtors to continue to operate their businesses during the pendency of these chapter 11 cases.  Third, the Orders' provisions for adequate protection of the interests of the Prepetition Secured Creditors in Cash Collateral and other collateral are fair and reasonable under the circumstances of this case. Accordingly, the terms of the Orders should be approved in their entirety.

**<u>Request for Authority to Use Cash Collateral Immediately</u>**

19.     Bankruptcy Rule 4001(b)(2) provides that a final hearing on a motion for authorization to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

20.     Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an interim hearing and authorize the Debtors to use, on an interim basis, Cash Collateral in accordance with the terms and provisions of the Interim Order in order to (i) maintain and

finance the ongoing operations of the Debtors and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estate and all parties in interest.

21.     As noted above, absent the immediate use of Cash Collateral, the Debtors lack funds to operate their businesses on a day to day basis. Even a temporary inability to access Cash Collateral would be a significant and irreparable harm the Debtors and their estates. The authorization to use Cash Collateral will provide the necessary assurance to employees and customers of the Debtors' ability to meet their near-term obligations.

## Request for a Final Hearing

22.     Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors respectfully request that the Court set a date for the Final Hearing and approve the provisions for notice of the entry of the Interim Order and the Final Hearing.

## Notice

23.     Notice of this Motion has been provided to: (a) the United States Trustee for the Southern District of New York; (b) counsel to the Administrative Agent for the Debtors' Prepetition Senior Secured Creditors; (c) counsel to the Second Lien Administrative Agent for the Debtors' Second Lien Lenders; and (d) those creditors holding the 50 largest unsecured claims against the Debtors' estates. The Debtors submit that no other or further notice need be provided.

## No Prior Request

24.     No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form attached hereto as <u>Exhibit A</u>:  (i) granting the relief sought herein; and (ii) granting to the Debtors such other and further relief as the Court may deem proper.

Dated:  February 10, 2010
       New York, New York

Respectfully submitted,

 /s/ Lisa G. Laukitis
Lisa G. Laukitis
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

 - and -

Brad B. Erens
Robert E. Krebs
David A. Hall
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585

PROPOSED ATTORNEYS FOR DEBTORS

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                          :
In re                                     :     Chapter 11
                                          :
Penton Business Media Holdings, Inc., et al.,¹  :  Case No. 10-_____ (___)
                                          :
                    Debtors               :     (Jointly Administered)
                                          :
                                          :
-------------------------------------------------------------x
```

**INTERIM ORDER (I) AUTHORIZING USE OF CASH COLLATERAL,
(II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING THE
AUTOMATIC STAY, AND (IV) SCHEDULING A FINAL HEARING**

Upon the motion (the "Motion") dated February 10, 2010, of Penton Business Media

Holdings, Inc., and certain of its direct and indirect subsidiaries, each as a debtor and debtor in

possession (each a "Debtor", and collectively, the "Debtors") in the above-captioned chapter 11

cases (collectively, with any successor case, the "Cases") pursuant to sections 105, 361, 362, 363

and 507 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (as amended, the

"Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") and Rule 4001-2 of the Local Bankruptcy Rules of the Southern

District of New York, seeking entry of an interim order (this "Interim Order"):

(i)       authorizing the Debtors' use of "cash collateral" (as defined in

section 363(a) of the Bankruptcy Code, "Cash Collateral") of the Prepetition Agents and

Prepetition Secured Creditors (each as defined herein);

---

1    The Debtors are the following nine entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Penton Business Media Holdings, Inc. (9837); Penton Media, Inc. (5386); Penton Business Media, Inc. (1277); Duke Communications International, Inc. (7904); Duke Investments, Inc. (2160); DVGM & Associates (5363); Internet World Media, Inc. (5519); Penton Business Media Internet, Inc. (8290); and Penton Business Media Publications, Inc. (8292).

(ii)     providing adequate protection to the Prepetition Agents and Prepetition Secured Creditors as set forth herein for any diminution in value of their respective interests in the Prepetition Collateral (as defined herein), including the Cash Collateral;

(iii)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order; and

(iv)     scheduling a final hearing (the "<u>Final Hearing</u>") to consider the relief requested in the Motion and the entry of a Final Order (as defined herein), and approving the form of notice with respect to the Final Hearing.

The Court (as defined herein) having considered the Motion, the *Affidavit of Jean B. Clifton in Support of the Debtors' Chapter 11 Petitions and Request for First Day Relief*, sworn to on February 10, 2010, the exhibits attached thereto, and the evidence submitted or adduced and the arguments of counsel made at the "First Day" hearing held on February ___, 2010 (the "<u>Interim Hearing</u>"); and notice of the Interim Hearing having been given in accordance with this Interim Order and Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; and the Interim Hearing having been held pursuant to Bankruptcy Rule 4001(b)(2) and concluded; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved or overruled by the Court (as defined herein); and it appearing to the Court (as defined herein) that the relief requested in the Motion is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT (AS DEFINED HEREIN) HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A. *Petition Date*. On February 10, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court") commencing these Cases.

B. *Debtors in Possession*. The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Cases.

C. *Jurisdiction and Venue*. This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Cases appears proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D. *Statutory Committee*. As of the date hereof, the United States Trustee (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Statutory Committee").

E. *Debtors' Stipulations*. The Debtors stipulate and agree that (collectively, Paragraphs E(i) through E(x) below are referred to herein as the "Debtors' Stipulations," which are not findings of the Court):

(i) *First Lien Credit Agreement*. Pursuant to that certain First Lien Credit Agreement, dated as of February 1, 2007 (as amended by that certain Consent and Amendment Agreement, dated as of November 24, 2009, that certain Amendment No. 2, dated as of December 23, 2009, that certain Amendment No. 3, dated as of January 15, 2010,

that certain Amendment No. 4, dated as of January 29, 2010, that certain Amendment No. 5, dated as of February 8, 2010, and as further amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof, the "First Lien Credit Agreement") among Penton Media, Inc. ("Penton"), Penton Business Media, Inc. ( "Penton Business", and together with Penton, the "Borrowers"), Penton Business Media Holdings, Inc. ("Holdings"), the Subsidiary Loan Parties (as defined in the First Lien Credit Agreement) party thereto (each such Subsidiary Loan Party a "Guarantor", and together with Holdings, the "Guarantors" and together with Holdings and the Borrowers, the "Loan Parties" [2]), General Electric Capital Corporation (in its capacity as administrative agent, the "Administrative Agent") and the other lenders party thereto from time to time (together with the Administrative Agent, the "First Lien Lenders"), the First Lien Lenders provided credit and other financial accommodations to or for the benefit of the Loan Parties. The First Lien Credit Agreement, all amendments thereto and all Security Documents (as defined in the First Lien Credit Agreement) and instruments related thereto are collectively referred to herein as the "First Lien Credit Documents". The First Lien Credit Documents shall govern the rights and obligations of the First Lien Lenders, subject to the provisions of this Interim Order.

(ii)     *Secured Swap Agreements.* Pursuant to (a) that certain ISDA Master Agreement and Schedule to the 1992 ISDA Master Agreement, each dated as of February 22, 2007 between Penton Business and Credit Suisse International ("Credit Suisse"), (b) that certain ISDA Master Agreement and Amended and Restated Schedule to the Master Agreement, each dated as of February 22, 2007 between Penton Business and UBS AG

---

[2] Each of the Debtors is a Loan Party.

("UBS"), and (c) that certain ISDA 2002 Master Agreement and Schedule to the 2002 Master Agreement, each dated as of February 22, 2007 among Penton, Penton Business and JPMorgan Chase Bank, National Association ("JPMorgan" and, together with Credit Suisse and UBS, each a "Swap Counterparty" and collectively, the "Swap Conterparties"), the Swap Counterparties agreed to terms that would govern one or more Secured Swap Agreements (as defined in the First Lien Credit Agreement). Each of the Secured Swap Agreements allow the Debtors to hedge against the variability in the interest rates that the Debtors are subject to under the Prepetition Credit Documents (as defined herein).

        (iii)    *First Lien Credit Agreement and Secured Swap Obligations*: The First Lien Credit Agreement provided the Borrowers with: (a) an $80 million first lien revolving credit facility (the "First Lien Revolver"); and (b) a $620 million first lien term loan (the "First Lien Term Loan", and together with the First Lien Revolver, collectively, the "First Lien Loans"). As of the Petition Date, the principal amount outstanding in respect of the First Lien Revolver is approximately $65 million and the principal amount outstanding in respect of the First Lien Term Loan is projected to be approximately $603 million. As of December 31, 2009, the Debtors' exposure under the Secured Swap Agreements was approximately $40 million (the "Swap Obligations", and together with all amounts outstanding in respect of the First Lien Loans, including all accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses and disbursements), reimbursement obligations, indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof to the extent and as provided for in the First Lien Credit Documents, collectively, the "First Lien Obligations").

(iv)    *Second Lien Credit Agreement*.  Pursuant to that certain Second Lien Credit Agreement, dated as of February 1, 2007 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Second Lien Credit Agreement"), among the Loan Parties, Wells Fargo Bank, N.A., as successor to General Electric Capital Corporation (in its capacity as administrative agent, the "Second Lien Administrative Agent", and together with the Administrative Agent, the "Prepetition Agents") and the other lenders party thereto from time to time (collectively, the "Second Lien Lenders", and together with the First Lien Lenders and the Swap Counterparties, the "Prepetition Secured Creditors"), the Second Lien Lenders provided a term loan facility to the Borrowers.  The Second Lien Credit Agreement, all amendments thereto and all Security Documents (as defined in the Second Lien Credit Agreement) and instruments related thereto are collectively referred to herein as the "Second Lien Credit Documents", and together with the First Lien Credit Documents, the "Prepetition Credit Documents".  The Second Lien Credit Documents shall govern the rights and obligations of the Second Lien Lenders, subject to the provisions of this Interim Order.

(v)    *Second Lien Credit Agreement Obligations*:  The Second Lien Credit Agreement provided the Borrowers with a $266 million second lien term loan (the "Second Lien Term Loan").  As of the Petition Date, the principal amount outstanding in respect of the Second Lien Term Loan is approximately $270 million, inclusive of accrued and unpaid interest, fees and expenses of the Second Lien Administrative Agent and Second Lien Lenders (collectively, the principal amount outstanding in respect of the Second Lien Term Loan, the "Second Lien Obligations", and together with the First Lien Obligations, the "Prepetition Obligations").

(vi)     *Prepetition Liens and Prepetition Collateral*.  As more fully set forth in the Prepetition Credit Documents, prior to the Petition Date, the Debtors granted security interests in and liens on, among other things, substantially all of the Debtors' existing and after acquired personal and real property, tangible and intangible assets, whether owned by, consigned to or leased from or to the Debtors, to the full extent of the Debtors' interest therein and regardless of where located, including the proceeds and products of, accessions to, substitutions and replacements for, and rents and profits of all such property and assets (collectively, the "Prepetition Collateral") to: (a) with respect to the First Lien Obligations, the Administrative Agent, for itself and the First Lien Lenders, and the Swap Counterparties (in each case, the "Prepetition First Liens"); and (b) with respect to the Second Lien Obligations, the Second Lien Administrative Agent, for itself and the Second Lien Lenders (in each case, the "Prepetition Second Liens", and together with the Prepetition First Liens, the "Prepetition Liens").  In their capacity as holders of their respective Prepetition First Liens, the First Lien Lenders and the Swap Counterparties shall be referred to collectively as the "Prepetition Senior Secured Creditors".  In their capacity as holders of their respective Prepetition Second Liens, the Second Lien Lenders shall be referred to herein collectively as the "Prepetition Junior Lenders".  The Prepetition Second Liens on the Prepetition Collateral are subordinate to the Prepetition First Liens on the Prepetition Collateral in accordance with and subject to that certain Intercreditor Agreement (as defined herein).

(vii)     *Intercreditor Agreement*.  The Administrative Agent for itself and on behalf of the Prepetition Senior Secured Creditors, the Second Lien Administrative Agent for itself and on behalf of the Prepetition Junior Lenders, and the Loan Parties entered into that certain Intercreditor Agreement dated as of February 1, 2007 (the "Intercreditor

Agreement")[3] to govern the respective rights, interests, obligations, priority, and the positions of the Administrative Agent and Prepetition Senior Secured Creditors and the Second Lien Administrative Agent and Prepetition Junior Lenders with respect to the assets and properties of the Debtors and other obligors. Pursuant to the Intercreditor Agreement, among other things, (a) any Lien (as defined in the Intercreditor Agreement) on the Prepetition Collateral securing any First Lien Obligations now or hereafter held by or on behalf of the Administrative Agent or any Prepetition Senior Secured Creditor or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien (as defined in the Intercreditor Agreement) on the Prepetition Collateral securing any Second Lien Obligations; and (b) any Lien (as defined in the Intercreditor Agreement) on the Prepetition Collateral securing any Second Lien Obligations now or hereafter held by or on behalf of the Second Lien Administrative Agent, any Prepetition Junior Lenders or any agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens (as defined in the Intercreditor Agreement) on the Prepetition Collateral securing any First Lien Obligations. By means of the terms and provisions of Section 6 of the Intercreditor Agreement, the Prepetition Junior Lenders have consented to the relief set forth herein. Subject only to the provisions of this Interim Order, the Intercreditor Agreement remains in full force and effect.

(viii) *Validity and Perfection of Prepetition Liens and Prepetition Obligations.* Each of the Debtors acknowledges and agrees that: (a) as of the Petition Date,

---

[3] Each of the Debtors is a signatory to the Intercreditor Agreement.

the Prepetition First Liens and the Prepetition Second Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected; (b) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (c) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (d) the Debtors and their estates have no claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against any of the Prepetition Agents, the Prepetition Secured Creditors or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to their loans or other financial accommodations to the Debtors; provided, however, that the Debtors reserve the right to assert that all or any portion of the Second Lien Obligations are unsecured claims under section 506(a) of the Bankruptcy Code. Notwithstanding the foregoing or anything to the contrary in this Interim Order, the Debtors reserve all rights to contest the validity of the Prepetition Liens solely with respect to the Debtors' cash and cash equivalents as of the Petition Date (the "Prepetition Cash"), subject at all times to the rights of the Prepetition Agents and Prepetition Secured Creditors to oppose any such action by the Debtors or any other party-in-interest in the Cases contesting the validity of the Prepetition Liens on all or a portion of the Prepetition Cash.

       (ix)    *Priority of Prepetition First Liens*.  As of the Petition Date, the Prepetition First Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens otherwise permitted by the Prepetition Credit Documents as the case may be (to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition First Liens as of the Petition Date, collectively, the "<u>Permitted Prior Liens</u>").[4]

       (x)    *Priority of Prepetition Second Liens*.  As of the Petition Date, the Prepetition Second Liens were senior in priority over any and all other liens on the Prepetition Collateral, other than the Prepetition First Liens and subject only to the Permitted Prior Liens.

       (xi)    *Cash Collateral*.  For the purposes of this Interim Order, each Debtor agrees that all of the Debtors' Prepetition Cash, including the cash in their deposit accounts, wherever located, whether as original Prepetition Collateral or proceeds of other Prepetition Collateral, shall be treated as the Cash Collateral of the Prepetition Agents and the Prepetition Secured Creditors, subject to the Intercreditor Agreement and to a determination as to the extent to which the Second Lien Administrative Agent and the Prepetition Junior Lenders have any interest in the Cash Collateral.  In the event the Court determines that any portion of the Prepetition Cash does not constitute Cash Collateral of the Prepetition Secured Creditors, the Debtors use of any such portion of the Prepetition Cash shall be deemed to have been used first by the Debtors in the ordinary course of their business before any use by the Debtors of the Cash Collateral of the Prepetition Secured Creditors.  Notwithstanding the

---

[4] Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Liens are valid, senior, enforceable, prior, perfected or non-avoidable.  Moreover, nothing shall prejudice the rights of any party in interest including, but not limited, to the Debtors, the Prepetition Agents, the Prepetition Secured Creditors, and any Statutory Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Permitted Prior Lien and/or security interest.

foregoing or anything to the contrary in this Interim Order, the Administrative Agent and Prepetition Senior Secured Creditors assert a valid, binding, enforceable, non-avoidable and properly perfected Prepetition Lien on all of the Prepetition Cash.

F.     *Adequate Protection*.  The Administrative Agent, for the benefit of itself and the First Lien Lenders, the Second Lien Administrative Agent, for the benefit of itself and the Second Lien Lenders, and the Swap Counterparties are each entitled to receive certain adequate protection as set forth herein to the extent of any diminution in value of their respective interests in the Prepetition Collateral (including the Cash Collateral) resulting from the use of Cash Collateral, the use, sale, lease, consumption or disposition of Prepetition Collateral authorized herein or the physical deterioration or shrinkage of the Prepetition Collateral, the subordination of the Prepetition Liens to the Carve Out (as defined herein), the imposition of the automatic stay or the physical deterioration, consumption, use, sale, lease, disposition, or shrinkage of the Prepetition Collateral (collectively the "Diminution in Value") pursuant to sections 361, 362, and 363 of the Bankruptcy Code.

(i)     Adequate Protection of Prepetition First Liens.  Pursuant to sections 361, 363, and 507(b) of the Bankruptcy Code and as further provided for herein, as adequate protection of the interests of the Administrative Agent and the Prepetition Senior Secured Creditors in the Prepetition Collateral (including the Cash Collateral), the Administrative Agent, for the benefit of itself and the First Lien Lenders, and the Swap Counterparties will receive with respect to their Prepetition First Liens: (a) the Senior Adequate Protection Liens (as defined herein); (b) the Senior Adequate Protection Superpriority Claim (as defined herein); and (c) the Senior Adequate Protection Payments (as defined herein), which include (i) current payments of interest at the non-default rate set forth

in the First Lien Credit Documents, (ii) fees (including, without limitation, letter of credit fees) and other amounts due and payable under the First Lien Credit Documents (with the exception of the Revolving Credit Commitment Fee (as defined in Section 2.12(a) of the First Lien Credit Agreement), (iii) current payments in respect of the Secured Swap Agreements (which payments shall be made directly to the Swap Counterparties) and (iv) ongoing payment of all reasonable fees, costs and expenses, including, without limitation, reasonable legal and other professionals' fees and expenses, of the Administrative Agent. Notwithstanding the foregoing, if the First Lien Obligations are determined by this Court to be undersecured, interest payments and payment of fees permitted hereunder may be recharacterized and recredited to the principal balance of such First Lien Obligations pursuant to further order entered by this Court.

(ii) <u>Adequate Protection of Prepetition Second Liens</u>. Pursuant to sections 361, 363, and 507(b) of the Bankruptcy Code and as further provided for herein, as adequate protection of any interests of the Second Lien Administrative Agent and the Second Lien Lenders in the Prepetition Collateral (including the Cash Collateral), the Second Lien Administrative Agent, for the benefit of itself and the Prepetition Junior Lenders will receive with respect to their Prepetition Second Liens (a) the Junior Adequate Protection Liens (as defined herein); and (b) the Junior Adequate Protection Payments (as defined herein).

G. *Necessity of Relief Requested*. The ability of the Debtors to operate their businesses requires the use of Cash Collateral, absent which immediate and irreparable harm would result to the Debtors, their estates and creditors, and the possibility for a successful chapter 11 case. In the absence of the use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors, their

estates and their creditors would occur. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses in the ordinary course or to maintain their property without the use of Cash Collateral. The relief requested in the Motion is therefore necessary for the continued operation of the Debtors' businesses and the preservation of their property. The Prepetition Agents, the Prepetition Secured Creditors and the Debtors have negotiated at arm's length and in good faith regarding the Debtors' use of Cash Collateral to fund the continued operation of the Debtors' businesses during the Specified Period (as defined herein). Entry of this Interim Order is in the best interests of the Debtors and their estates.

H. *Final Hearing.* At the Final Hearing, the Debtors will seek final approval of the relief requested in the Motion for the proposed use of Cash Collateral arrangements pursuant to a proposed final order (the "<u>Final Order</u>"), which shall be in form and substance acceptable to the Administrative Agent and the Debtors, approving such use of Cash Collateral arrangements, notice of which Final Hearing and Final Order will be provided in accordance with this Interim Order. For the avoidance of any doubt, all of the provisions of the Interim Order and the relief provided herein shall apply to, and remain in full force and effect with respect of, the Final Order.

I. <u>*Notice*</u>. Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including: (a) the United States Trustee for the Southern District of New York; (b) counsel to the Administrative Agent; (c) counsel to the Second Lien Administrative Agent; and (d) those creditors holding the 50 largest unsecured claims against the Debtors' estates. The parties have made reasonable efforts to afford the best notice possible under the circumstances, and no other or further notice is or shall be required.

Based upon the foregoing findings of facts and conclusions of law, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    <u>Motion Granted</u>.  The Motion is granted on an interim basis as set forth herein, and the use of Cash Collateral is authorized and approved, subject to the terms of this Interim Order.

2.    <u>Objections Overruled</u>.  All objections to the Motion to the extent not withdrawn or resolved are overruled.

3.    <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order, the Debtors are authorized to use Cash Collateral for the period (the "<u>Specified Period</u>") from the Petition Date through the date that is the earliest to occur of (a) the expiration of the Remedies Notice Period (as defined herein), (b) the occurrence of the Event of Default set forth in Paragraph 14(e) below, (c) the effective date of the plan of reorganization confirmed in these Cases or (d) May 3, 2010.  The Debtors may use the Cash Collateral during the Specified Period for operation of their businesses, subject at all times to the terms set forth in this Interim Order, including, without limitation, Paragraph 11 herein.  During the Remedies Notice Period, the Debtors may use Cash Collateral solely to meet payroll obligations in an amount not to exceed $4 million in the aggregate during such Remedies Notice Period and to pay other expenses in the ordinary course of the Debtors' businesses that are critical to the preservation of the Debtors and their estates in an amount not to exceed $10 million in the aggregate during such Remedies Notice Period.

4.      Adequate Protection Liens.

(a)      *Senior Adequate Protection Liens*.  As adequate protection of the interests of the Administrative Agent and the Prepetition Senior Secured Creditors against any Diminution in Value of such interest, pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Debtors are authorized to grant, and upon entry of this Interim Order shall be deemed to have granted, solely to the extent that there has been any Diminution in Value with respect to the Prepetition Collateral, to the Administrative Agent, for the benefit of itself and the First Lien Lenders, and to the Swap Counterparties, additional and replacement continuing valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens (the "Senior Adequate Protection Liens") on any and all presently owned and hereafter acquired personal property, real property, tangible assets, intangible assets and all other assets of the Debtors and their estates, together with any proceeds thereof, including, without limitation, as set forth in the First Lien Credit Documents, as the case may be (collectively, the "Collateral") having the priority set forth in Paragraph 4(c) below.  The Senior Adequate Protection Liens shall secure the payment of the First Lien Obligations, as the case may be, in an amount equal to any Diminution in Value of the Prepetition Senior Secured Creditors' interests in the Prepetition Collateral from and after the Petition Date.

(b)      *Junior Adequate Protection Liens*.  As adequate protection of the interests of the Second Lien Administrative Agent and the Second Lien Lenders against any Diminution in Value of their interests, if any, in the Prepetition Collateral, pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Debtors are authorized to grant, and upon entry of this Interim Order shall be deemed to have granted, solely to the extent that there has been any Diminution in Value in the interests of the Second Lien Lenders in the Prepetition Collateral, to

the Second Lien Administrative Agent, for the benefit of itself and the Second Lien Lenders, additional and replacement continuing valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens on the Collateral (the "Junior Adequate Protection Liens", and together with the Senior Adequate Protection Liens, the "Adequate Protection Liens") having the priority set forth in Paragraph 4(c) below. The Junior Adequate Protection Liens shall secure the payment of the Second Lien Obligations, as the case may be, solely to the extent of any Diminution in Value of the Second Lien Administrative Agent's and Second Lien Lenders' interests, if any, in the Prepetition Collateral from and after the Petition Date. Upon the effective date of that certain First Amended Joint Prepackaged Plan of Reorganization of Penton Business Media Holdings, Inc. and its Debtor Subsidiaries, dated as of February 4, 2010 (as may be amended only in accordance with the terms of the Lock-Up Agreement (as defined herein), the "Plan"), the Second Lien Lenders shall be deemed to have waived the Junior Adequate Protection Liens.

(c)     *Priority of Adequate Protection Liens.*

(i)     The Senior Adequate Protection Liens of the Administrative Agent and the Prepetition Senior Secured Creditors shall be junior only to: (A) the Carve Out (as defined herein) and (B) the Permitted Prior Liens. The Senior Adequate Protection Liens of the Administrative Agent and the Prepetition Senior Secured Creditors shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral, including the Junior Adequate Protection Liens.

(ii)     The Junior Adequate Protection Liens of the Second Lien Administrative Agent and the Second Lien Lenders shall be junior only to: (A) the Carve Out; (B) the Prepetition First Liens; (C) the Senior Adequate Protection Liens; and (D)

the Permitted Prior Liens. The Junior Adequate Protection Liens of the Second Lien Administrative Agent and the Second Lien Lenders shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

(iii) The Adequate Protection Liens shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee or other estate representative appointed in the Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, "Successor Cases"). Except as provided herein, during the Specified Period, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases, and, notwithstanding any expiration or termination of this Interim Order, the Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases. The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code. The Senior Adequate Protection Liens shall not be subject to section 506(c) of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code to the extent applicable shall be made *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

5.     Senior Adequate Protection Superpriority Claim.

(a)     *Senior Adequate Protection Superpriority Claim.* As further adequate protection of the interests of the Administrative Agent and the Prepetition Senior Secured

Creditors in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Administrative Agent and the Prepetition Senior Secured Creditors are hereby granted to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "Senior Adequate Protection Superpriority Claim").  Subject at all times to the Lock-Up Agreement (as defined in the Plan) remaining in full force and effect (including, without limitation, all of the Termination Dates set forth in Section 6 therein), upon the Effective Date (as defined in the Plan) of the Plan, the Administrative Agent and the Prepetition Senior Secured Creditors shall be deemed to have waived the Senior Adequate Protection Superpriority Claim.

(b)     *Priority of Senior Adequate Protection Superpriority Claim*.  The Senior Adequate Protection Superpriority Claim shall be junior only to the Carve Out.  Except for the Carve Out, the Senior Adequate Protection Superpriority Claim shall have priority over all administrative expenses and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 1113 and 1114 of the Bankruptcy Code.

6.     Senior Adequate Protection Payments.  As further adequate protection, each Debtor is authorized and directed to provide adequate protection payments to the Administrative Agent, for the benefit of itself and the First Lien Lenders, and in the case of clause (iii), the Swap Counterparties (in each case, the "Senior Adequate Protection Payments"), in the form of: (i) payments of interest on the First Lien Obligations at the non-default rate set forth in the First Lien Credit Documents, any fees of the Administrative Agent and the First Lien Lenders (including, solely with respect to the First Lien Credit Documents, any reimbursement and letter

of credit fees pursuant to the First Lien Credit Agreement, with the exception of the Revolving Credit Commitment Fee (as defined in Section 2.12(a) of the First Lien Credit Agreement)), payable at the times specified in the First Lien Credit Documents; (ii) ongoing payment of the reasonable fees, costs and expenses of the Administrative Agent, including, without limitation, the reasonable fees and expenses of legal and other professionals retained by the Administrative Agent; (iii) all payments when due and payable under the Secured Swap Agreements (which payments shall be made directly to the Swap Counterparties); and (iv) break funding payments as described in Section 2.16 of the First Lien Credit Agreement.  In addition, the Debtors shall provide continued maintenance and insurance in the amounts and for the risks, and by the entities, required under the Prepetition Credit Documents.

7.     Junior Adequate Protection Payments.  As further adequate protection, each Debtor is authorized and directed to provide adequate protection payments to the Second Lien Administrative Agent, for the benefit of itself and the Second Lien Lenders (in each case, the "Junior Adequate Protection Payments", and together with the Senior Adequate Protection Payments, the "Adequate Protection Payments"), in the form of ongoing payment of the reasonable fees and expenses of legal and other professionals retained by the Second Lien Administrative Agent.  Except as set forth in this Paragraph 7 or otherwise ordered by the Court, the Debtors shall not make any payments from the Cash Collateral or otherwise to the Second Lien Administrative Agent or the Second Lien Lenders on account of any Second Lien Obligations, unless agreed to in writing by the Administrative Agent with the consent of the Required Lenders (as defined in the First Lien Credit Agreement).

8.     Payment of Professionals to the Prepetition Agents.  Professionals for the Prepetition Agents (including, without limitation, legal counsel and financial advisors) shall not

be required to comply with the U.S. Trustee fee guidelines for the payment of fees and expenses, but each professional shall provide fee and expense invoices to the Debtors (which invoices may be redacted to delete any information which may be subject to the attorney-client privilege or constitute attorney work product), the U.S. Trustee and counsel to any Statutory Committee, and the Debtors are authorized and directed to pay after ten (10) days of the submission thereof the fees and expenses with respect thereto; provided that to the extent that the U.S. Trustee or any Statutory Committee has an objection to the fees and expenses of any such professional, the U.S. Trustee shall so advise the professional within five (5) days following delivery of the applicable invoice and the disputed portion of such invoice shall not be paid unless the objection is resolved (including by an order of the Court) and/or withdrawn within ten (10) days following delivery of the applicable invoice to the U.S. Trustee; provided further that if any such objection is raised and not resolved and/or withdrawn, the parties shall submit any dispute to this Court for adjudication. No provision of such invoices, however, shall constitute any waiver of the attorney-client privilege or of the attorney work product doctrine.

9. Modification of Automatic Stay. The automatic stay imposed under Bankruptcy Code section 362(a) is modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the Adequate Protection Liens, the Senior Adequate Protection Superpriority Claim and pay the Adequate Protection Payments; (b) permit the Debtors to perform such acts as the Prepetition Agents and Prepetition Secured Creditors may request in their reasonable discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the Prepetition Agents and Prepetition Secured Creditors under this Interim Order; and (d) authorize the Debtors to pay, and the Prepetition Agents and the Prepetition Secured

Creditors, as applicable, to retain and apply, payments made in accordance with the terms of this Interim Order; provided, however, that any stay of relief with respect to the exercise of remedies shall be in accordance with Paragraph 15 below or as otherwise ordered by this Court.

10. <u>Perfection of Adequate Protection Liens</u>. This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Adequate Protection Liens without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the Adequate Protection Liens, or to entitle the Prepetition Agents and Prepetition Secured Creditors to the priorities granted herein. Notwithstanding the foregoing, the Prepetition Agents are authorized to file, as each deems necessary or advisable, such financing statements, mortgages, notices of liens and other instruments or documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the applicable Adequate Protection Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create, evidence or perfect the Adequate Protection Liens. The Debtors are authorized and directed to execute and deliver promptly upon demand to the Prepetition Agents all such financing statements, mortgages, title insurance policies, notices, instruments and other documents as the Prepetition Agents may reasonably request. The Prepetition Agents may file a copy of this Interim Order as a financing statement or notice with any filing or recording office or with any

registry of deeds or similar office, in addition to or in lieu of such financing statements, mortgages, notices of lien, instrument, or similar document.

11.  <u>Additional Debtors Covenants</u>.  During the Specified Period, the Debtors shall:

(a)  Deliver to the Administrative Agent on or before the close of business on the relevant dates provided in the First Lien Credit Agreement, all notices, reports, certificates or other documents as required by the First Lien Credit Agreement, in each case along with such supporting information as the Prepetition Agents may request;

(b)  Serve the Prepetition Agents and their respective counsel, with a copy of each monthly report filed by the Debtors in these Cases as required by the Court, the U.S. Trustee or applicable law;

(c)  Deliver to the Administrative Agent on or before February 26, 2010, a preliminary, unaudited consolidated balance sheet and related statements of operations of cash flows showing the financial position of Holdings and its subsidiaries as of the close of the fiscal quarter ended December 31, 2009, and the consolidated results of its operations during such fiscal quarter and the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail and which a preliminary, unaudited consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer (as defined in the First Lien Credit Agreement) of Holdings as fairly presenting on a preliminary basis, in all material respects, the financial position and results of operations of Holdings and its subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes);

(d)     Deliver to the Administrative Agent on or before the date that is 30 days after the end of each of the first two fiscal months of each fiscal quarter an unaudited consolidated balance sheet and related statements of operations and cash flows showing the financial position of Holdings and its subsidiaries as of the close of such fiscal month and the consolidated results of its operations during the first two months of such fiscal quarter and the then-elapsed portion of the fiscal year, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer of Holdings on behalf of Holdings as fairly presenting, in all material respects, the financial position and results of operations of Holdings and its Subsidiaries (as defined in the First Lien Credit Agreement) on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes except as set forth in clause (i) of the proviso hereto); provided that it is understood that (i) such financial statements reflect internal operating results (with footnotes noting exceptions) and therefore may not reflect items such as quarter-end or year-end accruals, adjustments or reclassifications including but not limited to: period-end accruals, reserves, pension adjustments, IBNR adjustment, options or other non-cash compensation adjustment, impairment adjustments, fair value of derivatives, the tax provision and adjustments to valuation reserves and other reserves (including but not limited to bad debt reserves, reserves for inventory obsolescence), certain billing adjustments, certain current/non-current classifications of assets and liabilities, the results of account reconciliations, the change in valuation of certain assets and liabilities and adjustments typically booked by Holdings on a quarterly or annual basis, and as otherwise noted therein and (ii) Indebtedness (as defined in the First Lien Credit Agreement) is accounted for on a historical cost basis;

(e)     Not permit EBITDA (as defined in the First Lien Credit Agreement) for any period of twelve consecutive months ending on the last day of any fiscal month ("TTM EBITDA") to be less than (i) $77 million as of December 31, 2009 and (ii) $75 million thereafter; provided that, for the avoidance of doubt, EBITDA shall be calculated to give effect to Cure Amounts (as defined in the First Lien Credit Agreement) made in respect of the fiscal quarter ending June 30, 2009 and otherwise be determined for such period on a Pro Forma Basis (as defined in the First Lien Credit Agreement);

(f)     Within 30 days after the end of each of the first two fiscal months of each fiscal quarter and within 45 days after the end of the third fiscal month of each fiscal quarter (including the fourth fiscal quarter of each fiscal year), deliver to the Administrative Agent a report setting forth TTM EBITDA as at the close of such fiscal month, understanding that the report setting forth the TTM EBITDA for the fourth fiscal quarter will be unaudited and will be preliminary subject to normal year end adjustments;

(g)     Not permit the aggregate amount of cash and Permitted Investments (as defined in the First Lien Credit Agreement) of the Debtors (such amount, the "Minimum Cash") to be less than $10 million as of the last day of each fiscal month; and

(h)     Deliver to the Administrative Agent (i) on or before the third business day of each month the aggregate balance of Minimum Cash for the preceding month and (ii) on the second business day of each week in which the report in clause (h)(i) is not due, the aggregate balance of Minimum Cash as at the close of the prior week.

(i)     Deliver to the Administrative Agent all information regarding deposits, withdrawals and account balances of any account owned by any Loan Party from and after the

Closing Date (as defined in the First Lien Credit Agreement), within five business days after such information may be requested in writing by the Administrative Agent from time to time.

12.  Cash Management System.  During the Specified Period, the Debtors shall maintain the cash management system, in effect as of the Petition Date, subject to any provision of any cash management order approved by the Administrative Agent and entered by this Court (the "Cash Management Order").

13.  Disposition of Collateral.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral with an aggregate fair market value equal to or more than $2.5 million during the pendency of the Cases without the prior written consent of the Administrative Agent and compliance with applicable law; provided, however, that the Debtors are permitted to sell, transfer, convey, assign or otherwise dispose of any Collateral (a) in the ordinary course of business or (b) to other Debtors in both instances ((a) and (b)) solely in accordance with applicable law.  The Debtors are prohibited from returning goods constituting Collateral pursuant to section 546(h) of the Bankruptcy Code absent consent of the Administrative Agent.

14.  Events of Default.  The occurrence of any of the following events, unless waived in writing by the Administrative Agent with the consent of the Required Lenders (as defined in the First Lien Credit Agreement), shall constitute an event of default (each an "Event of Default", and collectively, the "Events of Default"):

(a)  the obtaining after the Petition Date of credit or the incurring of indebtedness that is (i) secured by a security interest, mortgage or other lien on all or any portion of the Collateral which is equal or senior to any security interest, mortgage or other lien of the Prepetition Agents and the Prepetition Secured Creditors, or (ii) entitled to priority

administrative status which is equal or senior to that granted to the Administrative Agent and Prepetition Senior Secured Creditors herein;

(b)     any Debtor seeking or the obtaining of authority for any Debtor to use Cash Collateral, except as authorized by this Interim Order or as otherwise agreed in writing by the Administrative Agent with the consent of the Required Lenders (as defined in the First Lien Credit Agreement);

(c)     the entry of an order by the Court, other than this Interim Order, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral with a value in excess of $2.0 million in the aggregate during the pendency of the Cases, or (ii) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a material adverse effect on the business, operations, property, assets, or condition, financial or otherwise, of the Debtors;

(d)     reversal, vacatur, or modification (without the express prior written consent of the Administrative Agent, in its sole discretion) of this Interim Order;

(e)     dismissal of the Cases or conversion of the Cases to cases under chapter 7 of the Bankruptcy Code, or appointment of a chapter 11 trustee or examiner with enlarged powers or other responsible person;

(f)     upon written notice from the Administrative Agent, any material misrepresentation of a material fact made after the Petition Date by any of the Debtors or their agents to the Administrative Agent about the financial condition of the Debtors, or any of them, the nature, extent, location or quality of any Collateral, or the disposition or use of any

Collateral, including Cash Collateral (it being understood that prospective or forward-looking guidance or projections shall not constitute material misrepresentations of material facts);

(g)     the sale after the Petition Date of any portion of any of the Debtors' assets that constitute Collateral with a value in excess of $2.5 million in the aggregate during the pendency of the Cases outside the ordinary course of business without the prior written consent of the Administrative Agent or an order of the Court;

(h)     upon written notice from the Administrative Agent, the material failure to make Senior Adequate Protection Payments or other payments to the Administrative Agent and Prepetition Senior Secured Creditors as set forth herein when due;

(i)     the Debtors' failure to perform, after notice from the Administrative Agent, in any respect, any of the material terms, provisions, conditions, covenants, or obligations under this Interim Order; provided, however, that failure to perform under Paragraph 3 of this Interim Order shall constitute an Event of Default for which no notice is necessary; and

(j)     the failure to (i) maintain the Collateral and (ii) to insure the Collateral in the amounts and for the risks, and by the entities, required under the First Lien Credit Documents.

15.     Rights and Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default, the Administrative Agent may declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (any such declaration, a "Termination Declaration").  The Termination Declaration shall be given by facsimile or other electronic means to counsel to the Debtors, counsel to the Administrative Agent, counsel to the Second Lien Administrative Agent and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "Termination

Declaration Date"). Except with respect to Paragraph 14(e) above, during the period that ends

five (5) business days after the Termination Declaration Date (the "Remedies Notice Period"),

the Debtors may request that this Court order the continued use of the Cash Collateral pursuant

to this Interim Order or otherwise, subject to the rights of the Prepetition Agents and Prepetition

Secured Creditors to oppose any such request by the Debtors for the continued use of the Cash

Collateral. Immediately upon the expiration of the Specified Period, unless the Court orders

otherwise, the Debtors shall no longer have the right to use Cash Collateral.

      16.   Carve Out.

      (a)    *Carve Out.* As used in this Interim Order, the "Carve Out" means the

following expenses: (i) statutory fees payable to this Court or to the United States Trustee

pursuant to 28 U.S.C. § 1930(a)(6); (ii) the accrued and unpaid professional fees and

disbursements incurred for any professionals of the Debtors retained by final order of this Court

(which order has not been reversed, vacated, or stayed, unless such stay has been vacated) under

sections 327, 328, 363 or 1102 of the Bankruptcy Code (the "Case Professionals") incurred prior

to the Termination Declaration Date (whether or not the retention of such Case Professionals by

the Debtors' estates pursuant to a final order or otherwise occurs prior to the Termination

Declaration Date), to the extent allowed or later allowed by order of this Court (which order has

not been reversed, vacated, or stayed, unless such stay has been vacated) under sections 328, 330

and/or 331 of the Bankruptcy Code and any interim compensation procedures order (the

"Allowed Professional Fees"); and (iii) after the Termination Declaration Date, the fees and

expenses of Case Professionals in an amount not to exceed $500,000 (plus the amounts specified

in (i) and (ii) hereof, the "Case Professionals Carve Out"). Notwithstanding anything to the

contrary herein, the Carve Out shall be senior in priority to the Prepetition First Liens, the

Prepetition Second Liens, the Adequate Protection Liens and the Senior Adequate Protection Superpriority Claim.  No payment of any Carve Out amount shall reduce any Prepetition Obligations.

(b)      *No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees*.  The Prepetition Agents and Prepetition Secured Creditors shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed (i) to obligate the Prepetition Agents or Prepetition Secured Creditors in any way (other than pursuant to the Carve Out) to pay compensation to or to reimburse expenses of any Case Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement, (ii) obligate the Prepetition Agents or Prepetition Secured Creditors to increase the Carve Out, (iii) as consent by the Prepetition Agents or Prepetition Secured Creditors to the allowance of any professional fees or expenses of any Case Professionals, or (iv) to affect the right of the Administrative Agent to object to the allowance and payment of such fees and expenses.  The Prepetition Agents' and Prepetition Secured Creditors' liens and claims shall be subject to the Carve Out to the extent set forth in this Interim Order.

17.      <u>Limitations on the Cash Collateral and the Case Professionals Carve Out</u>.  The Cash Collateral and the Case Professionals Carve Out may not be used: (a) to prosecute in any way or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the interests of the Administrative Agent and First Lien Lenders, or their rights and remedies under the Prepetition Credit Documents or this Interim Order, including, without limitation, for the payment of any services rendered by the

professionals retained by the Debtors or any Statutory Committee (if any) in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief adverse to the interests of the Administrative Agent and First Lien Lenders, or their rights and remedies under the Prepetition Credit Documents or this Interim Order, (ii) invalidating, setting aside, recharacterizing, avoiding or subordinating, in whole or in part, the Prepetition Obligations, (iii) for monetary, injunctive or other affirmative relief against the Administrative Agent and First Lien Lenders, or their respective collateral that would impair the ability of the Administrative Agent or First Lien Lenders to recover on the Prepetition Obligations or seeking affirmative relief against them, or (iv) preventing, hindering or otherwise delaying the exercise by the Administrative Agent or First Lien Lenders of any rights and/or remedies under this Interim Order, the Prepetition Credit Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the Administrative Agent or First Lien Lenders upon any of the Collateral subject to the provisions of this Interim Order; (b) subject to the limited use of Cash Collateral set forth in Paragraphs 3 and 15 above, objecting to, contesting, or interfering with in any way the enforcement or realization upon any of the Collateral once an Event of Default has occurred by the Administrative Agent subject to the First Lien Credit Documents and the Intercreditor Agreement as applicable; (c) using or seeking to use Cash Collateral or selling or otherwise disposing of Collateral outside the ordinary course of business and not in accordance with Paragraph 13 without the consent of the Administrative Agent; (d) using or seeking to use any insurance proceeds constituting Collateral without the consent of the Administrative Agent;

(e) incurring Indebtedness (as defined in the First Lien Credit Agreement and the Second Lien Credit Agreement) outside the ordinary course of business, without the prior consent of the Administrative Agent acting on behalf of the Required Lenders (as defined in the First Lien Credit Agreement); (f) objecting to or challenging in any way the claims, liens, or interests (including interests in the Collateral) held by or for the benefit of the Administrative Agent or First Lien Lenders; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the Administrative Agent or Prepetition Senior Secured Creditors; (h) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, characterization or enforceability of any of the Prepetition Obligations or Prepetition Liens or any other rights or interests of the Administrative Agent or Prepetition Senior Secured Creditors; or (i) preventing, hindering or otherwise delaying the exercise by the Administrative Agent or Prepetition Senior Secured Creditors of any rights and remedies granted under this Interim Order. Notwithstanding the foregoing provisions of this Paragraph, the Cash Collateral and the Case Professionals Carve Out may be used in an amount not to exceed $35,000 in the aggregate for Allowed Professional Fees incurred by the Statutory Committee (if one is appointed in the Cases) to investigate the validity, enforceability, perfection, priority or extent of the Prepetition Obligations and the Prepetition Liens.

18.     No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

19.     Section 506(c) Claims.  (i) No costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the Administrative

Agent, the Prepetition Senior Secured Creditors or any of their respective claims or the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior express written consent of the Administrative Agent, and (ii) no such consent shall be implied, directly or indirectly, from any other action, inaction or acquiescence by any such agents or lenders.

20.    No Marshaling.  The Administrative Agent and the Prepetition Senior Secured Creditors shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral, as the case may be.

21.    Section 552(b).  (i) The Administrative Agent and the Prepetition Senior Secured Creditors shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Administrative Agent or the Prepetition Senior Secured Creditors with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.

22.    Rights Preserved.  Notwithstanding anything herein to the contrary, and subject to the Intercreditor Agreement and Prepetition Credit Documents as applicable, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the Prepetition Agents' or any Prepetition Secured Creditor's right to seek any other or supplemental relief in respect of any Debtor, including the right to seek additional adequate protection (without prejudice to any other person's right to  object to or otherwise oppose such additional adequate protection); or (b) any of the rights of any Prepetition Agent or Prepetition Secured Creditor under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the

Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under chapter 7 of the Bankruptcy Code, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans.  Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the Prepetition Agents, the Prepetition Secured Creditors and the Debtors are preserved.

23.    Section 507(b) Reservation.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Creditors hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Cases or any Successor Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by the Prepetition Agents or Prepetition Secured Creditors that the adequate protection granted herein does in fact adequately protect them against any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral).

24.    No Waiver by Failure to Seek Relief.  The failure of any Prepetition Agent or Prepetition Secured Creditor to seek relief or otherwise exercise its rights and remedies under this Interim Order, the Prepetition Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the applicable Prepetition Agent or Prepetition Secured Creditor.

25.    Proofs of Claim.  The Prepetition Agents and Prepetition Secured Creditors will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein, and the Debtors' Stipulations in Paragraph E herein shall be deemed to constitute

a timely filed proof of claim for the Prepetition Agents and Prepetition Secured Creditors. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, the Prepetition Agents for the benefit of themselves and their respective Prepetition Secured Creditors are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in each of the Cases or Successor Cases for any claim allowed herein.

26.     Good Faith.  The Prepetition Agents and Prepetition Secured Creditors each have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.

27.     Continuing Effect of Intercreditor Agreement.  The Prepetition Agents and Prepetition Secured Creditors each shall be bound by and be subject to all the terms, provisions and restrictions of the Intercreditor Agreement.  Nothing in this Interim Order is meant to or shall be deemed to alter or otherwise modify the rights, including consent rights, contained in the Intercreditor Agreement as between and among the Prepetition Agents and Prepetition Secured Creditors and Debtors.

28.     Binding Effect of Interim Order.  Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the Prepetition Agents, the Prepetition Secured Creditors, all other creditors of any of the Debtors, any Statutory Committee or any other Court appointed committee appointed in any of the Cases, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon

dismissal of any Case or Successor Case. In the event of any inconsistency between the provisions of this Interim Order and the Prepetition Documents or any other order (including any "First Day" order), the provisions of this Interim Order shall govern and control. Any payments to be made under any order (including any "First Day" order) shall be made in accordance with this Interim Order.

29. <u>No Modification of Interim Order</u>. Subject to Paragraph 15, the Debtors irrevocably waive any right to seek any amendment or modification of this Interim Order without the prior written consent of the Administrative Agent, and no such consent shall be implied by any other action, inaction or acquiescence of any Prepetition Agent. In the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, such modification, amendment or vacatur shall not affect the validity, perfection, priority, allowability, enforceability or non-avoidability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby. Any liens or claims granted to the Prepetition Agents and Prepetition Secured Creditors hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

30. <u>Survival</u>. The liens and security interests granted pursuant to this Interim Order shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Cases provided that such liens and security interests have not been released; (b) converting any of the Cases to cases under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; (d) discharging any Debtor; or (e) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions

of this Interim Order, including the claims, liens, security interests and other protections granted to the Prepetition Agents and Prepetition Secured Creditors pursuant to this Interim Order shall continue in the Cases, or in any Successor Cases, and shall maintain their priority as provided by this Interim Order until the indefeasible payment in full of the First Lien Obligations, notwithstanding the expiration of the Specified Period or any earlier termination of the Debtors' authorization to use Cash Collateral.

31.     <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order is scheduled for _____ at _____ _.m. (prevailing Eastern time) before the Honorable _____, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York. On or before _____, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with a copy of this Interim Order and the Motion, on: (a) the United States Trustee for the Southern District of New York; (b) counsel to the Administrative Agent; (c) counsel to the Second Lien Administrative Agent; and (d) those creditors holding the 50 largest unsecured claims against the Debtors' estates.

32.     <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof.

33.     <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated:  February __, 2010

_____
UNITED STATES BANKRUPTCY JUDGE